## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| 1 THRASIO ONE, INC., | Case No. 24-11840 (CMG) |
|        Reorganized Debtor. | (Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust, | Adv. Proc. No. 24-01637-CMG |
|        Plaintiff, | |
| vs. | |
| JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; and YARDLINE CAPITAL CORP., | |
|        Defendants. | |

---

**BRIEF IN SUPPORT OF DEFENDANT YARDLINE CAPITAL CORP.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

---

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
John E. Jureller, Jr.

*Attorneys for Defendant Yardline Capital Corp.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

RELEVANT FACTUAL BACKGROUND ......................................................4

    A. Yardline Transactions ......................................................................4

    B. Thrasio Bankruptcy Case ................................................................8

STANDARD OF REVIEW ...........................................................................12

ARGUMENT ..............................................................................................13

    a. The Complaint Fails to meet fundamental pleading standards and must be dismissed ..................................................................................13

    II. The Fraudulent Transfer Claims against Yardline must be dismissed ..................15

    a. Choice of Law ................................................................................16

    b. Business Judgment of the Thrasio Board should not be second guessed ..............17

    c. COUNT XIX: Constructive Fraudulent Transfer Claims related to the Loans/Promissory Notes and Investments made by Thrasio to Yardline ..............18

    d. Actual Fraudulent Conveyance Claims related to the Promissory Notes and Investments to Yardline ..............................................................................23

    e. Constructive Fraudulent Transfer Claims related to Thrasio's Write-off or Forgiveness of the Promissory Notes and Investments made by Thrasio to Yardline ..................................................................................25

    f. Actual Fraudulent Transfer Claims related to Thrasio's Write-off or Forgiveness of the Promissory Notes and Investments made by Thrasio to Yardline ..................26

    III. Thrasio's Representations, Warranties and Release in the Yardline Stock Purchase Agreement should be considered in Support of the Motion ..................26

    IV. Joinder to all Arguments in Defendants' respective Motions to Dismiss ..........27

CONCLUSION .............................................................................................28

## <u>TABLE OF AUTHORITIES</u>

*Cases:*

*In re Alameda Rsch. Ltd. v. Giles,*
2024 Bankr. LEXIS 2584, *34 (citing 11 U.S.C. § 550(a)(1) and (2) ............................................ 27

*In re Alameda Rsch. Ltd. v. Giles,*
2024 Bankr. LEXIS 2584, *36 (Bankr. D. Del. Oct. 23, 2024) ..................................................... 24

*In re Alameda Rsch. Ltd. v. Giles,*
2024 Bankr. LEXIS 2584, *36, 10 F.4th 147, 160 (2d Cir. 2021) ................................................ 24

*In re Ashcroft v. Iqbal,*
556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ................................................ 12

*In re Ashcroft v. Iqbal,*
556 U.S. 678, 129 S. Ct. (1949) ................................................................................................... 12

*In re Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .......................................................... 12

*In re Bell Atl. Corp. v. Twombly,*
550 U.S. at 555, 127 S. Ct. (1955) ............................................................................................... 12

*In re Branch v. F.D.I.C.,*
825 F. Supp. 384, 399-400 (D. Mass. 1993) ................................................................................ 22

*In re Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256, 260 (3d Cir.) ............................................................................................................ 7

*In re Cox v. Chrysler Grp., LLC,*
2015 U.S. Dist. LEXIS 1333393, 2015 WL 5771400, at *4 (D.N.J. Sept. 30, 2015) .................... 16

*In re Ditech Holding Corp.,*
2024 Bankr. LEXIS 1736, *16 (Bankr. S.D.N.Y. July 26, 2024) .................................................. 13

*In re DVI, Inc.,*
326 B.R. 301, 306 (Bankr. D. Del. 2005) ..................................................................................... 22

*In re Eckert,*
388 B.R. 813, 835 (Bankr. N.D. Ill. 2008) ................................................................................... 21

*In re Eli Lilly & Co. v. Roussel Vorp.,*
23 F. Supp. 2d 460, 492 (D.N.J. 1998) ......................................................................................... 13

iv

*In re First City Bancorporation of Tex., Inc.,*
995 Bankr. LEXIS 1683, 1995 WL 710912, at *18 n.9 (Bankr. N.D. Tex. May 15, 1995) ........22

*In re Forman v. Gittleman,*
2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020)...........................................17

*In re Fun Bowl Vacations, Inc.,*
2025 Bankr. LEXIS 15, at *11 n.9 (Bankr. S.D.N.Y. Jan. 6, 2025)...........................................17

*In re Friedman v. Wellspring Capital Mgmt., LLC,*
2021 Bankr. LEXIS 2848, at *33 (Bankr. D. Del. Oct 14, 2021).......................................24

*In re FTX Trading Ltd.,*
2024 Bankr. LEXIS 2584, *36, 10 F.4th 147, 160 (2d Cir. 2021) ......................................24

*In re FTX Trading Ltd.,*
2024 Bankr. LEXIS 2584, *34 (citing 11 U.S.C. § 550(a)(1) and (2) ...........................27

*In re FTX Trading Ltd.,*
2024 Bankr. LEXIS 2584, *36 (Bankr. D. Del. Oct. 23, 2024).......................................24

*In re Frederico v. Home Depot,*
507 F.3d 188, 200 (3d Cir. 2007)...........................................................................13

*In re Jubelt v. United N. Bankers, Ltd.,*
2015 WL 3970227, at *9 (D.N.J. June 30, 2015) ...........................................................13

*In re Kirschner v. Large S'holders,*
2024 Bankr. LEXIS 2584, *36, 10 F.4th 147, 160 (2d Cir. 2021) ...............................24

*In re McDonald's Corp. S'holders Derivative Litig.,*
291 A.3d 652, 686 (Del. Ch. 2023)...........................................................................17

*In re Mills v. Polar Molecular Corp.,*
12 F.3d 1170, 1175 (2d Cir. 1993)...........................................................................13

*In re Motorworld, Inc. v. Benkendorf,*
228 N.J. 311, 327, 156 A.3d 1061 (2017)...........................................................................21

*In re Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC,*
590 B.R. 211, 266 (Bankr. D. Del. 2018) ...........................................................................22

*In re OpenPeak, Inc.,*
2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020)...........................................17

*In re O'Toole v. Heinemann,*
2025 Bankr. LEXIS 15, at *11 n.9 (Bankr. S.D.N.Y. Jan. 6, 2025) ............................................17

*In re Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.,*
998 F.2d 1192, 1196 (3d Cir. 1993) ..........................................................................................7

*In re Perkins v. N. Park Realty Mgmt., LLC,*
2021 Bankr. LEXIS 3457, at *149 (Bankr. D.N.J. Dec. 17, 2021) ............................................21

*In re Powell v. Subaru of Am., Inc.,*
2020 U.S. Dist. LEXIS 220096 **26 (D.N.J. Nov. 24, 2020) ......................................................16

*In re P.V. v. Camp Jaycee,*
197 N.J. 132, 155 (2008) ..........................................................................................................16

*In re Rapid Models & Prototypes, Inc. v. Innovated Sols.,*
71 F. Supp. 3d 492, 497 (D.N.J. 2014) ......................................................................................13

