## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

Mark S. Lichtenstein
mark.lichtenstein@akerman.com
Martin Domb (application *pro hac vice* pending)
martin.domb@akerman.com
Keith Blackman (application *pro hac vice* pending)
keith.blackman@akerman.com
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel.: (212) 880-3800

John Thompson (admitted *pro hac vice*)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760

*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC.*

| | |
|---|---|
| In re:<br><br>1 THRASIO ONE, INC.,<br><br>*Reorganized Debtor.* | Chapter 11<br>Case No. 24-11850-CMG<br>(Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br><br>*Plaintiff*,<br><br>v.<br><br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br><br>*Defendants*. | Adv. Pro. No. 24-01637-CMG |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS JOSHUA SILBERSTEIN AND EVERYTHING'S COMING UP MILLHOUSE, LLC TO DISMISS THE COMPLAINT

# Table of Contents

Introduction ........................................................................................................1

Factual Background ............................................................................................3

Legal Standard ..................................................................................................10

ARGUMENT ....................................................................................................11

I.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS AN
        IMPERMISSIBLE GROUP PLEADING .....................................................11

II.     PLAINTIFF FAILS TO STATE A CLAIM BASED ON THE TENDER
        OFFER (Counts 1 through 6) ........................................................................14

        A.     Section 546(e)'s Safe Harbor Bars All Tender Offer Claims .............15

        B.     The Disinterested Directors Report Bars All Tender Offer Claims....19

        C.     The Business Judgment Rule Bars the Tender Offer and
               Other Claims..........................................................................................20

        D.     Count 1 Fails To Allege Breach of the Fiduciary Duty of Loyalty ....21

        E.     Counts 2 and 3 Fail to Allege a Fraudulent Transfer..........................25

        F.     Count 4 Fails to Allege a Conspiracy ..................................................31

        G.     Count 5 Fails to Allege a Claim Under Del. GCL § 160.....................33

        H.     Count 6 Fails to Allege Unjust Enrichment ........................................34

III.    PLAINTIFF FAILS TO STATE A CLAIM BASED ON THRASIO'S
        INTERNAL CONTROLS AND INVENTORY (Counts 7 and 8)...............35

        A.     Count 7 Fails to Allege a *Caremark* Claim Based on "Inadequate
               Accounting and Inventory Controls" ..................................................35

        B.     Count 8 Fails to Allege Corporate Waste Based on Inventory...........42

IV.  PLAINTIFF FAILS TO STATE A CLAIM BASED ON THE
     SECONDARY SALES (Counts 9 and 10) ..................................................... 45

     A.   Count 9 Fails to Allege Usurpation of Corporate Opportunities ........ 45

     B.   Count 10 Fails to Allege Breach of Fiduciary Duty for Misuse of
          "Confidential Corporate Information" ................................................ 48

     C.   Counts 9 and 10 Are Time-Barred as to the 2020 Secondary Sales ... 52

V.   PLAINTIFF FAILS TO STATE A CLAIM BASED ON SILBERSTEIN'S
     SEPARATION AGREEMENT (Counts 13 and 14) ..................................... 52

     A.   Count 13 Fails to Allege Constructive Fraudulent Transfers ............. 53

     B.   Count 14 Fails to Allege Actual Fraudulent Transfers ....................... 54

VI.  PLAINTIFF FAILS TO STATE A CLAIM BASED ON YARDLINE
     (Counts 17, 25, and 26) .................................................................................. 55

     A.   Count 17 Fails to Allege Breach of Fiduciary Duty ........................... 55

     B.   Count 25 Fails to Allege a Conspiratorial Agreement ....................... 61

     C.   Count 26 Fails to Allege Corporate Waste ......................................... 63

     D.   Counts 17 and 26 Are Time-Barred to the Extent They Are Based
          on Conduct That Allegedly Occurred Before February 28, 2021 ....... 65

Conclusion ............................................................................................................. 65

80250550;2

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662, 664 (2009) .............................................................................. 11, 25

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
833 A.2d 961 (Del. Ch. 2003) ................................................................................47

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 32, 61

*Bocock v. Innovate Corp.*,
2022 WL 15800273 (Del. Ch. Oct. 28, 2022) ................................................ 13, 46

*Broz v. Cellular Info. Sys., Inc.*,
673 A.2d 148 (Del. 1996) ........................................................................................47

*Burkhart v. Genworth Fin., Inc.*,
250 A.3d 842 (Del. Ch. 2020) ................................................................................27

*Caremark Int'l Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996) ..................................................................... 35, 58

*Cent. Laborers' Pension Fund v. Dimon*,
2014 WL 3639185 (S.D.N.Y. July 23, 2014), *aff'd*, 638 F. App'x 34
(2d Cir. 2016) ........................................................................................................37

*City of Roseville Employees' Ret. Sys. v. Crain*,
2011 WL 5042061 (D.N.J. Oct. 24, 2011) ...........................................................38

*City of Roseville Employees' Ret. Sys. v. Crain*,
2013 WL 9829650 (D.N.J. Sept. 26, 2013) ...........................................................39

*Constr. Indus. Laborers Pension Fund v. Bingle*,
2022 WL 4102492 (Del. Ch. Sept. 6, 2022) .........................................................38

*Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*,
385 F. Supp. 2d 449 (D. Del. 2004) .............................................................. 43, 63

*Criden v. Steinberg*,
2000 WL 354390 (Del. Ch. Mar. 23, 2000) .................................................. 43, 63

*Digene Corp. v. Ventana Med. Sys., Inc.*,
476 F. Supp. 2d 444 (D. Del. 2007) .............................................................. 31, 62

*Foulke v. Twp. of Cherry Hill*,
2024 WL 3568841 (D.N.J. July 29, 2024) ...........................................................11

80250550;2

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ....................................................................................10

*Freedman v. Beneficial Corp.*,
  406 F. Supp. 917 (D. Del. 1975) ...........................................................................32

*Gelman v. State Farm Mut. Auto. Ins. Co.*,
  583 F.3d 187 (3d Cir. 2009) ....................................................................................10

*Higher Educ. Mgmt. Grp., Inc. v. Mathews*,
  2014 WL 5573325 (Del. Ch. Nov. 3, 2014)...........................................................42

*Holliday v. Credit Suisse Sec. (USA) LLC*,
  No. 20 CIV. 5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021),
  *aff'd sub nom. In re Bos. Generating, LLC*, No. 21-2543-BR, 2024 WL
  4234886 (2d Cir. Sept. 19, 2024), *cert denied sub nom. Holliday v. Credit
  Suisse Sec.*, --- S.Ct. ----, 2025 WL 581642 (Feb. 24, 2025) ........................ 16, 18

*In re AgFeed USA, LLC*,
  546 B.R. 318 (Bankr. D. Del. 2016).......................................................................30

*In re AgFeed USA, LLC*,
  558 B.R. 116 (Bankr. D. Del 2016)......................................................... 36, 37, 39

*In re Bridgepoint Educ., Inc. S'holder Deriv. Litig.*,
  2014 WL 5325711 (S.D. Cal. Oct. 17, 2014).........................................................23

*In re Bridgeport Holdings, Inc.*,
  388 B.R. 548 (Bankr. D. Del. 2008).......................................................................60

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ....................................................................................5

*In re Camping World Holdings, Inc.*,
  2022 WL 288152 (Del. Ch. Jan. 31, 2022) ............................................. 48, 49, 50

*In re Coca-Cola Enters.*,
  2007 WL 3122370 (Del. Ch. Oct. 17, 2007).........................................................22

*In re Cred Inc.*,
  650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783
  (D. Del. 2024)........................................................................................... 21, 23, 56

*In re Ctr. City Healthcare, LLC*,
  641 B.R. 793 (Bankr. D. Del. 2022).......................................................................29

*In re Direct Response Media, Inc.*,
  466 B.R. 626 (Bankr. D. Del. 2012)............................................................. passim

*In re Exide Techs., Inc.*,
   299 B.R. 732 (Bankr. D. Del. 2003).............................................................. 26, 52

*In re F-Squared Inv. Mgmt., LLC*,
   No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019)......... 28, 54

*In re Glob. Link Telecom Corp.*,
   327 B.R. 711 (Bankr. D. Del. 2005)......................................................................26

*In re Hechinger Inv. Co. of Delaware*,
   274 B.R. 71 (D. Del. 2002) ........................................................................... 18, 34

*In re Hill*,
   342 B.R. 183 (Bankr. D.N.J. 2006)......................................................................30

*In re IT Group, Inc.*,
   2005 WL 3050611 (D. Del. Nov. 15, 2005) ........................................................60

*In re Lear Corp. S'holder Litig.*,
   967 A.2d 640 (Del. Ch. 2008)..............................................................................58

*In re Midway Games, Inc.*,
   428 B.R. 303 (Bankr. D. Del. 2010)....................................................................21

*In re Molycorp, Inc. S'holder Deriv. Litig.*,
   2015 WL 3454925 (Del. Ch. May 27, 2015) .......................................................40

*In re Nobilis Health Corp.*,
   661 B.R. 891 (Bankr. D. Del. 2024)....................................................... 35, 58, 59

*In re Oakwood Homes Corp.*,
   325 B.R. 696 (Bankr. D. Del. 2005)....................................................................26

*In re Old BPSUSH, Inc.*,
   2021 WL 4453595 D. Del. Sept. 29, 2021)..........................................................36

*In re OpenPeak, Inc.*,
   2020 WL 7360482 (Bankr. D.N.J. Dec. 14, 2020) ................................. 10, 12, 21

*In re Our Alchemy, LLC*,
   2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019) ..................................... 13, 24

*In re Pitt Penn Holding Co.*,
   484 B.R. 25 (Bankr. D. Del. 2012)......................................................................32

*In re Plassein Int'l Corp.*,
   590 F.3d 252 (3d Cir. 2009)................................................................................16

*In re Space Case*,
   2024 WL 1628440 (Bankr. D. Del. Apr. 15, 2024) ..................................... passim

v

*In re Sportco Holdings, Inc.*,
   2021 WL 4823513 (Bankr. D. Del. Oct. 14, 2021)..............................................21

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005).................................................................................42

*In re Transunion Deriv. S'holder Litig.*,
   324 A.3d 869 (Del. Ch. 2024)..............................................................................41

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   946 F.3d 66 (2d Cir. 2019)...................................................................................18

*In re Trinsum Grp., Inc.*,
   460 B.R. 379 (Bankr. S.D.N.Y. 2011) .................................................................28

*In re U.S. Mortg. Corp.*,
   492 B.R. 784 (Bankr. D.N.J. 2013)....................................................... 15, 17, 18

*In re USDigital, Inc.*,
   443 B.R. 22 (Bankr. D. Del. 2011)................................................................ 59, 60

*In re Verso Techs., Inc.*,
   2010 WL 11598054 (N.D. Ga. June 30, 2010) ............................................ 44, 64

*In re W.R. Grace & Co.*,
   626 B.R. 217 (Bankr. D. Del. 2021)......................................................................3

*In re Walt Disney Co. Deriv. Litig.*,
   907 A.2d 693 (Del. Ch. 2005).............................................................................65

*In re Wonderwork, Inc.*,
   611 B.R. 169 (Bankr. S.D.N.Y. 2020) ..................................................... 13, 14, 36

*Klang v. Smith's Food & Drug Centers, Inc.*,
   702 A.2d 150 (Del. 1997)............................................................................. 33, 34

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003)........................................................................ 19, 20

*Lavin v. Reed*,
   2023 WL 7182950 (N.D. Ill. Nov. 1, 2023)................................................. 51, 64

*Lehman Bros. Holdings, Inc. v. Kee*,
   268 A.3d 178 (Del. 2021)....................................................................................35

*Lyondell Chem. Co. v. Ryan*,
   970 A.2d 235 (Del. 2009)....................................................................................39

*Maffei v. Palkon*,
   2025 WL 384054 (Del. Feb. 4, 2025) .................................................................57

vi

*Malleus v. George*,
  641 F.3d 560 (3d Cir. 2011), *as amended* (June 6, 2011)....................................11

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  583 U.S. 366 (2018) ..........................................................................................17

*Moody v. Sec. Pac. Bus. Credit, Inc*.,
  971 F.2d 1056 (3d Cir. 1992)............................................................................28

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010).......................................................................... 22, 23

*New Enter. Assocs. 14, L.P. v. Rich*,
  295 A.3d 520 (Del. Ch. 2023) ................................................................ 22, 23, 48

*Oakwood Labs. LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021) ...............................................................................10

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988) ................................................................................20

*Orman v. Cullman*,
  794 A.2d 5 (Del. Ch. 2002) ........................................................................ 56, 57

*PHP Liquidating, LLC v. Robbins*,
  291 B.R. 603 (D. Del. 2003), *aff'd* 128 F. App'x 839 (3d Cir. 2005) .......... 19, 33

*Polk 33 Lending, LLC v. Schwartz*,
  555 F. Supp. 3d 38 (D. Del. 2021) ........................................................ 42, 44, 63

*Rojas v. Ellison*,
  2019 WL 3408812 (Del. Ch. July 29, 2019)......................................................38

*Salit Auto Sales, Inc. v. CCC Info. Servs. Inc.*,
  No. 19-18107, 2020 WL 5758008 (D.N.J. Sept. 28, 2020) .......................... 31, 61

*Schmidt v. Skolas*,
  706 F. App'x 68 (3d Cir. 2017).............................................................. 24, 39, 58

