| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>David A. Kotler<br>DECHERT LLP<br>Three Bryant Park<br>1095 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 698-3669<br>Facsimile:  (212) 698-3599<br>Email: david.kotler@dechert.com<br><br>*Counsel for Defendants Carlos Cashman, Mounir Ouhadi,*<br>*Aditya Rathod, and Cashman Family Investment II, LLC* | |
| In re:<br><br>1 THRASIO ONE, INC.,<br><br>       *Reorganized Debtor.* | Chapter 11<br><br>Case No. 24-11850 (CMG) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br><br>       *Plaintiff,*<br><br>     v.<br><br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; and YARDLINE CAPITAL CORP.,<br><br>       *Defendants.* | Adv. Pro. No. 24-01637<br><br>Hearing Date: <u>June 24, 2025</u><br>             10:00 a.m.<br><br>Judge: <u>Christine M. Gravelle      </u> |

**DEFENDANTS CARLOS CASHMAN, MOUNIR OUHADI, ADITYA RATHOD, AND
CASHMAN FAMILY INVESTMENT II, LLC'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ IV

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ...................................................................................................................... 5

   I.   THE PARTIES ............................................................................................... 5

   II.   CASHMAN CO-FOUNDED THRASIO TO PURSUE AN INNOVATIVE
     APPROACH TO LEVERAGING ECONOMIES OF SCALE IN E-
     COMMERCE.................................................................................................. 6

   III.   THRASIO EXPERIENCED DRAMATIC GROWTH FROM 2018-2022 ................... 7

   IV.   THRASIO'S BOARD, INCLUDING ITS INDEPENDENT DIRECTORS,
     OVERSAW AND APPROVED SEVERAL SUCCESSFUL ROUNDS OF
     CAPITAL RAISES, SHARE SALES BY THRASIO INSIDERS, AND
     MULTIPLE TRANSACTIONS PURSUED BY MANAGEMENT........................... 9

   V.   CASHMAN RESIGNED AS THRASIO'S CEO AND RECEIVED A BROAD
     RELEASE OF CLAIMS IN EXCHANGE FOR HIS OWN RELEASE OF
     CLAIMS, NON-COMPETES, FORFEITURES OF RESTRICTED STOCK,
     STOCK SALE RESTRICTIONS, AND OTHER VALUABLE
     CONSIDERATION FOR THRASIO................................................................ 12

   VI.   AS COVID RECEDED, THRASIO AND THE ENTIRE E-COMMERCE
     INDUSTRY FACED AN UNPREDICTABLE DOWNTURN ................................. 13

   VII.   THRASIO'S DISINTERESTED DIRECTORS CONDUCTED AN
     EXTENSIVE AND INDEPENDENT INVESTIGATION AND CONCLUDED
     THAT SEVERAL POTENTIAL CAUSES OF ACTION SHOULD NOT BE
     RETAINED BY THE COMPANY ................................................................ 14

   VIII.   THRASIO'S BANKRUPTCY AND ADVERSARY PROCEEDING ....................... 17

LEGAL STANDARD............................................................................................................. 18

ARGUMENT ........................................................................................................................... 19

   I.   PLAINTIFF IMPROPERLY CHALLENGES BUSINESS JUDGMENTS
     MADE BY THRASIO'S FULL BOARD OF DIRECTORS THAT ARE
     ENTITLED TO DEFERENCE UNDER THE BUSINESS JUDGMENT RULE ....... 19

     A.   The Full Thrasio Board, Including All Of Its Independent And Disinterested
       Directors, Considered And Unanimously Approved Each Of The Transactions
       At Issue ................................................................................................ 19

     B.   The Complaint Fails To Make Any Allegation That A Majority Of Thrasio's
       Board Was Impaired .............................................................................. 20

     C.   Plaintiff Cannot Substitute Its Own Business Judgment For Thrasio's By Re-
       Characterizing Business Decisions In Hindsight As Risky Or Wrong ............ 22

II.  PLAINTIFF CANNOT RE-ASSERT THE SAME CLAIMS THAT THRASIO RENOUNCED IN THE BANKRUPTCY PROCEEDINGS AND IN THE RELATED INTERNAL INVESTIGATION ...................................... 26

    A.  Judicial Estoppel Precludes Plaintiff From Alleging Claims Contrary To The Conclusions Of The Disinterested Directors Submitted In Support Of Thrasio's Confirmed Plan ............................................................................................... 26

    B.  The Conclusions Of The Disinterested Directors As To The Non-Viability Of Potential Estate Claims Are Themselves Subject To Deference As Business Judgments.................................................................................................... 31

III.  EACH OF PLAINTIFF'S FIDUCIARY DUTY CLAIMS FAILS AS A MATTER OF LAW FOR ADDITIONAL REASONS .................................. 33

    A.  Several Of Plaintiff's Fiduciary Duty Claims Are Time Barred..................... 33

    B.  Plaintiff's Allegations That The COR Defendants Failed To Oversee Inventory And Financial Controls Does Not Properly State An Oversight Claim........... 35

        1.  Mere Allegations Of Poor Business Practices Do Not State An Oversight Claim ................................................................................. 35

        2.  Plaintiff Fails To Allege Facts That Meet The High Bar Required Of An Oversight Claim ....................................................... 36

    C.  Plaintiff Fails To State An Aiding And Abetting Claim Against Ouhadi Or Rathod .......................................................................................................... 39

IV.  THE CASHMAN SEPARATION AGREEMENT BARS PLAINTIFF FROM ASSERTING ITS RELEASED CLAIMS AGAINST CASHMAN ........................... 41

V.  PLAINTIFF FAILS TO STATE ANY FRAUDULENT CONVEYANCE CLAIMS ................................................................................................... 45

    A.  Plaintiff's Failure To Identify The Applicable State Law And Statutes Violates Rules 8 And 9(b)'s Pleading Requirements ..................................................... 46

    B.  Fraudulent Conveyance Laws Are Intended To Avoid Improper Transfers And May Not Be Used To Remedy Allegations Of General Corporate Misconduct ...................................................................................................... 47

    C.  Bankruptcy Courts Do Not Recognize A Claim For "Conspiracy To Fraudulently Transfer" ............................................................................... 48

    D.  Plaintiff's Conclusory Allegations Fail To Support Its Fraudulent Conveyance Claims ...................................................................................................... 49

        1.  Plaintiff Fails Plausibly To Allege That The Release Of Claims By Thrasio Against Cashman Was A Fraudulent Transfer.................. 50

        2.  Plaintiff Fails Plausibly To Allege That The Transfer Of Tender Offer Proceeds Was A Fraudulent Transfer......................................... 52

        3.  Plaintiff Fails Plausibly To Allege That The Yardline Transactions Were Fraudulent Transfers ............................................. 53

VI.     PLAINTIFF FAILS TO STATE AN UNJUST ENRICHMENT CLAIM
        AGAINST CASHMAN BY VIRTUE OF HIS PARTICIPATION IN THE
        TENDER OFFER ................................................................................................ 55

        A.      Plaintiff's Unjust Enrichment Claim Is Time Barred Under Delaware Law ... 55

        B.      Cashman Did Not Receive A Benefit At Plaintiff's Expense Through The
                Tender Offer ....................................................................................................... 56

VII.    PLAINTIFF FAILS TO STATE THE "RARE, UNCONSCIONABLE"
        CLAIM OF CORPORATE WASTE .............................................................................. 57

        A.      Plaintiff Fails To Allege That The COR Defendants Lacked A Rational
                Business Purpose For Their Inventory And Accounting Decisions ................ 58

        B.      Plaintiff Fails To Allege That Cashman Lacked A Rational Business Purpose
                With Respect To Thrasio's Purchase Of Yardline .......................................... 59

VIII.   PLAINTIFF FAILS TO STATE A CLAIM AGAINST CASHMAN FOR
        VIOLATION OF SECTION 160 OF THE DELAWARE GENERAL
        CORPORATION LAW ...................................................................................................... 60

        A.      Thrasio Board Members, Including Cashman, Reasonably Relied On Present
                Values To Approve The Tender Offer ............................................................. 60

        B.      Cashman's Vote In Favor Of Authorizing The Tender Offer Was Not A
                Willful Or Negligent Violation Of Section 160 Of The DGCL As Required To
                Recover Under Section 174 .............................................................................. 61

CONCLUSION ........................................................................................................................ 64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*151 Foods, LLC v. Tromp Grp. Americas, LLC*,
    2022 WL 18459639 (N.D. Ga. Aug. 10, 2022) ....................................................46

*In re Allegheny Health, Educ. & Rsch. Found.*,
    253 B.R. 157 (Bankr. W.D. Pa. 2000) ...................................................................54

*Aspen Advisors LLC v. United Artists Theatre Co.*,
    843 A.2d 697 (Del. Ch. 2004)...............................................................................43

*In re Bayou Steel BD Holdings, L.L.C.*,
    642 B.R. 371 (Bankr. D. Del. 2022) .....................................................................58

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .....................................................................................59

*Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*,
    229 F.3d 245 (3d Cir. 2000)..................................................................................47

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997).................................................................................7

*In Re Carton*,
    No. 20-19781 (VFP), 2023 WL 8057870 (Bankr. D.N.J. Nov. 20, 2023) ........44, 45

*In re Chemours Co. Derivative Litig.*,
    2021 WL 5050285 (Del. Ch. Nov. 1, 2021) .........................................................62

*In re Citigroup Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)...............................................................................35

*Citron v. Fairchild Camera & Instrument Corp.*,
    1988 WL 53322 (Del. Ch. May 19, 1988).............................................................24

*In re Cred Inc.*,
    658 B.R. 783 (D. Del. 2024).................................................................................40

*In re CTE 1 LLC*,
    No. 19-30256 (VFP), 2023 WL 5257940 (Bankr. D.N.J. Aug. 11, 2023) .............45

*Danise v. Saxon Mortg. Servs. Inc.*,
    738 F. App'x 47 (3d Cir. 2018) ............................................................................44

*Demodulation, Inc. v. Applied DNA Scis., Inc.*,
 2012 WL 6204172 (D.N.J. Dec. 12, 2012) ...............................................................18

*Desimone v. Barrows*,
 924 A.2d 908 (Del. Ch. 2007) ...................................................................................34

*In re Direct Response Media, Inc.*,
 466 B.R. 626 (Bankr. D. Del. 2012) ........................................................18, 33, 56

*In re Dow Chem. Co. Derivative Litig.*,
 2010 WL 66769 (Del. Ch. Jan. 11, 2010) .................................................................31

*Eli Lilly & Co. v. Roussel Corp.*,
 23 F. Supp. 2d 460 (D.N.J. 1998) .............................................................................48

*Eng'rd Abrasives, Inc. v. Am. Mach. Prods. & Serv., Inc.*,
 882 F.3d 650 (7th Cir. 2018) ....................................................................................43

*In re Exide Techs., Inc.*,
 299 B.R. 732 (Bankr. D. Del. 2003) .........................................................................46

*In re Fedders N. Am., Inc.*,
 405 B.R. 527 (Bankr. D. Del. 2009) ....................................................................20, 48

*Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*,
 2016 WL 6892802 (Del. Ch. Nov. 23, 2016) ...........................................................57

*In re Gen. Motors Co. Derivative Litig.*,
 2015 WL 3958724 (Del. Ch. June 26, 2015) .......................................................37, 39

*Gilchinsky v. Nat'l Westminster Bank N.J.*,
 159 N.J. 463 (1999) ..................................................................................................47

*In re Healthco Int'l, Inc.*,
 208 B.R. 288 (Bankr. D. Mass. 1997) ......................................................................40

*In re Innovation Fuels, Inc.*,
 No. 11-12911 (DHS), 2013 WL 3835827 (Bankr. D.N.J. July 22, 2013) ...............51

*Jiajing (Beijing) Tourism Co. v. Kaplan*,
 2024 WL 3355151 (D. Mass. July 9, 2024) .............................................................44

*In re KKR Fin. Holdings LLC S'holder Litig.*,
 101 A.3d 980 (Del. Ch. 2014) ..................................................................................21

*Klang v. Smith's Food & Drug Ctrs.*,
 702 A.2d 150 (Del. 1997) .....................................................................................61, 62

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003)..................................................................................27, 30

*In re Live Well Fin., Inc.*,
    2023 WL 4025816 (Bankr. D. Del. June 14, 2023) ................................................60

*Lyondell Chem. Co. v. Ryan*,
    970 A.2d 235 (Del. 2009) ......................................................................................39

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) ...............................................................................39, 40

*Marcus v. Rapid Advance, LLC*,
    2013 WL 2458347 (E.D. Pa. June 7, 2013) ..........................................................41

*In re McDonald's Corp. S'holder Derivative Litig.*,
    291 A.3d 652 (Del. Ch. 2023).............................................................................20, 24

*Mesadieu v. City of Elizabeth*,
    2021 WL 10187008 (D.N.J. May 5, 2021) ............................................................19

*In re Mindbody, Inc.*,
    --- A.3d ---, 2024 WL 4926910 (Del. Dec. 2, 2024)..............................................40

*Montrose Med. Grp. Participating Savs. Plan v. Bulger*,
    243 F.3d 773 (3d Cir. 2001)..................................................................................27

*Morefun Co. v. Mario Badescu Skin Care Inc.*,
    588 F. App'x 54 (2d Cir. 2014) .............................................................................43

*In re Murphy*,
    331 B.R. 107 (Bankr. S.D.N.Y. 2005) ..................................................................47

*Nat'l Utility Serv., Inc. v. Chesapeake Corp.*,
    45 F. Supp.2d 438 (D.N.J. 1999) ..........................................................................26

*Okla. Firefighters Pension & Ret. Sys. v. Corbat*,
    2017 WL 6452240 (Del. Ch. Dec. 18, 2017).....................................................35, 36

*In re Old CarCo LLC*,
    435 B.R. 169 (Bankr. S.D.N.Y. 2010) ..................................................................46

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)..................................................................................26

*In re OpenPeak, Inc.*,
    No. 16-28464 (SLM), 2020 WL 7360482 (Bankr. D.N.J. Dec. 14, 2020) .................34, 45, 47

*In re Opus E. LLC*,
    698 F. App'x 711 (3d Cir. 2017) .......................................................53

*Palmeri v. LG Elecs. USA, Inc.*,
    2008 WL 2945985 (D.N.J. July 30, 2008) ..................................19

*Pappalardo v. Combat Sports, Inc.*,
    2011 WL 7656949 (D.N.J. Dec. 23, 2011) ..................................56

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) .......................................45

*In re Pitt Penn Holding Co.*,
    484 B.R. 25 (Bankr. D. Del. 2012) .......................................48

*In re Sakhe*,
    No. 15-32238 (RG), 2021 WL 5999195 (Bankr. D.N.J. Dec. 17, 2021)................49

*Sands v. McCormick*,
    502 F.3d 263 (3d Cir. 2007)..................................................19

*Schechter v. Hyundai Motor Am.*,
    2019 WL 3416902 (D.N.J. July 29, 2019)..................................56

*Segway Inc. v. Cai*,
    2023 WL 8643017 (Del. Ch. Dec. 14, 2023).......................20, 35, 36, 37

*In re SemCrude L.P.*,
    796 F.3d 310 (3d Cir. 2015)..................................................43

*Seven Invs., LLC v. AD Cap., LLC*,
    32 A.3d 391 (Del. Ch. 2011)...........................................41, 43

*Shabbouei v. Potdevin*,
    2020 WL 1609177 (Del. Ch. Apr. 2, 2020) .......................32, 33, 42

*Solash v. Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988)..................................24

*Spikes v. Hamilton Farm Golf Club, LLC*,
    2014 WL 284432 (D.N.J. Jan. 24, 2014) ..................................48

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ..................................................37

*Strang v. Wells Fargo Home Mortg., Inc.*,
    266 F. App'x 108 (3d Cir. 2008) .......................................43

*SV Inv. Partners LLC v. ThoughtWorks, Inc.*,
    7 A.3d 973 (Del. Ch. 2010) ............................................................................60, 62

*Swift v. Pandey*,
    2014 WL 1366436 (D.N.J. Apr. 7, 2014) ..................................................................20

*Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*,
    2021 WL 3883932 (Del. Ch. Aug. 31, 2021) ............................................................21

*In re the Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ....................................................................57, 58, 59

*Thor 725 8th Ave. LLC v. Goonetilleke*,
    2019 WL 5304146 (D.N.J. Oct. 17, 2019) ................................................................49

*In re Trados Inc. S'holder Litig.*,
    73 A.3d 17 (Del. Ch. 2013) ......................................................................................21

*Traisman v. Khmelnitsky*,
    2020 WL 2847751 (D.N.J. June 1, 2020) ...........................................................52, 54

*In re Transunion Derivative S'holder Litig.*,
    324 A.3d 869 (Del. Ch. 2024) ............................................................................37, 38

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006) ..................................................................................22

*In re Trib. Co. Fraudulent Conv. Litig.*,
    2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) .................................................................46

*In re Troll Commc'ns., LLC*,
    385 B.R. 110 (Bankr. D. Del. 2008) ..................................................................18, 20

*In re Tzanides*,
    No. 16-11410 (RG), 574 B.R. 489 (Bankr. D.N.J. 2017) .........................................46

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) ....................................................56, 58, 59

*Valcom, Inc. v. Vellardita*,
    2014 WL 1628431 (D.N.J. Apr. 23, 2014) ...............................................................19

