**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *Caption in Compliance with D.N.J. LBR 9004-1(b)* | |
| Howard J. Kaplan (admitted *pro hac vice*)<br>Michelle A. Rice (admitted *pro hac vice*)<br>KAPLAN RICE LLP<br>142 W. 57th Street, Suite 4A<br>New York, NY 10019<br>Tel. (212) 235-0300<br>*Attorneys for Defendant Ari Horowitz* | |
| John Jureller, Jr.<br>(NJ Bar No. 056361993)<br>Klestadt Winters Jureller Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, NY 10036.<br>Telephone: 212-679-5315<br>Email: jjureller@klestadt.com<br>*Attorneys for Defendant Hudson Palm, LLC and local counsel for Defendant Ari Horowitz* | ------------------------------------------<br>Chapter 11 |
| In re:<br><br>1 THRASIO ONE, INC.,<br><br>*Reorganized Debtor*[1] | Case No. 24-11850-CMG<br><br>(Jointly Administered)<br>------------------------------------------ |
| META ADVIROS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br><br>Defendants. | Adv. Pro. No. 24-01637-CMG |

**JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**ARI HOROWITZ'S AND HUDSON PALM LLC'S RESPECTIVE**
**MOTIONS TO DISMISS THE COMPLAINT**

---

[1]    The last four digits of Reorganized Debtor's tax identification number are 4771. The Reorganized Debtor's service address for purposes of this chapter 11 case is 85 West Street, 3rd Floor, Walpole, MA, 02081.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    Horowitz's Employment at Thrasio and Termination In 2020 ............................ 2

    B.    The Formation of Yardline ................................................................................ 3

    C.    Horowitz Seeks to Raise Capital for Yardline Despite His Dispute with
          Silberstein ...................................................................................................... 4

    D.    Yardline Investors Threaten Silberstein and Cashman ...................................... 6

    E.    Thrasio's Loans to the Yardline Subsidiary and Thrasio's Forgiveness of
          that Debt ........................................................................................................ 6

    F.    Thrasio Sells Yardline to Horowitz ................................................................... 7

    G.    The Plan and Adversary Complaint .................................................................. 9

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ....................................................................................................................... 11

I.      PLAINTIFF IS REQUIRED TO LITIGATE ITS CLAIMS AGAINST
        HOROWITZ IN NEW YORK ................................................................................. 11

II.    PLAINTIFF'S CLAIMS AGAINST HOROWITZ ARE BARRED BY
        THE RELEASE AGREEMENT ............................................................................. 14

III.   PLAINTIFF'S CLAIMS AGAINST HOROWITZ ARE BARRED BY THE PLAN ..... 16

IV.   PLAINTIFF FAILS TO STATE A CLAIM ARISING OUT OF THE YARDLINE
        TRANSACTIONS ................................................................................................. 18

    A.    Pleading Standards .......................................................................................... 18

    B.    Plaintiff Fails to Adequately Allege That Any of the Yardline Transfers are
          Avoidable Under New Jersey Law ................................................................... 19

          1.    The Complaint Establishes that Thrasio Received Reasonably
                 Equivalent Value for Each Challenged Yardline Transfer ...................... 20

          2.    Allegations in the Complaint and Findings in the DDR Preclude any
                 Finding of Insolvency at the time of the Yardline Transfers ................... 22

3.      The Complaint Fails to Adequately Allege that the Yardline Transfers
        Are Avoidable as Actual Fraudulent Transfers (Counts XX, XXII,
        XXIV) .................................................................................................. 23

C.      Plaintiff Cannot Recover Property Transferred from Horowitz as a Matter
        of Law ................................................................................................................. 23

D.      Plaintiff Fails to State a Conspiracy Claim in Count XXV ................................. 25

V.      ALL CLAIMS ARISING OUT OF THE TENDER OFFER MUST BE DISMISSED ... 25

A.      Plaintiffs Fail to State a Claim for Fraudulent Transfer Counts (II and III) ......... 26

1.      Because Plaintiff's Own Allegations Make Clear that Thrasio Received
        Reasonably Equivalent Value in Exchange for Tender Offer Payment,
        Count II (Constructive) Must Be Dismissed ............................................... 26

2.      Allegations in the Complaint and Findings in the DDR Preclude any
        Finding of Insolvency at Time of Tender Offer .......................................... 27

3.      Complaint Fails to Sufficiently Allege an Actual Fraudulent Transfer
        Arising Out of Yardline .............................................................................. 27

B.      Count IV: Conspiracy – Tender Offer ................................................................. 27

C.      Count VI: Unjust Enrichment – Tender Offer ...................................................... 27

VI.     ALL CLAIMS AGAINST HUDSON PALM MUST BE DISMISSED ......................... 29

CONCLUSION ........................................................................................................................ 31

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................................... 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 10

*Bonded Financial Services v. European American Bank*,
  838 F.2d 890 (7th Cir.1988) ................................................................................... 18

*BVM S.p.A in Liquidazione v. BVM USA Moda, Inc*,
  2021 WL 3077441 (S.D.N.Y. July 20, 2021) ....................................................... 12, 13

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*,
  17 N.Y.3d 269, 952 N.E.2d 995 (2011) ................................................................. 15

*In re Broad St. Media LLC*,
  2017 WL 5624879 (Bankr. D.N.J. Nov. 20, 2017) .................................................. 12

*In re Crucible Materials Corp.*,
  2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012) ................................................. 24

*In re CTE 1 LLC*,
  2023 WL 5257940 (Bankr. D.N.J. Aug. 11, 2023) .................................................. 19

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ....................................................................... 25

*In re Glob. Outreach, S.A.*,
  2011 WL 2294168 (D.N.J. June 6, 2011) ........................................................... 18, 23

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ....................................................................... 20

*In re Lizza Equip. Leasing, LLC*,
  614 B.R. 653 (Bankr. D.N.J. 2020) ............................................................... 11, 12, 14

*In re Millennium Lab Holdings II, LLC*,
  242 F. Supp. 3d 322 (D. Del. 2017) ....................................................................... 17

*In re Modell's Sporting Goods, Inc.*,
  2023 WL 2961856 (Bankr. D.N.J. Apr. 14, 2023) .................................................. 18

*In re Nanobeak Biotech Inc.*,
  656 B.R. 350 (Bankr. S.D.N.Y. 2024) ................................................................. 27

*In re Odyssey Contracting Corp.*,
  581 B.R. 762 (Bankr. W.D. Pa. 2018) ................................................................. 14

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) ................................................................................................ 14

*Marcus v. Rapid Advance, LLC*,
  2013 WL 2458347 (E.D. Pa. June 7, 2013) ........................................................ 14

*Miller-Rich v. Altum Pharms. Inc.*,
  2024 WL 1638637 (S.D.N.Y. Apr. 16, 2024) ..................................................... 13

*Robinson v. Fam. Dollar Inc*,
  679 F. App'x 126 (3d Cir. 2017) ......................................................................... 10

*Salovaara v. Jackson Nat. Life Ins. Co.*,
  246 F.3d 289 (3d Cir. 2001) .......................................................................... 12, 13

*Schechter v. Hyundai Motor Am.*,
  2019 WL 3416902 (D.N.J. July 29, 2019) .......................................................... 28

*Seven Invs., LLC v. AD Cap., LLC*,
  32 A.3d 391 (Del. Ch. 2011) ............................................................................... 15

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
  533 F.3d 162 (3d Cir. 2008) .......................................................................... 22, 24

*Spizzirri v. Zyla Life Scis.*,
  802 F. App'x 738 (3d Cir. 2020) ......................................................................... 15

*Touloumis v. Chalem*,
  156 A.D.2d 230, 548 N.Y.S.2d 493 (App. Div. N.Y. f1989) .............................. 16

*Traisman v. Khmelnitsky*,
  2020 WL 2847751 (D.N.J. June 1, 2020) ........................................... 20, 23, 25, 26

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005) .................................................................................. 14

