**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *Caption in Compliance with D.N.J. LBR 9004-1(b)* | |
| James S. Carr, Esq. <br> Connie Y. Choe, Esq. <br> **KELLEY DRYE & WARREN LLP** <br> One Jefferson Road, 2nd Floor <br> Parsippany, New Jersey 07054 <br> Telephone: (973) 503-5900 <br> Facsimile: (973) 503-5950 <br> Email: jcarr@kelleydrye.com <br>       cchoe@kelleydrye.com <br> *Counsel to the Thrasio Legacy Trust* <br><br> Lorenzo Marinuzzi, Esq. <br> Douglas Mannal, Esq. (admitted *pro hac vice*) <br> Jamie A. Levitt, Esq. <br> Theresa A. Foudy, Esq. (admitted *pro hac vice*) <br> J. Alexander Lawrence, Esq. (admitted *pro hac vice*) <br> **MORRISON & FOERSTER LLP** <br> 250 West 55th Street <br> New York, NY 10019 <br> Telephone: (212) 468-8000 <br> Facsimile: (212) 468-7900 <br> Email: lmarinuzzi@mofo.com <br>       dmannal@mofo.com <br>       jlevitt@mofo.com <br>       tfoudy@mofo.com <br>       alawrence@mofo.com <br> *Counsel to the Thrasio Legacy Trust* | <br><br><br><br><br><br><br><br><br><br>-------------------------------------- <br> Chapter 11 <br><br> Case No. 24-11850-CMG <br><br><br> -------------------------------------- <br><br> Adv. Pro. No. 24-01637-CMG |
| In re: <br><br> 1 THRASIO ONE, INC., <br>                   *Reorganized Debtor[1]* <br> META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust, <br>                Plaintiff, <br>        v. <br><br> JOSHUA SILBERSTEIN, *et al*., <br>               Defendants. | |

---

[1] The last four digits of Reorganized Debtor's tax identification number are 4771.   The Reorganized Debtor's service address for purposes of this chapter 11 case is 85 West Street, 3rd Floor, Walpole, MA, 02081.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND................................................. 5

    A.    LACK OF PROPER INTERNAL CONTROLS .................................... 6

    B.    TENDER OFFER ................................................................................. 7

    C.    SECONDARY SALES ....................................................................... 8

    D.    YARDLINE ........................................................................................ 9

    E.    SILBERSTEIN AND CASHMAN RELEASES ............................... 10

    F.    THRASIO FILES FOR BANKRUPTCY ......................................... 10

THE PARTIES....................................................................................................... 12

LEGAL STANDARD............................................................................................ 15

ARGUMENT ........................................................................................................ 16

I.    ESTOPPEL DOES NOT APPLY HERE ....................................................... 16

    A.    The Plan Bars Defendants from Asserting Judicial Estoppel Arguments .......... 16

    B.    The Disinterested Directors Report Does Not Bar the Trust's Claims ............... 18

II.    THERE IS NO REQUIREMENT THAT THE TRUST IDENTIFY A PARTICULAR STATE'S LAWS TO PROVIDE ADEQUATE NOTICE OF ITS CLAIMS .................................................................................................. 20

III.    THE TRUST'S CLAIMS ARE TIMELY .................................................... 22

    A.    The Breach of Fiduciary Duty and Corporate Waste Claims Are Timely Asserted under Delaware Law ............................................ 23

        1.    Inherently Unknowable Injuries .................................. 24

        2.    Equitable Tolling .......................................................... 25

        3.    Continuing Wrong ........................................................ 26

    B.    Conspiracy to Fraudulently Transfer Tender Offer Proceeds (Count 4) and Unjust Enrichment (Count 6) Are Timely Asserted Under New Jersey and Massachusetts Law ................... 28

IV.    THE BUSINESS JUDGMENT RULE IS NOT PROPERLY CONSIDERED AT THE PLEADING STAGE AND, IN ANY EVENT, DOES NOT SHIELD DEFENDANTS' CONDUCT............................................... 31

    A.    The Business Judgement Rule Is an Affirmative Defense, Not a Ground to Dismiss the Complaint............................................. 31

    B.    Plaintiff Has Pled Sufficient Facts to Plausibly Allege the Business Judgment Rule Is Inapplicable Here ...................................... 33

    C.    The Business Judgment Rule Does Not Apply to the Disinterested Directors Report and the Plan Is Binding ................................. 36

# TABLE OF CONTENTS
(continued)

Page

D. The Tender Offer Is an Illegal Transaction that Cannot Be Shielded by the Business Judgment Rule ...................................................................................... 37

E. The Business Judgment Rule Does Not Apply to Officers, Employees, or Third-Party Corporations .......................................................................................... 37

V. THE TRUST'S CLAIMS ARE NOT BARRED BY ANY RELEASE OR SEPARATION AGREEMENT ......................................................................................... 38

A. The Employment, Separation, and Release Agreements of Excluded Parties are Rejected and No Longer in Effect ...................................................... 38

B. The Trust's Claims Fit within Cashman's Separation Agreement Carve Outs .......................................................................................................................... 39

C. For Cashman, Massachusetts Law Further Limits the Release .......................... 41

D. Horowitz and Yardline May Not Seek Inconsistent Remedies for Breach of Contracts .............................................................................................................. 42

E. Cashman's (and Cashman Investment's) Release Cannot Be Relied Upon Because They Are Subject to Avoidance ............................................................. 43

F. The Trust's Fraudulent Transfer Claims Were Not Release Pre-Petition ........... 44

VI. THE SECTION 546(E) SAFE HARBOR EXEMPTION IS INAPPLICABLE ............. 45

A. The Safe Harbor Exemption Does Not Apply to Tender Offer Claims ............... 45

B. Even If Section 546(e) May Apply to Claims Like Those Alleged by The Trust, It Does Not Apply Here ............................................................................. 48

VII. THE BANKRUPTCY COURT HAS SUBJECT MATTER JURISDICTION OVER ALL CLAIMS ASSERTED BY THE TRUST ................................................. 51

VIII. THE COMPLAINT IS NOT AN IMPERMISSIBLE GROUP PLEADING ................. 52

IX. ALL CLAIMS RELATED TO THE TENDER OFFER HAVE BEEN SUFFICIENTLY PLED (COUNTS 1-6) ........................................................................ 54

A. Breach of Fiduciary Duty of Loyalty – Approving Tender Offer (Count 1) ....... 54

B. Avoidance and Recovery of Tender Offer Proceeds as Constructive and Actual Fraudulent Transfers (Counts 2 and 3) ...................................................... 57

C. Conspiracy to Fraudulently Transfer Tender Offer Proceeds (Count 4) ............. 62

D. Delaware General Corporation Law Violation (Count 5) ...................................... 63

E. Unjust Enrichment (Count 6) ................................................................................ 64

X. ALL CLAIMS RELATED TO BREACH OF FIDUCIARY DUTIES FOR LACK OF CONTROLS ARE SUFFICIENTLY ALLEGED (COUNT 7) ................................ 65

XI. ALL CLAIMS RELATED TO WASTE OF CORPORATE ASSETS IN CONNECTION WITH INVENTORY ARE SUFFICIENTLY ALLEGED (COUNT 8) ...................................................................................................................... 70

ii

# TABLE OF CONTENTS

(continued)

**Page**

XII. ALL CLAIMS RELATED TO THE SECONDARY SALES ARE SUFFICIENTLY ALLEGED (COUNTS 9-11) ............................................................ 73

    A. Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod Breached Their Fiduciary Duties (Counts 9 and 10) ........................................... 73

    B. Defendants Boockvar, Falcao, Ouhadi, and Rathod Aided and Abetted Cashman and Silberstein's Breaches of Fiduciary Duty (Count 11) .................. 77

XIII. THE TRUST HAS SUFFICIENTLY ALLEGED ALL CLAIMS RELATED TO THE CASHMAN AND SILBERSTEIN RELEASES (COUNTS 12-16) ..................... 81

    A. Breach of Fiduciary Duty for Approving the Silberstein Release Has Been Adequately Pled as to Cashman (Count 12) ...................................... 81

    B. Constructive Fraudulent Transfer Claims Have Been Adequately Alleged for the Silberstein and Cashman Separation Agreements (Counts 13 and 15) ...................................................................................................................... 83

    C. Actual Fraudulent Transfer Claims Have Been Adequately Pled (Counts 14 and 16) ...................................................................................................... 87

XIV. PLAINTIFF HAS ADEQUATELY ALLEGED ALL CLAIMS RELATED TO THE YARDLINE TRANSACTIONS OR TRANSFER (COUNTS 17-26) .................. 89

    A. Breach of Fiduciary Duty Claims Against Silberstein and Cashman Have Been Adequately Pled (Count 17) ....................................................... 91

    B. Aiding and Abetting Breach of Fiduciary Duty Has Been Adequately Pled Against Boockvar (Count 18) ................................................................. 95

    C. Actual and Constructive Fraudulent Transfer Claims Have Been Adequately Pled Against Cashman (Counts 19-22) ........................................... 96

    D. Actual and Constructive Fraudulent Transfer Claims Have Also Been Adequately Pled Against Horowitz, Hudson Palm, and Yardline (Counts 19-24) ...................................................................................................................... 97

    E. The Conspiracy to Commit a Fraudulent Transfer Related to Yardline Has Been Adequately Alleged (Count 25) ................................................................ 100

    F. The Complaint Adequately Alleges Corporate Waste Related to the Yardline Transfers (Count 26) ......................................................................... 102

XV. FALCAO'S AND BOOCKVAR'S MOTIONS TO COMPEL ARBITRATION SHOULD BE DENIED ................................................................................................ 104

    A. Because the Plaintiff Here Is Not a Party to the Applicable Arbitration Agreements, the Court May Decide Arbitrability ............................................. 104

    B. The Separation Agreements and Consulting Agreement Were Rejected in the Bankruptcy Case ............................................................................................ 106

# TABLE OF CONTENTS

(continued)

|  |  | Page |
|---|---|---|
| C. | The Plaintiff's Claims Do Not Relate to the Separation or Consulting Agreements and Are Not Arbitrable | 108 |
| D. | The Trustee—the Plaintiff Here—Cannot Be Required to Arbitrate its Section 544(b) Claims | 110 |
| E. | The Court Should Not Stay the Proceeding Pending Any Arbitration | 111 |
| CONCLUSION | | 113 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*,
No. 22-cv-5211, 2023 WL 3841746 (D.N.J. June 6, 2023)........................................87, 88, 96

*In re Am. Bus. Fin. Servs., Inc.*,
375 B.R. 112 (Bankr. D. Del. 2007) ....................................................................................15

*In re Am. Int'l Grp., Inc.*,
965 A.2d 763 (Del. Ch., 2009)............................................................................................68

*In re AmCad Holdings, LLC*,
Case No. 14-12168, Adv. No. 15-51979, 2016 WL 3412289 (Bankr. D. Del.
June 14, 2016)....................................................................................................................52

*Apotex, Inc. v. Senju Pharm. Co.*,
921 F. Supp. 2d 308, 314 (D. Del. 2013)...........................................................................112

*Aphton Corp. v. Sonafi Pasteur (In re Aphton Corp.)*,
423 B.R. 76 (Bankr. D. Del. 2010) .....................................................................................65

*Ausikaitis v. Kiani*,
962 F. Supp. 2d 661 (D. Del. 2013).....................................................................................21

*Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*),
473 B.R. 525 (Bankr. D. Del. 2012) .....................................................................................84

*B.G. Balmer & Co., Inc. v. U.S. Fid. and Guar. Co.*,
No. 98-734, 1998 WL 764669 (E.D. Pa. Oct. 30, 1998) .....................................................110

*Baker v. Deutschland GmbH*,
240 F. Supp. 3d 341 (M.D. Pa. 2016)............................................................................15, 16

*Banco Popular N. Am. v. Gandi*,
184 N.J. 161 (2005) ............................................................................................................63

*Banco Popular N. Am. v. Gandi*,
876 A.2d 253 (N.J. 2005)..................................................................................................102

*Bank of Am. Corp. v. Braga Lemgruber*,
385 F. Supp. 2d 200 (S.D.N.Y. 2005)..................................................................................43

*In re Bayou Steel BD Holdings, L.L.C.*,
642 B.R. 371 (Bankr. D. Del., 2022) ...................................................................................48

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.*,
362 B.R. 624 (Bankr. S.D.N.Y. 2007)......................................................................61

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
833 A. 2d 961 (Del. Ch. 2003)................................................................................75

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................15

*Beyha v. Conestoga Title Ins. Co. (In re Beyha)*,
637 B.R. 430 (Bankr. E.D. Pa., 2022) ...................................................................36

*Broz v. Cellular Info. Sys. Inc.*
673 A.2d 148 (Del. 1996) .......................................................................................75

*In re Buffets Holdings, Inc.*,
387 B.R. 115 (Bankr. D. Del. 2008) .....................................................................107

*Burtch v. Huston (In re USDigital, Inc.)*,
443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................80

*Burtch v. Opus, LLC (In re Opus E., LLC)*,
528 B.R. 30 (Bankr. D. Del. 2015) ........................................................................94

*Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*,
Case No. 11-10776, Adv. No. 13-51215, 2014 WL 1320145 (Bankr. D. Del.
Apr. 2, 2014) ...........................................................................................................80

*BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP (In re BYJU's Alpha, Inc.)*,
661 B.R. 109 (Bankr. D. Del. 2024) .......................................................................92

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................................40

*Cede & Co. v. Technicolor*,
634 A.2d 345 (Del. 1993) .......................................................................................81

*Cent. Laborers' Pension Fund v. Dimon*,
No. 14-cv-1041, 2014 WL 3639185 (S.D.N.Y. July 23, 2014), *aff'd*, 638 F.
App'x 34 (2d Cir. 2016)...........................................................................................68

*In re Columbia Pipeline Grp., Inc.*,
No. 2018-0484, 2021 WL 772562 (Del. Ch. Mar. 1, 2021) ...................................34

*In re Contract Research Solutions, Inc.*,
No. 12-11004, 2013 WL 1910286 (Bankr. D. Del. May 1, 2013).........................107

# TABLE OF AUTHORITIES

(continued)

**Page**

*Crawford v. W. Jersey Health Sys. (Voorhees Div.)*,
   847 F. Supp. 1232 (D.N.J. 1994) ........................................................................112

*In re Cyber Litig. Inc.*,
   No. 20-12702 (CTG), 2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023)............................62

*In re Cybergenics Corp.*,
   226 F.3d 237 (3d Cir. 2000).....................................................................44, 45

*DelphX Corp. v. Fondren*,
   600 F. Supp. 3d 540 (E.D. Pa. 2022) ........................................................74

*In re Direct Response*,
   466 B.R. 626 (Bankr. D. Del. 2012) .......................................................69, 72

*In re Draw Another Circle*,
   602 B.R. 878 (Bankr. D. Del. 2019) ...........................................................81

*In re DSI Renal Holdings, LLC*,
   574 B.R. 446 (Bankr. D. Del. 2017) ...........................................................60

*Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft
   (In re Fah Liquidating Corp.)*,
   572 B.R. 117 (Bankr. D. Del. 2017) ...........................................................21

*Empire State Ethanol & Energy, LLC v. BBI Int'l*,
   No. 1:08-cv-623, 2009 WL 1813205 (N.D.N.Y. June 25, 2009) .........................................112

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
   76 F. Supp. 2d 383 (S.D.N.Y. 1999).............................................................42

*Off. Comm. of Unsecured Creditors of High Strength Steel, Inc. ex rel. Est. of
   High Strength Steel, Inc. v. Lozinski (In re High Strength Steel, Inc.)*,
   269 B.R. 560 (Bankr. D. Del. 2001) ..........................................................82, 91

*Evancho v. Fisher*,
   423 F.3d 347 (3d Cir. 2005)...................................................................15

*In re EXDS, Inc.*
   316 B.R. 817 (Bankr. D. Del. 2004) ..........................................................112

*In re Exide Techs., Inc.*,
   299 B.R. 732 (Bankr. D. Del. 2003) ...........................................................22

*In re F-Squared Inv. Mgmt., LLC*,
   Case No. 15-11469, Adv. No. 17-50716, 2019 WL 4261168 (Bankr. D. Del.
   Sept. 6, 2019) ...............................................................................84

# TABLE OF AUTHORITIES
(continued)

**Page**

*F.D.I.C. v. Perry,*
    No. 11-5561, 2012 WL 589569 (C.D. Cal. Feb. 21, 2012) ..............................................37, 39

*Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.,*
    319 A.3d 849 (Del. 2024) ..........................................................................................99

*Finkel v. Parzych (In re Midnight Madness Distilling, LLC),*
    No. 21-11750, 2024 WL 3517620 (Bankr. E.D. Pa. July 23, 2024)..................................53, 54

*In re Fleming Cos.,*
    325 B.R. 687, 695 (Bankr. D. Del. 2005) ............................................................................112

*Foulke v. Twp. of Cherry Hill,*
    No. 23-cv-2543, 2024 WL 3568841 (D.N.J. July 29, 2024) ..................................................53

*End of the Rd. Tr. ex rel. Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.),*
    250 B.R. 168 (D. Del. 2000) ....................................................................................25, 26, 40

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC),*
    595 B.R. 686 (Bankr. D. Del. 2020) ...................................................................................50

*Gaillard v. Natomas Co.,*
    256 Cal. Rptr. 702 (Cal. Ct. App. 1989) ...............................................................................38

*Garthon Bus. Inc. v. Stein,*
    30 N.Y.3d 943 (2017) ...............................................................................................105

*Allison ex rel Gen. Motors Corp. v. Gen. Motors Corp.,*
    604 F. Supp. 1106 (D. Del. 1985)............................................................................................90

*Gilbert v. El Paso Co.,*
    490 A.2d 1050 (Del. Ch. 1984)...............................................................................................80

*In re Glob. Outreach, S.A.,*
    No. 11-620, 2011 WL 2294168 (D.NJ. June 6, 2011).....................................................21, 98

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.),*
    Adv. No. 21-51190, 2023 Bankr. LEXIS 1471 (Bankr. D. Del. Apr. 18, 2023) ....................61

*Gouger v. Citibank NA,*
    No. 19-02434, 2020 WL 1320723 (D. Kan. Mar. 20, 2020) ................................................113

*Griswold v. Coventry First LLC,*
    762 F.3d 264 (3d Cir. 2014)........................................................................................ *passim*

viii

# TABLE OF AUTHORITIES

(continued)

**Page**

*Hacker v. Elec. Last Mile Sols. Inc.*,
    687 F. Supp. 3d 582 (D.N.J. 2023) ...............................................................94, 100

*Hays & Co. v. Merril Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)......................................................................110, 111

*Heartland Payment Sys., LLC v. Carr*,
    No. 3:18-cv-9764, 2020 WL 13836621 (D.N.J. Jan. 27, 2020)...................76, 77, 95

*In re Hechinger Inv. Co. of Delaware*,
    274 B.R. 71, 95-98 (D. Del. 2002)...........................................................................47

*Heintz & Co. v. Provident Tradesmens Bank & Tr. Co.*,
    29 F.R.D. 144 (E.D. Pa. 1961)...............................................................................17

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ........................................................................99

*In re Highland Cap. Mgmt., L.P.*,
    No. 19-34054, 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021) ...................106, 107, 108

*HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*,
    No. 2019-0972, 2022 WL 3010640 (Del. Ch. July 29, 2022) ...............................26

*Indus. Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.)*,
    484 B.R. 25 (Bankr. D. Del. 2012) ........................................................................41

*In re Innovation Fuels, Inc.*,
    Case No. 11-12911, Adv. No. 13-01009, 2013 WL 3835827 (Bankr. D.N.J.
    July 22, 2013)........................................................................................................84

*Jackson v. Mishkin (In re Adler, Coleman Cleaning Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001)...............................................................................47

*Jackson, LLC v. Willie Gary, LLC*,
    906 A.2d 76 (Del. 2006) ......................................................................................105

*Jenkins v. PetSmart, LLC*,
    No. 23-2260, 2023 WL 8548677 (E.D. Pa. Dec. 11, 2023)..................................105

*JTED46, Inc. v. Espresso Dream, LLC*,
    213 N.Y.S.3d 15 (N.Y. App Div. 1st Dept. 2024 )................................................42

*KIND Operations, Inc. v. Cadence Bank, N.A. (In re PA Co-Man, Inc.)*,
    644 B.R. 553 (Bankr. W.D. Pa. 2022) ...............................................................33, 34

ix

## TABLE OF AUTHORITIES

(continued)

**Page**

*KKR Fin. Holdings LLC S'holder Litig.*,
  101 A.3d 980, 990 (Del. Ch. 2014)........................................................................36

*Kost v. Kozakiewicz*,
  1 F.3d 176 (3d Cir. 1993)....................................................................................15

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003)................................................................................20

*Lautieri v. Bae*,
  2003 Mas. Super. LEXIS 290, *12-13 (Mass. Dist. Ct., Oct. 29, 2003) ................................41

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ............................................................................80, 96

*In re Mallinckrodt PLC*,
  Case No. 20-12522, Adv. No. 22-50433, 2024 WL 206682 (Bankr. D. Del.
  Jan. 18, 2024).............................................................................................48, 49

*In re Maxus Energy Corp.*,
  641 B.R. 467 (Bankr. D. Del. 2022) .......................................................................60

*McCarrell v. Hoffmann-La Roche, Inc.*,
  227 N.J. 569 (2017) ...............................................................................28, 29, 30

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  583 U.S. 366 (2018)..........................................................................................49

*Michaels v. World Color Press, Inc. (In re LGI, Inc.)*,
  322 B.R. 95 (Bankr. N.J. 2005) ............................................................................51

*Miller v. Am. Tel. & Tel. Co.*,
  507 F.2d 759 (3d Cir. 1974)................................................................................37

*Miller v. Bradley (In re W.J. Bradley Mortg. Capital, LLC)*,
  598 B.R. 150 (Bankr. D. Del. 2019) ...................................................31, 32, 81, 82

*Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*,
  368 B.R. 394 (Bankr. D. Del. 2007) .....................................................................103

*Mills Acquisition Co. v. MacMillan, Inc.*,
  559 A.2d 1261 (Del. 1989) .................................................................................35

*Mills v. Everest Reinsurance Co.*,
  410 F. Supp. 2d 243 (S.D.N.Y. 2006)....................................................................60

x

# TABLE OF AUTHORITIES
(continued)

Page

*In re ML-Lee Acquisition Fund II, L.P.*,
  848 F. Supp. 527 (D. Del. 1994) ............................................................................24

*In re Modell's Sporting Goods, Inc.*,
  Case No. 20-14179, Adv. No. 22-1076, 2023 WL 2961856 (Bankr. D.N.J.,
  April 14, 2023) ........................................................................................................23

*Motorworld, Inc. v. Benkendorf*,
  156 A.3d 1061 (N.J. 2017) ......................................................................................83

*In re Mystic Tank Lines Corp.*,
  544 F.3d 524 (3d Cir. 2008) ....................................................................................90

*Neal v. Asta Funding, Inc.*,
  No. 13-3438, 2014 WL 131770 (D.N.J. Jan. 6, 2014) ..........................................112

*Neff v. Comm'rs of Schuylkill Cnty. Halcovage, Bender & Hess*,
  No. 3:21-cv-00993, 2021 WL 4593577 (M.D. Pa. Oct. 6, 2021) ...........................17

*In re Norvergence, Inc.*,
  405 B.R. 709 (Bankr. D.N.J. 2009) .........................................................................87

*O'Donnell v. Knott*,
  283 F. Supp. 3d 286 (E.D. Pa. 2017) .....................................................................101

*In re Oakwood Homes Corp.*,
  325 B.R. 696 (Bankr. D. Del. 2005) ........................................................................21

*In re Oakwood Homes Corp.*,
  340 B.R. 510 (Bankr. D. Del. 2006).   ...............................................................21, 87

*Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
  304 B.R. 214 (Bankr. W.D. Pa. 2004) ...............................................................16, 98

*Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R.
  Grace & Co.)*,
  281 B.R. 852 (Bankr. D. Del. 2002) ........................................................................21

*In re Old CarCo LLC*,
  435 B.R. 169 (Bankr. S.D.N.Y. 2010) .....................................................................86

*In re OODC, LLC*,
  321 B.R. 128 (Bankr. D. Del. 2005) ........................................................................15

*In re Our Alchemy, LLC*,
  642 B.R. 155 (Bankr. D. Del. 2022) ..................................................................87, 88

## TABLE OF AUTHORITIES
(continued)

**Page**

*Pagliuca v. City of Bos.*,
626 N.E.2d 625 (Mass. App. 1994) ...............................................................29, 30

*Palmer v. Reali*,
211 F. Supp. 3d 655 (D. Del. 2016) ....................................................................81

*Paragon Litig. Trust v. Noble Corp., PLC (In re Paragon Offshore PLC)*,
588 B.R. 735 (Bankr. Del. 2018) .......................................................1, 104, 112

*Performance Motorcars of Westchester, Inc. v. KPMG Peat Marwick*,
274 N.J. Super. 56 (Super. Ct. App. Div. 1994) ...................................................30

*PHP Liquidation, LLC v. Robbins*,
291 B.R. 603 (D. Del. 2003) ..............................................................................48

*In re Physiotherapy Holdings, Inc.*,
No. 13-12965, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016) ..................45, 46

*Polk 33 Lending, LLC v. Schwartz*,
555 F. Supp. 3d 38 (D. Del. 2021) .....................................................................72

*Powell v. Subaru of Am., Inc.*,
508 F. Supp. 3d 856 (D.N.J. Nov. 24, 2020) .......................................................22

*In re PWS Holding Corp.*,
303 F.3d 308 (3d Cir.2002) ...............................................................................45

*Quadrant Structured Prods. Co. v. Vertin*,
102 A.3d 155 (Del. Ch. 2014) ................................................................92, 93, 99

*In re Quorum Health Corp.*,
No. 20-10766, 2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) .......................46

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) ...................................................................................36

*In re Ramirez*,
413 B.R. 621 (Bankr. S.D. Tex. 2009) ................................................................63

*RBC Cap.l Mkts., LLC v. Jervis*,
129 A.3d 816 (Del. 2015) ...................................................................................80

*In re Rescue Rangers, LLC*,
576 B.R. 521 (Bankr. E.D. Va. 2017) .................................................................63

*Rich v. Yu Kwai Chong*,
66 A.3d 963 (Del. Ch. 2013) ..............................................................................70

## TABLE OF AUTHORITIES
(continued)

**Page**

*Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,
  950 A.2d 868,877-878 (Sup. Ct. N.J. 2008) ..........................................................................64

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007).............................................................................................33

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
  968 F.2d 371 (3d Cir. 1992)...............................................................................................43

*Seidman v. Clifton Sav. Bank, S.L.A.*,
  14 A.3d 36 (N.J. 2011).......................................................................................................55

*Seplow v. Closing Pro., Inc.*,
  717 F. Supp. 3d 427 (E.D. Pa. 2024) ................................................................................28

*Shabbouei v. Potdevin*,
  No. 2018-0847, 2020 WL 1609177 (Del. Ch. Apr. 2, 2020)...............................................85

*Shamrock Holdings, Inc. v. Arenson*,
  456 F. Supp. 2d 599 (D. Del. 2006)...................................................................................32

*Sovereign Bank v. B.J.*,
  533 F.3d 162, 181 (3d Cir. 2008).....................................................................................100

*In re Space Case*,
  Case No. 22-10657, Adv. Prod. No. 23-50748, 2024 WL 1628440 (Bankr. D.
  Del. Apr. 15, 2024) ............................................................................................................94

*Spiegel v. Beacon Participations, Inc.*,
  8 N.E.2d 895 (Mass. 1937) ................................................................................................41

*State, Dept. of Envtl. Prot. v. Ventron Corp.*,
  468 A.2d 150 (Sup. Ct. N.J. 1983).....................................................................................64

*SV Inv. Partners, LLC v. ThoughtWorks, Inc.*,
  7 A.3d 973 (Del. Ch. 2010)................................................................................................63

*Telebrands Corp. v. 1byOne Prods., Inc.*,
  No. CV 17-997, 2018 WL 3696558 (D. Del. Aug. 3, 2018) ...............................................17

*In re TEU Holdings, Inc.*,
  287 B.R. 26 (Bankr. D. Del. 2002) ....................................................................................72

*In re Think3, Inc.*,
  529 B.R. 147 (Bankr. W.D. Tex., 2015)........................................................................67, 69

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Tribune Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019) ..................................................................................... 50

*In re Tribune Media Co.*,
    902 F.3d 384 (3d Cir. 2018) .................................................................................. 90

*Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*,
    586 B.R. 598 (Bankr. S.D. Tex. 2018) .................................................................. 99

*In re U.S. Mortg. Corp.*,
    492 B.R. 784 (Bankr. D.N.J. 2013) ....................................................................... 47

*VR Consultants, Inc. v. J.P. Morgan Chase & Co.*,
    No. 20-cv-6110, 2021 WL 5494373 (D.N.J. Nov. 23, 2021) ................................ 105

*W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*,
    310 A.3d 985 (Del. Ch. 2024) ......................................................................... 26, 27

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005) ............................................................................... 54

*Weinberger v. Uop*,
    457 A.2d 701 (Del. 1983) ...................................................................................... 93

*Weiss v. Swanson*,
    948 A.2d 433 (Del. Ch. 2008) .............................................................................. 102

*Westerkamp v. Samsung Elecs. Am., Inc.*,
    No. 21-cv-15639, 2023 WL 4172967 (D.N.J. June 26, 2023) .............................. 105

*Williams v. Medley Opp. Fund II, LP*,
    965 F.3d 229 (3d Cir. 2020) ........................................................................ 104, 105

*In re World Health Alts., Inc.*,
    385 B.R. 576, 593 (Bankr. D. Del. 2008) .............................................................. 72

*Yurth v. Experian Info. Sols.*,
    622 F. Supp. 3d 89 (E.D. Pa. 2022) ......................................................... 104, 105, 106

*In re Xura, Inc. S'holder Litig.*
    No. 12698, 2018 WL 6498677 (Del. Ch. Dec. 10, 2018) ................................ 34, 35

*Zardinovsky v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l, Inc.)*,
    901 F.3d 162 (3d Cir. 2018) .................................................................................. 36

*Zazzali v. AFA Fin. Grp., LLC*,
    No. 10-54524, 2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) ...................... 49

# TABLE OF AUTHORITIES
(continued)

**Page**

*Zirpoli v. Midland Funding, LLC*,
  48 F.4th 136 (3d Cir. 2022) ...........................................................................106

**Statutes**

6 Del. C. § 1304(a)(2) .......................................................................................85

8 Del. C. § 102(b)(7) .........................................................................................92

8 Del. C. § 160(a)(1) ....................................................................................37, 63

10 Del. C. § 8106 ..............................................................................................24

11 U.S.C. § 101(22) ..........................................................................................50

11 U.S.C. § 101(48) ..........................................................................................50

11 U.S.C. § 101(53A) ........................................................................................50

11 U.S.C § 544(b) ..............................................................................44, 110, 111

11 U.S.C § 544(b)(1) .........................................................................................21

11 U.S.C § 546(e) ........................................................................................*passim*

11 U.S.C § 550 ...........................................................................................44, 98

11 U.S.C. § 1141 ...............................................................................................36

11 U.S.C. § 1327 ...............................................................................................36

M.G.L. c. 260, § 2A .....................................................................................29, 30

N.J.S.A. § 25:2-20, et seq. ................................................................................87

N.J.S.A § 2A:32C-11 ........................................................................................29

**Other Authorities**

*Corporate Governance and the Sarbanes–Oxley Act: The Sarbanes–Oxley Act* .........................67

*Findings of Fact, Conclusions of Law, and Order Confirming the First Amended
  Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor
  Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*
  (Case No. 24-11840, Docket No. 1124) ..............................................................11

### PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust ("Plaintiff" or the "Trust") respectfully opposes: (i) Defendant Yardline Capital Corp.'s Motion to Dismiss, filed on March 3, 2025 (Dkt. No. 62); (ii) Defendants Joshua Silberstein's and Everything's Coming Up Millhouse, LLC's Motion to Dismiss, filed on March 3, 2025 (Dkt. No. 63); (iii) Defendant Joseph Falcao's Motion to Compel Arbitration and Stay or, in the Alternative, to Dismiss (Dkt. No. 65), filed on March 3, 2025; (iv) Defendant Daniel Boockvar's Motion to Compel Arbitration and Stay, or, in the Alternative, to Dismiss (Dkt. No. 66), filed on March 3, 2025; (v) Defendants Carlos Cashman's, Mounir Ouhadi's, Aditya Rathod's, and Cashman Family Investment II, LLC's Motion to Dismiss (Dkt. No. 67), filed on March 3, 2025; and (vi) Defendants Ari Horowitz's and Hudson Palm LLC's Motions to Dismiss (Dkt. No. 109), filed on March 17, 2025 (together, the "Motions to Dismiss"). The Motions to Dismiss should be denied in their entirety for the below reasons.