*In re Sakhe,*
2021 Bankr. LEXIS 3457, at *149 (Bankr. D.N.J. Dec. 17, 2021) ............................................21

*In re Santiago v. Warminster Tp.,*
629 F.3d 121, 129 (3d Cir. 2010) ..............................................................................................12

*In re Skeen v. BMW of North America, LLC,*
2014 U.S. Dist. LEXIS 9256, 2014 WL 283628, at *5 n.5 (D.N.J. Jan. 24, 2014) ....................16

*In re SportCo Holding, Inc.,*
2021 Bankr. LEXIS 2848, at *33 (Bankr. D. Del. Oct 14, 2021) ................................................24

*In re Suprema Specialties, Inc. Sec. Litig.,*
438 F.3d 256, 270 (3d Cir. 2006) ..............................................................................................13

*In re Tribune Co. Fraudulent Conveyance Litig.*
10 F.4th 147, 160 (2d Cir. 2021) ..............................................................................................24

*In re Troll Communications, LLC,*
385 B.R. 110, 118 (Bankr. D. Del. 2008) ..................................................................................17

*In re Westpoint Home, LLC v. Dormify, Inc.,*
2024 NY Slip Op 33793(U), ¶ 9 (Sup. Ct.) ..............................................................................17

*In re Zohar III Corp.,*
631 B.R. 133, 174 (Bankr. D. Del. 2021) ..................................................................................25

*Other Authorities:*

11 U.S.C. § 548 ..............................................................................................14, 16, 17

11 U.S.C. § 548(a)(1) .................................................................................................14

11 U.S.C. § 548(a)(1)(B) ...........................................................................................17

1995 Del. SB 308 (Section 1304) ..............................................................................17

Federal Rule of Civil Procedure 12(b)(1) ................................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ....................................................................1

Federal Rule of Bankruptcy Procedure 7012 ...............................................................1

Federal Rule of Civil Procedure 8(a) .........................................................................13

Federal Rule of Civil Procedure 9(b) ..........................................................13, 24, 25

N.J. Stat. § 25:2-25 ....................................................................................................16

N.J. Stat. § 25:2-25(a) ...............................................................................................19

N.J. Stat. § 25:2-25(a)1 ..............................................................................................24

N.J. Stat. § 25:2-27 ....................................................................................................16

N.J. Stat. § 25:2-27(a) ...............................................................................................19

N.J. Stat. § 25:2-25(a)(1) ...........................................................................................24

N.Y. Debt. & Cred. Law § 273 ..................................................................................16

N.Y. Debt. & Cred. Law § 274 ..................................................................................16

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("Federal Rules"), as made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Defendant Yardline Capital Corp. ("Yardline") respectfully submits this memorandum of law in support of its motion to dismiss the complaint (the "Complaint") of META Advisors, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust.[1]

## PRELIMINARY STATEMENT

The Complaint must be dismissed because it fails to allege facts that plausibly show any actual or constructive fraudulent transfers to Yardline by Thrasio. Each of the purported transfers was made by Thrasio, in its business judgment with the approval of the Thrasio Board including independent directors, in exchange for reasonably equivalent value, all at a time when Thrasio was the controlling majority or sole owner of Yardline and was indisputably not insolvent. Indeed, at the time of the transfers, Thrasio was in the process of completing a capital raise of more than $1 billion in a Series D offering in October and November 2021, which included participation from funds whose representatives were on the Board of Thrasio at all relevant times.

Counts XIX and XX of the Complaint allege claims for avoidance of constructive or actual fraudulent transfers[2] related to loans (secured by promissory notes) or investments made by Thrasio to Yardline, all at a time when Thrasio was, or with the effect of making Thrasio, the sole owner of Yardline. As set forth in the Complaint, the loans and investments arise from a three-step plan by Thrasio to take over sole ownership of Yardline. The Yardline transactions, approved by the Thrasio Board in its business judgment, resulted in reasonably equivalent value to Thrasio, namely sole equity ownership of Yardline – a company that had been financially attractive for the

---

[1]Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint.
[2]Putting aside the fundamental pleading failure in that the Complaint fails to identify what State's law it is basing its fraudulent conveyance claims on.

significant Yardline Convertible Noteholders and prospective Yardline Series A investors at the time and complimented the business of Thrasio and removed a material competitive threat.

With respect to the claims of actual fraudulent transfer, the Complaint is devoid of any factual allegation that the transactions were intended to hinder, delay or defraud creditors or otherwise; instead only asserting general conclusory allegations which do not meet the heightened pleadings standard.

Similarly, Counts XXI and XXII of the Complaint allege claims for avoidance of constructive or actual fraudulent transfers related to Thrasio's decision to write-off or forgive the loans and investment made by Thrasio to Yardline in exchange for equity. Thrasio was not insolvent at the time, as evidenced by the more than $1 billion Series D financing received in the same time frame. The Complaint fails to plausibly allege that Thrasio did not receive reasonably equivalent value in exchange, given that the forgiveness in promissory notes resulted in an equivalent increase in Thrasio's equity position. These transactions were approved in the reasonable business judgment of Thrasio's Board's as in the best interests of Thrasio. The Complaint fails to plead facts sufficient to overcome the legitimate business judgment decisions that Thrasio was receiving fair value in exchange for the alleged transfers.

In fact, in each of these four Counts, the Complaint merely seeks to second guess the legitimate business decisions made by the unanimous approval of the Thrasio Board, including those independent directors thereon. There are no facts alleged in the Complaint which establish that the business decisions of the Board were not made or acted upon properly. As such, these informed decisions must be upheld without resorting to 20/20 hindsight more than three years later.

On May 23, 2024, as <u>Exhibit G</u> to their Plan Supplement, the Debtors filed the *Summary Report of the Disinterested Directors of Thrasio Holdings, Inc. Regarding Independent Investigation of Potential Estate Causes of Action Against Related Parties* ("<u>Independent Investigation Results</u>") [ECF No. 805].  The Board of the Debtors appointed the Disinterested Directors and delegated to them, among other things, the sole authority to conduct an independent investigation of potential estate causes of action against the Debtors' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties.  Included in the Independent Investigation Results was the Disinterested Director's analysis of certain transactions related to Yardline, including the loans and other payments made to Yardline by Thrasio.  The Independent Investigation Results concluded "*.... it is important to note that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the Series D Preferred Stock Financing, in which sophisticated third parties (including Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence.  As a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers ....*"  *See* Independent Investigation Results, ¶ 45 (emphasis added).   The Independent Investigation Results, which were relied upon by the Debtors in their Plan, were the material basis for the Plan's releases, exculpations and reserved causes of action, and the Plaintiff should be estopped from ignoring this investigation and its results in the Complaint.

Finally, Plaintiff should be bound by Thrasio's representations, warranties and releases of Yardline in connection with that certain Stock Purchase Agreement ("Stock Purchase Agreement") dated January 13, 2022 between Thrasio and Swiftline Corp.  In furtherance of the sale of 100% of the equity of Yardline by Thrasio to Swiftline Corp. in January 2022[3], Thrasio made

---

[3]Complaint, ¶ 119.