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  476 B.R. 715 (S.D.N.Y. 2012) ...........................................................................17

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  773 F.3d 411 (2d Cir. 2014) ...............................................................................17

*Segway, Inc. v. Cai*,
  2023 WL 8643017 (Del. Ch. Dec. 14, 2023) ............................................... 38, 41

*Shabbouei v. Potdevin*,
  C.A. No. 2018-0847-JRS, 2020 WL 1609177 (Del. Ch. Apr. 2, 2020)...............54

*Stone v. Ritter*,
　　911 A.2d 362 (Del. 2006)........................................................................36

*SV Inv. Partners, LLC v. ThoughtWorks, Inc.*,
　　7 A.3d 973 (Del. Ch. 2010) ...................................................................24

*Swift v. Pandey*,
　　2014 WL 1366436 (D.N.J. Apr. 7, 2014)...............................................21

*Tilden v. Cunningham*,
　　2018 WL 5307706 (Del. Ch. Oct. 26, 2018)..................................... 45, 48, 49, 50

*Weiland v. Palm Beach Cnty. Sheriff's Office*,
　　792 F.3d 1313 (11th Cir. 2015) .............................................................11

**Statutes**

10 Del. C. § 8106 .................................................................... 25, 32, 34, 52

11 U.S.C. § 101(22)(A).............................................................................18

11 U.S.C. § 101(32) ...................................................................................28

11 U.S.C. § 101(53A) ................................................................................16

11 U.S.C. § 1125(a)(1)...............................................................................20

11 U.S.C. § 544(b) .......................................................... 14, 25, 26, 34

11 U.S.C. § 546(e) ............................................................................ passim

11 U.S.C. § 548(a)(1)........................................................... 26, 27, 30

15 U.S.C. § 78c(23)(A)..............................................................................17

6 Del. C. § 1304(a)............................................................................. passim

6 Del. C. § 1304(b)....................................................................................30

8 Del. C. § 102(b)(7)..................................................................................60

8 Del. C. § 154 ...........................................................................................33

8 Del. C. § 160 ........................................................................... 19, 33, 34

**Rules**

Fed. R. Bankr. P. 7012(b) ...........................................................................1

Fed. R. Civ. P. 12(b)(6)............................................................................2, 11

Fed. R. Civ. P. 8(a)...................................................................................2, 11

Fed. R. Civ. P. 9(b) ...................................................................... 2, 26, 30

Defendants Joshua Silberstein ("Silberstein") and Everything's Coming Up Millhouse, LLC ("Millhouse") submit this memorandum of law in support of their motion to dismiss the Complaint filed by META Advisors, LLC ("Plaintiff") in its capacity as Trustee to the Thrasio Legacy Trust ("Trust"), the successor-in-interest to the claims of chapter 11 debtor Thrasio Holdings, Inc. ("Thrasio" or "Company").

Silberstein and Millhouse do not consent to entry of final orders or judgment by the bankruptcy court in this adversary proceeding. Fed. R. Bankr. P. 7012(b).

## Introduction

This adversary proceeding is part of an orchestrated plan designed to extract money from a select group of Thrasio's former officers and directors for the purpose of distributing funds to some of Thrasio's creditors, no matter the merits of the alleged claims. Plaintiff drafted the Complaint with the benefit of witness interviews; all of the Company's records and communications; and the findings of a months-long investigation by two Thrasio "disinterested directors." Against that backdrop, the dearth of factual allegations in the Complaint is perplexing, and telling, as is Plaintiff's impermissible reliance on group pleading, conclusory allegations, unreasonable inferences, and innuendo.

Despite its 375 paragraphs with allegations that span from Thrasio's inception in 2018 until 2022, the Complaint frames this case through a myopic lens

1

that filters out context and pretends that Thrasio was immune from real world events. The Complaint, for example, doesn't even mention Covid. This is a stunning omission given Thrasio's filings in the bankruptcy case, which confirm what is undeniable: the Covid pandemic had sudden, unexpected, and profound impacts on all aspects of Thrasio's business, initially for the better but ultimately for the worst.

Based on hindsight, speculation, and conclusory allegations, this lawsuit seeks to hold a handful of former officers and directors personally liable for how Thrasio operated during its first five years in business, a period that included some of the most turbulent conditions in e-commerce history. Plaintiff's claims are incompatible with well-settled principles of corporation law and the pleading requirements of Fed. R. Civ. P. 8(a), 9(b) and 12(b)(6). For the many reasons discussed below, Silberstein and Millhouse respectfully request that the Court dismiss all 15 claims asserted against them in the Complaint: Counts 1 through 10, 13, 14, 17, 25, and 26. A table summarizing the multiple grounds for dismissal of each claim appears as Appendix A to this memorandum.

2

## Factual Background[1]

### Thrasio Evolves From a Start-Up to a Dominant Aggregator of Online Brands Under Silberstein's Leadership

Defendants Joshua Silberstein and Carlos Cashman co-founded Thrasio in 2018 and served as co-CEOs and members of Thrasio's board of directors until Silberstein's departure in September 2021. Compl. ¶¶ 30, 31, 41. Thrasio is known as an "aggregator" of online retail sellers. From the beginning, its business has focused on (1) acquiring companies that sell products online, particularly through Amazon; (2) consolidating them into Thrasio's platform; and (3) expanding their footprint and sales in the "e-commerce marketplace." Domb Decl., Ex. 1 ("CFO Decl.") ¶¶ 1, 2, 11-15; Compl. ¶ 6.[2]

Under Silberstein's and Cashman's leadership, Thrasio acquired some of its most successful brands and "evolved from a small start-up to become [one of the] largest aggregator[s] of e-commerce brands." Ex. 1 (CFO Decl.) ¶¶ 11, 15-18.

---

[1]  Unless otherwise noted, sources for the factual statements in this section are non-conclusory allegations in the Complaint filed December 3, 2024 ("Complaint"); documents that are integral or central to the Complaint's allegations; documents filed in the Bankruptcy Court docket ("Bankr. Doc.") for the underlying chapter 11 case (case no. 24-11840-CMG); and public information of which the Court may take judicial notice. Allegations in the Complaint are assumed to be true only for purposes of this motion.

[2] The Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First Day Motions (Bankr. Doc. 38) ("CFO Decl.") is attached as Exhibit 1 to the Declaration of Martin Domb ("Domb Decl."). As a sworn representation of Thrasio filed in the underlying chapter 11 case, it may be relied on by the Court on a motion to dismiss. *In re W.R. Grace & Co.*, 626 B.R. 217, 237 (Bankr. D. Del. 2021) ("a bankruptcy court may take judicial notice of its own docket entries, its own records, and contents of court records from other courts in related matters").

3

Audited annual financial statements show that Thrasio's sales revenue grew from around $4 million for its first nine months in business (April-December 2018) to $53 million in 2019, $345 million in 2020, $891 million in 2021, and $1.26 billion in 2022.

Much of Thrasio's growth was driven by sudden and unprecedented changes in the e-commerce market. Beginning in early 2020, the Covid pandemic "radically accelerated" the growth of online shopping, causing an unexpected and dramatic surge in demand for e-commerce. Ex. 1 (CFO Decl.) ¶¶ 39-43. Thrasio's well-stocked inventory and business model allowed it to thrive as "demand for online retail skyrocketed." *Id.* ¶¶ 39, 43. This was the context in which Thrasio's tender offer and the D&O Defendants' secondary sales took place. Compl. ¶¶ 59, 65, 79.

### Thrasio Nets More Than $112 Million in Combined Stock Sales and a Tender Offer

As stated in the Disinterested Directors Report ("DDR"), Thrasio entered into a Series C Preferred Stock Purchase Agreement in July 2020 ("Series C Agreement"). Domb Decl., Ex. 2 (DDR) ¶ 50.[3] In the Series C Agreement, Thrasio agreed to: (i) sell and issue approximately 5.6 million shares to third-party investors for approximately $259 million, net of issuance costs (the "Series C-1

---

[3] The Court may take judicial notice of the DDR (attached as Exhibit 2 to the Domb Declaration), which Plaintiff filed in support of the First Amended Joint Plan of Reorganization (Bankr. Doc. 805). See footnote 2 above.

4

Stock Issuance"); and then (ii) use a portion of the proceeds from the Series C-1

Stock Issuance to repurchase outstanding shares of stock, vested warrants, and

options ("Tender Offer"). *Id.*; Compl. ¶ 59. Thrasio had no obligation to launch the

Tender Offer if the initial closing of the Series C-1 Stock Issuance did not occur.

Ex. 2 (DDR) ¶ 51.

In August 2020, Thrasio retained The NASDAQ Private Market, LLC

("NPM") as information agent and SMTX, LLC ("SMTX") as depository and

paying agent to complete the Tender Offer, repurchasing approximately three

million shares from existing shareholders for an aggregate price of

$144,941,591.75, and retiring the tendered shares. Domb Decl., Ex. 3 ("Board

Approval"), at 1 & Ex. B;[4] *see also* Compl. ¶¶ 60, 62. Thrasio's entire board voted

to approve the Tender Offer, and several officers and directors, including

Silberstein, participated. Compl. ¶¶ 59, 61. Outside shareholders also participated

and collectively received more than 60% of the Tender Offer distribution. *Id.* ¶ 61.

---

[4]Although Plaintiff strategically failed to disclose in the Complaint the roles played by NPM and
SMTX in the Tender Offer, this information was set forth in the Action by Unanimous Written
Consent of the Board of Directors of Thrasio approving the Tender Offer ("Board Approval"),
which also included the Information and Paying Agent Agreement ("IPAA") among NPM,
SMTX and Thrasio. Domb Decl., Ex. 3 (Board Approval), at 1 & Ex. B. The Court may consider
the Board Approval because Plaintiff "relied on these documents in framing the complaint." *In
re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot
prevent a court from looking at the texts of the documents on which its claim is based by failing
to attach or explicitly cite them."); *see* Compl. ¶¶ 59, 63, 130-137 (alleging claim for relief based
on board's approval of Tender Offer).

After accounting for the Tender Offer, Thrasio netted over $112 million in cash from the Series C-1 Stock Issuance. Ex. 2 (DDR) ¶ 51; Compl. ¶ 59. Even if the Tender Offer were viewed independently from the Series C-1 Stock Issuance (which is contrary to the Series C Agreement), sophisticated and highly-experienced third-party equity investors in the Series C-1 Stock Issuance concluded, based on due diligence, that the Company retained significant equity value following the Tender Offer. Ex. 2 (DDR) ¶ 53.

### Silberstein Separation Agreement

Silberstein left Thrasio on September 25, 2021. Compl. ¶ 122. Upon his departure, he and Thrasio entered into a Separation Agreement and Mutual Release ("Silberstein Separation Agreement"), which the Thrasio board unanimously approved the same day. *Id.*

In the Silberstein Separation Agreement, Silberstein agreed, among other things: (i) to non-compete and non-solicitation provisions; (ii) to stringent restrictions on his sales of Thrasio stock; (iii) to transfer additional Thrasio shares, for no consideration, to purchasers in the July and August 2021 Secondary Sales if Thrasio consummated a subsequent equity financing at a lower price per share (which occurred and Silberstein complied with); (iv) to indemnify Thrasio for any losses arising out of any claims or demands in connection with the July and August 2021 Secondary Sales (which Silberstein also has complied with); and (v) to

6

release Thrasio from any claims he might have with respect to the separation, sparing Thrasio from "a potentially value-destructive public dispute – and potential litigation – with its departing co-founder and Co-CEO." Ex. 2 (DDR) ¶ 48. In exchange, Thrasio agreed, among other things, to release Silberstein from any claims "arising from facts that occurred before the date of the agreement," apart from any claims "arising from Silberstein's 'grossly negligent actions, fraudulent conduct, or any felony criminal conduct [unknown to Thrasio],' in addition to claims based on Silberstein's indemnity obligation." Compl. ¶ 124.

Following Silberstein's departure, Cashman remained as sole CEO for nearly another year, until August 1, 2022, and as a director until the Plan was confirmed in June 2024. *Id.* ¶ 126.

### Thrasio Files for Bankruptcy

Following Silberstein's departure, Thrasio's board of directors installed a new management team and hired consultants to help "lead an operational transformation." Ex. 1 (CFO Decl.) ¶¶ 48-49; Ex. 2 (DDR) ¶ 35. The decisions made by the new management team unfortunately failed to maintain the "significant equity value" that Thrasio had in October 2021 (a month after Silberstein departed), Ex. 2 (DDR) ¶ 45, and the Company faced a tumultuous transition period while incurring substantial losses. Most importantly, during that period, e-commerce market demand – which had "skyrocketed in 2020 and

7

2021" – "unpredictably" and "unexpectedly decreased" in late 2021 and early 2022. Ex. 1 (CFO Decl.) ¶¶ 3, 41, 48. It was this dramatic change in market conditions – not any actions by Silberstein years before – that most directly led to the Company's bankruptcy. *Id.*

Thrasio filed a chapter 11 petition on February 28, 2024 ("Petition Date") – nearly 2½ years after Silberstein's departure. Compl. ¶ 21. The initial proposed plan for reorganization provided only $250,000 for distribution to general unsecured creditors (Bankr. Doc. 398 at 8), which, according to the certified votes on the Plan, collectively held about $385 million in claims (Bankr. Doc. 1100 at 6). That proposal was unacceptable to the unsecured creditors.