*In re W.R. Grace & Co.*,
    626 B.R. 217 (Bankr. D. Del. 2021) ...........................................................................6

*White v. Panic*,
    783 A.2d 543 (Del. 2001) ..................................................................................58, 59

**Statutes**

11 U.S.C. § 108(a) ...................................................................................................33

11 U.S.C. § 544(b) ......................................................................................45, 46, 48

11 U.S.C. § 550 ...........................................................................................45, 48, 53

8 Del. C. § 154 .......................................................................................................60

8 Del. C. § 160 ...........................................................................................60, 61, 62

8 Del. C. § 172 .......................................................................................................62

8 Del. C. § 174 ...............................................................................................61, 62

10 Del. C. § 8106 .............................................................................................33, 55

N.J.S.A. § 2A:14-1 ...............................................................................................55

N.J.S.A. §§ 25:2-25 ...............................................................................................49

N.J.S.A. § 25:2-26 .................................................................................................49

N.J.S.A. § 25:2-27 .................................................................................................49

N.J.S.A. § 25:2-31 .................................................................................................49

N.J.S.A § 25:2-35(b) .............................................................................................46

**Other Authorities**

Fed. R. Bankr. P. 2004 ...........................................................................................46

Fed. R. Bankr. P. 7012(b) .................................................................................1, 18

Fed. R. Civ. P. 8 ..............................................................................................45, 46

Fed. R. Civ. P. 9(b) .........................................................................................45, 46

Fed. R. Civ. P. 12(b)(6) ...................................................................................18, 41

## PRELIMINARY STATEMENT

Plaintiff META Advisors, LLC ("Plaintiff") has filed the instant suit to seek recovery for unsecured creditors of Thrasio Holdings, Inc. ("Thrasio" or the "Company") by stitching together a blunderbuss of claims against certain former directors and officers of Thrasio that collectively constitute a *post hoc* recharacterization of rational business decisions made, in many cases years before the bankruptcy petition, by a board of fully informed and disinterested directors.  In essence, Plaintiff's theory of liability is that because Thrasio petitioned to reorganize itself in bankruptcy in 2024 and its unsecured creditors were left with nothing in Thrasio's confirmed plan, a handful of cherry-picked, past business decisions by Thrasio's former leadership must have been breaches of fiduciary duty or fraud.  But Plaintiff's theory is legally and factually flawed at its most basic level and the individual claims are further subject to numerous legal infirmities that require the dismissal of all claims as a matter of law against defendants Carlos Cashman, Cashman Family Investment II, LLC (together, "Cashman"), Mounir Ouhadi, and Aditya Rathod (collectively, "COR Defendants").[1]

Most of the Complaint's claims suffer from the fundamental flaw that they seek impermissibly to second-guess reasonable business decisions made (usually unanimously) by Thrasio's Board of Directors (the "Board") without providing any allegation whatsoever that a majority of those directors were either uninformed or self-interested in making those decisions. Delaware law requires a plaintiff seeking to overcome the protections of the business judgment rule at least to <u>allege</u> that much.  Instead, Plaintiff improperly seeks to lower its burden by casting

---

[1] The COR Defendants do not consent to entry of final orders or judgment by the bankruptcy court in this adversary proceeding.  Fed. R. Bankr. P. 7012(b).

aspersions on only two—and sometimes only one—of Thrasio's former directors. As a matter of law, this is entirely inadequate.

The reason for Plaintiff's selective aim is clear: the overwhelming majority of Thrasio's Board was comprised of outside investors from sophisticated private equity and venture capital firms that represented the principal funders of Thrasio. These individuals not only were well-versed in corporate finance and business operations, but they were wholly independent from Thrasio's management and had every incentive to ensure that their firms' respective investments in Thrasio were well protected. And, notably, all of these individuals received full releases from liability as part of Thrasio's plan of reorganization.

Further to this point, the Complaint brazenly makes allegations of wrongdoing that conclusively have been dispelled after a lengthy and costly investigation by Thrasio as part of the bankruptcy proceedings. Plaintiff, as trustee to the litigation trust formed as part of the Plan approved by this Court, stands in the shoes of the debtor, Thrasio. As part of the bankruptcy proceeding, Thrasio authorized two of its disinterested directors (the "Disinterested Directors") to retain outside counsel and investigate any colorable claims Thrasio may have to preserve after its reorganization. After spending months and millions of dollars on this task, the Disinterested Directors issued a report—filed with this Court in support of the extensive release that Thrasio, its executives, and its Board members sought and received—that identified those claims that were colorable and those that were not. Notwithstanding this prior position taken by Thrasio in support of the release that it and those directors and officers had approved by this Court, Plaintiff disregards these findings wholesale and makes allegations contradicted by the Disinterested Directors' investigation and conclusions reported to this Court. Judicial estoppel forecloses Plaintiff's cynical gamesmanship.

Beyond these fundamental flaws, all of the claims against the COR Defendants suffer from myriad fatal defects, principally among them:

- With respect to Cashman, all of the claims against him are barred because Thrasio released any claims it had against him (including those in the Complaint) when he separated as CEO. Thrasio indisputably received reasonable value from Cashman in exchange for this release, including a release from Cashman, a non-compete agreement, forfeitures of restricted stock units, and restrictions on his sale of Thrasio stock;

- Many of the claims are time-barred, as the statute of limitations on them expired prior to the filing of Thrasio's bankruptcy petition in February 2024;

- The Complaint's oversight claims are premised on business decisions that ultimately failed to succeed or mismanagement viewed in hindsight, which cannot form the basis of an oversight claim as a matter of law; and

- In any case, despite having received millions of documents from Thrasio, including Defendants' emails, and deposition and interview testimony from numerous directors and officers, and taking six months to mine that wealth of information to form its Complaint, the allegations of fact—as opposed to conclusory statements— against Cashman, Ouhadi, and Rathod are glaringly threadbare and fail to adequately allege a claim.

The Complaint is legally insufficient on these and other grounds. A list of Plaintiff's claims against the COR Defendants and the numerous bases for dismissal is provided in the below chart for the Court's convenience.

| Count No. | Claim | Defendant(s) | Basis for Dismissal |
|---|---|---|---|
| 1 | Breach of Fiduciary Duty of Loyalty – Approving Tender Offer | Cashman | Time-barred<br>Claim released by Thrasio<br>Judicial estoppel<br>Insufficiently pled |
| 7 | Breach of Fiduciary Duty of Oversight/Loyalty – No Controls | Cashman<br>Ouhadi<br>Rathod | Time-barred<br>Claim released by Thrasio<br>Judicial estoppel<br>Insufficiently pled |

| Count No. | Claim | Defendant(s) | Basis for Dismissal |
|---|---|---|---|
| 9 | Breach of Fiduciary Duty of Loyalty – Usurping Corporate Opportunity | Cashman<br><br>Ouhadi<br><br>Rathod | Time-barred<br><br>Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |
| 10 | Breach of Fiduciary Duty of Loyalty – Misuse of Confidential Corporate Information | Cashman<br><br>Ouhadi<br><br>Rathod | Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |
| 11 | Aiding and Abetting Breach of Fiduciary Duty of Oversight/Loyalty – Secondary Sales | Ouhadi<br><br>Rathod | Time-barred<br><br>Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |
| 12 | Breach of Fiduciary Duty – Silberstein Separation Agreement | Cashman | Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |
| 17 | Breach of Fiduciary Duty – Yardline | Cashman | Claim released by Thrasio<br><br>Insufficiently pled |
| 4 | Conspiracy to Fraudulently Transfer Tender Offer Proceeds | Cashman | Claim released by Thrasio<br><br>Judicial estoppel<br><br>No such claim exists |
| 25 | Conspiracy to Fraudulently Transfer Yardline Transfers | Cashman | Claim released by Thrasio<br><br>No such claim exists |
| 15 | Avoidance and Recovery of Cashman Release as Constructive Fraudulent Transfer | Cashman | Insufficiently pled |
| 16 | Avoidance of Cashman Release as Actual Fraudulent Transfer | Cashman | Insufficiently pled |
| 2 | Avoidance and Recovery of Tender Offer Proceeds as Constructive Fraudulent Transfers | Cashman<br><br>Cashman Investment | Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |
| 3 | Avoidance and Recovery of Tender Offer Proceeds as Actual Fraudulent Transfers | Cashman<br><br>Cashman Investment | Claim released by Thrasio<br><br>Judicial estoppel<br><br>Insufficiently pled |

- 4 -

| Count No. | Claim | Defendant(s) | Basis for Dismissal |
|---|---|---|---|
| 19 | Avoidance and Recovery of Yardline Transfers as Constructive Fraudulent Transfers | Cashman | Claim released by Thrasio<br>Insufficiently pled |
| 20 | Avoidance and Recovery of Yardline Transfers as Actual Fraudulent Transfers | Cashman | Claim released by Thrasio<br>Insufficiently pled |
| 21 | Avoidance and Recovery of Yardline Transfers as Constructive Fraudulent Transfers | Cashman | Claim released by Thrasio<br>Insufficiently pled |
| 22 | Avoidance and Recovery of Yardline Transfers as Actual Fraudulent Transfers | Cashman | Claim released by Thrasio<br>Insufficiently pled |
| 6 | Unjust Enrichment | Cashman | Time-barred<br>Claim released by Thrasio<br>Judicial estoppel<br>Insufficiently pled |
| 8 | Waste of Corporate Assets – Inventory | Cashman<br>Ouhadi<br>Rathod | Claim released by Thrasio<br>Judicial estoppel<br>Insufficiently pled |
| 26 | Waste of Corporate Assets – Yardline | Cashman | Claim released by Thrasio<br>Insufficiently pled |
| 5 | Violations of Delaware General Corporation Law | Cashman | Claim released by Thrasio<br>Judicial estoppel<br>Insufficiently pled |

The Court should dismiss this fundamentally and fatally flawed Complaint as against the

COR Defendants in its entirety and with prejudice.

## BACKGROUND

## I.     THE PARTIES

Defendant Carlos Cashman is a prominent serial entrepreneur who has founded numerous

successful companies.  He was a co-founder of Thrasio and served as a co-CEO from April 2018

to August 2022 and as a board member from April 2018 to June 2024.  Cashman also served on

the board of directors of Yardline Capital Corp. ("Yardline").

Defendant Cashman Family Investment II, LLC, is a limited liability company

incorporated in Delaware.

Defendant Mounir Ouhadi is a former Thrasio employee who served as Chief Supply Chain

Officer of Thrasio from February 2019 to September 2022.

Defendant Aditya Rathod is a former Thrasio employee who served as Vice President of

Strategic Planning & Analysis of Thrasio from February 2019 to November 2022.

Plaintiff is the trustee of the Thrasio Legacy Trust and the successor-in-interest to the

claims of Thrasio Holdings, Inc. and its affiliated debtors.

## II.    CASHMAN CO-FOUNDED THRASIO TO PURSUE AN INNOVATIVE APPROACH TO LEVERAGING ECONOMIES OF SCALE IN E-COMMERCE

In April 2018, Cashman and Joshua Silberstein co-founded Thrasio, an e-commerce

"aggregator" whose business model relied on acquiring companies, usually via asset purchases.[2]

The companies acquired by Thrasio typically sold their goods on Amazon or other online retail

platforms and had competitive advantages in niche markets.[3]  Thrasio then onboarded the product

of the target companies, optimized the business to achieve high returns, and quickly generated

high growth, including by achieving scale that the niche target companies otherwise would be

unable to achieve on their own.[4]  Thrasio's continued acquisition of undervalued target companies

---

[2] See Decl. of Josh Burke, CFO Of Thrasio, In Supp. Of First Day Mots. ("First Day Decl."), Bankr. Dkt. 38, ¶ 2. Because Thrasio filed the First Day Declaration in the underlying chapter 11 case, it, along with the other docket entries cited herein, may be relied on by the Court on the present motion to dismiss.  In re W.R. Grace & Co., 626 B.R. 217, 236 n.13 (Bankr. D. Del. 2021) ("[A] bankruptcy court may take judicial notice of its own docket entries, its own records, and contents of court records from other courts in related matters.").

[3] First Day Decl. ¶ 2.

[4] See Second Am. Discl. Statement For Joint Plan of Reorg. of Thrasio And Debtor Affils. Purs. To Ch. 11 Of Bankr. Code ("Disclosure Statement"), Bankr. Dkt. 397, at 19-20.

and their inventory was critical to the Company's business model because the scale that was

created drove Thrasio's capacity to pursue further acquisitions and growth.[5]  Notably, Thrasio

climbed from a mere start-up in 2018 to a company with ████████ in revenue just four years

later.[6]

Cashman and Silberstein served as co-CEOs and directors from Thrasio's founding until

September 2021, when Silberstein resigned from the Company.[7]  Cashman continued as CEO until

August 2022, when he stepped down from that role, but remained as a director of Thrasio until the

Plan was confirmed in June 2024.[8]  At all relevant times to the Complaint, Thrasio was governed

by a Board of Directors, the majority of whom were independent of management.  Indeed, of

Thrasio's seven or eight directors, Silberstein and Cashman were the only non-independent

directors.

## III.    THRASIO EXPERIENCED DRAMATIC GROWTH FROM 2018-2022

The early part of Thrasio's story is one of dramatic and nearly immediate growth, fueled

in large part by the industry demand for e-commerce aggregators and the pandemic-driven market

demand for consumer goods.  In approximately its first two years of operation, Thrasio's sales

revenues grew rapidly, reaching ████████ in 2020.[9]  Sales revenue continued to explode from

---

[5] *Id.*

[6] Thrasio Holdings, Inc. Consolidated Financial Statements, Years Ended Dec. 31, 2022 and 2021 ("Audited Financials (2022 and 2021)") at 6 (attached as Ex. A to the Declaration of David A. Kotler submitted in support of the COR Defendants motion to dismiss ("Kotler Decl.")).  The Court may consider the audited financials, as well as the board consents cited herein, at this stage of the adversary proceeding because Plaintiff "relied on these documents in framing the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").

[7] Compl. ¶ 122.

[8] *Id.* ¶ 126; First Am. Joint Plan Of Reorg. Of Thrasio And Debtor Affils. Purs. To Ch. 11 Of Bankr. Code (the "Plan"), Bankr. Dkt. 1125.

[9] Thrasio Holdings, Inc. Consolidated Financial Statements, Year Ended Dec. 31, 2020 ("Audited Financials (2020)") at 5 (Kotler Decl. Ex. B).

there to ▮▮▮▮▮▮ in 2022.[10]  Thrasio's strategy of "buy[ing] up small business at an incredible

pace in order for [it] to grow as fast as possible" was a product of design and necessity.[11]

Acquisitions of undervalued companies, leveraging synergies, and scale were always core to the

business proposition of Thrasio.  That approach was vindicated when "[t]he tremendous boom in

demand shocked the global supply chain as suppliers rushed to meet demand and produce

inventory."[12]  Because "Amazon prioritizes sellers and suppliers who keep their products in stock,"

Thrasio's business model simply <u>required</u> ensuring it had enough inventory to avoid having its

"products deprioritized in search results" by Amazon and being "heavily penalized due to

inventory shortages."[13]

Unfortunately for Thrasio, the demand boom, in the context of the COVID-19 supply chain

crisis, "led to a vicious feedback loop: sellers were forced to purchase substantial amounts of

inventory to keep up with surging consumer demand, which contributed to high demand for

merchandise; high demand for merchandise led to months-long delays in shipping, which

exacerbated demand for inventory and forced sellers to over-purchase inventory to avoid running

out of stock; to keep demand in stock, e-commerce businesses sought to acquire more inventory,

leading back to 'square one'—increased demand for inventory."[14]

To manage this complex and unprecedented phenomenon, Thrasio hired seasoned

professionals, including Ouhadi and Rathod.  Ouhadi served as Chief Supply Chain Officer starting

in February 2019 and worked under the company's President.[15]  Along with his team and others

---

[10] Audited Financials (2022 and 2021) at 6 (Kotler Decl. Ex. A).

[11] Compl. ¶ 42.

[12] Disclosure Statement at 1.

[13] First Day Decl. ¶ 43.

[14] Disclosure Statement at 1.

[15] Compl. ¶ 34.

at Thrasio, Ouhadi helped to manage the Company's exponentially increasing, complex operations

by sourcing inventory for thousands of products "through a highly complex network" of contract

manufacturers, warehouses and third-party fulfilment centers, and managing the "shipping and

logistics process for [Thrasio's] brands and contracts directly with freight forwarders, steamship

lines, and international trucking companies to move products around the world" as Thrasio

acquired more and more brands, inheriting their complexity.[16]  Rathod, as the Vice President of

Strategic Planning & Analysis, worked under the Company's Chief Financial Officer to help

manage the Company's expanding finances.[17]  Together with senior management, they helped

guide the Company through the tumultuous market conditions that defined the early growth stages

at Thrasio.

IV.    **THRASIO'S BOARD, INCLUDING ITS INDEPENDENT DIRECTORS, OVERSAW AND APPROVED SEVERAL SUCCESSFUL ROUNDS OF CAPITAL RAISES, SHARE SALES BY THRASIO INSIDERS, AND MULTIPLE TRANSACTIONS PURSUED BY MANAGEMENT**

Over the course of Thrasio's sudden growth, its Board of Directors authorized the issuance

of several series of preferred shares, which helped the Company take advantage of the

opportunities created by the favorable market conditions fueling Thrasio's growth.  From April

2019 through December 2021, Thrasio raised a staggering ████████, largely from

sophisticated private equity firms who had the ability and wherewithal to perform substantial and

meaningful due diligence on Thrasio's business.[18]  Two rounds of share sales are particularly

notable.