Statutes

11 U.S.C.A. § 550 ...................................................................................................... 23

N.J.S.A. § 25:2-25 ................................................................................................ 19, 26

N.J.S.A. § 25:2-26 ...................................................................................................... 20

### Rules

Fed. R. Civ. P. 8(a) ............................................................................................................ 10, 18

Fed. R. Civ. P. 9(b) ................................................................................................................. 18

Fed. R. Civ. P. 12(b)(6)........................................................................................... *passim*

Fed. R. Bankr. P. 7012 ............................................................................................................ 1

Defendant Ari Horowitz ("Horowitz") and Defendant Hudson Palm, LLC ("Hudson Palm") respectfully submit this joint memorandum of law in support of their motions to dismiss the Complaint ("Compl.") (ECF No. 1) filed in this adversary proceeding commenced by Meta Advisors, LLC ("Plaintiff"), pursuant to Federal Rule of Bankruptcy Procedure 7012 and Rule 12(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

## PRELIMINARY STATEMENT

The Complaint should be dismissed. The Complaint suffers from numerous legal and pleading deficiencies. It purports to assert eleven claims against Horowitz, even though there are few allegations even referring to Horowitz and those that exist are vague, conclusory and at odds with the balance of Plaintiff's allegations and theory of the case. Indeed, the Complaint itself establishes that Horowitz had no actionable involvement in any of the challenged transactions.

As discussed below, there are several reasons the Complaint should be dismissed. First, Plaintiff was required to bring the action in New York pursuant to an exclusive forum selection clause. Second, the claims are subject to a binding release in favor of Horowitz. Thrasio fully released Horowitz from any liability, in any possible capacity, in exchange for consideration and in connection with a transaction alleged on the face of the Complaint.

Second, Horowitz also is also released under the terms of the Plan confirmed by this Court. The exception to the release relating to Yardline (included in the definition of "Excluded Party") is narrow and only applies only to the extent that Horowitz was a transferee of Thrasio's assets in connection with transactions involving Yardline. Because the Complaint fails to allege facts demonstrating that Horowitz was a transferee of Thrasio's assets in connection with any Yardline transaction, Plaintiff's claims are barred and Plaintiff lacks standing to pursue them.

Even ignoring both releases, the claims asserted against Horowitz are deficiently pleaded under *Iqbal* and accordingly should be dismissed. None of the claims identifies the state law under

which Plaintiff is proceeding, an apparently intentional omission.  And, none of the claims, as

pleaded, plausibly demonstrate either that Horowitz acted with the requisite intent sufficient to

state an actual fraudulent transfer claim or that Horowitz knew or had reason to believe that Thrasio

was insolvent sufficient to state a constructive fraud transfer claim.  Indeed, the Complaint makes

plain that it was Thrasio's plan to take control and ownership of Yardline and oust Horowitz, and

that all of the transactions alleged were in furtherance of that plan.  Horowitz is not alleged to have

had any role in the decisions to block the Yardline noteholders from converting their convertible

notes to equity or to transfer Thrasio funds to Yardline to pay noteholders as required under their

agreements.  Horowitz did not receive any of these funds.  Nor does the Complaint allege that

Horowitz had any involvement in the 2020 tender offer, which occurred after Horowitz had been

terminated by Thrasio.  Finally, New Jersey does not recognize a claim for conspiracy to commit

fraudulent transfers.

Because the claims asserted against Horowitz are either barred or legally deficient, the

Complaint should be dismissed as to Horowitz.

## **STATEMENT OF FACTS**

A.    Horowitz's Employment at Thrasio and Termination In 2020

In April 2019, Thrasio's Co-CEO, Defendant Cashman, hired Horowitz as a senior vice

president.  Compl. ¶ 93.  As an employee of Thrasio, Horowitz received certain Thrasio stock

options (the "Horowitz Options").  *Id.*

According to the Complaint, "Silberstein and Horowitz did not get along, and Silberstein,"

co-founder, co-CEO and board member of Thrasio, "wanted to terminate Horowitz."  *Id.* (¶ 94).

As a result, Horowitz was terminated from Thrasio as of March 31, 2020, less than one year after

he was hired.  *Id.* (¶ 95).  Horowitz retained his options and agreed to be a consultant to Thrasio

pursuant to an advisory agreement.  *Id.*

B.    The Formation of Yardline

In May 2020, Horowitz formed Yardline "in coordination with Thrasio." *Id*. Silberstein envisioned that Yardline "would complement Thrasio's business model by providing debt financing to small businesses that sold products on Amazon but were not yet ready to be acquired by Thrasio." *Id.* (¶ 96).

In June 2020, in connection with the formation of Yardline, Thrasio's board approved an amendment regarding the vesting of the Horowitz Options. Specifically, the Horowitz Options "would vest early" if Yardline "successfully closed a capital raise of at least $4 million in debt or equity by April 30, 2021". *Id.* (¶ 97).[2]

In September 2020, in exchange for providing Yardline with $1 million in "founding capital," Thrasio became a 19.9% shareholder of Yardline. *Id.* (¶ 98). Thrasio received "non-voting class B common stock, which would automatically convert into 47.1% of the outstanding class A common stock on March 31, 2021" so long as Thrasio satisfied a contractual obligation to "hold monthly business updates." *Id*. Thrasio maintained a consent right over any future equity financing by Yardline. *Id*.

In August and November 2020, Yardline raised additional liquidity by issuing "convertible notes due 2025 to outside investors," which could be converted into Yardline stock, including at the time of an equity financing. *Id.* (¶ 99). However, noteholders could automatically lose their right to convert their notes to equity, and the notes would then become due and payable at a substantial premium (120% to 200% of principal), if an "extraordinary event" occurred. Compl.

---

[2]    On July 18, 2020, the Thrasio Board approved a tender offer to re-purchase 3 million of Thrasio common and preferred shares at a cost of approximately $145 million (the "Tender Offer"). Compl. ¶¶ 60, 63. Horowitz tendered shares and received total proceeds of $1,720,273.53. *Id.* (¶¶ 61, 154). As the Tender Offer occurred approximately six months after Horowitz was terminated, Horowitz had no involvement in it and there are no allegations in the Complaint suggesting otherwise.

¶ 108.  The definition of an "extraordinary event" included, without limitation, the consolidation of Yardline's financial statements with Thrasio's financial statements.  *Id.* (¶ 109).

       C.      Horowitz Seeks to Raise Capital for Yardline
                Despite His Dispute with Silberstein

Pursuant to the board resolution contemplating that Yardline would raise at least $4 million by April 30, 2021, in February 2021, Horowitz began fundraising for a "Series A" round of preferred stock.[3]  Thrasio incentivized Horowitz by agreeing to early vesting of the Horowitz Options, "which [Horowitz] believed to be worth up to $62.5 million at the time," if this goal were met.  Compl. ¶¶ 100-01.  Potential Series A investors also "purchased Convertible Notes in hopes of obtaining additional Yardline equity through the conversion feature."  *Id.*

Horowitz continued to solicit investors for the Series A and, by late March 2021, Horowitz had "secured enough commitments that would have allowed for the Series A transaction to close and thus trigger the vesting of the" Horowitz Options.  *Id.* (¶ 105).  Silberstein became enraged and charted a course to sabotage the Series A transaction.  *Id.* (¶ 103).  Silberstein not only withheld Thrasio's consent to the Series A financing, but "also convinced the Thrasio affiliated directors that the Yardline board should not support the transaction."  *Id.*

Beginning in April 2021, Silberstein embarked on a plan to acquire control of Yardline, and "to remove Horowitz".  *Id.* (¶ 106).  "[W]orking with Cashman, Boockvar, and certain other D&O Defendants, Silberstein moved to finalize a [three-step] takeover transaction," pursuant to which Yardline would "becom[e] a wholly owned subsidiary of Thrasio."  *Id.*  First, satisfying the