### INTRODUCTION

The Trust was created so that Defendants might finally be held accountable for their wrongful conduct that drove Thrasio Holdings, Inc. and its affiliated entities ("Thrasio" or the "Company") into bankruptcy less than three years after they falsely claimed that Thrasio was worth more than $12 billion. The proceeds from this litigation will compensate Thrasio's creditors, including small business owners who sold their businesses to Thrasio but are now left with neither their businesses nor the payments promised to them by the Company before it filed for bankruptcy. The Trust's extensive investigation of the Defendants' actions resulted in the filing of a comprehensive, 78-page complaint. (Adv. No. 24-01637, Dkt. No. 1, the "Complaint" or "Compl.")

1

The facts set forth in the Complaint paint a damning picture of how the individual

Defendants squandered *billions of dollars* of capital invested in the Company and drove the

Company into insolvency, all while enriching themselves at the Company's and its creditors'

expense.  And, while Thrasio was able to delay its inevitable bankruptcy until 2024, the reality is

that the Company had long been insolvent.  Even the Company's auditors agreed that there was

substantial doubt as to the Company's ability to continue as a going concern as early as 2020.

Defendants' malfeasance kept the Company's financial woes hidden until the Company's

auditors were finally able to complete their review of the 2020 financials in June 2022.  Along

with an expression of "substantial doubt" that the Company could continue as a going concern,

the auditors also determined that in 2020 Thrasio had an accumulated deficit of $302.9 million

following a net loss of $148.1 million.  During that same year, the Defendants falsely claimed to

investors that the Company had been profitable from its inception.  All told, the Company

squandered at least $2.5 billion, much of it spent on inventory that would be sold at a loss or

never be sold, and much of it spent to enrich the Defendants.

The Complaint contains a total of 375 paragraphs of factual allegations in support of

26 separate counts against the Defendants.  Each count not only separately identifies the

Defendants against whom the count is asserted, but each count also sets forth the specific acts of

wrongdoing committed by those specific Defendants.  The Complaint sets forth a detailed

discussion of facts supporting Thrasio's (i) insolvency and gross mismanagement, (ii) the

individual defendants' failure to establish any proper internal controls for accounting or

inventory management necessary to operate any successful retail business, (iii) numerous self-

dealing transactions, including the 2020 tender offer and secondary sales pursuant to which

defendants received millions of dollars, and (iv) misappropriation of funds in connection with the

related party transactions with Yardline.

The Complaint alleges sufficient facts to put Defendants on notice of the claims against them, and, when required, meets any applicable heightened pleading standard.

In response to the Complaint, the Defendants filed six separate Motions to Dismiss, accompanied by 249 pages of argument.  For efficiency, and in light of the overlapping arguments made by Defendants, the Trust has elected to submit a single, omnibus opposition ("Opposition") to those Motions in response to each of the issues raised in Defendants' Motions. Following a discussion of the factual and procedural background, and after setting out the applicable legal standard, the Opposition addresses legal arguments raised by Defendants, as summarized below:

- Section I addresses arguments raised by Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, Horowitz and Yardline and explains why estoppel is not applicable here;

- Section II explains that the Trust was not required to identify a particular state's laws to provide adequate notice of its claims, contrary to arguments raised by Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, Falcao and Yardline;

- Section III explains why the Trust's claims are timely, despite arguments from Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, and Falcao;

- Section IV addresses arguments from Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, and Yardline regarding the business judgment rule and explains why it is premature to address the business judgment rule at this stage of the case, as well as why the business judgment rule is not applicable here;

- Section V explains why none of the claims asserted here are barred by any release or

3

separation agreement and explains why Defendants Cashman, Cashman Investments, and Horowitz's arguments are meritless;

- <u>Section VI</u> explains why Defendants Silberstein and Millhouse are wrong that the Section 546(e) safe harbor applies to any of the Trust's claims;

- <u>Section VII</u> addresses arguments from Defendant Boockvar and seeks to explain that the Court does have subject matter jurisdiction here over any and all claims asserted by the Trust; and

- <u>Section VIII</u> counters arguments from Defendants Silberstein, Millhouse, and Falcao and explains that the Complaint is not an impermissible group or "shotgun" pleading.

The Opposition then turns to the specific counts alleged in the Complaint and explains why each of these counts have been sufficiently alleged for purposes of withstanding a motion to dismiss as to all of the Defendants against whom they have been asserted.  The Opposition addresses these counts as follows:

- <u>Section IX</u> explains why Counts 1-6, all of which relate to the Tender Offer, have been sufficiently alleged;

- <u>Section X</u> addresses why Count 7 sufficiently alleges a breach of fiduciary duty related to Thrasio's lack of controls;

- <u>Section XI</u> addresses why Count 8 sufficiently alleges a claim for waste of corporate assets in connection with Thrasio's inventory controls;

- <u>Section XII</u> tackles the counts related to the Secondary Sales (Counts 9-11);

- <u>Section XIII</u> explains why Counts 12-16 related to the Silberstein and Cashman releases have been sufficiently alleged; and

- <u>Section XIV</u> explains why the Complaint has adequately alleged all claims related

4

the Yardline transactions or transfers (Counts 17-26).

Finally, <u>Section XV</u> explains why motions to compel arbitration by Defendants Falcao

and Boockvar should be denied.

To assist the Court in its review of the Opposition, Plaintiff has prepared Appendix A that

sets forth the above listed sections, the counts that are implicated by those sections, and the

portions of each Motion to Dismiss that are addressed in that section.  In light of various

Defendants' assertions that the Complaint is a undifferentiated "group pleading" against them,

Plaintiff has also prepared Appendix B that provides a summary, on a Defendant-by-Defendant

basis, of the counts asserted against them.  This information is all derived from Paragraphs 130-

375 of the Complaint, which sets out each of the Complaint's 26 counts.

For all the reasons discussed below, each and every one of Defendants' Motions to

Dismiss, and both motions to compel arbitration should be denied in their entirety.

## **PROCEDURAL AND FACTUAL BACKGROUND**

Thrasio was founded in 2018 by Defendants Silberstein and Cashman, who, together with

certain other former directors and officers of Thrasio named as Defendants herein (collectively,

the "<u>D&O Defendants</u>"), continuously used their positions of control over Thrasio and Thrasio's

Board to enrich themselves, at the expense of the Company and its stakeholders.  (Compl. ¶¶ 1-2,

41.)  The evidence is now clear that Thrasio was an operational disaster and was insolvent years

prior to its bankruptcy filing.  (*Id.* ¶¶ 2, 14.)  Meanwhile, in their pursuit of ever-increasing

investor demand in what they misrepresented to be a profitable Company, the D&O Defendants

masked their self-dealing and gross mismanagement to extract hundreds of millions of dollars for

personal gain.  (*Id.* ¶ 4.)  Starting in 2020, the D&O Defendants abused their positions of control

to effectuate a tender offer of insider shares, and subsequently offloaded more insider shares

using misleading and deceptive information in direct competition with the Company's capital

raises, and used Company resources to serve personal interests in connection with a related

business venture in Yardline. (*Id.* ¶¶ 4, 12, 92.) Unsurprisingly, these calculated steps had a

devastating impact on Thrasio's stakeholders. As described in detail in the Complaint, the D&O

Defendants ignored Thrasio's flawed and neglected systems, relentlessly advanced their personal

financial interests at the expense of the Company, and caused serious harm to the unsecured

creditors of Thrasio, who have yet to recover anything on their claims in the above captioned

bankruptcy proceedings ("Bankruptcy Case").

### A.      LACK OF PROPER INTERNAL CONTROLS

Since its inception, Thrasio acquired businesses selling their products Amazon at a crazed

pace with the goal attracting investors by misrepresenting the "pro forma" cash flows that would

be generated by the acquired businesses. (Compl. ¶¶ 3, 6.) The D&O Defendants failed to build

the operational infrastructure necessary to integrate and operate the acquired businesses in a

sustainable manner, let alone profitably. (*Id.* ¶¶ 41-43.) For years, Thrasio lacked even the most

basic financial and accounting controls, had no functional general ledger, and did not follow

Generally Accepted Accounting Principles ("GAAP"), resulting in serious accounting

irregularities and preventing the Company from timely or accurately completing annual audits.

(*Id.* ¶¶ 44, 47-48.) Despite being fully aware of these issues since early 2019, the D&O

Defendants failed to correct the deficiencies and used the dysfunctional accounting practices to

their personal advantage. (*Id.* ¶¶ 45, 46, 78, 79.) In fact, they manipulated Thrasio's financial

reporting to hide from the Company's stakeholders more than $2.5 billion of losses over a five-

year period. (*Id.* ¶¶ 43, 45, 49-53.)

Amid the frenzied acquisitions, the D&O Defendants also did not bother to implement

inventory management controls that were core to Thrasio's operation, meaning the Company had

no way of knowing how much inventory to purchase, where the purchased inventory was

6

located, or how to value the inventory. (Compl. ¶¶ 54-56.)  Amazingly, Thrasio effectuated

acquisitions without knowing whether the purchased inventory even existed. (*Id*. ¶¶ 6, 41, 54.)

By early 2022, Thrasio had purchased more than $800 million of excess inventory that cost it

millions to store and liquidate—all of which should have been avoided by implementing proper

controls. (*Id.* ¶ 58.)  Thrasio's inventory control environment was so egregiously bad that, when

PricewaterhouseCoopers LLP ("PwC") was engaged to audit the Company's 2020 financials, the

audit took approximately two years to complete because, among other things, PwC had to order a

physical count of Thrasio's inventory, finding that Thrasio also lacked effective controls to

analyze and account for numerous transactions. (*Id.* ¶ 48.)

## B.      TENDER OFFER

While Thrasio persistently suffered from massive avoidable losses and accounting

inefficiencies, the D&O Defendants focused solely on enriching themselves with no intention of

developing the proper tools to promote the wellbeing of the Company.  In July 2020, less than

72 hours after the Company closed a $260 million round of funding, the D&O Defendants

caused the Board to approve a tender offer to repurchase up to $160 million worth of Thrasio

shares, including shares owned by insiders (the "Tender Offer").  (Compl. ¶¶ 59-60.)  The

Company's cash used to fund the Tender Offer should have been invested into a struggling

business, rather than line the pockets of insiders.  The D&O Defendants participated in the

Tender Offer with complete disregard to the Company's insolvency, as shares tendered by

Defendants Silberstein and Cashman—who should have recused themselves based on their

fiduciary obligations from the Board's vote on the Tender Offer—depleted nearly 40% of the

cash proceeds received by the Company in the most recent round of funding. (*Id.* ¶¶ 61-64.)

Several other insider shareholders participated in the Tender Offer, including Defendants

Millhouse, Cashman Investment, Boockvar, Falcao, and Horowitz. (*Id.* ¶ 61.)  In approving the

7

Tender Offer, the Board represented that Thrasio had an available surplus and that the Tender

Offer would not impair the Company's capital, without performing even a simple calculation that

would have shown that no surplus existed.  (*Id.* ¶ 63.)  At the time of the Tender Offer, Thrasio

was insolvent, as the total fair value of Thrasio's liabilities exceeded the total amount of

Thrasio's assets, and Thrasio received no value for the proceeds that it distributed.  (*Id.* ¶ 64.)

### C.    SECONDARY SALES

Starting in December 2020, Silberstein and Cashman marketed and sold their insider

shares—to the tune of $24.35 million and in direct competition with the Company's fundraising

efforts.  (*Id.* ¶¶ 65, 71-73.)  In the first half of 2021, the D&O Defendants entertained the

possibility of an initial public offering, although the Company was assessed by Protiviti Inc., a

consulting firm, and found to be in no position to become a publicly reporting company.  (*Id.*

¶¶ 66-70.)  While the Company marketed a potential SPAC transaction and another capital raise,

Defendant Silberstein solicited the Company's investors to purchase insider shares held by the

D&O Defendants through secondary sales (the "Secondary Sales"), going as far as representing

to potential investors that the insider shares were offered at a better price compared to what was

being offered by the Company.  (*Id.* ¶¶ 69-72, 80-81.)  By doing so, Silberstein prioritized his

personal gain and directly harmed Thrasio's fundraising and development, eventually leading to

a breakdown of the SPAC negotiations.  (*Id.* ¶¶ 71-75.)

On or about July 20-21, Thrasio's then-CFO (who had been hired specifically to help

ready the Company to go public) submitted his resignation to Silberstein when he discovered the

profound problems in Thrasio's financial reporting.  (*Id.* ¶¶ 68, 76.)  Defendant Silberstein—

concerned that the abrupt departure would raise questions from the Board and lead to scrutiny of

his involvement in Thrasio's financial reporting—then went so far as to withhold notice of the

CFO's resignation to secure Board approval of additional Secondary Sales of up to 14 million

shares of Thrasio common stock.  (*Id.* ¶¶ 76-77.)  Unsurprisingly, the 14 million shares were owned by none other than Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod, and entities directly affiliated with them.  (*Id.* ¶ 77.)  The Secondary Sales caused substantial harm to the Company and its stakeholders.  Investors who might have otherwise purchased Thrasio stock were instead convinced by Silberstein to purchase his personal shares and shares from other D&O Defendants, and the D&O Defendants knowingly provided inaccurate information regarding Thrasio's financial condition to potential purchasers.  (*Id.* ¶¶ 80-83.)  Contrary to the D&O Defendants' misrepresentations that Thrasio was healthy and profitable, PwC found in its 2020 and 2021 audits that "substantial doubt" existed as to Thrasio's "ability to continue as a going concern," pointing to Thrasio's rapidly deepening deficit and unsustainable continuing cash burn.  (*Id.* ¶¶ 64, 85.)

## D.    YARDLINE

Horowitz, a former senior vice president of Thrasio, ultimately found himself on at odds with Silberstein.  When Silberstein's and Horowitz's relationship deteriorated, Silberstein made unfounded and relationship-driven decisions with his personal interest in mind, and sought to strip Horowitz of power, costing the Company millions of dollars of losses in the process thereof.  (Compl. ¶¶ 94, 104-06.)  After initially removing Horowitz from the Company, Silberstein, Cashman, and Horowitz agreed that Horowitz would form his own company— Yardline—and Thrasio would invest millions of dollars into Yardline and install three Thrasio insiders on the Yardline board: Cashman, Boockvar, and Stephanie Fox.  (*Id.* ¶¶ 92, 102.)

Horowitz, on behalf of Yardline, sought consent from Thrasio to close a Series A funding.  (*Id.* ¶¶ 103.)  Silberstein, again, wanting to sabotage Horowitz, withheld Thrasio's consent and instead caused Thrasio to *acquire* Yardline and make Yardline a subsidiary of the Company through a "loophole" transaction that enraged Yardline's other investors.  (*Id.* ¶¶ 103-

13.)  When Thrasio faced blowback from other investors in Yardline for the acquisition,

Silberstein and Cashman misappropriated Company resources to protect themselves from

litigation risk, spending those resources to pay off angry Yardline investors to stave off a

potential suit from them.  (*Id.* ¶¶ 112-16, 306, 322, 345.)  After the acquisition, Thrasio

continued to provide Yardline with approximately $25 million in total, including issuing

$20.9 million of promissory notes to Yardline (the "Promissory Notes") that were never repaid

but issued solely to provide funds to Yardline to use to placate angry investors who may threaten

litigation against Cashman.  (*Id.* ¶¶ 116-19.)

### E.     SILBERSTEIN AND CASHMAN RELEASES

As investors became aware of Thrasio's substantial financial and operational issues,

Silberstein and Cashman were removed from their positions with the Company, in September

2021 and August 2022, respectively.  (Compl. ¶¶ 122, 126.)  Both Silberstein and Cashman

sought to protect themselves by entering into separation agreements with the Board.  These

agreements sought to release them from acts that occurred before the date of the agreements

(subject to certain exceptions) including claims like the ones brought here arising from "grossly

negligent actions, fraudulent conduct, or any felony criminal conduct about which neither

Company Releasors nor the officers of [the] Company . . . have actual or constructive knowledge

as of the Employment Separation Date."  (*Id.* ¶¶ 120-28.)

### F.     THRASIO FILES FOR BANKRUPTCY

On February 28, 2024 (the "Petition Date"), Thrasio and its debtor affiliates (collectively,

the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the U.S. Code

(the "Bankruptcy Code") in the United States Bankruptcy Court for the District Of New Jersey

(the "Bankruptcy Court").  On March 12, 2024, the U.S. Trustee filed the *Notice of Appointment*

*of Official Committee of Unsecured Creditors* (Case No. 24-11840, Docket No. 163), appointing

10

the Official Committee of Unsecured Creditors (the "Committee").  The Committee was

immediately concerned that the plan of reorganization filed on February 28, 2024 contemplated

only a $250,000 "General Unsecured Claims (GUC) Recovery Pool," to be shared among

creditors holding at least $61 million of general unsecured claims. *Joint Plan of Reorganization*

*of Thrasio Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 Of The Bankruptcy*

*Code* § A.86 (Case No. 24-11840, Docket No. 40.)

Following its appointment, the Committee commenced an investigation into the value

and extent of the Debtors' assets, potential estate litigation claims, and the Debtors' prepetition

affairs and the events leading to chapter 11—namely, how the Debtors wasted over $2.5 billion

in the two years leading up to the Petition Date.  The Committee negotiated a settlement of the

treatment of general unsecured claims under the Plan (Case No. 24-11840, Dkt. No. 1125),

resulting in a "Committee Settlement," pursuant to which certain estate claims were vested in the

Trust (the "Vested Causes of Action") and it was ordered that, among other things, certain

parties (the "Excluded Parties") would not receive releases under the terms of the Plan

(compared to the "Released Parties").  (Confirmation Order ¶ 113; Plan § J.)  All of the

Defendants are Excluded Parties and, thus, are not Released Parties.  (Confirmation Order ¶ 100;

Plan § A.75.)

On June 13, 2024, the Bankruptcy Court entered the *Findings of Fact, Conclusions of*

*Law, and Order Confirming the First Amended Joint Plan of Reorganization of Thrasio*

*Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (Case

No. 24-11840, Docket No. 1124) (the "Confirmation Order"), confirming the *First Amended*

*Joint Plan of Reorganization of Thrasio Holdings, Inc. and its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code (Further Technical Modifications)* (Case No. 24-11840,

Docket No. 1125) (the "Plan").  The Confirmation Order approved the terms of the Plan,

including, without limitation, the Committee Settlement, stating:

> Except as otherwise set forth herein, the Bankruptcy Court
> will have sole and exclusive jurisdiction to determine
> whether a claim or Cause of Action constitutes a direct or
> derivative claim, is colorable and, only to the extent legally
> permissible and as provided for in Article XI of the Plan, the
> Bankruptcy Court shall have jurisdiction to adjudicate the
> underlying claim or Cause of Action.

(¶ 119.)

Article XI of the Plan includes language that states the Bankruptcy Court will retain

jurisdiction over all matters arising out of the Plan including, specifically, to:

> adjudicate, decide, or resolve any and all matters related to
> Causes of Action . . . resolve any cases, controversies, suits,
> disputes, or Causes of Action with respect to the settlements,
> compromises,     discharges,     releases,     injunctions,
> exculpations, and other provisions contained in Article VIII
> hereof and enter such orders as may be necessary or
> appropriate to implement or enforce such releases,
> injunctions, and other provisions.

(Secs. 6, 12, 21.)

## THE PARTIES

Plaintiff is the trustee for the Trust, a common law trust governed by New York law, and

a grantor trust pursuant to federal regulations.  The Trust was created pursuant to the Plan.  (Plan

§ J.2.)  The Trust's primary purposes include investigating, prosecuting, settling, or abandoning

the Vested Causes of Action.

Defendant Josh Silberstein ("Silberstein") is a co-founder and former co-chief executive

officer of Thrasio, and a former member of the Board of Directors of Thrasio (the "Board").

(Compl. ¶ 30.)  During his tenure at Thrasio, as an officer and director, Silberstein was involved

in and/or oversaw all aspects of Thrasio's formation, policies, acquisitions, and operations,

including communications with investors and preparation of financial statements. (*Id.*)

Defendant Everything's Coming Up Millhouse ("Millhouse") is a limited liability company incorporated in Delaware. (*Id.* ¶ 38.) Upon information and belief, Silberstein is the managing member of Millhouse. (*Id.*) Defendants Silberstein and Millhouse submitted a combined memorandum of law in support of their respective motions to dismiss the Complaint on March 3, 2025 ("Silberstein MTD"). (Dkt. No. 63-1.)

Defendant Carlos Cashman ("Cashman") is a co-founder, former co-chief executive Officer, and former Board member of Thrasio, as well as a former board member of Yardline Capital Corp. ("Yardline"). (*Id.* ¶ 31.) While at Thrasio, as an officer and director, Cashman was involved with and/or oversaw all aspects of Thrasio's formation, policies, and operations, including communications with investors and preparation of financial statements. (*Id.*)

Defendant Cashman Family Investment II, LLC ("Cashman Investment") is a limited liability company incorporated in Delaware. (*Id.* ¶ 39.) Upon information and belief, Cashman and/or one of his family members is the managing member of Cashman Investment. (*Id.*)

Defendant Mounir Ouhadi ("Ouhadi") is a former chief supply chain officer of Thrasio. (*Id.* ¶ 34.) During his tenure at Thrasio, Ouhadi was responsible for all aspects of Thrasio's supply chain and operations, including the development of policies and procedures regarding Thrasio's supply chain and inventory systems. (*Id.*)

Defendant Aditya Rathod ("Rathod") is a former vice president of strategic planning & analysis of Thrasio. (*Id.* ¶ 35.) In his role, Rathod was responsible for developing financial models for Thrasio, creating reports of Thrasio's financial performance for Thrasio's lenders, investors, Board members, and executives, and maintaining its books and records. (*Id.*)

Defendants Cashman, Ouhadi, Rathod, and Cashman Investment (the "COR

13

Defendants") submitted a combined memorandum of law in support of their respective motions to dismiss the Complaint ("COR MTD").  (Dkt. No. 67-1.)

Defendant Yardline is a corporation incorporated in Delaware and maintains a headquarters in New York.  (Compl. ¶ 40.)  Yardline submitted a *Brief in Support of Yardline Capital Corp.'s Motion to Dismiss Plaintiff's Complaint* ("Yardline MTD").  (Dkt. No. 62.)

Defendant Ari Horowitz ("Horowitz") is a former senior vice president of strategic partnerships & corporate development of Thrasio, the former CEO of Yardline, and the current chairman and CEO of Swiftline Corp. ("Swiftline"). (Compl. ¶ 36.)

Defendant Hudson Palm LLC ("Hudson Palm") is a limited liability company incorporated in Connecticut.  (*Id.* ¶ 37.)  Upon information and belief, Horowitz is the managing member of Hudson Palm.  (*Id.*)

Defendants Horowitz and Hudson Palm jointly submitted a memorandum of law in support of their motions to dismiss the Complaint ("Horowitz MTD").  (Dkt. No. 109-1.)

Defendant Daniel Boockvar ("Boockvar") is a former president of Thrasio and former board member of Yardline.  (Compl. ¶ 32.)  While at Thrasio, Boockvar was responsible for overseeing all aspects of Thrasio's operations, including finance and inventory functions, as well as notifying the Board of issues that needed their approval.  (*Id.*)  Boockvar submitted a *Memorandum of Law in Support of Defendant Boockvar's Motion to Compel Arbitration and Stay, or, in the Alternative, to Dismiss the Complaint* ("Boockvar MTD").  (Dkt. No. 66-1.)

Defendant Joseph Falcao ("Falcao") is a former chief financial officer ("CFO") and formers senior vice president of finance and treasurer of Thrasio.  (Compl. ¶ 33.)  During his tenure at Thrasio, Falcao was responsible for managing Thrasio's finances and financial systems, which should have included establishing a general ledger, drafting Thrasio's financial policies

and procedures, ensuring Thrasio's compliance with accounting rules, and maintaining accurate

books and records for Thrasio and its related entities.  (*Id.*)  Falcao submitted a *Memorandum of*

*Law in Support of Motion By Defendant Joseph Falcao to Compel Arbitration and Stay or, in the*

*Alternative, to Dismiss* ("Falcao MTD").  (Dkt. No. 65-5.)

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) serves to test the sufficiency of the

allegations in a plaintiff's complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  To

survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient

"factual allegations," which, if true, would establish "plausible grounds" for a claim: "the

threshold requirement . . . [is] that the 'plain statement' possess enough heft to 'sho[w] that the

pleader is entitled to relief.'"  *Id.*

A court must accept all well-pleaded allegations in the complaint as true and view them

in the light most favorable to the plaintiff.  *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005).

All reasonable inferences are drawn in favor of the plaintiff.  *Kost v. Kozakiewicz*, 1 F.3d 176,

185 (3d Cir. 1993).  "The issue is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims."  *In re Am. Bus. Fin. Servs., Inc.*, 375

B.R. 112, 116 (Bankr. D. Del. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974),

*abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)); *see also In re*

*OODC, LLC*, 321 B.R. 128, 134 (Bankr. D. Del. 2005) ("Granting a motion to dismiss is a

'disfavored' practice.").  The burden of showing that dismissal is appropriate lies with the party

moving to dismiss.  *Baker v. Deutschland GmbH*, 240 F. Supp. 3d 341 (M.D. Pa. 2016).

# ARGUMENT

## I.  ESTOPPEL DOES NOT APPLY HERE

### A.  The Plan Bars Defendants from Asserting Judicial Estoppel Arguments

Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, Millhouse, Horowitz, and Yardline wrongly assert that estoppel bars the Trust's claims.  (*See* COR MTD at 26-30; Silberstein MTD at 19-20, 22, 26, 33-34; Horowitz MTD at 16-18, 22-23, 27; Yardline MTD at 21.)  The Plan squarely forecloses this argument.  Specifically, the Plan provides that estoppel "judicial, equitable, or otherwise" cannot be asserted against the Trust:

> The Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, settled under the Plan or pursuant to a Bankruptcy Court order, or settled pursuant to the Committee Settlement, the Debtors or the Thrasio Legacy Trust, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  (Plan Art. IV.O., at 46.)

The Plan is clear that the Trust's causes of action are reserved "for later adjudication." (*Id.*)  At least one other district court within the Third Circuit has found that where a plan of reorganization specifically anticipates creditors litigating against defendants, and where the plan states that "nothing shall infringe" upon the plaintiff's right to move forward with litigation, defendants may not assert judicial estoppel to block claims.  *Off. Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 223 (Bankr. W.D. Pa. 2004) (holding "no merit" to assertion of estoppel claims based on prior filings in bankruptcy proceeding where "cause of

action was contemplated for a significant portion of the duration of the case").  The Court should find the same here and deny any motions to dismiss based on estoppel.

The plain terms of the Plan are also fatal to Defendant Horowitz's argument that he was granted a release and, relatedly, that even if he was not granted a general release, claims against him related to the Tender Offer were released.  (Horowitz MTD at 16-18.)  Horowitz is specifically named as an Excluded Party.  (Plan Art. I.A.75., at 15.)  Excluded Parties are defined within Article I.A of the Plan, which states, "[n]otwithstanding anything contained in the Plan, any ballot, any prior order of the Court, or otherwise, none of the Excluded Parties shall be Released Parties or Releasing Parties under the Plan." (*Id*. ¶ 75.)  In other words, Horowitz is not a Released Party, he was not granted any release per the Plan, and claims against him related to the Tender Offer were not released by the Plan.  To the extent there is any dispute of the material terms of the Plan, this Bankruptcy Court is the proper forum for determining the proper interpretation of its terms.