3

representations and warranties that "[Yardline] has no liability or obligation to Thrasio (or any of its affiliates) that is not reflected on [Yardline's] Financial Statements" and that "there is no material liability, debt or obligation of [Yardline]".[4]   Further, the Stock Purchase Agreement references that "each of the Parties [defined therein as Thrasio, Swiftline and Yardline] is executing a general release [in favor of Yardline and Swiftline Corp.] of any claims related to [Yardline], each becoming effective upon the Closing."   The representations and warranties were integral to, and the releases constitute additional consideration in exchange for, the transaction.

For these reasons, detailed below, Plaintiff's claims against Yardline in the Complaint should be dismissed with prejudice.

## RELEVANT FACTUAL BACKGROUND

### A.  Yardline Transactions.[5]

Thrasio's business model was to acquire "mom and pop" businesses that sell consumer products through amazon.com and other e-commerce outlets and consolidate them into Thrasio's platform, thereby expanding sales through economies of scale and other synergies. Thrasio was among the first companies to pursue this "aggregator" business model.  *See* Complaint, ¶ 6.

In or about May 2020, Yardline was formed by Horowitz in coordination with Thrasio. *Id.* at ¶ 96.  It was expected that Yardline would complement[6] Thrasio's business model by providing debt financing to small businesses that sold products to Amazon.com but were not yet ready to be acquired by Thrasio *Id.*  This was a strategic investment by Thrasio intended to compliment and

---

[4] *See* Declaration of Ari Horowitz, dated March 3, 2025 ("Horowitz Decl."), Exhibit A (Stock Purchase Agreement).
[5] Yardline accepts the facts in the Complaint as true and correct for purposes of this Motion only.  Yardline reserves the right to dispute, and does dispute, the facts as alleged in the Complaint.  All rights remain reserved on this matter.
[6] One of the key drivers for why Thrasio wanted to acquire the business is that the main element driving their multi-billion dollar valuation was deal flow. Yardline provided material deal flow for acquisitions and Thrasio wanted this to be proprietary. Thrasio did not want Yardline entering into exclusive relationships with other parties nor did Thrasio want Yardline to be acquired by any of their competitors.

grow its business, and the loans and investments that followed were in furtherance of this strategic relationship and overall business model of Thrasio.

In September 2020 Thrasio provided Yardline with $1 million of seed capital in exchange for (i) convertible preferred stock equal to 19.9% of Yardline's class A common stock and (ii) non-voting class B common stock, which would automatically convert into 47.1% of the outstanding class A common stock on March 31, 2021, provided that Thrasio was in compliance with the Service Level Agreement which required Thrasio provide monthly business updates. *Id.* at ¶ 98. If Thrasio was not in compliance with the Service Level Agreement on March 31, 2021, then conversion would be delayed until Thrasio came into compliance. *Id.* Thrasio held consent rights over any future equity financing by Yardline. *Id.*

In order to obtain additional liquidity, in August and November 2020, Yardline issued the Convertible Notes (due 2025) to the Convertible Noteholders (each of which were outside investors). *Id.* The Convertible Notes could be converted into Yardline stock at the time of an equity financing, among other things. *Id.*

In or about February 2021, Yardline began soliciting interest in a Series A preferred stock financing (the "Series A").[7] *Id.* at ¶ 100. In late February 2021, Yardline signed a term sheet with several investors, providing that, among other things, upon the closing of the Series A equity financing, Yardline's outstanding Convertible Notes could be converted into preferred stock in accordance with the terms of the Convertible Notes. *Id.* at ¶ 101. The Series A investors subsequently purchased Convertible Notes in hopes of obtaining additional Yardline equity through the conversion feature. *Id.*

---

[7] Per Yardline's Board minutes dated May 4, 2021, the Series A financing was based upon a valuation of $40 million.

On February 26, 2021, Yardline's board of directors were asked to approve the closing of the Series A equity financing. *Id.* at 102.  At the time, Thrasio controlled the board of directors as three of the five directors were Thrasio insiders – Cashman, Boockvar and Stephanie Fox.  *Id.* Yardline also needed consent from Thrasio directly to close any equity financing. *Id.* at 103. Thrasio withheld its consent, and in addition, Silberstein convinced the three-Thrasio directors of Yardline to not approve the Series A equity financing. *Id.*  Instead, in April 2021, Thrasio decided to proceed with its own acquisition of Yardline, which would make Yardline a wholly owned subsidiary.  *Id.* at ¶ 106.

On April 27, 2021, Thrasio held a business update to purportedly come into compliance with the Service Level Agreement, which automatically converted its class B stock into Class A common stock, resulting in Thrasio now holding 67% of Yardline's voting stock. *Id.* at 107.

To prevent dilution of its ownership, Thrasio took advantage of a special feature of Yardline's Convertible Notes to eliminate any possibility of their conversion.  *Id.* at ¶ 108.  Under the terms of the Convertible Notes, if an "Extraordinary Event" occurred prior to the conversion or maturity of the notes, the Convertible Notes would automatically become due and payable, and the Convertible Noteholders would lose their call options. *Id.*  Specifically, if an Extraordinary Event was triggered by Thrasio's consolidation of Yardline's financial statements (an affirmative action solely by Thrasio), the Convertible Noteholders would be compensated for the loss of their conversion rights by a payment equal to 120% or 200% of the outstanding principal, as applicable, plus any accrued and unpaid interest, in full consideration for all outstanding amounts under the notes. *Id.*

On April 27, 2021, after becoming the majority shareholder of Yardline, Thrasio notified Yardline that Thrasio was now required to consolidate Yardline's financial statements with its own

and that Thrasio had decided to operate Yardline as a subsidiary. *Id.* at ¶ 109. The Yardline board of directors (as controlled by the Thrasio insiders) confirmed on April 28, 2021 that, because of Thrasio's notice, an Extraordinary Event had occurred pursuant to the terms of the Convertible Notes, obligating Yardline to make full payment of the notes with the applicable premium. *Id.*

Lastly, in May 2021 Thrasio retired the stock held by other Yardline shareholders and became the sole shareholder of Yardline. *Id.* at ¶ 110.

As a result of Thrasio's direct actions, Yardline became obligated to pay the Convertible Noteholders. Between April and early May 2021, Thrasio provided Yardline with six loans in exchange for promissory notes, which proceeds were used, in part, to pay the obligations to the Convertible Noteholders. *Id.* at ¶ 116.

After acquiring Yardline, Thrasio provided three so-called "cash injections" to Yardline: $1 million in June 2021, $1.8 million in September 2021 and $1.3 million in November 2021. *Id.* at ¶ 117.

Around October 2021, Thrasio forgave all outstanding amounts owed by Yardline under the promissory notes. *Id.* at ¶ 116.[8]

In October and November 2021, Thrasio consummated a more than $1 billion capital raise from sophisticated third-party investors. *See, e.g.,* Independent Investigation Results [ECF No. 805]. At all relevant times, Thrasio's Board included independent directors who were representatives of funds who participated in the Series D capital raise.