In an effort to appease the unsecured creditors and secure their votes, Plan proponents dropped the $250,000 set-aside in favor a litigation-driven strategy designed to extract money from Silberstein and a handful of other former officers and directors of Thrasio (the "D&O Defendants" in this case). To that end, the Plan established the Trust, funded it with $5 million, and empowered and incentivized it to bring claims against the D&O Defendants, with the unsecured creditors eligible to receive *a portion* of any recovery. Plan (Bankr. Doc. 1124), pp. 105-06 of 152, definitions 163-177.[5] To provide a semblance of legitimacy for this strategy,

---

[5]  Bankr. Doc. 1124, consists of the Bankruptcy Court's findings of fact, conclusions of law, and order confirming the Plan (pp. 1-85 of 152) and, as its Exhibit A, the Plan (pp. 86-152).

Thrasio submitted the DDR in support of the First Amended Joint Plan of

Reorganization. *See generally* Ex. 2 (DDR). While the DDR conveniently opined

that Thrasio *may* have certain causes of action against Silberstein and three other

former officers and directors of Thrasio, it found no basis for claims against

Silberstein or Millhouse based on the Tender Offer or the Silberstein Separation

Agreement. *Id.* ¶¶ 47-54.

Based on the materials submitted in support of the Plan, including the DDR,

the Court confirmed the Plan on June 13, 2024. Bank. Doc. 1124. The Court closed

the bankruptcy case for Thrasio (and all its affiliated debtors) on August 22, 2024,

and left open for any remaining matters the "Remaining Case of 1 Thrasio One,

Inc. [the reorganized debtor], Case No. 24-11850." Bankr. Doc. 1983, p. 11 of 13.

## Plaintiff Files This Adversary Proceeding

Plaintiff commenced this adversary proceeding on December 23, 2024 by

filing the Complaint (ECF No. 1) in the Bankruptcy Court. On February 18, 2025,

Silberstein and Millhouse moved to withdraw the standing reference to the

Bankruptcy Court with respect to this adversary proceeding, and to transfer the

action to the United States District Court for the District of New Jersey (ECF No.

43). The motion to withdraw the reference, which was transmitted to the District

Court the following day (ECF No. 48), has not been fully briefed.

9

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint's "factual allegations 'must be enough to raise the right to relief above the speculative level' and should 'plausibly suggest' that the pleader is entitled to relief.'" *In re OpenPeak, Inc.*, 2020 WL 7360482, at *8 (Bankr. D.N.J. Dec. 14, 2020). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief" – it "has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). *See also Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) ("'[If] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.'"). Only well-pleaded factual allegations "are entitled to the assumption of truth." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 911 (3d Cir. 2021). Conclusory allegations, unwarranted inferences, and legal conclusions are not accepted as true, and thus cannot defeat a motion to dismiss. *Id.* at 904; *In re OpenPeak, Inc.*, 2020 WL 7360482, at *8-9.

Courts in the Third Circuit apply the following three-step analysis to assess the sufficiency of a plaintiff's allegations:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual

allegations, a court should assume their veracity and then determine
whether they plausibly give rise to an entitlement for relief."

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), *as amended* (June 6, 2011)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009)).

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS AN IMPERMISSIBLE GROUP PLEADING

As an improper "group" or "shotgun" pleading, the Complaint violates Fed.

R. Civ. P. 8(a) because it asserts "'multiple claims against multiple defendants

without specifying which of the defendants are responsible for which acts or

omissions, or which of the defendants the claim is brought against.'" *Foulke v.

Twp. of Cherry Hill*, 2024 WL 3568841, at *7 (D.N.J. July 29, 2024) (quoting

*Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir.

2015)). "[P]leadings of this nature have long been criticized," and subject to

dismissal, because "they fail[,] to one degree or another and in one way or another,

to give the defendants adequate notice of the claims against them and the grounds

upon which each claim rests." *Id.* at *7-8.[6] Plaintiff's "use of the pen for broad

strokes is common throughout the [Complaint]," rendering it virtually impossible

---

[6] In further violation of Rule 8, the Complaint also contains "'conclusory, vague, and immaterial
facts not obviously connected to any particular cause of action.'" *See Foulke*, 2024 WL 3568841,
at *8. These types of allegations are addressed in the arguments below for dismissal under Rule
12(b)(6) for failure to state a claim. *See* Points II-VI below.

11

to "determine[e] who is responsible for what and to whom." *OpenPeak, Inc.*, 2020
WL 7360482, at *20.

*First*, the Complaint makes it impossible to determine what each Defendant
allegedly knew or did. It asserts 26 claims and names 11 defendants: seven
individuals, all of whom are grouped together as the "D&O Defendants," and four
entities, which, along with the D&O Defendants, are grouped together as
"Defendants." Compl. at 1. These all-encompassing terms are not used sparingly:
the Complaint refers to the D&O Defendants and Defendants over 100 times. And
when claims are made against fewer than all Defendants, the Complaint lists their
names and then makes undifferentiated allegations against all of them. *E.g.*, *id.*
¶¶ 212, 217, 220, 229, 231. But the lack of clarity doesn't end there. The
Complaint is also rife with allegations of poor decision-making that Plaintiff
attributes to Thrasio and various unidentified members of its board and/or
management, finance, and accounting teams. *Id.* ¶¶ 13, 46, 53, 67, 84, 111, 112,
125, 129.

*Second*, the Complaint makes it impossible to determine what entity was
harmed by the alleged conduct. In fact, the Complaint indicates that all or part of
the asserted claims arise from damages purportedly suffered, not by Thrasio, but
by unnamed lenders, creditors, investors, and "other stakeholders." *E.g.*, *id.* ¶¶ 1,
15, 51, 80, 230. For example, in reference to Thrasio's "unsecured creditors," the

12

Complaint states: "[t]his action seeks damages to compensate **them** for the D&O

Defendants' wrongful conduct." *Id.* ¶ 15 (emphasis added). Yet, it does not

identify these nonparties or explain the nature of their purported claims against the

estate.

  ***Third***, group pleading is particularly problematic here, where fiduciary duty

claims are asserted against multiple former officers and directors, on behalf of

unidentified entities, for conduct that allegedly occurred over a five-year period.

*See In re Our Alchemy, LLC*, 2019 WL 4447541, at \*10 (Bankr. D. Del. Sept. 16,

2019) ("To state a plausible claim for a breach of fiduciary duty, the plaintiff

should allege specific conduct by each individual officer or director in authorizing

the challenged transaction."); *Bocock v. Innovate Corp.*, 2022 WL 15800273, at

\*15 (Del. Ch. Oct. 28, 2022) ("When it comes to fiduciary duty claims: 'A plaintiff

must adequately plead a breach of fiduciary duty claim against each individual

director or officer; so-called 'group pleading' will not suffice.'"); *In re*

*Wonderwork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020) ("'[A] plaintiff may

not rely on group pleading to assert a breach of fiduciary duty claim.'").

  The group pleading is especially inexcusable because Plaintiff spent months

investigating and had access to witness interviews and Thrasio's voluminous

records and communications. That Plaintiff still relies on wholesale group pleading

and conclusory allegations indicates that the asserted claims lack factual support,

and are therefore legally insufficient. But as a threshold matter, Rule 8 does not allow Plaintiff to force Silberstein and each Defendant to speculate about, among other things, who allegedly did what, when, to whom, and how. Because the Complaint fails to provide sufficient notice, it should be dismissed. *E.g.*, *In re Wonderwork, Inc.*, 611 B.R. at 199-201.

## II.    PLAINTIFF FAILS TO STATE A CLAIM BASED ON THE TENDER OFFER (Counts 1 through 6)

Plaintiff alleges six claims based on the Thrasio board's decision in July 2020 to use a portion of the $260 million it received in its Series C-1 round of funding to repurchase approximately $145 million in Thrasio stock from inside and outside shareholders. Compl. ¶¶ 59-64, 130-194. Plaintiff primarily attempts to avoid the Tender Offer as a "fraudulent transfer" under 11 U.S.C. § 544(b), which provides that the "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b); Compl. ¶¶ 138-15, 156-75 (Counts 2 and 3). Plaintiff also seeks the same relief under other state-law theories: breach of fiduciary duty (Count 1), conspiracy (Count 4), Delaware statutory law (Count 5) and unjust enrichment (Count 6).

As explained below, Plaintiff's claims relating to the Tender Offer are not only legally insufficient; they are also expressly barred by the Bankruptcy Code's

safe harbor provision, judicially estopped by Plaintiff's prior representations to the Court, and proscribed by the business judgment rule.

### A.    Section 546(e)'s Safe Harbor Bars All Tender Offer Claims

Section 546(e) of the Bankruptcy Code provides a safe harbor barring avoidance under section 544 of most transfers affecting the securities markets: "Notwithstanding sections 544 [and other sections], the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of)" certain covered entities – "a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency" – or that "is a transfer made by or to (or for the benefit of)" such qualifying entities "in connection with a securities contract." 11 U.S.C. § 546(e). To fall within § 546(e)'s safe harbor, therefore, the transfer must satisfy two requirements: (1) it must be a qualifying payment, such as a securities settlement payment or a transfer in connection with a securities contract, and (2) it must be made by, to, or for the benefit of a stockbroker or other covered entity.

The first requirement is clearly met here. The "Third Circuit has interpreted the term 'settlement payment' very broadly" to include essentially any "transfer of cash or securities made to complete a securities transaction." *In re U.S. Mortg. Corp.*, 492 B.R. 784, 806 (Bankr. D.N.J. 2013). In this Circuit, "settlement payments" under the § 546(e) safe harbor include transactions not only in publicly

15

traded shares, but also in private securities where the payment did not "travel through the settlement system." *In re Plassein Int'l Corp.*, 590 F.3d 252, 258 (3d Cir. 2009). Because Thrasio's payment of approximately $150 million to its shareholders was made to "complete a securities transaction" (*i.e*., the Tender Offer), it was a "settlement payment" under § 546(e). *Holliday v. Credit Suisse Sec. (USA) LLC*, No. 20 CIV. 5404 (GBD), 2021 WL 4150523, at *4 (S.D.N.Y. Sept. 13, 2021) (transfer in connection with a tender offer "is a settlement payment protected by the safe harbor"), *aff'd sub nom. In re Bos. Generating, LLC*, No. 21-2543-BR, 2024 WL 4234886 (2d Cir. Sept. 19, 2024), *cert denied sub nom. Holliday v. Credit Suisse Sec.*, --- S.Ct. ----, 2025 WL 581642 (Feb. 24, 2025).[7]

The second requirement is also met because the payments were made "by or to (or for the benefit of)" a stockbroker or securities clearing agency under § 546(e). A stockbroker, as defined in § 101(53A) of the Bankruptcy Code, includes a person like a registered broker-dealer "with respect to which there is a customer . . . and [] that is engaged in the business of effecting transactions in securities [] for the account of others." 11 U.S.C. § 101(53A); *Sec. Inv. Prot. Corp.*

---

[7] Alternatively, Thrasio's distribution constituted a "transfer . . . in connection with a securities contract." The Bankruptcy Code defines a "securities contract" to include any "contract for the purchase, sale, or loan of a security … and … any repurchase … transaction on any such security." 11 U.S.C. § 741(7)(A)(i); *In re Bos. Generating, LLC*, No. 21-2543-BR, 2024 WL 4234886, at *2 (2d Cir. Sept. 19, 2024) (transactions associated with tender offer constitute transfers executed in connection with a securities contract).

16

*v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (registered

securities broker-dealer qualifies as "stockbroker" under Bankruptcy Code), *aff'd*

773 F.3d 411 (2d Cir. 2014). A "clearing agency" is "any person who acts as an

intermediary in making payments or deliveries or both in connection with

transactions in securities," including "any person, such as a securities depository,

who (i) acts as a custodian of securities . . . , or (ii) otherwise permits or facilitates

the settlement of securities transactions." 15 U.S.C. § 78c(23)(A).

Through a combination of artful pleading and strategic omission, the

Complaint describes the Tender Offer without indicating how it was accomplished.

Compl. ¶¶ 59-64. The Thrasio board's approval of the Tender Offer, however,

confirms that SMTX, LLC served as Thrasio's depository and paying agent. Ex. 3

(Board Approval), at 1. In that role, SMTX – a registered broker-dealer – held the

proceeds used for the Tender Offer pending settlement, then distributed those

proceeds in accordance with the terms of a written Information and Paying Agent

Agreement ("IPAA") approved by the entire board. *Id.* Ex. B at 1 & § 6.3.