---

[16] Disclosure Statement at 20.

[17] Compl. ¶ 35.

[18] Audited Financials (2020) at 24-25 (Kotler Decl. Ex. B).

On July 1, 2020, as part of a single-stock purchase agreement that was unanimously approved by the Company's full Board, Thrasio: (i) agreed to sell and issue approximately $259 million in shares to third-party investors in a Series C-1 issuance; and (ii) agreed to launch a tender offer ("Tender Offer") as soon as reasonably practicable following the initial closing of the Series C-1 issuance, to purchase up to $160 million in stock, using the proceeds of the Series C-1 issuance. [19]   The Tender Offer was completed in August 2020, with Thrasio repurchasing approximately $146.5 million in shares from existing shareholders, including approximately $25.5 million from Cashman, with the remaining shares tendered by other officers as well as non-management investors many of whom Thrasio released from liability in the bankruptcy proceedings.[20]   The tendered shares were repurchased by Thrasio "at a price per share equal to the Series C Agreement purchase price."[21]   The Thrasio Board of Directors approved the Series C-1 issuance and the Tender Offer as part of a single Unanimous Written Consent, dated July 18, 2020.[22]  As the Disinterested Directors correctly noted in their subsequent Report, the "significant equity investments in Thrasio" at this time were made "by sophisticated and highly-experienced parties" that conducted due diligence prior to investing.[23]

Over the following year and a half, Thrasio raised approximately $800 million in additional capital by issuing several series of additional shares.  Then, in October and December 2021, the

---

[19] Summ. Rep. Of Disint. Dirs. Of Thrasio Re. Indep. Investig. Of Potent. Est. Causes Against Rel. Parties ("Disinterested Directors' Report"), Bankr. Dkt. 805, ¶ 50 (Kotler Decl. Ex. C).

[20] *Id.*; Compl. ¶ 5.

[21] Disinterested Directors' Report ¶ 50 (Kotler Decl. Ex. C).

[22] *Id.* ¶ 51; Action By Unanimous Written Consent Of The Board Of Directors Of Thrasio, Inc., Jul. 18, 2020 ("Tender Offer Board Consent") (Kotler Decl. Ex. D); Action By Unanimous Written Consent Of The Board Of Directors Of Thrasio, Inc., Jul. 1, 2020 ("Series C Board Consent") (Kotler Decl. Ex. E).

[23] Disinterested Directors' Report ¶ 45 (Kotler Decl. Ex. C).

Company ██████████████████████████████████████.[24]  Over this period

of significant capitalization for Thrasio, Cashman, Ouhadi, and Rathod sold some of their own

shares to third-party investors in the secondary market, consistent with explicit, written Board

approvals to do so.[25]  Further, as the Complaint acknowledges, "Silberstein informed the Board

that … it 'has always been the plan' for Thrasio's insiders, including Silberstein and Cashman, to

sell $350 million of their own shares to potential SPAC and Series D investors through secondary

sales."[26]  Again as the Disinterested Directors correctly noted in their subsequent Report, rather

than being viewed as "competing with a corporate opportunity," the Board-approved secondary

sales ("Secondary Sales") were considered to be in the best interests of Thrasio because they had

the effect of "diversifying the community of equity holders, among other benefits."[27]

Thrasio's full Board also unanimously approved other relevant transactions re-

characterized by Plaintiff in its Complaint as contrary to Thrasio's interests—years after the fact

and in its attempt to extract value for unsecured creditors.  One such series of transactions involved

Yardline, which was started by a former Company employee, Ari Horowitz.  Yardline was created

to provide ███████████████████ with ███████████████████████████

████████████████[28]  Thrasio "envisioned that Yardline would complement Thrasio's

business model by providing debt financing to small businesses that sold products on Amazon, but

were not yet ready to be acquired by Thrasio."[29]  In pursuit of this vision, Thrasio provided

---

[24] *Id.* ¶ 45.

[25] Compl. ¶ 77.

[26] *Id.* ¶ 70.

[27] Disinterested Directors' Report ¶ 38 (Kotler Decl. Ex. C).

[28] Audited Financials (2020) at 30 (Kotler Decl. Ex. B).

[29] Compl. ¶ 96.

Yardline, in late 2020, with founding capital in exchange for stock.[30]  From Yardline's inception

to May 2021, Thrasio ███████████████████████████████████████████████████

███████████████████[31] █████████████████████████████████████████████████████████

███████████████[32]  The material decisions concerning Thrasio's investment in, acquisition of,

and ultimate divestment of Yardline were again approved unanimously by Thrasio's full Board in

September 2021.[33]  Eventually, in January 2022, Thrasio sold Yardline to Swiftline Corp.

("Swiftline") for $7.1 million in cash and $5 million in Swiftline stock—which also was approved

unanimously by Thrasio's full Board.[34]

## V.    CASHMAN RESIGNED AS THRASIO'S CEO AND RECEIVED A BROAD RELEASE OF CLAIMS IN EXCHANGE FOR HIS OWN RELEASE OF CLAIMS, NON-COMPETES, FORFEITURES OF RESTRICTED STOCK, STOCK SALE RESTRICTIONS, AND OTHER VALUABLE CONSIDERATION FOR THRASIO

Silberstein resigned as CEO and a director of Thrasio in September 2021, and Cashman

agreed to continue briefly as sole CEO for several months while the Company searched for a

permanent replacement.[35]  By mid-2022, Thrasio's Board identified candidates to take over as the

Company's chief executive and Thrasio and Cashman negotiated, and ultimately entered into, a

Separation Agreement, dated August 1, 2022, by which Cashman resigned as CEO, but remained

as a director of the Company ("Cashman Separation Agreement").[36]  The Separation Agreement

provides that it ████████████████████████████████████████████████████████████

---

[30] *Id.* ¶ 98.

[31] Audited Financials (2020) at 30 (Kotler Decl. Ex. B).

[32] *Id.*

[33] Disinterested Directors' Report ¶ 42 (Kotler Decl. Ex. C).

[34] Compl. ¶ 119; Audited Financials (2020) at 30 (Kotler Decl. Ex. B); Action By Unanimous Written Consent Of The Board Of Directors Of Thrasio Holdings, Inc. ("Yardline Board Consent") (Kotler Decl. Ex. F).

[35] Compl. ¶¶ 122, 126.

[36] *Id.*



███████████████████████ [37]

In return for this release, Cashman (and his Releasees) also gave Thrasio valuable
consideration.  Among other things, Cashman provided Thrasio with the following:



- ████████████████████████████████████████ [38]
- ████████████████████████████ [39]
- ████████████████████████████████████████
- ████████████████████████████████████████ [41]

## VI.    AS COVID RECEDED, THRASIO AND THE ENTIRE E-COMMERCE INDUSTRY FACED AN UNPREDICTABLE DOWNTURN

The surge in demand, desperate search for sufficient inventory, major manufacturing and
shipping delays, and Amazon restrictions that characterized the early years of the pandemic
ultimately receded.  The "headwinds" of supply chain disruptions "were further exacerbated when
the COVID-19 pandemic ended and post-pandemic demand for e-commerce dropped between
2022 and 2023," after the COR Defendants all had left management.[42]  Indeed, Thrasio's financials,

---

[37] Carlos Cashman Thrasio Separation Agreement ("Cashman Separation Agreement") ¶ 10 (Kotler Decl. Ex. G)
(emphasis added).

[38] *Id.* ¶ 9.

[39] *Id.* ¶ 6.

[40] *Id.* ¶ 3(e).

[41] *Id.* at Ex. B n.2.

[42] Disclosure Statement at 1.

and overall prospects, deteriorated in 2023 following the departure of Cashman, Ouhadi, and

Rathod.  The Disclosure Statement filed by the Company during its chapter 11 proceedings (and

approved by this Court) lists several factors that led to Thrasio's ultimate insolvency, including:

industry-wide headwinds and the impact of the COVID-19 pandemic; strategic missteps that were

ultimately investigated by the Disinterested Directors, as discussed below; operational initiatives

in 2022, including the engagement of AlixPartners, LLP ("AlixPartners") to implement savings

initiatives; and an unsuccessful 2023 capital raise.[43]  Indeed, in late 2023, Thrasio spent untold

resources hiring consultants and lawyers to evaluate reorganization.[44]  While no one factor led to

Thrasio's bankruptcy, "significant macroeconomic headwinds and global volatility," as well as

supply gluts and demand imbalance, were too much to bear.

Notably, Thrasio did not blame its bankruptcy on the COR Defendants, or the Company's

financial controls, or any of the numerous transactions highlighted in the Complaint.

## VII.    THRASIO'S DISINTERESTED DIRECTORS CONDUCTED AN EXTENSIVE AND INDEPENDENT INVESTIGATION AND CONCLUDED THAT SEVERAL POTENTIAL CAUSES OF ACTION SHOULD NOT BE RETAINED BY THE COMPANY

In September 2023, well after Cashman, Ouhadi and Rathod had left Thrasio's

management team, the Thrasio Board adopted "delegating resolutions" and appointed the

Disinterested Directors, Anthony R. Horton and Stefan M. Selig, to conduct an independent

investigation of Thrasio ("Independent Investigation"), including investigating any potential

claims Thrasio had against any related parties.[45]  Both of the Disinterested Directors' sterling

---

[43] *Id.* at 21-23.

[44] First Day Decl. ¶ 55-63.

[45] Disinterested Directors' Report ¶ 1 (Kotler Decl. Ex. C); Debtors' Application For Entry Of An Order Authorizing The Retention And Employment Of Katten Muchin Rosenman LLP As Counsel To Thrasio Holdings, Inc. On Behalf Of And At The Sole Direction Of The Disinterested Directors Effective As Of The Petition Date ("Disinterested Directors' Application To Retain Katten"), Bankr. Dkt. 276, ¶¶ 8, 13.

credentials include serving as independent directors to numerous companies and overseeing independent investigations.[46]   On December 12, 2023, the Disinterested Directors retained experienced, independent counsel, Katten Muchin Rosenman LLP ("Katten") and communicated regularly with them throughout the Independent Investigation.[47]

The scope of the Independent Investigation was broad, covering Thrasio's activities over a period of more than five years.[48]   Katten received over 2.3 million electronic documents, thousands of corporate documents and investor data room materials, as well as over 60,000 documents from Thrasio in the course of the bankruptcy, and almost 15,000 documents from third parties produced in response to the subpoenas from the Official Committee of Unsecured Creditors (the "UCC").[49] Katten also conducted interviews, depositions or meetings with 15 witnesses, including then-current or former members of management and Thrasio's auditor, securities counsel, and corporate counsel, in addition to taking depositions pursuant to a subpoena issued by the UCC.[50]   Katten ultimately sought, and the Court approved, nearly $4.2 million in fees, including approximately $3.4 million in fees for 3,021 hours of investigation work.[51]

The result of this extensive and expensive effort was a 236-page analysis of potential causes of action that Katten prepared and presented to the Disinterested Directors.[52]   On May 23,

---

[46] Disinterested Directors' Report ¶ 1 (Kotler Decl. Ex. C).

[47] *Id.* ¶ 2; Disinterested Directors' Application To Retain Katten, Bankr. Dkt. 276, ¶ 9, Ex. A.

[48] Disinterested Directors' Report ¶ 4 (Kotler Decl. Ex. C).

[49] *Id.* ¶¶ 19-21.

[50] *Id.* ¶¶ 24-25.

[51] *See* Final Application for Compensation for Katten Muchin Rosenman LLP For The Period February 28, 2024 Through June 13, 2024 ("Katten Fee Application"), Bankr. Dkt. 1952, ¶¶ 30, 35(f), 43; Order Approving Final Fee Applications Of Certain Retained Professionals ("Order Approving Fees"), Bankr. Dkt. 1984, ¶ 1.

[52] Disinterested Directors' Report ¶ 5 (Kotler Decl. Ex. C).  Thrasio elected not to share the full 236-page analysis with the COR Defendants; accordingly, the COR Defendants refer herein to the contents of the summary of the report, which Thrasio filed in the bankruptcy proceedings in support of the Plan.  *See* Bankr. Dkt. 805; Katten Fee Application, Bankr. Dkt. 1952, ¶ 43.

2024, the Disinterested Directors made their determinations and conclusions, a summary of which was filed in the bankruptcy proceedings.[53]

Several conclusions of the Disinterested Directors, who specifically evaluated whether certain "potentially viable estate causes of action … should be retained by [Thrasio] pursuant to the Plan," are centrally relevant to Plaintiff's claims.[54]  Notably, the Disinterested Directors did not conclude whether any actual liability existed, or even whether any claims should be brought.[55]  Rather the Disinterested Directors made determinations concerning which claims, directors, and officers of Thrasio and the other debtors should opt not to release in bankruptcy.[56]  While the Disinterested Directors did conclude that certain causes of action related to the Company's financial controls and the transactions involving Yardline should not be released in connection with the Plan, they importantly:

- Identified no potential causes of action against Ouhadi or Rathod;[57]

- Concluded that Thrasio's independent directors became aware of what Katten describes as the Company's "financial and inventory control issues" no later than the receipt of the AlixPartners report in September 2021;[58]

- Concluded that the Tender Offer "occurred contemporaneously with, or prior to, significant equity investments in Thrasio by sophisticated and highly experienced [sic] parties that bargained at arm's length and engaged in due diligence prior to investing";[59]

- Found no colorable causes of action related to Secondary Sales by insiders, including Cashman, Ouhadi, or Rathod;

---

[53] *Id.*

[54] Disinterested Directors' Report ¶ 6 (Kotler Decl. Ex. C).

[55] *Id.* ¶¶ 12-13.

[56] *Id.* ¶ 6.

[57] *Id.*

[58] *Id.* ¶ 15.

[59] *Id.* ¶ 16.

- Concluded that "there are no viable claims worthy of pursuit with respect to Thrasio's entry into the [Silberstein] Separation Agreement."[60]

## VIII.    THRASIO'S BANKRUPTCY AND ADVERSARY PROCEEDING

Thrasio and its debtor affiliates voluntarily filed for bankruptcy under 11 U.S.C. § ch. 11 (the "Bankruptcy Code") with this Court on February 28, 2024.[61]  On June 13, 2024, the Court entered the Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Plan of Reorganizations of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order").[62]

The Confirmation Order confirmed the Plan.  Thrasio's unsecured creditors did not receive any recovery pursuant to the Plan.  Instead, the Plan approved a Committee Settlement, which provided for the Company and most of its current and former officers and directors to be released from potential "Vested Causes of Action" and for certain other parties to be "Excluded Parties" that would not be so released.  Excluded Parties include, *inter alia*, Cashman, Ouhadi, and Rathod and "related trusts, investment vehicles, affiliates, and successors and assigns" of the Excluded Parties.[63]  The Plan further established a Thrasio Legacy Trust (the "Trust"), which was empowered to investigate, prosecute, settle, or abandon the Vested Causes of Action.[64]  The Trust retained Morrison & Foerster LLP, which also had served as counsel to the UCC, to pursue its assigned claims.

Notably, the Trust had access to all of the voluminous documents and discovery provided to the UCC, which included all of the non-privileged materials that the Disinterested Directors

---

[60] *Id.* ¶ 49.

[61] Compl. ¶ 21.

[62] *Id.* ¶ 22.

[63] *Id.* ¶ 24.

[64] *Id.* ¶¶ 26-27.

obtained as part of their investigation (which included all of Cashman, Ouhadi, and Rathod's Company emails), among other materials sought and obtained by the UCC.  From June 2024, the Trust, with the assistance of the same counsel that represented the UCC, presumably reviewed in detail the trove of materials provided by the Company in order to fashion whatever claims that it could.

With the benefit of all of the discovery that it had received, Plaintiff, as trustee for the Thrasio Legacy Trust, filed its Complaint on December 3, 2024.[65]

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7012(b), serves to test the sufficiency of the factual allegations in a plaintiff's complaint.[66]  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: "the threshold requirement . . . [is] that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"[67]

While "a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff,"[68] "[i]t is not sufficient merely to state the elements of a claim; a claim must be supported by '[f]actual allegations' sufficient 'to raise a right to relief above the

---

[65] On February 18, 2025, Defendants Silberstein and Millhouse moved to withdraw the standing reference to the Bankruptcy Court with respect to this adversary proceeding, and to transfer the action to the United States District Court for the District of New Jersey (ECF No. 43).  That motion, which was transmitted to the District Court the following day (ECF No. 48), has not been fully briefed.

[66] *In re Troll Commc'ns., LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008); *In re Direct Response Media, Inc.*, 466 B.R. 626, 637 (Bankr. D. Del. 2012).