---

[3]     As of February 26, 2021, the Yardline Board had five members, three of which were appointed by Thrasio.  Thrasio accordingly was in a position to control all Yardline board decisions.  Compl. ¶ 102.

requirements in the agreement with Yardline, Thrasio converted its class B stock to class A voting stock, making Thrasio the majority (67%) owner of Yardline. *Id.* (¶ 107).[4]

Second, "to prevent dilution of its ownership," Thrasio decided to consolidate its and Yardline's financial statements and "provided notice to Yardline that it had decided to operate Yardline as a subsidiary". *Id.* (¶¶ 108-09).  This triggered the "extraordinary event" provisions of the convertible notes. *Id.* (¶ 109).  As a result, the convertible noteholders lost their right to convert the notes into equity and "Yardline became obligated to make full payment of the notes with the applicable premium." *Id.*

Third, "to remove Yardline completely from Horowitz's control," Thrasio "retired" the Yardline stock held by Horowitz and other Thrasio insiders.  Thrasio paid $1.8 million for Horowitz's Yardline stock, which was held by Hudson Palm.[5]  Thrasio thus became Yardline's sole shareholder. *Id.* (¶ 110).[6]

Horowitz did not take any of these actions; nor is he alleged to have made ***any*** statements concerning Yardline or its value to "Thrasio" in connection with this takeover transaction.  Indeed, the alleged purpose of these actions was to remove Horowitz from the control of Yardline.  Compl. ¶ 106.

---

[4]     By no later than April 27, 2021, Thrasio was majority shareholder of Yardline.  Compl. ¶¶ 107, 109.

[5]     The Complaint is devoid of any other allegations regarding Hudson Palm, although it suggests an affiliation with Horowitz.  Compl. ¶ 110.

[6]     Declaration of Howard J. Kaplan submitted in support of Ari Horowitz's Motion to Dismiss the Complaint ("Kaplan Decl.") Ex. A (January 13, 2022 Stock Purchase Agreement between Yardline, Swiftline Corp. and Thrasio LLC) ("Swiftline SPA").

D.      Yardline Investors Threaten Silberstein and Cashman

After Thrasio interfered with Yardline's Series A transaction, frustrated Yardline investors allegedly "contacted Thrasio's investors and even threatened legal action, convinced that Thrasio acted in bad faith in the takeover and that Thrasio's management exerted improper control over the Yardline board."  *Id.* (¶ 112).  "Cashman was especially uneasy with the fact that the Convertible Noteholders were trying to rile up Thrasio investors, who would clearly disapprove of a reckless investment based on Silberstein's personal feud."  *Id.* (¶ 113).  Cashman allegedly "took the threats of litigation from the Yardline Convertible Noteholders seriously"; "communicated the importance of 'put[ting] to bed' any litigation risks 'quickly and quietly' for the good of the Company, because being dragged to court would damage Thrasio's reputation in the capital markets; and "grew 'personally legally worried' about any liability he might have incurred in his dual role as a Thrasio D&O and a Yardline director," and accordingly "shared with Silberstein that he believed that 'the lawsuit threats are real' and needed to be resolved, even if at a great 'cost.'" *Id.* (¶¶ 114-115).

The Complaint does not allege that Horowitz was involved in any of these discussions or that he was the target of any litigation threats.

E.      Thrasio's Loans to the Yardline Subsidiary and Thrasio's Forgiveness of that Debt

Between late April and Early May 2021, six promissory notes were advanced by Thrasio to its subsidiary Yardline in the total amount of $20.9 million—a transaction approved unanimously by Thrasio's full board of directors.[7]  These payments were expressly earmarked to

---

[7]      Kaplan Decl. Ex. B (Notice of Filing of Independent Investigation Results as Exhibit G to the Plan Supplement," attaching the "Summary Report of the Disinterested Directors of Thrasio Holdings, Inc. Regarding Independent Investigation of Potential Estate Causes of Action Against Related Parties," dated May 23, 2024, filed in the bankruptcy action *In re Thrasio Holdings, Inc.*, Case 24-11840-CMG (ECF 805))

pay the Convertible Noteholders and could not be used for any other purpose. *Id.* (¶ 116). There are no allegations in the Complaint that Horowitz received the funds loaned to Yardline or participated in Thrasio's decision to pay the noteholders.

The Complaint alleges that in October 2021,[8] five months later, Thrasio—with unanimous approval from Thrasio's full Board[9]—forgave the outstanding amounts of Yardline's debt. *Id.* There are no allegations in the Complaint that Horowitz participated in the decision to forgive Yardline's debt.

F.    Thrasio Sells Yardline to Horowitz

Months later, on January 13, 2022, Swiftline and Thrasio entered into a Stock Purchase Agreement dated as of January 13, 2022,[10] pursuant to which Thrasio sold Yardline to Swiftline. *Id.* (¶ 119). Swiftline paid Thrasio $7.1 million in cash and $5 million in Swiftline equity. *Id.*

In connection with the Yardline sale, Horowitz and Thrasio agreed to end their relationship by terminating Horowitz's Advisory Agreement with Thrasio and exchanging mutual releases. Accordingly, on January 13, 2022, Horowitz and Thrasio entered into an Advisory Termination Agreement, which attached a letter agreement regarding "Advisory Termination Agreement, Release Agreement and Option Vesting" (collectively, the "Horowitz Release Agreement" or

---

("Disinterested Directors Report" or "DDR" at ¶ 42) ("In September 2021, the Thrasio Board retroactively approved these advances . . .").

[8]    Contrary to Plaintiff's vague and unsupported allegations regarding the timing of the alleged "writing off/forgiveness" claims (see Compl. ¶116 (alleging forgiveness occurred "[a]round October 2021," and ¶¶ 326, 335 (alleging forgiveness "occurred in 2021")), the Disinterested Directors Report concluded that the notes were forgiven by the Thrasio Board "in September 2021." Kaplan Dec. Ex. B (DDR ¶ 42).

[9]    Kaplan Dec. Ex. B (DDR ¶ 42) ("In September 2021, the Thrasio Board . . . forgave approximately $21 million of "debt" purportedly owed by Yardline, which at that time was a consolidated subsidiary of Thrasio.")

[10]    *See* Kaplan Dec. Ex. A (Swiftline SPA).

"Horowitz Release").[11]   The Horowitz Release Agreement terminated Horowitz's consulting

agreement with the company, and Thrasio also agreed to vest certain of the Horowitz Options.  *See*

Kaplan Dec. Ex. C (Horowitz Release Agreement at 5).

> The Release is indisputably broad:

> Thrasio, on behalf of itself, its successors, assigns, heirs and any of their respective Affiliates, ***hereby release and forever discharge you from any and all liability whatsoever*** (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued and whether due or to become due) that Thrasio ever had, now have or hereafter could, shall or may have against you ***in any of your capacities*** as a stockholder, option holder, warrant holder, director, officer, employee, consultant, independent contractor of or in any other capacity related to any Company entity, whether directly or derivatively through a Company entity, arising contemporaneously with or prior to the consummation of the Transaction, or on account of or arising out of any act, omission, transaction, matter, cause or event occurring contemporaneously with or up to and including the date of this Release.

Kaplan Decl. Ex. C (Horowitz Release Agreement at § 2(b)) (emphasis added).

The Horowitz Release Agreement also prohibits Thrasio from suing Horowitz with respect

to a released claim:  "Thrasio hereby irrevocably covenant[s] to refrain from, directly or indirectly

through any Company entity or otherwise, asserting any claim or demand, or commencing,

instituting or causing to be commenced, any action, claim or legal proceeding of any kind against

you before any court or other judicial or arbitral forum by reason of any matters released hereby."

*Id.* (§ 2(c)).