Defendant Yardline, in turn, attempts to piggyback on the estoppel defense asserted by unnamed co-defendants through "incorporation by reference."  (Yardline MTD at 13.)  When incorporating a pleading by reference, "it must be done with a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation." *Neff v. Comm'rs of Schuylkill Cnty. Halcovage, Bender & Hess*, No. 3:21-cv-00993, 2021 WL 4593577, at *3 (M.D. Pa. Oct. 6, 2021) (rejecting pleadings lacking a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation); *Heintz & Co. v. Provident Tradesmens Bank & Tr. Co.,* 29 F.R.D. 144, 145 (E.D. Pa. 1961) (same);  *Telebrands Corp. v. 1byOne Prods., Inc*., No. CV 17-997, 2018 WL 3696558, at *2 (D. Del. Aug. 3, 2018) (rejecting incorporation by reference as inadequate because the pleading did not clearly indicate where the

relevant material was located within the referenced brief). Here, because Yardline has not specified which co-Defendants, which estoppel arguments, or which paragraphs Yardline joins, the reference is not sufficiently clear for Plaintiff to respond. Accordingly, Yardline's argument regarding estoppel should be disregarded.

Defendant Boockvar makes a similarly vague statement that he "incorporates by reference the legal arguments raised in the motions to dismiss filed by the other Defendants in this action." (Boockvar MTD at ¶ 46.) As with Yardline's attempt, the Trust cannot be expected to respond because Boockvar has not made it sufficiently clear what arguments made by what Defendants relevant to what claims he is adopting as his own.

The attempts by other Defendants to similarly incorporate by reference or adopt arguments presented in separate briefs are likewise improper. (COR MTD at n. 72; Silberstein MTD at 20; Falcao MTD at n. 7.) In any event, the Trust has addressed each argument supposedly incorporated or adopted in each separately filed brief, none of which has any merit.

### B. The Disinterested Directors Report Does Not Bar the Trust's Claims

The Trust's claims also are not barred by the Independent Investigation Results (the "Disinterested Directors Report" or "DDR"), contrary to the baseless challenges of Defendants Cashman, Cashman Investment, Ouhadi, Rathod, Silberstein, Horowitz, and Yardline. (COR MTD at 26-30; Silberstein MTD at 19-20; Horowitz MTD at 9; Yardline MTD at 3.) As noted above, the terms of the Plan make clear that the Disinterested Directors Report, as incorporated by the Confirmation Order, cannot be used to estop claims made by the Trust. Further, the Confirmation Order and Plan state that the Disinterested Directors Report cannot be used to limit the Trust's claims, the Disinterested Directors did not come to any final conclusions in their published report, and any inconsistency between the Disinterested Directors Report and the Plan should be resolved in favor of the Plan.

18

*First*, the Confirmation Order and Plan expressly state the Disinterested Directors Report cannot be used to limit the Trust's claims. They provide that "[t]he Vested Causes of Action shall in no way be limited or impaired by the conclusions of the Independent Investigation." (Confirmation Order at 106; Plan at 24 n.4.) The term "Independent Investigation" references the investigation undertaken by the Disinterested Directors, including, but not limited to, the Disinterested Directors Report. The term "Vested Causes of Action," in turn, refers to the causes of action vested in the Trust, a subset of which have been brought as claims against Defendants in the current action.

Tellingly, Cashman, Ouhadi, and Rathod have offered no legal support for their argument that the Court should ignore this language to find otherwise. (COR MTD at 30.) That is not surprising given that the result from this language is clear: Defendants may not rely on the Disinterested Directors Report to limit the claims the Trust can pursue.

*Second*, the Disinterested Directors did not come to any final conclusions, as reflected by the Disinterested Directors Report itself. (DDR at 31-32.) Nor was the Disinterested Directors Report the final say about causes of action and exculpations. The final, approved and confirmed Plan is. Further, only a summary of the Independent Investigation by the Disinterested Directors was filed, *not the full result*. (DDR at 8 (describing the filed DDR as a "summary report of the principal findings and summary conclusions regarding the results of the independent investigation").)

Notably, the report itself reflects that the Disinterested Directors continued to investigate potential claims after the Disinterested Directors Report was filed: "The Disinterested Directors reserve the right to continue the Independent Investigation of potential estate causes of action, including by evaluating additional document productions and further witness testimony. This

19

could result in further modifications to the Plan, including, without limitation, changes to the release and exculpation provisions and the Indemnification Obligations." (DDR at 31-32.) The Plan reflects the Disinterested Directors' continued work, further illustrating how the Disinterested Directors Report did not contain final conclusions. In the final, confirmed Plan, the list of Excluded Parties was updated to include additional parties such as Ouhadi, Rathod, and Horowitz, as a named "Yardline Transferee."

*Finally*, because the Plan specifically preserved the rights of the Trust to bring these claims, neither the doctrine of judicial estoppel, nor the doctrine of equitable estoppel, apply on their face. In order for judicial estoppel to apply, a party must have obtained relief from a court by asserting one position, and then turn around and assert another position that is "irreconcilably inconsistent." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003). Here, Silberstein argues that the Company obtained confirmation of the Plan in reliance on the DDR, and that the Trust may not now take a position that is inconsistent with the DDR. However, the Trust and the Company are not the same party. And, even if they were considered so, the Company did not obtain confirmation of the Plan in reliance on inconsistent portions of the DDR for the simple reason that the Plan always carved out the causes of action that the Trust now brings. There is nothing inconsistent between the Plan and Confirmation Order, on the one hand, and the Trust's Complaint on the other. Moreover, to the extent there are inconsistencies between the Disinterested Directors Report and the Plan and Confirmation Order, the terms of the Confirmation Order control. (Plan Art. I.G., at 26.)

## II.    THERE IS NO REQUIREMENT THAT THE TRUST IDENTIFY A PARTICULAR STATE'S LAWS TO PROVIDE ADEQUATE NOTICE OF ITS CLAIMS

Under federal pleading standards, a plaintiff is not required to specify which state law applies. Accordingly, Defendants are wrong that the Complaint is deficient because it does not

specify which state's law applies.  (COR MTD at 46; Silberstein MTD at 26-27, 52; Falcao MTD at 10; Yardline MTD at 14-15.)  *In re Oakwood Homes Corp.* is instructive.  There, the court held that to survive a motion to dismiss, the complaint need not have identified a particular state's uniform fraudulent transfer law.  340 B.R. 510, 526 (Bankr. D. Del. 2006).  Further, the court allowed state law particulars to be developed during the discovery process.  (*Id.*)  The Trust has given appropriate notice of the law invoked and implied the state law applicable.  Nor was the Trust required to plead sufficient facts (including what state's laws apply) to "avoid an affirmative defense based on the statute of limitations." *Ausikaitis v. Kiani*, 962 F. Supp. 2d 661, 674 (D. Del. 2013) (citing *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012)).

Courts within the Third Circuit recognize as a matter of course that it is unnecessary for plaintiffs to specify the state law applicable to fraudulent transfer claims, as the court will engage in a choice of law analysis based on the state law of the forum state to determine which law applies where the applicable law is not specified in the complaint.  *See, e.g., Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re Fah Liquidating Corp.)*, 572 B.R. 117, 128-129 (Bankr. D. Del. 2017) (holding it is appropriate for the Court to engage in choice of law analysis where the plaintiff brought a constructive fraudulent transfer claim based on Section 544(b)(1) of the Bankruptcy Code and "applicable non-bankruptcy law."); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.),* 281 B.R. 852, 855 (Bankr. D. Del. 2002) (holding a court may apply New Jersey Law based on choice of law analysis, where the plaintiff did not specify the "applicable law" for fraudulent transfer claims.)

Plus, Defendant Silberstein's reliance on *In re Glob. Link Telecom Corp.* is unpersuasive.  (Silberstein MTD at 26.)  There, the court held that plaintiff did not plead the legal standard or

21

any relevant facts—a distinct difference from the Complaint at issue here.  Similarly,

Silberstein's reliance on *In re Exide Techs., Inc.,* 299 B.R. 732, 749 (Bankr. D. Del. 2003) is

misplaced.  (Silberstein MTD at 26.)  In *In re Exide Techs.* the plaintiff cited to *model statutes,*

the UFTA and UFCA, as if they were the equivalent to enacted law, which was improper.  *Id*.

Here, Plaintiff does not cite the *wrong* law and does not cite to *model law*, but instead leaves the

court to engage in the choice of law analysis.

Rather, and as Defendant Falcao notes, the Court must engage in its own choice of law

analysis.  (Falcao MTD at 6.)  Per that analysis, the Court should find (as Falcao concedes), that

the Company was incorporated in Delaware, had a principal place of business in Massachusetts,

and filed bankruptcy in the state of New Jersey.  *Id.*  And it is undisputed that the Court should

apply the choice of law rules of the forum state of the bankruptcy, here New Jersey. *Id.* at 13

(citing *In re Clark Ent. Grp., Inc.*, 183 B.R. 73, 77 (Bankr. D.N.J. 1995); *In re PHP Healthcare

Corp.*, 128 Fed. Appx. 839, 843 (3d Cir. 2005); *In re Modell's Sporting Goods Inc.*, Case No.

20-14179, Adv. No. 22-1076, 2023 WL2961856, at *26 (Bankr. D.N.J. Apr. 14, 2023).)

Moreover, as recognized by defendant Yardline (Yardline MTD at 16-17), the Court will

employ the law of the forum state if there is no actual conflict between potentially applicable

laws.  *See Powell v. Subaru of Am., Inc.*, 508 F. Supp. 3d 856, at *875 (D.N.J. Nov. 24, 2020).

Here, all the potentially applicable jurisdictions – Delaware, Massachusetts, New Jersey, and

New York (where Horowitz lives) – have adopted the Uniform Voidable Transactions Act to

govern potential claims of fraudulent transfer.  No party has identified any actual conflict

between the fraudulent transfer laws of any of these states that would require the performing a

choice-of-law analysis as compared to just applying the forum state's law.

### III.     THE TRUST'S CLAIMS ARE TIMELY

Certain Defendants have argued that the statute of limitations bars certain of the Trust's

claims, as summarized below:

| Counts Challenged as Time Barred | Defendants Raising Statute of Limitations |
|---|---|
| Count 1 – Breach of Fiduciary Duty ("BOFD") of Loyalty – Tender Offer | Silberstein (Silberstein MTD at 25) Cashman (COR MTD at 33) |
| Count 4 – Conspiracy to Fraudulent Transfer –Tender Offer | Silberstein, Millhouse (Silberstein MTD at 32) Boockvar (Boockvar MTD at ¶ 92) Falcao (Falcao MTD at 13) |
| Count 6 – Unjust Enrichment – Tender Offer | Silberstein, Millhouse (Silberstein MTD at 34) Boockvar (Boockvar MTD at ¶47) Cashman, Cashman Investment (COR MTD at 55) Falcao (Falcao MTD at 15) |
| Count 7 - BOFD of Oversight/Loyalty – Internal Controls | Silberstein (Silberstein MTD at 41) Boockvar (Boockvar MTD at ¶47) Cashman, Rathod, and Ouhadi (COR MTD at 34) |
| Count 8 – Waste of Corporate Assets | Silberstein (Silberstein MTD at 45) Boockvar (Boockvar MTD at ¶47) |
| Count 9 – Usurpation of Corporate Opportunity – Secondary Sales | Silberstein (Silberstein MTD at 52) Cashman, Rathod, and Ouhadi (COR MTD at 33) |
| Count 10 – BOFD of Loyalty – Misuse of Confidential Corporate Information (Secondary Sales) | Silberstein (Silberstein MTD at 52) |
| Count 11 – Aiding and Abetting BOFD of Oversight/Loyalty – Secondary Sales | Rathod, Ouhadi (COR MTD at 33) |
| Count 17 – BOFD –Yardline | Silberstein (Silberstein MTD at 65) |
| Count 26 – Corporate Waste – Yardline | Silberstein (Silberstein MTD at 65) Boockvar (Boockvar MTD at ¶47) |

### A.    The Breach of Fiduciary Duty and Corporate Waste Claims Are Timely Asserted under Delaware Law

The Court should find that the law of Thrasio's state of incorporation (*i.e.*, Delaware) applies to claims that relate to Thrasio's internal affairs under New Jersey's choice of law analysis.  *See In re Modell's Sporting Goods, Inc.*, Case No. 20-14179, Adv. No. 22-1076, 2023 WL 2961856, *25 (Bankr. D.N.J., April 14, 2023).  All breach of fiduciary duty claims, claims for corporate waste and claims for usurpation of corporate activity, as identified in Counts 1, 7-11, 17 and 26, relate to the internal affairs of Thrasio.  Thus, Delaware law applies to these claims.

23

Delaware law recognizes the tolling doctrines of (i) inherently unknowable injuries, (ii) equitable tolling, and (iii) continuing wrong.  These doctrines apply to toll each of the claims Defendants argue are barred by Delaware's three-year statute of limitations.  Del. Code Ann. tit. 10, § 8106.

### 1. Inherently Unknowable Injuries

Delaware law tolls a statute of limitations where the action is "inherently unknowable" until "a person of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury."  *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 554 (D. Del. 1994) (*citing Studiengesellschaft Kohle, MbH v. Hercules, Inc.*, 748 F. Supp. 247, 252 (D. Del. 1990)) (internal quotations omitted).

Here, each of the breach of fiduciary duty claims (*i.e.*, Counts 1, 7, 10-11, 17) and corporate waste claims (Counts 8 and 26) relates to injuries to the Company that were unknowable at the time, based on duties owed while the Company was *insolvent*, or actions taken by Defendants that rendered the Company insolvent.  The insolvency and injury to the Company was not known or discovered because Defendants hid the true state of the balance sheet by using "pro forma" financial statements and inventory accounting that was materially false.  (Compl. ¶¶ 9-10.)  The dismal state of the Company's finances was not revealed until the audited financial statements for 2020 and 2021 were completed in 2022 by PwC.  (*Id.* ¶ 48.)  Ultimately, the true extent of the Debtors' insolvency was not uncovered until nearly the end of the Bankruptcy Case in 2024.  Through discovery in the Bankruptcy Case, it was also revealed that the audited financials for 2019 produced by the Company's auditor at that time, MFA Companies, were unreliable and inaccurate.

The statute of limitations for each of the breach of fiduciary duty claims (*i.e.*, Counts 1, 7, 10-11, 17) and corporate waste claims (Counts 8 and 26) should thus be tolled until June 2022,

when the PwC audit was released, or at the very earliest until the fall of 2021, when

AlixPartners, LLP ("AlixPartners") released their initial findings after being engaged by

concerned investors to investigate the Company and indicated that there were notable issues with

Thrasio's financial reporting and inventory tracking.  (*Id.* ¶ 50.)  Accordingly, with tolling, the

applicable three-year statute of limitations did not expire before the Petition Date for any of the

breach of fiduciary duty or corporate waste claims.

### 2.       Equitable Tolling

Delaware law also applies the doctrine of equitable tolling where there is "an abuse of the

fiduciary relationship through actionable self-dealing."  *End of the Rd. Tr. ex rel. Fruehauf*

*Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 193 (D. Del. 2000).

The elements of equitable tolling for abuse of a fiduciary relationship are "(1) a fiduciary

relationship; (2) actionable or fraudulent self-dealing; and (3) lack of inquiry notice."  *Id.*

Equitable tolling should apply to all breach of fiduciary duty claims (*i.e.*, Counts 1, 7,

10-11, 17) because of Defendants' self-dealing.  Plaintiff alleges that the D&O Defendants

engaged in self-dealing by participating in the Tender Offer, which harmed the Company

because it was insolvent at the time.  (Compl. ¶ 135.)  The D&O Defendants engaged in self-

dealing by (i) selling their personal stock in the Secondary Sales, thereby usurping the

Company's opportunities to raise capital, and (ii) forcing the Yardline transactions on the

Company for personal gain, rather than legitimate business reasons.  (*Id.* ¶¶ 218, 289.)

Specifically, Defendants Silberstein, Cashman, Boockvar, Rathod, and Ouhadi were fiduciaries

engaged in actionable self-dealing when they knowingly relied on materially wrong financial

information to sell their personal shares at the direct expense of the Company.  Once again, the

true extent of the injury caused by the D&O Defendants to the Company was obfuscated and

unknowable until the audited, accurate financial statements were produced in November 2022.

*See In re Fruehauf Trailer Corp.*, 250 B.R. at 193 (applying tolling to claims where defendants allegedly withheld material information related to insolvency and the financial status of the company).

### 3.    Continuing Wrong

Delaware law applies the continuing wrong doctrine to claims where part of the alleged wrongdoing occurs outside of the limitations period, and part of it occurs within the period.  The rule is that the wrongful act "is not complete, and the limitations period does not begin to run, until the continuing wrong ceases."  *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 994 (Del. Ch. 2024).  In such situations, a plaintiff's recovery is not limited to the amount of damage caused during the limitations period.  Rather, if any portion of the wrongdoing occurs within the statute of limitations period, "then the plaintiff can seek to impose liability and recover damages for the entire period covered by the continuing wrong."  *Id* at 995.  "[I]f there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period."  *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, No. 2019-0972, 2022 WL 3010640, at *12 (Del. Ch. July 29, 2022).  The pleading standard for continuing wrong is that "the various acts are 'so inexorably intertwined that there is but one continuing wrong.'"  *Id.*  To hold otherwise would permit defendants to use the statute of limitations to cut off their liability for continuing fraudulent and wrongful actions and simply hide behind the time bar.  It would also signal, here, that it is acceptable to falsify or neglect business ledgers and require that the Trust rely on those inaccurate financial reports because they were within the statute of limitations.

Counts 7 and 8 both allege an ongoing breach of duty and wasteful actions dating from at least January 2019 through February 2022, continuing through the Petition Date of February 28, 2024.  (Compl. ¶¶ 46, 58, 90, 200-04.)  These wrongful acts caused the Company to accumulate

26

over *$800 million* worth of excess inventory.  The continuing inventory control deficiencies

resulted in the discovery of a further 12.4 million units of excess inventory worth $92.3 million

after the Company filed for bankruptcy in 2024.  (*Id.* ¶¶ 10, 58, 212, 213.)  This ongoing

wrongdoing and continuing harm means that the doctrine of continuing wrongdoing should apply

to Counts 7 and 8.  *W. Palm Beach Firefighters' Pension Fund,* 310 A.3d at 996  (holding that

even if any portion of the wrongdoing occurred outside of the statute of limitations period, the

claims are still timely, and defendants are still liable for the totality of the wrongful acts).

The Complaint alleges a continuous set of interconnected actions that form the

foundation for Counts 9, 10, and 11 (which allege breach of duty of loyalty, usurpation of

corporate opportunity, and aiding and abetting breach of fiduciary duty all related to secondary

stock sales by Defendants).  (Compl. ¶¶ 5, 57, 65-91.)  Defendants Cashman and Silberstein

began selling shares and breaching their fiduciary duties in December 2020.  They then

continued to cash out in breach of their duties through the end of 2021, assisted by Defendants

Boockvar, Falcao, Ouhadi, and Rathod, who were rewarded for their support with being granted

access to participation in the Secondary Sales.  Plaintiff was unaware of the harm caused to the

Company at the time of the Secondary Sales because the facts of the Company's insolvency, and

true financial distress, were hidden until the audited financial statements for 2020 and 2021 were

released in June 2022.  (*Id.* ¶¶ 5, 57, 65-91.)  Given the continuous and interrelated nature of

Defendants' wrongdoing, the doctrine of continuing wrong should also apply to these counts.

*W. Palm Beach Firefighters' Pension Fund*, 310 A.3d at 996.

No portion of Counts 17 (breach of fiduciary duty related to Yardline transactions) and

26 (corporate waste related to Yardline) should be dismissed based on Delaware's three-year

statute of limitations.  (*See, e.g.*, Silberstein MTD at 65.)  The Company's payment of

$20.9 million for the Promissory notes issued by an insolvent Yardline, $4.2 million of cash

injections to an insolvent Yardline, and transfers of $1.8 million to Defendant Hudson Palm in

exchange for Defendant Horowitz's worthless Yardline shares all occurred within three years of

the Petition Date.  (Compl. ¶¶ 92-119, 284-292, 350, 372-75.)  While a portion of Defendants'

culpable conduct falls outside of the statute of limitations for Counts 17 and 26, the doctrine of

continuing wrong applies, as Defendants' conduct was a continuous series of interrelated actions

related to the acquisition of Yardline by the Company.

> **B.** **Conspiracy to Fraudulently Transfer Tender Offer Proceeds (Count 4) and Unjust Enrichment (Count 6) Are Timely Asserted Under New Jersey and Massachusetts Law**

Defendants Silberstein, Cashman, Rathod, Ouhadi, Falcao, Millhouse, and Cashman

Investment wrongly assert that Delaware law should apply to the unjust enrichment claim (*i.e.*,

Count 6).  In addition, Defendant Silberstein wrongly asserts that Delaware law should also

apply to the fraudulent transfer conspiracy claim (*i.e.*, Count 4).  Under choice of law analysis,

Delaware law does not apply to either of these claims because the internal business judgment of

the Company is not implicated.  Instead, these claims focus on the unlawful and improper

conduct of the Defendants to leverage the Tender Offer (which were illegal agreements) to

enrich themselves.  *See Seplow v. Closing Pro., Inc.*, 717 F. Supp. 3d 427, 434 (E.D. Pa. 2024)

(holding unjust enrichment claim may be brought based on unlawful or improper conduct).

As established by the New Jersey Supreme Court, New Jersey choice of law rules apply

to claims brought in the state, and a specialized test derived from Section 142 of the Second

Restatement of Torts applies in instances when choosing one state's statute of limitations law

over another would mean that the limitations period of the has expired.  *McCarrell v. Hoffmann-*

*La Roche, Inc.*, 227 N.J. 569, 597 (2017).  The test asks *first* whether New Jersey has a

significant interest in the maintenance of the claim.  If New Jersey does, the inquiry ends, and

New Jersey law applies.  *Id.*  *Only if* the court finds "no substantial interest" within exceptional circumstances would the statute of limitations of another state apply.  *Id.* at 598.  If there are "exceptional circumstances" that "would lead to an unreasonable result" then New Jersey examines whether the other state in question has a "more significant relationship to the parties and occurrence" and if so, may apply the law of that state.  *Id.* at 597, 598.  Even so, New Jersey maintains a "small window of discretion to override the outcome."  *Id.* at 599.

The *McCarrell* test should be applied here for Count 6 because under New Jersey and Massachusetts' six-year statutes of limitations periods the claim is timely.  *See* NJ Rev. Stat. § 2A:32C-11 (2024); M.G.L. c. 260, § 2.  The *McCarrell* test should also be applied for Count 4, which also likely would be timely under either New Jersey or Massachusetts law.  NJ Rev. Stat. § 2A:32C-11 (2024); M.G.L. c. 260, § 2A; *Pagliuca v. City of Bos.*, 626 N.E.2d 625, 628 (Mass. App. 1994) (statute of limitations begins to run when "knowledge that an injury has occurred").

Here, the application of the *McCarrell* test shows that New Jersey law and its 6-year statute of limitations should apply to both Count 4 and Count 6 because New Jersey has a significant relationship to the litigation in question.  For both claims, New Jersey is the forum of the above-captioned bankruptcy for the estate of the Debtors.  The Trust, bringing this action is a creation of the New Jersey Bankruptcy Court.  (Compl. ¶¶ 21-28.)  The claims are brought in an adversary proceeding attempting to recover some funds for unsecured creditors of the Debtors, whose interests the Trust represents.  (*Id.* ¶ 15.)  Defendant Silberstein is a resident of the state of New Jersey.  As outlined in the Complaint, Defendant Silberstein played a significant role in the actions giving rise to Count 4 and Count 6.  Accordingly, it is not possible to say that New Jersey has "no substantial interest" in either claim.  Therefore, the choice of law analysis test ends in the first stage.  New Jersey's general six-year statute of limitations for civil claims should apply to

29

both counts, which were asserted well within the limitations period.

Alternatively, if the Court were to determine that the Tender Offer occurred in Massachusetts, because the Company was headquartered in Massachusetts and Cashman and Falcao reside there, and Massachusetts law were to apply, Counts 4 and 6 are both timely under Massachusetts law.  Massachusetts has a statute of limitations of six years for unjust enrichment claims, so Count 6 is well within that limit.  M.G.L. c. 260, § 2.  Moreover, for civil conspiracy claims, Massachusetts has a three-year limitations period that only starts to run when a plaintiff learns of the injury, thereby making Count 4 timely as well.  *See* M.G.L. c. 260, § 2A; *Pagliuca v. City of Bos.*, 626 N.E.2d 625, 628 (Mass. App. 1994) (holding statute of limitations begins to run when "knowledge that an injury has occurred").  Although Defendant Falcao asserts that the statute of limitations has expired for Count 4 if Massachusetts law were to be applied, this analysis is incorrect if the limitations period is tolled from when Plaintiff, standing in the shoes of unsecured creditors, first learned of the potential fraudulent transfer conspiracy injury, which would date to the time of the Bankruptcy proceedings in 2024.  (*See Id.*; Falcao MTD at 19.)

Under a choice of law analysis, the Court should not find that Delaware law and its three-year statute of limitations applies to Counts 4 and 6 because Delaware *does not have* a "more significant relationship to the parties and occurrence" and thus the Court may not, under *McCarrell* apply the law of Delaware to these claims.  *Id.* at 597, 598.  Rather, Delaware has a lesser relationship to these counts compared to New Jersey or Massachusetts.  Delaware is merely the state of the Company's incorporation, which is not dispositive of the choice of law analysis, but instead is simply one factor among many considered as part of the choice of law analysis.  *See Performance Motorcars of Westchester, Inc. v. KPMG Peat Marwick*, 274 N.J. Super. 56, 62 (Super. Ct. App. Div. 1994) (holding state of incorporation is, "but one factor to be

considered in the overall qualitative analysis of the relevant contacts of the states under

consideration" in choice of law analysis).  No activities related to Counts 4 or 6 are alleged to

have occurred in Delaware.  Accordingly, Delaware does not have a more significant

relationship to either tort claim than Massachusetts or New Jersey, states where Defendants are

known to reside.

Therefore, Counts 4 and 6 are both timely under New Jersey and Massachusetts law,

either of which the Court may apply.

### IV.    THE BUSINESS JUDGMENT RULE IS NOT PROPERLY CONSIDERED AT THE PLEADING STAGE AND, IN ANY EVENT, DOES NOT SHIELD DEFENDANTS' CONDUCT

Dismissal under the business judgment rule is improper here for several reasons, and the

Court should decline to adopt Defendants' reasoning to the contrary.  (Silberstein MTD at 20;

COR MTD at 19-26; Yardline MTD at 17.)  *First*, the business judgment rule is an affirmative

defense and should not be applied to bar claims at the motion to dismiss stage.  *Second*, Plaintiff

has pled sufficient facts demonstrative of bad faith, including that Defendants Silberstein and

Cashman were on both sides of transactions and misled the rest of the Board, to render dismissal

based on the business judgment rule inapplicable.  *Third*, the business judgment rule does not

apply to the Disinterested Directors Report, as it was not a final judgment of the Disinterested

Directors.  *Fourth*, the business judgment rule is inapplicable to the Tender Offer, as the

transaction violated Delaware law.  *Fifth*, the business judgment rule does not apply to officers,

employees, or third-party corporations.

### A.    The Business Judgement Rule Is an Affirmative Defense, Not a Ground to Dismiss the Complaint

As numerous courts have held, the business judgment rule is an "affirmative defense []

and should not be considered at the motion to dismiss [stage]."  *Miller v. Bradley (In re W.J.*

*Bradley Mortg. Capital, LLC)*, 598 B.R. 150, 163 (Bankr. D. Del. 2019) (*citing Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005)) (holding the business judgement rule is not appropriate to consider at the motion to dismiss stage unless the rule was mentioned on the face of a complaint).

*Miller v. Bradley* is instructive on this point.  There, defendants (including former officers and members of W.J. Bradley Company corporate entities) relied on the business judgment rule to argue that the court should dismiss claims alleging breaches of fiduciary duty. The court disagreed, explaining that considering the business judgment rule at the pleading stage is not proper because, "the business judgment rule is an affirmative defense."  The *Miller* court noted a limited exception to that rule, which arises only if the business judgment rule appears on the face of the complaint but determined that this exception was not applicable there.  *Id.*

The Trust submits that the Court should follow *Miller* and deny those portions of Defendants' Motions to Dismiss that ask the Court to apply the business judgement rule to bar any of the Trust's claims.  Here, like in *Miller*, the Complaint has not raised the issue on its face, so the narrow exception does not apply.  Accordingly, the business judgment rule affirmative defense does not require dismissal of the Complaint.

Further, contrary to the arguments made by certain Defendants (*see* Silberstein MTD at 20; COR MTD at 19-26; Yardline MTD at 17), the Trust was not obligated to "plead around" the business judgment rule to withstand a motion to dismiss because the Trust made no affirmative allegations about the business judgment rule in the Complaint.  *Id.*; *see also Shamrock Holdings, Inc. v. Arenson*, 456 F. Supp. 2d 599, 609 (D. Del. 2006) (declining to "infer" any ability for the court to dismiss claims based on "unanswered affirmative defenses which are raised only implicitly on the face of the complaint").  The Defendants will have an opportunity to raise the

business judgment rule as an affirmative defense after determinations have been made on the

Motions to Dismiss.

As alleged in the Complaint, Defendants repeatedly engaged in self-dealing transactions,

including in connection with the Tender Offer, Secondary Sales, and Yardline transactions.  This

is sufficient for the Trust to overcome, at the pleading stage, arguments that the business

judgment rule bars the Trust's claims.  *KIND Operations, Inc. v. Cadence Bank, N.A. (In re PA*

*Co-Man, Inc.)*, 644 B.R. 553, 587 (Bankr. W.D. Pa. 2022) ("[C]ourts have held that a plaintiff

can overcome the Business Judgment Rule at the pleading stage of litigation by alleging self-

dealing or lack of disinterestedness on the part of the fiduciary-defendant.").