On January 16, 2022, Thrasio entered into the Stock Purchase Agreement with Swiftline Corp., selling all of the issued and outstanding shares of Yardline to Swiftline Corp. for $7.1

---

[8] The Plan states that the loans were forgiven in exchange for equity of Yardline. *See* Disclosure Statement, Section IV,I,1(v)(e) [ECF No. 397]. Whie it is uncertain whether this fact was intentionally left out of the Complaint, the Court should take judicial notice of same.

million in cash and $5 million in Swiftline stock.  *Id.* at ¶ 119; Horowitz Decl., Exhibit A.[9]  The

Stock Purchase Agreement provides "each of the Parties[10] is executing a general release [to

Yardline and Swiftline Corp.] of any claims [by Thrasio] related to [Yardline] (the "General

Releases"), each to become effective upon the Closing."  Horowitz Decl., Exhibit A.

Further, in the Stock Purchase Agreement, Thrasio represents and warrants as follows:

> (j) Liabilities.  To Thrasio's knowledge, (i) the Company [Yardline] has no
> liabilities or obligation to Thrasio (or any of its affiliates) that is not reflected on
> the Company Financial Statements, except obligations incurred or arising in the
> ordinary course of business following the date of the Company Financial
> Statements, and (ii) three is no material liability, debt or obligation of the Company
> except for liabilities, debtors and obligations (a) reflected or reserved for on the
> balance sheet of the Company as of the date of the Company Financial Statements,
> (b) that have arisen since the date of the Company Financial Statements in the
> ordinary course of business, (c) incurred in accordance with the terms of this [Stock
> Purchase] Agreement or (d) incurred in connection with the Transaction."

*See Id.* at Exhibit A (Stock Purchase Agreement), ¶4(j).

The representations and warranties were integral to, and the release was further

consideration for, the transaction between Thrasio and Swiftline.   As a result of the transaction,

and based upon these representations, warranties and releases, Swiftline, an unaffiliated third

party, became the sole owner of Yardline as of January 2022.

### B.  Thrasio Bankruptcy Case.

On February 28, 2024, Thrasio and certain of its affiliates filed their Bankruptcy Cases.

The Debtors continued to operate the businesses as debtors and debtors-in-possession.

---

[9] "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to
dismiss if the plaintiff's claims are based on the document."  *Pension Ben. Guar. Corp. v. White Consol. Industries,
Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *See also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir.) ("In
evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and
any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record,
orders, and items appearing the record of the case.")
[10] Under the Stock Purchase Agreement, "Parties" is defined as Swiftline, Thrasio and Yardline.  "Company" is
defined as Yardline.

On April 18, 2024, the Bankruptcy Court entered an order ("Disclosure Statement Order")
[ECF No. 399], (a) authorizing the Debtors to solicit acceptances for the *Joint Plan of
Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the
Bankruptcy Code* (as modified, amended or supplemented, the "Plan") [ECF No. 398]; (b)
approving the Debtors' *Second Amended Disclosure Statement for the Joint Plan of
Reorganization of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the
Bankruptcy Code* (as modified, amended, or supplemented, the "Disclosure Statement") [ECF No.
397] as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c)
approving the solicitation materials and documents to be included in the solicitation packages; and
(d) approving procedures for soliciting, noticing, receiving and tabulating votes on the Plan and
for filing objections to the Plan.

Both of the Plan and Disclosure Statement Order contemplated the filing of the
Independent Investigation Results by the Independent Directors as part of the Plan Supplement to
the Plan.  To this end, the Disclosure Statement contained the following provisions:

a. The Release and Exculpation provisions in the Plan are expressly subject to the
   outcome of the Independent Investigation [*See* Disclosure Statement, p. 12 ECF 397];
b. The Independent Investigation will be filed at least one week prior to the Voting
   Deadline [*Id.,* p.17, Sect. III,R];
c. Voting deadline will be extended if Independent Investigation not filed by May 13,
   2024 [*Id.*, Sect. III.S];
d. "***The Debtors fully intend to comply with the result of the Independent Investigation***"
   [*Id.*, Sect. IV,C,2](emphasis added).

On May 23, 2024, the Debtors filed their *Notice of Filing of Independent Investigation
Results as Exhibit G to the Plan Supplement* ("Independent Investigation Results Notice") [ECF
No. 805].  The Independent Director Results Notice stated that "*the Plan Supplement was integral
to, part of, and incorporated by reference into the Plan." Id.* at p.2.  In fact, the timing of the

receiving and tabulation of votes under the Plan was conditioned upon the filing and service of the Independent Investigation Results. *See* Disclosure Statement, Sect. III.S.

Significantly, after the filing of the Independent Investigation Results, the Creditors Committee, who's counsel represent the Plaintiff herein, changed their recommendation to general unsecured creditors from rejecting the proposed plan of reorganization [notice served in or about 4/22/2024] to voting in favor of the proposed plan of reorganization (letter dated 6/2/2024).

The Board of the Debtors appointed the Disinterested Directors and delegated to them, among other things, the sole authority to conduct an independent investigation (the "Independent Investigation") of potential estate causes of action against the Debtor' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties (the "Related Parties"). *See* Independent Investigation Results, p.1, ¶ 1.

The Disinterested Directors retained Katten, who "are widely regarded as market leaders in the representation of independent directors and, in recent years, have represented independent directors in some of the largest and most complex chapter 11 cases throughout the United States and in additional out-of-court restructuring matters." *Id.* at 2.

According to the Independent Investigation Results, the Independent Investigation was broad. *Id.* at 4. The Disinterested Directors investigated the course of conduct and material dealings involving Thrasio and its Related Parties spanning more than 5 years, reviewed 2.3 million documents and conducted interviews, depositions, or informal meetings with 15 witnesses. *Id.* The Disinterested Directors received a detailed 236-page legal presentation providing analysis of potential estate causes of action from Katten, and based thereon made their determination and conclusion of principal findings and conclusions. *Id.* at 5. Yardline has not been provided with the Katten Presentation, nor has it been filed publicly on the docket. The Independent Investigation

Results is apparently a summary report of the Disinterested Directors' principal findings and conclusions. *Id.*

The Independent Investigation Results identifies certain individuals as "Excluded Parties" – namely Silberstein, Cashman, Boockvar and Falcao – and states that Excluded Parties will not be "Released Parties" under the Plan and ***all*** potential claims and causes of action against the Excluded Parties will be preserved under the Plan.  *Id.* at 9.   In addition, the Independent Investigation Results indicates that avoidance actions related to the Yardline Transactions will be preserved under the Plan. *Id.*

The Independent Investigation Results set forth the Disinterested Director's analysis of certain transactions related to Yardline, including the loans and other payments made to Yardline by Thrasio, and the ultimate sale of Yardline (or the "<u>Disinvestment</u>") in January 2022. *Id.* at ¶¶ 7, 42-45.  The Independent Investigation Results outlined material factual details determined in the Independent Investigation, including:

- In early 2020, Thrasio made a $1 million investment in Yardline, a startup merchant cash advance business, and ***became its majority shareholder***.
- In early 2021, Silberstein implemented a strategy ***on behalf of Thrasio*** to acquire 100% of the equity of Yardline and to consolidate Yardline as a subsidiary.
- The course of action taken by Silberstein, with the knowing participation of Cashman and Boockvar, among others, triggered payment obligations from Yardline to its third-party investors.
- In April and May 2021, Thrasio paid approximately $18.4 million to satisfy Yardline's obligations to third-party investors ***that had been triggered by Thrasio's actions***, and $1.8 million to acquire the remaining equity in Yardline.
- In September 2021, Thrasio's Board retroactively ***approved these advances*** and also forgave approximately $21 million of debt purportedly owed by Yardline which at that time was a consolidated subsidiary of Thrasio.
- In November 2021 Thrasio executed a letter of intent to sell the Yardline business for consideration of $7 million in cash and equity securities of $5 million (the "<u>Yardline Divestment</u>"), which closed in January 2022.