SMTX's role indisputably fits within the definitions of stockbroker and securities

clearing agency. *In re U.S. Mortg. Corp.*, 492 B.R. at 791, 816 (safe harbor applied

due to involvement of "a securities broker-dealer," since "Section 546(e) applies

when a transfer is made by, to or for the benefit of a stockbroker"); *see also Merit

Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 384 (2018) ("If the transfer

17

that the trustee seeks to avoid was made 'by' or 'to' a securities clearing agency . . . then § 546(e) will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary").[8]

Because the Tender Offer payments were settlement payments made by, to or for the benefit of a stockbroker, the § 546(e) safe harbor applies. Plaintiff "may not exercise the vested state law intentional and constructive fraudulent conveyance claims to avoid a transfer," and Counts 2 and 3 must therefore be dismissed. *Holliday*, 2021 WL 4150523, at *8. But the safe harbor also requires dismissal of Counts 1, 4, 5 and 6, which attempt to "circumvent[] the provisions of § 546(e) by merely re-labeling [fraudulent transfer] claims but seeking essentially the same relief" with respect to the same securities transaction. *U.S. Mortg. Corp.*, 492 B.R. at 817 (section 546 safe harbor bars conspiracy claim); *In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 95-98 (D. Del. 2002) (dismissing unjust enrichment claim "based on the same facts and seeking essentially the same relief" as fraudulent transfer claim barred by § 546(e)); *PHP Liquidating, LLC v. Robbins*,

---

[8] Alternatively, SMTX may be considered a "financial institution," which includes not only a bank or similar institution, but also any "customer" for which the financial institution "is acting as agent . . . in connection with a securities contract." 11 U.S.C. §101(22)(A). Numerous courts have held that entities in Thrasio's position, as customers, constituted financial institutions for purposes of applying § 546(e)'s safe harbor. *E.g., In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 78-80 (2d Cir. 2019) (debtor was a "financial institution" for purposes of § 546(e) where it retained an institution that "received and held Tribune's deposit of the aggregate purchase price for the shares," "received tendered shares," "retained them on Tribune's behalf" and "paid the tendering shareholders.").

291 B.R. 603, 607 (D. Del. 2003) (Section 546(e) bars claims under Del. GCL

§ 160 if brought by trustee), *aff'd* 128 F. App'x 839 (3d Cir. 2005).

Accordingly, Counts 1 through 6 are barred by the § 546(e) safe harbor and

should be dismissed.

### B.     The Disinterested Directors Report Bars All Tender Offer Claims

Plaintiff is also judicially estopped from bringing claims concerning the

Tender Offer. Judicial estoppel applies when a party takes two positions in the

same proceeding that are irreconcilably inconsistent, and the party changed its

position "in bad faith—*i.e.*, with intent to play fast and loose with the court."

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d

314, 319 (3d Cir. 2003) (citations omitted).

In seeking confirmation of the Plan, Plaintiff informed the Court that it has

no claim against Defendants with regard to the Tender Offer. The DDR – which

Plaintiff submitted as an exhibit to the Plan Supplement (Bankr. Doc.

805) – concluded, *inter alia,* that the estate had "***no viable claims worthy of***

***pursuit with respect to the Tender Offer***," in part because "the Company had

significant equity value after accounting for the Tender Offer." Ex. 2 (DDR) ¶¶ 53,

54 (emphasis added). This determination was made after an extensive independent

investigation that included review of over 2.3 million documents and interviews of

15 witnesses. *Id.* ¶ 4. In reliance on Plaintiff's representations in the DDR, the
Court approved the Joint Plan. Bankr. Doc. 1124, 1143.

Having obtained the decision it desired, Plaintiff cannot change course and
bring claims it affirmatively disavowed. It is well-settled that "judicial estoppel [i]s
properly invoked" where a debtor's claim conflicts with a previously approved
plan of reorganization and disclosure statement. *Krystal*, 337 F.3d at 316, 321-22
("a party seeking chapter 11 bankruptcy has an affirmative duty to provide
creditors with a disclosure statement containing 'adequate information' to 'enable
a creditor to make "an informed judgment" about the Plan.'") (quoting 11 U.S.C.
§ 1125(a)(1)). Here, where Plaintiff repudiated any claims "with respect to the
Tender Offer" in the materials it submitted to the Court in obtaining Plan approval,
Plaintiff is judicially estopped from bringing the claims asserted under Counts 1
through 6.[9]

### C.    The Business Judgment Rule Bars the Tender Offer and Other Claims

Silberstein and Millhouse hereby respectfully adopt the arguments on the
business judgment rule set forth in Point I of *Defendants Carlos Cashman, Mounir
Ouhadi, Aditya Rathod, And Cashman Family Investment II, LLC's Memorandum*

---

[9] Alternatively, the doctrine of equitable estoppel similarly prevents a party from contradicting a
final plan of reorganization relied upon by creditors. *Oneida Motor Freight, Inc. v. United Jersey
Bank*, 848 F.2d 414 (3d Cir. 1988).

80250550;2

*Of Law In Support Of Motion To Dismiss*. Because Plaintiff improperly asks this Court to second-guess unanimous decisions of Thrasio's full board, and fails to allege that a majority of the board was impaired, the business judgment rule bars all claims based on board-approved actions, namely Counts 1 through 6, 9, 10, 13, 14, 17, 25, and 26.

### D.    Count 1 Fails To Allege Breach of the Fiduciary Duty of Loyalty

Under Delaware law, generally "'[t]here are two ways to breach the duty of loyalty: (1) self-dealing and (2) failure of oversight.'" *In re OpenPeak, Inc.*, 2020 WL 7360482, at *11 (quoting *In re Midway Games, Inc.*, 428 B.R. 303, 318 (Bankr. D. Del. 2010)).[10] Count 1 relies on alleged self-dealing. Compl. ¶¶ 134, 136. To establish this claim, "'plaintiff[] must show that [Silberstein] either (1) stood on both sides of the transaction and dictated its terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally.'" *In re Cred Inc.*, 650 B.R. 803, 830 (Bankr. D. Del. 2023)

---

[10] Delaware law applies to the fiduciary duty and corporate waste claims because Silberstein was an officer and director of Thrasio, "a corporation organized under the laws of Delaware." (Compl. ¶¶ 30, 41.) "'[U]nder New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs.'" *Swift v. Pandey*, 2014 WL 1366436, at *7 (D.N.J. Apr. 7, 2014). The internal affairs doctrine holds that "'anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders.'" *Id.* Claims against directors and officers for alleged breach of fiduciary and corporate waste fall squarely within the doctrine. *Id.* (applying Delaware law to fiduciary claims against former officers and directors); *In re Sportco Holdings, Inc.*, 2021 WL 4823513, at *5 (Bankr. D. Del. Oct. 14, 2021) (internal affairs doctrine applies to claims based on fiduciary duty and corporate waste).

(dismissing aiding and abetting claim where trust failed to state a claim for breach of the duty of loyalty) (quoting *In re Coca-Cola Enters.*, 2007 WL 3122370, at *4 (Del. Ch. Oct. 17, 2007)), *aff'd*, 658 B.R. 783 (D. Del. 2024).

Beyond being subject to the safe harbor, judicial estoppel and the business judgment rule, as discussed above, Count 1 should be dismissed because the fiduciary claim is (1) preempted by contract, (2) insufficiently alleged, and (3) time-barred in its entirety.

### 1. Count 1 is preempted by contract.

Under Delaware law, "contractual obligations preempt overlapping fiduciary duty claims that arise out of the same set of facts." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 562-64 (Del. Ch. 2023) (discussing cases). As the Delaware Supreme Court explained this "well-settled principle": "[W]here a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (affirming dismissal of fiduciary duty claim where dispute involved contractual rights to redeem shares).

Thrasio's board approved the Tender Offer on July 18, 2020, shortly after Thrasio closed on its Series C-1 Stock Issuance. Compl. ¶¶ 59-60. Though not

alleged in the Complaint, the Tender Offer and the Series C-1 Stock Issuance were part of the Series C Agreement, which was a single, integrated contract approved by the board. Ex. 2 (DDR) ¶¶ 50, 51. The Series C Agreement governed both transactions, including the terms and conditions under which the Tender Offer could be launched. *Id.* ¶ 51. Accordingly, disputes relating to the Tender Offer are governed by the Series C Agreement, thus foreclosing Count 1. *See Nemec*, 991 A.2d at 1129; *New Enter. Assocs. 14, L.P.*, 295 A.3d at 562-64.[11]

### 2. Plaintiff fails to allege self-dealing.

Even if not preempted by contract, Count 1 fails to state a claim because the Complaint does not plead that Silberstein "(1) stood on both sides of the [Tender Offer] and dictated its terms in a self-dealing way, or (2) received in the [Tender Offer] a personal benefit that was not enjoyed by the shareholders generally.'" *See In re Cred Inc.*, 650 B.R. at 830. In fact, the allegations show that Silberstein participated in the Tender Offer *on the same terms as other shareholders*. Compl. ¶¶ 59-61. That he, along with the entire board, approved the Tender Offer does not amount to self-dealing. *In re Bridgepoint Educ., Inc. S'holder Deriv. Litig.*, 2014 WL 5325711, at *12 (S.D. Cal. Oct. 17, 2014) ("[T]he court concludes Plaintiffs have insufficiently pled the Individual Defendants stand on both sides of the

---

[11] The Complaint does not acknowledge the existence of the Series C Agreement, let alone allege that Silberstein breached any of its terms. However, when viewed in conjunction with the DDR, the allegations indicate that the Tender Offer was conducted in accordance with the agreement.

23

transaction simply by both approving the [tender] offer and intending to participate in a manner available to all other shareholders."). Nor can plaintiff transform the transaction into a viable claim by alleging, in the most conclusory fashion, that Silberstein (and other D&O Defendants) "caused the Board to approve" the Tender Offer. Compl. ¶¶ 59, 133. *See In re Our Alchemy, LLC*, 2019 WL 4447541, at *10.[12]

To the extent Plaintiff contends the Tender Offer was unfair to Thrasio, that too fails. In an apparent attempt to bolster the bald allegation that Thrasio was insolvent at the time of the Tender Offer or rendered insolvent by it (Compl. ¶ 135), the Complaint refers to losses shown in Thrasio's audited financials for the year ended December 31, 2020 (which were not issued until June 30, 2022) (*id.* ¶¶ 48, 64). But year-end financial data – as of December 31, 2020 – cannot show that Thrasio was insolvent in *July or August 2020*. Nor does Plaintiff allege insolvency under Delaware law – *i.e.*, that, at the time of the Tender Offer, Thrasio's "liabilities exceed[ed] its assets" or was "unable to pay its debts as they come due." *See SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 987 (Del. Ch. 2010). Perhaps cognizant of these deficiencies, Plaintiff caps off Count 1

---

[12] Plaintiff "makes no real challenge [or any challenge at all] to the loyalty of the majority of board members" who approved the Tender Offer, "which [further] 'undercuts any inference that the decisions of the board can be attributed to disloyalty.'" *Schmidt v. Skolas*, 706 F. App'x 68, 74 (3d Cir. 2017).

24

with the catch-all allegation that Thrasio was harmed by the Tender Offer "as well as the other [alleged] numerous breaches." Compl. ¶ 137. Such "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" fail to show unfairness or harm. *Iqbal*, 556 U.S. at 678.

### 3.    Count 1 is time-barred.

"Delaware has a three year statute of limitations to assert claims for breaches of fiduciary duties," which begins to accrue "'at the time of the alleged wrongful act, even if plaintiff is ignorant of the cause of action.'" *In re Direct Response Media, Inc.*, 466 B.R. 626, 647 (Bankr. D. Del. 2012) (citing 10 Del. C. § 8106). The two-year extension granted under the Bankruptcy Code "only applies if the limitations had not expired prior to the [bankruptcy] filing date." *Id.* The fiduciary duty claim under Count 1 is premised on the D&O Defendants' approval and participation in the Tender Offer, which occurred on July 18, 2020. Compl. ¶¶ 59, 133-136. Because the limitations period expired on July 18, 2023 – some seven months before the Petition Date – Count 1 is time-barred in its entirety.

### E.    Counts 2 and 3 Fail to Allege a Fraudulent Transfer

Plaintiff purports to challenge allegedly fraudulent transfers under 11 U.S.C. § 544(b), which provides that the "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b); Compl. ¶¶ 138-15, 156-

75.[13] Such claims must be pled with particularity. *In re Oakwood Homes Corp.*, 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud.").

Even if Plaintiff's fraudulent transfer claims were not barred by the § 546(e) safe harbor, judicial estoppel or the business judgment rule (which they are), they would fail as a matter of law for several reasons.

*First*, Plaintiff fails to identify the source of the "applicable law" under which it proceeds, other than to generically cite "appliable state law." Compl. ¶¶ 146, 164. That omission is fatal to the § 544(b) claims. Without a statement of which state law Plaintiff is invoking, neither Defendants nor the Court can determine, among other things: (1) whether Plaintiff has adequately pled the substantive elements of a particular state's fraudulent transfer law, or (2) whether the challenged transactions occurred within a particular state's "look-back" period. *See In re Exide Techs., Inc.*, 299 B.R. 732, 749 (Bankr. D. Del. 2003) (dismissing state-based fraudulent transfer claims where "Plaintiffs have failed to identify the state(s) whose laws apply to these claims"); *In re Glob. Link Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (finding state law fraudulent conveyance not

---

[13] Although the Bankruptcy Code itself provides for avoidance of allegedly fraudulent transfers under Section 548, Plaintiff does not proceed under that section, presumably because it is limited to transactions occurring within two years of the petition date. 11 U.S.C. § 548(a)(1).

sufficiently pled where plaintiff did not identify "the applicable state law, the legal standard, or any relevant facts").

**Second**, the constructive fraud claim (Count 2) requires Plaintiff to plead two elements: (1) that the debtor "did not receive 'reasonably equivalent value'" for the transfer, and (2) that the debtor "was rendered insolvent." *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 854 (Del. Ch. 2020); *see* 6 Del. C. § 1304(a)(2); *cf.* 11 U.S.C. § 548(a)(1)(B). Neither element is adequately pled.