[67] *Direct Response*, 466 B.R. at 637 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[68] *Demodulation, Inc. v. Applied DNA Scis., Inc.*, 2012 WL 6204172, at *3 (D.N.J. Dec. 12, 2012).

speculative level.'"[69]  "[A] court need not credit a plaintiff's 'bald assertions' or 'legal conclusions'

when deciding a motion to dismiss."[70]  The Court also need not accept unwarranted inferences

"cast in the form of factual allegations."[71]

Under the foregoing settled standard, the Complaint is fundamentally and fatally flawed as

to each claim asserted against each of the COR Defendants.[72]

## ARGUMENT

## I.    PLAINTIFF IMPROPERLY CHALLENGES BUSINESS JUDGMENTS MADE BY THRASIO'S FULL BOARD OF DIRECTORS THAT ARE ENTITLED TO DEFERENCE UNDER THE BUSINESS JUDGMENT RULE

### A.    The Full Thrasio Board, Including All Of Its Independent And Disinterested Directors, Considered And Unanimously Approved Each Of The Transactions At Issue

In no fewer than 18 of the 20 claims it asserts against Cashman, Plaintiff asks the Court to

second-guess unanimous decisions of Thrasio's full Board that are protected by the business

judgment rule by questioning the motives of only one or two of the management directors.  This

is impermissible as a matter of law.

---

[69] *Valcom, Inc. v. Vellardita*, 2014 WL 1628431, at *3 (D.N.J. Apr. 23, 2014) *on reconsideration in part*, 2014 WL 2965708 (D.N.J. July 1, 2014) (quoting *Twombly*, 550 U.S. at 555); *see Mesadieu v. City of Elizabeth*, 2021 WL 10187008, at *2 (D.N.J. May 5, 2021) ("Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth").

[70] *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

[71] *Palmeri v. LG Elecs. USA, Inc.*, 2008 WL 2945985, at *2 (D.N.J. July 30, 2008).

[72] In addition to the arguments set forth herein, the COR Defendants join in and adopt the arguments set forth in Points I (group pleading), II.A (Sec. 546 safe harbor), IV.A (failure to state claim for usurpation of corporate opportunity) and IV.B (failure to state claim for misuse of confidential information) of the memorandum of law submitted by Defendants Silberstein and Everything's Coming Up Millhouse, LLC.

Under Delaware law,[73] there is a presumption that in making a business decision, the directors and officers[74] of a corporation act on "an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[75]  Thus, the judgment of a properly functioning board will not be second-guessed by the courts.[76]  As such, Plaintiff bears the heavy burden of alleging sufficient facts to rebut this presumption.[77]  Plaintiff wholly fails to meet its burden.

### B.    The Complaint Fails To Make <u>Any</u> Allegation That A Majority Of Thrasio's Board Was Impaired

Plaintiff improperly singles out individual Board members for decisions made by the entire Thrasio Board.  To state viable fiduciary duty claims, however, Plaintiff must allege with respect to <u>the entire Board</u>, not just one or two directors, "facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority."[78]  In determining whether the directors approving a transaction comprised a disinterested and independent board majority, the

---

[73] Delaware law applies to the breach of fiduciary duty claims because they pertain to the internal affairs of Thrasio, a Delaware corporation.  *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) ("The courts have long recognized that few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers.").  "[U]nder New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs.'" *Swift v. Pandey*, 2014 WL 1366436, at *7 (D.N.J. Apr. 7, 2014) (quoting *Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005)).  Thrasio is incorporated in Delaware.  Compl. ¶ 41.

[74] While no Delaware court explicitly has held that the business judgment rule applies to officers, the Delaware Court of Chancery has observed that these same arguments have been made in favor of extending the protections of the business judgment rule to officers.  *Segway Inc. v. Cai*, 2023 WL 8643017, at *4 (Del. Ch. Dec. 14, 2023) ("[O]fficers of Delaware corporations owe context-specific duties of oversight comparable to those of directors.").

[75] *Troll*, 385 B.R. at 118 (quoting *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002)).

[76] *Id.* (quoting *Orman*, 794 A.2d at 19-20).

[77] *Id.* ("Because a board is presumed to have acted properly, the burden is on the party challenging the decision to establish facts rebutting the presumption.").

[78] *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 686 (Del. Ch. 2023).

court "counts heads" and conducts a "director-by-director analysis"[79] starting from the presumption that the directors are independent.[80]  A plaintiff therefore must allege "there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority."[81]  Otherwise, a plaintiff is unable to rebut the business judgment presumption.[82]

Plaintiff fails to allege any facts about any of Thrasio's directors save Silberstein and Cashman, much less facts suggesting these sophisticated Board members were impaired.  Instead, Plaintiff engages in the legal fiction that Silberstein and Cashman acted alone and otherwise relies on conclusory statements and hindsight bias to try to make its claims.  Thrasio went as far as to release from liability the other Board members whose decisions Plaintiff now alleges were so improper that they constituted breaches of their duties (not to mention fraudulent transfers).[83]

Plaintiff improperly attempts to ascribe total responsibility—and liability—surrounding these Board-approved decisions to Cashman (and Silberstein) individually.  By closing its eyes to the actions of the other Board members, Plaintiff does not allege any facts to call their independence into question.  The Complaint's meek nods toward allegations of disloyalty by Cashman simply do not suffice to invalidate the considered and informed decisions of Thrasio's full Board.  Because Plaintiff fails to allege impairment related to any decision by any director

---

[79] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44-45 (Del. Ch. 2013) (collecting cases).

[80] *Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *14 (Del. Ch. Aug. 31, 2021)

[81] *Trados*, 73 A.3d at 44.

[82] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014) (granting motion to dismiss for failure to state a claim as to a breach of fiduciary duty where plaintiff failed to allege facts supporting a reasonable inference that a majority of the directors were not independent), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

[83] *See* Compl. ¶ 24.

other than Silberstein and Cashman, all claims predicated on Board-approved actions fail as a matter of law.

### C. Plaintiff Cannot Substitute Its Own Business Judgment For Thrasio's By Re-Characterizing Business Decisions In Hindsight As Risky Or Wrong

In its vain attempt to meet its burden, Plaintiff repeatedly points to what it alleges were risky business decisions to justify re-evaluating the decisions made by the Thrasio Board. This form of judgment in hindsight has been rejected categorically and consistently by the courts.[84] Alleging that Thrasio merely made a bad business decision is not sufficient to overcome the strong presumption of validity and reasonableness under Delaware law. The business judgment rule does not exist to punish directors and officers for taking chances on risky business opportunities that turn out poorly. In fact, the rule exists precisely to "ensure directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."[85] Therefore, it is not enough for a plaintiff to point to the fact that a business strategy turned out poorly as a reason for courts to second-guess these business decisions. Indeed, "[i]f the mere fact that a strategy turned out poorly is in itself sufficient to create an inference that the directors who approved it breached their fiduciary duties, the business judgment rule will have been denuded of much of its utility."[86] But that is exactly what Plaintiff does here. ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████:

---

[84] *See e.g.*, *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006) ("What Delaware law does not do is to impose retroactive fiduciary obligations on directors simply because their chosen business strategy did not pan out."), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

[85] *Trenwick*, 906 A.2d at 193.

[86] *Id.*

- ██████████████████████████████████████████████████
  ████.[87]
  ;

- ██████████████████████████████████████████████████
  ██████████████████.[88]
  ;

- Thrasio's Board initiated Silberstein's departure from the Company, had
  independent counsel review the release agreement they negotiated with him,[89] ███
  ████████████████.[90]

- ██████████████████████████████████████████████████
  ███.[91]

---

[87] Disinterested Directors' Report ¶¶ 51-52 (Kotler Decl. Ex. C); Tender Offer Board Consent (████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████) (Kotler Decl. Ex. D).

[88] Compl. ¶ 77; *see* Action By Unanimous Written Consent Of The Board Of Directors And Waiver And Action By
Written Consent Of The Stockholders Of Thrasio Holdings, Inc., Dec. 30, 2020 ("2020 Secondary Sales Board
Consent") (███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████) (Kotler Decl. Ex. H); Action By Unanimous Written
Consent Of The Board Of Directors And Waiver And Action By Written Consent Of The Stockholders Of Thrasio
Holdings, Inc., Jul. 12, 2021 ("July 2021 Secondary Sales Board Consent") (████) (Kotler Decl. Ex. I); Action By
Unanimous Written Consent Of The Board Of Directors And Waiver And Action By Written Consent Of The
Stockholders Of Thrasio Holdings, Inc., Nov. 15, 2021 ("November 2021 Secondary Sales Board Consent") (████)
(Kotler Decl. Ex. J).

[89] Compl. ¶ 121.

[90] *Id.* ¶ 122; Action By Unanimous Written Consent Of The Board Of Directors Of Thrasio Holdings, Inc., Sept. 25,
2021 ("Silberstein Separation Agreement Board Consent") (███████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████) (Kotler Decl. Ex. K).

[91] Disinterested Directors' Report ¶ 42 (Kotler Decl. Ex. C); Yardline Board Consent (████████████
████████████████████████████████████████████████
████████████) (Kotler Decl. Ex. F).

Yet Plaintiff, notwithstanding that it now stands in the shoes of Thrasio, provides no substantive allegations that Thrasio's Board failed to act in good faith in making any of these decisions, which it did in every instance unanimously.

"The business judgment rule recognizes that people can make mistakes, even when acting diligently, loyally, and in good faith."[92]  This is because, "in the world of business (as elsewhere), persons are often (or always) required to act on less than perfect or complete information."[93] Determining how much information is enough to act upon, and whether to wait for additional information and risk losing an opportunity, are questions that are legitimately addressed by persons charged with decision-making abilities.[94]  Therefore, "the amount of information that it is prudent to have before a decision is made is itself a business judgment of the very type that courts are institutionally poorly equipped to make."[95]  Such is the case here.  Without regard to the nature of fiduciary duties under Delaware law, Plaintiff improperly attempts to pin responsibility, and importantly, civil liability, for the post-pandemic bankruptcy of an e-commerce start-up on a small number of Board-approved actions undertaken by management.

Plaintiff even admits in its Complaint that Yardline was intended to "complement Thrasio's business model by providing debt financing to small businesses that sold products on Amazon but were not yet ready to be acquired by Thrasio."[96]  Plaintiff's own words reveal the transactions'

---

[92] *McDonald's*, 291 A.3d at 691.

[93] *Citron v. Fairchild Camera & Instrument Corp.*, 1988 WL 53322, at *17 (Del. Ch. May 19, 1988), *aff'd*, 569 A.2d 53 (Del. 1989).

[94] *Solash v. Telex Corp.*, 1988 WL 3587, at *8 (Del. Ch. Jan. 19, 1988) ("Information is not without costs of various kinds.  Whether the benefit of additional information is worth the cost-in terms of delay and in terms of alternative uses of time and money—is always a question that may legitimately be addressed by persons charged with decision-making responsibility.").

[95] *McDonald's*, 291 A.3d at 692 (quoting *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *19 (Del. Ch. Jan. 31, 1989)).

[96] Compl. ¶ 96.

true business purpose—one that was intended to benefit Thrasio.  Yet Plaintiff improperly asks this Court once again to second-guess many years later a handful of business decisions made by Thrasio executives simply because it has the benefit of hindsight.  Delaware law forbids courts to indulge in such *post hoc* reviews.

Further, with respect to the Secondary Sales, Plaintiff alleges that "[o]n July 12, 2021, without informing the Board about the CFO's abrupt departure, Silberstein and Cashman had the Board sign a written consent approving the Secondary Sales of up to 14 million shares of Thrasio common stock[.]"[97]  Rarely does a single allegation so starkly reveal a Plaintiff's attempt to evade a board's judgment.  Through its phrasing that management "had the Board sign a written consent," Plaintiff vaguely suggests—but fails to provide a single fact to substantiate—that management was capable of "forcing" sophisticated Board members to sign consents.  But it does not allege any facts to support such a conclusion, not even the identities of these apparently hapless directors, each of whom represent past and current major shareholders of Thrasio, and who conveniently gave themselves full releases as part of the bankruptcy process.

Instead, Plaintiff tries to eat its cake and have it, too, by alleging contradictory stories of a hapless Board that passively does management's bidding while at the same time rising up to forcibly remove the Company's co-founder and co-CEO, Silberstein.  Specifically, the Complaint alleges that a mere month after management "had the Board sign a written consent," the "Board determined that Silberstein could no longer stay at the Company."[98]  A Board that decides to remove a CEO and negotiates the terms of that removal hardly can be said to be operating blindly

---

[97] *Id.* ¶ 77.  Notably, Plaintiff does not allege any failure by Cashman in this instance.  As the preceding paragraph of the Complaint makes clear, "Thrasio's CFO, Wafford, submitted his resignation to Silberstein and left Thrasio days later . . . . Therefore, Silberstein withheld notice of the CFO's resignation from the Board and Thrasio's shareholders." *Id.* ¶ 76.  Yet purely by sleight of hand, Cashman's name appears in the subsequent paragraph as an individual responsible for failing to inform the Board of the resignation.

[98] *Id.* ¶ 121.

under management's direction.    But despite its own acknowledgement of the Board's

independence and authority by, for example, removing Silberstein, Plaintiff repeatedly attempts to

impugn the Board's impartiality and its judgment: "the Board represented in a conclusory manner

that Thrasio had an available surplus" and "[c]ontrary to the Board's unsupported conclusion . . .

Thrasio was insolvent[.]"[99]    These types of theories that are premised on second-guessing directors

are the exact types of allegations that the business judgment rule is meant to bar, particularly where,

as here, the majority of Board members who approved those decisions indisputably were both

independent and released from liability pursuant to the Plan.

## II.    PLAINTIFF CANNOT RE-ASSERT THE SAME CLAIMS THAT THRASIO RENOUNCED IN THE BANKRUPTCY PROCEEDINGS AND IN THE RELATED INTERNAL INVESTIGATION

### A.    Judicial Estoppel Precludes Plaintiff From Alleging Claims Contrary To The Conclusions Of The Disinterested Directors Submitted In Support Of Thrasio's Confirmed Plan

The doctrine of judicial estoppel exists precisely to prevent a litigant from asserting a

position inconsistent with one they have previously asserted in the same or a previous

proceeding.[100]    The Third Circuit has held that judicial estoppel may be invoked against a party

when three conditions are met: (1) the party to be estopped has taken two positions that are

irreconcilably inconsistent; (2) the party changed their position "in bad faith – i.e., with the intent

to play fast and loose with the court"; and (3) application of the doctrine is tailored to address the

---

[99] *Id.* ¶¶ 63-64.

[100] *Nat'l Util. Serv., Inc. v. Chesapeake Corp.*, 45 F. Supp. 2d 438, 444 (D.N.J. 1999) (quoting *In re Chambers Dev. Co.*, 148 F.3d 214, 229 (3d Cir. 1998)); *see Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988) (doctrine of judicial estoppel is warranted to protect "the integrity of the system").

harm identified.[101]  Judicial estoppel is properly invoked where, as here, a debtor's claim conflicts with a previously approved plan of reorganization and disclosure statement.[102]

Here, the following claims should be dismissed pursuant to the doctrine of judicial estoppel: all claims asserted against Ouhadi and Rathod (Counts VII-XI), all claims related to the Tender Offer (Counts I-VI), the breach of fiduciary duty claim as to the Silberstein Separation Agreement (Count XII), and the breach of fiduciary duty claims as to the Secondary Sales (Counts IX and X).  Each of these claims directly contradicts the conclusions of the Disinterested Directors' Report, which Thrasio submitted to this Court to justify the broad release the Court granted to it and certain of its directors and officers, necessitating the use of judicial estoppel here.  Plaintiff stands in the shoes of the debtor, Thrasio, in this case.  During the bankruptcy proceedings before this Court, the debtor funded a five-month, multi-million-dollar independent investigation directed by its Disinterested Directors and filed a summary of the findings with this Court.[103]  The purpose of this investigation was both to justify the broad release Thrasio sought (and obtained) and to provide potential claims to unsecured creditors to pursue, thus justifying the Plan's payment of no consideration to them from the estate.  Thus, there is no question that the positions Thrasio asserted through the Disinterested Directors' Report were relied upon by this Court to the advantage of Thrasio.

There is also little question of the thoroughness of the Disinterested Directors' investigation into the very transactions and issues advanced in the Complaint.  The Disinterested

---

[101] *Montrose Med. Grp. Participating Savs. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001) (quoting *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999)).

[102] *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314 (3d Cir. 2003) (quoting *Oneida*, 848 F.2d at 418) (holding that use of judicial estoppel against debtor was "required to preserve the integrity of the earlier proceedings").

[103] *See generally* Disinterested Directors' Report (Kotler Decl. Ex. C).

Directors, together with their independent legal counsel from Katten, diligently investigated any colorable claims the Company might have that it ought to preserve after reorganization. Katten obtained millions of documents as part of the investigation, in addition to tens of thousands more in the course of the bankruptcy, as well as documents produced from third parties in response to subpoenas from the UCC.[104] Katten also conducted interviews, depositions or meetings with over a dozen witnesses, including management, auditors, and counsel.[105] Katten sought, and this Court approved, nearly $4.2 million in fees, including approximately $3.4 million in fees for the investigation work.[106] On May 23, 2024, the Disinterested Directors made their determinations and conclusions, a summary of which was filed in these bankruptcy proceedings in support of the Plan.[107] The Plan was proposed and approved, in part, on the basis of those conclusions.

Now, Plaintiff attempts to bring claims that Thrasio's previous representations to this Court in service of Plan confirmation deemed unworthy of pursuit. The Court should not countenance this bait and switch.

Plaintiff asserts five claims against Ouhadi and Rathod (Counts VII-XI) that all should be barred by judicial estoppel. Not only did the Disinterested Directors investigate any potential claims against Ouhadi and Rathod, but counsel to the Disinterested Directors interviewed both of them in the course of their investigation and concluded that the estate did not have even a "colorable" cause of action against either of them.[108] Indeed, the threadbare allegations against them in the Complaint, despite Plaintiff's access to the overwhelming quantum of evidence made

---

[104] *Id.* ¶¶ 19-21.