The Horowitz Release Agreement is governed by New York law and contains a venue

provision mandating that any dispute between Thrasio and Horowitz "arising out of or relating to

this Release Agreement or any of the transactions contemplated by this Release Agreement" be

heard in New York courts.  *Id.* (§ 7).  Specifically, the Horowitz Release Agreement states that

---

[11]    Kaplan Dec. Ex. C (Horowitz Release Agreement).

each party "irrevocably and unconditionally consents and submits to the ***exclusive jurisdiction and venue of the state and federal courts located in New York***." *Id.* (emphasis added). The parties also agreed to waive their respective rights to a jury trial. *Id.*

      G.    <u>The Plan and Adversary Complaint</u>

On June 18, 2024, the Bankruptcy Court entered the "Notice of (I) Entry of the Order Confirming the First Amended Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Further Technical Modifications) and (II) Occurrence of the Effective Date. [Case No. 24-11840, Docket No. 1143]" (the "Plan"). Compl. ¶ 23.[12]  Notably, the Disinterested Directors Report—filed with the Bankruptcy Court just a few weeks earlier, on May 23, 2024—is expressly incorporated into the confirmed Plan.[13]  The Disinterested Directors Report concluded that: (i) "there are no viable claims worthy of pursuit with respect to the Tender Offer"; and that (ii)  because in October 2021 "sophisticated third parties (such as Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence . . . Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers, which would defeat constructive fraudulent transfer claims."[14]

Plaintiff nonetheless commenced the instant adversary proceeding on December 3, 2024.

---

[12]    *See also* Kaplan Decl. Ex. D (Plan).

[13]    Kaplan Decl. Ex. B (DDR at 2) ("**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement is integral to, part of, and incorporated by reference into the Plan.").

[14]    Kaplan Decl. Ex. B (DDR ¶¶ 45, 52-53).

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Robinson* v. *Fam. Dollar Inc*, 679 F. App'x 126, 131 (3d Cir. 2017) (citing *Twombly* and *Iqbal*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Courts in the Third Circuit engage in the following three-step test for evaluating the sufficiency of pleadings:

> First, the court must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. And third, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id*. (internal quotation marks and citations removed).

Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation," a complaint that "asserts mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Robinson*, 679 F. App'x at 131 (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). It is well-settled that the "factual allegations pleaded 'must be enough to raise a right to relief above the speculative level.'" *Id.*; *Ashcroft* v. *Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

# **ARGUMENT**

The Complaint asserts (i) eight so-called "fraudulent transfer" claims arising out of either the Tender Offer (Counts II-III) and Yardline Transactions (Counts XIX-XXIV) (the "Fraudulent Transfer Claims"), (ii) two claims for conspiracy to engage in fraudulent transfers arising out of the Tender Offer (Count IV) and Yardline Transactions (Count XXV) (the "Conspiracy Claims"), and (iii) one claim for unjust enrichment arising out of the Tender Offer (Count VI). These eleven claims must be dismissed because (i) they are all covered by an agreement requiring them to be litigated exclusively in New York; (ii) they are barred by the Horowitz Release Agreement; (iii) they are barred by the release in the Plan; and/or (iv) they fail to state a claim.

## I.   **PLAINTIFF IS REQUIRED TO LITIGATE ITS CLAIMS AGAINST HOROWITZ IN NEW YORK**

The Horowitz Release Agreement contains a mandatory forum selection clause that covers all of the claims asserted in this action. In connection with the sale of Yardline to Horowitz in January 2022, Thrasio entered into a purchase agreement and a related "Advisory Termination Agreement" that included a mutual release of all claims relating to Yardline. The Horowitz Release Agreement states that it is governed by the laws of New York, and the parties "irrevocably and unconditionally consent[ed] and submit[ted] to the exclusive jurisdiction and venue of the state and federal courts located in New York" with respect to any action between Thrasio and Horowitz "arising out of or relating to this Release Agreement or any of the transactions contemplated by this Release Agreement." Kaplan Decl. Ex. C (Horowitz Release Agreement at ¶ 7).

A mandatory forum selection clause is considered presumptively valid. *In re Lizza Equip. Leasing, LLC*, 614 B.R. 653, 667 (Bankr. D.N.J. 2020). "The Third Circuit has made clear that dismissal under Rule 12(b)(6) is a permissible means of enforcing a forum selection clause that

allows suit to be filed in another federal forum." *Id.* (holding that forum selection clause in prepetition agreement required transfer of fraudulent inducement claim to New York, and dismissing adversary proceeding under 12(b)(6)); *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 298 (3d Cir. 2001) (affirming dismissal under Rule 12(b)(6) on grounds that there is "no doubt that a 12(b)(6) dismissal is a permissible means of enforcing a forum selection clause that allows suit to be filed in another federal forum" even where a forum selection clause may be enforced via transfer, because "when a defendant moves under Rule 12, a district court retains the judicial power to dismiss.").

Here, Plaintiff's claims unquestionably are subject to the forum selection clause in the Horowitz Release Agreement.  First, this is a broad forum selection clause, covering any claims that "relate to" the Thrasio release.  *BVM S.p.A in Liquidazione v. BVM USA Moda, Inc,* 2021 WL 3077441, at *4 (S.D.N.Y. July 20, 2021) ("the dispute here is captured by the broad forum selection clause, which is not limited to disputes that "arise out of" the agreement but also includes disputes that "relate to" the agreement).[15]

Second, the claims "relate to" the Horowitz Release.  Thrasio has expressly agreed to "release and forever discharge [Horowitz] from any and all liability whatsoever," and the Release applies to claims "arising contemporaneously with *or prior to* the consummation of the Transaction, or on account of or arising out of *any act, omission, transaction, matter, cause or event* occurring contemporaneously with *or up to* and including the date of this Release."  Kaplan

---

[15]    New York law applies to applicability of the forum selection clause in the Horowitz Release.  *See In re Broad St. Media LLC*, 2017 WL 5624879, at *8 (Bankr. D.N.J. Nov. 20, 2017) (holding that a "contract's governing law determines the enforceability of the forum selection clause, unless a 'significant conflict between some federal policy or interest and the use of state law exists.").  In *Broad Street*, because of the New York choice-of-law provision in the agreement at issue, this Court relied on Second Circuit case law to analyze and then enforce the forum selection clause.  *Id. at *9.*

Decl. Ex. C (Horowitz Release Agreement at 6 § 2(b))  (emphasis added).  Moreover, Thrasio agreed to release Horowitz in connection with the sale of Yardline to Horowitz, a transaction specifically referenced in the Complaint.  Compl. ¶ 119.  Plaintiffs claims that relate to transactions relating to Yardline all arose prior to the date of the Release.  *See Salovaara*, 246 F.3d at 300 ("Since this lawsuit involves that subject matter [defined under the relevant agreement], it is covered by the forum selection clause); see also *BVM S.p.A,* 2021 WL 3077441, at *4.  Similarly, Plaintiff's claims relating to the Tender Offer also are covered by the broad language of the release and arose before the date of the release.

Third, the forum selection clause applies even though the Complaint has carefully avoided mentioning the Release.  *BVM S.p.A* is illustrative.  In that case, an Italian company sued its former subsidiary, BVM USA, which previously had been sold to a US company pursuant to a sale agreement with a forum selection clause.  BVM USA moved to dismiss the action based on the forum selection clause in the sale agreement.  The Italian parent company argued that its claims did not arise out of the sale agreement.  The district court held that the forum selection clause applied because the court was required to interpret the language of the sale agreement even though it had not been explicitly referenced in the plaintiff's complaint: "the fact that BVM USA raises the Sale Agreement as a defense to BVM Italy's claims does not bar the application of the forum selection clause.  To the contrary, it means that the dispute here is captured by the broad forum selection clause because the claims are necessarily related to the Sale Agreement."  Horowitz similarly contends that all of Plaintiff's claims are barred by the Release.  As in *BVM S.p.A*, Plaintiff cannot succeed in its action against Horowitz without addressing the Release and, concomitantly, the Release's forum selection clause.  *See Miller-Rich v. Altum Pharms. Inc.,* 2024 WL 1638637, at *3 (S.D.N.Y. Apr. 16, 2024) (holding that it was  "appropriate for the Court to

consider the full extent of the Release's forum-selection clause in ruling on the Appearing

Defendants' motions to dismiss" because "each of Plaintiff's claims involves "matter[s] arising [

]under or related [ ]to" the Release, and thus is subject to the Release's forum-selection clause.");

*Marcus v. Rapid Advance, LLC*, 2013 WL 2458347, at *3 (E.D. Pa. June 7, 2013); *In re Odyssey*

*Contracting Corp.*, 581 B.R. 762, 779 (Bankr. W.D. Pa. 2018) (citing *TVT Records v. Island Def*

*Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005)), *subsequently aff'd,* 944 F.3d 483 (3d Cir. 2019).