### B.    Plaintiff Has Pled Sufficient Facts to Plausibly Allege the Business Judgment Rule Is Inapplicable Here

Even if the Court were to evaluate at this stage whether the business judgment rule

applies—and it should not—it should still deny the Motions to Dismiss on this ground because

the Trust has alleged sufficient facts to rebut its application to the Trust's claims.

The business judgment rule presumes good faith.  Accordingly, where, as here, a plaintiff

has made plausible allegations of bad faith, self-dealing, and breaches of the duty of loyalty, the

business judgment rule is overcome and cannot be relied on to bar claims.  *Ryan v. Gifford*, 918

A.2d 341, 357 (Del. Ch. 2007) (declining to apply the business judgment rule where a complaint

"alleges bad faith and, therefore, a breach of the duty of loyalty sufficient to rebut the business

judgment rule and survive a motion to dismiss"); *In re PA Co-Man, Inc.*, 644 B.R. at 587.

The business judgment rule does not apply, as the Complaint alleges facts sufficient to

show that the D&O Defendants breached their fiduciary duties through actions taken related to

the Company's shocking lack of controls, the 2020 Tender Offer, Secondary Sales, and the

Company's acquisition of Yardline, as applicable, in each case for their own pecuniary benefit.

33

(*See, e.g.*, Compl. ¶¶ 134, 198, 205, 210, 218, 241, 286.)

Further, the business judgment rule does not apply where a fiduciary has engaged in fraud on the board, ultimately tainting the decisions of the board. As explained in *In re Xura, Inc. S'holder Litig.* ("*Xura*"), a complaint is not barred just because the complaint names a defendant director, without alleging wrongdoing or interested-ness against the whole board. No. 12698, 2018 WL 6498677, at *13-14 (Del. Ch. Dec. 10, 2018) (holding "[a] plaintiff need not allege that a majority of the board committed a non-exculpated breach by failing to supervise management in order to state a claim against a disloyal CEO"). *Xura* further held that it is not necessary to plead a "fraud-on-the-board" claim, only facts supporting "a reasonable inference" that the full board was not informed of conduct by the alleged wrongdoer. *Id.* The court in *Xura* reasoned, "[t]he Board, like shareholders, cannot approve [] what it did not know." *Id.*

As the *Xura* court explained, the board must be fully informed for their business judgement to be entitled to deference. *Id.* Where a board lacks information, particularly through "fraud on the board," deference is unjustified. And where material information has been withheld from the board by individual officers and directors, or the board has been provided materially false or misleading information, the business judgement rule does not apply to the board's decisions, and individual directors and officers can be held liable for breaches of their fiduciary duties. *In re Columbia Pipeline Grp., Inc.*, No. 2018-0484, 2021 WL 772562, at *51 (Del. Ch. Mar. 1, 2021) (holding that a plaintiff may plead a claim against an officer based on material withholding of information from directors).

Here, as the Complaint makes clear, the Board was *not informed*. (Compl. ¶¶ 75-76.) Defendants Silberstein and Cashman withheld material information from the Board and Thrasio's shareholders, including that Defendant Silberstein scuppered a potential SPAC

transaction to prioritize cashing out his own shares in the Secondary Sales.  (*Id.* ¶ 75.)

Defendants Silberstein and Cashman also withheld the fact that the Company's CFO abruptly

resigned to push through Board consent to sell large quantities of their own shares in the

secondary market, before the true state of the Company's finances were revealed.  (*Id.* ¶ 76.)  As

noted in *Xura*, it is not necessary to plead a separate fraud on the board claim.  *Xura*, 2018 WL

6498677, at *32-33.  Silence alone, or failure to share material information, is sufficient to show

fraud on the board.  *See Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1283 (Del.

1989) ("[T]here can be no dispute but that such silence was misleading and deceptive.  In short,

it was a fraud upon the board.").

Defendants misstate Delaware law to argue that the Trust can only sufficiently plead a

breach of fiduciary duty claim if the Trust makes claims against, or asserts conflict of, a majority

of the Board.  (COR MTD at 20-22.)  Delaware courts have explicitly *disagreed* with this

reasoning, including in circumstances where breach of fiduciary duty claims were asserted

against a CEO holding a dual director/officer role.  *Xura*, 2018 WL 6498677, at *12

("[defendants] argue that *Corwin* requires application of the business judgment standard and

dismissal of the claim because an informed, uncoerced majority of Company's stockholders

approved the Transaction.  I disagree.") (*citing KKR Fin. Holdings LLC S'holder Litig.*, 101

A.3d 980, 990 (Del. Ch. 2014) ("*KKR*"), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125

A.3d 304 (Del. 2015).)  (COR MTD at 21, n.82.)

In any event, and contrary to Defendants' arguments, *KKR* actually reinforces the

principle that a board's decision-making must be *fully informed* for the business judgment rule to

apply.  While the *KKR* court dismissed claims for failing to allege controlling shareholder status

or that directors were not disinterested, that result was only possible *"because the merger was*

approved by a majority of disinterested KFN stockholders in a *fully informed vote*." *KKR*, 101

A.3d at 990 (emphasis added).  *KKR* thus stands for the principle, which carries over to boards of

directors, that votes must be *informed* to receive business judgment rule deference.

### C.    The Business Judgment Rule Does Not Apply to the Disinterested Directors Report and the Plan Is Binding

Defendants incorrectly contend that the business judgement rule applies to "Conclusions"

of the Disinterested Directors Report.  (COR MTD at 31.)  To do so, they sidestep key features

of the Disinterested Directors Report itself and the Plan, either of which doom this line of attack.

*First*, Defendants omit that the Disinterested Directors Report represented only *interim*

findings.  (*Infra*, § I.B.)  Where no final decision is made, the business judgment rule does not

apply.  *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (*citing Aronson v. Lewis*, 473 A.2d

805, 813 (Del. 1984)) ("[w]here there is no conscious decision by directors to act or refrain from

acting, the business judgment rule has no application").

*Second*, the Plan reflects a conscious decision of Thrasio's Board, to both act—to exclude

*all* Defendants from releases—and refrain from acting—to not limit the scope of the claims that

the Trust could assert against Excluded Parties.  The Plan specifically noted that any

"conclusions" of the Disinterested Directors Report did not limit the Trust's claims, which

further underscores the fact that the Board did not treat it as a final binding decision by the

Disinterested Directors.  (Plan at 24.)  It is *this* decision reflected in the Plan, not the

Disinterested Directors Report, which requires deference.

*Third*, the Plan also carries the binding weight of law.  *See* 11 U.S.C. §§ 1327, 1141;

*Zardinovsky v. Arctic Glacier Income Fund (In re Arctic Glacier Int'l, Inc.)*, 901 F.3d 162

(3d Cir. 2018) (holding confirmed bankruptcy reorganization plan is *res judicata*); *Beyha v.*

*Conestoga Title Ins. Co. (In re Beyha)*, 637 B.R. 430, 440 (Bankr. E.D. Pa., 2022) (holding

confirmed bankruptcy reorganization plan is binding and cannot be revoked even through appeal

to a court's equity powers).  The Court should reject the Defendants implicit request to ignore

the specific terms contained in the Plan and its own Confirmation Order and to instead defer to a

non-final, interim factual report.

### D.    The Tender Offer Is an Illegal Transaction that Cannot Be Shielded by the Business Judgment Rule

The business judgment rule is not a defense to any claim related to the Tender Offer

because that transaction was illegal under Delaware law.  Here the Complaint alleges that, for the

Tender Offer, "[a]s of the date on which Thrasio paid the Tender Offer Proceeds, the total fair

value of Thrasio's liabilities exceeded the total amount of Thrasio's assets, and Thrasio was

insolvent with no reasonable prospects to continue its business successfully." (Compl. ¶ 144.)

Because the Company was insolvent at the time of the Tender Offer, it was an illegal transaction.

*See* DGCL § 160(a)(1) ("[N]o corporation shall: (1) [p]urchase or redeem its own shares of

capital stock for cash or other property when the capital of the corporation is impaired or when

such purchase or redemption would cause any impairment of the capital of the corporation.").  It

therefore cannot be shielded because illegal transactions do not receive the deference of the

business judgment rule.  *Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974) (holding

that the business judgment rule "cannot insulate" defendants if transaction violated a statute).

### E.    The Business Judgment Rule Does Not Apply to Officers, Employees, or Third-Party Corporations

Defendants Cashman, Cashman Investment, Ouhadi and Rathod concede that no

Delaware court has explicitly ruled that the business judgment rule applies to officers, let alone

third-party corporations like Cashman Investment, Yardline, or Millhouse.  (COR MTD at 20,

Fn. 74.)  Rather, courts have held exactly the opposite:  that the business judgment rule *does not*

apply to officers.  *See F.D.I.C. v. Perry,* No. 11-5561, 2012 WL 589569, at *2 (C.D. Cal. Feb.

21, 2012) (holding the business judgment rule does not apply to officers where no prior case in

California applied the business judgment rule to officers).  Further, at least one court has held

that the business judgment rule does not apply to interested directors acting in their capacity as

officers.  *Gaillard v. Natomas Co.*, 256 Cal. Rptr. 702, 711 (Cal. Ct. App. 1989) (holding

business judgment did not apply directors "acting as officer employees of the corporation").

## V.  THE TRUST'S CLAIMS ARE NOT BARRED BY ANY RELEASE OR SEPARATION AGREEMENT

Defendants Cashman, Cashman Investment, Horowitz, and Yardline assert that all claims

against them are barred by release and/or separation agreements.  (COR MTD at 31; Horowitz

MTD at 14; Yardline MTD at 3.)  However, the release agreements at issue[2] do not bar the

Trust's claims.  Cashman, Cashman Investment, and Horowitz's release agreements were each

rejected in the Bankruptcy Case and are thus not binding on the Trust.[3]

Separately, the election of remedies doctrine blocks Horowitz and Yardline from seeking

to enforce release agreements with the Debtors, where Horowitz and Yardline (through its parent

company, Swiftline) have filed proofs of claim in the Bankruptcy Case asserting breach of

contract claims against the Debtors for damages related to those same agreements.

### A.  The Employment, Separation, and Release Agreements of Excluded Parties are Rejected and No Longer in Effect

Cashman, Cashman Investment, Yardline, and Horowitz are all Excluded Parties.  Both

Cashman's (and Cashman Investment's) and Horowitz's release agreements were rejected during

---

[2] For Cashman and Cashman Investment:  Carlos Cashman Thrasio Separation Agreement (the "Cashman Separation Agreement") ¶ 10 (Kotler Decl. Ex. G); for Horowitz:  Kaplan Decl. Ex. C (the "Horowitz Release Agreement"); for Yardline:  Declaration of Ari Horowitz, dated March 3, 2025 (Horowitz Decl.), Exhibit A (Stock Purchase Agreement).

[3] Defendants Silberstein and Millhouse, unlike Defendants Cashman and Cashman Investment, do not dispute their status as Excluded Parties and do not dispute the fact that the Silberstein Separation Agreement is no longer in effect and was rejected during the Bankruptcy Case.

the Bankruptcy Case.  The Confirmation Order details in three separate sections how

"[e]mployment Agreements and/or separation agreements" are "rejected" and "no longer in

effect."  There are two identical passages regarding how the Release Agreements are rejected

and "no longer in effect": "The Employment Agreements, separation agreements, and/or

purported releases between the Debtors and the Excluded Parties, which are rejected and, upon

the Effective Date, are no longer in effect."  (Confirmation Order at 15-16 and 44-45.)  The

Confirmation Order continues, explaining that release agreements for the Excluded Parties do

not have to be listed to be rejected:

> The Employment Agreements and/or separation agreements
> between the Debtors and the Excluded Parties shall be
> rejected, and not be in effect on the Effective Date,
> regardless as to whether such Employment Agreement,
> separation agreement, and/or purported release is listed on
> the Schedule of Rejected Executory Contracts and
> Unexpired Leases.  Notice of the Plan shall be sufficient
> notice to the Excluded Parties that such Employment
> Agreements, separation agreements, and purported releases
> have been Rejected.  *Id.* at 45.

There can be no dispute that the Confirmation Order has the weight of findings of fact

and conclusions of law.  Further, the Confirmation Order has a preclusive effect through *res*

*judicata*.  *Id.* at 1.  This means that all employment and/or separation agreement and any

purported releases between the Company and all Defendants are rejected and no longer in effect

(including those for Cashman, Cashman Investment, Horowitz, and Yardline).  The text of the

Confirmation Order is binding on Defendants, and they may not resurrect these agreements by

ignoring the plain text of the Confirmation Order.

### B.    The Trust's Claims Fit within Cashman's Separation Agreement Carve Outs

Defendant Cashman acknowledges that the Cashman Separation Agreement contains a

broad carve-out for "claims that arose from grossly negligent actions, fraudulent conduct or

felony criminal conduct . . . about which the Company had no actual or constructive knowledge as of the date the Company executed this Agreement." (COR MTD at 41.) This carve-out language is expansive and, at this stage, provides a separate reason why the Cashman Separation Agreement is not a ground to dismiss any of the Trust's claims, even if the Court finds that it remains in effect and is a valid, enforceable agreement.

The Complaint alleges claims against Cashman that relate to his fraudulent conduct (such as fraudulent transfers) and also claims based on Cashman's gross negligence. (*See, e.g.*, Compl. ¶¶ 2-14; 41-59; 264-83.) These alleged claims are within the scope of the carve-out and they were not released unless Thrasio "had no actual or constructive knowledge as of the date the Company executed" the Cashman Separation Agreement. The Complaint does not make allegations that Thrasio had such knowledge.

To try and argue that the claims are nonetheless released, Cashman claims that the carve-out to the Cashman Separation Agreement does not apply based on his unsupported assertion that "the Company diligently looked into the specific conduct raised by the Plaintiff, including conduct by Cashman." (COR MTD at 44.) However, Cashman does not rely on allegations from the Complaint. Rather, he asks the Court to rely on matters from outside the Complaint and to draw inferences in *his favor* rather than Plaintiff's. This is not proper at the motion to dismiss stage. Further, whether the Company had information that would amount to "actual or constructive knowledge" of Cashman's culpable acts before entering into the release is a fact issue not suitable for resolution now. *See In re Fruehauf Trailer Corp.*, 250 B.R. at 195 (denying motion to dismiss because issues related to scope of a release agreement, "which carves out certain non-released claims" make the release agreement ambiguous and interpretation of the agreement becomes a question for the "trier of fact" at a later stage); *In re Campbell Soup Co.*

*Sec. Litig.,* 145 F. Supp. 2d 574, 602 (D.N.J. 2001) (denying motion to dismiss holding that

constructive knowledge of acts giving rise to potential claims is more properly resolved by a

"trier of fact" at a later stage, where "diligent investigation" raised by defendant).

### C.    For Cashman, Massachusetts Law Further Limits the Release

Massachusetts law, which governs Cashman's Separation Agreement (Cashman

Separation Agreement at 10), is also fatal to Cashman's argument that his Separation Agreement

bars claims based on "actual or constructive knowledge" of actions.  (COR MTD at 44.)

Massachusetts does not permit the release of claims of gross negligence, such as those relating to

a breach of fiduciary duty.  *Lautieri v. Bae*, 2003 Mas. Super. LEXIS 290, *12-13 (Mass. Dist.

Ct., Oct. 29, 2003) (denying motion for summary judgment where claims *may* have been the

result of gross negligence, even where gross negligence was not pled as a claim, because

Massachusetts does not permit release of gross negligence as a matter of public policy).  Thus,

the actual or constructive knowledge exception to the carve-out in the Cashman Separation

Agreement is no basis to limit the Trust's ability to bring claims based on gross negligence.

Further, it has long been the law in Massachusetts that directors of a corporation, *even

acting in good faith*, may be held liable for a breach of fiduciary duty where their actions

amounted to gross negligence.  *See Spiegel v. Beacon Participations, Inc.*, 8 N.E.2d 895, 910

(Mass. 1937) (holding directors may be held liable for breaches of duty related to gross

negligence regardless of good faith).  So, for Cashman, all claims related to his grossly negligent

actions (Counts 1-10, 12, 15-17, 19-22, 25-26) should be permitted to proceed, no matter the

wording of the Cashman Release.  *Indus. Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn

Holding Co.)*, 484 B.R. 25, 38 (Bankr. D. Del. 2012) (holding the legal and factual issues raised

by the parties related to a Settlement Agreement were "more appropriate for determination upon

a motion for summary judgment").

### D.     Horowitz and Yardline May Not Seek Inconsistent Remedies for Breach of Contracts

Pursuant to the election of remedies doctrine under state law applicable to the Horowitz

Release Agreement (New York) and the Yardline SPA (Delaware), Horowitz, Yardline, and

Swiftline may not rely on contracts they assert are breached while simultaneously asserting

breach of contract claims based on these same agreements.  Undeterred, they do exactly that

here.  (Horowitz, Claim Nos. 109, 111, 114; Swiftline Claim Nos. 107, 108.)

New York law does not permit a party to both sue for breach of contract and attempt to

enforce the contract provisions as valid.  A "party must make an election and cannot at the same

time treat the contract as broken and subsisting.  One course of action excludes the other."

*ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999)

(internal citations omitted); *see also JTED46, Inc. v. Espresso Dream, LLC*,  213 N.Y.S.3d 15

(N.Y. App Div. 1st Dept. 2024 ) (declining to permit a party from simultaneously seeking to

rescind a contract or seek damages for breach, while trying to enforce that same contract as a

valid and binding agreement at trial).

Horowitz's inconsistent elections of remedies are legion.  In his claims filed in the

Bankruptcy Case he asserts "Claims for damages for fraud, fraudulent misrepresentation, breach

of contract, violation of securities laws and constructive trust" and references, as a breached

contract "Restrictive Covenants" which appears to be the same agreement as the Horowitz

Release Agreement.  (Kaplan Dec. Ex. C; Horowitz Claim No. 111 at 5-6.)  Horowitz then relies

on this same breached agreement to argue that the Debtors released all claims they might have

against him.  (Horowitz MTD at 13-14.)  Further, by asserting claims against the Debtors in the

Bankruptcy Case, Horowitz himself appears to have breached the "general releases" granted to

the Debtors as part of the Horowitz Release Agreement.  (Horowitz Release Agreement at 2.)

Under Delaware law, Yardline's reliance on the Yardline Stock Purchase Agreement (the

"Yardline SPA") is similarly foreclosed.  As the Third Circuit has held, "under basic contract

principles, when one party to a contract feels that the other contracting party has breached its

agreement, the non-breaching party may either stop performance and assume the contract is

avoided, or continue its performance and sue for damages.  Under no circumstances may the

non-breaching party stop performance and continue to take advantage of the contract's benefits."

*S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992).

Swiftline asserts "Claims for damages for fraud, fraudulent misrepresentation, breach of

contract, violation of securities laws and constructive trust," and references the "Yardline SPA"

as a breached contract.  (Swiftline Claim No. 108 at 5-6.)  The referenced "Yardline SPA"

appears to be the same Stock Purchase Agreement that Yardline asserts contains binding releases

of all claims against it.  (Yardline MTD at 3-4.)

That the claim was asserted by Yardline's parent corporation Swiftline while Swiftline

was acting on behalf of its subsidiary does not change the result.  A corporate subsidiary is in

privity with its parent for *res judicata* purposes and "would be bound by any judgment on the

breach of contract claim."  *Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp. 2d 200, 233

(S.D.N.Y. 2005).  Accordingly, Yardline, as a wholly owned subsidiary of Swiftline, should be

bound by Swiftline's claims in the Bankruptcy Case for purposes of *res judicata*.  Here, within

the Bankruptcy Case, it would result in inconsistent remedies if Swiftline were to succeed in its

breach of contract claims, while Yardline enforces that same, purportedly breached, contract

against the Debtors and their estates.

> **E.    Cashman's (and Cashman Investment's) Release Cannot Be Relied
> Upon Because They Are Subject to Avoidance**

Defendant Cashman and Cashman Investment's reliance on the Cashman Separation

Agreement allegedly providing them with a release (the "Cashman Release") is premature at best because that contract is subject to avoidance under Section 550 of the Bankruptcy Code.  Counts XV and XVI of the Complaint seeks avoidance of the Cashman Release as a constructive and actual fraudulent transfer, respectively.  Even if this Court were to find that any allegations currently made against Cashman or Cashman Investment would be barred by the Cashman Release (which it should not for all the reasons stated herein), it would still be premature to dismiss any claims on that ground unless and until the claims for avoidance of the Cashman Release are adjudicated.

F.      **The Trust's Fraudulent Transfer Claims Were Not Release Pre-Petition**

The release provisions included in any separation agreement entered into between the company and any Defendant are inapplicable to and do not release the Trust's alleged fraudulent transfer claims.  The Trust brings Counts 13-16 pursuant to the avoidance power provided by Section 544(b) of the Bankruptcy Code, which authorizes a trustee or a debtor in possession to avoid a transfer "only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action."  *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000).

The Third Circuit has explained at length that Section 544(b) provides standing for a debtor-in-possession to assert a fraudulent transfer cause of action for the benefit of the bankruptcy estate, but it does not mean that the fraudulent transfer claims themselves are an asset of the debtor-in-possession. *See id.* at 243-44.  By arguing that any fraudulent transfer claims were released by Thrasio prior to the Bankruptcy Case, Defendants Cashman and Horowitz (COR MTD at 41-44; Horowitz MTD at 14-16) necessarily rely on an assumption that such claims were assets of Thrasio such that Thrasio could release them at the time of entering into the separation agreements.  However, prepetition Thrasio simply did not hold claims under state

44

or federal law to avoid any of the Trust's alleged transfers as fraudulent transfers, since such

claims had belonged to Thrasio's creditors.  *See id.* at 245 ("the fraudulent transfer claims, which

state law provided to [the debtors'] creditors, were never assets of [the debtors], and this

conclusion is not altered by the fact that a debtor in possession is empowered to pursue those

fraudulent transfer claims for the benefit of all creditors").  Thrasio could not release claims it

did not hold on a prepetition basis.  *Cf. In re PWS Holding Corp.*, 303 F.3d 308, 315 (3d

Cir.2002) (prepetition state law fraudulent transfer actions only become vested in the debtor and

could be released by it upon the filing of bankruptcy).  Therefore, regardless of the scope or

validity of the release provisions, they do not prevent the Trust from pursuing the alleged

fraudulent transfer claims.

## VI.   THE SECTION 546(e) SAFE HARBOR EXEMPTION IS INAPPLICABLE

### A.   The Safe Harbor Exemption Does Not Apply to Tender Offer Claims

Defendants Silberstein and Millhouse wrongly assert that Section 546(e) of the

Bankruptcy Code bars the Trust's Tender Offer claims (Counts 1-6) here.  That argument fails for

numerous reasons.

*First*, Section 546(e) does not preempt state law fraudulent transfer claims like those

asserted by the Trust.  *See In re Physiotherapy Holdings, Inc.*, No. 13-12965, 2016 WL 3611831,

at *9 (Bankr. D. Del. June 20, 2016) (holding that Section 546(e) does not preempt state law

fraudulent transfer claims and finding that the plain language of Section 546(e) "constitutes

strong evidence that Congress did not intend [Section 546(e)] to preempt state-law avoidance

claims").  As the *In re Physiotherapy* court recognized, Congress enacted Section 546(e) to

reduce systemic risk to the financial market, and "avoidance of payments made to final recipients

of a cash tender offer fail to implicate these concerns."  *Id.* at *8.

*In re Physiotherapy* is instructive on this point.  There, the court held that "a litigation

45

trustee may assert state law fraudulent transfer claims in the capacity of a creditor-assignee

when:  (1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant

securities markets; (2) the transferees received payment for non-public securities, and (3) the

transferees were corporate insiders that allegedly acted in bad faith."  *Id.* at *10.  All three factors

are satisfied for the Tender Offer claims:  (1) the Trust's claims do not threaten to create ripple

effects because the payments at issue were to the final recipients of a cash tender offer; (2) there

is no dispute that the securities at issue were non-public securities; and (3) the Complaint alleges

that the transferees were corporate insiders acting in bad faith.  (Compl. ¶¶ 59-64.)

    *Second*, the plain language of Section 546(e) explicitly carves out actual or intentional

fraudulent transfer claims made under 548(a)(1)(A) of the Bankruptcy Code.  Accordingly, it

cannot and does not apply to bar Count 3, which alleges an actual fraudulent transfer related to

the Tender Offer.  (Compl. ¶¶ 156-175.)

    *Third*, Defendants Silberstein and Millhouse are also wrong that Section 546(e) can be

stretched to apply to Counts 1, 4, 5, and 6, none of which are fraudulent transfer claims or

avoidance claims.  "The safe harbors are not all encompassing and do not offer 'fail safe'

protection against every cognizable claim made in relation to transactions that may fit within the

statutory framework."  *In re Quorum Health Corp*., No. 20-10766, 2023 WL 2552399, at *12

(Bankr. D. Del. Mar. 16, 2023).  Rather, Section 546(e) only applies to actions by a trustee to

"avoid a transfer."  11 U.S.C. § 546(e).  And "'the plain language of section 546(e), read

literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law

claims, intentional fraud claims and any other claims not expressly embraced by section

546(e).'"  *In re Quorum Health Corp*., 2023 WL 2552399, at *12 (quoting *Lehman Bros.* at 450).

The *In re Quorum* court held that that the safe harbor did not bar unjust enrichment claims or

conversion claims that sought to hold defendants liable for intentionally wrongful and fraudulent acts, even where the safe harbor applied to related constructive fraudulent transfer claims. It reasoned that Section 546(e) was not applicable because the plaintiff's claims were more akin to "claims grounded in actual fraudulent intent" and were not "replicas" of the constructive fraudulent transfer claims. *Id.*

The same result is warranted here. The Trust's claims for breach of fiduciary duty, conspiracy relating to the fraudulent transfer, violations of the DGCL, and unjust enrichment are sufficiently grounded in intentionally wrongful conduct such that they are not "replicas" of constructive fraudulent transfer claims. And, further, Section 546(e) cannot be invoked by transferees who participated and were complicit in the fraud. *See e.g.*, *Jackson v. Mishkin (In re Adler, Coleman Cleaning Corp.)*, 263 B.R. 406, 481 (S.D.N.Y. 2001) (declining to apply Section 546(e) where transaction involved payments "so steeped in fraud" that they were not the type "commonly used in the securities trade").

*Finally*, the authority Defendants Silberstein and Millhouse rely on to argue otherwise is readily distinguishable. The court in *In re U.S. Mortg. Corp.*, 492 B.R. 784, 806 (Bankr. D.N.J. 2013) expressly recognized that "[w]hen systemic fraud is present," as is alleged here, "the transaction runs afoul of the portion of § 741(8) definition of the term 'settlement payment' that includes the phrase 'any other similar payment *commonly used* in the securities trade.'" *Id.* at 816. Similarly, the *In re Hechinger Inv. Co. of Delaware* court's holding that Section 546(e) preempted the trustee's unjust enrichment claims arose in the context of a leveraged buyout. 274 B.R. 71, 95-98 (D. Del. 2002). The court thus reasoned that it would "implicate the same concerns regarding the unraveling of settled securities transactions" Section 546(e) is designed to address. *Id.* at 96. But, as discussed above, those same concerns *are not present here* given the

47

nature of the underlying Tender Offer transactions.  As to *PHP Liquidation, LLC v. Robbins*, 291

B.R. 603 (D. Del. 2003), the court's reasoning depended upon a determination that a

"stockbroker" was involved and the sales "cleared through stockbrokers."  There was no dispute

as to whether that fact had been established or was accurate because the plaintiff had conceded

that point.  *Id*. at 607.  As discussed below, the Trust disputes Defendants Silberstein's and

Millhouse's assertions that SMTX qualifies as a stockbroker for purposes of Section 546(e),

which in any event, is a factual inquiry not suitable for resolution on a motion to dismiss.

### B.    Even If Section 546(e) May Apply to Claims Like Those Alleged by The Trust, It Does Not Apply Here

Defendants Silberstein and Millhouse also wrongly argue that the safe harbor exemption

applies because it was a "qualifying payment" and "made by or to (or for the benefit of)" a

stockbroker or other covered entity.  (Silberstein MTD at 15.)  This argument likewise fails for

numerous reasons and is not grounds to dismiss Counts 1-6.

*First*, to support this argument Defendants Silberstein and Millhouse seek to have the

Court consider facts outside of the pleadings related to an entity called SMTX that Silberstein

and Millhouse assert is a "registered broker-dealer."  Whether SMTX is a "registered broker-

dealer" and whether SMTX's role in the Tender Offer qualifies SMTX as a "stockbroker and

securities clearing agency" such that Section 546(e) might apply is a factual inquiry that is not

ripe for decision at this time.  *See In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 389

(Bankr. D. Del., 2022) (holding that at the motion to dismiss stage the court "need not address

the parties' arguments as to whether the Distribution was made by or to a financial institution").

*Second*, and more generally speaking, *any* determination of whether Section 546(e)

applies to a specific transaction is inappropriate at this time.  The Court in *In re Mallinckrodt*

*PLC* aptly observed that "[g]enerally, determinations under Section 546(e) require fact-intensive

determinations that are not appropriate for resolution at the motion to dismiss stage." Case No.
20-12522, Adv. No. 22-50433, 2024 WL 206682, at *14 (Bankr. D. Del. Jan. 18, 2024).
Accordingly, courts will consider the affirmative defense based on the safe harbor provision only
"where the defense is clearly established on the face of the complaint." *Zazzali v. AFA Fin.
Grp., LLC*, No. 10-54524, 2012 WL 4903593 at *11 (Bankr. D. Del. Aug. 28, 2012) ("[I]t is
premature to dismiss this count on the basis of the 546(e) defense.")  As Defendants Silberstein
and Millhouse concede, all of the facts necessary to implicate the safe harbor are not present in
the Complaint.  (Silberstein MTD at 17 (acknowledging that the Complaint does not include
facts "indicating how [the Tender Offer] was accomplished").)  Indeed, that is the very reason
why they ask the Court to look outside the pleadings to make the factual determination that
SMTX is a "registered broker-dealer."  This is fatal to their attempt to have the Complaint
dismissed based on the application of the 546(e) safe harbor at this time.  *In re Mallinckrodt
PLC*, 2024 WL 206682 at *17 (denying motion to dismiss based on the safe harbor defense when
its application required a factual inquiry and implicated facts outside of the pleadings).