*Id.* at ¶¶ 42, 44 (emphasis added).

The Independent Investigation Results concluded "*… it is important to note that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the Series D Preferred Stock Financing, in which sophisticated third parties (such as Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence.  As a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers, which would defeat constructive fraudulent transfer claims.*"  *Id.* at ¶ 45 (emphasis added).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Twombly*, 550 U.S. at 555, 127 S. Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  While a court must accept as true all of the factual allegations in the complaint, this "tenet . . . is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

In assessing a complaint in connection with a motion to dismiss, the Third Circuit has instructed courts to undertake a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago v. Warminster Tp.*, 629 F.3d 121, 129 (3d Cir. 2010) (internal citations, quotation marks, and alterations omitted).

<u>**ARGUMENT**</u>[11]

**a.  The Complaint fails to meet fundamental pleading standards and must be dismissed.**

The Complaint fails to meet the necessary pleading requirements which provide adequate notice to the defendants of the claims being asserted against them.  The fundamental purposes of Rule 8(a), which governs the pleading standard for the constructive fraudulent transfer claims, is "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *See Fed. R. Civ. P. 8(a); In re Ditech Holding Corp.,* 2024 Bankr. LEXIS 1736, *16 (Bankr. S.D.N.Y. July 26, 2024). Rule 9(b), which is the heightened pleading standard required by a claim for actual fraudulent transfer, must be pleaded with particularity regarding the circumstances. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (noting that where "plaintiff grounds [his claims] in allegations of fraud – and the claims thus 'sound in fraud' – the heightened pleading requirements of Rule 9(b) apply").[12]

The Complaint alleges four separate causes of action as against Yardline, two claims for avoidance of constructive fraudulent transfers and two claims for avoidance of actual fraudulent

---

[11] In addition to the arguments set forth herein, Yardline joins in and incorporates by reference the applicable arguments (including business judgment and judicial estoppel) asserted by the other Defendants in their respective motions to dismiss the Complaint as if more fully set forth herein.

[12] Federal Rule of Civil Procedure 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "The purpose of Rule 9(b) is to provide notice of the precise misconduct with which defendants are charged and to prevent false or unsubstantiated charges." *Rapid Models & Prototypes, Inc. v. Innovated Sols.*, 71 F. Supp. 3d 492, 497 (D.N.J. 2014) (internal citations omitted). Plaintiff must allege the date, time, and place of the alleged fraud, who made the alleged fraudulent statement, and the substance of the alleged statement. *Id.* (quoting *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)). When multiple defendants are accused of fraud, this particularity requirement applies to each one separately. *Jubelt v. United N. Bankers, Ltd.*, No. 13-7150, 2015 WL 3970227, at *9 (D.N.J. June 30, 2015) (internal citations omitted). "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'" *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 492 (D.N.J. 1998) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

transfers; yet the Complaint fails to identify which State's laws these claims are being asserted under, or provide any choice of law analysis required to be performed by the Court.

Actual and constructive fraudulent transfer laws under Sections 548 of the Bankruptcy Code only provide, in pertinent part, for the avoidance of a fraudulent transfer "*that was made or incurred on or within 2 years before the date of the filing of the petition.*" See 11 U.S.C. § 548(a)(1). Each of the purported transfers that the Plaintiff seeks to avoid in the Complaint occurred in 2021, more than 3 years prior to the petition date.

As such, the Complaint seeks to (and can only) avoid actual or constructive fraudulent transfers "*under applicable state law.*" *See, e.g.,* Complaint, ¶¶ 307, 308, 321, 323, 324, 344, 347, 354, 355. Yet, the Complaint does not identify which State's laws are being applied to these claims.

- Thrasio was a Delaware corporation. The Complaint does not allege where Thrasio had its principle place of business. Plaintiff is a trust governed by New York law. *See* Complaint, ¶ 29.
- Yardline is a Delaware corporation, with its principal place of business in New York. *Id.* at ¶ 40. There is no indication in the Complaint where the funds were transferred, or where these funds were used by Yardline, although it is likely that it was in New York.
- The claims against Yardline (Counts XIX, XX, XXI, XXII) each stem from a loan and promissory note, or an investment, made by Thrasio to Yardline in 2021 (and the purported write-off thereof), all while Thrasio was the sole or majority shareholder of Yardline, and exercised complete control over Yardline. *See, e.g.,* Complaint at ¶¶ 92-119.
- The Complaint does not identify any choice of law provisions in the promissory notes, nor does it identify any choice of law provisions related to these purported investments by Thrasio into its wholly owned subsidiary.
- The Complaint alleges that Yardline was ultimately sold by Thrasio for the sum of $12 million in January 2022. Pursuant to the Stock Purchase Agreement related to this transaction, the transaction is governed by "the domestic substantive laws of Delaware." *See* Horowitz Decl., Exhibit A, Section 8(b).
- The Confirmation Order and Plan indicate that the laws of the State of New York shall govern the rights, obligations, construction and implementation of the Plan

and related matters.  *See* Confirmation Order, ¶141 [ECF 1124]; Plan, Section 1.D. [ECF 1124].

Based upon the foregoing facts, there appears to be no nexus to the State of New Jersey. Nonetheless, the Complaint does not provide any analysis of the choice of law, nor any allegation regarding which State's fraudulent transfer law is being applied to these four causes of action against Yardline.  Instead, the Complaint only alleges that these transfers are avoidable *under all applicable laws.*

### II.  The Fraudulent Transfer Claims against Yardline must be dismissed.

Counts XIX and XX of the Complaint allege claims for avoidance of constructive or actual fraudulent transfers related to loans (secured by promissory notes) or investments made by Thrasio to Yardline, all at a time when Thrasio was the majority or sole owner of Yardline, or in order to enable Thrasio to become the sole owner of Yardline.  As set forth in the Complaint, the loans and investments arise from a three-step plan by Thrasio to take over sole ownership of Yardline.  At the time, the Complaint alleges that it was believed that Yardline complemented the business of Thrasio. Complaint,¶ 96. These transactions, unanimously approved by Thrasio's Board in its business judgment, resulted in reasonably equivalent value to Thrasio, namely sole equity ownership of Yardline – a company that had been financially attractive for these significant Convertible Noteholders and Series A investors at the time.