Thrasio received equivalent value in exchange for effecting the Tender Offer, which – as the Disinterested Directors concluded after a thorough investigation – must be viewed as a single transaction with the Series C-1 Stock Issuance. Ex. 2 (DDR) ¶ 51 (Series C-1 Stock Issuance and Tender Offer were agreed to in a single contract and in a single board action; "[i]mportantly, Thrasio would not have been required to launch the Tender Offer if the initial closing of the Series C-1 Stock Issuance did not occur"). Because Thrasio "netted over $112 million in cash from the Series C-1 Stock Issuance after the Tender Offer," *id.*, the Complaint's conclusory and unsupported allegation that "Thrasio did not receive anything in return for the transfers" is palpably false. Compl. ¶ 143; Ex. 2 (DDR) ¶ 51 (concluding Thrasio's receipt of "reasonably equivalent value in connection with the Series C Agreement . . . would defeat a constructive fraudulent transfer claim").

27

The Complaint also fails to adequately plead Thrasio's insolvency at the time of the Tender Offer. The Bankruptcy Code defines insolvency as "the financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32). "Insolvency is determined as of the time of the conveyance." *Moody v. Sec. Pac. Bus. Credit, Inc*., 971 F.2d 1056, 1066 (3d Cir. 1992) (internal citation omitted); thus, "insolvency of the transferor for the purposes of the statute cannot be presumed from subsequent insolvency at a later point in time." *In re Trinsum Grp., Inc*., 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011). To make an insolvency determination, the Court must be provided with specific facts to allow it to determine whether the debtor's liabilities exceeded its assets at "the time at which the transfer took place." *Id.*

The Complaint does not allege any specific facts regarding Thrasio's assets or liabilities *at the time of the Tender Offer*. Instead, the Complaint points to Thrasio's audited 2020 financial statements to allege that Thrasio had an "operating loss," a "net loss" and an "accumulated deficit" as of December 31, 2020. Compl ¶ 64. These allegations are utterly insufficient. They do not concern the time of the alleged transfer and do not disclose Thrasio's assets or liabilities. *Id*. ¶ 14; *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *11 (Bankr. D. Del. Sept. 6, 2019) (dismissing fraudulent transfer claim where "the Complaints do not contain any specific allegations regarding Debtors' assets

or liabilities at the time of each transfer."). The Complaint's allegations of insolvency therefore are both unsubstantiated and implausible.

Indeed, these allegations fundamentally contradict Plaintiff's previous representations to this Court. The disinterested directors concluded that "a constructive fraudulent transfer claim relating to the Tender Offer is not worthy of pursuit," in part because Thrasio "***had significant equity value after accounting for the Tender Offer***," whether the Tender Offer was viewed together with, or independently from, the Series C-1 Stock Issuance. Ex. 2 (DDR) ¶¶ 52-53. And they further concluded that Thrasio's directors (including Silberstein) "likely held a good faith belief that Thrasio had a surplus or other funds with which to effectuate the Tender Offer." *Id.* ¶ 52. Having made this representation to the Court following a thorough investigation of Thrasio's potential claims, Plaintiff cannot reverse course and allege insolvency. *See In re Ctr. City Healthcare, LLC*, 641 B.R. 793, 804 (Bankr. D. Del. 2022) ("plaintiff must allege facts sufficient to support a finding that the debtor was insolvent at the time of the transfers or that the transfers rendered it insolvent").

Without any plausible allegation that Thrasio failed to receive equivalent value with respect to the Tender Offer, or that it was insolvent, Plaintiff cannot succeed on its constructive fraudulent transfer claim. Count 2 should therefore be dismissed.

***Third***, to successfully plead an actual fraudulent transfer (Count 3), Plaintiff must allege that a transfer was made with "actual intent to hinder, delay or defraud any creditor of the debtor." 6 Del. C. § 1304(a); *cf*. 11 U.S.C. § 548(a)(1)(A). It is "the intent of the transferor that is at issue, not the Transferee." *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006). Delaware law provides eleven "badges of fraud" for courts to consider. 6 Del. C. § 1304(b). Because the Complaint does not plead actual fraud with the particularity required by Rule 9(b), Count 3 must be dismissed.

In fact, the Complaint does nothing except identify the transfer, parrot the statutory language, and suggest conclusorily "the presence of a number of 'badges of fraud.'" Compl. ¶ 159. "This type of conclusory language that simply mirrors the statute is insufficient." *In re AgFeed USA, LLC*, 546 B.R. 318, 337 (Bankr. D. Del. 2016). The only attempt the Complaint makes to allege facts that satisfy any of the statutory badges of fraud is to allege that Defendants were Thrasio insiders, or related to insiders. But merely showing that insiders participated (with non-insiders) in a $150 million tender offer immediately after the Company raised $260 million in capital is insufficient to demonstrate that Defendants had an "actual intent to hinder, delay or defraud any creditor." 6 Del. C. § 1304(a).[14]

---

[14] Plaintiff also realleges that Thrasio "did not receive anything in return for the transfers" and that Thrasio was insolvent – *i.e.*, the elements of a constructive fraudulent transfer. Compl. ¶¶ 161, 163. These allegations fail for the reasons stated above.

And, as is the case with its constructive fraudulent transfer claims, Plaintiff's

actual fraud claims utterly contradict Plaintiff's previous representations to the

Court that an "estate cause[] of action for . . . actual fraudulent transfer relating to

the Tender Offer [is] not worthy of pursuit because, among other

reasons,  . . . there are no indications that Thrasio intended to hinder, delay, or

defraud its creditors." Ex. 2 (DDR) ¶ 53. Count 3 should be dismissed.

## F.     Count 4 Fails to Allege a Conspiracy

To state a claim for civil conspiracy, Plaintiff must allege "a combination of

two or more persons acting in concert to commit an unlawful act, or to commit a

lawful act by unlawful means, the principal element of which is an agreement

between the parties to inflict a wrong against or injury upon another, and an overt

act that results in damage." *Salit Auto Sales, Inc. v. CCC Info. Servs. Inc.,* No. 19-

18107, 2020 WL 5758008, at *7 (D.N.J. Sept. 28, 2020). Plaintiff's conspiracy

claim is based on an alleged agreement to fraudulently transfer the Tender Offer

payments. Compl. ¶ 178. Because the fraudulent transfer claims fail for the reasons

stated above, the conspiracy claim likewise must be dismissed. *Digene Corp. v.*

*Ventana Med. Sys., Inc*., 476 F. Supp. 2d 444, 446 (D. Del. 2007) ("Civil

conspiracy is not an independent cause of action in Delaware, but requires an

underlying wrong which would be actionable absent the conspiracy.").

31

Moreover, Plaintiff's claim for conspiracy to fraudulently transfer the Tender Offer proceeds is a "non-starter" for the separate reason that "Bankruptcy courts do not recognize claims for damages for conspiracy to commit a fraudulent transfer." *In re Pitt Penn Holding Co.*, 484 B.R. 25, 48 (Bankr. D. Del. 2012) ("a trustee cannot assert claims for conspiracy to commit a fraudulent conveyance except as avoidance and recovery actions under §§ 544, 548, and 550").

In any case, Plaintiff fails to adequately plead an agreement between the parties. The Complaint merely alleges that "Silberstein, Cashman, Horowitz, Boockvar, and Falaco all had an agreement to participate in the Tender Offer and benefit themselves at the expense of the Company." Compl. ¶ 177. Participation in a Tender Offer to redeem shares for a profit, by itself, is not illegal. The named Defendants' actions are as consistent with acting individually as with acting in concert, which cannot support a conspiracy claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) ("at the pleading stage," plaintiff alleging conspiracy must offer "allegations plausibly suggesting (not merely consistent with) agreement").

Finally, Plaintiff's conspiracy claim is time-barred under Delaware's three-year statute of limitations. 10 Del. C. § 8106; *Freedman v. Beneficial Corp*., 406 F. Supp. 917, 924 (D. Del. 1975) ("The limitations period for civil conspiracy is three years, and the statute of limitations in a civil conspiracy runs from the time of the overt act which is alleged to have caused the damages complained of even though

32

damages continue to flow indefinitely as a result of such act.") (quotations

omitted). Plaintiff's conspiracy claim is based on the August 2020 Tender Offer

(Compl. ¶ 157), and Thrasio did not file its bankruptcy petition until February 2024

(Compl. ¶ 21). Count 4 should be dismissed.

### G.    Count 5 Fails to Allege a Claim Under Del. GCL § 160

Count 5, which is based on Delaware GCL § 160, must be dismissed

because, as explained above, the claim is barred by the § 546(e) safe harbor,

judicial estoppel and the business judgment rule. *PHP Liquidating, LLC*, 291 B.R.

at 607 (§ 546(e) bars claims under Del. GCL § 160 if brought by trustee).

Moreover, to bring a claim under § 160, Plaintiff must demonstrate that, at

the time of the Tender Offer, "the capital of the corporation [wa]s impaired" or the

Tender Offer "would cause any impairment of the capital of the corporation." 8

Del. C. § 160(a)(1). "A repurchase impairs capital if the funds used in the

repurchase exceed the amount of the corporation's 'surplus,' defined by 8 Del. C.

§ 154 to mean the excess of net assets over the par value of the corporation's

issued stock." *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150, 153

(Del. 1997).

The Complaint utterly fails to demonstrate that Thrasio's capital was

impaired. Absent are specific allegations concerning the amount of Thrasio's net

assets or the par value of its issued stock, even though Plaintiff has full access to

Thrasio's books and records. The Complaint alleges only that Thrasio's liabilities exceeded its assets, Compl. ¶ 184, which is irrelevant to an impairment inquiry. *Klang*, 702 A.2d at 154 (rejecting argument that "balance-sheet net worth is controlling for purposes of determining compliance with [§ 160].").

In any case, even if the Complaint's allegations of insolvency were relevant for purposes of § 160 – which the are not – they contradict the findings of the DDR, which concluded that Plaintiff has no § 160 claim against Silberstein. Ex. 2 (DDR) ¶ 52 (given Thrasio's solvency at the time of the Tender Offer, "a claim asserting that the Tender Offer constituted an unlawful stock purchase or redemption under Delaware General Corporation Law is not worthy of pursuit").

### H.   Count 6 Fails to Allege Unjust Enrichment

In addition to being barred by the § 546(e) safe harbor, the doctrine of judicial estoppel and the business judgment rule, Plaintiff's unjust enrichment claim "is preempted because the Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy." *Hechinger*, 274 B.R. at 97 (the Bankruptcy Code "explicitly limits and displaces state law by setting forth federal limits on the use of state law avoidance powers under Section 544.").

In addition, Plaintiff's unjust enrichment claim is time-barred under Delaware's three-year statute of limitations. 10 Del. C. § 8106; *Lehman Bros.*

34

*Holdings, Inc. v. Kee*, 268 A.3d 178, 185 (Del. 2021). Unjust enrichment

"'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff

is ignorant of the cause of action." *Id.* Plaintiff's unjust enrichment claim is based

on the August 2020 Tender Offer (Compl. ¶ 157), and Thrasio did not file its

bankruptcy petition until February 2024 (*id.* ¶ 21). The unjust enrichment claim is

time-barred, and Count 6 should therefore be dismissed.

## III.    PLAINTIFF FAILS TO STATE A CLAIM BASED ON THRASIO'S INTERNAL CONTROLS AND INVENTORY (Counts 7 and 8)

### A.    Count 7 Fails to Allege a *Caremark* Claim Based on "Inadequate Accounting and Inventory Controls"

Count 7 alleges that Silberstein (and five other D&O Defendants) breached

the duty of loyalty by failing to "fix" Thrasio's "inadequate internal accounting

and inventory." Compl. ¶¶ 199, 204. A duty of loyalty claim based on oversight

failures is known as a "*Caremark* claim," which is "possibly the most difficult

theory in corporation law upon which a plaintiff might hope to win a judgment." *In

re Nobilis Health Corp.*, 661 B.R. 891, 904 (Bankr. D. Del. 2024).[15] The claim

requires a plaintiff to allege facts establishing one of the following prongs:

> [1] the directors [or officers] utterly failed to implement any reporting
> or information system or controls; or

---

[15] "*Caremark* claim" is named after the decision in *Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

> [2] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

*In re AgFeed USA, LLC*, 558 B.R. 116, 126 (Bankr. D. Del. 2016) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). Under either prong, "a showing of bad faith conduct . . . is essential to establish director [or officer] oversight liability." *Stone*, 911 A.2d at 369-70. That "requires a showing that the directors [or officers] knew that they were not discharging their fiduciary obligations." *Id.* at 369. Gross negligence is not enough. *In re Old BPSUSH, Inc.*, 2021 WL 4453595, at \*11-12 (D. Del. Sept. 29, 2021) ("Loyalty claims predicated on bad faith must be supported by allegations amounting to 'more than gross negligence.'").

Plaintiff's penchant for lumping together groups of parties and nonparties, as addressed in Point I above, illustrates why "[t]he problem of group pleading is especially acute when analyzing [a] *Caremark* claim." *In re Wonderwork*, 611 B.R. at 199. In addition, conclusory allegations of "inadequate" controls, "bad faith," and "red flags" do not satisfy the exacting standard for *Caremark* claims.