[105] *Id.* ¶¶ 24-26.

[106] *See* Katten Fee Application, Bankr. Dkt. 1952, ¶¶ 30, 35(f), 43; Order Approving Fees, Bankr. Dkt. 1984, ¶ 1.

[107] *See generally* Disinterested Directors' Report (Kotler Decl. Ex. C).

[108] *Id.* ¶¶ 6, 26.

available to the Disinterested Directors and UCC, confirms the Disinterested Directors'
conclusions with respect to Ouhadi and Rathod.

Additionally, Plaintiff's claims related to the Tender Offer (Counts I-VI) should be barred.
The Disinterested Directors concluded that: (1) "a claim asserting that the Tender Offer constituted
an unlawful stock purchase or redemption under Delaware General Corporation Law is not worthy
of pursuit"[109]; (2) "a constructive fraudulent transfer claim relating to the Tender Offer is not
worthy of pursuit"[110]; (3) "estate causes of action for breach of fiduciary duty or actual fraudulent
transfer relating to the Tender Offer are not worthy of pursuit"[111]; and (4) for even further clarity,
"there are no viable claims worthy of pursuit with respect to the Tender Offer."[112]

Plaintiff's breach of fiduciary duty claim concerning the Silberstein Separation Agreement
(Count XII) is also judicially estopped by the Disinterested Directors' finding that Thrasio received
numerous benefits from the Agreement and therefore "there [we]re no viable claims worthy of
pursuit with respect to Thrasio's entry into the [Silberstein] Separation Agreement."[113] After
conducting their investigation, the Disinterested Directors found that by entering into the
Silberstein Separation Agreement, "Thrasio avoided a potentially value-destructive public
dispute—and potential litigation—with its departing co-founder and co-CEO." [114]    The
Disinterested Directors' Report even went as far as to say that "the interests of Thrasio's directors

---

[109] *Id.* ¶ 52.

[110] *Id.* ¶ 53.

[111] *Id.*

[112] *Id.* ¶ 54 (emphasis added).

[113] *Id.* ¶ 48.

[114] *Id.*

(other than Silberstein) were aligned with Thrasio's interests in connection with the Separation

Agreement."[115]

Finally, Plaintiff's breach of fiduciary duty claims with respect to secondary sales (Counts

IX and X) are also barred.  The Disinterested Directors reviewed the secondary sales and concluded

that the potential causes of action related to secondary sales by insiders did not include any sales

by the COR Defendants.[116]  Therefore, Plaintiff should be judicially estopped from asserting these

claims.

While judicial estoppel is not appropriate where the party's "initial claim was never

adopted by a court or agency," here, the Disinterested Directors' Report was expressly

incorporated into the Confirmation Order approve by this Court.[117]  All parties and the Court were

familiarized with its findings.  Plaintiff is acting in bad faith by asserting these claims even after

the debtor-funded, Court-sanctioned investigation concluded that many of these claims were not

even worth retaining.  Plaintiff, standing in the shoes of the debtor, is not entitled to seek a "do

over," expending substantial resources of the Court and the parties to litigate these already-

resolved issues.[118]  Yet that is what Plaintiff attempts in its Complaint.[119]

---

[115] *Id.*

[116] *Id.* ¶¶ 39-41 (the only mention of any of the COR Defendants in the context of the potential claims concerning secondary sales was the observation that "Cashman and Fahey, Thrasio's General Counsel, among others, became concerned with Silberstein's conduct in connection with the Secondary Sales").

[117] Plan, Bankr. Dkt. 1125.  Despite footnote 4 of the Court's Confirmation Order, which states that claims are not limited or impaired by the conclusions of the Disinterested Directors, the Court's Confirmation Order should not be read to countenance the Trust's allegations where those assertions were refuted in filings this Court made by the Trust's predecessor-in-interest.

[118] *Krystal*, 337 F.3d at 319 (quoting *Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996)) ("[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.").

[119] Plaintiff is not judicially estopped from asserting its inadequate internal accounting/inventory controls claims and Yardline claims against Cashman because the Disinterested Directors' Report recommended retaining those claims pursuant to the Plan.  However, the Disinterested Directors made no judgment as to ultimate liability with respect to those claims.  Additionally, no "reverse judicial estoppel" doctrine exists such that those claims automatically survive a motion to dismiss.  And for the reasons discussed in this Memorandum, those claims also fail as a matter of law.

**B.  The Conclusions Of The Disinterested Directors As To The Non-Viability Of Potential Estate Claims Are Themselves Subject To Deference As Business Judgments**

Judicial estoppel based on the debtor's prior reliance on the Disinterested Directors' Report in the bankruptcy proceedings is not the only reason such report bars all claims asserted against Ouhadi and Rathod (Counts VII-XI), all claims related to the Tender Offer (Counts I-VI), the breach of fiduciary duty claim as to the Silberstein Separation Agreement (Count XII), and the breach of fiduciary duty claims as to the Secondary Sales (Counts IX and X).  The conclusions reached by the Disinterested Directors as to the non-viability of those claims are themselves business judgments that the Court should not overturn absent allegations that the Disinterested Directors were not independent, or that their process was materially deficient.  Plaintiff has made no such allegation.

Judgments made by independent board members historically have been given great deference under Delaware law,[120] and Plaintiff offers no reason to doubt the independence of the Disinterested Directors or the thoroughness of their investigation process—nor could it, given that the Thrasio Board itself empowered the Disinterested Directors to conduct the investigation, and Thrasio relied on the conclusions reached by the Disinterested Directors in support of the releases it granted as part of the Plan.  Plaintiff is therefore not entitled to ignore the conclusions reached by its own Disinterested Directors simply because those conclusions are at odds with its present litigation-driven contentions.

As described above, the Disinterested Directors already reviewed the transactions at the heart of Plaintiff's Complaint and found that many did not produce viable causes of action because

---

[120] *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *10 (Del. Ch. Jan. 11, 2010) ("A business decision made by a majority of disinterested, independent board members is entitled to the deferential business judgment rule[.]").

they were the result of valid business judgments.  For example, they concluded that Thrasio had no causes of action for breach of fiduciary duty with respect to the Tender Offer because, among other reasons, there were valid business reasons to enter into the Tender Offer and because there was no indication that Thrasio intended to hinder, delay, or defraud its creditors.[121]  They similarly concluded that the Secondary Sales were beneficial to Thrasio by, among other benefits, diversifying the community of equity holders.[122]

The Disinterested Directors also found that Thrasio entered into the Silberstein Separation Agreement for a legitimate business purpose that allowed the company to avoid a public dispute and potential litigation.  This situation mirrors *Shabbouei v. Potdevin*.[123]  In that case, a breach of fiduciary duty claim arose from a not-for-cause termination of the company's CEO for allegations of unprofessional and harassing behavior.[124]  The court rejected the claim on a motion to dismiss, holding that a board acts "well-within the bounds of proper business judgment when it decide[s] to settle with [its CEO] rather than fire him 'for cause,' a decision that could have embroiled the Company in an embarrassing legal battle with its former CEO."[125]  In the context of a related claim for corporate waste, the court also held that the separation agreement provided value to the company by (i) requiring the separating CEO to release all the claims he had against the company and (ii) securing an extended non-solicitation covenant from the CEO.[126]  Even putting aside those tangible benefits, the court recognized that "it is undisputed that the Separation Agreement liberated the Company from Potdevin's troublesome tenure as CEO, facilitated the Company's

---

[121] Disinterested Directors' Report ¶ 53 (Kotler Decl. Ex. C).

[122] *Id.* ¶ 38.

[123] *Shabbouei v. Potdevin*, 2020 WL 1609177, at *1 (Del. Ch. Apr. 2, 2020).

[124] *Id.* at *1.

[125] *Id.* at *12.

[126] *Id.* at *13.

efforts swiftly to remediate an environment the Complaint describes as 'toxic' and allowed the

Company to avoid potentially costly and embarrassing litigation. These, by any measure, are

corporate benefits."[127] So, too, the Silberstein Separation Agreement was neither unfair to

shareholders nor an abuse of discretion warranting a departure from the business judgment rule.

## III.    EACH OF PLAINTIFF'S FIDUCIARY DUTY CLAIMS FAILS AS A MATTER OF LAW FOR ADDITIONAL REASONS

### A.    Several Of Plaintiff's Fiduciary Duty Claims Are Time Barred

Plaintiff's claims regarding the Tender Offer (Count I), the 2020 Secondary Sales (Counts

IX and XI), and "inadequate inventory controls" (Count VII) are untimely.

Claims for breach of fiduciary duty are subject to a three-year statute of limitations under

Delaware law.[128] The statute of limitations begins to run at the moment of the alleged wrongful

act.[129] The Bankruptcy Petition was filed on February 28, 2024, and Plaintiff filed its Complaint

on December 3, 2024.[130]

Plaintiff claims that Cashman breached his fiduciary duty in approving the 2020 Tender

Offer (Count I) that occurred on July 18, 2020. Therefore, any breach of fiduciary duty claim

related to this action expired on July 18, 2023, nearly eight months before the Bankruptcy Petition

was filed. This claim is thus time-barred.

Plaintiff's claims regarding the 2020 Secondary Sales are also untimely. Plaintiff claims

that Cashman breached his fiduciary duty in connection with the 2020 Secondary Sales (Count

IX), which the Complaint alleges occurred on December 31, 2020, more than three years before

---

[127] *Id.*

[128] 10 Del. C. § 8106.

[129] *Direct Response*, 466 B.R. at 646-47.

[130] While the Bankruptcy Code provides a two-year extension of the statute of limitations from the filing of bankruptcy, this extension only applies if the limitations period has not expired prior to the filing. *Id.* (citing 11 U.S.C. § 108(a)).

the Bankruptcy Petition was filed.[131]  With respect to its aiding and abetting claim (Count XI),

Plaintiff fails to allege to which round of Secondary Sales (2020 vs. 2021) its allegation refers.

With respect to the 2020 sales, the three-year statute of limitations elapsed before the Bankruptcy

Petition and Complaint were filed; thus, the aiding and abetting claim as to the 2020 sales is time-

barred as well.[132]

Plaintiff's claim concerning the alleged lack of controls (Count VII) is also time-barred.

Plaintiff conspicuously omits allegations as to when Defendants' alleged breaches of oversight

began.  Plaintiff only mentions that the COR Defendants "recognized the weak inventory control

environment as early as March and April 2019[.]"[133]  Given Delaware's three-year statute of

limitations for such claims, these claims are time-barred.  Plaintiff also is not entitled to rely on

the "continuing wrong doctrine" here, because under Delaware law, "it is settled that the failure to

remedy a wrong does not mean that the wrong is continuing."[134]  Plaintiff's core allegation is that

Thrasio had poor inventory and accounting systems that resulted in operational deficiencies.  But

the Complaint acknowledges that Thrasio had three different systems in place to calculate its

inventory as it grappled with uncertain demand during the height of the COVID-19 pandemic.[135]

Plaintiff therefore does not allege any specific time, much less a continuing period of time, when

Defendants committed the alleged breach of oversight.  As Plaintiff solely points to "March and

---

[131] Compl. ¶ 65.

[132] To the extent Plaintiff alleges aiding and abetting based on any secondary sales occurring within the statute of limitations, it must amend its complaint to re-plead such allegations properly.  *See In re OpenPeak, Inc.*, No. 16-28464 (SLM), 2020 WL 7360482, at *8 (Bankr. D.N.J. Dec. 14, 2020) (noting that Rule 8(a) "mandates the plaintiff provide enough information to put each defendant on notice of the allegations and damages sought separately against each defendant").

[133] Compl. ¶ 55.

[134] *Desimone v. Barrows*, 924 A.2d 908, 925 (Del. Ch. 2007).

[135] Compl. ¶ 57.

April 2019," more than three years before the Complaint was filed, this claim is also time-barred and should be dismissed.

### B. Plaintiff's Allegations That The COR Defendants Failed To Oversee Inventory And Financial Controls Does Not Properly State An Oversight Claim

#### 1. Mere Allegations Of Poor Business Practices Do Not State An Oversight Claim

Under Delaware law, an oversight claim, commonly known as a *Caremark* claim, is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[136]    Courts consistently have held that allegations of mere business risk are not sufficient to state an oversight claim.[137]    This is because business decision-makers, who are regularly operating with imperfect information and limited resources, must make difficult judgment calls on the opportunity cost of acting now or waiting for more information.[138]    Delaware courts have recognized that "it is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision."[139]

*Caremark* claims involve a knowing failure to prevent or remedy illegality within the corporation, and do not concern mere mismanagement of business operations, as is alleged in the Complaint.[140]    Delaware courts apply *Caremark* to situations where corporate entities, acting

---

[136] *Segway*, 2023 WL 8643017, at *5 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).

[137] *See Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *1 (Del. Ch. Dec. 18, 2017) ("*Caremark* provides that if directors have failed to put in place any system whereby they may be made aware of and oversee corporate compliance with law, they may be liable."); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 127 (Del. Ch. 2009) ("Such conclusory allegations, however, are not sufficient to state a claim for failure of oversight that would give rise to a substantial likelihood of personal liability, which would require particularized factual allegations demonstrating bad faith by the director defendants.").

[138] *Citigroup*, 964 A.2d at 126 ("Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future.    To impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks.").

[139] *Id.*

[140] *Okla. Firefighters*, 2017 WL 6452240, at *18 ("In other words, *Caremark* claims involve a knowing failure to prevent or remedy illegality within the corporation.").

through their employees, violate laws or regulations and incur fines and penalties as a result. The doctrine therefore seeks to force these directors to make the company whole again for these losses.[141]

"The *Caremark* doctrine is not," however, "a tool to hold fiduciaries liable for everyday business problems."[142]  Rather, it "is intended to address the extraordinary case where fiduciaries' 'utter failure' to implement an effective compliance system or 'conscious disregard' of the law gives rise to a corporate trauma."[143]  "These tenets of our law persist regardless of whether a *Caremark* claim is brought against a director or an officer.  Officers' management of day-to-day matters does not make them guarantors of negative outcomes from imperfect business decisions."[144]

### 2. Plaintiff Fails To Allege Facts That Meet The High Bar Required Of An Oversight Claim

Even if the Complaint's oversight claims touched on Thrasio's failure to comply with the law (and they do not), the allegations still fall well short of stating an oversight claim.  Under Delaware law, an oversight claim implicates only the duty of loyalty.[145]  Thus, to plead a viable claim for breach of the duty of oversight, a plaintiff must allege sufficient facts to support a reasonable inference that the fiduciary acted in bad faith, not merely negligently.[146]  Specifically, *Caremark* and its progeny require a plaintiff to allege either (a) that an officer or director

---

[141] *Id.* at *1 ("The essence of a *Caremark* claim is an attempt by the owners of the company, its stockholders, to force the directors to personally make the company whole for these losses.").

[142] *Segway*, 2023 WL 8643017, at *5.

[143] *Id.*

[144] *Id.*

[145] *Id.* at *3 ("Oversight duties arise from the duty of good faith, which is a subsidiary element of the duty of loyalty.")

[146] *Id.*

consciously failed to make a good-faith effort to establish information systems to ensure compliance, or (b) consciously ignored red flags of illegal activity.[147]

The so-called "red flags" described in the Complaint are not the stuff of a *Caremark* claim. As discussed *supra*, the threshold for liability based on failed oversight "is quite high" and requires a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight."[148]  Directors who "try" to implement and attend to a "reasonable board-level system of monitoring and reporting" have met their baseline duty.[149]  Similarly for officers, Plaintiff must allege at least that the officer failed to make a good-faith effort to monitor central compliance risks within his responsibility that pose potential harm to the company or others.[150]

Count VII of Plaintiff's Complaint presents no allegations suggesting that Defendants showed an "utter failure" to implement financial controls or a "conscious disregard" to oversee such controls.[151]  Thrasio's officers were charged with managing complex operations, including "inventory for over 24,000 unique products through a highly complex network of over 350 contract manufacturers, 35 third-party warehouses, and numerous fulfillment centers[.]"[152]  Plaintiff itself acknowledges that Thrasio had three different methods of calculating inventory as it attempted to grapple with the complexities of a start-up inventory manager and uncertain demand that

---

[147] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

[148] *In re Transunion Derivative S'holder Litig.*, 324 A.3d 869, 884 (Del. Ch. 2024).

[149] *Id.* ("Since liability can only attach where a plaintiff pleads facts showing a disloyal state of mind, steps toward compliance defeat such claims—even where corporate traumas unfold.").

[150] *Segway*, 2023 WL 8643017, at *5.

[151] *Id.* To allege a conscious disregard to oversee controls, a plaintiff must allege that the red flags were observed but "consciously disregarded" such that the defendant completely "disable[d himself] from being informed of risks or problems requiring [his] attention."  *See In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016); *Stone*, 911 A.2d at 370.