After a movant has "raised the issue of the forum selection clause, the burden now shifts

to [non-movant] to 'make a strong showing that it should be set aside'." *In re Lizza*, 614 B.R. at

667 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).  The forum selection

clause should be enforced unless non-movant can "***clearly*** show that enforcement would be

reasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*M/S Bremen*, 407 U.S. at 15 (emphasis added).  Given that the Release was agreed to by Thrasio

in connection with a complicated commercial transaction that effectively unwound the relationship

between Thrasio and Horowitz and Yardline, there are no compelling grounds to ignore the

negotiated forum selection clause.

For these reasons, the Court should give effect to the Horowitz Release Agreement's

mandatory forum selection clause and dismiss the claims asserted against Horowitz pursuant to

Fed. R. Civ. P. 12(b)(6).

## II.    PLAINTIFF'S CLAIMS AGAINST HOROWITZ ARE BARRED BY THE RELEASE AGREEMENT

The above-discussed forum selection clause notwithstanding, Plaintiff's claims are barred

by the Horowitz Release Agreement, which settled several outstanding matters between Thrasio

and Horowitz, including the vesting of his outstanding options and the termination of his

consulting agreement.  The parties entered into this agreement in connection with the sale of

Yardline to Swiftline.  According to the Complaint, in January 2022, "Thrasio sold Yardline to

Swiftline"—an entity associated with Horowitz—for $7.1 million in cash and $5 million in

Swiftline stock (the "Swiftline Sale").  Comp. ¶¶ 118-19.[16]  The Release Agreement acknowledges

that the Board expressly made the vesting of Horowitz's options conditioned upon Horowitz (a)

signing, return, and not revoking the Horowitz Release Agreement and (b) the closing of the

Swiftline Sale.

The Horowitz Release covers claims "arising contemporaneously with or prior to its

consummation of the Transaction, or on account of or arising out of any act, omission, transaction,

matter, cause or event occurring contemporaneously with or up to an including the date of this

Release." Kaplan Decl. Ex. C (Horowitz Release Agreement at 6 ¶ 2(b)).  The claims against

Horowitz—the funding of Yardline by Thrasio, Thrasio's purchase of Horowitz's stock, and

Horowitz's participation in the 2020 Tender Offer—all arose prior to the Transaction (*i.e.,* the sale

of Yardline to Swiftline in January 2022).  Moreover, the Horowitz Release is given "on behalf of

[Thrasio] and its successors, assigns, heirs and any of their respective Affiliates."  Under the plain

language of the Release, all of the claims against Horowitz are barred.

Under New York law, "a valid release constitutes a complete bar to an action on a claim

which is the subject of the release."  *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de

C.V.*, 17 N.Y.3d 269, 276, 952 N.E.2d 995 (2011) (internal quotation marks and citations omitted);

---

[16]    Because the Complaint explicitly refers to the Swiftline Sale transaction but omits reference to the
Horowitz Release Agreement that was part and parcel of the Swiftline Sale transaction, the Court may
consider the Horowitz Release Agreement submitted in support of this Motion as Ex. C to the Kaplan
Declaration. *Spizzirri v. Zyla Life Scis.*, 802 F. App'x 738, 739 (3d Cir. 2020) (holding that documentary
exhibit was "integral to the Complaint because [Plaintiff's] claims are based on the document, even if it is
not explicitly cited to," on grounds that "Plaintiffs cannot prevent a court from looking at the texts of the
documents on which its claim is based by failing to attach or explicitly cite them").  *See Seven Invs., LLC
v. AD Cap., LLC,* 32 A.3d 391, 396 (Del. Ch. 2011) (a "[r]elease nevertheless can be considered on a Rule
12(b)(6) motion because the Complaint incorporates the" document containing the release "by reference.").

*see, e.g., Touloumis v. Chalem,* 156 A.D.2d 230, 548 N.Y.S.2d 493 (N.Y. App. Div. 1989) (holding

that, in absence of fraud or mistake, "the terms of that release serve as a bar to this action").

Because all claims asserted against Horowitz arise out of purported acts and transactions explicitly

alleged to have taken place *prior* to the execution of the Horowitz Release Agreement in January

2022, Plaintiff is barred from maintaining them here.

## III.    PLAINTIFF'S CLAIMS AGAINST HOROWITZ ARE BARRED BY THE PLAN

Article VIII.E of the Plan, titled "Debtor Release," provides:

> Except as otherwise specifically provided in the Plan or the Confirmation Order,
> pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable
> consideration, as of the Effective Date, ***each Released Party is deemed released
> and discharged*** by the Debtors, the Reorganized Debtors, and their Estates from
> any and all Causes of Action . . . .

Kaplan Decl. Ex. D (Plan at Art. VIII.E).

A "Released Party" is defined as Thrasio and "each current and former wholly-owned

Affiliate" of Thrasio, and each "Related Party" of these entities. A "Related Party" includes former

directors, officers, employees, consultants and equity holders of Thrasio or any such Affiliate.

Kaplan Decl. Ex. D (Plan at Art. I.A ¶ 132). Horowitz was an equity holder and consultant of

Thrasio and a director, officer and employee of Yardline, formerly a wholly-owned Affiliate of

Thrasio. See Compl. ¶¶ 36, 110.

The Plan carves out of the release certain individuals and matters, defined as "Excluded

Parties." Kaplan Decl. Ex. D (Plan at Art. I.A ¶ 75). The Plan defines "Excluded Parties" as

Joshua Silberstein, Carlos Cashman, Joseph Falcao, Daniel Boockvar, Mounir Ouhadi, and Aditya

Rathod. *Id.* In addition, with respect to Yardline and Horowitz, the term is further limited to

individuals who actually received any assets of Thrasio through Yardline. Excluded Parties thus

includes only "transferees of Thrasio's assets in connection with transactions involving Yardline

Capital Corp. between April 2020 and January 2022, including, but not limited to, Ari Horowitz."
*Id.*

The Plan created the Thrasio Legacy Trust, which upon confirmation of the Plan received a transfer of (among other assets) of all "Vested Causes of Action," defined as claims against Excluded Parties and causes of action not released under the Plan.  Plaintiff thus lacks standing to bring any claims released under the Plan, and its standing is limited to the matters expressly falling within the definition of Excluded Parties.  *See In re Millennium Lab Holdings II, LLC,* 242 F. Supp. 3d 322, 339 (D. Del. 2017), *as amended* (Mar. 20, 2017) (the "Plan's release, which permanently extinguished Appellants' claims, is tantamount to resolution of those claims on the merits against Appellants.").

The plain language of the Plan precludes Plaintiff's claims.  Horowitz is not included in the first clause of the definition of Excluded Parties, which preserved claims against Silberstein, Cashman, Falcao, Boockvar, Ouhadi and Rathod, without any limitation as to the type of claim. The second clause, however, is limited to "transferees"[17] of Thrasio's assets ***in connection with transactions involving Yardline***.  Compl. ¶ 24 (emphasis added).  None of Plaintiff's claims against Horowitz meet this definition.

First, Plaintiff's claims arising out of the 2020 Tender Offer are explicitly released under the Plan as to Horowitz.  These claims have nothing to do with Yardline.  *See In re Millennium Lab Holdings II, LLC,* 242 F. Supp. 3d at 339.[18]

---

[17]    Black's Law Dictionary defines "transferee" as "[o]ne to whom a property interest is conveyed." TRANSFEREE, Black's Law Dictionary (12th ed. 2024).