 *Third*, Silberstein and Millhouse also misconstrue the Supreme Court's holding in *Merit
Mgmt.* when they argue that Section 546(e) applies because SMTX assisted in facilitating the
underlying transactions.  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc*., 583 U.S. 366 (2018)
actually held that the relevant focus of the inquiry is the "overarching transfer that the trustee
seeks to avoid, not any component part of that transfer." *Id.* at 379.  The Supreme Court further
clarified that "[t]he safe harbor saves from avoidance certain securities transactions 'made by or
to (or for the benefit of)' covered entities.  Transfers 'through' a covered entity, conversely,
appear nowhere in the statute." *Id.* at 385.  Here, the Tender Offer counts seek to avoid the
"overarching transfer" from the company to Silberstein, not an "overarching transfer" to SMTX,

who was at most a conduit or intermediary through which the transfer was made to Silberstein.
Accordingly, the safe harbor does not apply. *See FTI Consulting, Inc. v. Sweeney (In re Centaur,
LLC)*, 595 B.R. 686, 694 (Bankr. D. Del. 2020) (holding that banks which facilitated flows of
funds from a corporate acquiror to selling shareholders were simply "intermediaries within the
transaction" but irrelevant to the analysis of the relevant transfer—from corporate acquiror to
selling shareholders).

*Finally*, Defendants Silberstein and Millhouse are wrong both that (i) SMTX may also be
considered a "financial institution," and (ii) Thrasio could also thus be deemed a "financial
institution" such that the safe harbor applies.  Putting aside issues of fact, Defendants Silberstein
and Millhouse claim that SMTX is a "broker-dealer."  (Silberstein MTD at 17.)  SMTX therefore
does not fit within the code's definition of a "financial institution" which is essentially limited to
banks or similar institutions. *See* 11 U.S.C. § 101(22).

Further, this argument depends upon authority from the Second Circuit —*In re Tribune
Co. Fraudulent Conv. Litig.*, 946 F.3d 66 (2d Cir. 2019)—that has not been adopted by the Third
Circuit. *In re Tribune* (and other courts adopting its logic) rely upon the fact that the definition
of a "financial institution" in the Bankruptcy Code specifically includes a "customer" when the
financial institution is acting as an agent or custodian for the financial institution.  But SMTX is
not a financial institution.  At most, if SMTX is a "broker-dealer," there is a potential fact issue
as to whether SMTX meets the definition of a "stockbroker" or a "securities clearing agency"
under the Bankruptcy Code.  However, unlike the definition.  financial institution," neither of
those definitions includes a "customer." *See* 11 U.S.C. §§ 101(48) & 101(53A).  Accordingly,
the reasoning of *In re Tribune* is not applicable here.

50

## VII.    THE BANKRUPTCY COURT HAS SUBJECT MATTER JURISDICTION OVER ALL CLAIMS ASSERTED BY THE TRUST

Defendant Boockvar is wrong that the Court lacks subject matter jurisdiction over Counts 6-11, 18, and 26 asserted against him.  No other Defendant asserts that this Court lacks subject matter jurisdiction over any of the Trust's claims.  And with good reason.  As Boockvar concedes, the Plan contains an "exceedingly broad definition of 'Causes of Action' for which the bankruptcy court retains jurisdiction."  (Boockvar MTD at ¶ 42.)  Among other things, the Plan provides that the "Causes of Action" include "any claim based on or relating to, or in any manner arising from, in whole or in part, *tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence*."  (Plan at 3 (emphasis added).)  It specifically identifies the individuals and entities who were not granted releases under the Plan, Boockvar among them.  (*Id.* at 7-8.)  The Confirmation Order also provides that the Court retained jurisdiction over the Vested Causes of Action.  (Confirmation Order at ¶ 154; Plan Art. XI.)

Boockvar does not dispute that Counts 6-11, 18, and 26 are Causes of Action.  Nor does he dispute that each of these counts are Causes of Action that developed pre-petition and undoubtedly were estate assets.  As such, they are "intended to be distributed to certain creditors as part of the reorganization process.  These facts, without more, could well establish the close nexus to the bankruptcy plan or proceeding, which the Third Circuit requires for subject matter jurisdiction."  *Michaels v. World Color Press, Inc. (In re LGI, Inc.)*, 322 B.R. 95, 102 (Bankr. N.J. 2005) (cleaned up).  As in *In re LGI, Inc.*, "this adversary proceeding plainly serves the plan through the 'implementation, consummation [and] execution' which typify many post-confirmation matters."  *Id.*

Here, the Plan also sufficiently identified both the nature of the claims—including breach

51

of fiduciary duty claims—over which the Court retained jurisdiction and also sufficiently

identified the parties against whom the Trust might bring claims—the individuals and entities

who were not granted releases under the Plan.  The authority on which Boockvar relies is thus

plainly distinguishable, including *In re AmCad Holdings, LLC*, Case No. 14-12168, Adv. No. 15-

51979, 2016 WL 3412289, at *2 (Bankr. D. Del. June 14, 2016), where the court reasoned that

the retention of jurisdiction language in the plan was not sufficient to create a "close nexus"

because "the Plan in this case does not mention any of the estate's putative breach of fiduciary

duty claims against the Officer Defendants or Manager Defendants."

Further, each of Counts 6-11, 18, and 26 do implicate the interpretation of the Plan and

Confirmation Order, including, at least, those provisions that ordered that any separation

agreements or employment agreements with any of the Defendants were rejected and are no

longer in effect.  Cashman and Cashman Investment both assert that Counts 6-10 are barred by

releases contained in the Cashman Separation Agreement and resolving this argument

necessarily requires the Court to interpret and construe the Plan and Confirmation Order.

(*Supra*, §V.)  Counts 11 and 18, in turn, are aiding and abetting claims that relate to underlying

counts Cashman and Cashman Investment say are affected by those releases.  Accordingly, the

Court's determination of the viability of the underlying counts might affect the viability of these

counts, too.  Defendant Boockvar's own motion to compel arbitration of Counts 6-11, 18, and 26

and to stay this litigation pending resolution of arbitration also involves interpretation of the Plan

and Confirmation Order, as discussed below.  (*Infra*, § XV.B.)

## VIII.   THE COMPLAINT IS NOT AN IMPERMISSIBLE GROUP PLEADING

As the authority on which Silberstein and Millhouse rely reflects, the rationale for

dismissing a complaint on the ground that it is a "shotgun" pleading is based on a concern that

such a pleading does not provide defendants with fair or adequate notice of the claims they are

facing.  *Foulke v. Twp. of Cherry Hill*, No. 23-cv-2543, 2024 WL 3568841, at *7 (D.N.J. July

29, 2024).  Thus, when analyzing whether a pleading is an impermissible group or "shotgun"

pleading the question a court must answer is simply whether "the complaint gives the defendants

adequate notice of the claims against them and the grounds upon which each claim rests."  *Finkel*

*v. Parzych (In re Midnight Madness Distilling, LLC)*, No. 21-11750, 2024 WL 3517620, at *8

(Bankr. E.D. Pa. July 23, 2024) (internal quotation marks omitted).  The answer here is,

undoubtedly, "yes."

While the Complaint here is "lengthy" and might even be "dense" like the complaint in

*In re Midnight Madness*, its factual allegations "detail which Defendant or Defendants acted or

failed to act in a manner that renders them liable."  *Id.* at *9.  The Complaint spends

246 paragraphs (out of a total of 375) specifying each of the alleged counts, against which

specific Defendant they are asserted, and the factual basis of those claims.  (Compl. ¶¶ 130-375.)

Those counts are further supported by the prior 129 paragraphs of detailed allegations about the

shocking misconduct of Silberstein alongside his co-Defendants.

Silberstein and Millhouse nonetheless argue that they lack sufficient notice of the claims

asserted against them, including Count 1 that alleges that Silberstein (and his then co-CEO

Cashman) breached the fiduciary duties he owed to Thrasio by approving the Tender Offer that

caused "nearly 60% of the proceeds from the Series C" fundraising round (the "Series C-1 Stock

Issuance") to go "straight out the door to repurchase Thrasio stock from participating

shareholders, including entities controlled by or affiliated with Silberstein and Cashman."  (*Id*. ¶

133.)  Even Count 2, that alleges that the Tender Offer was a constructive fraudulent transfer and

seeks to avoid and recover transactions with specific dollar amounts (down to the penny) from

Silberstein, Millhouse, and other Defendants, is apparently not sufficient, per Silberstein and

Millhouse, for either of them to be on notice of the basis of this claim.  Nonsense.

Similarly, Silberstein and Millhouse try to make much out of the number of times the terms "D&O Defendants" and "Defendants" are used in the Complaint—averring that the Complaint "refers to the D&O Defendants and Defendants over 100 times" to suggest that this has left them undifferentiated from the rest of the Defendants.  (Silberstein MTD at 12.)  What Silberstein avoids mentioning is that "Silberstein" is mentioned *230 times* in the Complaint.

The standard is not whether the Complaint is a "perfect" pleading, but whether, through the Complaint the Trust has provided adequate notice to Silberstein and Millhouse of the claims asserted against them and the factual basis for those claims.  Here, the Trust submits it has done so for each and every claim asserted against Silberstein and Millhouse.  *See In re Midnight Madness*, 2024 WL 3517620, at *8 (denying motion to dismiss complaint and holding that complaint was not an impermissible shotgun pleading even when it alleged 14 counts against 21 different individual and entity defendants, including claims asserting breach of fiduciary duty claims against corporate insiders).  Silberstein and Millhouse's motion to dismiss on this ground should be denied.

## IX.   ALL CLAIMS RELATED TO THE TENDER OFFER HAVE BEEN SUFFICIENTLY PLED (COUNTS 1-6)

### A.   Breach of Fiduciary Duty of Loyalty – Approving Tender Offer (Count 1)

"The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of transaction or receives a personal benefit not shared by all shareholders." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005) (finding board member breached fiduciary duty of loyalty by prioritizing their own interests over the company and its shareholders).  On "a motion to dismiss, the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or its

duty of care." *Seidman v. Clifton Sav. Bank, S.L.A.*, 14 A.3d 36, 54, (N.J. 2011).  Count 1

alleges that Silberstein and Cashman breached the fiduciary duties of loyalty they owed to

Thrasio by approving the 2020 Tender Offer, which provided no benefit to Thrasio, and, by

doing so, they put their own interests ahead of those of Thrasio.  (Compl. ¶¶ 134-36.)  The facts

alleged in the Complaint support the reasonable inference that by approving the Tender Offer,

Silberstein and Cashman breached their duties of loyalty to Thrasio.  Defendants' arguments to

the contrary are unavailing.

 *First*, Count 1 is not preempted by contract, as Defendant Silberstein asserts.  Defendant

Silberstein argues that, because the Series C-1 Stock Issuance was governed by a contract – and

because the Series C-1 Stock Issuance was allegedly an integrated agreement with the Tender

Offer – the Series C-1 Stock Purchase Agreement preempts any fiduciary duty he may have had

in approving the tender offer.  (Silberstein MTD at 22.)  But the cases on which Silberstein relies

are cases in which the plaintiffs had contracts with the company and the plaintiffs were arguing

that the company either violated the contract or exercised their rights under the contract in a

manner that harmed plaintiffs.  (*Id.* (citing cases).)  Here, the Trust is not arguing that it had a

contract with the Company that was breached.  Instead, it is arguing that Defendant Silberstein

breached his fiduciary duty of loyalty by approving a tender offer that benefitted himself while

knowing that the Company was insolvent and would be harmed by sending money out-the-door

to redeem stock.

 *Second*, the Complaint properly alleges self-dealing by Cashman and Silberstein who

stood on both sides of the Tender Offer and dictated its terms in a self-dealing manner.

(Silberstein MTD at 21.)  Silberstein and Cashman may not rely on the "entire Board" approving

the Tender Offer when they were the ones feeding the Board false information, which concealed

that the Company was insolvent and could not afford to engage in the Tender Offer.  (COR MTD at 20-22); (Compl. ¶¶ 13, 53, 78, 82, 87, 225.)  Defendant Cashman attempts to convince this Court that it should conduct a director-by-director analysis as to whether there were enough sufficiently informed, disinterested individuals.  (COR MTD at 20.)  But this defies logic when the very Defendants against whom this claim is asserted were the ones keeping the other directors in the dark.  Cashman's representation that his breach of fiduciary duties and his intentional conduct that placed Thrasio's business into a tailspin are considered "mere business risk" is wrong.  Contrary to Cashman's mischaracterization, his involvement with the Tender Offer was not made "with imperfect information and limited resources" that led to "judgment calls on the opportunity cost of acting now or waiting for more information."  (*Id.*)  Cashman was a co-chief executive officer who had information available to him that would have made clear Thrasio's true financial situation.  And what's more, the Complaint alleges that Cashman knowingly *chose* not to act in the best interest of Thrasio, because what was in the best interest of the Company was not in his own best financial interests.  (Compl. ¶¶ 59, 134.)

Cashman urges this Court to believe that he was a fiduciary dealing with "everyday business problems" and that he is not liable for "imperfect business decisions."  (COR MTD at 36.)  However, Silberstein and Cashman are liable because they were operating the Company contrary to "everyday business" and put the Company's interest second to their own.  As the 2021 AlixPartners "quality of earnings" report confirmed, Thrasio had fundamentally flawed information and could not determine the reasonableness of its inventory purchases.  (Compl. ¶ 56.)  Silberstein and Cashman knew this.  Silberstein and Cashman collectively received nearly 40% of the total amount of the Tender Offer Proceeds.  (*Id.* ¶ 61.)  Conversely, Thrasio as a company did not receive *any* value in return for the proceeds that it distributed, and it

immediately retired the shares that were tendered.  (*Id.* ¶ 62.)

**B.      Avoidance and Recovery of Tender Offer Proceeds as Constructive and Actual Fraudulent Transfers (Counts 2 and 3)**

Counts 2 and 3 of the Complaint are alleged against Defendants Silberstein, Cashman, Millhouse, Cashman Investment, Boockvar, Falcao, and Horowitz for constructive and actual fraudulent transfers and are properly pled with particularity.

As an initial matter, Defendant Silberstein (joined by Boockvar and Falcao) is incorrect that the fraudulent transfer claims are not particular enough because they do not specify which state fraudulent transfer laws apply to the claims.  (Silberstein MTD at 26; Falcao MTD at 10.) As discussed in detail above, this is not accurate.  Further, the Complaint meets the heightened standard of Rule 9(b) by pleading the who, what, when, how, and why.

Plaintiff specifies under Counts 2 and 3 that the Trust is entitled to recover any value thereof from the constructive or actual fraudulent transfers.  (Compl. ¶ 138-175.)

**Who:**  The Complaint specifies: Silberstein, Millhouse, Cashman, Cashman Investment, Horowitz, Hudson Palm, Boockvar, and Falcao.  (*Id.* ¶¶ 142, 158.)

**When:**  The Complaint traces the timing of the Tender Offer to in or about August 2020. (*Id.* ¶ 141.)  Thrasio was insolvent at the time of the Tender Offer or rendered insolvent by the Tender Offer.  (*Id.* ¶ 144.)  PwC in fact emphasized in its 2020 audit report (issued years later) that there was "substantial doubt" as to Thrasio's "ability to continue as a going concern."  (*Id.*)

**What and How:**  The Complaint specifies that Defendants Silberstein, Millhouse, Cashman, Cashman Investment, Horowitz, Hudson Palm, Boockvar, and Falcao were initial transferees of the Tender Offer Proceeds or the immediate or mediate transferees of initial transferees or persons for whose benefit these transfers were made.  (*Id.* ¶ 147.)  Further, Defendants Silberstein, Cashman, Boockvar, and Falcao were insiders of Thrasio.  (*Id.* ¶ 160.)

57

Thrasio did not receive anything in return for the transfers from the Tender Offer, because as a then-insolvent company Thrasio's shares are properly considered worthless.  (*Id.* ¶ 143.)

**<u>Why</u>:**  The why is clear.  All of the Defendants listed here were using their positions to personally profit, which they did in large sums as follows.  Silberstein, through Millhouse, received a transfer of $31,714,653.22 of the proceeds generated by the Tender Offer ("<u>Tender Offer Proceeds</u>") as a result of his participation in the Tender Offer.  (*Id.* ¶ 150.)  Cashman, through Cashman Investment, received a transfer of $25,500,407.99 of the Tender Offer Proceeds.  (*Id.* ¶ 151.)

On information and belief, Boockvar received one transfer of $236,815.31, a second transfer of $663,092.14, and a third transfer of $1,159,495.25, for a total of $2,424,545.92 of the Tender Offer Proceeds as a result of his participation in the Tender Offer.  (*Id.* ¶ 152.)  Falcao received one transfer of $602,937.53, a second transfer of $663,092.14, and a third transfer of $1,159,495.25, for a total of $2,425,524.92 as a result of the Tender Offer.  (*Id.*)  Horowitz used his insider position as former senior vice president, and personal friend of Cashman, to profit. Horowitz received a transfer of $1,720,273.53 of the Tender Offer Proceeds as a result of his participation in the Tender Offer.  (*Id.* ¶ 154.)  The Company's audited 2020 financial statements reflect an operating loss of approximately *$88.04 million*, a net loss of approximately *$148.71 million*, and an accumulated deficit of approximately *$302.95 million*.  (*Id.* ¶ 64.) Despite what Defendants state, there was no gain for Thrasio.

The Complaint also sufficiently alleges that Thrasio was insolvent at the time of the Tender Offer to state a claim for constructive fraudulent transfer.  The question at the motion to dismiss stage is not whether Thrasio actually received equivalent value in exchange for effecting the Tender Offer (Silberstein MTD at 27; Falcao MTD at 12), but whether the Complaint

reasonably and plausibly alleges that it did not.  Defendants confuse a pleaded allegation and a

provable fact.  Silberstein's attempt to *prove* that Thrasio received equivalent value does not

change the legal standard as to whether the Complaint pleads that it did not receive equivalent

value.  (Silberstein MTD at 27.)  Similarly, Silberstein may attest that Thrasio was *not* insolvent

at the time of the conveyance, but it is of no import.  (*Id.* at 28.)  The Complaint pleads that

Thrasio was insolvent at the time of the Tender Offer and recites facts from audited financial

statements, meeting the standard for particularity.

    To try and counter the Complaint' allegations of insolvency, Silberstein and Boockvar

claim that at the time of the Tender Offer "sophisticated and highly-experienced third-party

equity investors in the Series C-1 Stock Issuance" chose to invest in the Company after

completing due diligence.  (Boockvar MTD at ¶ 21.)  But, as described in detail in the Complaint

and herein, the D&O Defendants provided fraudulent information to those investors, concealed

information about the Company's true financial condition, and had unreliable and inaccurate

financial and operational records.  Thus, the fact that third parties invested is not adequate proof

of solvency, especially at the motion to dismiss stage.

    Moreover, because the Company immediately retired the shares it redeemed—and the

shares had no value in any event—the Company did not receive reasonably equivalent value in

the Tender Offer.  Defendant Boockvar argues that the Tender Offer should be viewed together

with the Company's Series C-1 capital raise to conclude that Thrasio received reasonably

equivalent value because more money was raised in the Series C-1 capital raise than was

expended in the tender offer.  (Boockvar MTD at ¶ 79.)  However, Defendant Boockvar does not

cite a single bankruptcy case that supports his proposition that the Trust is not permitted to

conduct a transaction-by-transaction analysis.  In fact, fraudulent transfer laws in general

requires "each transfer [to] be evaluated as a separate transaction." *See, e.g.*, *In re Maxus Energy Corp.*, 641 B.R. 467, 531 (Bankr. D. Del. 2022); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006).

While courts sometimes apply an equitable exception to the rule and collapse separate transactions into an integrated scheme for analyzing fraudulent transfer claims, the determination of whether that exception applies is highly "fact-intensive" and reserved for trial. *In re Maxus Energy Corp.*, 641 B.R. 467 at 534-35 (declining to rule on the applicability of the collapsing doctrine on summary judgment); *id.* (citing *In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013),(court decided to collapse certain transactions "[o]nly after finding . . . clear and convincing evidence" based on a thirty-four-day trial, tens of thousands of pages of documents and testimony from over fifty witnesses); *see also In re DSI Renal Holdings, LLC*, 574 B.R. 446, 470 (Bankr. D. Del. 2017) ("Deciding whether to collapse transactions is a fact-intensive exercise, and courts have been reluctant to solve collapsible transaction issues at the motion to dismiss stage.").  Accordingly, Defendant Boockvar's request for the Court to determine whether the Tender Offer and the Series C-1 Stock Issuance should be collapsed is premature.[4]

When performing the analysis for collapsing transactions, courts focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." *In re DSI Renal Holdings, LLC*, 574 B.R. at 467.  Here, the D&O Defendants used their positions of power to ensure that the Board would approve the transactions for their personal gain while simultaneously stripping valuable proceeds away from the Company.

---

[4] As but one example of why this is a fact issue inappropriate for resolution at the motion to dismiss stage, the Boockvar MTD wrongly claims that the Tender Offer and the Series C-1 Stock Issuance were approved in the same Unanimous Written Consent.  (Boockvar MTD at ¶ 79.)  The Unanimous Written Consent that Silberstein submitted as Exhibit 3 to the Domb Declaration shows that what was approved at the same time as the Tender Offer was an *amendment* to the Series C-1 Stock Issuance to increase the amount of shares sold.  (Domb Decl. at Ex. 3.)

Accordingly, they acted with inappropriate intent and should not be permitted to launder their bad acts (Tender Offer) by coupling them with "good" ones (Series C-1) to defraud the estate.

The same arguments hold true for pleading an actual fraudulent transfer. Defendant Boockvar argues that the Complaint only adequately pleads two badges of fraud (a transfer to an insider, and a transfer for less than reasonably equivalent value), which he claims is insufficient to plead an actual fraudulent transfer. (Boockvar MTD at ¶ 85; *see also* Silberstein MTD at 30.) But, contrary to his assertions (Boockvar MTD at ¶ 86), the Complaint has adequately pleaded a third badge of fraud in that the Company was insolvent. Further, in analogous circumstances courts have considered the concealment of the debtor's true financial condition or the existence of irregularities in records or false financial statements to be additional badges of fraud. *See Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, Adv. No. 21-51190, 2023 Bankr. LEXIS 1471 at \*7 (Bankr. D. Del. Apr. 18, 2023); *Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.*, 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007).

There is no litmus test of a minimum number of badges of fraud that must be pled. Rather, the question is whether all the facts and circumstances pleaded, including by pleading badges of fraud, are sufficient to give rise to an inference of actual fraudulent intent. Here, the facts and circumstances pleaded, including the three badges of fraud and the fact that the D&O Defendants provided false and misleading information to investors to convince them to invest money that they would turn around and pay to themselves in the Tender Offer, are more than adequate to state an actual fraudulent transfer at the pleading stage. Specifically, Defendants Silberstein and Cashman prepared or were actually aware of the Company's fraudulent financial records at the time the Tender Offer was approved by the Board. Thus, even if the majority of the Board was unaware of the fraud, the actual intent of the individuals that prepared the

fraudulent financials that the Board of Directors relied upon to approve the Tender Offer is

imputed to the Company.  *See In re Cyber Litig. Inc*., No. 20-12702 (CTG), 2023 WL 6938144

(Bankr. D. Del. Oct. 19, 2023) (holding that the fraudulent intent of a single board member

would be imputed to the debtor when the debtor's board was deceived by falsified financial

information in the approval of a tender offer).

In addition, Silberstein argues that the Complaint's allegations "fundamentally contradict

Plaintiff's previous representations to this Court."  (Silberstein MTD at 29.)  That is not accurate.

The "previous representations" Silberstein refers are statements from the Disinterested Directors

Report.  As discussed above, there is no contradiction between the Trust's claims and those

statements.  (*Supra*, § I.B.)

### C.      Conspiracy to Fraudulently Transfer Tender Offer Proceeds (Count 4)

Count 4 of the Complaint is alleged against Defendants Silberstein, Cashman, Boockvar,

Falcao, and Horowitz for conspiracy to fraudulently transfer the Tender Offer Proceeds.  It is

clear that the Defendants worked in concert to transfer money away from Thrasio and towards

each of them and their related entities.  (Compl. ¶ 117.)  Silberstein, Cashman, Horowitz,

Boockvar, and Falcao all had an agreement to participate in the Tender Offer and benefit

themselves at the expense of the Company where Silberstein and Cashman ensured that the

Board approved the Tender Offer and signed the consent approving the Tender Offer.  (*Id.*)

Defendant Falcao's assertion that the Court is unable to infer that he had reached an agreement

with the other Defendants is nonsensical.  (Falcao MTD at 14.)  As alleged, Falcao assisted with

organizing this transfer of the Tender Offer Proceeds and sought approval for the wire payments.

Horowitz, along with Silberstein, Cashman, Boockvar, and Falcao, agreed to and participated in

the Tender Offer despite knowing about the internal problems the Company had, including the

Company's financial troubles.  (Compl. ¶ 177.)

Conspiracy to commit fraudulent transfer is a cognizable claim, though Defendants argue

it is not.  (COR MTD at 48; Boockvar MTD at ¶¶ 89-91; Silberstein MTD at 32.)  The New

Jersey Supreme Court has recognized conspiracy to commit fraudulent transfer as a cause of

action.  *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 178 (2005) ("[A] creditor in New Jersey

may bring a [conspiracy to commit fraudulent transfer] claim against one who assists another in

executing a fraudulent transfer.").  Though bankruptcy courts may not explicitly recognize

conspiracy to commit fraudulent transfer claims as cognizable under the Bankruptcy Code,

bankruptcy courts have jurisdiction over related state-law claims.  *See In re Rescue Rangers,*

*LLC*, 576 B.R. 521 (Bankr. E.D. Va. 2017).  Conspiracy to commit fraudulent transfer claims

may also be considered "core" bankruptcy claims and can be heard by the bankruptcy court.  *See*

*In re Ramirez*, 413 B.R. 621 (Bankr. S.D. Tex. 2009).

### D.    Delaware General Corporation Law Violation (Count 5)

Count 5 of the Complaint is alleged against Defendants Silberstein and Cashman for their

violations of the Delaware General Corporation Law ("DGCL").  The Complaint unmistakenly

asserts that at the time of the Tender Offer, "the capital of the corporation [wa]s impaired" and

that the Tender Offer "would cause . . . impairment of the capital of the corporation."  8 Del. C.

§ 160(a)(1).  (Compl. ¶¶ 182, 184; Silberstein MTD at 33).   There is no merit to Silberstein's

argument that the Complaint fails to adequately allege capital impairment by focusing on the fact

that Thrasio's liabilities exceeded its assets.  (Silberstein MTD at 33-34).  Contrary to

Silberstein's claim that this is irrelevant, as a practical matter, courts have held that the surplus

requirement prohibits "distributions to stockholders that would render the company balance-

sheet insolvent."  *SV Inv. Partners, LLC v. ThoughtWorks, Inc*., 7 A.3d 973, 982 (Del. Ch. 2010).

That is because surplus is determined by looking at the value of net assets, which is determined

by the amount by which a company's assets exceed its liabilities.  A balance sheet insolvent

company has no net assets, and thus no surplus.

Nor should the Court credit Cashman's claim that he reasonably relied on present values

to approve the Tender Offer.  (COR MTD at 60.)  The Complaint alleges that Silberstein and

Cashman provided no analysis of the Company's surplus to the Board prior to approving the

Tender Offer and, in fact, knew that the Company was insolvent.  (Compl. ¶ 185).  Those

allegations must be accepted as true for purposes of a motion to dismiss, and Cashman's contrary

argument is quintessentially a fact question inappropriate for resolution on a motion to dismiss.

### E.    Unjust Enrichment (Count 6)

Count 6 of the Complaint is alleged against Defendants Silberstein, Millhouse, Cashman,

Cashman Investment, Boockvar, Falcao, and Horowitz for unjust enrichment.  Defendants

Millhouse, Silberstein and Falcao do not even attempt to argue why the Complaint does not

sufficiently allege unjust enrichment.  Instead, they assert baseless defenses to the claim.

(Silberstein MTD at 34-35; Falcao MTD at 15-16.)  Cashman and Horowitz declare that under

New Jersey law, a plaintiff may assert an unjust enrichment claim where it conferred a benefit on

a defendant pursuant to a "quasi-contractual relationship, for which it expected renumeration in

return."  (COR MTD at 56; Horowitz MTD at 28.)  Here, the Complaint asserts such unjust

enrichment and is not barred as an "independent tort cause of action."  Rather, the D&O

Defendants are not entitled to be shielded where they engaged in fraud and operated both Thrasio

and Yardline as shams to commit fraud.  *See State, Dept. of Envtl. Prot. v. Ventron Corp.*, 468

A.2d 150, 164-165 (Sup. Ct. N.J. 1983); *accord Richard A. Pulaski Constr. Co. v. Air Frame

Hangars, Inc.*, 950 A.2d 868,877-878 (Sup. Ct. N.J. 2008) (piercing corporate veil in cases of

fraud, injustice, or the like).

Further, Defendant Cashman is incorrect that the Complaint has not alleged that, through

the Tender Offer, he benefited at the expense of the Plaintiff.  (COR MTD at 56-57.)  Here, the

Complaint alleges that Cashman extracted millions of dollars from the Company when he sold

his worthless shares back to the Company in the Tender Offer, and that he did so while he *knew*

that his shares were worthless and that the Company was in financial and operational disarray.

(Compl. ¶¶ 59-64, 188, 191.)  By doing so, Cashman diverted value from the Company that

should have been available for its creditors.  (*Id.* ¶ 192.)

Defendant Horowitz attempts to claim that because he tendered shares of the Company's

stock, Plaintiff is unable to prove that Horowitz was unjustly enriched.  (Horowitz MTD at 29.)