With respect to Thrasio's investments of $4.1 million into its wholly owned subsidiary Yardline over the period from June 23, 2021 through November 23, 2021, each investment was made by Thrasio, as the sole owner of Yardline, and ultimately approved by Thrasio's Board. These investments, creatively defined as "cash injections", were properly approved by the Board, in its business judgment.  There are no factual assertions in the Complaint to determine otherwise.

Similarly, Counts XXI and XXII of the Complaint allege claims for avoidance of constructive or actual fraudulent transfers related to Thrasio's Board decision to write-off or forgive the loans/promissory notes or investments made to Yardline (in exchange for equity in Yardline).

a. **Choice of Law:**

Federal courts apply the forum state's choice of law rules in determining which state's substantive laws are controlling. *Powell v. Subaru of Am., Inc.*, 2020 U.S. Dist. LEXIS 220096 **26 (D.N.J. Nov. 24, 2020) (citations omitted). When conducting a choice of law analysis, New Jersey uses the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *Id. (*citing *P.V. v. Camp Jaycee*, 197 N.J. 132, 155 (2008)("In balancing the relevant elements of the most significant relationship test, we seek to apply the law of the state that has the strongest connection to the case."). Choice of law analysis is a two-step process. First, the Court must determine whether there is an actual conflict between the laws of the two forums: "if there is no conflict or only a 'false conflict', where the laws of the two jurisdictions would produce the same result on the particular issue presented, the substantive law of the forum state applies." *Id.* (citing *Skeen v. BMW of North America, LLC*, 2014 U.S. Dist. LEXIS 9256, 2014 WL 283628, at *5 n.5 (D.N.J. Jan. 24, 2014). If the Court finds an actual conflict of law exists, it proceeds to step two, where it "must determine which state has the 'most significant relationship' to the claim, by weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action. *Id.* (citing *Cox v. Chrysler Grp., LLC,* 2015 U.S. Dist. LEXIS 1333393, 2015 WL 5771400, at *4 (D.N.J. Sept. 30, 2015).

Here, the Court may use the law of the forum state, New Jersey, because no actual conflict exists between the applicable laws of Delaware, New Jersey and New York. All three states have

16

adopted the Uniform Voidable Transactions Act modeled after Section 548 of the Bankruptcy Code. *Compare* N.Y. Debt. & Cred. Law §§ 273 and 274 *with* N.J. Stat. § 25:2-25 and 25:2-27 *with* 6 Del. C. §§ 1304 and 1305; *see also Forman v. Gittleman (In re OpenPeak, Inc.)*, Nos. 16-28464 (SLM), 17-01755 (SLM), 2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020) ("Here, no distinction exists between the applicable laws of Florida, Delaware, and New Jersey . . . It is undisputed that the Delaware and New Jersey Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa) . . . Here, there is no real conflict"); *O'Toole v. Heinemann (In re Fun Bowl Vacations, Inc.)*, Nos. 21-22521 (KYP), 23-07026 (KYP), 2025 Bankr. LEXIS 15, at *11 n.9 (Bankr. S.D.N.Y. Jan. 6, 2025) ("The current iteration of the New York constructive fraudulent transfer statute more closely tracks section 548(a)(1)(B) of the Bankruptcy Code…."); *Westpoint Home, LLC v. Dormify, Inc.*, 2024 NY Slip Op 33793(U), ¶ 9 (Sup. Ct.) ("New York's Uniform Voidable Transactions Act is inapplicable . . . New York and New Jersey Uniform Voidable Transactions Acts, however, are similar.").

**b. Business Judgment of the Thrasio Board should be not be second-guessed in the Yardline Transactions.**

Each of the claims in the Complaint related to the Yardline transactions seeks to second guess the business judgment decisions made by Thrasio's Board, all more than three years after their unanimous approvals. These decisions were approved by the Thrasio Board in its business judgment and the Complaint fails to state any facts to the contrary. Because a board is presumed to have acted properly, the burden is on the party challenging the decision to establish facts rebutting the presumption. *In re Troll Communications, LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008). The Complaint fails to provide any facts to establish that the Thrasio Board's decisions were not acted upon properly, and thus the Complaint fails to meet this burden required to rebut the presumption. Further, the Complaint fails to take into account the actions of the independent

directors on the Board, none of which are targets of this Complaint. *See In re McDonald's Corp. S'holders Derivative Litig.*, 291 A.3d 652, 686 (Del. Ch. 2023). In fact, many of these Thrasio Board members were representatives from the same funds which participated in the Series D financing which provided more than $1 billion in capital in October and November 2021. The law is intended to protect informed business decisions of the Board, even if the decisions are ultimately not deemed as successful as hoped. The Complaint fails to rebut the business decisions of the Thrasio Board, which unanimously approved the Yardline transactions as providing value to and otherwise being in the best interests of Thrasio. As stated in the Complaint, Yardline's business was deemed to complement Thrasio's business model, i.e. Yardline was established to provide financing to the small "mom-and-pop" companies which did business with Amazon and were on the radar of Thrasio as potential take-over targets, namely Thrasio's business model. *See* Complaint, ¶6. One of the key drivers for why Thrasio wanted to acquire Yardline is that the main element driving their multi-billion dollar valuation was deal flow. Yardline provided material deal flow for acquisitions and Thrasio wanted this to be proprietary. Thrasio did not want Yardline entering into exclusive relationships with other parties nor did Thrasio want Yardline to be acquired by any of their competitors. There are no allegations contained in the Complaint, beyond merely conclusory allegations, that support a determination that Thrasio did not receive reasonably equivalent value in exchange for the alleged transfers resulting from Thrasio's Board's decisions.

### c. COUNT XIX: Constructive Fraudulent Transfer Claims related to the Loans/Promissory Notes and Investments made by Thrasio to Yardline.

As to constructive fraudulent transfers claims, New Jersey's Uniform Voidable Transactions Act provides, in pertinent part, as follows with respect to present or future creditors:

> **a.** A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

….

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

*See* N.J. Stat. § 25:2-25(a).

In addition, with respect to a present creditor, New Jersey's Uniform Voidable Transactions Act provides, in pertinent part, as follows:

A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*See* N.J. Stat. § 25:2-27(a).

It is submitted that the Complaint fails to assert facts sufficient to establish a viable claim for avoidance of constructive fraudulent transfers related to the loans or investments made by Thrasio to Yardline in 2021.

Count XIX the Complaint alleges claims for avoidance of constructive fraudulent transfers related to the loans or investments made by Thrasio to Yardline, all while Thrasio was the sole or majority owner of Yardline and in complete control of its subsidiary Yardline.