### 1.   Plaintiff fails to state a *Caremark* claim under prong one.

Plaintiff pleads itself out of a claim under the first prong because the Complaint concedes that Thrasio had accounting and inventory controls in place. Compl. ¶¶ 33, 44, 47, 50, 54, 57, 199, 211. Plaintiff alleges these controls were "inadequate" and "prone to errors," suggesting various alternatives that, with the

benefit of hindsight, Plaintiff believes would have yielded more efficiencies and fewer errors. *See id.* Nevertheless, controls were in place. Thus, Plaintiff cannot state a claim based on the "utter[] fail[ure] to implement any [controls]." *Cent. Laborers' Pension Fund v. Dimon*, 2014 WL 3639185, at *3 (S.D.N.Y. July 23, 2014) (allegations of "inadequate" controls fail to plead oversight liability under the first prong because it requires the "'utter failure to implement *any* reporting information system or controls'") (emphasis in original), *aff'd*, 638 F. App'x 34 (2d Cir. 2016). *See also In re AgFeed USA, LLC*, 558 B.R. at 127 (allegations that "systems did not function 'to the plaintiff's hindsight-driven satisfaction'" are insufficient to establish a claim under the first prong).

### 2.   Plaintiff fails to state a *Caremark* claim under prong two.

In an apparent effort to state a claim under the second prong, Plaintiff alleges "Defendants ignored numerous red flags" about Thrasio's "inadequate accounting and inventory controls." Compl. ¶¶ 199, 211. But the Complaint fails to identify any specific red flags, let alone which D&O Defendant ignored them and when. Rather, it makes broad allegations about inaccurate pro forma financials, error-prone financial systems, inventory tracking risks, inconsistent inventory values, and a purported delay in establishing an audit committee. *Id.* ¶¶ 44-58. Plaintiff tries to pin the blame on the D&O Defendants, alleging they knew about these problems "since at least early 2019" but failed to "remediate [them]." *Id.*

¶¶ 45, 199, 211. Even if the *Caremark* doctrine encompassed these kinds of issues, plaintiff fails to allege that Silberstein consciously ignored red flags or knowingly disregarded his fiduciary duties.

*First*, Count 7 seeks to impermissibly expand the "narrow range of actionable failure of oversight claims[.]" *City of Roseville Employees' Ret. Sys. v. Crain*, 2011 WL 5042061, at *6 (D.N.J. Oct. 24, 2011). "Historically," viable claims under the second prong have been limited to officers' or directors' "failure to act in the face of 'red flags' disclosed to them so vibrant that lack of action implicates bad faith, *in connection with the corporation's violation of positive law*." *Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *1 (Del. Ch. Sept. 6, 2022) (emphasis in original). *See also Rojas v. Ellison*, 2019 WL 3408812, at *13 (Del. Ch. July 29, 2019) ("[A] complaint must allege particularized facts to show 'that the directors knew or should have known that the corporation was violating the law'"). Count 7 is not based on alleged violations of positive law but rather on "generic financial [and operational] matters," which "are far from the sort of red flags that could give rise to *Caremark* liability if deliberately ignored." *Segway, Inc. v. Cai*, 2023 WL 8643017, at *2, 4 (Del. Ch. Dec. 14, 2023) (dismissing *Caremark* claim based on alleged failure to address financial discrepancies in company's financial information).

**Second**, Plaintiff "must allege that the red flags were observed but 'consciously disregarded' such that [Silberstein] completely 'disabled himself from being informed of risks or problems requiring his attention.'" *In re AgFeed USA, LLC*, 558 B.R. at 127. Plaintiff does not do so. The factual allegations refer to two instances in 2019 when Silberstein raised concerns about inaccuracies in the 2018 "pro forma" financials and a misplaced product shipment. Compl. ¶¶ 46, 52. Both instances concerned matters from Thrasio's first year in business, and neither was utterly ignored, let alone indicative of "a sustained or systematic failure of oversight." *See City of Roseville Employees' Ret. Sys. v. Crain*, 2013 WL 9829650, at \*7 (D.N.J. Sept. 26, 2013) ("'[O]nly a sustained or systematic failure of oversight . . . will establish the lack of good faith that is a necessary condition to liability.'") (quoting *Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)). Plaintiff may believe Silberstein's efforts were insufficient, but that is not bad faith. *E.g.*, *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."). Moreover, Plaintiff "makes no real challenge [or any challenge at all] to the loyalty of the majority of board members" who oversaw Thrasio, "which [further] 'undercuts any inference that the decisions of the . . . board can be attributed to disloyalty.'" *Schmidt*, 706 F. App'x at 74.

**Third**, the factual record makes it impossible to reasonably infer bad faith. With allegations that span from Thrasio's inception in 2018 through 2022, the Complaint ignores far too much. To begin, it ignores that "[a] developing company almost certainly will have budget issues" and growing pains. *See In re Molycorp, Inc. S'holder Deriv. Litig.*, 2015 WL 3454925, at *10 (Del. Ch. May 27, 2015). Nevertheless, as shown by "notable examples" cited in Thrasio's bankruptcy filings, some of the Company's most successful brands were acquired and monetized in its initial years. Ex. 1 (CFO Decl.) ¶¶ 15-18. Next, it ignores the "sudden" and "dramatic" surge in demand for e-commerce sparked by the Covid pandemic in early 2020. *Id.* ¶¶ 39-40. "[A]s demand for online retail skyrocketed," Thrasio's business model allowed it to thrive and grow. *Id.* ¶¶ 39, 43. Further, it ignores that "post-pandemic demand for e-commerce actually, and unpredictably, dropped between 2022 and 2023," contrary to the predications of industry experts. *Id.* ¶ 41. The "unexpected[] decrease[]" left Thrasio in a precarious financial situation. *Id.* ¶ 3. It also revealed that Thrasio grew too "quickly [] without the proper protocols in place to scale efficiently and limit costs" and "made several decisions that, *through the benefit of hindsight*, [were] identified as having a negative effect on [its] financial position." *Id*. (emphasis added). As Thrasio's CFO put it: "The last five years have been exceptionally turbulent for e-commerce companies due to unexpected demand shifts and supply chain disruption[s]." *Id.*

40

Against that backdrop, Count 7 stretches to hold corporate fiduciaries – of an early-stage company – the "guarantors of negative outcomes" from business decisions made in the face of sudden, unexpected, and unprecedented market changes. That would turn *Caremark* on its head. *E.g.*, *Segway, Inc.*, 2023 WL 8643017, at *5 ("The *Caremark* doctrine is not a tool to hold fiduciaries liable for everyday business problems" or "guarantors of negative outcomes from imperfect business decisions."); *In re Space Case*, 2024 WL 1628440, at *9 (Bankr. D. Del. Apr. 15, 2024)  ("Oversight duties under Delaware law are not, however, designed to subject [fiduciaries] to personal liability for failure to predict the future and to properly evaluate business risk."); *In re Transunion Deriv. S'holder Litig.*, 324 A.3d 869, 884-85 (Del. Ch. 2024) ("[A] *Caremark* claim cannot lie where a plaintiff, 'with the benefit of hindsight[,] seeks to equate a bad outcome with bad faith.'").

*Fourth*, Count 7 is time-barred in whole or in part under the three-year statute of limitations for fiduciary duty claims. *See In re Direct Response Media, Inc.*, 466 B.R. at 647. Count 7 does not allege *when* the alleged breaches of oversight/loyalty occurred. Compl. ¶¶ 195-206. The underlying factual allegations (*id.* ¶¶ 44-58) cite events between January 2019  and "the end of 2021" (*id.* ¶¶ 46, 57) (Silberstein left Thrasio in September 2021). Count 7 is time-barred to the extent it is based on conduct or events before February 28, 2021.

41

In sum, Count 7 should be dismissed because (1) it is not a proper *Caremark* claim and, even if it were, (2) the Complaint fails to allege red flags, "a sustained or systematic failure of oversight," or bad faith on the part of Silberstein, and (3) the claim is time-barred in whole or in part.

### B.    Count 8 Fails to Allege Corporate Waste Based on Inventory

In Count 8, Plaintiff contends that costs and expenses associated with Thrasio's "excess inventory" amounted to corporate waste. Compl. ¶ 212. "'The standard for adequately pleading corporate waste is high and rarely satisfied."' *Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021) (citing cases). Plaintiff must show the "transaction was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *Higher Educ. Mgmt. Grp., Inc. v. Mathews*, 2014 WL 5573325, at *11 (Del. Ch. Nov. 3, 2014). A waste claim will be sustained against an officer or director "only in the rare, 'unconscionable case where [they] irrationally squander or give away corporate assets.'" *Id.* at *11. "[T]he decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). Plaintiff fails to meet this "high and rarely satisfied" standard.

*First*, Count 8 doesn't even make it out of the gate because Plaintiff fails to allege what inventory was purchased, when, by whom, or for what purpose. And

42

despite staking the claim on inventory purchases that occurred over the course of several years (*e.g.*, Compl. ¶ 213), Plaintiff fails to allege when the purchases became wasteful and why. Therefore, there is no alleged transaction or exchange to even consider. *See Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 465 (D. Del. 2004) ("'In evaluating a waste claim, courts look to the exchange itself."'). In lieu of facts, Plaintiff attempts to manufacture a waste claim by parroting the legal standard, alleging "Defendants irrationally squandered corporate assets by causing Thrasio to purchase an estimated $800 million in excess inventory by February 2022," and "[n]o business person of ordinary sound judgment could conclude that the Company received adequate consideration for the purchase of this inventory." Compl. ¶ 213. Count 8 is wholly conclusory and should be dismissed on that basis. *See Criden v. Steinberg*, 2000 WL 354390, at *3 (Del. Ch. Mar. 23, 2000) (dismissing waste claim as "wholly conclusory").

**Second**, Thrasio told its story to the Court last year, and it's nothing like the one told in the Complaint. As Thrasio's then-CFO explained, the Company's inventory needs were driven by (1) "skyrocket[ing]" demand for online retail due to Covid, and (2) Amazon's prioritization of sellers with well-stocked inventories.

43

Ex. 1 (CFO Decl.) ¶¶ 40, 43.[16] While "experts predicted . . . the [e-commerce] industry would continue to grow by double digits through 2023," post-pandemic demand "unpredictably dropped between 2022 and 2023," leaving Thrasio with surplus inventory. *Id.* ¶¶ 41, 43. Thus, Thrasio received adequate consideration: the inventory purchases and expenses allowed it to thrive, initially, in the face of surging demand and industry realities. *See*, *e.g.*, *Polk 33 Lending, LLC*, 555 F. Supp. 3d at 44. "The fact that [Thrasio], based on subsequent events, needed only some of the inventory to fulfill orders does not retroactively render such [] ordinary course transaction[s] to be 'waste.'" *Id.* (dismissing inventory-based waste claim). *See also In re Verso Techs., Inc.*, 2010 WL 11598054, at *24 (N.D. Ga. June 30, 2010) ("[T]hat certain transactions entered into by [the company] through the [defendants] ultimately proved unprofitable, combined with the Trustee's disapproval of those transactions in hindsight, does not meet [Delaware's] exacting standard to state a claim for corporate waste.").

**Third**, Count 8, like Count 7, does not allege **when** the alleged waste of corporate assets occurred, and the underlying allegations, also like Count 7, cite dates between "March and April 2019" (¶ 55) and "the end of 2021" (¶ 57)

---

[16] *See also* Ex. 2 (DDR) ¶ 33 ("Notably, like a number of other companies, Thrasio over-purchased inventory of certain products to meet outsized demand driven by the COVID-19 pandemic[.]"); *id.* ¶ 34 ("Thrasio's management weighed the impact of purchasing excess inventory, on the one hand, versus running out of stock and being penalized in the rankings by Amazon's search algorithm, on the other.").

44

(Silberstein left Thrasio in September 2021). Count 8 is time-barred by Delaware's three-year statute of limitations to the extent it is based on conduct or events before February 28, 2021. *See In re Direct Response Media, Inc.*, 466 B.R. at 647.

Count 8 should therefore be dismissed because the claim is (1) wholly conclusory, (2) refuted and rendered wholly implausible by Thrasio's bankruptcy filings, and (3) time-barred in whole or in part.

## IV.   PLAINTIFF FAILS TO STATE A CLAIM BASED ON THE SECONDARY SALES (Counts 9 and 10)

### A.   Count 9 Fails to Allege Usurpation of Corporate Opportunities

Count 9 alleges the D&O Defendants usurped corporate opportunities by their secondary sales of stock in 2020 and 2021, when Thrasio was allegedly "trying to raise financing" through stock offerings to "potential investors." Compl. ¶¶ 219-223. The "general rule [in Delaware] is that 'corporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation.'" *Tilden v. Cunningham*, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018). The Court should reject Plaintiff's attempt to skirt the general rule by invoking the corporate opportunity doctrine. The doctrine "holds that a fiduciary 'may not take a business opportunity for [his or her] own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for [their] own,

the corporate fiduciary will thereby be placed in a position inimicable to [his or her] duties to the corporation.'" *Bocock*, 2022 WL 15800273, at *17. "No one factor is dispositive, and all [applicable ones] must be taken into account." *Id.*

### 1. Plaintiff fails to allege any specific corporate opportunity.

The Complaint does not identify any specific corporate opportunity (*e.g.*, potential investors) or its purported value to Thrasio. Nor does it identify which D&O Defendant allegedly usurped any particular opportunity. Compl. ¶¶ 65-91, 215-226. The claim cannot rest on allegations that a lumped-together group of defendants usurped some unidentified corporate opportunity. *Bocock*, 2022 WL 15800273, at *18 (dismissing usurpation claim where complaint lumped defendants together and failed to identify any opportunity they took). Count 9 should be dismissed for this reason alone.