[152] Disclosure Statement at 20.

characterized the height of the COVID-19 pandemic. [153]    While Plaintiff makes conclusory allegations that the COR Defendants "took no action" to implement proper controls,[154] it does not provide sufficient allegations as to how any of the COR Defendants supposedly failed to carry out their duties.  Plaintiff relies instead on *ipse dixit* that, for example, the allegedly excess inventory Thrasio ultimately purchased must have resulted from a complete failure to institute inventory controls.  But this theory has been debunked in numerous filings Thrasio made with this Court that described that the Company made a conscious, rational business decision to maintain high inventory in order to meet the historic demand for its e-commerce stores in the face of unprecedented supply chain disruptions during the pandemic. [155]    As with many other representations Thrasio previously made to this Court, Plaintiff now conveniently ignores them wholesale.

Plaintiff's allegations regarding financial and accounting controls also fail to meet the high standard of a *Caremark* claim.  Far from an "utter failure" to develop controls, the Complaint concedes that Thrasio generated "'pro forma' financial statements"[156] and conducted financial modeling and performance reporting. [157]    In support of those efforts, the Company hired PricewaterhouseCoopers ("PwC") to perform an audit of the company's financials—a clear example of steps towards compliance that defeat an oversight claim.[158]  Plaintiff's allegations that, as a start-up company, Thrasio's models included "over-inflated projections" simply do not

---

[153] Compl. ¶ 199.

[154] *Id.* ¶ 205.

[155] *See, e.g.*, Disinterested Directors' Report ¶ 33 (Kotler Decl. Ex. C); First Day Decl. ¶ 43; Disclosure Statement at 20.

[156] Compl. ¶ 41.

[157] *Id.* ¶ 35.

[158] *Transunion*, 324 A.3d at 873 ("Since liability can only attach where a plaintiff pleads facts showing a disloyal state of mind, steps toward compliance defeat such claims—even where corporate traumas unfold.").

support a *Caremark* claim.    Moreover, notwithstanding certain control issues identified by

AlixPartners in 2021, sophisticated parties continued to make significant investments in Thrasio.[159]

Delaware courts recognize that there is "a vast difference between inadequate or flawed" business

practices and "a conscious disregard for" fiduciary duties.[160]    The fact that the financial systems

in place did not function "to the Plaintiffs' hindsight-driven satisfaction" does not establish the

bad faith required to plead an oversight claim.[161]    In fact, Plaintiff's critique of Thrasio's

"spreadsheet-based calculations"[162] further reveals the impropriety of their argument—Thrasio

clearly had financial control systems in place.    Plaintiff's hindsight-driven critiques of mere

alleged mismanagement are not enough to state an oversight claim.

### C.    Plaintiff Fails To State An Aiding And Abetting Claim Against Ouhadi Or Rathod

To state a claim for aiding and abetting breach of fiduciary duty, Plaintiff must plausibly

allege facts that establish: "(1) the existence of a fiduciary relationship, (2) a breach of the

fiduciary's duty . . . (3) knowing participation in that breach by the defendants, and (4) damages

proximately caused by the breach."[163]    Once the Court concludes here that Plaintiff did not

adequately allege a breach of the duty of loyalty, there can be no claim for aiding and abetting that

nonexistent breach.[164]    As explained above, Plaintiff fails to adequately allege its breach of

fiduciary duty of oversight claim under *Caremark*, and thus, its aiding and abetting claim against

Ouhadi and Rathod must also fail.

---

[159] Disinterested Directors' Report ¶ 35 (Kotler Decl. Ex. C).

[160] *See, e.g.*, *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.").

[161] *Gen. Motors*, 2015 WL 3958724, at *16.

[162] Compl. ¶ 199.

[163] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

[164] *See id.* at 1096-98.

Even if the Court finds that Plaintiff adequately has alleged a fiduciary duty breach claim, however, Plaintiff has failed to plead that Ouhadi or Rathod knowingly participated in such a breach of duty.  Knowing participation in a breach of fiduciary duty requires that the third-party act "with the knowledge that the conduct advocated or assisted constitutes such a breach."[165]  To plead knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper."[166]  Participation requires allegations that the third party either "participated in the [fiduciary] decisions, conspired with [the fiduciary], or otherwise caused the [fiduciary] to make the decisions at issue."[167]  "To defeat a motion to dismiss, a plaintiff must plead specific facts showing the defendant knowingly participated in a fiduciary's breach; a conclusionary statement to that effect is not enough."[168]

For example, in *Malpiede*, the court found the plaintiffs' aiding and abetting claim failed as a matter of law because there was "no indication in the amended complaint that Knightsbridge participated in the board's decisions, conspired with the board, or otherwise caused the board to make the decisions at issue."[169]  Here, rather than alleging knowledge by Ouhadi or Rathod, Plaintiff simply refers to its breach of fiduciary duty claims and makes conclusory allegations that Defendants knew these alleged breaches were occurring, rather than making individualized

---

[165] *In re Mindbody, Inc.*, --- A.3d ---, 2024 WL 4926910, at *32 (Del. Dec. 2, 2024) (quoting *Malpiede*, 780 A.2d at 1097).

[166] *In re Cred Inc.*, 658 B.R. 783, 793 (D. Del. 2024) (quoting *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015)).

[167] *Id.* at 794 (quoting *Malpiede*, 780 A.2d 1098).

[168] *In re Healthco Int'l, Inc.*, 208 B.R. 288, 309 (Bankr. D. Mass. 1997).

[169] *Malpiede*, 780 A.2d at 1098.  Additionally, in *Cred*, the plaintiff's aiding and abetting claim similarly failed because the Complaint was devoid of allegations that defendant had knowledge of problems at the company that would have necessarily led the defendant to conclude the company's executives were breaching their fiduciary duties.  *Cred*, 658 B.R. at 794-803.

allegations of fact that plausibly (or at all) suggest their actual, knowing participation. This is not sufficient to state an aiding and abetting claim.

## IV.    THE CASHMAN SEPARATION AGREEMENT BARS PLAINTIFF FROM ASSERTING ITS RELEASED CLAIMS AGAINST CASHMAN

Plaintiff improperly attempts to circumvent the unambiguous and validly executed Cashman Separation Agreement by asserting that it is a fraudulent conveyance. Plaintiff does so solely to bring claims against Cashman that indisputably are barred by the express terms of the release from Thrasio in that Agreement. The Court is empowered to decide the validity of the Separation Agreement's release at this stage of the litigation because it is raised in the Complaint. [170] Here, not only is the enforceability of the Cashman Separation Agreement foundational to Plaintiff's Complaint—its validity obviates the need to decide the other issues related to Cashman—but also, the Complaint explicitly incorporates the release by seeking to invalidate it as a fraudulent conveyance. [171] The Court therefore can and should consider the validity of the Separation Agreement at the motion to dismiss stage, and, for the following reasons, find that Plaintiff's claims against Cashman are barred by the plain release language in the validly executed Separation Agreement. [172]

The Cashman Separation Agreement, executed in September 2022, includes a comprehensive release stating that it is to be ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[170] *Marcus v. Rapid Advance, LLC*, 2013 WL 2458347, at *3 (E.D. Pa. June 7, 2013) ("[T]he law of this Circuit (the so-called 'Third Circuit Rule') permits a defense based on a release to be raised by motion under Rule 12(b)(6), where the release is raised in the complaint or the defense is apparent on the face of the complaint.").

[171] Compl. ¶¶ 264-83.

[172] *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (dismissing complaint because unambiguous release encompassed plaintiff's claims).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ [173]

This broad release is just one part of the Separation Agreement negotiated by Thrasio and Cashman, each represented by their own counsel, from which each received substantial consideration.  For example, the Separation Agreement provides for, *inter alia*: ████████

██████████████████████ █████████████████████████████████████████ [175]

███████████████████████████████████████████████████████████████████

████████████████████ [176] ████████████████████████████████████████

██████████████████████ [177] ████████████████████████████████████████

██████████████████████████ [178] ██████████████████████████████████

██████ [179]  In addition, as discussed in relation to Silberstein's departure, Thrasio received the benefit of being able to appoint its own chosen new management to replace Cashman, which courts have found to be a benefit of separation agreements. [180]  Plaintiff now ignores all of these indisputable benefits that Thrasio received in an attempt to re-paint this valid contract, which includes substantial consideration from Cashman, as a fraudulent conveyance. [181]

---

[173] Cashman Separation Agreement ¶ 10 (Kotler Decl. Ex. G).

[174] *Id.* ¶ 9.

[175] *Id.* ¶ 6(c).

[176] *Id.* ¶ 6(e).

[177] *Id.* ¶ 8.

[178] *Id.* ¶ 9.

[179] *Id.* at Ex. B, n.2.

[180] *See Shabbouei*, 2020 WL 1609177, at *13 (finding separation from CEO to be a measurable corporate benefit).

[181] Compl. ¶¶ 264-83.

Principles of contract law dictate that where the terms of a contract are "plain and unambiguous, binding effect should be given to their evident meaning."[182]    The Court therefore need not wait for discovery or parol evidence to conclude that the release bars Plaintiff's claims.[183] It is hornbook law that a validly executed release bars claims within its scope from being asserted in a subsequent lawsuit.[184]    And where, as here, "the language of the release is clear and unambiguous, it will not lightly be set aside."[185]

Under these long-settled legal principles, Plaintiff's claims against Cashman for breach of fiduciary duty of loyalty/oversight, unjust enrichment, waste of corporate assets, and violations of Delaware General Corporation Law are all barred by the express terms of the Cashman Separation Agreement.  Absent any conditions, Thrasio released its right to pursue "any and all claims" for actions taken by Cashman during his tenure that do not arise from "gross negligence, fraud, or felonious conduct[.]"  These claims do not arise from allegations of grossly negligent actions, fraudulent conduct, or felony criminal conduct, and thus, the release bars Plaintiff from pursuing them.  These claims must be dismissed.

In addition, even Plaintiff's claims that arguably sound in fraud, namely, Plaintiff's fraudulent conveyance and conspiracy to fraudulently transfer claims, are barred by the release. The release precludes Plaintiff from bringing claims arising from fraud about which ███████

---

[182] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 704 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

[183] *Id.* at 705 ("[E]xtrinsic evidence is not considered [where] the language of the contract itself obviously expresses the intentions of the contracting parties").

[184] *Seven Invs.*, 32 A.3d at 396 (holding that an effective release terminates the rights of the party executing the release and is a bar to recovery on the claim released); *Eng'rd Abrasives, Inc. v. Am. Mach. Prods. & Serv., Inc.*, 882 F.3d 650, 653 (7th Cir. 2018) (same); *In re SemCrude L.P.*, 796 F.3d 310 (3d Cir. 2015) (same); *Morefun Co. v. Mario Badescu Skin Care Inc.*, 588 F. App'x 54, 55 (2d Cir. 2014) (summary order) (same); *Strang v. Wells Fargo Home Mortg., Inc.*, 266 F. App'x 108, 109 (3d Cir. 2008) (summary order) (same).

[185] *Seven Invs.*, 32 A.3d at 396 (quoting *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982)).

███████████████████████████████████████████████████████

██████████ [186]    Here, Plaintiff indisputably had actual and constructive knowledge of the transactions underlying Plaintiff's fraudulent conveyance claims, including because the Company investigated the facts surrounding these very transactions.    The Tender Offer and Yardline transactions, which Plaintiff now alleges are fraudulent conveyances, were approved by the Board.[187]    And the Cashman Separation Agreement was executed months and years after Thrasio engaged in the Tender Offer and Yardline transactions.    The Company also engaged the Cooley law firm in August 2021 "to perform an investigation into whether Thrasio had provided inaccurate or misleading financial information to investors."[188]    Prior to executing the Cashman Separation Agreement, the Company diligently looked into the specific conduct and transactions raised by Plaintiff, including conduct by Cashman.    Therefore, the Company unquestionably had actual and/or constructive knowledge of Cashman's conduct at the time of the Cashman Separation Agreement.[189]    That said, despite having such actual and/or constructive knowledge of Cashman's conduct, the plain language of the release makes clear that Thrasio did not view any of his conduct as grossly negligent or fraudulent.    As a result, Plaintiff's fraudulent conveyance claims and conspiracy to fraudulently transfer claims are barred by the release and must be dismissed.

---

[186] Cashman Separation Agreement ¶ 10 (Kotler Decl. Ex. G).

[187] *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 51 (3d Cir. 2018) (summary order) (finding debtor had constructive knowledge when she had "enough information [before confirmation of the plan] to suggest that a possible claim existed" requiring disclosure of that claim in the bankruptcy petition).

[188] Disinterested Directors' Report ¶ 40 (Kotler Decl. Ex. C).

[189] Even assuming Thrasio did not possess actual or constructive knowledge of the transactions underlying Plaintiff's constructive fraudulent conveyance claims, such claims do not arise from fraudulent conduct, and thus, are barred by the release.  *See In Re Carton*, No. 20-19781 (VFP), 2023 WL 8057870, at *3 (Bankr. D.N.J. Nov. 20, 2023) (noting that "a cause of action based on constructive fraud does not require proof of fraud"); *Jiajing (Beijing) Tourism Co. v. Kaplan*, 2024 WL 3355151, at *3 (D. Mass. July 9, 2024) (noting that "constructive fraud" is "essentially [where] a debtor negligently defrauds a creditor").

## V.    PLAINTIFF FAILS TO STATE ANY FRAUDULENT CONVEYANCE CLAIMS

Plaintiff attempts to repurpose its claims for breach of fiduciary duty claims as eight

different fraudulent conveyance claims, but such claims are equally unavailing.[190]

Plaintiff's fraudulent conveyance claims are subject to the pleading requirements of both

Fed. R. Civ. P. 8 and 9(b).  Specifically, Plaintiff's constructive fraudulent conveyance claims are

subject to Rule 8(a)'s notice pleading requirements,[191] which mandate that a plaintiff "provide

enough information to put each defendant on notice of the allegations and damages sought

separately against each defendant." [192]   Plaintiff's actual fraudulent conveyance claims are

governed by the heightened pleading standards of Rule 9(b), which requires a plaintiff "alleging

fraud or mistake to 'state with particularity the circumstances constituting fraud or mistake.'"[193]

Although bankruptcy courts have recognized that "a less burdensome standard [than Rule 9(b)

mandates] may be imposed on a Trustee who typically does not have actual knowledge of the

underlying transactions,"[194] here, however, Plaintiff has extensive knowledge of the underlying

facts surrounding the transactions.  As described above, Plaintiff has had unfettered access for

months to the millions of documents (including the COR Defendants' emails) obtained by the

---

[190] Plaintiff alleges eight fraudulent conveyance claims against Cashman pursuant to Sections 544(b) and 550 of the Bankruptcy Code as well as unspecified state law:  transfer of the Tender Offer proceeds (Counts II & III); the release of claims against Cashman pursuant to the Cashman Separation Agreement (Counts XV & XVI); cash payments to Yardline in exchange for Promissory Notes (Counts XIX & XX); and "writing off/forgiving" the Promissory Notes (Counts XXI & XXII).  Compl. ¶¶ 138-175, 264-83, 298-347.  Plaintiff alleges two conspiracy to fraudulently transfer claims against Cashman based on allegations that Cashman conspired by (1) agreeing to and participating in the Tender Offer (Count IV), and (2) providing Promissory Notes to Yardline and later "writing off/forgiving" the Promissory Notes (Count XXV).  *Id.* ¶¶ 176-80, 369-71.

[191] *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 455-56 (Bankr. D. Del. 2018); *see Carton*, 2023 WL 8057870, at *3 ("[A]s it relates to constructive fraud, 'the great majority of cases hold that since a cause of action based on constructive fraud does not require proof of fraud, the heightened pleading requirements of Rule 9(b) are not applicable.'").

[192] *OpenPeak*, 2020 WL 7360482, at *8.

[193] *In re CTE 1 LLC*, No. 19-30256 (VFP), 2023 WL 5257940, at *11 (Bankr. D.N.J. Aug. 11, 2023) (quoting Fed. R. Civ. P. 9(b)).

[194] *Id.* at *12.

UCC during its exhaustive discovery. In fact, Plaintiff obtained access to these documents six months <u>prior</u> to filing its complaint and relied on them in forming the basis of its claims. Therefore, it would be improper to relax Rule 9(b)'s heightened pleading standard here.[195] Plaintiff should be required to state with particularity the circumstances surrounding the alleged actual fraudulent transfers.

For the following reasons, Plaintiff's fraudulent conveyance claims must be dismissed because, *inter alia*, Plaintiff has failed to plead these claims with the requisite specificity.

### A.   Plaintiff's Failure To Identify The Applicable State Law And Statutes Violates Rules 8 And 9(b)'s Pleading Requirements

Plaintiff fails to satisfy the most basic pleading requirements by neglecting to identify the State statute(s) under which it attempts to bring its fraudulent conveyance claims. The federal statute under which Plaintiff seeks to avoid the transactions, Section 544(b), allows a trustee to "pursue fraudulent transfers premised on state law[.]"[196] But the Complaint is devoid of any allegations identifying the State law applicable to Plaintiff's claims. As a result, Cashman must speculate as to which State's law and statutes govern the claims against him, leaving him without proper recourse to prepare a responsive pleading and defend against Plaintiff's allegations of misconduct. Under either a Rule 8 or Rule 9(b) analysis, Plaintiff fails to adequately plead.[197]

---

[195] *See In re Trib. Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at *4 (S.D.N.Y. Jan. 6, 2017) ("[T]he particularity requirement [of Rule 9(b)] still applies in cases where, as here, the bankruptcy trustee had access to 'numerous documents' and 'depositions of many witnesses' when crafting [its] Complaint[.]"), *aff'd*, 10 F.4th 147 (2d Cir. 2021); *In re Old CarCo LLC*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010) (refusing to relax the heightened pleading standard of Rule 9(b) where plaintiff had "ample opportunity to investigate any potential claims prior to filing the Complaint," due to "a period in which Rule 2004 discovery was conducted that allowed access to numerous documents, as well as the depositions of many witnesses [and] access to other interested parties").