[18]    Moreover, claims arising out of the Tender Offer were explicitly renounced by the Disinterested Directors tasked with evaluating which potential claims to retain.

Second, the Complaint is clear that all of the funds that Thrasio allegedly loaned to Yardline were paid to Yardline noteholders, not Horowitz.  Moreover, these payments were part of a plan by Thrasio to take control of Yardline and oust Horowitz.  None of these transactions resulted in the transfer of Thrasio's assets to Horowitz, and accordingly, Horowitz was not a "transferee" of those assets.

Third, the Complaint alleges that Horowitz benefitted from the payments because he was seeking to avoid a lawsuit arising out of the payments to noteholders.  Aside from the failure to plausibly plead this claim, the plain language of the Plan does not apply to anyone other than a transferee of the Thrasio assets.  Moreover, an alleged beneficiary of a fraudulent transfer cannot be the "transferee."  *In re Glob. Outreach, S.A.*, 2011 WL 2294168, at *10 (D.N.J. June 6, 2011) (quoting *Bonded Financial Services v. European American Bank,* 838 F.2d 890, 895 (7th Cir.1988)).

## IV.    PLAINTIFF FAILS TO STATE A CLAIM ARISING OUT OF THE YARDLINE TRANSACTIONS[19]

### A.    Pleading Standards

Plaintiff's constructive fraud claims are governed by Fed. R. Civ. P. 8(a), which demands that the Complaint "give the defendant fair notice of what the claim is and the grounds upon which it rests." *See In re Modell's,* 2023 WL 2961856, at *23 (this Court "will follow the majority rule, which it believes is the better reasoned and supported view, principally because a constructive fraud claim does not require proof of actual fraud, and find that Rule 9(b) does not apply to constructive fraudulent transfer claims.").

---

[19]    The Complaint is silent as to what state's laws applies to the fraudulent transfer claims.  However, given the "similar standards" among the "federal bankruptcy law and New York and New Jersey fraudulent transfer law" (*In re Modell's Sporting Goods, Inc.*, 2023 WL 2961856, at *33 (Bankr. D.N.J. Apr. 14, 2023)), for purposes of this Motion, Horowitz relies on New Jersey law.

Generally, the heightened pleading standard of Rule 9(b) applies to claims for actual fraudulent transfers involving Yardline (Counts XX, XXII, XXIV), which demands that Plaintiff allege "with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b); *In re CTE 1 LLC*, 2023 WL 5257940, at *12 (Bankr. D.N.J. Aug. 11, 2023) ("actual fraudulent transfer claims must generally be pleaded with particularity in bankruptcy proceedings (as well as outside them)."). Even a cursory review of each allegation "supporting" the actual fraud claims against Horowitz confirms that these claims do not, in fact, "sound in fraud". Because each of Plaintiff's claims fail to meet the requirements of *Iqbal*, they should be dismissed accordingly. *See* 556 U.S. at 662.

B.    Plaintiff Fails to Adequately Allege That Any of the Yardline Transfers are Avoidable Under New Jersey Law

To establish its claim under New Jersey law for constructive fraudulent transfers arising out of the Yardline Transfers (Counts IXX, XXI, XXII), Plaintiffs must sufficiently allege that the debtor—Thrasio—made the challenged transfer: first, "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and second, the debtor either: "(a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or  (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due."  N.J.S.A. § 25:2-25.

To maintain its claims for actual fraudulent transfers (Counts XX, XXII, XXIV) arising out of the same transactions, New Jersey law demands that Plaintiff allege that debtor—here, Thrasio—executed the challenged transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor."  N.J.S.A. § 25:2-25.  Under New Jersey law, "[w]hether the transferor had

the intent to evade creditors is evaluated by the presence of certain badges of fraud,[20] which are circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent." *Traisman v. Khmelnitsky*, 2020 WL 2847751, at *6 (D.N.J. June 1, 2020) (internal quotation marks and citations removed).

1.    The Complaint Establishes that Thrasio Received Reasonably Equivalent Value for Each Challenged Yardline Transfer

"Courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer" because when it does, "the transferor receives value equal to the transferred asset." *In re HH Liquidation, LLC*, 590 B.R. 211, 266 (Bankr. D. Del. 2018). Here, Thrasio was the majority owner of Yardline at the time the transfers to pay the noteholders were made, and shortly thereafter became the sole owner of the company. The very purpose of the transfers according to the complaint were for Thrasio to become the sole owner of Yardline. Thrasio thus is the only beneficiary of these transfers, and Thrasio received equivalent value – the elimination of any risk of dilution to its equity opposition and of the notes issued by Yardline.

The Complaint alleges that Thrasio commenced its three-step scheme to takeover and become the sole 100% shareholder of Yardline beginning on April 27, 2021, when it triggered certain conversion rights to become a controlling 67% shareholder. Compl. ¶¶ 108-109. The Complaint also alleges that, at the same time, *Yardline* was attracting investment interest from

---

[20]    Under N.J.S.A. § 25:2-26, Courts will consider whether: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. N.J.S.A. § 25:2-26.

both debt and equity investors, with Horowitz "securing enough commitments that would have allowed for the Series A to close and thus trigger the vesting of his Thrasio stock options" by March 2021 (Compl. ¶105)," while Noteholders that had "also committed to participating in the equity financing and were expecting greater returns on their investment based on Horowitz's Series A pitch." Compl. ¶ 112.  And the Complaint further alleges that between April 29, 2021 and November 23, 2021, Thrasio issued $20.9 million in loans evidenced by promissory notes and "cash injections" to its wholly owned subsidiary, Yardline. *See, e.g.,* Compl. ¶ 299.  Based on these findings, the Disinterested Directors Report concluded that the payments were made by Thrasio—at the time, parent company to wholly-owned subsidiary Yardline—in order "to satisfy Yardline's obligations to third-party investors that had been triggered by Thrasio's actions." Kaplan Dec. Ex. B (DDR at ¶ 42).

With respect to the allegation that "Thrasio did not receive reasonably equivalent value" in exchanging for "writing off/forgiving" approximately $20.9 million in promissory notes (for the purported benefit of Horowitz) (*see e.g.*, Compl. ¶328), again, Yardline was a wholly owned subsidiary of Thrasio at this time.

Finally, as to the Hudson Palm transfer, the Complaint alleges that "Thrasio did not receive reasonably equivalent value" in exchange for paying "$1,823,707 to Hudson Palm to purchase Horowitz's and/or Hudson Palm's Yardline shares" because "Yardline had no value, and Thrasio had no use for additional shares of an insolvent company." Compl. ¶ 351.  The allegation in Count XXIII that Thrasio did not receive equivalent value in exchange for this payment is dependent on the allegation that Yardline was "insolvent" such that its shares had "no value." *Id*.  But because the Complaint itself explicitly alleges that, at the exact same time, Yardline was attracting significant interest in its Convertible Notes and Series A offerings from third party investors

(Compl. ¶¶ 99-105), baseless allegations respecting Yardline's purported "insolvency" are implausible as a matter of law. *See Sovereign Bank* v. *BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008).