However, where a complaint asserts claims related to transactions of shares of a then-insolvent

company, it may be assumed that these shares were worthless.  *See Aphton Corp. v. Sonafi*

*Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 93 (Bankr. D. Del. 2010) (denying motion to dismiss

for claim based on value of shares of allegedly insolvent company because it was "facially

plausible" such shares were worthless).

Defendant Boockvar asserts that the unjust enrichment claim cannot stand against *him*

because his "only" alleged participation was selling his shares to the Company in a transaction

that was unanimously approved by the Board.  (Boockvar MTD at ¶56.)  However, Boockvar

was unjustly enriched because he was well aware of the Company's dysfunctional financial and

inventory controls and used that knowledge to put money in his own pockets.  (Compl. ¶ 88.)

Further, neither the Tender Offer agreement, nor Boockvar's employment agreement, preclude

Plaintiff's unjust enrichment claim.

## X.     ALL CLAIMS RELATED TO BREACH OF FIDUCIARY DUTIES FOR LACK OF CONTROLS ARE SUFFICIENTLY ALLEGED (COUNT 7)

Count 7 of the Complaint asserts a breach of duty of oversight/loyalty claim based on the

Company's lack of internal controls related to its acquired and held—and unaccounted for—

inventory, against Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod.

Defendant Silberstein argues that Count 7 fails to allege a *Caremark* claim based on "inadequate accounting and inventory controls." (Silberstein MTD at 35.) The Silberstein MTD also argues that there were controls in place, no red flags, and no concerns about inaccuracies were raised. (*Id.* at 37-41.) The COR Defendants similarly state that Count 7 is insufficiently pled. (COR MTD at 37.) Specifically, the COR MTD asserts that "*Caremark* and its progeny require a plaintiff to allege either (a) that an officer or director consciously failed to make a good faith effort to establish information systems to ensure compliance, or (b) consciously ignored red flags of illegal activity." (*Id.* at 36-37.) Further, the COR MTD states the "Plaintiff's Complaint presents no allegations suggesting that Defendants showed an 'utter failure' to implement financial controls or a 'conscious disregard' to oversee such controls." (*Id.* at 37.)

These Defendants' characterizations of the Complaint are simply not true. The Complaint makes clear allegations reflecting that there were no proper controls in place at Thrasio and there was a myriad of red flags evident to the D&O Defendants. For example, on January 15, 2019, Silberstein emailed Cashman, expressing concerns that the business was making decisions "based on really bad info" and identifying serious internal control issues. (Compl. ¶ 46.) The Complaint also alleges that Thrasio did not have management controls and was relying on third-party platforms like Amazon and Shopify, to track inventory. (*Id.* ¶ 54.) Thrasio never put proper controls in place to determine how much inventory it controlled or was paying to store. (*Id.*) While Silberstein attempts to make excuses based on COVID for changing the predictably of the business model, these excuses only further support the allegation that Silberstein acted recklessly during a time when businesses were at their most vulnerable. At best, this is an issue of fact that the Court cannot decide at this stage.

Defendant Falcao argues that Plaintiff must allege that he owed a duty of oversight that he breached. (Falcao MTD at 18.) The Complaint does exactly that. (Compl. ¶¶ 160, 189, 202.) Defendant Falcao alleges that corporate directors, not corporate *officers*, owe a duty of oversight necessary to support a *Caremark* claim. (*Id.*) Under Delaware law, corporate officers have oversight obligations as they are optimally positioned to identify red flags and either address them or report upward to more senior officers or to the Board. *See, e.g.*, *In re Think3, Inc.*, 529 B.R. 147, 180 (Bankr. W.D. Tex., 2015) (stating under Delaware law, corporate officers owe the same fiduciary duties of care and loyalty as directors to a corporation). Here, Falcao was responsible for managing Thrasio's finances and financial systems which is directly tied to the duty to establish monitoring systems and checking for illegal activity. In November and December 2020, Falcao even affirmatively identified issues with the Company's accounting practices and that information was withheld from Thrasio's investors. (Compl. ¶ 52.)[5] This information was also communicated to Defendant Boockvar on March 3, 2021. (*Id.* ¶ 88.)

Falcao further argues that the allegations rely on impermissible group pleadings and fail to provide adequate notice with respect to Count 7. As explained herein, the Complaint is not an impermissible group pleading just because many of the facts overlap—in fact, the D&O Defendants acted in concert, intertwining their actions and culpability. In any event, the Complaint does contain allegations specific to Falcao and his culpable dereliction of his duties. Along with alleging that he "knew about the inventory control problems and did not have confidence in Thrasio's internal control environments" (*id.* ¶ 202), the Complaint alleges that

---

[5] *See also Corporate Governance and the Sarbanes–Oxley Act: The Sarbanes–Oxley Act and Fiduciary Duties,* 30 Wm. Mitchell L. Rev. 1149, 1205–06 (2004) ("Although often overlooked, corporate officers, including senior officers such as the . . . General Counsel, Executive Vice Presidents, . . . and others are 'agents' of the corporation. Agency is a fiduciary relationship. Even though senior officers of corporations typically have employment agreements, they still occupy a fiduciary status in relation to the corporate principal.").

Falcao—as CFO, SVP of Finance, and Treasurer at various applicable times—had knowledge of and oversight responsibility for Thrasio's accounting and other financial systems. (*Id.* ¶ 33.) And these very systems were found to be fundamentally flawed and led to Thrasio being unable to determine the reasonableness of inventory purchases, including failures to timely record inventory transactions. (*Id.* ¶ 56.)

Boockvar's arguments regarding Count 7 are similarly without merit. (Boockvar MTD at ¶¶ 50-53.) Plaintiff unquestionably alleges in the Complaint that Boockvar acted in bad faith in direct breach of his fiduciary duties. Boockvar alleges that because Plaintiff does not specify what Boockvar's role was with respect to inventory controls, it has not properly pled its claim. But Boockvar inappropriately attempts to hold the Trust to a heightened standard to plead a breach of fiduciary duty. It is premature for Boockvar to move to dismiss on the basis that Plaintiff has failed to demonstrate a breach of fiduciary duty without having the benefit of discovery. Through discovery, Plaintiff will be able to provide more specificity as to Boockvar's responses (or lack thereof) to inventory controls issues.

*In re Am. Int'l Grp., Inc.* illustrates how Rule 12(b)(6)'s lenient pleading standard eases this Court's scrutiny of a *Caremark* claim at the motion to dismiss stage. *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 782 (Del. Ch., 2009). "Given the pervasiveness of the fraud" during the relevant time period, "even the transactions that cannot be tied to specific defendants support the inference that" the Defendants were involved in illegal conduct. *Id.* Plaintiff has undoubtedly met its burden under Rule 12(b)(6). Further, the Complaint offers plausible allegations showing that Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod were well-aware of the Company's dysfunctional financial and inventory controls. (Compl. ¶¶ 88, 89, 200-205.)

The facts here are distinguishable from *Cent. Laborers' Pension Fund v. Dimon*, No.

14-cv-1041, 2014 WL 3639185 (S.D.N.Y. July 23, 2014), *aff'd*, 638 F. App'x 34 (2d Cir. 2016),

where the Second Circuit found that the plaintiffs had not pled facts to show bad faith based on

omission.  Conversely, there is no omission allegation here—except Defendants' material

omissions to the Board.  The Complaint alleges that the D&O Defendants had actual knowledge

of the inaccurate financial reports and intentionally misled the Board with that information.  The

Defendants' decisions were not mere omissions.

As already explained (*supra*, § X), Plaintiff can and has demonstrated a *Caremark* claim.

A sustained or systematic failure under *Caremark* can be either an utter failure to implement

reporting or information controls, or a conscious failure to monitor, "thus disabling [the

fiduciaries] from being informed of risks or problems requiring their attention."  *In re Direct

Response*, 466 B.R. 626, 651 (Bankr. D. Del. 2012).  The same circumstances apply here where

Defendants plainly failed to implement reporting or information controls.  Defendants cannot

absolve themselves of responsibility for monitoring a business that they run and possess all

relevant information about, and then argue that they acted in compliance with their fiduciary

duties.  The lack of monitoring reports and the failure to report information on the *accurate*

financial health (or disease) of the company directly demonstrate that the Complaint has pled

sufficient facts for a plausible claim that the Defendants violated their fiduciary duties and

should survive the Motions to Dismiss.

In *In re Think3, Inc.*, the director defendants failed to consult experts as to how the board

should handle massive tax liability, and the court found that the complaint sufficiently alleged

the board had manipulated the financial statements to improve its operations.  529 B.R. at 180.

The Court should similarly find here that the Complaint adequately alleges that the D&O

Defendants hid behind the lack of a general ledger and nonstandard accounting practices to

commit fraud and intentionally mislead the Board.  S*ee Rich v. Yu Kwai Chong*, 66 A.3d 963,

982–84 (Del. Ch. 2013) (finding that plaintiffs sufficiently alleged a *Caremark* claim, in part,

because of the directors' "woefully inadequate" recordkeeping system).

### XI.    ALL CLAIMS RELATED TO WASTE OF CORPORATE ASSETS IN CONNECTION WITH INVENTORY ARE SUFFICIENTLY ALLEGED (COUNT 8)

Count 8 asserts a claim of waste of corporate assets against Defendants Silberstein,

Cashman, Boockvar, Falcao, Ouhadi, and Rathod.  This claim is based on the purchase of over

$800 million in *excess* inventory and is connected to the breach of duty of oversight/loyalty in

lacking internal inventory controls.  Although they recognized the weak inventory control

environment in as early as March 2019 and becameaware of additional acute issues in 2020 and

2021 with respect to inventory transfers, warehousing and Amazon order fulfillment, the D&O

Defendants turned a blind eye to these deficiencies.  (Compl. ¶¶ 54-56.)  Instead, because of the

Company's complete lack of ability to track their inventory levels, the D&O Defendants

squandered corporate assets by causing Thrasio to continuously over-purchase massive amounts

of inventory.  (Compl. ¶¶ 58, 213.)

Silberstein argues that the standard for pleading corporate waste is satisfied only where a

plaintiff can show that the transaction was so one sided that no business person of ordinary,

sound judgment could conclude that the corporation has received adequate consideration.

(Silberstein MTD at 42; Boockvar MTD ¶ 52.)  The COR Defendants similarly argue that

Plaintiff has not alleged that they took accounting or inventory actions without "any rational

business purpose."  (COR MTD at 58.)  But it is abundantly clear that no business person of

ordinary, sound judgement would conclude that the paying for more $800 million in inventory,

without also considering for how such inventory may be sold or deposed of without causing

further damage to the Company, would generate adequate consideration for the Company.

Knowing that there was no legitimate business purpose for purchasing the excess inventory and that no rational business person would act in this way, Defendants Boockvar and Falcao, despite their management positions, attempt to remove themselves from the decision-making process altogether to avoid culpability.  Boockvar argues that the Complaint fails to allege whether *he* was involved in the decision to purchase any inventory in a particular transaction.  (Boockvar MTD ¶ 53.)  But the Complaint alleges that Boockvar, as President of Thrasio, was "responsible for overseeing all aspects of Thrasio's operations . . . including inventory functions."  (Compl. ¶ 32.)  It is thus reasonable to infer that he was involved in decisions related to inventory purchases.  Any suggestion from Boockvar that the President of Thrasio would not be familiar with the spending decision of over $800 million in corporate funds only goes to show that the transaction was a result of gross negligence and would not have occurred if Thrasio's management were exercising sound judgment.

Falcao, on the other hand, was responsible for managing Thrasio's finances and financial systems and, as alleged in the Complaint, was sufficiently aware of the dysfunction at the Company related to inventory management (which would include purchases).  (*Id.* ¶¶ 33, 88.)  In fact, the Complaint makes a pointed allegation that, on at least one instance in 2021, Falcao had informed Boockvar (and thereby making Boockvar also aware) of his concerns with respect to the Company's lack of a number of controls.  (*Id.* ¶ 88.)  Falcao also wrongly asserts that "as a non-director, Mr. Falcao had no ability to control the assets of the corporation; and (2) there are no individual allegations."  (Falcao MTD at 19.)  The Complaint makes multiple assertions that Falcao was specifically responsible for managing Thrasio's finances and financial systems as the chief *financial* officer.  (Compl. ¶¶ 33, 44, 52, 68, 216, 228.)  Further, as stated above, as an officer, Falcao was better positioned *than any other officer or director* to catch the problems with

71

any inventory and accounting controls in the process of acquiring information to make business

decisions of the type ordinarily made by chief financial officers.  In fact, Thrasio's stakeholders

were reliant on Falcao to accurately compile and report inventory and financial information.

At the motion to dismiss stage, there are two ways for a corporate waste claim to survive:

(1) the complaint alleges facts showing that the entity received no consideration, or (2) the

complaint alleges that a transfer of corporate assets served no corporate purpose.  *See In re*

*Direct Response*, 466 B.R. at 657.  Here, the Complaint satisfies both.  Similar to the allegations

in *In re World Health Alts., Inc.*, the Complaint asserts that Defendants "knew or should have

known" of the corporate waste and took no action to prevent such conduct.  385 B.R. 576, 593

(Bankr. D. Del. 2008).  As explained in *In re World Health Alts., Inc.*:

> [t]he Delaware Supreme Court held: "[W]aste entails an
> exchange of corporate assets for consideration so
> disproportionately small as to lie beyond the range at which
> any reasonable person might be willing to trade." *Brehm v.
> Eisner*, 746 A.2d 244, 263 (Del.2000).   At this phase,
> however, "[t]he doctrine of waste ... allows a plaintiff to pass
> go at the complaint stage even when the motivations for a
> transaction are unclear by pointing to economic terms so
> one-sided as to create an inference that no person acting in a
> good faith pursuit of the corporation's interests could have
> approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670
> (Del. Ch. 2007); *Harbor Fin. Partners v. Huizenga*, 751
> A.2d 879, 893 (Del. Ch. 1999).

*Id.*

The D&O Defendants had no valid—or even *any*—business reason to purchase the

amount of excess inventory that they did, which ultimately led to the substantial loss of profits

and sale revenues.  *See In re TEU Holdings, Inc.*, 287 B.R. 26 (Bankr. D. Del. 2002).  The

Complaint here is thus distinguishable from *Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d

38, 44 (D. Del. 2021).  There, the court held that the transaction was only retroactively ill-

72

advised.  Here, there was no legitimate business reason to continue buying inventory at a time of both financial uncertainty and lack of proper controls.  The gist of Defendants' argument seems to be they were ignorant about whether Thrasio would or would not need the inventory, so there can be no claim of waste.  But the (reckless) purchase of inventory without any knowledge as to whether that inventory was needed, or indeed, could *ever be sold*, does not excuse a claim for waste when such inventory is confirmed to be worthless.

At this stage of the litigation, even if the motivations are unclear (though the Trust submits the inventory purchases were a clear attempt to inflate asset values) the Complaint has alleged an extreme and unnecessary over-purchase of inventory that resulted in severe losses. The purchase of inventory far exceeding any possible demand was at best reckless and had no business justification.

## XII.    ALL CLAIMS RELATED TO THE SECONDARY SALES ARE SUFFICIENTLY ALLEGED (COUNTS 9-11)

### A.    Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod Breached Their Fiduciary Duties (Counts 9 and 10)

Count 9 of the Complaint alleges the Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod breached their fiduciary duties to Thrasio by acting in bad faith, failing to act in the best interest of the Company, failing to subordinate their personal interests to the interests of the Company, and engaging in self-dealing.  (Compl. ¶ 218.)  Silberstein argues that Count 9 fails to plead that he usurped corporate opportunities (Silberstein MTD at 45-48), while the Complaint details instances where the Company was directly harmed by the Secondary Sales of insider stock in 2020 and 2021.  In 2020, Silberstein and Cashman sold their stock to potential investors of Thrasio against the interest of the Company.  (Compl. ¶ 219.)  Those Thrasio investors bought Defendants' insider stock rather than increase their purchase of the Company's Series C stock.  (*Id.* ¶¶ 59, 65, 133.)

73

In 2021, Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod again directly solicited and sold their stock to potential investors of Thrasio, against the interest of the Company.  (*Id.* ¶ 65.)  Potential Company investors bought insider shares as part of the Secondary Sales rather than increase their purchase of the Company's Series D stock.  (*Id.* ¶ 220.)  These allegations are sufficient to state a breach of fiduciary duty claim for usurping a corporate opportunity.  *See DelphX Corp. v. Fondren*, 600 F. Supp. 3d 540, 549 (E.D. Pa. 2022) (denying motion to dismiss for breach of fiduciary duty usurpation of corporate opportunity claim where former chief executive officer engaged in securities transactions for his own benefit at the expense of the corporation's opportunity).

Silberstein and Boockvar further assert that Plaintiff failed to state a claim under Delaware law by not alleging a specific corporate opportunity and by failing to satisfy the corporate opportunity doctrine.  (Silberstein MTD at 45-47; Boockvar MTD ¶¶ 60-64.)

Boockvar also attempts to re-frame the usurpation claim to focus only on the value of the shares he sold.  Unsurprisingly, after his self-serving narrowing of the allegations related to this claim, Boockvar asserts that it makes "no sense."  (Boockvar MTD at ¶ 60.)  But Silberstein and Boockvar are mistaken, and in fact, Boockvar admits that he sold approximately $6 million worth of insider shares.  (*Id.*)  While the Company pursued its Series C and Series D equity fundraising rounds, potential Company investors ended up purchasing individual Defendants' stock over those of the Company—after Defendants engaged in various "horse and pony" shows to entice investors to purchase secondary shares.  For example, Defendants sought, for certain investors, to make it a precondition to their participation in the Series D that they first purchase Defendants' shares in the Secondary Sales.

Further, Silberstein and Boockvar are also wrong that because Thrasio was not in the

business of "selling stock" Plaintiff has failed to state a claim for usurping a corporate

opportunity. For this proposition they rely on the inapposite *Beam ex rel. Martha Stewart Living*

*Omnimedia, Inc. v. Stewart*, 833 A. 2d 961 (Del. Ch. 2003) that does not stand for such a broad

proposition. The *Beam* court held that no corporate opportunity had been usurped when the

plaintiff did not "allege any facts that would imply that [the company] was in need of additional

capital, seeking additional capital, or even remotely interested in finding new investors." *Id.* at

973. Further, the company in *Beam* was publicly traded and there was a "readily available liquid

market" for the company to tap into if it had wished to raise capital. *Id.* Accordingly, the court

did not find any connection between the stock sales that were challenged and the nature of the

company. Here, however, the Complaint does allege that the Company was seeking new capital

contemporaneous with the challenged Secondary Sales. (Compl. ¶¶ 219-23.) In fact, in order to

facilitate diligence for the Secondary Sales, Defendants Silberstein and Cashman had investors

access the same data room that the Company had already set up for the SPAC and Series D

investors. (*Id.* ¶ 73.)

Nor is Falcao correct that *Broz v. Cellular Info. Sys. Inc.* 673 A.2d 148, 154-55 (Del.

1996) means Count 9 must be dismissed as alleged against him. (Falcao MTD at 21.) Falcao

ignores that *Broz* was an appeal taken *after trial*, meaning after facts had been established by the

court, and it was procedurally proper for the court to make factual determinations. He further

ignores the repeated warnings from the *Broz* court of the *fact intensive* nature of a claim for

usurping a corporate opportunity, including the *Broz* court's caution that "hard and fast rules are

not easily crafted to deal with such an array for complex situations." *Id.* at 155. Yet that is

exactly what Falcao says the Court should do here: create a "hard and fast" rule that because the

Board approved the Secondary Sales (even where the Complaint alleges the Board had been

75

misled by, among others, Falcao himself) this count should be dismissed.  To the contrary,

Plaintiff has adequately alleged a claim of breach of fiduciary duties and Defendants' arguments

are a misplaced attempt to evade the claims set forth in Count 9.

Count 10 alleges that in 2021 at the time of the Secondary Sales, Silberstein, Cashman,

Boockvar, Falcao, Ouhadi, and Rathod, by virtue of their respective insider positions, each had

access to—and in fact possessed—material *adverse* confidential information regarding Thrasio.

(Compl. ¶ 230; Falcao MTD at 21-22.)  This confidential information was not known to the

lenders, investors, and other stakeholders of Thrasio, including information that Thrasio lacked

proper internal accounting and inventory controls, that Thrasio's financing reporting had been

inaccurate for years, and that the financial information being provided to potential investors in

connection with the Secondary Sales and the Company's contemporaneous capital raising was

false and misleading.  (Compl. ¶ 230.)

According to Silberstein, Count 10 fails because it does not allege insider trading.  He

bases his argument on the fact that the Board consented to the Secondary Sale and that

Silberstein's original claims to investors were based on the projected EBITDA.  (Silberstein

MTD at 49-52.)  Boockvar and Falcao also argue that the Complaint does not state a claim for

misuse of confidential information.  (Falcao MTD at 21-22; Boockvar MTD ¶ 66.)  But Count 10

is not one for "insider trading."  It is a claim for breach of fiduciary duty claim based on misuse

of confidential corporate information.  (Compl. ¶¶ 227-32.)  Accordingly, all the Trust is

required to allege was that a fiduciary duty existed (which is not in dispute) and that it was

breached.  *See Heartland Payment Sys.*, *LLC v. Carr*, No. 3:18-cv-9764, 2020 WL 13836621, at

*7 (D.N.J. Jan. 27, 2020).

The Complaint satisfies this requirement by alleging that the COR Defendants, and

76

Defendants Boockvar, Falcao and Silberstein—who as corporate officers were "not permitted to use their position of trust and confidence to further their private interests,"—nevertheless did so by relying on confidential corporate information to pursue the Secondary Sales and unjustly enrich themselves. (Compl. ¶¶ 231); *Heartland Payment Sys.*, 2020 WL 13836621, at *7 (denying motion to dismiss claim for misuse of confidential corporate information because complaint sufficiently alleged corporate executive relied on confidential information for his own benefit).

Based on the allegations in the Complaint, Plaintiff has adequately alleged Count 10 asserting a claim of breach of fiduciary duties as to each of Defendants Silberstein, Cashman, Boockvar, Falcao, Ouhadi, and Rathod.

### B.   Defendants Boockvar, Falcao, Ouhadi, and Rathod Aided and Abetted Cashman and Silberstein's Breaches of Fiduciary Duty (Count 11)

Count 11 to the Complaint alleges that Ouhadi, Rathod, Boockvar, and Falcao, all knew of and actively assisted with the breaches of duty by Cashman and Silberstein and each other by, among other things:  failing to implement internal controls, failing to address red flags, personally profiting from transfers of value from the Company, usurping the Company's corporate opportunities, and/or causing hundreds of millions of dollars in Company losses through over-purchasing inventory. (Compl. ¶ 236.)

Defendants Ouhadi and Rathod argue that Plaintiff has failed to sufficiently allege that Ouhadi and Rathod knowingly participated in the primary, underlying breach of fiduciary duty. (COR MTD at 40.)  Defendants Boockvar and Falcao similarly argue that this count has not been sufficiently alleged against them. (Boockvar MTD at ¶ 68; Falcao MTD 23.)  On the contrary, the Complaint sufficiently alleges facts that would allow the Court to reasonably infer that Ouhadi, Rathod, Boockvar, and Falcao all acted with the knowledge that the conduct they were

assisting others with was itself a breach of fiduciary duty.

For example, the Complaint alleges Defendant Ouhadi was at all relevant times "responsible for all aspects of Thrasio's supply chain and operations" and was tasked with developing "policies and procedures regarding Thrasio's supply chain and inventory systems." (Compl. ¶ 34.)  The Complaint also alleges that Thrasio utterly lacked any inventory controls and that the failure to implement proper policies and procedures (*i.e.*, for Ouhadi to have satisfactorily performed his job) led to Thrasio over-purchasing inventory and contributed to its financial reporting weaknesses.  (*Id*. at ¶¶ 54-58.)  On the basis of his role in the Company, and his access to information about its condition, the Court can reasonably infer that Ouhadi had actual or constructive knowledge of this information.  The Court can also infer that Ouhadi knew that such information had not been adequately disclosed at the time of the Secondary Sales in order to induce purchasers to participate in the Secondary Sales and purchase shares owed by insiders like himself, Cashman, and Silberstein, rather than purchase shares from the Company itself.  (*Id.* ¶ 236.)  Finally, the Court can reasonably infer that Defendant Ouhadi assisted effectuating the underlying breach by keeping hidden information regarding Thrasio's true condition and lack of inventory controls from the Board so that it would approve the Secondary Sales that benefited him and other insiders.

Similarly, the Court can reasonably infer that Rathod, as vice president of strategic planning & analysis, had actual or constructive knowledge of the underlying breaches of fiduciary duties related to the Secondary Sales, including those by Defendant Silberstein. Rathod is alleged to have assisted by, among other things, furnishing misleading financial information to potential investors.  (Compl. ¶ 84.)  Rathod is also alleged, on the day before the Secondary Sales were approved, to have *admitted to Falcao* that false information had been

reported to an investor.  (*Id.* ¶ 89.)  The Court can reasonably infer that Rathod knew that

providing false information to investors to purchase the Secondary Shares from himself and

other insiders rather than the Company was wrongful and that, even with this knowledge, Rathod

still went forward and participated in the Secondary Sales.

     As to Boockvar, the Complaint alleges he was the President of Thrasio at all relevant

times and was responsible for overseeing its operations—including its finance and inventory

functions—and also directly communicated with the Board when their approval was required,

such as for the Secondary Sales.  (Compl. ¶ 32.)  Boockvar is alleged to have been on notice of

the Company's dysfunctional financial and inventory controls *since* March 3, 2021.  (*Id.* ¶ 88.)

Despite being in a position of authority at the Company (junior only to Cashman and

Silberstein), Boockvar did nothing to rectify these issues nor to inform the Board or investors of

the Company's true condition.  On the basis of these allegations, the Court can reasonably infer

that Boockvar knew that Silberstein and Cashman were misleading potential investors in the

Secondary Sales to induce them to buy shares from insiders rather than directly from the

Company, in violation of the duties they owed to the Company.  The Court can further

reasonably infer that Boockvar assisted in perpetuating this scheme by asking the Board to

approve the Secondary Sales and also by going forward with the sale of his own shares in the

Secondary Sales.

     Defendant Falcao, in turn, was deeply entrenched in the financial functions of the

Company at all relevant times.  (*Id.* ¶ 33.)  And he was informed by Rathod the day the before

the Secondary Sales were approved in 2021 that buyers had been induced to participate in them

on the basis of *false information*.  (*Id.* ¶ 89.)  From these allegations and others, the Court can

reasonably infer that Falcao knew of the underlying breaches related to the Secondary Sales and

that he also participated by, among other things, withholding information from investors and selling his own shares.  (*Id.* ¶¶ 89, 236.)

*Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) on which Rathod, Ouhadi, and Boockvar rely is distinguishable and does not support their argument here.  In *Malpiede* the alleged aider and abettor was a third-party bidder involved in a potential merger.  Here, in contrast, the alleged aiders and abettors—Ouhadi and Rathod and Boockvar and Falcao—are officers who are alleged to have assisted other officers of the same company to breach their fiduciary duties.  That is sufficient to state an aiding and abetting claim against them.  *See RBC Cap.l Mkts., LLC v. Jervis*, 129 A.3d 816, at 862-63 (Del. 2015) (finding third party financial advisory firm liable for aiding and abetting breach of fiduciary duty when firm "induced the breach by exploiting its own conflicted interests to the detriment of [the company] and by creating an informational vacuum").

At the pleading stage, the Trust has alleged sufficient facts to state claims against Rathod, Ouhadi, Boockvar, and Falcao for aiding and abetting breach of fiduciary duty related to the Secondary Sales.  Their motions to dismiss on this basis should be denied.  *See Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Case No. 11-10776, Adv. No. 13-51215, 2014 WL 1320145, at *7 (Bankr. D. Del. Apr. 2, 2014).

Defendants Falcao and Boockvar assert that they could not have aided and abetted as a fiduciary, themselves.  (Falcao MTD at 23; Boockvar MTD ¶ 67.)  Falcao relies on *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 47 (Bankr. D. Del. 2011), which dismissed an aiding and abetting count against a director defendant *only after* the court determined that the primary breach of fiduciary duty count could proceed against the same director defendant.  Here, the Court has not made such a determination so this argument from Falcao is premature.  *Gilbert v.*

80

*El Paso Co.* 490 A.2d 1050, 1057 (Del. Ch. 1984) did not hold that aiding and abetting claims

against a direct fiduciary are barred in all respects and the quotation Boockvar relies on is mere

*dicta* and not a disputed issue.  The Trust respectfully submits that because *In re Draw Another*

*Circle* 602 B.R. 878, 905 (Bankr. D. Del. 2019) relied on that dicta for its own conclusion

(which Boockvar likewise relies on), it should not be followed here.

Falcao further argues that Count 10 suffers from group pleading, but as described herein,

that argument similarly fails.  (Falcao MTD at 23).  (*Supra*, § VII.)

Plaintiff has met the standard to adequately pled aiding and abetting the breach of

fiduciary duty.

### XIII.   THE TRUST HAS SUFFICIENTLY ALLEGED ALL CLAIMS RELATED TO THE CASHMAN AND SILBERSTEIN RELEASES (COUNTS 12-16)

Plaintiff has asserted several claims against Defendants related to the Silberstein

Separation Agreement and the Cashman Separation Agreement (Counts 12-16).  All of these

counts are alleged sufficiently and Defendants' motions to dismiss them should be denied.