First, it is submitted that the constructive fraudulent transfer claims under Count XIX in the Complaint must be dismissed as the Complaint fails to provide facts or allegations sufficient to establish that Thrasio *(i) was engaged or about to engage in a business or a transaction for*

*which the remaining assets of the debtor were unreasonably small in relation to the business or*

*transaction; or (ii) intended to incur, or believed or reasonably should have believed that the*

*debtor would incur, debts beyond the debtor's ability to pay as they became due.*

Without providing any detail, the Complaint alleges that "Thrasio was insolvent at the time

or became insolvent as a result of transferring these cash payment to Yardline." *See* Complaint, ¶

304. The Complaint baldly asserts, with no specificity, that the total fair value of Thrasio's

liabilities exceeded the total amount of Thrasio's assets, and that PwC emphasized in Thrasio's

2020 and 2021 audit reports that there was "substantial doubt" as to Thasio's 'ability to continue

as a going concern.'" Nonetheless, there are no details regarding the claim that the liabilities

exceed the assets, and no details regarding what or how PwC made its determination, or the context

thereof. The Complaint relies solely upon these conclusory allegations, all while ignoring

undisputed facts regarding Thrasio's solvency and ongoing billion dollar investments in its

business.

The Independent Investigation Results, which were relied upon by the Debtors and the

Creditors Committee in formulating the Plan and incorporated by reference into the Plan itself,

states the contrary. The Independent Investigation Results concluded "*.... it is important to note*

*that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the*

*Series D Preferred Stock Financing, in which sophisticated third parties (such as Advent and*

*Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence. As*

*a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline*

*Transfers, which would defeat constructive fraudulent transfer claims.*" *See* Independent

Investigatory Results, ¶ 45 (emphasis added). Yet, the Complaint conveniently fails to even

address this report or account for the $1 billion investment (and related valuation by sophisticated

investment parties, some of which were represented on Thrasio's Board at the time of the Yardline transactions) and therefore fails to state facts that plausibly allege insolvency.

In formulating their Plan, the Debtors represented that "the Debtors fully intend to comply with the results of the Independent Investigation" [*See* Disclosure Statement, Section IV,C,2] and the Debtors (and the Committee by recommending that the creditors vote to accept the Plan) used the Independent Investigation Results to, among other things, determine the Releases, Exculpation, Excluded Parties, Retained Cause of Action[13], and other material provisions of the Plan, which effectively kept parties in interest from participating in the plan process. As such, it is submitted that the Plaintiff should be judicially estopped from ignoring or feigning ignorance of the facts concluded by the Disinterested Directors in the Independent Investigation Records.

Further, the Complaint fails to assert facts to establish a plausible claim that Thrasio did not receive reasonable equivalent value in exchange for the transfers or obligations.

The Supreme Court of New Jersey has held that determining "reasonably equivalent value" is a two-step process. *Motorworld, Inc. v. Benkendorf*, 228 N.J. 311, 327, 156 A.3d 1061 (2017) citing to *In re Eckert*, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008). First "[a] court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave up." *Id.* "Value and reasonably equivalent value are measured at the time of the transaction." *Perkins v. N. Park Realty Mgmt., LLC (In re Sakhe)*, Nos. 15-32238-RG, 16-01576- RG, 2021 Bankr. LEXIS 3457, at *149 (Bankr. D.N.J. Dec. 17, 2021) (dismissing complaint where "the record does not contain sufficient proofs demonstrating the Debtor's $1.5 million investment in North Park was a fraudulent transfer").

---

[13] Each as defined in the Plan.

In conclusory fashion, the Complaint baldly alleges that Yardlin was insolvent yet the facts asserted in the Complaint undisputably establish otherwise based upon the significant interest of both the Bondholders and the Series A investors (based on a $40 million valuation) at the relevant time (*see, e.g.,* Complaint, ¶¶ 99, 100, 101, 102, 105).  Here, because Yardline was a solvent wholly-owned subsidiary of Thrasio, the transfers provided Thrasio with reasonably equivalent value as a matter of law. "Courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer." *In re DVI, Inc.*, 326 B.R. 301, 306 (Bankr. D. Del. 2005) (concluding that where a debtor "made a contribution to a solvent wholly-owned entity, the Committee would not be able to state a fraudulent transfer claim.").  As courts have explained, "[i]t is not fraudulent to allocate property to a solvent, wholly-owned subsidiary because the transferor receives value equal to the transferred asset." *See Branch v. F.D.I.C.,* 825 F. Supp. 384, 399-400 (D. Mass. 1993) ("The Court is aware of no case in which transfers to a solvent subsidiary have been determined to be for less than equivalent value.").

That is exactly what happened in this case, where the transfer was to a downstream wholly-owned subsidiary. It is undisputed that the non-debtor Yardline is solvent, meaning that the value of the transferred property received by Yardline is ultimately available to satisfy claims against its parent, the Debtor.  Any benefit received by Yardline resulted in a corresponding increase in the value of Thrasio's stock interest. *See In re First City Bancorporation of Tex., Inc.*, 1995 Bankr. LEXIS 1683, 1995 WL 710912, at *18 n.9 (Bankr. N.D. Tex. May 15, 1995) ("[A] transfer to a wholly-owned solvent subsidiary is often for reasonably equivalent value, because the value of the parent's stock interest in the subsidiary may be correspondingly increased . . . ."); *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 266 (Bankr. D. Del. 2018).

Plaintiff fails to plausibly allege otherwise. Any allegations of lack of reasonably equivalent are merely conclusory and belied by the very facts alleged in the Complaint. First, Thrasio was intent on becoming the 100% owner of Yardline, increasing its equity holdings over Yardline and taking affirmative actions to avoid dilution of its interests in the company. Second, Thrasio invested $1 million in seed financing to Yardline, which it deemed to be a material competitive advantage for its own business model. Yardline provided material deal flow for acquisitions and Thrasio wanted this to be proprietary. Thrasio did not want Yardline entering into exclusive relationships with other parties nor did Thrasio want Yardline to be acquired by any of their competitors. Third, Yardline attracted significant interest from Convertible Noteholders, and had secured sufficient Series A investors, based on $40 million valuation, to allow a closing on the equity financing. Fourth, Thrasio sold Yardline for more than $12 million in January 2022.

Based upon the allegations, there can be no disputing that Yardline was or could be a valuable asset of the Debtor and that the acquisition of Yardline provided reasonable value to Thrasio. Without 20/20 hindsight, the business judgment of the Debtors should not be disregarded more than three years later. While the Complaint further alleges that these loans and investments were intended to shield Yardline, along with Cashman and Horowitz, from lawsuits by the Convertible Noteholders, there is no factual support in the Complaint to establish that there was any credible threat of such lawsuits against Yardline or the individuals, or that the transactions were undertaken for these purposes. The conclusory allegations in the Complaint do not meet the required pleadings standards.

**d. COUNT XX: Actual Fraudulent Conveyance Claims related to the Promissory Notes and Investments to Yardline.**

To establish a claim for avoidance of an actual fraudulent transfer, New Jersey's Uniform Voidable Transactions Act provides, in pertinent part, as follows:

23

**a.** A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

**(1)** With actual intent to hinder, delay, or defraud any creditor of the debtor.

*See* N.J. Stat. § 25:2-25(a)(1).