### 2. Plaintiff fails to satisfy the corporate opportunity doctrine.

Plaintiff only broadly and generally alleges that, if the secondary sales buyers had not bought shares from Defendants, they would have bought shares from Thrasio. Compl. ¶¶ 219-223. In addition to its failure to identify any specific opportunity, Count 9 fails to state a claim under the corporate opportunity doctrine.

*First*, the Complaint slurs over the fact that the secondary sales were of common shares, whereas the Series D offering, like the previous series that raised capital, were of preferred shares.

*Second*, the line of business inquiry looks at the company from an operational standpoint – *i.e.*, what it does to generate profit. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 972-73 (Del. Ch. 2003). Thrasio's line of business is e-commerce: it acquires third party brands, consolidates them into its global platform, and sells them in the Amazon marketplace. Ex. 1 (CFO Decl.) ¶ 2. Selling stock was not then (and is not now) within Thrasio's line of business. *See Beam*, 833 A.2d at 973 (dismissing usurpation claim against fiduciaries where, *inter alia*, the company's business was selling "consumer products" and "advice to homemakers," not "selling stock").

*Third*, to show "an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 156 (Del. 1996). No such tie is alleged here – as stated above, selling stock was not "the nature of the corporate business."

*Fourth*, "[i]n the absence of allegations based on well-pled facts that call into question the propriety of [Silberstein's] sales at the time they were made, it is impossible to infer that [he] acted in bad faith . . . or placed [himself] in a position inimical to [his] duties to [Thrasio]." *See Beam*, 833 A.2d at 974.

As permitted by Delaware law, the Thrasio's board gave its express written consent to the 2021 secondary sales. Compl. ¶¶ 74, 77. The board's approval both

47

negates any plausible inference of bad faith and also establishes that the board

renounced and waived any corporate opportunity claim concerning those sales. 8

Del. Code § 122(17). *See also New Enter. Assocs. 14*, 295 A.3d at 552 (stating

board's waiver of a corporate opportunity is akin to a covenant not to sue).

What is more, the DDR refutes the claim's underlying premise. Ex. 2 (DDR)

¶ 38 ("[W]itnesses [interviewed during the investigation] expressed the view that,

in general, Secondary Sales were beneficial to Thrasio because they diversified the

community of equity holders, among other benefits.").

Thus, the factors considered under the corporate opportunity doctrine weigh

heavily, if not entirely, in favor of dismissing Count 9.

## B.      Count 10 Fails to Allege Breach of Fiduciary Duty for Misuse of "Confidential Corporate Information"

Count 10 alleges that Silberstein and others breached fiduciary duties "by

misusing material confidential information to pursue [the 2021] secondary sales[.]"

Compl. ¶ 232. "[T]he [long-standing] general rule is that 'corporate officers and

directors may purchase and sell the corporation's stock at will, without any liability

to the corporation.'" *Tilden*, 2018 WL 5307706, at *19. Delaware thus "'sets the

bar for stating a claim for breach of fiduciary duty based on insider trading very

high.'" *In re Camping World Holdings, Inc.*, 2022 WL 288152, at *9 (Del. Ch. Jan.

31, 2022). Plaintiff must show: "(1) 'the corporate fiduciary possessed material,

nonpublic information'; and (2) 'the corporate fiduciary used that information

improperly by making trades because she was motivated, in whole or in part, by the substance of that information.'" *Id.* Scienter must also be alleged with "facts to support a reasonable inference that 'each sale by each individual defendant was entered into and completed *on the basis of, and because of*, adverse material non-public information.'" *Tilden*, 2018 WL 5307706, at *20. (emphasis in original); *Camping World Holdings, Inc.*, 2022 WL 288152, at *9.

As alleged in the Complaint, potential secondary sale purchasers and potential Thrasio investors were given access to the same data room and financial documents "to facilitate diligence." Compl. ¶¶ 71, 73, 78. Plaintiff does not allege that this information was confidential or disclosed without permission. Rather, Plaintiff alleges that, "by virtue of their respective positions," Silberstein and other D&O Defendants (1) "possessed material confidential information," specifically purported knowledge that (a) Thrasio "lacked proper internal accounting and inventory controls" and (b) the financials and projections provided to potential purchasers and investors were false or misleading; and (2) used such information "to their personal advantage" in the 2021 secondary sales. *Id.* at ¶ 230, 231. The claim is legally deficient, as discussed below.

*First*, the allegation that the D&O Defendants possessed material confidential information "by virtue of their respective positions" is "wholly conclusory and insufficient to support an insider trading claim." *Tilden*, 2018 WL

49

5307706, at \*19 (finding allegations that "because [defendants] were on the Board

and in management . . . [they] must have obtained some additional material,

nonpublic information" to be "wholly conclusory and insufficient to support an

insider trading claim").

   ***Second***, there is no basis to reasonably infer that each secondary sale "'was

entered into and completed *on the basis of, and because of*, adverse material non-

public information.'" *Tilden*, 2018 WL 5307706, at \*20 (emphasis in original).

Thrasio insiders only participated in secondary sales with the board's consent. Ex.

2 (DDR) ¶ 37. In fact, the board approved those sales and consented to them in

writing, "authoriz[ing] the sale of approximately \$350 million worth of common

stock" at \$25 per share. Compl. ¶ 77. Yet, the D&O Defendants sold at least \$94

million less than the authorized amount. *Id.* ¶ 79. And the broader context also

matters: in mid-2021, the e-commerce industry was in the midst of surging and

unprecedented demand due to the pandemic. Ex. 1 (CFO Decl.) ¶¶ 43-46.

Thrasio's then-management, as well as industry experts, "projected [the outsized

demand] would continue," and "believed the Company would grow at a historic

pace." Ex. 2 (DDR) ¶ 33; Ex. 1 (CFO Decl.) ¶ 46. Nothing about the timing,

volume, or circumstances of the sales supports an inference of scienter. *See In re

Camping World Holdings, Inc.*, 2022 WL 288152, at \*12 (any inference of scienter

was "further undercut by the timing of the trades"); *Lavin v. Reed*, 2023 WL

7182950, at *8 (N.D. Ill. Nov. 1, 2023) (allegations failed to show insider trades "were unusually large or suspiciously timed").

**Third**, Plaintiff cannot save the claim with conclusory and scattershot allegations that Silberstein and the other D&O Defendants "manipulated" the numbers or knew the "financial information . . . was false and misleading." Compl. ¶¶ 50, 82, 86, 87, 230. Even if the financials in hindsight were inaccurate, there are no factual allegations that Silberstein manipulated numbers or "knew [they] were false or misleading when [he] sold [his] stock" in 2021. *See Lavin*, 2023 WL 7182950, at *9. Potential investors were provided with 2020 financial statements (Compl. ¶ 82), and the alleged inaccuracies in those statements did not come to light until the audited financials were issued on June 30, 2022, almost a year after the 2021 secondary sales (*id.* at ¶ 14). The optimism reflected in the projected EBITDA that Silberstein allegedly sent to a potential investor in July 2021 was grounded in then-existing reality, not "completely detached" from it. *Id.* ¶ 84; *see also* Ex. 1 (CFO Decl.) ¶¶ 43-46. Despite the benefit of extensive pre-suit investigation, the Complaint does not allege any facts to support its sweeping and conclusory allegations of misconduct.

Because the claim rests on conclusory allegations, unwarranted inferences, and conjecture, Count 10 should be dismissed.

### C. Counts 9 and 10 Are Time-Barred as to the 2020 Secondary Sales

Like the other fiduciary claims, Counts 9 and 10 are subject to a three-year

statute of limitations. *In re Direct Response Media, Inc.*, 466 B.R. at 647 (citing 10

Del. C. § 8106). Because the 2020 secondary sales occurred in December 2020

(Compl. ¶ 65), the limitations period for any fiduciary claims arising from those

sales expired before the Petition Date. If Counts 9 and 10 are not dismissed in their

entirety for the reasons stated above, any portion of the claims based on the 2020

secondary sales should be dismissed as time-barred.

## V. PLAINTIFF FAILS TO STATE A CLAIM BASED ON SILBERSTEIN'S SEPARATION AGREEMENT (Counts 13 and 14)

Plaintiff's claims seeking to avoid the Silberstein Separation Agreement as

an actual or constructive fraudulent transfer fail for many of the same reasons that

Plaintiff's fraudulent transfer claims fail with respect to the Tender Offer.

Initially, three threshold issues bar both claims. First, Plaintiff is judicially

estopped from bringing these claims because it has already represented to the

Court in the DDR "that there are no viable claims worthy of pursuit with respect to

Thrasio's entry into the Separation Agreement." Ex. 2 (DDR) ¶ 49. Second, as

stated above, Plaintiff fails to identify the source of the "applicable law" under

which it asserts these claims, other than to generically cite "applicable state law."

Compl. ¶¶ 252, 263; *In re Exide Techs., Inc*., 299 B.R. at 749 (dismissing state-

based fraudulent transfer claims where "Plaintiffs have failed to identify the

state(s) whose laws apply to these claims"). And third, the business judgment rule

prevents Plaintiff from second-guessing decisions approved by the full Thrasio

board. Counts 13 and 14 should be dismissed for these reasons alone.

Moreover, Plaintiff fails to adequately allege the elements of either

constructive or actual fraudulent transfer, as explained below.

### A. Count 13 Fails to Allege Constructive Fraudulent Transfers In Connection With the Separation Agreement

Plaintiff fails to adequately plead the elements of constructive fraudulent

transfer with respect to the Silberstein Separation Agreement.

*First,* Plaintiff does not adequately plead that Thrasio failed to receive

reasonably equivalent value in exchange for entering into the Silberstein

Separation Agreement, as required for a constructive fraudulent transfer claim. 6

Del. C. § 1304(a)(2). As the disinterested directors found – and Plaintiff does not

credibly dispute – "Thrasio obtained numerous benefits in entering into the

Separation Agreement":

> By entering into the Separation Agreement, Thrasio avoided a
> potentially value-destructive public dispute—and potential
> litigation—with its departing co-founder and Co-CEO . . . .
> Specifically, the Separation Agreement included, among other things:
> (i) non-compete and non-solicitation provisions; (ii) restrictions on
> Silberstein's sales of Thrasio stock; (iii) "true-up" provision that
> required Silberstein to transfer  Thrasio shares, for no consideration,
> to purchasers in the July and August 2021 Secondary Sales if Thrasio
> consummated a subsequent equity financing at a lower price per
> share; (iv) indemnification of Thrasio by Silberstein for losses arising
> out of any claims or demands in connection with the July and August

53

> 2021 Secondary Sales; and (v) a mutual release of claims between
> Silberstein and Thrasio.

Ex. 2 (DDR) ¶ 48. These benefits are at least "reasonably equivalent" in value, if
not of far greater value, than what Thrasio gave up: the hypothetical ability to sue
Silberstein for negligence. 6 Del. C. § 1304(a)(2); *see also Shabbouei v. Potdevin*,
C.A. No. 2018-0847-JRS, 2020 WL 1609177, at *13 (Del. Ch. Apr. 2, 2020)
(company received substantial "value" in exchange for entering into separation
agreement where it obtained release of claims and non-solicitation covenant, and
"avoid[ed] potentially costly and embarrassing litigation").

*Second,* Plaintiff fails to plead Thrasio's insolvency at the time it entered
into the Separation Agreement, the second required element for a constructive
fraudulent transfer claim. 6 Del. C. § 1304(a)(2). Indeed, Plaintiff does not make
any specific allegations at all regarding Thrasio's assets or liabilities in September
2021, the date of the Separation Agreement, despite having possession of Thrasio's
books and records. *F-Squared Inv. Mgmt.,* 2019 WL 4261168, at *11 (dismissing
fraudulent transfer claim where "the Complaints do not contain any specific
allegations regarding Debtors' assets or liabilities at the time of each transfer").

### B.   Count 14 Fails to Allege Actual Fraudulent Transfers In Connection With the Separation Agreement

As with its claims alleging actual fraudulent transfer with respect to the
Tender Offer, Plaintiff fails to adequately allege that the Silberstein Separation

Agreement was entered into with "actual intent to hinder, delay or defraud any

creditor of the debtor." 6 Del. C. § 1304(a). It is much more plausible that Thrasio

entered into the Silberman Separation Agreement to spare itself a potentially costly

and public dispute with its co-founder and co-CEO, and to secure the additional

benefits set forth above. In fact, that is precisely what plaintiff has already

represented to this Court. Ex. 2 (DDR) ¶ 48 (concluding that Thrasio entered into

the Separation Agreement to "avoid[] a potentially value-destructive public

dispute – and potential litigation – with its departing co-founder and Co-CEO" and

to reap "numerous benefits"). The Complaint fails to allege facts sufficient to

contradict Plaintiff's prior submissions to this Court.

## VI.    PLAINTIFF FAILS TO STATE A CLAIM BASED ON YARDLINE (Counts 17, 25, and 26)

The Complaint asserts ten claims in connection with the Yardline

transactions, only three of which name Silberstein (Counts 17, 25, and 26). These

claims should be dismissed as to Silberstein for multiple reasons.

### A.    Count 17 Fails to Allege Breach of Fiduciary Duty.

Count 17 alleges Silberstein and other D&O Defendants breached fiduciary

duties by "facilitating Thrasio's acquisition of Yardline," which included Thrasio's

loan to Yardline to pay off its noteholders and investors so Thrasio could be the

sole equity holder. Compl. ¶¶ 116, 287-291. The claim alleges bad faith and gross

negligence without specifying if it arises under the duty of loyalty or the duty of care. *Id.* ¶¶ 286, 290. Plaintiff fails to state a claim under either theory.