[196] *In re Tzanides*, No. 16-11410 (RG), 574 B.R. 489, 511 (Bankr. D.N.J. 2017).

[197] *In re Exide Techs., Inc.*, 299 B.R. 732, 749 (Bankr. D. Del. 2003) (dismissing fraudulent transfer claims where plaintiff failed to identify which State's law applied, as "they are not identical and vary from state to state"); *151 Foods, LLC v. Tromp Grp. Americas, LLC*, 2022 WL 18459639, at *10 (N.D. Ga. Aug. 10, 2022) (dismissing fraudulent conveyance claims under New Jersey law where plaintiff failed to allege that the debtor was "located" in New Jersey when "the transfer [was] made or the obligation [was] incurred," as required by N.J.S.A § 25:2-35(b)), *on reconsideration in part*, 2022 WL 18459844 (N.D. Ga. Oct. 13, 2022).

**B.**      **Fraudulent Conveyance Laws Are Intended To Avoid Improper Transfers And May Not Be Used To Remedy Allegations Of General Corporate Misconduct**

Plaintiff cannot properly allege fraudulent conveyance claims premised solely on Cashman's alleged mismanagement of Thrasio. The purpose of federal fraudulent conveyance law and the New Jersey UVTA[198] "is to prevent a debtor from placing his or her property beyond a creditor's reach."[199] Underlying fraudulent conveyance law is "the notion that a debtor cannot deliberately cheat a creditor by removing his property from 'the jaws of execution.'"[200] "Fraudulent conveyance claims thus allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection."[201] In pleading its fraudulent conveyance claims, Plaintiff apparently suggests that, years before the bankruptcy proceedings and as part of various financial transactions such as the Tender Offer and Yardline transactions, Cashman was shielding Thrasio's property from creditors, and thereby <u>acting in the interest</u> of Thrasio at the expense of creditors.[202] Yet, in asserting its fiduciary duty claims, Plaintiff alleges that Cashman was <u>acting against the interests</u> of Thrasio by participating in the same Tender Offer and Yardline transactions.[203] As evidenced by these contradictory allegations, Plaintiff is once again attempting

---

[198] Notwithstanding Plaintiff's pleading deficiencies, this motion will analyze Plaintiff's fraudulent conveyance claims under the New Jersey Uniform Voidable Transfer Act ("UVTA"). Left with no choice but to guess, the COR Defendants' best guess is that Plaintiff would assert its claims under the New Jersey UVTA, as it is the governing law of the forum state. *See OpenPeak*, 2020 WL 7360482, at *30 (applying the New Jersey UVTA as the governing law where there was no conflict between the fraudulent conveyance laws of the suggested forums and "when there is no real conflict between the choice of law, the Court may utilize the law of the forum state").

[199] *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 475 (1999); *see In re Murphy*, 331 B.R. 107, 124 (Bankr. S.D.N.Y. 2005) ("The purpose of fraudulent conveyance law, whether state or federal, and of Section 548 is to prevent harm to creditors by a transfer of property from the debtor.").

[200] *Gilchinsky*, 159 N.J. at 475 (quoting *Klein v. Rossi*, 251 F. Supp. 1, 2 (E.D.N.Y. 1966)); *see Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away.").

[201] *Gilchinsky*, 159 N.J. at 475.

[202] Compl. ¶¶ 159, 314, 337.

[203] *Id.* ¶¶ 136, 286.

to eat its cake and have it too.  This inconsistent and opportunistic approach makes apparent that

Plaintiff brings its fraudulent conveyance claims solely to evade the consequences of the Cashman

Separation Agreement and that agreement's full release of claims against Cashman. [204]

Consequently, Plaintiff's contradictory allegations of Cashman's mismanagement of Thrasio do

not support an inference that Thrasio engaged in any fraudulent conveyances.

### C.    Bankruptcy Courts Do Not Recognize A Claim For "Conspiracy To Fraudulently Transfer"

Plaintiff's conspiracy to fraudulently transfer claims (Counts IV and XXV) should be

dismissed for the simple reason that bankruptcy courts do not recognize such a claim.  While "a

handful of courts have recognized a cause of action for . . . conspiracy to commit a fraudulent

conveyance under state law, including the law of New Jersey," "whether any state law recognizes

such a claim . . . is irrelevant in bankruptcy proceedings[.]"[205]  This is because "bankruptcy courts

have refused to permit trustees to use section 544(b) to pursue such a claim."[206]  In any event,

Plaintiff's conspiracy claims fail because, as detailed *infra*, Plaintiff has failed to demonstrate that

Thrasio engaged in any fraudulent conveyances.[207]  Thus, Plaintiff's conspiracy to fraudulently

transfer claims must be dismissed.

---

[204] *See Spikes v. Hamilton Farm Golf Club, LLC*, 2014 WL 284432, at *5 (D.N.J. Jan. 24, 2014) (dismissing fraudulent conveyance claim where, *inter alia*, the transfer at issue did not raise concerns because fraudulent conveyance laws are designed to address, namely, the placing of assets beyond a creditor's reach).

[205] *Fedders*, 405 B.R. at 548.

[206] *Id.*; *see In re Pitt Penn Holding Co.*, 484 B.R. 25, 48 (Bankr. D. Del. 2012) ("Bankruptcy courts do not recognize claims for damages for conspiracy to commit a fraudulent transfer.  This Court has previously ruled that a trustee cannot assert claims for conspiracy to commit a fraudulent conveyance except as avoidance and recovery actions under §§ 544, 548, and 550.").

[207] *See Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 497 (D.N.J. 1998) ("A conspiracy is not actionable absent an independent wrong[.]").

### D.    Plaintiff's Conclusory Allegations Fail To Support Its Fraudulent Conveyance Claims

Under the New Jersey UVTA, fraudulent conveyance claims are brought pursuant to N.J.S.A. §§ 25:2-25 and 25:2-27.  A plaintiff may allege an <u>actual</u> fraudulent conveyance claim under N.J.S.A. § 25:2-25(a)(1), which provides that "a transfer by a debtor is fraudulent as to creditor 'if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.'"[208]  In determining whether a debtor made a transfer with fraudulent intent, courts rely on a non-exhaustive list of factors ("badges of fraud") set forth in N.J.S.A. § 25:2-26.[209]

A plaintiff may allege a <u>constructive</u> fraudulent conveyance claim pursuant to N.J.S.A. §§ 25:2-25(a)(2) and 25:2-27.  Under N.J.S.A. § 25:2-25(a)(2), a transfer by a debtor is fraudulent as to a creditor "if the debtor made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value," and the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small," or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay[.]"[210]  And pursuant to N.J.S.A. § 25:2-27(a), a "creditor whose claim arose before a transfer may avoid that transfer 'if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time.'"[211]

---

[208] *Thor 725 8th Ave. LLC v. Goonetilleke*, 2019 WL 5304146, at *4 (D.N.J. Oct. 17, 2019) (quoting N.J.S.A. § 25:2-25(a)).

[209] *In re Sakhe*, No. 15-32238 (RG), 2021 WL 5999195, at *50 (Bankr. D.N.J. Dec. 17, 2021).

[210] N.J.S.A. § 25:2-25(a)(2).

[211] *Thor*, 2019 WL 5304146, at *4 (quoting N.J.S.A. § 25:2-27(a)).  A plaintiff also may bring a constructive fraudulent conveyance claim pursuant to N.J.S.A. § 25:2-27(b).  Under this subsection, a creditor whose claim arose before a transfer may void the transfer if it "was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."  N.J.S.A. § 25:2-27(b).  Plaintiff cannot allege a claim under this subsection because: (1) the statute of repose, set forth in N.J.S.A. § 25:2-31, bars these claims; (2) Plaintiff does not allege any antecedent debts; and (3) specific to Plaintiff's constructive fraudulent

On the following grounds, Plaintiff has failed plausibly to allege a fraudulent conveyance claim under any of these subsections.

### 1. Plaintiff Fails Plausibly To Allege That The Release Of Claims By Thrasio Against Cashman Was A Fraudulent Transfer

Plaintiff's fraudulent conveyance claims seeking to avoid the release of claims against Cashman pursuant to the Cashman Separation Agreement (Counts XV & XVI) are without merit. Plaintiff's intention in challenging the Cashman Separation Agreement as a fraudulent transfer is evident—Plaintiff does so solely to bring its other claims unencumbered, which would otherwise be barred by the express terms of the release. But Plaintiff's allegations that the release was an actual or constructive conveyance are wholly conclusory and as such, Plaintiff's claims must be dismissed.

Plaintiff fails to plead sufficient factual allegations that the Cashman Separation Agreement, including the liability release, was a fraudulent conveyance. In support of its assertion that Thrasio acted with an intent to defraud, Plaintiff merely parrots the claim elements, *i.e.*, that Cashman was an insider of Thrasio, Thrasio did not receive reasonably equivalent value for the release of claims against Cashman, and Thrasio was insolvent at the time it agreed to the Cashman Separation Agreement.[212] These conclusory alleged "badges of fraud" do not establish that Thrasio possessed a fraudulent intent in releasing the claims against Cashman. The only plausible inference is that Thrasio executed the Separation Agreement back in 2022 not to defraud creditors, but rather, to part ways with Cashman in a mutually beneficial manner. Indeed, the mutual benefits and legitimate business purposes of the Cashman Separation Agreement that doom Plaintiff's other

---

conveyance claim seeking to avoid the cash payments to Yardline in exchange for Promissory Notes (Count XIX), Plaintiff does not allege a transfer to an insider.

[212] Compl. ¶¶ 277-81.

claims against Cashman, as discussed *supra* at Section IV (*e.g.*, Board approval, departure of management from the company, non-competition agreements, restrictions on sales of stock, etc.), similarly refute Plaintiff's allegations of actual and constructive fraudulent transfer.

The Complaint's additional allegation, that the Cashman Separation Agreement constitutes a constructive fraudulent conveyance because Thrasio was insolvent at the time that it executed the Cashman Separation Agreement, is merely conclusory and insufficient to support a claim.[213] Despite the exhaustive discovery provided to the UCC, the Complaint wholly fails to allege when Thrasio actually became insolvent.  Among its conclusory and conflicting allegations, the Complaint alleges Thrasio became insolvent at various points (or, counterfactually, was continuously insolvent since its inception and more than six years thereafter): "Thrasio's Business Was Insolvent and in Disarray from the Start";[214] "[a]s early as 2020, Thrasio … was hopelessly insolvent";[215] "Thrasio was insolvent at the time [of the Tender Offer] or was rendered insolvent by the Tender Offer";[216] "Thrasio was insolvent at the time or became insolvent as a result of transferring … cash payments to Yardline"; "Thrasio was insolvent at the time that Thrasio agreed to the Cashman Separation Agreement."[217]  Plaintiff's scattershot pleading alleging insolvency throughout the entirety of Thrasio's corporate existence renders meaningless its perfunctory recitation of elements of its fraudulent conveyance claims.[218]

---

[213] *See id.* ¶¶ 269-70.

[214] *Id.* ¶ 10.

[215] *Id.* ¶ 43.

[216] *Id.* ¶ 135.

[217] *Id.* ¶ 270.

[218] *See In re Innovation Fuels, Inc.*, No. 11-12911 (DHS), 2013 WL 3835827, at *13 (Bankr. D.N.J. July 22, 2013) (dismissing fraudulent conveyance claim where, *inter alia*, plaintiff failed to set forth sufficient factual allegations of insolvency "at the time of the transfer, a fundamental element for a fraudulent conveyance cause of action" notwithstanding its access to the debtor's books and records).

Accordingly, Plaintiff's fraudulent conveyance claims concerning the Cashman Separation Agreement must be dismissed.

### 2. Plaintiff Fails Plausibly To Allege That The Transfer Of Tender Offer Proceeds Was A Fraudulent Transfer

Plaintiff's claims challenging the proceeds of the Tender Offer as a fraudulent conveyance (Counts II & III) are equally deficient as a matter of law. As set forth *infra*, Plaintiff has failed plausibly to allege that Thrasio acted with an intent to defraud creditors, Thrasio did not receive reasonably equivalent value for the transfer of Tender Offer proceeds, and Thrasio was insolvent before or after the transfer of proceeds.

Plaintiff's threadbare assertions that Cashman was an insider of Thrasio, Thrasio "did not receive anything in return for the transfers," and Thrasio was insolvent at the time of the Tender Offer or was rendered insolvent by the Tender Offer, do not state a claim.[219] As discussed *supra* at Section II, the Disinterested Directors' Report found that there were valid reasons to enter into the Tender Offer and there was no indication that Thrasio intended to hinder, delay, or defraud its creditors.[220] This is so because "Thrasio received approximately $259 million in cash in the Series C-1 Stock Issuance, while paying approximately $146.5 million in the Tender Offer[.]"[221] Thus, Plaintiff has not sufficiently alleged that Thrasio, in carrying out the Tender Offer, acted with the requisite fraudulent intent or that Thrasio failed to receive reasonably equivalent value for the purpose of Plaintiff's constructive fraudulent conveyance claim.

---

[219] Compl. ¶¶ 159-64.

[220] Disinterested Directors' Report ¶¶ 50-53 (Kotler Decl. Ex. C).

[221] *Id.* ¶ 52. Plaintiff's allegations that Thrasio did not receive a reasonably equivalent value are also wholly conclusory. *See Traisman v. Khmelnitsky*, 2020 WL 2847751, at *6 (D.N.J. June 1, 2020) (dismissing fraudulent conveyance claim where, *inter alia*, plaintiff's allegations as to reasonably equivalent value "merely parrot[ed] the language of the statute, which is insufficient").

Plaintiff's allegations that Thrasio was insolvent at the time of the Tender Offer or was rendered insolvent by the Tender Offer in support of its constructive fraudulent conveyance claim are also legally insufficient. Indeed, the Disinterested Directors found otherwise; in truth, "sophisticated and highly-experienced third-party equity investors in the Series C-1 Stock Issuance believed, based on due diligence, that the Company had significant equity value after accounting for the Tender Offer."[222] Significantly, Thrasio survived for <u>four years</u> after the Tender Offer, and all the while, raised substantial capital (indeed, over $1 billion) from multiple sophisticated investors.[223] Therefore, Plaintiff has failed plausibly to allege that Thrasio was insolvent at the time of the Tender Offer or was rendered insolvent by the Tender Offer. Consequently, Plaintiff's fraudulent conveyance claims challenging the Tender Offer must be dismissed.

### 3. Plaintiff Fails Plausibly To Allege That The Yardline Transactions Were Fraudulent Transfers

Plaintiff's fraudulent conveyance claims concerning the cash payments to Yardline in exchange for Promissory Notes (Counts XIX & XX), and Thrasio's "writing off/forgiving" the Promissory Notes (Counts XXI & XXII) also should be dismissed. Plaintiff's allegations are wholly conclusory and do not support an inference that the transfers were to or for the benefit of Cashman, Thrasio acted with an intent to defraud creditors, or these transfers amounted to constructive fraudulent conveyances.

Plaintiff has not alleged plausibly that the cash payments to Yardline or the "writing off/forgiving" of the Promissory Notes was a transfer <u>to</u> Cashman or made for the benefit of Cashman as required for recovery under 11 U.S.C. § 550. Plaintiff asserts only that "Defendants

---

[222] Disinterested Directors' Report ¶ 53 (Kotler Decl. Ex. C).

[223] *See In re Opus E. LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) (summary order) (recognizing that courts generally will not find unreasonably low capital where the company survives for an extended period after an alleged fraudulent transfer).

schemed to have Thrasio issue the Promissory Notes to Yardline and pay the third-party investors, all to benefit Horowitz and Cashman[.]"[224]   But these threadbare allegations do not plead sufficiently that the transactions at issue were to Cashman or made for his benefit.  Simply put, Plaintiff cannot recover <u>from Cashman</u> for these transactions.[225]   As a result, Plaintiff's claims concerning these transactions must be dismissed.

Even if Plaintiff somehow were permitted to recover from Cashman, Plaintiff has not adequately pled that these transactions were actual fraudulent conveyances.  In support of its assertion that the transactions were done with an intent to defraud, Plaintiff alleges that "Horowitz was a former insider of Thrasio and had a close relationship with Cashman," "[a] number of Yardline's directors were insiders of Thrasio," "Thrasio did not receive reasonably equivalent value" from the transactions, and "Thrasio was insolvent at the time or became insolvent" at the time of the transfers.[226]   But these proclaimed "badges of fraud" do not tend to show that Thrasio acted with a fraudulent intent.[227]   Indeed, as discussed *supra* at Section I, Plaintiff alleges that Yardline was intended to "complement Thrasio's business model," and thus, the Yardline transactions were intended to benefit Thrasio.   Consequently, Plaintiff's actual fraudulent conveyance claims concerning these transactions must be dismissed.

Plaintiff's constructive fraudulent conveyance claims challenging these same transactions also fail.  Plaintiff again alleges in a conclusory fashion that "Thrasio provided Yardline with

---

[224] Compl. ¶¶ 322, 345.