Because, as a matter of law, Thrasio received reasonable equivalent value in connection with its investments in Yardline, the Complaint does not state a claim for constructive fraudulent transfer. *Id.*

> 2.    Allegations in the Complaint and Findings in the DDR Preclude any Finding of Insolvency at the time of the Yardline Transfers

The sole "fact" pleaded in support of Plaintiff's otherwise conclusory (and internally conflicting) allegations regarding Thrasio's purported insolvency at the time of the transfers is that "PwC emphasized in Thrasio's 2020 and 2021 audit reports that there was "substantial doubt" as to Thrasio's "ability to continue as a going concern." *See*, *e.g.*, Compl. ¶ 329.  Even putting aside the fact that, as the Complaint concedes, such reports were not actually published until approximately seven months after the last Yardline Transfer (Compl. ¶ 48), there is nothing in the Complaint's description of the PWC reports that would support an inference that Thrasio was at or near insolvency as of the date of *any* of the Yardline Transfers.   Indeed, elsewhere in the Complaint, Plaintiff tellingly alleges that PWC's opinion was based on its assessment "that there was 'no certainty that additional capital . . . would be raised'" by Thrasio.  Compl. ¶ 64.  Finally, the Complaint explicitly alleges that as of February 2021—two months before Thrasio undertook the Yardline Transfers—Horowitz began soliciting interest in Yardline's Series A "in order to trigger the vesting of his Thrasio stock options, which he believed to be worth up to $62.5 million at the time." Compl. ¶ 100.  Because there is no reason to credit Plaintiff's unsupported allegations

that Thrasio was at or near insolvency at the time of the Yardline Transfers in April 2021, the

claims must be dismissed.

        3.      The Complaint Fails to Adequately Allege that the Yardline Transfers Are
                  Avoidable as Actual Fraudulent Transfers (Counts XX, XXII, XXIV)

The Complaint makes no substantive allegations sufficient to support the conclusion that

Thrasio executed any of the Yardline transfers with actual intent to defraud Thrasio's creditors.

Apart from merely "parrot[ing] the language of" the statutes setting forth the badges of fraud

(Compl. ¶¶ 314-15, 337-38, 359-60), the claims are supported only by the vague non-sequitur that

"Yardline's founder and CEO, Horowitz, was a former insider of Thrasio and had a close

relationship with Cashman."  Compl. ¶¶ 316, 339, 361.  As a result, and as in *Traisman*, where a

claim is grounded only in "conclusory statements" respecting the badges of fraud, it should be

dismissed for lack of "sufficient factual allegations to permit a reasonable inference that [debtor]

acted with "actual intent to hinder, delay, or defraud" [creditor]."  2020 WL 2847751, at *6.

        C.      Plaintiff Cannot Recover Property Transferred from Horowitz as a Matter
            of Law

Section 550(a) provides that, for transfers held to be avoidable under state law pursuant to

Section 544, "the trustee may recover, for the benefit of the estate, the property transferred, or, if

the court so orders, the value of such property, from—(1) the initial transferee of such transfer or

the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of

such initial transferee."  11 U.S.C.A. § 550.  Critically, however, "an entity must fall under one

subsection or the other: a subsequent transferee cannot also be an entity for whose benefit the

transfer was made. *Id.* at 895–896. *See In re Glob. Outreach, S.A.*, 2011 WL 2294168, at *11

(holding that the categories in subsections (a)(1) and (a)(2) are "mutually exclusive.")."

Here, and as to Counts XIX-XXII, the Complaint alleges that:

> Horowitz, Cashman, and Yardline were the persons for whose benefit the
> [transactions] were made. Defendants schemed to have Thrasio issue the
> Promissory Notes to Yardline and pay the third-party investors, all to benefit
> Horowitz and Cashman by ensuring that they would not be sued by Yardline
> investors. This was done at the expense of Thrasio, which received no consideration
> for [the Transaction].

Compl. ¶¶ 306, 322, 331, 345. But because Plaintiff's already implausible contention—namely,

that the approximately $24 million conveyed in the board-approved Yardline Transfers was made

for the Horowitz's benefit (Counts XIX-XXIII)—is belied by allegations appearing on the face of

Plaintiff's own complaint, all four counts must be dismissed. *See Sovereign Bank,* 533 F.3d at 181

(affirming dismissal where allegations in "complaint fatally undermines [plaintiff's] contention"

on grounds that conflicting allegation in complaint is a "binding judicial admission," where

plaintiff's "attempt to salvage its []claim now requires that it take a contrary position.").

Specifically, each of the four causes of action pleads that the transfers benefitted Horowitz by

paying off Yardline's third party investors for the purpose of "ensuring that they [Horowitz and

Cashman] would not be sued by Yardline Investors." *See, e.g.,* Compl. ¶ 306.[21]   But there are no

allegations that Horowitz was exposed to legal threats from Yardline investors.  Thus, there is no

basis for the allegation that Horowitz would have benefitted at all from the perceived reduction in

likelihood that Yardline Investors would file any suit against any person.  And it is for this reason

that the law treats amorphous and hard-to-define benefits like a perceived reduction of litigation

exposure as an "indirect, unquantifiable benefit [] not sufficient to establish liability under section

550(a)." *In re Crucible Materials Corp.*, 2012 WL 5360945, at *7 (Bankr. D. Del. Oct. 31, 2012)

---

[21]     *See also* Compl. ¶ 115 (alleging that Cashman grew "personally legally worried" and "shared with
Silberstein that he believed that the 'lawsuit threats are real."); *id.* at ¶ 287 (alleging that "angered Yardline
Convertible Noteholders and other Yardline investors [] threatened lawsuits" at  "Silberstein and
Cashman.").

(explaining that the "classic example" of a 550(a)(1) "entity for whose benefit a transfer was made" is "a guarantor who receives a benefit but not the money.").

The allegations as to the Hudson Palm Transfer (Counts XXIII-XXIV) are deficient for the same reasons. The Complaint baldly alleges that "Horowitz was the person for whose benefit this transfer was made." This—without more—amounts to an impermissible end-run around the doctrinal requirements of a veil-piercing action and cannot provide the basis for recovery against Horowitz. *Traisman*, 2020 WL 2847751, at *6 (allegation that "merely parrots the language of the statute" is insufficient to sustain a constructive fraudulent conveyance claim under *Iqbal*).

> D.   Plaintiff Fails to State a Conspiracy Claim in Count XXV

This Court does not recognize a claim for "conspiracy to commit fraudulent transfer" because it is not a claim to "avoid a fraudulent transfer" and is therefore not an "applicable state law" under which the Trustee is authorized to pursue avoidance and recovery. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 548 (Bankr. D. Del. 2009) (even where a Trustee is granted right to pursue claims on behalf of creditors "under the law of a state that does recognize a claim such as [] 'conspiracy to commit a fraudulent transfer,' bankruptcy courts have refused to permit trustees to use section 544(b) to pursue such a claim.") As a result, Plaintiff has failed to state a claim for conspiracy arising out of the Yardline Transfers.

## V.   ALL CLAIMS ARISING OUT OF THE TENDER OFFER MUST BE DISMISSED

For the reasons argued above at Sections II-III, all causes of action asserted against Horowitz that arise out of the Tender Offer were either contractually released or waived under the Plan. Counts II-IV and VI should also be dismissed for the independent reason that they fail to state a claim against Horowitz.

A.    Plaintiffs Fail to State a Claim for Fraudulent Transfer Counts (II and III)

Critically, all of the events giving rise to plaintiff's Tender Offer claims occurred before any of the challenged Yardline Transfers. *See* Statement of Facts, Section E, *supra*. As a direct result, and as to their constructive Tender Offer claim (Count II), plaintiff could not (and does not) plausibly allege that Thrasio was teetering on insolvency on or before July 18, 2020. On the contrary, the Complaint alleges that in April 2021, Yardline's unnamed "Series A investors" were "were expecting greater returns on their investment based on Horowitz's Series A pitch," and that "Cashman was especially uneasy with the fact that the Convertible Noteholders were trying to rile up Thrasio investors, who would clearly disapprove of a reckless investment based on Silberstein's personal feud." (Comp. 111-12). These allegations render implausible any claim grounded in the notion that Thrasio was at or near insolvency. N.J.S.A. § 25:2-25(a)(2).