### A.   Breach of Fiduciary Duty for Approving the Silberstein Release Has Been Adequately Pled as to Cashman (Count 12)

In Delaware, "[a] claim for breach of fiduciary duty requires proof of two elements:

(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Palmer v. Reali*,

211 F. Supp. 3d 655, 666 (D. Del. 2016) (citing *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del.

Ch. 2010)).  Both officers and directors owe fiduciary duties.  *Id.*  ("In Delaware, corporate

officers, like directors, owe fiduciary duties of care and loyalty, and the fiduciary duties of

officers are the same as those of directors").  "The duty of care is the duty to act on an informed

basis." *Miller*, 598 B.R. at 163.  The duty of loyalty requires a director or officer act in the best

interest of a corporation.  *See Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) ("The

duty of loyalty mandates that the best interest of the corporation and its shareholders takes

precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

Directors and officers owe creditors a special fiduciary duty to maximize value for creditors once a corporation is insolvent.  *See Off. Comm. of Unsecured Creditors of High Strength Steel, Inc. ex rel. Est. of High Strength Steel, Inc. v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 569 (Bankr. D. Del. 2001) ("Under Delaware law, once a corporation becomes insolvent, its officers and directors owe unsecured creditors a fiduciary duty.").  "That fiduciary duty [to creditors] requires that the controlling shareholder(s) and director(s) of the debtor maximize the value of the assets for payment of unsecured creditors."  *Id.*

To sufficiently plead a claim for breach of the duty of loyalty, the Trust need only allege "facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."  *Miller*, 598 B.R. at 163 (citing *Joyce v. Cuccia*, No. 14953, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997)).  Gross negligence is the standard for a director's breach of the duty of care.  *See Id.*

Plaintiff has adequately alleged that Defendant Cashman breached his duties of care and loyalty when he approved the Silberstein Separation Agreement.  Thrasio was insolvent prior to and when the Silberstein Separation Agreement was signed on September 25, 2021, because the fair value of the Debtors' liabilities exceed the amount of assets.  (Compl. ¶¶ 84, 250; *see also id.* ¶¶ 238-45 (Thrasio's audited financial statements from 2020 and 2021 express "substantial doubt" about Thrasio's ability to continue).)  When he approved the Silberstein Separation Agreement, Cashman approved the release of valuable claims against Silberstein but did so in a manner that failed to maximize value for creditors, and also allowed for claims worth hundreds of millions of dollars to be released.

82

Cashman further breached his duty of loyalty because he approved the Silberstein

Separation Agreement in a self-interested manner.  (Compl. ¶¶ 238-45.)  Cashman failed to

disclose bad acts jointly committed with Silberstein to the Board or other stakeholders of the

Company, such as misleading potential investors and Thrasio's Board about the state of the

Debtors financial and inventory controls, and misleading investors by pitching the Secondary

Sales in the summer of 2021 with false information.

Cashman does not argue that the Complaint's factual allegations are insufficient to state a

claim for breach of fiduciary duty for approving the Silberstein Separation Agreement.  Rather,

he relies on some combination of arguments related to the Cashman Separation Agreement,

judicial estoppel, and the business judgment rule to assert that this claim is legally deficient.

(COR MTD at 27-33.)  As discussed above, none of these arguments have any merit.  (*Supra*, §§

I, IV, V.)  Outside of these theories, Cashman has not supported his argument that the Trust

failed to sufficiently allege a breach of fiduciary duty claim related to Cashman's approval of

Silberstein's release agreement.  Thus, the Court should accordingly deny Cashman's motion to

dismiss for failure to state a claim as to this count.

### B.    Constructive Fraudulent Transfer Claims Have Been Adequately Alleged for the Silberstein and Cashman Separation Agreements (Counts 13 and 15)

"[A] transfer made by a debtor is constructively fraudulent as to a creditor whose claim

arose before the transfer was made, if the debtor made the transfer without receiving 'reasonably

equivalent value' in exchange for the transfer and the debtor was insolvent at that time or became

insolvent as a result of the transfer." *Motorworld, Inc. v. Benkendorf*, 156 A.3d 1061, 1064 (N.J.

2017) (citing N.J.S.A. 25:2-27(a)).  To constitute "reasonably equivalent value" for purposes of

the UFTA, the "value" must be received by and for the benefit of the debtor-transferor, not for

the benefit of a different person or entity.  *Id.*  For constructive fraudulent transfers claims, New

Jersey and Delaware law are generally aligned.  *Id.*; *cf. Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 567 (Bankr. D. Del. 2012) (holding New Jersey and Delaware constructive fraudulent transfer claim elements as near identical, "[i]t is undisputed that the Delaware and New Jersey Fraudulent Transfer Acts track section 548 of the Bankruptcy Code (or vice versa).").  Here, Plaintiff has adequately pled constructive fraudulent transfer as to the Silberstein Separation Agreement and Cashman Separation Agreement.

*First*, the Complaint alleges the Company was insolvent at the time of both the Silberstein Separation Agreement and Cashman Separation Agreement.  (Compl. ¶¶ 84-85, 250.) Further, Plaintiff consistently pleads a theory of insolvency: "the total fair value of Thrasio's liabilities exceeded the total amount of Thrasio's assets."  (*See, e.g.*, *id*. ¶¶ 250, 260, 270, 280.) Cashman's and Silberstein's arguments that these allegations are not sufficient are without merit and the case law they rely on does not support their arguments here.  The *In re F-Squared Inv. Mgmt., LLC*, court found that insolvency had not been sufficiently alleged when the plaintiff sought to incorporate by reference an *entire* first day declaration into a complaint, resulting in absurd contradictions.  Case No. 15-11469, Adv. No. 17-50716, 2019 WL 4261168, at *11 (Bankr. D. Del. Sept. 6, 2019).  It does not stand for the general proposition that allegations of insolvency, like those made by Plaintiff here, are not sufficient to withstand a motion to dismiss.

Nor is *In re Innovation Fuels, Inc.*, on which Defendants rely, applicable here.  (COR MTD at 51, n.218.)  There, the plaintiff failed "to identify the alleged transfers or transactions" and had difficulty showing insolvency because the defendants were able to point to loan documents that directly contradicted the allegations of insolvency.  *In re Innovation Fuels, Inc.*, Case No. 11-12911, Adv. No. 13-01009, 2013 WL 3835827, at *13 (Bankr. D.N.J. July 22, 2013).  Here, no documents showing *solvency* have been offered by Defendants.  Further,

84

Plaintiff, contrary to Cashman's assertions, has consistently alleged insolvency at the time of the

transfers.  In fact, the audited financial statements that Defendant Cashman points to *support*

insolvency.  (COR MTD at 61.)  PwC, the independent auditor, determined there was

"substantial doubt" about the Company's ability to "continue as a going concern," as is alleged

in the Complaint.  (*See, e.g.*, Compl. ¶¶ 250, 260, 270, 280.)

*Second*, the Complaint adequately alleges that the Company did not receive "reasonably

equivalent value" for the transfer.  The fair market value of the claims against Silberstein would

at minimum be for $183,700,919, and for Cashman $65,869,719, *i.e.*, the amount each earned

from the Secondary Sales.  (Compl. ¶ 79.)  The Company did not receive anything of equivalent

value in releasing such high-value claims.  (*Id.* ¶¶ 249, 269.)  To argue otherwise, Silberstein

incorrectly relies on *Shabbouei v. Potedevin* for the proposition that "a company received

substantial 'value' in exchange for entering into separation agreement where it obtained release

of claims and non-solicitation covenant, and 'avoid[ed] potentially costly and embarrassing

litigation.'"  (Silberstein MTD at 54, citing *Shabbouei v. Potdevin*, No. 2018-0847, 2020 WL

1609177, at *13 (Del. Ch. Apr. 2, 2020).)  But *Shabbouei* makes no mention of a release

agreement representing reasonably equivalent value.  2020 WL 1609177, at *13.  Nor does it

address pleading standards for fraudulent transfer claims.  That is unsurprising since *Shabbouei*

is a shareholder derivative suit about breach of fiduciary duty that addressed whether it was

reasonable for the board to engage in separation negotiations with its CEO based on allegedly

inappropriate personal conduct, such as showing sexual favoritism and engaging in illicit drug

use.  *Id.* at *3.

By contrast, and in accordance with 6 Del. C. § 1304(a)(2), which Silberstein cites,

Plaintiff properly alleges the Company did not receive equivalent value.  The conduct released

by the Silberstein Separation Agreement was negotiated by fellow insider Cashman, at a time when the Company was insolvent, and the Silberstein Separation Agreement released hundreds of millions of dollars' worth of claims against Silberstein, for what amounted to little in return—a release agreement essentially voidable by Silberstein's false warranties at the outset.  (Compl. ¶¶ 75-76, 80-82, 123-124, 249.)

*Third*, the Complaint also sufficiently alleges that there was not an "arms-length" relationship between Silberstein and Cashman and the Company, who as directors and Co-CEOs worked hand-in-hand to protect each other's personal interests.  Accordingly, Silberstein and Cashman lacked good faith, because Silberstein and Cashman, working together, knowingly engaged in harmful acts to the Company, putting their own interests over the Company's interests.  (*Id*. ¶¶ 70, 72, 77, 86, 87.)

*Finally*, Cashman wrongly asserts, relying primarily on Rule 9(b), that Plaintiff's claims are improperly pled because Plaintiff has not adequately alleged the exact moment of insolvency.  (COR MTD at 50-51.)  As Cashman correctly notes, New Jersey bankruptcy courts apply "a less burdensome standard than Rule 9(b) mandates" to fraudulent transfer claims.  (COR MTD at 45, (citing *In re CTE 1 LLC*, Case No. 19-30256, Adv. No 21-1455, 2023 WL 5257940, at *12 (Bankr. D.N.J. Aug. 11, 2023)).)  Plaintiff's allegations clear this bar.

Cashman nonetheless asserts that applicable pleading standards change depending upon whether the plaintiff has access to documents (and the number of documents the plaintiff has access to).  Here, Cashman relies on out-of-circuit district court and bankruptcy court authority.  (COR MTD at 46, citing *In re Trib. Co. Fraudulent Conv. Litig.*, No. 11-md-2296, 2017 WL 82391, at *4 (S.D.N.Y. Jan. 6, 2017) and *In re Old CarCo LLC*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010)).  But this reasoning has not been adopted by the Third Circuit.  On the contrary,

the Third Circuit has held that for bankruptcy trustees who are pleading fraudulent transfer

counts there is a "relaxed standard of applying Rule 9(b)." *In re Norvergence, Inc.*, 405 B.R.

709, 733 (Bankr. D.N.J. 2009) (citing *In re Oakwood Homes Corp.*, 325 B.R. 696, 698 (Bankr.

D. Del. 2005)).  Defendants do not point to any Third Circuit precedent holding otherwise.

Cashman's underlying premise that 9(b) standards have not been met because Plaintiff

has failed to allege which state fraudulent transfer law applies, is also mistaken.  As a court

within the Third Circuit clarified, 9(b) pleading standards have "nothing to do" with identifying

which state law applies, "to survive dismissal, the complaint need not identify a particular state's

uniform fraudulent transfer law." *In re Oakwood Homes Corp.*, 340 B.R. at 526; *see also In re*

*Our Alchemy, LLC*, 642 B.R. 155, 162 (Bankr. D. Del. 2022) (holding that fraudulent transfer

claims adequately pled and that the court did not need to decide which fraudulent transfer state

statute applied at the motion to dismiss stage).

### C.    Actual Fraudulent Transfer Claims Have Been Adequately Pled (Counts 14 and 16)

New Jersey's version of the UFTA defines the elements of actual fraudulent transfer.

N.J.S.A. § 25:2-20, et seq.  It provides that a transfer or obligation accrued by a debtor is

fraudulent to the creditor, "whether the claim arose before or after the transfer:  (i) with

the actual intent to hinder, delay, or defraud any creditor; or (ii) without receiving a reasonably

equivalent value in exchange for the transfer or obligation, and where the debtor either:  (a)

engaged in a business transaction for which the remaining assets of the debtor were unreasonably

small in relation to the business or transaction, (b) intended to incur, or reasonably believed or

should have known that they would incur debts beyond its ability to pay." *A.M.E. Inc. v. T.R.*

*Ricotta Elec., Inc.*, No. 22-cv-5211, 2023 WL 3841746, *2-3 (D.N.J. June 6, 2023) (citing

N.J.S.A. § 25:2-25; and *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 488 (N.J. 1999)).

Rule 9(b)'s particularity requirement, which applies to actual fraudulent transfer claims, is met where several "badges of fraud" are pled. *In re Our Alchemy, LLC,* 642 B.R. at 164. These badges of fraud are listed by the UFTA "to consider in determining actual intent" because "fraudulent intent, by its very nature, is rarely susceptible to direct proof." *A.M.E. Inc.*, 2023 WL 3841746 at *2-3 (citing N.J.S.A. § 25:2-26; *Gilchinsky,* 732 A.2d at 482). The badges of fraud include: transactions to those with an insider status, not receiving equivalent value, and the debtor being insolvent at the time of the transaction or became insolvent shortly thereafter. *Id.* "Even 'a single . . . badge of fraud may cast suspicion on the transferor's intent'" but "the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *Id.* (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254-55 (1st Cir. 1991)).

Here, Plaintiff has alleged both Count 14 (Silberstein Separation Agreement) and Count 16 (Cashman Separation Agreement) as actual fraudulent transfers with the particularity necessary to meet Rule 9(b)'s standards. The Silberstein and Cashman Separation Agreements displayed at least three badges of fraud: they were signed when the Company was insolvent, gave up valuable claims for no equivalent value, and were transactions involving insiders. (Compl. ¶¶ 79, 253-263, 273-283.) Since even a single badge of fraud could be sufficient to establish actual fraud, the three badges of fraud present here should be sufficient to allege fraudulent intent at the pleading stage. *See A.M.E. Inc.* 2023 WL 3841746 at *2-3; *In re Our Alchemy, LLC,* 642 B.R. at 164.

### XIV.   PLAINTIFF HAS ADEQUATELY ALLEGED ALL CLAIMS RELATED TO THE YARDLINE TRANSACTIONS OR TRANSFER (COUNTS 17-26)

Three transactions underlie the Trust's claims related to Yardline:  (1) "[A]pproximately $20.9 million to Yardline in exchange for Promissory Notes (that were later forgiven without consideration) in 2021" (Compl. ¶¶ 299-302; 310); (2) writing off/forgiving the six Promissory Notes (*id.* ¶ 336); and (3) Thrasio's payment to Hudson Palm of $1,823,707 on May 10, 2021. (*Id.* ¶ 349).  Cashman and Silberstein, assisted by Boockvar, caused the Company to acquire Yardline, despite the assessment that the Yardline had no meaningful value to the Company, that it was of "zero value," and had a negative EBITDA.  (*Id.* ¶¶ 104, 106.)  Fueled by Silberstein's personal feud with Horowitz and his desire to thwart Horowitz's capital raising efforts, Silberstein caused Thrasio to complete Thrasio's acquisition of Yardline without proper diligence or approval.  (*Id.* ¶¶ 110-111.)  Millions of dollars were wasted by the Company on Yardline, in a series of transactions motivated by personal interests of Silberstein and Cashman, even though the transactions were against the best interests of the Company.  (*Id.* ¶ 92.)

As part of and after the acquisition, Silberstein and Cashman caused transfers to be made to Yardline, Hudson Palm, and Horowitz, without any equivalent value received by the Company because Yardline was worthless.  (*Id.* ¶¶ 106-119.)  Cashman admitted that "every other stakeholder" was ignored, in favor of Silberstein's personal interests.  (*Id.* ¶ 111.)  Further, the Company had no legitimate business justification for the acquisition of Yardline, management understood the transaction was driven by personal animus, and Defendant Silberstein expressed the transaction was intended to head off personal legal threats Cashman faced for playing a questionable role as a director and officer of the Company, and a director of Yardline.  (*Id.* ¶¶ 110-117.)  None of Defendants' arguments that the Yardline-related claims should be dismissed have any merit.

89

As an initial matter, Defendant Horowitz is simply incorrect that the Trust's claims against him must be litigated in New York.  Horowitz has consented to this Court as the proper venue for litigation by filing proofs of claim related to the Horowitz Release Agreement, the same agreement he relies upon as a defense to the Yardline claims.  *See In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528 (3d Cir. 2008) (holding filing proof of claim in a bankruptcy court necessarily means claimant submits to the jurisdiction of the bankruptcy court); *In re Tribune Media Co.*, 902 F.3d 384, 395 (3d Cir. 2018) (holding filing proof of claim in a bankruptcy proceeding seeking relief implies consent to bankruptcy court jurisdiction).

Yardline's attempt to invoke the business judgement rule also has no merit.  The business judgment rule is a defense for *directors'* good faith actions.  *Allison ex rel Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1121 (D. Del. 1985) ("the business judgment rule operates only in the context of director action").  Yardline is not a director of the Company, so it cannot assert the business judgment rule as a defense.  Further, the transactions at issue necessarily do not merit business judgment protection, as they are fraudulent transfers, as discussed herein.  (*Supra*, § IV.E.; *infra*, § XIV.)  Plaintiff also disputes that if it is successful in its claims against Yardline, that Yardline's corporate parent Swiftline would have "full recourse" for any clawed back amounts.  (Yardline MTD at 27.)  In any event, whether a third-party (Swiftline) can recover from Debtors is irrelevant to whether a claim has been stated against Yardline and is not grounds for dismissal of any claims here.

None of the other arguments made by Defendants Silberstein, Cashman, Horowitz, Hudson Palm, and Yardline related to Yardline have any merit.  All of the claims related to Yardline (Counts17-26) are alleged adequately.

## A.    Breach of Fiduciary Duty Claims Against Silberstein and Cashman Have Been Adequately Pled (Count 17)

The Trust has adequately alleged breach of fiduciary duty claims against Silberstein and Cashman with respect to Yardline.  As detailed above, officers and directors owe fiduciary duties of loyalty and care.  (*Supra*, §XIII.A.)  Both Defendant Silberstein and Cashman, as directors and officers of the Company, owed a duty of loyalty to act in the Company's best interest, and as directors and officers of *an insolvent company*, to maximize value to creditors.  *In re High Strength Steel, Inc.*, 269 B.R. at 569.

In direct violation of these duties, and as alleged in the Complaint, Silberstein and Cashman forced the Company to acquire a worthless company (Yardline) because it served their own interests.  (Compl. ¶¶ 104, 106, 115-16.)  Then, Cashman and Silberstein caused the Company to make further unnecessary transfers to keep Yardline afloat.  (*Id.* ¶¶ 117, 119.)  This entire scheme was motivated by Silberstein's known feud with Horowitz and Cashman's own concern based on his role as director of Yardline, rather than motivated by any legitimate business purpose for Thrasio.  (*Id.* ¶¶ 111, 113-16, 289.)  Moreover, the transaction to acquire Yardline was clearly conflicted as Cashman served as a director and officer of the Company and a director of Yardline at the time of the acquisition, yet the Board did not review or even approve of the transaction at the time the transaction occurred.  As the then-CFO noted, no normal business justification documents accompanied the transaction.  (*Id.* ¶ 110.)

The Complaint has thus alleged facts plausibly showing both Defendant Silberstein and Defendant Cashman breached their fiduciary duty of loyalty by causing the Company to acquire Yardline, a valueless company, for personal reasons, and by causing the Company to make further unnecessary payments for personal reasons—including to protect the interests of Silberstein, Cashman, and Horowitz—instead of in the interests of the Company.  (*Id.* ¶¶ 104-19,

285-92.)  None of Silberstein's or Cashman's arguments that these claims are not properly pled are persuasive.

*First*, Plaintiff does not need to specify whether a breach of duty of loyalty or breach of duty of care, or both, has occurred in order to state a breach of fiduciary duty claim, as Silberstein asserts.  *See BYJU's Alpha, Inc. v. Camshaft Cap. Fund, LP (In re BYJU's Alpha, Inc.),* 661 B.R. 109, 122 (Bankr. D. Del. 2024) (granting motion for injunction in favor of a breach of fiduciary duty claim holding that per Third Circuit precedent, "as long as the issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy") (citing *Bechtel v. Robinson*, 886 F.2d 644, 650 n.9 (3d Cir. 1989) and *Kahan v. Rosenstiel*, 424 F.2d 161, 174 (3d Cir. 1970)).  Nor is it accurate, as Silberstein asserts, that a breach of duty of loyalty is proven only through standing on "both sides" of a transaction or receiving a benefit "not equally shared by stockholders."  (Silberstein MTD at 56.)  Rather, a breach of duty of loyalty may be shown in the form of lack of good faith where a fiduciary "intentionally acts with a purpose other than advancing the best interests of a corporation" for example by acting on personal emotions like "greed" or "revenge" when engaging in a strategy.  *Quadrant Structured Prods. Co. v. Vertin,* 102 A.3d 155, 189 (Del. Ch. 2014).  Here, as alleged in the Complaint, Silberstein acted on "personal animosity" akin to revenge to execute a transaction to force the Company to acquire Yardline for "no business purpose."  (Compl. ¶¶ 110-111.)  The Complaint's facts, as alleged, are sufficient to show bad faith actions on the part of Silberstein which amount to a breach of fiduciary duty of loyalty.

*Second*, when a breach of duty of loyalty has adequately been pled, directors' exculpation provision for the duty of care, may not be used to "eliminate or limit" liability for such a breach. 8 Del. C. § 102(b)(7).  Thus, it is no moment that Thrasio's Charter contains an exculpatory

provision relieving directors of a duty of care.  (Silberstein MTD at 59-60 (citing *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 573 (Bankr. D. Del. 2008).)

*Third,* both Silberstein and Cashman are incorrect that deference must be given to the Board's approval of the Yardline acquisition.  (COR MTD at 22; Silberstein MTD at 60.)  As Cashman freely admits, he stood on both sides of the transaction.  Cashman was a board member of both Yardline and the Company at the time of the Company's acquisition of Yardline.  (COR MTD at 16; Compl. ¶ 102.)  Serving on the board of both the acquirer and the target company is a textbook example of a conflict of interest and is one where Delaware law provides no "safe harbor."  *See Quadrant Structured Prods. Co.* at 187; *Weinberger v. Uop,* 457 A.2d 701, 710 (Del. 1983) (holding that "when directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").  In other words, where a board member is conflicted, and does not recuse, business judgment deference is replaced by "inherent fairness" analysis of the decision.  *Id.*

Here, the Board's decision to approve of the Yardline acquisition is further suspect because the acquisition occurred in a series of transactions in April and May 2021 (Compl. ¶¶ 107-116).  But (as Cashman recognizes) the Company's Board did not approve of the transaction until several *months later* in September 2021, in an undated unanimous consent transaction where neither Cashman nor Silberstein recused himself.  (COR MTD at 22, 32; Action by Unanimous Written Consent of The Board of Directors of Thrasio Holdings, Inc. (Kotler Decl. Ex. F.).) In other words, where (1) the Board's approval occurs after the fact, and (2) there is no evidence that either Silberstein—the director acting in bad faith—or Cashman—the director sitting on both sides of the transaction—fully disclosed their conflicts to the rest of

the Board, the burden shifts to the Defendants to show the transaction was objectively entirely

fair. *Burtch v. Opus, LLC (In re Opus E., LLC),* 528 B.R. 30, 66-67 (Bankr. D. Del. 2015)

(holding for conflicted transactions, "[n]ot even an honest belief that the transaction was entirely

fair is sufficient to establish entire fairness—the transaction itself must be objectively fair,

independent of the fiduciary's belief"). And whether the transaction was objectively entirely fair

is not an issue that is ripe for determination at the pleading stage.

*Finally*, Silberstein and Cashman rely on an assortment of other arguments to assert that

these claims are not sufficiently alleged. Cashman's attempt to scuttle the Trust's claims by

pointing to the Cashman Separation Agreement fairs no better this time and fails for all the same

reasons discussed above. The Court should similarly disregard Silberstein's unsupported factual

argument that "the only reasonable inference" is that when the Board approved the Yardline

acquisition it "exercised reasonable care and was fully informed about the acquisition."

(Silberstein MTD at 60 (citing *In re Space Case*, Case No. 22-10657, Adv. Prod. No. 23-50748,

2024 WL 1628440, at *9 (Bankr. D. Del. Apr. 15, 2024)).) This is improper at the pleading

stage where inferences are to be drawn in *Plaintiff's* favor, not Defendants'. *See Hacker v. Elec.

Last Mile Sols. Inc.*, 687 F. Supp. 3d 582, 588 (D.N.J. 2023) (holding courts are required to draw

all inferences from the facts alleged in the light most favorable to the plaintiff at the motion to

dismiss stage).

Further, *In re Space Case* is distinguishable. There, it was alleged that a space travel

company's unrealistic expectations and unfortunate business decisions led to its bankruptcy. *In

re Space Case*, 2024 WL 1628440, at *7. Here, Plaintiff has alleged more than unfortunate

business decisions. Rather, the Complaint alleges knowing unnecessary payments were made

related to Yardline. As an example, Plaintiff alleges that Defendants forced the Company to

make payments to Yardline's lenders holding certain convertible notes ( the "Convertible Noteholders") and investors that were unnecessary and that the Company was not legally obligated to make to further Cashman's personal interests as part of the Yardline acquisition.  (Compl. ¶ 116.)

### B.     Aiding and Abetting Breach of Fiduciary Duty Has Been Adequately Pled Against Boockvar (Count 18)

In an attempt to evade liability for his role in the Yardline debacle, Boockvar significantly understates the Complaint's allegations of his role in Thrasio, Yardline, and the transaction itself.  (Boockvar MTD at ¶72.)  As alleged in the Complaint, Boockvar was President of Thrasio, and in that role he was responsible for overseeing all aspects of Thrasio's operations, including financial activities, and for notifying the Board of issues that needed their approval.  (Compl. ¶ 24.)  Boockvar also was a member of the Yardline Board of Directors, including during the pivotal periods of time.  (*Id.* ¶ 102.)  Further, the Complaint specifically alleges that Silberstein worked with Boockvar to finalize the initial "takeover" transaction.  (*Id.* ¶ 106.)  In other words, Boockvar did more than just "receiv[e] emails" after the Yardline saga finally ran its course.  (Boockvar MTD at ¶72.)  The Complaint's allegations of Boockvar's central, senior role at Thrasio, combined with Boockvar's membership on Yardline's Board of Directors at the time are therefore sufficient for the Court to reasonably infer that Boockvar *at least* participated with Silberstein and Cashman's decisions related to the wrongful Yardline transactions.  *See Heartland Payment Sys., LLC*, No. 3:18-cv-9764, 2019 WL 949120, at *8-*9 (D.N.J. Feb. 27, 2019) (denying motion to dismiss aiding and abetting breach of fiduciary duty claim where it could be "logically inferred by reasonable inferences drawn from facts alleged in the Complaint" that the defendant knowingly participated in and was actively involved in the underlying breach).

The quality of Boockvar's alleged conduct means that his reliance on *Malpiede* is misplaced.  The *Malpiede* court did not address allegations directed at a consummate insider that was intimately involved with the fiduciaries on a regular basis.  Rather, the court assessed whether allegations about an acquirer's tactics related to a "merger agreement [that] was the product of arm's-length negotiations" were sufficient to state an aiding and abetting breach of fiduciary duty claim against the acquirer.  780 A.2d at 1097-98.

### C.   Actual and Constructive Fraudulent Transfer Claims Have Been Adequately Pled Against Cashman (Counts 19-22)

Defendant Cashman generally lumps his arguments related to the Yardline transfer in with his (meritless) arguments related to the application of the business judgement rule or the Trust's allegations of insolvency.  The deficiencies in these arguments are not belabored here again.  (*Supra*, § IV.E.)

Cashman's Yardline-specific arguments fare no better here.  *First*, Cashman is incorrect that the Trust has not sufficiently plead that the Yardline transfers were made for Cashman's benefit.  (COR MTD at 54.)  For example, in describing the Yardline transfers, the Complaint alleges Silberstein wrote to Cashman how the Yardline transfers would be made for *Cashman's* benefit:  "[W]e'll use company resources to make sure that you feel covered."  (Compl. ¶ 115.)  The inference to be drawn from this statement from Cashman's then co-CEO is that the Yardline transaction was designed to benefit Cashman.

*Second*, Plaintiff has adequately pled "badges of fraud" for the actual fraudulent transfer claims, as only one badge of fraud can be sufficient to support the inference of fraudulent intent.  Here, Plaintiff has pled several, including a fact Cashman has conceded—that he was an insider of both the Company and Yardline as he served on the board of both.  *See A.M.E. Inc.*, 2023 WL 3841746 at *2-3.  (*See, e.g.*, Compl. ¶¶ 315-320; COR MTD at 6.)

**D.      Actual and Constructive Fraudulent Transfer Claims Have Also Been Adequately Pled Against Horowitz, Hudson Palm, and Yardline (Counts 19-24)**

The Complaint alleges that while the Company was insolvent, Defendants forced the Company to make multiple payments to Yardline and entities related to Yardline for personal reasons and against the best interests of the Company, and the Company did not receive reasonably equivalent value for doing so, while the transactions personally benefitted Horowitz, Cashman, and Yardline. (Compl. ¶¶ 41, 104-19, 298-308, 362.) While the transfers alleged in Counts 19 and 20 were made to Yardline, the transfers were made to benefit Horowitz and Cashman. (*Id*. ¶¶ 306, 322.) Defendants Horowitz and Cashman extracted value by causing Thrasio to bear the costs of alleviating their personal litigation risks. (*Id*. ¶ 306.) Similarly, while the transfer alleged in Count 23 was made to Hudson Palm, Horowitz was the person for whose benefit the transfer was made. (*Id*. ¶ 353.) As for the transfers alleged in Count 21, that transfer was made for the benefit of Horowitz, Cashman, and Yardline. (*Id*. ¶ 331.) For Count 22, Horowitz, Cashman, and Yardline were the persons for whose benefit the Promissory Notes were written off/forgiven. (*Id*. ¶ 345.) The Company did not receive equivalent value for the transfers because Yardline was an asset without value to the Company; it was a "zero value" proposition. (*Id*. ¶ 104.)

Notably, the transfers were made to insiders, like Cashman, who received value in that his personal legal concerns were removed by the payments. (*Id*. ¶ 345.) Further "badges" of fraud were present such as the insider relationship between Cashman and Horowitz, and the fact that the Company did not receive "reasonably equivalent value" when it forgave Yardline's Promissory Notes, and the Company was insolvent at the time. (*Id*. ¶¶ 335-347; 356-368.)

Horowitz and Yardline nonetheless contend that the Complaint fails to allege actual fraudulent transfer claims under New Jersey law. (Horowitz MTD at 19; Yardline MTD 23-26.)