It is well-established that a plaintiff may establish intent in an actual fraudulent transfer case in one of two ways: (1) through direct evidence; or (2) through circumstantial evidence." *Alameda Rsch. Ltd. v. Giles (In re FTX Trading Ltd.)*, 2024 Bankr. LEXIS 2584, *36 (Bankr. D. Del. Oct. 23, 2024); *Friedman v. Wellspring Capital Mgmt., LLC (In re SportCo Holding, Inc.)*, Nos. 19-11299, 20,50554 (JKS), 2021 Bankr. LEXIS 2848, at *33 (Bankr. D. Del. Oct 14, 2021) ("For an actual fraudulent conveyance claim to survive a motion to dismiss, the plaintiff must allege facts that, taken as true, establish direct or circumstantial evidence of intent to defraud.").

It is submitted that the Complaint does not plead facts, in conformance with the heightened pleading standard under Rule 9(b), which establish direct evidence of any intent to defraud with respect to the loans or investments made by Thrasio to Yardline.   Instead, the Complaint alleges that Silberstein held certain ill-will towards Ari Horowitz.   This does not overcome the presumption of the unanimous approval of the Thrasio Board of all of these Yardline transaction.

"To demonstrate fraudulent intent in the absence of direct evidence, claimants typically rely on 'badges of fraud', i.e. circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Alameda Rsch. Ltd. v. Giles (In re FTX Trading Ltd.)*, 2024 Bankr. LEXIS 2584, *36 (citing *Kirschner v. Large S'holders (In re Tribune Co. Fraudulent Conveyance Litig.*), 10 F.4th 147, 160 (2d Cir. 2021)).   The "badges of fraud" that courts often refer to include: "(1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the Debtors; (4) how much of

the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor

over the property transferred, and (6) secrecy or concealment of the transaction." *Id. (citing In re*

*Zohar III Corp.*, 631 B.R. 133, 174 (Bankr. D. Del. 2021)).

None of the allegations in the Complaint establish any facts to prove the existence of any

of these badges of fraud, or cumulative in nature to meet the heightened pleading standards under

Rule 9(b).  To the contrary, the facts establish that transfers were made by Thrasio to gain 100%

ownership interest in Yardline, based upon Board approval, in their business judgment.  Nothing

in the complaint establishes any facts showing an intent by Thrasio to hinder, delay or defraud any

party.   There was no scheme; just a business decision which the Plaintiff seeks to second guess

and unwind because it ultimately lacked any financial gain for Thrasio at the end of the day due to

Thrasio management missteps with the business.  This fact is especially true when taking into

account the requirement under the heightened pleading standards.

**e.  Constructive Fraudulent Transfer Claims related to Thrasio's Write-off or Forgiveness of the Promissory Notes and Investments made by Thrasio to Yardline.**

Count XXI the Complaint alleges claims for avoidance of constructive fraudulent transfers

related to Thrasio's decision to write-off or forgive the loans and investments made by Thrasio to

Yardline.

First, it is submitted that the facts alleged by the Complaint are in direct contrast to the

facts asserted in the Plan. The Plan states, in plain language, that the loans and investments (or

cash injections) were forgiven in exchange for equity.  This is fundamentally different than a write

off of the obligations by Thrasio.  Since the Plan is referenced by the Complaint, this creates a

pleading issue because there are two different factual allegations asserted on the same point.

In any event, the Complaint fails to assert a plausible claim against Yardline as reasonably

equivalent value exists as set forth above herein.

Further, as stated above in the argument related to Count XIX, the facts alleged in the Complaint fail to establish that Thrasio was insolvent at the time of transfer.   In fact, as set forth in the Independent Investigation Results, Thrasio received a more than $1 billion capital investment from sophisticated investment funds and other investors in October and November 2021, the same time period as the alleged forgiveness and exchange for equity.

**f.  Actual Fraudulent Transfer Claims related to Thrasio's Write-off or Forgiveness of the Promissory Notes and Investments made by Thrasio to Yardline.**

Similar to the above, Count XXII of the Complaint alleges claims for avoidance of actual fraudulent transfers related to Thrasio's decision to write-off or forgive the loans and investments made by Thrasio to Yardline.  The Complaint merely asserts general legal conclusions, with no facts as required to allege fraud either by direct evidence or circumstantially through "badges of fraud."  There are no allegations of intent to hinder, delay or defraud asserted in the Complaint with respect to Count XXII.  To the contrary, Thrasio's decision to forgive and exchange the debt for equity was a business decision approved by the Board, based upon their business judgment, which inured to the benefit of Thrasio as the ultimate parent of Yardline.

**III. Thrasio's Representations, Warranties and Release in the Yardline Stock Purchase Agreement should be considered in support of the Motion.**

In January 2022, Thrasio entered into the Stock Purchase Agreement where Thrasio sold 100% ownership of Yardline to Swiftline, an unaffiliated  third party entity.  The purchase price for the sale was $12.1 million, consisting of $7.1 million in cash and $5 million in Swiftline stock.

As an integral part of the sale transaction, Thrasio made representations and warranties in the Stock Purchase Agreement that "[Yardline] has no liability or obligation to Thrasio (or any of its affiliates) that is not reflected on [Yardline's] Financial Statements" and that "there is no material liability, debt or obligation of [Yardline]".  *See* Horowitz Decl., Exhibit A.

Further, the Stock Purchase Agreement states that "each of the Parties [defined therein collectively as Thrasio, Swiftline and Yardline] is executing a general release of any claims related to [Yardline], each becoming effective upon the Closing."    This release was a material consideration for the transaction.

The Complaint and the allegations therein disregard without any basis Thrasio's representations and warranties in the Stock Purchase Agreement, and the release intended thereunder. The Plaintiff has presented no plausible facts to overcome these representations, warranties or releases more than three years after the transaction was closed in January 2022.

To the contrary, these provisions required under the Stock Purchase Agreement make sense in that Yardline is being purchased by an unrelated third party, which was not involved in any of the prior transactions including the loans or investments made by Thrasio to Yardline or the subsequent forgiveness of such loans in exchange for equity.   These representations, warranties and releases are material terms of the transaction and provided by Thrasio to Swiftline as consideration for the transaction.   If Thrasio, as the purchaser, seeks to clawback material consideration for the transaction, then Swiftline would have full recourse against Thrasio for the full payment thereunder.   Swiftline is a subsequent transferee and is protected from avoidance entirely because they took the transfers in good faith. *See Alameda Rsch. Ltd. v. Giles (In re FTX Trading Ltd.)*, 2024 Bankr. LEXIS 2584, *34 (citing 11 U.S.C. § 550(a)(1) and (2)).

## IV.    Joinder to all Arguments in Defendants' respective Motions to Dismiss

In addition to the arguments set forth herein, Yardline joins in and incorporates by reference the applicable arguments (including business judgment and judicial estoppel) asserted by the other Defendants in their respective motions to dismiss the Complaint as if more fully set forth herein.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Complaint must be dismissed with prejudice as against

Yardline.

Dated: New York, New York
   March 3, 2025

         KLESTADT WINTERS JURELLER
         SOUTHARD & STEVENS, LLP

         By: */s/ John E. Jureller, Jr.*
           John E. Jureller, Jr.
         200 West 41st Street, 17th Floor
         New York, NY 10036
         Tel:  (212) 972-3000
         Fax:  (212) 972-2245
         jjureller@klestadt.com

         *Attorneys for Defendant*
         *Yardline Capital Corp.*