### 1. Plaintiff fails to allege breach of the duty of loyalty.

If Count 17 is based on the duty of loyalty, it is presumably based on alleged self-dealing. *See* Compl. ¶¶ 288-291. However, there are no allegations that Silberstein "'either (1) stood on both sides of the transaction and dictated its terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally.'" *In re Cred Inc.*, 650 B.R. at 830. "[I]n the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received *any* benefit not equally shared by the stockholders." *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (emphasis in original). The "benefit must be alleged to be *material* to that director" – meaning "significant enough '*in the context of the director's economic circumstances,* as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.'" *Id.* (emphasis in original). Here, Plaintiff seemingly suggests the "personal benefit" was protection against potential future litigation and, perhaps, a sense of satisfaction for squeezing out Yardline's CEO, who Silberstein purportedly disliked. *See* Compl. ¶¶ 105, 106, 112-116. Neither is sufficient.

*First*, the Complaint alleges that "[a] few" Yardline noteholders or investors "contacted Thrasio's investors" and "threatened legal action" *against Thrasio*, but does not identify any specific noteholders/investors, the grounds for any then-existing potential claims, or any litigation threats against Silberstein personally. *Id.* ¶¶ 112-116. Conclusory allegations of protection against potential litigation fail to show a "non-ratable benefit" (*i.e.*, one not equally shared by shareholders). *Maffei v. Palkon*, 2025 WL 384054, at *20-21 (Del. Feb. 4, 2025) (reversing denial of motion to dismiss where plaintiffs failed to satisfy "the requirement of pleading a material benefit because they have not alleged anything more than speculation about what potential liabilities Defendants may face in the future"). Moreover, "Cashman communicated the importance of "putting [these litigation risks] to bed . . . for the good of the Company [*i.e.*, Thrasio]." Compl. ¶ 114. Thrasio's loan to Yardline achieved that goal. *Id.* ¶ 116.

*Second*, to the extent plaintiff contends Silberstein engaged in self-dealing by causing Thrasio to pursue the acquisition based on his alleged personal dislike for Yardline's CEO, the claim is facially implausible. Self-dealing requires a material personal financial or economic benefit. *Maffei*, 2025 WL 384054, at *18; *Orman*, 794 A.2d at 23. Emotional satisfaction does not qualify. In any event, Plaintiff alleges that Silberstein believed Thrasio could benefit from Yardline: he "envisioned [it] would complement Thrasio's business model by providing debt

57

financing to small businesses that sold products on Amazon but were not yet ready to be acquired by Thrasio." Compl. ¶ 96. Furthermore, Thrasio's board approved the acquisition. Ex. 2 (DDR) ¶ 42. Plaintiff's failure to challenge the loyalty of the majority of board members further "'undercuts any inference that the decisions of the board can be attributed to disloyalty.'" *Schmidt*, 706 F. App'x at 74.

Count 17 therefore must be dismissed to the extent it asserts a claim under the duty of loyalty.

### 2. Plaintiff fails to allege breach of the duty of care.

In an apparent effort to allege a duty of care claim, the Complaint asserts that Thrasio had no "legitimate business justification" for acquiring Yardline and did not "conduct proper due diligence prior to the acquisition." Compl. ¶¶ 110, 288-290. The duty of care requires that fiduciaries "(1) use the amount of care which ordinarily careful and prudent persons would use in similar circumstances; and (2) consider all material information reasonably available." *In re Space Case*, 2024 WL 1628440, at *6. Courts focus on "the process leading to the relevant decision," not on whether fiduciaries made the "correct or best decision." *In re Nobilis Health Corp.*, 661 B.R. at 903; *see also Caremark Int'l Deriv. Litig.*, 698 A.2d at 967. Duty of care claims require a showing of gross negligence, *In re Space Case*, 2024 WL 1628440, at *6, which imposes an "extremely stringent" standard, *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008). It

requires a showing of "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *In re Nobilis Health Corp.*, 661 B.R. at 903. *See also In re Space Case*, 2024 WL 1628440, at \*6 ("plaintiff must plead that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason'"). Count 17 fails for multiple reasons.

*First*, despite the importance of context, plaintiff again ignores it. *In re USDigital, Inc.*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) ("The precise behavior constituting gross negligence varies depending on the context, but in general 'a trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner.'"). The Complaint shows that Thrasio and Yardline had an ongoing business relationship since Yardline's inception in May 2020, which included Thrasio providing Yardline with "$1 million in founding capital." Compl. ¶¶ 96, 98. By the time of the acquisition, Thrasio had a year's worth of first-hand experience and knowledge about Yardline's business, management, and operations. *See generally id.* ¶¶ 92-119. Plaintiff's conclusory assertions about the lack of "proper due diligence" are legally insufficient.

*Second*, as noted in the DDR, Thrasio's charter "relieves directors from any personal liability for breaches of the duty of care." Ex. 2 (DDR) ¶ 35. Plaintiff is

thus precluded from asserting this claim against Silberstein. *E.g.*, *In re USDigital, Inc.*, 443 B.R. 22, 43 (Bankr. D. Del. 2011) ("[C]ourts have found that a trustee is precluded from bringing a claim of breach of the duty of care against directors in a Delaware corporation when the corporation has an exculpatory provision in its certificate of incorporation."). *See also* 8 Del. C. § 102(b)(7). Nor does Plaintiff's failure to distinguish Silberstein's actions as an officer or director warrant a different outcome. *See In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 573 (Bankr. D. Del. 2008) ("'[S]ince no allegations are made against [defendant] based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim.'") (quoting *In re IT Group*, *Inc.*, 2005 WL 3050611, at *13 (D. Del. Nov. 15, 2005)).

"The mere fact that a strategy turned out poorly is in itself insufficient to create an inference that the officers and directors who oversaw the strategy breached their fiduciary duties." *In re Space Case*, 2024 WL 1628440, at *7-8 (dismissing duty of care claim that alleged, *inter alia*, defendants "failed to conduct appropriate due diligence to ensure [the company] had the resources, employees, and infrastructure to complete [a failed project]" that ultimately led to its bankruptcy). The only reasonable inference is that Thrasio's board, which approved the acquisition, exercised reasonable care and was fully informed about

60

the acquisition. That the acquisition did not turn out as hoped does not amount to gross negligence in breach of the duty of care. *Id.* at *8.

Count 17 should therefore be dismissed. The Complaint fails to allege any breach of the duty of care and, even if it did, the claim is precluded by the exculpatory provision in Thrasio's charter.

### B.    Count 25 Fails to Allege a Conspiratorial Agreement

Plaintiff alleges, without a shred of support, that Silberstein entered into an alleged conspiracy with Cashman, Boockvar and Horowitz "to benefit Cashman's long-time friend Horowitz" with respect to the Yardline transfers. Compl. ¶ 370. The conspiracy claim must be dismissed because its own allegations disprove the essential element of a conspiratorial agreement. *Salit Auto Sales, Inc.*, 2020 WL 5758008, at *7 (to state a claim for civil conspiracy, plaintiff must allege "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, *the principal element of which is an agreement* between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage") (emphasis added).

Far from "allegations plausibly suggesting (not merely consistent with) agreement" among the alleged conspirators, *Bell Atl. Corp.*, 550 U.S. at 557, Plaintiff repeatedly alleges an utter *lack* of agreement – conceding that the Yardline transactions were instead "driven by personal animosity" among the

61

group. Compl. ¶ 111. The Complaint repeatedly alleges discord and dissention

among Defendants, bordering on outright public conflict. *E.g., id.* ¶ 94 ("Contrary

to Cashman's hopes, Silberstein and Horowitz did not get along, and Silberstein

wanted to terminate Horowitz."), ¶ 102 (Silberstein omitted from Yardline board),

¶ 103 ("Silberstein not only withheld Thrasio's consent [from Horowitz], but also

convinced the Thrasio-affiliated directors that the Yardline Board should not

support the transaction"), ¶ 103 ("Silberstein claimed that Horowitz had acted

improperly"), ¶ 104 (Silberstein declared Yardline had no "meaningful value to

Thrasio"), ¶ 105 ("This enraged Silberstein, who insisted that Horowitz was a

'self-serving con artist' who generated interest in the Series A by 'lying' about

Thrasio's support"), ¶ 111 ("Cashman wrote to Boockvar . . . [that] Thrasio's

decision to acquire Yardline [w]as purely a result of Silberstein's irrational,

emotional response" stemming from "Josh Silberstein's anger at Ari Horowitz")

(alternations omitted), ¶ 113 (Cashman wrote to Boockvar that he was "dragged

into something" resulting from "Silberstein's personal feud" with Horowitz). The

Complaint's exhaustive allegations of hostility among the alleged co-conspirators

utterly demolish the "agreement" element necessary for any conspiracy claim

against Silberstein.

Moreover, a conspiracy claim requires an alleged "unlawful act done in

furtherance of the conspiracy." *Digene Corp.*, 476 F. Supp. 2d at 446. Plaintiff fails

to allege that Silberstein engaged in any underlying unlawful act with respect to the Yardline transfers.

Count 25 therefore should be dismissed. The claim is implausible and fails to allege either an agreement among alleged co-conspirators or any unlawful act.

### C.   Count 26 Fails to Allege Corporate Waste.

Count 26 attempts to use the Yardline acquisition as the basis for a waste claim, alleging Silberstein and other D&O Defendants "irrationally squandered corporate assets by causing Thrasio to purchase Yardline," a company that was purportedly "without value" and of "no use" to Thrasio. Compl. ¶ 374. This claim, like the corporate waste claim under Count 8, is wholly conclusory and fails to meet the "'high and rarely satisfied'" standard for waste claims. *Polk 33 Lending, LLC*, 555 F. Supp. 3d at 43.

*First*, there are no allegations of what Thrasio received in the acquisition. Plaintiff has this information, but chose not to include it. Instead, Plaintiff merely alleges, in conclusory fashion, that the acquisition was worthless and again resorts to parroting the legal standard. Compl. ¶ 374. Thus, there is no way to evaluate the crux of the claim: the exchange itself. *See Continuing Creditors' Comm. of Star Telecomm., Inc.*, 385 F. Supp. 2d at 465. Count 26 should be dismissed as wholly conclusory. *See Criden*, 2000 WL 354390, at *3.

63

**Second**, Thrasio received over $12 million in consideration when it sold

Yardline in January 2022, including $7.1 million in cash. Compl. ¶ 119. That may

be less than what Thrasio paid for it, but it indicates that Thrasio received

substantial consideration in the acquisition and defeats Plaintiff's bald assertion

that Yardline had no value. That the acquisition "ultimately proved unprofitable,

combined with [plaintiff's] disapproval of th[e] transactions in hindsight, does not

meet [Delaware's] exacting standard to state a claim for corporate waste." *In re

Verso Techs., Inc.*, 2010 WL 11598054, at *24. *See also Lavin*, 2023 WL 7182950,

at *11 (although the acquisition "may have been a raw deal for [the acquiring

company's] shareholders, it was not the sort of unconscionable [and egregious]

misstep that constitutes corporate waste"). Moreover, if Thrasio had "irrationally

squandered" its assets on a worthless acquisition, then it's highly unlikely the

Company would have secured over $1 billion from sophisticated investors in the

wake of the acquisition. Compl. ¶ 80.

**Third**, to the extent Count 26 is based on Thrasio's alleged forgiveness of

the Yardline loans (*see id.* ¶ 373), no such claim can be stated against Silberstein.

By the time Thrasio decided to forgive its loans to Yardline in October 2021,

Silberstein had already left the Company. Compl. ¶¶ 116, 122. Plaintiff is therefore

precluded from bringing fiduciary claims against Silberstein based on forgiveness

of those loans. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 758 (Del. Ch.

64

2005) ("[F]ormer directors [and officers] owe no fiduciary duties, and after [their departure], [they] could not breach a duty [they] no longer had.").

Count 26 should therefore be dismissed. The claim is conclusory, implausible, and based on alleged events that occurred after Silberstein's departure from Thrasio.

### D. Counts 17 and 26 Are Time-Barred to the Extent They Are Based on Conduct That Allegedly Occurred Before February 28, 2021.

Although the temporal scope of Count 17 (breach of fiduciary duty) and Count 26 (corporate waste) is not entirely clear, the Complaint includes Yardline-related allegations that date back to 2020 and early 2021. Compl. ¶¶ 92-102. Thus, if Counts 17 and 26 are not dismissed in their entirety, as they should be, any portion of these claims based on conduct that allegedly occurred before February 28, 2021 is time-barred under Delaware's three-year statute of limitations. *In re Direct Response Media, Inc.*, 466 B.R. at 647, 657.

### Conclusion

For the foregoing reasons, the Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC respectfully request that the Court dismiss (a) Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15, 25, and 26 of the Complaint as they relate to Joshua Silberstein, and (b) Counts 2, 3, and 6 as they relate to Everything's Coming Up Millhouse, LLC.

Dated:  March 3, 2025

/s/ **Mark S. Lichtenstein**

Mark S. Lichtenstein
mark.lichtenstein@akerman.com
Martin Domb (application *pro hac vice* pending)
martin.domb@akerman.com
Keith Blackman (application *pro hac vice* pending)
keith.blackman@akerman.com
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel.: (212) 880-3800

- and -

John Thompson (admitted *pro hac vice*)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760

*Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC*

66