[225] *In re Allegheny Health, Educ. & Rsch. Found.*, 253 B.R. 157, 167-68 (Bankr. W.D. Pa. 2000) (dismissing fraudulent conveyance claim where plaintiff failed to plausibly allege that the defendant received a benefit from the alleged fraudulent transfer).

[226] Compl. ¶¶ 314-21, 337-44.

[227] *See Traisman*, 2020 WL 2847751, at *6 (dismissing actual fraudulent conveyance claim where plaintiff's "badges of fraud" were merely "conclusory legal statements" and therefore did not "permit a reasonable inference" that the debtor acted with an intent to defraud creditors).

Promissory Notes totaling $20.9 million and then forgave the loans for nothing in return," and at the time of the transactions, "the total fair value of Thrasio's liabilities exceeded the total amount of Thrasio's assets.  These allegations do not support an inference that Thrasio did not receive reasonably equivalent value for the transactions or that Thrasio was insolvent at the time of the transactions or rendered insolvent by the transactions.[228]  As demonstrated in Section V.C.1, Plaintiff's conflicting allegations concerning the timing of Thrasio's insolvency despite extensive discovery on that very subject doom its claims.  In sum, the entirety of Plaintiff's fraudulent conveyance claims must be dismissed for failure to state a claim.

## VI.    PLAINTIFF FAILS TO STATE AN UNJUST ENRICHMENT CLAIM AGAINST CASHMAN BY VIRTUE OF HIS PARTICIPATION IN THE TENDER OFFER

Plaintiff's claim that Cashman was unjustly enriched due to his participation in the Tender Offer is time-barred and fails to allege facts sufficient to survive a motion to dismiss.

### A.    Plaintiff's Unjust Enrichment Claim Is Time Barred Under Delaware Law

As with Plaintiff's claims for breach of fiduciary duty, the Court should apply Delaware law to Plaintiff's unjust enrichment claim because the claim similarly concerns the internal affairs of Thrasio.  The unjust enrichment claim presents a conflict between New Jersey and Delaware law concerning statutes of limitations.  In Delaware, the statute of limitations for such a claim is three years;[229] in New Jersey, the statute of limitations is six years.[230]  Because Thrasio is a Delaware corporation, the Court should apply Delaware law.  As discussed *supra*, the Tender Offer

---

[228] Again, Plaintiff fails to set forth more specific allegations of Thrasio's alleged insolvency <u>at the time</u> of the transfer despite its access to the millions of documents obtained by the UCC during discovery.  *See* Section V.C.1 (demonstrating Plaintiff's conflicting allegations concerning the timing of Thrasio's insolvency).

[229] 10 Del. C. § 8106(a).

[230] N.J.S.A. § 2A:14-1.

occurred on July 18, 2020, over four years before the Bankruptcy Petition was filed or this adversary proceeding was commenced.

Even if New Jersey law were to apply to Plaintiff's unjust enrichment claim, while the claim would not be time-barred, it still would fail as a matter of law. Under New Jersey law, a plaintiff may assert an unjust enrichment claim only to the extent it conferred a benefit on a defendant pursuant to "a quasi-contractual relationship, for which it expected remuneration in return."[231] New Jersey law does not recognize an independent cause of action for unjust enrichment claims sounding in tort like the one asserted in the Complaint. Plaintiff's unjust enrichment claim is devoid of any allegation that Plaintiff, or the Company, expected remunerated from the COR Defendants who served as directors and/or officers of Thrasio or that its claim relates to any sort of quasi-contractual relationship. Hence, even under New Jersey law, the unjust enrichment claim would fail.

### B.    Cashman Did Not Receive A Benefit At Plaintiff's Expense Through The Tender Offer

In addition to being time-barred, Plaintiff's unjust enrichment claim (Count VI) also fails on its face. To state a claim for unjust enrichment, Plaintiff must allege that: (i) Defendant benefitted; (ii) at Plaintiff's expense; and (iii) circumstances exist demonstrating that Defendant's retention of benefits is unconscionable or that equity and good conscience require restitution.[232] Plaintiff makes only conclusory allegations that Cashman was unjustly enriched through his participation in the Tender Offer. Plaintiff, however, fails to plead both how this participation was at the expense of the Plaintiff and whether there are any circumstances that would make the Tender

---

[231] *Schechter v. Hyundai Motor Am.*, 2019 WL 3416902, at *10-11 (D.N.J. July 29, 2019); *see Pappalardo v. Combat Sports, Inc.*, 2011 WL 6756949, at *11 (D.N.J. Dec. 23, 2011) (dismissing unjust enrichment claim where allegation was based on fraudulent conduct and thus sounded in tort).

[232] *Direct Response*, 466 B.R. at 656; *see In re USDigital, Inc.*, 443 B.R. 22, 48 (Bankr. D. Del. 2011).

Offer unconscionable.  The Tender Offer occurred in connection with a stock issuance by Thrasio that raised significant capital for the Company.[233]  Additionally, Plaintiff provides no explanation as to why the released parties under the Plan, namely the Board members who also approved the Tender Offer, were exculpated for this claim yet it is still asserted against Cashman.

Moreover, the share price that Cashman received for tendered shares was the same as the price paid by investors in the contemporaneous Series C fundraising round that was conducted as part of the same transaction.  Plaintiff, of course, does not argue that the Company itself illicitly benefited via an inflated share price in its Series C round, which was nearly twice the size of the Tender Offer.  As described *supra*, at Section I, the Tender Offer was unanimously approved by the Thrasio Board of Directors.  Additionally, the Disinterested Directors' Report, paid for by Thrasio and approved by this Court, concluded that there were no claims worthy of pursuit with regard to the Tender Offer.[234]  Accordingly, Plaintiff's unjust enrichment claim should be dismissed as a matter of law.[235]

## VII.  PLAINTIFF FAILS TO STATE THE "RARE, UNCONSCIONABLE" CLAIM OF CORPORATE WASTE

A colorable claim for corporate waste requires Plaintiff to make the nearly impossible allegation that actions were taken without "any rational business purpose."[236]  Indeed, to plead waste of corporate assets, Plaintiff must allege that the economics of the transaction were "so flawed that no disinterested person of ordinary business judgment could think the transaction

---

[233] Disinterested Directors' Report ¶ 51 (Kotler Decl. Ex. C).

[234] *Id.* ¶ 54.

[235] Dismissal of Plaintiff's unjust enrichment claim also is warranted because it is duplicative of its breach of fiduciary duty claim as to the Tender Offer which, as set forth *supra*, is meritless.  *See Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at *19 (Del. Ch. Nov. 23, 2016) (dismissing unjust enrichment claim as duplicative where claim was premised on same theory as plaintiff's breach of fiduciary duty claim after finding plaintiff failed to state a claim for breach of fiduciary duty), *aff'd*, 172 A.3d 884 (Del. 2017).

[236] *In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006).

beneficial to the corporation."[237]  "A corporate waste claim must fail if 'there is <u>any substantial</u>

consideration received by the corporation, and . . . there is a <u>good faith judgment</u> that in the

circumstances the transaction is worthwhile.'"[238]  This high pleading standard is only satisfied in

the "rare, unconscionable case" in which the defendant irrationally squandered or gave away

assets.[239]  Plaintiff asserts two counts of corporate waste against the COR Defendants (Counts VIII

and XXVI) and neither comes close to clearing this high hurdle.

### A.    Plaintiff Fails To Allege That The COR Defendants Lacked A Rational Business Purpose For Their Inventory And Accounting Decisions

First, Plaintiff alleges that the COR Defendants committed corporate waste with regard to

Thrasio's inventory controls (Count VIII).  Plaintiff, however, has not alleged that the COR

Defendants took accounting or inventory actions without "any rational business purpose."[240]  In

actuality, Thrasio officers had clear business reasons for their decision-making processes and are

entitled to deference for those decisions.  The Complaint itself concedes that Thrasio had three

systems to help manage and calculate its inventory in the early years of its operations and that

rapid growth helped fuel investment in the Company.[241]  The e-commerce aggregator business

grew and changed rapidly before and during the COVID-19 pandemic, necessitating quick

responses from the Company.  Additionally, at the time inventory was purchased, the Company

reasonably anticipated that its growth would continue (as it had since Day 1) and could not be

expected to foresee the sudden and dramatic shift away from online shopping that followed the

---

[237] *USDigital*, 443 B.R. at 47-48.

[238] *White v. Panic*, 783 A.2d 543, 554 (Del. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)) (emphasis in original).

[239] *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 406 (Bankr. D. Del. 2022).

[240] *Disney*, 906 A.2d at 74.

[241] Compl. ¶ 211.

pandemic and that similarly impacted other large and sophisticated retailers. Plaintiff cannot

support a claim of corporate waste based on a business decision for which the law explicitly grants

deference.[242]

### B. Plaintiff Fails To Allege That Cashman Lacked A Rational Business Purpose With Respect To Thrasio's Purchase Of Yardline

Second, Plaintiff's claim that Cashman committed corporate waste regarding the Yardline

transaction is also meritless (Count XXVI). Although Thrasio divested from Yardline at an

immediate loss, it still received substantial consideration of approximately $7 million in cash plus

$5 million in equity securities and negotiated the terms of the agreement.[243] Cashman, along with

the rest of the Thrasio Board, believed in good faith that the purchase of Yardline would be

beneficial to the Company. As the Complaint states, Thrasio "envisioned that Yardline would

complement Thrasio's business model."[244] This exchange therefore was not "so one-sided that no

businessperson of ordinary, sound judgment could conclude" that the corporation "received

adequate consideration."[245] Plaintiff thus has failed to meet the nearly impossible standard for

corporate waste, as it has not alleged that this purchase was "so flawed that no disinterested person

of right mind and ordinary business judgment" could conclude it was beneficial to the Company.[246]

---

[242] *White*, 783 A.2d at 554 ("A board's decisions do not constitute corporate waste unless they are exceptionally one-sided").

[243] Compl. ¶¶ 118-19.

[244] *Id.* ¶ 96.

[245] *Brehm*, 746 A.2d at 263.

[246] *USDigital*, 443 B.R. at 47-48; *Disney*, 906 A.2d at 74.

## VIII.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST CASHMAN FOR VIOLATION OF SECTION 160 OF THE DELAWARE GENERAL CORPORATION LAW

### A.    Thrasio Board Members, Including Cashman, Reasonably Relied On Present Values To Approve The Tender Offer

Plaintiff again improperly attempts to pin blame solely on Cashman for the Board-approved decision to enter into the Tender Offer with its claim that he violated Section 160 of the Delaware General Corporation Law ("DGCL").

Section 160 of the DGCL prohibits the purchase or redemption of a corporation's own shares of capital stock for cash when the capital of the corporation is impaired or when such purchase would cause the corporation's capital to be impaired.[247]  A corporation's capital is impaired "if the funds used in the repurchase exceed the amount of the corporation's surplus, defined by 8 Del. C. § 154 to mean the excess of net assets over the par value of the corporation's issued stock."[248]  The job of directors to determine whether to effectuate a Tender Offer in compliance with Section 160 is a "judgment-laden exercise."[249]  When an issuer's board decides on the amount of surplus available to make redemptions, its decision is entitled to deference absent a showing that the board: (1) acted in bad faith, (2) relied on unreliable methods and data, or (3) made determinations so far off the mark as to constitute actual or constructive fraud.[250]

Plaintiff has not adequately pled any of these three factors.  Instead, Plaintiff's allegation rests solely on its own *post hoc* view that Thrasio was insolvent at the time of the Tender Offer.  This directly contradicts Delaware law, under which the Court "may defer to the board's measurement of surplus unless . . . the directors 'failed to fulfill their duty to evaluate the assets

---

[247] 8 Del. C. § 160; *In re Live Well Fin., Inc.*, 2023 WL 4025816, at *6 (Bankr. D. Del. June 14, 2023).

[248] *Live Well*, 2023 WL 4025816, at *6.

[249] *SV Inv. Partners LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 983 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011).

[250] *Id.*

on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present values'" at the time the repurchase decision was made.[251]  Critically, Thrasio received approximately $259 million in cash in the Series C-1 Stock Issuance, at the same time it paid approximately $146.5 million as part of the Tender Offer—a net inflow of more than $112 million in cash.  Thrasio raised hundreds of millions of dollars, including several rounds led by sophisticated investors even <u>after</u> the Tender Offer.  Thrasio's directors had more than good reason to believe in good faith that Thrasio had a surplus or other funds with which to effectuate the Tender Offer.[252]  Moreover, the PwC report on which Plaintiff heavily relies was issued on June 30, 2022, well <u>after</u> the Tender Offer; even timely audited financials would not have been available to the Board at the time of the Tender Offer.[253]  At the time the decision actually was made, however, the Board unanimously approved the Tender Offer in writing based on a good faith, informed belief about the finances of the Company.[254]  Plaintiff therefore has not stated a claim for violation of Section 160 of the DGCL.

### B.    Cashman's Vote In Favor Of Authorizing The Tender Offer Was Not A Willful Or Negligent Violation Of Section 160 Of The DGCL As Required To Recover Under Section 174

Plaintiff asserts that it should be able to recover from Cashman personally for his approval of the Tender Offer under Section 174 of the DGCL, but ignores that Cashman was one of numerous Board members who <u>unanimously</u> approved the Tender Offer.  Additionally, Plaintiff ignores that it elected to release most of the other Board members in the course of the bankruptcy proceedings before this Court.

---

[251] *Klang v. Smith's Food & Drug Ctrs.*, 702 A.2d 150, 155-56 (Del. 1997) (quoting *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 582 (Del. Ch. 1949)).

[252] Disinterested Directors' Report ¶ 52 (Kotler Decl. Ex. C).

[253] Audited Financials (2020) at 3 (Kotler Decl. Ex. B).

[254] Disinterested Directors' Report ¶¶ 51-52 (Kotler Decl. Ex. C).

While Section 174 of the DGCL provides that directors are jointly and severally liable for a violation of Section 160 during their tenure, it expressly provides that such recovery is only permitted when the violation was "willful or negligent."[255]  The court in *Chemours Co. Derivative Litig.* expressly held that a Board's decision in compliance with Section 160 could not be the basis of a "willful or negligent violation for which to hold [Defendant] liable" under Section 174.[256]  For the reasons discussed above, Cashman did not violate Section 160.  Even if there was a violation of Section 160, it could not have been willful or negligent because Cashman, along with the rest of the Board, had information about the finances of the Company at the time of the Tender Offer and relied in good faith on that information.  Indeed, the Company continued to raise significant capital for two years <u>after</u> the Tender Offer.  Claims under Sections 160 and 174 of the DGCL are not intended to be used for *post hoc* surplus calculations made with the benefit of hindsight; rather, the law allows deference for directors' judgments about surplus that were made in good faith and in reliance on acceptable data and methods at the time the decision was made.[257]

Moreover, Section 172 of the DGCL also "temper[s]" the Section 174 liability scheme, as directors are "fully protected from liability if they rely 'in good faith' upon the corporation's records, officers and employees, committees of the board, or experts, in determining that the corporation has adequate funds to repurchase stock[.]"[258]  The Complaint fails to allege facts to disturb Cashman's—and the other directors'—good faith determination ███████████████

████████████████████████████████████████████████████████████

---

[255] 8 Del. C. § 174(a) (2002).

[256] *In re Chemours Co. Derivative Litig.*, 2021 WL 5050285, at *16 (Del. Ch. Nov. 1, 2021).

[257] *Klang*, 702 A.2d at 155-56; *ThoughtWorks*, 7 A.3d at 988.

[258] *Chemours*, 2021 WL 5050285, at *13; 8 Del. C. § 172.

██████████████████████████████████[259]  Therefore, the only plausible inference is that Cashman held an informed belief that the Company was solvent and had a surplus at the time he voted to approve the unanimously favored Tender Offer.[260]  Plaintiff's DGCL claim fails as a matter of law.

---

[259] Tender Offer Board Consent (Kotler Decl. Ex. D).

[260] *Id.*

## **CONCLUSION**

For the foregoing reasons, Carlos Cashman, Aditya Rathod, Mounir Ouhadi, and Cashman

Family Investment II, LLC respectfully request that their Motion to Dismiss be granted and the

Complaint be dismissed against either of them in its entirety and with prejudice.

Dated: March 3, 2025                              Respectfully submitted,

                              By:    */s/ David A. Kotler*

                                 **DECHERT LLP**

                                 David A. Kotler
                                 Micaela Scotti (*pro hac vice pending*)
                                 1095 Avenue of the Americas
                                 New York, NY  10036-6797
                                 Telephone: (212) 698-3500
                                 Facsimile: (212) 698-3599
                                 Email: david.kotler@dechert.com
                                      micaela.scotti@dechert.com

                                 Joshua D.N. Hess (*pro hac vice pending*)
                                 45 Freemont Street, 26th Floor
                                 San Francisco, CA 94105
                                 Telephone: (415) 262-4500
                                 Facsimile: (415) 262-4555
                                 Email: joshua.hess@dechert.com

                                 Eric Auslander (*pro hac vice pending*)
                                 1900 K Street, N.W.
                                 Washington, D.C. 20006-1110
                                 Telephone: (202) 261-3300
                                 Facsimile: (202) 261-3333
                                 Email: eric.auslander@dechert.com

                                 *Counsel for Defendants Carlos Cashman,*
                                 *Mounir Ouhadi, Aditya Rathod, and*
                                 *Cashman Family Investment II, LLC*