    1.  Because Plaintiff's Own Allegations Make Clear that Thrasio Received Reasonably Equivalent Value in Exchange for Tender Offer Payment, Count II (Constructive) Must Be Dismissed

First, the Complaint makes no substantive allegations in support of its contention that Thrasio "did not receive anything" (Compl. ¶ 143) in exchange for the Tender Offer transfers. *Traisman*, 2020 WL 2847751, at *6 (allegation that "merely parrots the language of the statute" by conclusory statement that debtor did not receive reasonably equivalent value is insufficient to sustain a constructive fraudulent conveyance claim under *Iqbal*). On the contrary, the Complaint alleges that Thrasio received "approximately three million shares of common and preferred stock, along with a number of options and warrants" from participating shareholders—including Horowitz—in exchange for a distribution of cash proceeds approved by the Board.

Second, and as the Disinterested Directors Report accurately concluded, the $146 million Tender Offer was not a standalone transaction but was instead part and parcel of a broader $259

million Series C-1 Stock Issuance.  Kaplan Decl. Ex. B (DDR at ¶¶ 51-52) (Thrasio "netted over

$112 million in cash from the Series C-1 Stock Issuance after the Tender Offer").

2.     Allegations in the Complaint and Findings in the DDR Preclude any
Finding of Insolvency at Time of Tender Offer

As argued above, the sole fact offered in support of Plaintiff's otherwise conclusory (and

internally conflicting) allegations regarding Thrasio's purported insolvency at the time of the

transfers is that "PwC emphasized in Thrasio's 2020 and 2021 audit reports that there was

"substantial doubt" as to Thrasio's "ability to continue as a going concern." *See, e.g.*, Compl. ¶

64.  But this allegation fails to support the Tender Offer claims.  First, and as Plaintiff is well

aware, the referenced year-end audit for 2020—the only possibly relevant report here—was in fact

published by PWC in June 2022.  Compl. ¶ 48 (acknowledging that it took PWC "two years to

complete its audit").  But dispositively, even assuming PWC had timely provided the audit by

year-end 2020, the Complaint would still fail to plausibly allege Thrasio was at or near insolvency

at the time of the Tender Offer transfer closed months earlier, on July 18, 2020.  *In re Nanobeak*

*Biotech Inc.*, 656 B.R. 350, 364 (Bankr. S.D.N.Y. 2024) (Trustee did not "trigger the presumption

of insolvency" due to its failure to sufficiently allege "that the Debtor had outstanding debts to

creditors at the time of the Transfers.").

3.     Complaint Fails to Sufficiently Allege an Actual Fraudulent Transfer
Arising Out of Yardline

As above, Counts XXIII and XXIV of the Complaint allege nothing beyond a mere

recitation of the elements of its claim.   As a result, and for the reasons outlined at Section IV.B-C

*supra*, Count IV should be dismissed.

B.    <u>Count IV: Conspiracy – Tender Offer</u>

For the reasons outlined at Section IV.D *supra*, Count IV should be dismissed.

C.    <u>Count VI: Unjust Enrichment – Tender Offer</u>

In addition to the ten causes of action for fraudulent transfer, Plaintiff asserts against Horowitz one quasi-contractual claim for unjust enrichment arising out of the Tender Offer.  The only non-conclusory substantive allegation offered in support of this claim is that "Horowitz was a Senior Vice President of the Company and similarly sought to enrich himself at the expense of Thrasio and its stakeholders" and that Defendants (including Horowitz) "wrongfully obtained their share of the Proceeds through the unfair and fraudulent actions of Silberstein, Cashman, Boockvar, Falcao, and Horowitz."  As a threshold matter, and despite Plaintiff's attempt to style it otherwise, Count VI—which takes aim at Horowitz's allegedly "fraudulent actions"—clearly sounds in tort. But "New Jersey law does not recognize unjust enrichment as an independent tort cause of action" and instead requires allegations that Plaintiff "performed or conferred a benefit upon Defendants pursuant to a quasi-contractual relationship, for which [it] expected remuneration in return." *Schechter v. Hyundai Motor Am.*, 2019 WL 3416902, at *11 (D.N.J. July 29, 2019) (dismissing unjust enrichment claim sounding in tort where alleged misconduct was "unlawful, unjust, and inequitable conduct").

In all events, Plaintiff fails to state a claim for unjust enrichment against Horowitz.  To state a claim for unjust enrichment under New Jersey law, "a plaintiff must show both that [1] defendant received a benefit" and [2] that retention of that benefit without payment would be unjust." *Id.* (internal quotation marks and citations omitted).  Moreover, because it must allege that Plaintiff (Thrasio) conferred the benefit on Defendant (Horowitz), Thrasio is required to "allege a sufficiently direct relationship with the defendant"—not some third party—to maintain its claim. *Id.* (dismissing unjust enrichment claim for failure to allege a sufficiently direct connection between plaintiff and defendant).

The Complaint makes exclusively conclusory allegations modeled off the elements of an unjust enrichment claim. Compl. ¶¶ 191-194. The Complaint's total failure to support these allegations with facts tending to show that Horowitz's receipt of Tender Offer proceeds was "to the detriment of Thrasio and its creditors," or that "the Company received nothing in return," is no accident. *Id.* As described above, because it is undisputed that Thrasio received Horowitz's shares in return for the Tender Offer proceeds, Plaintiff cannot show that Horowitz received the proceeds "without payment." *See supra* Section V.A. Nor are there facts pled that identify what was "unjust" or "unconscionable" about Horowitz's receipt of proceeds in connection with a transaction in which Thrasio undisputably "netted over $112 million in cash from the Series C-1 Stock Issuance after the Tender Offer." Kaplan Decl. Ex. B (DDR at ¶¶ 51-52).

Finally, dismissal is required because plaintiff's theory of the case is *not* that Thrasio conferred some benefit on Horowitz, but rather that Thrasio's officers and board members at the time of the Tender Offer—Silberstein, Cashman, Boockvar, and Falcao (and *not* Horowitz)—unjustly enriched Defendants (including Horowitz) via their "unfair and fraudulent actions," to the detriment of Thrasio. Compl. ¶ 191. Just as there are no allegations of deceit, dishonesty, or even misrepresentation offered in support of Plaintiff's fraudulent transfer claims against Horowitz, there are no allegations respecting a direct quasi-contractual relationship between Thrasio (as conferrer) and Horowitz (as recipient) in Count VI.

## VI.    ALL CLAIMS AGAINST HUDSON PALM MUST BE DISMISSED

The sole allegations against Hudson Palm are that it was the entity which held the shares of Yardline for or on behalf of Horowitz (*see* Compl. ¶ 110), and Thrasio "paid for Horowitz's Yardline shares through a transfer to Hudson Palm." *Id.* As set forth in the Complaint, the purchase of the shares (and extinguishment of any other ownership interest in Yardline) was part

of Thrasio's three step process to take 100% ownership and control of Yardline. *Id.* In exchange,
Thrasio became the sole owner and operator of Yardline as a result of the transaction. *Id.*

On this basis, and without any further argument regarding reasonably equivalent value for
such exchange, the Complaint asserts bald and fact-deficient claims for Actual and Constructive
Fraudulent Conveyances against Hudson Palm.

For the reasons argued above, and in particular at Sections VI (D and E) hereof, all claims
asserted against Hudson Palm arising out of the purchase of the Yardline shares must be dismissed.
It is respectfully submitted that Counts XXIII and XXIV should be dismissed for failing to state a
claim against Hudson Palm.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Horowitz's motion to dismiss the Plaintiff's Complaint.  The Court should also grant Hudson Palm's motion to dismiss Plaintiff's Complaint.

Dated:  March 17, 2025

        */s/ John Jureller*
John Jureller, Jr.
(NJ Bar No. 056361993)
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036.
Telephone: 212-679-5315
Email: jjureller@klestadt.com

*Attorneys for Hudson Palm LLC and local counsel for Defendant Ari Horowitz*

        */s/ Michelle A. Rice*
Howard J. Kaplan (admitted *pro hac vice*)
Michelle A. Rice (admitted *pro hac vice*)
hkaplan@kaplanrice.com
mrice@kaplanrice.com
KAPLAN RICE LLP
142 W. 57th St., Suite 4A
New York, New York 10019
Phone: (212) 235-0300

*Attorneys for Defendant Ari Horowitz*