97

Specifically, Horowitz contends that Plaintiff inadequately pled Horowitz was an insider, as a "badge of fraud" while Yardline contends "badges of fraud" were not pled with sufficient specificity because the transfers were approved by the Thrasio Board and are owed deference under the business judgement rule.  (Horowitz MTD at 23; Yardline MTD at 25.)  Neither of these arguments are cause for dismissal, because, as outlined above, Plaintiff need not plead more than one badge of fraud to show intent, and the business judgment rule is an inapplicable defense for Yardline.  (*Supra*, §§ IV.E.; XIV.C.)

Further, there is no merit to Horowitz's argument that the Trust cannot recover fraudulent transfers under Section 550(a) pursuant to Section 544 because the Complaint has inconsistently alleged Horowitz's status whereas "initial transferees" and the entity for whose benefit the transaction was made are mutually exclusive.  (Horowitz MTD at 23, citing *In re Glob. Outreach, S.A.*, No. 11-620, 2011 WL 2294168, at *11 (D.NJ. June 6, 2011)).  Rather, and as discussed above, for each count, the Complaint states with specificity the status of each defendant as transferee or beneficiary.  (Compl. ¶¶ 322, 345, 366.)  Even if the Court were to entertain Horowitz's semantics, *In re Glob. Outreach, S.A.*, 2011 WL 2294168, at *9, on which Horowitz relies, illustrates that the Trust's claims should survive.  There, while the court held that "subsections of (a)(1) and (a)(2) were mutually exclusive" in pleadings, the court declined to dismiss claims on this basis.  *Id.*  Instead, the *In re Glob. Outreach* court held that, the trustee could still seek recover transferred assets under Section 550, citing the goals of the formation of the Trust.  *Id.*  Accordingly, Horowitz's arguments about judicial admissions and "veil piercing" should be disregarded.

Finally, Plaintiff has sufficiently alleged the payments as a tangible benefit—the payments were made to the Convertible Noteholders who were Yardline's *creditors*.  Payments

to such persons are sufficient to allege a personal benefit.  *See Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 689 (Bankr. S.D. Tex. 2018) (findings personal benefit to defendant where loan proceeds from the debtor went to corporate entity's bank account and then were used to pay corporations creditors.)

Horowitz's and Yardline's arguments regarding the constructive fraudulent transfer claims are similarly deficient.  As an initial matter, and as discussed in Section I, above, the Disinterested Directors Report or the Plan does not impede the Trust's claims in any way.  Nor do any of their arguments regarding the application of estoppel or the business judgement rule arguments hold water, as outlined above.  (*Supra*, §§ I, IV.)

Horowitz also incorrectly asserts that the Trust's constructive fraudulent transfer claims are barred because, as a matter of law, fraudulent transfers cannot be made to wholly owned subsidiaries.  (Horowitz MTD at 20-21.)  While *In re HH Liquidation, LLC*, 590 B.R. 211, 266, (Bankr. D. Del. 2018), may so hold for *solvent* subsidiaries, here, the Complaint alleges Yardline was an *insolvent* subsidiary.  (Compl. ¶¶ 305, 320, 330, 343, 364.)  Fraudulent transfers claims may be pled between a parent and a subsidiary where the subsidiary is insolvent.  *See Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 873 (Del. 2024) (fraudulent transfer alleged between parent and insolvent subsidiary); *Quadrant Structured Prods. Co.*, 102 A.3d at 168 (declining to dismiss fraudulent transfer claim where insolvent parent acquired insolvent subsidiary, then allegedly made fraudulent transfer transactions involving subsidiary).

Yardline's argument regarding its status as a wholly subsidiary of the Company likewise fails because it was insolvent.  *See, e.g.*, *Quadrant Structured Prods. Co.*, 102 A.3d at 168. Here, Yardline attempts to claim that the Complaint, on its face, supports an inference that Yardline was solvent.  (Yardline MTD at 21-22.)  Yardline is wrong.  The Complaint *does not*

99

*mention,* as Yardline alleges, any $40 million valuation for Yardline, whether in Paragraphs 99-102 and 105 (cited by Yardline for this proposition) or otherwise.  (Yardline MTD at 21-22.)  By contrast, the Complaint on its face directly alleges Yardline's insolvency including that Yardline had "zero value" and Yardline's statements showed Yardline "was projected to have negative EBITDA in 2021."  (Compl. ¶ 104; *see also id.* ¶¶ 305, 320, 330, 343, 364.)

Horowitz also relies on a flawed premise and distinguishable authority when he argues that supposed (and unalleged) interest from investors and lenders in Yardline supports the inference that the Company received reasonably equivalent value in the exchange.  (Horowitz MTD at 21-22.)  *Sovereign Bank v. B.J.'s Wholesale Club,* on which Horowitz relies, does not address fraudulent transfer claims.  533 F.3d 162, 181 (3d Cir. 2008).  Further, at the motion to dismiss stage all inferences must be made in favor of *Plaintiff*, not the defendant.  *Hacker*, 687 F. Supp. 3d at 588 (holding courts are required to draw all inferences from the facts alleged in the light most favorable to the plaintiff at the motion to dismiss stage).  Accordingly, no inference should be drawn in Horowitz's favor that because investors were interested in investing in Yardline that it was valuable.  Nor is Horowitz correct when he attempts to claim that he was not a "beneficiary" of any fraudulent transfers related to Yardline because he did not benefit from the resolution of legal threats made by Yardline's creditors.  Rather, the allegations in the Complaint support the reasonable inference that Horowitz was also facing potential legal liability and also benefitted from the payoff that was made to investors who had been threatening litigation.  (*See, e.g.*, Compl. ¶¶ 113, 345.)

### E.    The Conspiracy to Commit a Fraudulent Transfer Related to Yardline Has Been Adequately Alleged (Count 25)

The Complaint adequately alleges civil conspiracy to commit a fraudulent transfer related to the Yardline transaction.  Defendants Silberstein, Cashman, Boockvar, and Horowitz schemed

to have the Company pay Hudson Palm for Horowitz's stake in the insolvent Yardline, when the

Company acted to acquire the valueless Yardline to fulfill Silberstein's desire for revenge against

Horowitz, all when both Thrasio and Yardline were insolvent.  (Compl. ¶ 370.)  Thrasio also

issued unnecessary Promissory Notes to Yardline to pay off Yardline's Convertible Noteholders

and investors, which served to ward off litigation threats against Cashman and Horowitz.  (*Id.*)

The Company's primary aim in undertaking the subsequent transaction was apparently to benefit

and protect Cashman Cashman's long-time friend Horowitz from personal liability.  (*Id.*)

By pursuing and approving these transfers, Silberstein, Cashman, and Boockvar took

overt acts to further the conspiracy, including working together to effectuate the acquisition

transaction of Yardline, and causing Thrasio to provide six Promissory Notes to Yardline to

arrange for unnecessary payments to Yardline's Convertible Noteholders and investors.  (Compl.

¶¶ 106, 116.)  Horowitz similarly took an overt act by assisting with facilitating the transfers.

(*Id.* ¶ 370.)  The Complaint further alleges the conspiracy caused damages.  (*Id.* ¶ 371.)  The

Company spent over $20 million making unnecessary payments to benefit Horowitz, Cashman,

Yardline, and Hudson Palm while insolvent.  (*See e.g.*, *Id.* ¶¶ 299-306, 348-55.)

The Trust has done what the law requires of it at this stage of the proceedings.  Contrary

to Silberstein's arguments, the Trust was not required to allege that Silberstein specifically

engaged in an unlawful act.  Rather, for a civil conspiracy to be adequately pled, only one of the

co-conspirators needs to engage in the underlying wrongful act for liability to be imputed to all

co-conspirators.  *See O'Donnell v. Knott,* 283 F. Supp. 3d 286 (E.D. Pa. 2017) (holding that civil

conspiracy is "a mechanism for subjecting co-conspirators to liability when <u>one</u> of their members

committed a tortious act; therefore, a plaintiff need not allege an underlying tortious claim

against every co-conspirator") (citing *Tender Touch Rehab Servs., LLC v. Brighten at Bryn*

*Mawr*, 26 F. Supp. 3d 376, 405 (E.D. Pa. 2014))(internal citations omitted).  Nor was the Trust

required to point to a formal agreement between co-conspirators.  (Silberstein MTD at 61.)

Instead, the conspiracy may be inferred by "implicitly" agreeing to "do your part" such as

assisting in executing a fraudulent transfer.  *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263

(N.J. 2005) (holding a creditor may bring a conspiracy to fraudulently transfer claim against

someone who assists in executing a fraudulent transfer; doing "their part.").

Further, Defendants Cashman and Horowitz are wrong that a claim for conspiracy to

fraudulently transfer does not exist.  (COR MTD at 48; Horowitz MTD at 25.)  As discussed

above (*supra*, § IX.C.), New Jersey courts recognize the cause of action.  *See e.g.*, *Banco*

*Popular N. Am.*, 876 A.2d at 263.

### F.     The Complaint Adequately Alleges Corporate Waste Related to the Yardline Transfers (Count 26)

As discussed above, corporate waste is akin to a breach of fiduciary duty claim and under

Delaware law, it consists of "an exchange of corporate assets" for such little consideration that it

is "beyond" what a "reasonable person" would be willing to accept.  *Weiss v. Swanson*, 948 A.2d

433, 450 (Del. Ch. 2008).  Corporate waste claims are often made where a transfer of corporate

assets has been made which "serves no corporate purpose."  *Id.*

The Complaint alleges that the Yardline transfers amount to corporate waste because

Yardline was of "zero value" to the Company, yet the Company nonetheless spent millions of

dollars to acquire it, against its own interests.  (Compl. ¶¶ 372-75.)  The reasonable inference

from these allegations is that no rational actor would accept such a deal.  Indeed, the Company's

Board did not approve of the transactions at the time they occurred, and the CFO noted at the

time there was no business purpose accompanying the paperwork.  (*Id.* ¶ 110.)  These allegations

are not conclusory, notwithstanding Silberstein's,[6] Cashman's, and Boockvar's assertions. On the contrary, the Trust has alleged all elements of this claim and had pled specific details of the challenged transaction. This is more than sufficient to survive a motion to dismiss. *See Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, 368 B.R. 394, 408 (Bankr. D. Del. 2007) (declining to dismiss corporate waste claim where plaintiff alleged "no business person of ordinary sound judgment could believe that the Debtors received adequate consideration in exchange for the payments and/or transfers") (cleaned up).

As to Defendant Boockvar specifically, along with specific emails from Cashman to Boockvar that support the inference that the Yardline transactions were not the product of sound business judgment, there is no dispute that Boockvar was president of Thrasio at all relevant times. This is enough to draw the inference that Boockvar's involvement in the transactions involved bad faith. To allege this claim against Boockvar, the Trust is not required to "establish any knowledge of illegality" by Boockvar prior to the acquisition of Yardline. (Boockvar MTD at ¶73.) Boockvar cites no authority whatsoever in support of this proposition.

Silberstein's and Cashman's arguments based on the implications of Yardline's later sale to Swiftline also do not move the needle. It is inappropriate to wade into the implications of competing facts at the pleading stage. These arguments also reflect a misunderstanding of the economics of the acquisition and further ignore that the economics of the two transactions must be viewed in isolation. Notably, Defendants *do not dispute* the initial acquisition of Yardline, at a time when the Company valued it at zero, meets the definition of waste. They elect instead to pin their arguments on the later sale of Yardline to Swiftline, *even though* Defendant Horowitz

---

[6] Silberstein asserts he cannot be liable for forgiveness of Yardline promissory notes in October 2021, after he had left the Company. Plaintiff acknowledges that Silberstein, for his portion of damages, may only be liable for waste which he authorized while he was a Director and Officer of the Company.

and Defendant Yardline, through its parent Swiftline, have alleged the transaction amounted to breach of contract or potential fraud in the Bankruptcy Case.  (Horowitz, Claim Nos. 109, 111, 114; Swiftline Claim Nos. 107, 108.).  Discovery will show the true motivation behind the Yardline sale to Swiftline.  In either case, the fact remains that the initial acquisition of Yardline sufficiently meets the standard to plead waste.

## XV.    FALCAO'S AND BOOCKVAR'S MOTIONS TO COMPEL ARBITRATION SHOULD BE DENIED

As a final matter, Defendants Boockvar and Falcao move to compel arbitration, asserting that the Court cannot even decide whether the Trust's claims are arbitrable.  To do so, Boockvar and Falcao rely on provisions in separation agreements they entered into (i) with an entity other than Plaintiff (the "Separation Agreements" and the "Consulting Agreement"), (ii) that were rejected by the Debtors, and (iii) that the Court further ordered are "no longer in effect." Plan at 16, 44.  They also seek to have this entire litigation stayed pending arbitration of only a subset of the Trust's claims asserted against them.  The Court should deny these motions in their entirety because no "arbitration agreement exists at all" here between Plaintiff and Boockvar and Falcao. *Williams v. Medley Opp. Fund II, LP*, 965 F.3d 229, 237 n.7 (3d Cir. 2020) (quoting *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 n.4 (5th Cir. 2019)).

### A.    Because the Plaintiff Here Is Not a Party to the Applicable Arbitration Agreements, the Court May Decide Arbitrability

Neither Boockvar nor Falcao claim that Plaintiff here—the Trustee of the Trust—is a party to any arbitration agreement with them.  Thus, the Court may decide whether the claims are arbitrable, regardless of whether a clause delegating arbitrability to an arbitrator is present in the underlying agreements.  *See Yurth v. Experian Info. Sols.,* 622 F. Supp. 3d 89 (E.D. Pa. 2022); *see also Paragon Litig. Trust v. Noble Corp., PLC (In re Paragon Offshore PLC)*, 588 B.R. 735, 760 (Bankr. Del. 2018).  This is because "[t]he presumption [of arbitrability] applies only to

parties that have consented to and are bound by the arbitration clause—not to non-signatories."
*Yurth,* 622 F. Supp. 3d at 98 (citing *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir.
2014)).  The caselaw on which Boockvar relies supports this position.  *See Westerkamp v.
Samsung Elecs. Am., Inc.*, No. 21-cv-15639, 2023 WL 4172967, at *9 (D.N.J. June 26, 2023)
(evaluating whether any agreement to arbitrate existed between the plaintiff (a consumer) and the
defendant earbud manufacturer when the defendant asserted that an agreement to arbitrate had
been formed based on language contained on the earbuds' packaging).

Here, there is no clear agreement to arbitrate or to delegate any questions of arbitrability
to the arbitrator because signatories (Boockvar and Falcao) seek to compel arbitration of claims
asserted by a non-signatory.  In other words, no agreement to arbitrate exists between or among
the parties, much less any agreement to allow only an arbitrator to decide the scope of that
agreement.  *Williams*, 965 F.3d at 237 n.7.  Thus, the Court may determine the scope of the
arbitration clause and whether it is applicable here, rather than deferring determination of this
issue to an arbitrator.  *Yurth*, 622 F. Supp. 3d at 89 (citing *In re Remicade (Direct Purchaser)
Antitrust Litig.*, 938 F.3d 515, 522 (3d Cir. 2019)).

The other authority Falcao and Boockvar rely on is distinguishable on this basis.  In each
of *Jenkins v. PetSmart, LLC*, No. 23-2260, 2023 WL 8548677, at *4-6 (E.D. Pa. Dec. 11, 2023),
*VR Consultants, Inc. v. J.P. Morgan Chase & Co.*, No. 20-cv-6110, 2021 WL 5494373, at *3
(D.N.J. Nov. 23, 2021), *Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006) and
*Garthon Bus. Inc. v. Stein*, 30 N.Y.3d 943, 944 (2017), both the party who sought to compel
arbitration and their opponent were signatories or parties to the over-arching agreement
containing the at-issue arbitration provision.  There was thus no dispute that an agreement
between them to arbitrate existed.

*Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142-43 (3d Cir. 2022), is similarly distinguishable. There, the defendant had been assigned the plaintiff's delinquent loan by the original lender. The plaintiff had agreed in the loan to arbitrate any claims with the original lender *and* with any assignee of the loan agreement. After the defendant abandoned an initial suit it had brought to collect on the plaintiff's delinquent loan, the plaintiff filed a purported class action alleging that the defendant's debt collect practices were unlawful. In response, the defendant moved to compel the plaintiff—a signatory to the original loan agreement containing the arbitration agreement—to arbitrate. Here, in contrast, Plaintiff is neither a signatory to any arbitration agreement with Boockvar or Falcao, nor is Plaintiff (or the Trust) an assignee of any such agreement, which in any event and as discussed below, were rejected by the signatory. The Court thus must ascertain whether any agreement exists to arbitrate claims Plaintiff asserts here, including the scope of any such agreement. *See Yurth*, 622 F. Supp. 3d at 89.

### B.     The Separation Agreements and Consulting Agreement Were Rejected in the Bankruptcy Case

As provided in the Plan, and reiterated in the Confirmation Order, the Separation Agreements, including their arbitration provisions, were rejected in the Bankruptcy Case and are "no longer in effect." Accordingly, there is no obligation for the Trust or any other party to perform under these agreements in the future, including as to the arbitration provisions contained in them. In *In re Highland Cap. Mgmt., L.P.*, No. 19-34054, 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021), the court addressed a similar motion to compel arbitration. There, the court held that, although the arbitration clause could be treated as a separate agreement from the underlying contract, by rejecting the underlying contract, the debtor effectively rejected both, so the counterparty could no longer seek to compel arbitration under the rejected arbitration agreement but could seek damages for breach of the contract. *Id.*

106

Importantly, the *Highland* court emphasized that, when a contract is rejected, the injured party cannot insist on specific performance of the contract by the trustee, and specific performance is ultimately the remedy sought by a party moving to compel arbitration. *Id.* at *7. Further, the court explained that although as a matter of *contract law*, arbitration provisions survive breaches of contract, "executory obligations may be avoided by the trustee as a matter of bankruptcy law through the exercise of the trustee's power to reject executory contracts," and because "specific performance is not available against a trustee, it follows that an arbitration agreement is like any other executory contract which the trustee may reject." *Id.* at *7.

The same result is warranted here. There can be no dispute that the Separation Agreements were rejected by the Debtors, including the unperformed, executory obligation for Thrasio and Falcao and Boockvar to arbitrate any disputes that might arise related to their terms. Boockvar's Consulting Agreement was also rejected because it is explicitly integrated with Boockvar's Separation Agreement. (Boockvar Ex. A at ¶ 25 ("**Entire Agreement.** This Agreement, as well as the Separation Agreement, constitutes the entire understanding of the parties relating to the subject matter . . .").) It is blackletter bankruptcy law that "assumption or rejection of an executory contract or unexpired lease must be done in its entirety; the executory contract or unexpired lease cannot be assumed or rejected in part." *In re Contract Research Solutions, Inc.*, No. 12-11004, 2013 WL 1910286, at *4 (Bankr. D. Del. May 1, 2013). Accordingly, because the Company rejected the Boockvar Separation Agreement, it cannot have separately assumed the Boockvar Consulting Agreement with which it is integrated. *See In re Buffets Holdings, Inc.*, 387 B.R. 115, 128 (Bankr. D. Del. 2008) (holding that when several agreements are integrated with one another, the Debtors must assume or reject them as a whole).

Despite the rejection of these agreements, which excused any future performance, Falcao

and Boockvar seek an order requiring the Plaintiff to specifically perform the terms of the

arbitration provisions within these Agreements, despite such relief being unavailable.  *In re*

*Highland*, 2021 WL 5769320, at *7.  The Court should not grant such an order.

What is more, the Confirmation Order specifically ordered that the Separation

Agreements—including the Separation Agreements entered into by Thrasio and Boockvar and

Falcao— "are no longer in effect."  (Confirmation Order at 44.)  Neither Boockvar nor Falcao

objected to the Confirmation Order on that basis, nor did they appeal the Confirmation Order to

the District Court.  The Confirmation Order is final and binding and, as discussed above (*supra* §

IV.D.) it has the force of law.  Because the Separation Agreements are "no longer in effect"

Boockvar and Falcao cannot rely on their terms to force the Plaintiff to arbitrate its claims

against them.

### C.    The Plaintiff's Claims Do Not Relate to the Separation or Consulting Agreements and Are Not Arbitrable

Fundamentally, the Plaintiff's claims are beyond the reach of the Separation Agreements'

arbitration provisions, according to their plain terms.  The Separation Agreements' arbitration

provisions limit their applicability only to "disputes arising out of the terms of this separation

agreement, their interpretation, and any of the matters herein released."  (Separation Agreement

§ 16.)[7]  Specifically, the arbitration provision provides:

> The parties agree that any and all disputes arising out of the
> terms of this separation agreement, their interpretation, and
> any of the matters herein released, shall be subject to
> arbitration in the county in which employee primarily
> performed services for the company, before the judicial
> arbitration and mediation service ("***JAMS***") under its
> comprehensive arbitration rules ("***JAMS Rules***") and the
> law of the state in which employee primarily performed
> services for the company.  (Id § 16.)

---

[7] Because Boockvar and Falcao's Separation Agreements contain identical arbitration provisions, Plaintiff quotes from and cites to the Boockvar Separation Agreement only.

The Plaintiff's claims are none of these things. First, the claims have nothing to do with the terms of the Separation Agreements, as they relate to the actions of Boockvar and Falcao while they were employed, and occurred, in some instances years before the Separation Agreements were entered into. Second, the claims do not relate to the "interpretation" of any of the terms of the Separation Agreements. Finally, the claims do not relate to "any of the matters herein released."

While each Separation Agreement contains a release of claims, the only releases that were granted were from Falcao and Boockvar, as former employees, to Thrasio. (*See, e.g.*, Recitals ("the Parties wish to resolve any and all disputes, claims, complaints, grievances, charges, actions, petitions, and demands that Employee may have against the Company and any of the Releasees as defined below, including but not limited to, any and all claims arising out of or in any way related to the Employee's employment with or separation from the Company").) Thrasio granted *no release* of any claim it may have to any employee in any Separation Agreement. Neither Falcao nor Boockvar contend that the Plaintiff's claims relate to any claims *they* might have against Plaintiff. Accordingly, no arbitration agreement exists that applies to the Plaintiff's claims against Boockvar or Falcao.

The arbitration provision in the Consulting Agreement Boockvar entered into after his employment with Thrasio ended also does not require the Plaintiff to arbitrate its claims. By its terms, the Consulting Agreement applies only to Boockvar's (limited) work as an independent contractor serving *his client* Thrasio after he was no longer employed by Thrasio:

> To ensure the timely and economical resolution of disputes that may arise between Consultant and Client, both Consultant and Client mutually agree that pursuant to the Federal Arbitration Act, 9 U.S.C. §1-16, and to the fullest extent permitted by applicable law, they will submit solely

> to final, binding and confidential arbitration any and all
> disputes, claims, or causes of action arising from or relating
> to:     **(a)** the negotiation, execution, interpretation,
> performance, breach or enforcement of this Agreement; or
> **(b)** the relationship between Client and Consultant; or **(c)** the
> termination of that relationship; *provided, however*, that this
> Section 26 shall not apply to any claim or cause of action
> that cannot be subject to arbitration as a matter of law.
> (Consulting Agreement § 26.1.)

Boockvar relies on a tortured (and unsupported) reading of the Consulting Agreement to argue that the claims asserted by Plaintiff are subject to the arbitration provision in the Consulting Agreement. He claims that the arbitration provision in the Consulting Agreement has retroactive effect because it speaks of the "relationship" between Boockvar and Thrasio. (Boockvar MTD at ¶¶ 29-30.) In so doing, Boockvar ignores that the "relationship" described in the Consulting Agreement was not between Boockvar and his employer Thrasio. Rather, the relationship was, Thrasio as the "Client" and Boockvar as the "Consultant" and an independent contractor. Indeed, Boockvar acknowledged that when he was entering into the Consulting Agreement, he was initiating a different, *new* relationship with Thrasio where he was an "independent contractor and not an employee" of Thrasio. (Consulting Agreement § 7.) Accordingly, *B.G. Balmer & Co., Inc. v. U.S. Fid. and Guar. Co.*, No. 98-734, 1998 WL 764669, at *5 (E.D. Pa. Oct. 30, 1998), which does not involve a *new* relationship on distinct terms between parties, but rather involved a continuation of an agency relationship, is not applicable here.

### D.    The Trustee—the Plaintiff Here—Cannot Be Required to Arbitrate its Section 544(b) Claims

Under controlling precedent from the Third Circuit, Plaintiff here, the Trustee of the Trust, "cannot be required to arbitrate its section 544(b) claims." *Hays & Co. v. Merril Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989). Defendant Falcao admits that

*Hays* means that Counts 2 and 3, which are asserted against him and arise under Section 544(b), are not subject to arbitration, regardless of whether the Court finds that an arbitration agreement exists that would require Plaintiff to arbitrate its other claims against Defendant Falcao.  (Falcao MTD at 8.)  He also does not ask the Court to compel arbitration of those claims because he only argues that the "breach of fiduciary duty or waste claims" that are asserted against him must be arbitrated.  (*Id*.)  Nonetheless, Falcao claims he "reserves the right to argue on appeal" that *Hays* should be overturned as applied to claims asserted against him under Section 544(b).  Plaintiff submits that Falcao has reserved nothing here since he does not seek to compel arbitration of those claims.  Out of an abundance of caution, however, Plaintiff asks the Court to rule that any claims asserted against any Defendant—Falcao included—that arise under Section 544(b) are not subject to arbitration.  *Hays*, 885 F.2d at 1155.

### E.      The Court Should Not Stay the Proceeding Pending Any Arbitration

It is left to the Court's discretion whether to stay litigation for claims not subject to arbitration, as Boockvar recognizes.  (Boockvar MTD at ¶ 33.)  Should the Court grant any portion of Boockvar or Falcao's motions to compel arbitration—which Plaintiff submits it should not do—the Court should exercise its discretion and deny Boockvar and Falcao's requests to stay the litigation of all of Plaintiff's claims, including those not even asserted against them, pending the resolution of any arbitration.

Boockvar and Falcao admit that they do not seek to arbitrate all of the claims asserted against them.  (Boockvar MTD at § III (seeking to compel arbitration of only Counts 6-11, 18, 26); Falcao MTD at § I (seeking to compel arbitration of only "the breach of fiduciary duty and waste claims asserted against Mr. Falcao" which are Counts 7-11).)  They also do not assert that all of the claims asserted against all of the Defendants must be arbitrated.  Nor do they contend that a majority of the claims asserted in the Complaint must be arbitrated.

Nevertheless, they ask the Court to freeze this litigation and Plaintiff's efforts to seek recovery on behalf of the creditors of a company they helped bleed dry, including claims that are not even asserted against them.  The Court should not do so.  *See In re Paragon Offshore PLC*, 588 B.R. at 762 (denying request to stay because the court saw no reason "to delay litigation of the majority of the claims pending the resolution of one associated claim, particularly given the more limited collateral estoppel problems established by the results of arbitration.").

None of the authority on which Defendants Boockvar and Falcao rely should lead the Court to conclude otherwise.  In *In re Fleming Cos.*, for example, the court stayed resolution of four bankruptcy law claims that were not subject to arbitration because their resolution *depended upon* the resolution of the arbitrable claims.  325 B.R. 687, 695 (Bankr. D. Del. 2005).  And in *Apotex, Inc. v. Senju Pharm. Co.* (which was an antitrust case that was stayed pending the resolution of patent claim appeals), the court determined resolution of patent claims bore directly on each of the three claims for relief asserted by the plaintiff.  921 F. Supp. 2d 308, 314 (D. Del. 2013).  Here, the claims that Boockvar nor Falcao do not contend are arbitrable *do not depend* upon the outcome of any of the arbitral claims, even if they may be related.

In the same vein, the *Empire State Ethanol & Energy, LLC v. BBI Int'l*, No. 1:08-cv-623, 2009 WL 1813205, at *2 (N.D.N.Y. June 25, 2009), court relied on its determination of the "predominant nature" of the arbitrable claims and the "questionable nature" of the non-arbitrable claims when it granted a stay of the plaintiff's claims against certain non-arbitrating defendants pending the resolution of arbitration. Similarly, the courts in *Crawford v. W. Jersey Health Sys. (Voorhees Div.)*, 847 F. Supp. 1232, 1243 (D.N.J. 1994), *In re EXDS, Inc.* 316 B.R. 817, 826 (Bankr. D. Del. 2004), and *Neal v. Asta Funding, Inc.*, No. 13-3438, 2014 WL 131770, at *5 (D.N.J. Jan. 6, 2014), granted stays of the resolution of non-arbitrable claims pending arbitration

where none or only a minority of the claims at issue were not subject to arbitration.  This is the

opposite of the present case, where Boockvar and Falcao seek to compel only a minority of the

overall claims.[8]

## CONCLUSION

Plaintiff respectfully urges the Court to deny Defendants' Motions to Dismiss and to

compel arbitration in their entirety for the reasons set forth in this memorandum.

*[Remainder of page intentionally left blank]*

---

[8] *Gouger v. Citibank NA* should not be followed by the Court either because it relied on authority from the Tenth Circuit that is not binding on this Court and that narrows the stay analysis to whether resolution of the "arbitrable claims will have a preclusive effect on the nonarbitrable claim."  No. 19-02434, 2020 WL 1320723, at *3 (D. Kan. Mar. 20, 2020) (quoting *Moss v. Kopp*, 559 F.3d 1155,1161 (10th Cir. 2004)).

Dated:  May 12, 2025

**KELLEY DRYE & WARREN LLP**

_/s/ James S. Carr_
James S. Carr, Esq.
Connie Y. Choe, Esq.
One Jefferson Road, 2nd Floor
Parsippany, New Jersey 07054
Telephone: (973) 503-5900
Facsimile:(973)503-5950
Email: jcarr@kelleydrye.com
        cchoe@kelleydrye.com

-and-

Lorenzo Marinuzzi, Esq.
Douglas Mannal, Esq. (admitted _pro hac vice_)
Jamie A. Levitt, Esq.
Theresa A. Foudy, Esq. (admitted _pro hac vice_)
J. Alexander Lawrence, Esq. (admitted _pro hac vice_)
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019-9601
Telephone: (212) 468-8000
Facsimile:  (212) 468-7900
Email: lmarinuzzi@mofo.com
        dmannal@mofo.com
        jlevitt@mofo.com
        tfoudy@mofo.com
        alawrence@mofo.com

_Counsel to the Thrasio Legacy Trust_

114