## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| Mark S. Lichtenstein<br>mark.lichtenstein@akerman.com<br>Martin Domb (admitted *pro hac vice*)<br>martin.domb@akerman.com<br>AKERMAN LLP<br>1251 Avenue of the Americas, 37th Floor<br>New York, NY 10020<br>Tel.: (212) 880-3800 | |
| John Thompson (admitted *pro hac vice*)<br>john.thompson@akerman.com<br>AKERMAN LLP<br>750 Ninth Street, N.W., Suite 750<br>Washington, D.C. 20001<br>Tel.: (202) 824-1760 | |
| *Attorneys for Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC* | |
| In re:<br>1 THRASIO ONE, INC.,<br>　　　　　　　　　　*Reorganized Debtor.* | Chapter 11<br>Case No. 24-11850-CMG<br>(Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br>　　　　　　　　　　*Plaintiff,*<br>v.<br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br>　　　　　　　　　　*Defendants.* | Adv. Pro. No. 24-01637-CMG |

## REPLY IN SUPPORT OF MOTION BY DEFENDANTS JOSHUA SILBERSTEIN AND EVERYTHING'S COMING UP MILLHOUSE, LLC TO DISMISS THE COMPLAINT (ECF NO. 63)

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................................... i

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION ...................................................................................................1

ARGUMENT ...........................................................................................................2

I.   PLAINTIFF FAILS TO SHOW COMPLIANCE WITH RULE 8.................2

II.  PLAINTIFF FAILS TO SHOW IT STATES A CLAIM
     BASED ON THE TENDER OFFER (Counts 1 through 6)...........................5

   A.   The Section 546(e) Safe Harbor Bars All Six Tender Offer
        Related Claims (Counts 1 through 6).........................................................5

      1.   The Court must consider Thrasio's own Tender Offer
           documents on which Counts 1 through 6 are based. ..............................5

      2.   Section 546(e) preempts state fraudulent transfer laws. .........................9

      3.   Section 546(e) applies to alleged actual as well as
           constructive fraud. ...............................................................................13

      4.   Application of Section 546(e) in this case is consistent with
           the Supreme Court's decision in *Merit*..................................................15

   B.   The Disinterested Directors Report Bars Counts 1 through 6.................18

   C.   The Business Judgment Rule Bars the Tender Offer and
        Other Claims............................................................................................19

   D.   Count 1 Fails to Allege Breach of the Fiduciary Duty of
        Loyalty.....................................................................................................19

   E.   Counts 2 and 3 Fail to Allege Any Fraudulent Transfer.........................23

      1.   Plaintiff fails to identify "applicable state law."..................................23

      2.   Plaintiff fails to plead *constructive* fraudulent transfer. ......................25

      3.   Plaintiff fails to plead *actual* fraudulent transfer.................................29

   F.   Count 4 Fails to Allege Any Conspiracy .................................................31

   G.   Count 5 Fails to Allege Any Claim Under Del. GCL § 160 ...................33

   H.   Count 6 Fails to Allege Unjust Enrichment ............................................34

III. PLAINTIFF FAILS TO SHOW IT STATES A CLAIM
     BASED ON THRASIO'S INTERNAL CONTROLS OR
     INVENTORY (Counts 7 and 8)...................................................................36

A.    Count 7 Fails to Allege a *Caremark* Claim Based on "Inadequate Accounting and Inventory Controls" ...................................36

B.    Count 8 Fails to Allege Corporate Waste Based on Inventory ...............40

IV. PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON THE SECONDARY SALES (Counts 9 and 10).....................43

A.    Count 9 Fails to Allege Usurpation of Corporate Opportunities ............................................................................43

B.    Count 10 Fails to Allege Breach of Fiduciary Duty for Misuse of "Confidential Corporate Information" ...................................47

V.  PLAINTIFF FAILS TO STATE A CLAIM BASED ON SILBERSTEIN'S SEPARATION AGREEMENT (Counts 13 and 14) ........................................................................................51

A.    Count 13 Fails to Allege Constructive Fraudulent Transfers In Connection With the Separation Agreement .......................................52

B.    Count 14 Fails to Allege Actual Fraudulent Transfers In Connection With the Separation Agreement............................................53

VI. PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON YARDLINE  (Counts 17, 25, and 26).....................................55

A.    Count 17 Fails to Allege Breach of Fiduciary Duty in Connection With the Yardline Transaction.............................................55

1.    Plaintiff fails to allege breach of the duty of loyalty. ...........................56

2.    Plaintiff fails to allege breach of the duty of care................................60

B.    Count 25 Should Be Dismissed Because Plaintiff Fails to Allege Any Conspiratorial Agreement......................................................63

C.    Count 26 Fails to Allege Corporate Waste Based on Yardline. .................................................................................64

VII. PLAINTIFF'S BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, CONSPIRACY AND UNJUST ENRICHMENT CLAIMS ARE TIME-BARRED .......................................66

A.    There Is No Basis for Tolling the Fiduciary Duty and Corporate Waste Claims.........................................................................66

1.    Plaintiff fails to show any basis for applying the doctrine of inherently unknowable injuries. ..........................................................66

2.   Plaintiff fails to show any basis for applying the doctrine of
equitable tolling. ....................................................................................70

3.   Plaintiff fails to show any basis for applying the continuing
wrong doctrine. ....................................................................................72

B.   Conspiracy to Fraudulently Transfer Tender Offer Proceeds
(Count 4) and Unjust Enrichment (Count 6) Are Untimely
Under Delaware Law................................................................................75

CONCLUSION ......................................................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.M.E. Inc. v. T.R. Ricotta Elec., Inc.*,
  No. 22-cv-5211, 2023 WL 3841746 (D.N.J. June 6, 2023) ...............................54

*Abbott Labs. v. Owens*,
  No. 13C-09-186 JRJ CCLD, 2014 WL 8407613 (Del. Super. Ct. Sept.
  15, 2014) ........................................................................................................37

*Altenbaugh v. Benchmark Builders Inc.*,
  271 A.3d 188 (Del. 2022) ..........................................................................67, 69

*AM Gen. Holdings LLC v. Renco Grp., Inc.*,
  No. 7639-VCS, 2016 WL 4440476 (Del. Ch. Aug 22, 2016)............................73

*Am. Int'l Grp., Inc. v. Greenberg*,
  965 A.2d 763 (Del. Ch. 2009) ....................................................................36, 37

*Armstrong v. Pomerance*,
  423 A.2d 174 (Del.1980) ..................................................................................49

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................24

*Banco Popular N. Am. v. Gandi*,
  184 N.J. 161, 178 (2005) ..................................................................................31

*Beam ex rel. Stewart Living Omnimedia, Inc. v. Stewart*,
  833 A.2d 961 (Del. Ch. 2003) ...............................................................44, 45, 46

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................29, 32, 53

*Bocock v. Innovate Corp.*,
  No. 2021-0224-PAF, 2022 WL 15800273 (Del. Ch. Oct. 28, 2022).........passim

*Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *11 (Del.
  Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017)................................56, 57, 59

*Brotherton v. Celotex Corp.*,
   202 N.J.Super. 148 (N.J. Super. 1985) ............................................................... 76

*Cason v. Middlesex Cnty. Prosecutors' Off.*,
   2023 WL 2263674 (D.N.J. Feb. 27, 2023) ........................................................... 21

*Cent. Laborers' Pension Fund v. Karp*,
   No. 2023-0864-LWW, 2025 WL 1213104 (Del. Ch. Apr. 25, 2025) .......... 48, 49

*City of Roseville Employees' Ret. Sys. v. Crain*,
   No. 11–2919 (JLL), 2011 WL 5042061 (D.N.J. Oct. 24, 2011) ......................... 38

*Clem v. Skinner*,
   No. 2021-0240-LWW, 2024 WL 668523 (Del. Ch. Feb. 19, 2024) .................. 38

*Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988) ................................................................................. 21

*Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*,
   385 F. Supp. 2d 449 (D. Del. 2004) ..................................................................... 40

*DelphX Corp. v. Fondren*,
   600 F. Supp. 3d 540 (E.D. Pa. 2022) .............................................................. 43, 44

*Digene Corp. v Ventana Med. Sys., Inc.*,
   476 F. Supp. 2d 444 (D. Del. 2007) ................................................................ 31, 63

*Emerson Radio Corp. v. Fok Hei Yu*,
   2001 WL 1186824 (D.N.J. Mar 30, 2021) ........................................................... 76

*Ewing v. Beck*,
   520 A.2d 653 (Del. 1987) ..................................................................................... 73

*Foulke v. Twp. of Cherry Hill*,
   No. 23-cv-2543, 2024 WL 3568841 (D.N.J. July 29, 2024) ................................. 4

*Fountain v. Giove L. Off.*,
   No. 06–2993 (WHW), 2006 WL 3833471 (D.N.J. Dec. 29, 2006) ................... 60

*Gilchinsky v. Nat'l Westminster Bank N.J.*,
   159 N.J. 463 (1999) ............................................................................................. 54

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
885 F.2d 1149 (3d Cir. 1989) ............................................................................20

*Heartland Payment Sys., LLC v. Carr*,
No. 3:18-CV-9764-BRM-DEA, 2020 WL 13836621 (D.N.J. Jan. 27,
2020) .......................................................................................................48, 49

*HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*,
No. 2019-0972-KSJM, 2022 WL 3010640 (Del. Ch. July 29, 2022) ...............67

*In re Adler, Coleman Cleaning Corp.*,
263 B.R. 406 (S.D.N.Y. 2001) ....................................................................14, 15

*In re AgFeed USA, LLC*,
558 B.R. 116 (Bankr. D. Del. 2016)..................................................................39

*In re APF Co.*,
274 B.R. 634 (Bankr. D. Del. 2001)..................................................................23

*In re Bridgeport Educ., Inc. S'holder Derivative Litig.*,
Nos. 13-cv-2947 JM (JLB), 13-cv-2950 JM (JLB) 2014 WL 5325711
(S.D. Cal. Oct. 17, 2014) ..................................................................................21

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..............................................................................7

*In re Camping World Holdings, Inc.*,
No. 2019-0179-LWW, 2022 WL 288152 (Del. Ch. Jan. 31, 2022).............47, 48

*In re Citigroup Inc. S'holder Deriv. Litig.*,
964 A.2d 106 (Del. Ch. 2009) ...........................................................................37

*In re Cred Inc.*,
650 B.R. 803 (Bankr. D. Del. 2023)............................................................50, 56

*In re Cyber Litigation Inc.*,
No. 20-12702 (CTG), 2023 WL 6938144 (Bankr. D. Del. Oct. 19,
2023) .................................................................................................................30

*In re DSI Renal Holdings, LLC*,
574 B.R. 446 (Bankr. D. Del. 2017)..................................................................27

*In re Exide Techs., Inc.*,
299 B.R. 732 (Bankr. D. Del. 2003) ....................................................23, 24, 25

*In re F-Squared Inv. Mgmt., LLC*,
No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) ..............29

*In re FAH Liquidating Corp.*,
572 B.R. 117 (Bankr. D. Del. 2017) ...................................................................25

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) .............................................................31, 76

*In re Hechinger Inv. Co. of Delaware*,
274 B.R. 71 (D. Del. 2002) ...................................................................12, 34, 35

*In re High Strength Steel, Inc.*,
269 B.R. 560 (Bankr. D. Del. 2001) ...................................................................57

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
846 F.3d 625 (3d Cir. 2017) ...............................................................................60

*In re Lear Corp. S'holder Litig.*,
967 A.2d 640 (Del. Ch. 2008) ............................................................................60

*In re Live Well Fin., Inc.*,
No. 19-11317 (LSS), 2023 WL 4025816 (Bankr. D. Del. June 14, 2023).........33

*In re LMI Legacy Holdings, Inc.*,
553 B.R. 235 (Bankr. D. Del. 2016) ...................................................................20

*In re Lyondell Chem. Co.*,
503 B.R. 348 (Bankr. S.D.N.Y. 2014) ................................................................10

*In re Maxus Energy Corp.*,
641 B.R. 467 (Bankr. D. Del. 2022) ..............................................................27, 28

*In re Midnight Madness Distilling, LLC*,
No. AP 23-00047-MDC, 2024 WL 3517620 (Bankr. E.D. Pa. July 23,
2024) ("*Midnight Madness*") ...........................................................................2, 3

*In re ML/EQ Real Est. P'ship Litig.*,
No. CIV.A. 15741, 1999 WL 1271885 (Del. Ch. Dec. 21, 1999) ................68, 70

*In re Oakwood Homes Corp*,
   340 B.R. 510 (Bankr. D. Del. 2006)............................................................24, 25

*In re Old Bpsush, Inc.*,
   No. 16-12373 (BLS), 2021 WL 4453595 (D. Del. Sept. 29, 2021) ...................40

*In re Our Alchemy, LLC*,
   642 B.R. 155 (Bankr. D. Del. 2022)..................................................................54

*In re PennySaver USA Publ'g, LLC*,
   587 B.R. 445 (Bankr. D. Del. 2018)....................................................................4

*In re Phar-Mor, Inc. Securities Litigation*,
   185 B.R. 497 (W.D. Pa. 1995), *aff'd*, 101 F.3d 689 (3d Cir.1996)..............26, 27

*In re Physiotherapy Holdings, Inc.*,
   No. 13-12965, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016) ............passim

*In re Pitt Penn Holding Co.*,
   484 B.R. 25 (Bankr. D. Del. 2012)....................................................................31

*In re Plug Power, Inc. S'holder Deriv. Litig.*,
   No. 2022-0569-KSJM, 2025 WL 1277166 (Del. Ch. May 2, 2025)..................37

*In re Quorum Health Corp*.,
   No. 20-10766, 2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)............passim

*In re Space Case*,
   No. 22-10657 (BLS), 2024 WL 1628440 (Bankr. D. Del. Apr. 15,
   2024) ....................................................................................................39, 61, 62

*In re Teleglobe Commc'ns Corp.*,
   493 F.3d 345 (3d Cir. 2007), *as amended* (Oct. 12, 2007)................................76

*In re TEU Holdings, Inc.*,
   287 B.R. 26 (Bankr. D. Del. 2002)....................................................................41

*In re Think3, Inc.*,
   529 B.R. 147 (Bankr. W.D. Tex. 2015)..............................................................39

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005) ..............................................................................65

*In re Trados Inc. S'holder Litig.*,
73 A.3d 17 (Del. Ch. 2013) ................................................................................60

*In re Tribune Co. Fraudulent Conveyance Litig.*,
2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10 F.4th 147 (2d
Cir. 2021) ...............................................................................................7, 10, 37

*In Re: Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019) ("*Tribune 2019*") .............................................10, 17

*In re: Tribune Co. Fraudulent Conveyance Litig.*,
946 F.3d 98 (2d Cir. 2016) ("*Tribune 2016*") ......................................................9

*In re Tronox Inc.*,
503 B.R. 239 (Bankr. S.D.N.Y. 2013).........................................................27, 28

*In re U.S. Mortg. Corp.*,
492 B.R. 784 (Bankr. D.N.J. 2013) .............................................................12, 32

*In re Verso Techs., Inc.*,
2010 WL 11598054 (N.D. Ga. June 30, 2010)....................................................42

*In re W.R. Grace & Co.*,
281 B.R. 852 (Bankr. D. Del. 2002)............................................................24, 25

*In re Walt Disney Co. Deriv. Litig.*,
906 A.2d 27 (Del. 2006) ..............................................................................56, 58

*In re Wonderwork, Inc.*,
611 B.R. 169 (Bankr. S.D.N.Y. 2020)..................................................................4

*In re World Health Alts., Inc.*,
385 B.R. 576 (Bankr. D. Del. 2008)...................................................................41

*Iron Workers Mid-S. Pension Fund v. Davis*,
No. 13–289, 2013 WL 6858567 (D. Minn. Dec. 30, 2013) ...............................37

*Jarbough v. Att'y Gen. of U.S.*,
483 F.3d 184, 189 (3d Cir. 2007) .......................................................................48

*Klang v. Smith's Food & Drug Centers*,
Inc., 702 A.2d 150,153 (Del. 1997)....................................................................33

*Krys v. Aaron*,
106 F.Supp.3d 472 (D.N.J. 2015) .......................................................................77

*Leb. Cnty. Employees' Ret. Fund v. Collis*,
287 A.3d 1160 (Del. Ch. 2022) ..........................................................................73

*Martinez v. E.I. DuPont de Nemours & Co.*,
86 A.3d 1102 (Del. 2014) ...................................................................................49

*McPadden v. Sidhu*,
964 A.2d 1262 (Del. Ch. 2008) ..........................................................................58

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018) ...............................................................................10, 15, 16

*Morse v. Lower Merion School District*,
132 F.3d 902 (3d Cir. 1997) ...............................................................................40

*N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) .....................................................................................57

*New Enter. Assocs. 14, L.P. v. Rich*,
295 A.3d 520 (Del. Ch. 2023) ............................................................................46

*Petr v. BMO Harris Bank, N.A.*,
95 F.4th 1090 (7th Cir. 2024). ...........................................................................11

*Polk 33 Lending, LLC v. Schwartz*,
555 F. Supp. 3d 38 (D. Del. 2021) ...............................................................42, 64

*Pomeranz v. Museum Partners, L.P.*,
No. Civ.A. 20211, 2005 WL 217039 (Del. Ch. Jan. 24, 2005) ..............66, 68, 72

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
115 A.3d 535 (Del. Ch. 2015) ............................................................................57

*Quadrant Structured Prods. Co. v. Vertin*,
102 A.3d 155 (Del. Ch. 2014) ............................................................................59

*Repetti v. Vitale*,
No. A-0424-10T2, 2011 WL 3962518 (N.J. Super. Ct. App. Div. Sept.
9, 2011) ...............................................................................................................31

*Rich v. Yu Kwai Chong*,
   66 A.3d 963 (Del. Ch. 2013) ................................................................................39

*Rudani v. Ideanomics, Inc.*,
   No. 19 Civ. 6741 (GBD), 2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) .........22

*Schmidt v. Skolas*,
   706 F. App'x 68 (3d Cir. 2017) .....................................................................22, 59

*Segway Inc. v. Cai*,
   2023 WL 8643017 (Del. Ch. Dec. 14, 2023).......................................................36

*Southey v. Twp. of Vernon*,
   No. 21-11844 (JXN) . 2025 WL 1341742 (D.N.J. May 7, 2025) ..............passim

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) .....................................................................................37

*Superior Towing & Transp., LLC v. J.B. Hunt Transp., Inc.*,
   No. 3:21-cv-00900-PGS-LHG, 2021 WL 4482824 (D.N.J. Sept. 30,
   2021) ....................................................................................................................40

*SV Inv. Partners, LLC v. ThoughtWorks, Inc.*,
   7 A.3d 973, 982 (Del. Ch. 2010) ..................................................................33, 34

*Swift v. Pandey*,
   2013 WL 3336768 (D.N.J. July 2, 2013) .............................................................4

*Tearpock-Martini v. Borough of Shickshinny*,
   756 F.3d 232 (3d Cir. 2014) .................................................................................73

*Tilden v. Cunningham*,
   No. 2017-0837-JRS, 2018 WL 5307706 (Del. Ch. Oct. 26, 2018)..............49, 50

*W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*,
   310 A.3d 985 (Del. Ch. 2024) .............................................................................75

**Statutes**

11 U.S.C. § 101(22) .................................................................................................16

11 U.S.C. § 101(22) .................................................................................................17

11 U.S.C. § 544.................................................................................11, 14, 24, 51

11 U.S.C. § 546(e) .............................................................................................passim

11 U.S.C. § 550...................................................................................................14

11 U.S.C. § 741(7) ..............................................................................................17

N.J.S.A. § 25:2-25...............................................................................................53

6 Del. C. § 1304(a)........................................................................................30, 53

10 Del. C. § 8106 ................................................................................................75

## Rules

Fed. R. Civ. P. 8.........................................................................................2, 4, 5, 33

Fed. R. Evid. 201 .................................................................................................7

Silberstein and Millhouse submit this reply in support of their motion to dismiss the Complaint.[1]

## INTRODUCTION

This is a lawsuit about holding a small group of former officers and directors personally liable for the profound disruption Covid caused across the e-commerce landscape between 2020 and 2022. Ignoring that real-word context – as well as many of the findings of Thrasio's own disinterested directors – Plaintiff assembled a sprawling Complaint that leans heavily on group pleading, conclusory allegations and hindsight. As made clear in the Motion, the Complaint fails to allege with particularity what Silberstein or Millhouse did wrong, how it was unlawful, or how it caused any cognizable harm.

Nowhere in its 114-page, smaller font Opposition (ECF No. 118) does Plaintiff meaningfully confront these shortcomings. Instead, Plaintiff recycles the same legally deficient allegations, sidesteps basic pleading standards, misreads key case law, and continues to ignore the conclusions of its own internal investigation. The Opposition's volume does not mask its lack of substance.

Below, Silberstein and Millhouse address the specific deficiencies of each of the 15 claims asserted against them. But the broader problem remains: Plaintiff's

---

[1] Capitalized terms not defined herein have the same meanings as in Silberstein and Millhouse's Motion to Dismiss the Complaint (ECF No. 63-1, "Motion" or "Mot.").

suit constitutes an improper attempt to impose personal liability on Silberstein and

Millhouse based not on plausible allegations of misconduct, but rather on

dissatisfaction with the outcome of a volatile period in Thrasio's history. That is

not a basis for liability – and it is not enough to survive a motion to dismiss.

## ARGUMENT

## I.    PLAINTIFF FAILS TO SHOW COMPLIANCE WITH RULE 8

It's true that the rules don't require "a 'perfect' pleading," as Plaintiff notes.

Opp. at 54. But there's a difference between a less-than-perfect pleading and one

that runs roughshod over Rule 8's pleading requirements. *See* Fed. R. Civ. P. 8.

The Complaint falls into the latter category and should be dismissed on that basis.[2]

The Complaint is not comparable to the "lengthy" and "dense" one in *In re*

*Midnight Madness Distilling, LLC*, No. AP 23-00047-MDC, 2024 WL 3517620

(Bankr. E.D. Pa. July 23, 2024) ("*Midnight Madness*"). Opp. at 53. Unlike the one

there, the Complaint does not contain "detailed factual allegations against the

Defendants [that] detail[] the acts and involvement of each in the alleged scheme."

*Midnight Madness*, 2024 WL 3517620, at *9. Rather, it makes conclusory

allegations against lumped-together groups of Defendants.[3] And "where certain

---

[2] Because the Complaint is rife with improper group-pled allegations, this section provides
representative examples of such allegations in footnotes, which are preceded by "*E.g.*"

[3] *E.g.*, Compl. ¶ 55 (alleging "D&O Defendants recognized the weak inventory control
environment as early as in March and April 2019" and "became aware of additional inventory
control issues in 2020 and 2021"); *id.* ¶ 82 (alleging "D&O Defendants knowingly provided false
or inaccurate information" in connection secondary sales).

alleged conduct was undertaken by a group of Defendants," the complaint in

*Midnight Madness* "defin[ed] the Defendants in groups and alleg[ed] claims

against them as groups." 2024 WL 3517620, at *9. Here, the Complaint alleges

certain actions by the Defendants or D&O Defendants, but does not assert

seemingly corresponding claims against the group.[4] In light of these (and other)

differences, Plaintiff's bald proclamation that the Complaint is "like the [one]" in

*Midnight Madness* rings hollow. Opp. at 53.[5]

The Opposition asserts that Silberstein "is mentioned *230 times* in the

Complaint." Opp. at 54 (emphasis in original). True, but irrelevant in context. In

most of those instances, the allegations refer to Silberstein and one or more other

Defendants without distinguishing between them.[6] For example, the allegations for

Count 8 identify Silberstein and five other D&O Defendants by name and assert

---

[4] *Compare, e.g.*, Compl. ¶¶ 59, 61 (alleging "D&O Defendants caused the Board to approve [the] Tender Offer" and participated in it) *with* Count 1 (asserting breach of fiduciary duty claim against Silberstein and Cashman for approving the Tender Offer).

[5] These are not the only differences between the Complaint here and the one in *Midnight Madness*. Indeed, the Complaint shares features with pleadings that were found insufficient in other cases—and that were distinguished in *Midnight Madness*—including its assertion of allegations and claims against multiple defendants despite "temporal impossibility." *Midnight Madness*, 2024 WL 3517620, at *9. *E.g.*, Compl. ¶ 122 (alleging Silberstein resigned from Thrasio in September 2021); *id.* at ¶¶ 116, 373 (alleging Thrasio forgave the promissory notes to Yardline in October 2021, and using that as an example of corporate waste under Count 26).

[6] *E.g.*, Compl. ¶¶ 11, 12, 52, 59, 65, 70, 72, 77, 87, 92, 94, 116, 132-134, 162, 185, 204, 289-291, 294 (making allegations against Silberstein and another Defendant); *id.* at ¶¶ 15, 24, 41, 77, 78, 80, 106, 142-147, 149, 155, 158, 160, 165, 169, 175, 177, 179, 191, 197, 198, 209, 210, 212, 214, 217, 218, 220-222, 225, 370 (making allegations against Silberstein and multiple Defendants).

that all of them "breached their fiduciary duties" without alleging specific facts against any of them individually. Compl. ¶¶ 207-214. Like the group-pled allegations that refer to "Defendants" and "D&O Defendants," these allegations "'fail, to one degree or another, and in one way or another, to give [Silberstein and the other ten Defendants] adequate notice of the claims against them and the grounds upon which each claim rests.'" *Foulke v. Twp. of Cherry Hill*, No. 23-cv-2543 (RMB/SAK), 2024 WL 3568841, at \*\*7-8 (D.N.J. July 29, 2024).[7]

Further, the nature of Plaintiff's claims renders group pleading more problematic here. The Complaint asserts eight fiduciary duty claims against multiple D&O Defendants, including a *Caremark* claim.[8] "'Group pleading will not suffice'" to adequately plead fiduciary duty claims. Mot. at 13-14 (citing cases). And "[t]he problem of group pleading is especially acute," where, as here, Plaintiff asserts a *Caremark* claim. *In re Wonderwork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020). Nor does it become a permissible tactic because Plaintiff asserts claims for constructive and fraudulent transfer against multiple Defendants. *E.g.*, *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 465-66 (Bankr. D. Del. 2018) (to state a fraudulent transfer claim, "the Trustee must not lump defendants

---

[7] *See also Swift v. Pandey*, 2013 WL 3336768, at \*3 (D.N.J. July 2, 2013) (complaint failed to comply with Rule 8 where asserted claims alleged that multiple named defendants "breached their fiduciary duty" but offered "no further facts to substantiate [that] legal conclusion").

[8] Counts 1, 7, 9, 10, 12, and 17 (breach of fiduciary duty, with Count 7 asserting a *Caremark* claim); Counts 11 and 18 (aiding and abetting breach of fiduciary duty).

together 'without supplying specific facts as to each defendant's wrongdoings'"). Plaintiff cannot pluck partial allegations from two asserted claims to suggest that those claims, *and the other twenty-four asserted claims*, comply with Rule 8. Opp. at 53.

Given Plaintiff's pre-suit benefits of an investigation, witness interviews, and access to Thrasio's records and communications, these pleading tactics are as telling as they are problematic. The Opposition's cavalier defense of these tactics further indicates that the claims lack factual support. Simply put, Rule 8 does not allow Plaintiff to force the eleven Defendants to speculate about, among other things, who allegedly did what, when, to whom, and how. Mot. at 11-14.

## II.    PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON THE TENDER OFFER (Counts 1 through 6)

Plaintiff fails to save its Tender Offer-based claims, which are not only legally insufficient, but also barred by the Bankruptcy Code's safe harbor provisions and judicially estopped by Plaintiff's prior representations to the Court.

### A.    The Section 546(e) Safe Harbor Bars All Six Tender Offer Related Claims (Counts 1 through 6)

#### 1.    The Court must consider Thrasio's own Tender Offer documents on which Counts 1 through 6 are based.

In determining whether § 546(e) applies to the six claims concerning the Tender Offer, the Court must consider Thrasio's own formal documents that governed the Tender Offer (ECF No. 63-6, filed under seal). These documents

consist of: (i) the unanimous written resolutions of Thrasio's board approving the

Tender Offer and the related Series C preferred stock financing, including the

approved forms of documents for consummating the Tender Offer; and (ii)

Thrasio's written agreement ("IPAA") with the two entities that served as

Thrasio's "Information Agent" (The NASDAQ Private Market, LLC, or "NPM")

and "Intermediary Agent" (SMTX, LLC, or "SMTX") for the Tender Offer.

Plaintiff does not even suggest that the Tender Offer documents are not

*authentic*, nor could it. They bear Bates numbers that Thrasio assigned to them:

THRASIO_DEBTORS_045383 *et seq*. (board resolutions and exhibits); and

THRASIO_DEBTORS_045396 *et seq*. (IPAA).

Plaintiff's argument that these documents should not be considered because

they are "outside the pleadings" (Opp. at 49) is contrary to established practice and

precedent, as two cases Plaintiff itself cites illustrate. *See* Opp. at 45-46 (citing *In*

*re Physiotherapy Holdings, Inc.*, No. 13-12965, 2016 WL 3611831 (Bankr. D. Del.

June 20, 2016); *In re Quorum Health Corp*., No. 20-10766, 2023 WL 2552399

(Bankr. D. Del. Mar. 16, 2023)).

In *Physiotherapy*, the court admitted and considered exhibits to defendant's

motion to dismiss because they were "Integral to the Complaint, Part of the

Chapter 11 proceeding, [or] relied upon in the Complaint." *Physiotherapy* at *16.

And in *Quorum*, the court considered SEC filings that the movant-defendants

submitted with their dismissal motion over the plaintiffs' objection that the SEC filings were "neither referenced in, relied upon, nor integral to the Complaint," and that the plaintiffs "must be afforded an opportunity for discovery on this factual issue" – the same arguments Plaintiff makes in this case (Opp. at 49). The court rejected the plaintiffs' arguments and considered the SEC filings, taking judicial notice of them under Fed. R. Evid. 201. *Quorum* at \*7. Plaintiff cites no caselaw to the contrary.

The Third Circuit and other courts have also so held. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at \*11 (S.D.N.Y. Apr. 23, 2019) (in denying motion to amend complaint, as it would be futile under § 546(e), court considered the proposed amended complaint's allegations "in combination with documents that are either judicially noticeable or are integral to the complaint"), *aff'd*, 10 F.4th 147 (2d Cir. 2021) ("a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss").

The Tender Offer claims reference and are based on the documents governing the Tender Offer, without which the Tender Offer could not have been

consummated. *See, e.g.*, Compl. ¶¶ 59, 63 (referencing board's approval of Tender

Offer), ¶¶ 130-137 (alleging claim for relief based on board's approval of Tender

Offer).

The Tender Offer documents state quite clearly the roles of Thrasio's agents,

SMTX and NPM, in connection with the Tender Offer. The IPAA, signed by

Thrasio's General Counsel Michael Fahey[9] (as well as NPM and SMTX) expressly

states (in the second "whereas" clause):

> Intermediary [SMTX] is registered as a broker-dealer with the
> Securities and Exchange Commission (the "SEC") pursuant to Section
> 15 of the Securities and Exchange Act of 1934, as amended . . . and is
> a member of the Financial Industry Regulatory Authority ("FINRA").

The IPAA proceeds to describe SMTX's responsibilities, in sections 2-7; they

include:

- Receiving tenders from shareholders,

- Determining whether they are qualified,

- Informing persons tendering of any irregularities or defects,

- Processing requests to withdraw tenders,

- Preparing a spreadsheet detailing the results of the Tender Offer,
  including names of persons who validly tendered, number of
  shares sold by each, purchase price, type of security sold (shares,
  options, warrants), and

---

[9] According to his LinkedIn page, Mr. Fahey served as Chief Legal Officer and Secretary of
Thrasio from April 2020 to May 2025, which included and extended well past the period of
Thrasio's reorganization in this Court. https://www.linkedin.com/in/faheymichael1/ (last visited
June 10, 2025).

- Paying the amounts payable to the persons who tendered, from SMTX's bank account, with funds Thrasio deposited in that account for that purpose.

It is therefore ludicrous for Plaintiff to argue that SMTX's role, including whether it is a "registered broker-dealer" – and, therefore, a "stockbroker" for purposes of § 546(e) – "is a factual inquiry" (Opp. at 48). Thrasio's own documents, on which Counts 1 through 6 are based, spell that out in black and white.

## 2. Section 546(e) preempts state fraudulent transfer laws.

Plaintiff also is wrong in arguing that § 546(e) does not preempt state law fraudulent transfer claims (Opp. at 45-46). In so arguing, Plaintiff relies entirely on the Delaware Bankruptcy Court's 2016 decision in *Physiotherapy*. That case did hold that § 546(e) does not preempt state law fraudulent transfer claims when three factors are present.[10] That holding is wrong on several levels and is not binding on this Court. The court in *Physiotherapy* acknowledged that: (a) district courts within the Second Circuit had split on whether section 546(e) preempts state law fraudulent transfer claims, and (b) the "Second Circuit [had] recently resolved the divide within the New York Federal Courts" in *In re: Tribune Co. Fraudulent*

---

[10] The court stated its holding as follows: "the Court holds that a litigation trustee may assert state law fraudulent transfer claims in the capacity of a creditor-assignee when: (1) the transaction sought to be avoided poses no threat of "ripple effects" in the relevant securities markets; (2) the transferees received payment for non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith. When these three factors are present, a finding of implied preemption is inappropriate." *Physiotherapy*, 2016 WL 3611831 at *10.

*Conveyance Litig.*, 946 F.3d 98 (2d Cir. 2016) ("*Tribune 2016*"), by holding that section 546(e) *does* preempt state law fraudulent transfer claims.[11]

The *Physiotherapy* court disagreed with the Second Circuit's holding and chose to adopt the reasoning and holding of an earlier decision by a district court within the Second Circuit that the Second Circuit's *Tribune 2016* decision had *abrogated*, *In re Lyondell Chem. Co.*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014).

Neither the Delaware Bankruptcy Court's decision in *Physiotherapy* nor the Second Circuit's *Tribune* decision is binding on this Court. Plaintiff does not cite a decision by the Third Circuit Court of Appeals on this point. This Court should follow the holding of a Court of Appeals of another circuit (Second) rather than that of a district court within that circuit (SDNY) that the appellate court *abrogated*.

Indeed, in 2023, seven years after *Physiotherapy*, another bankruptcy judge in the District of Delaware discussed *Physiotherapy* and *Tribune 2019*, adopted the reasoning of *Tribune 2019*, held that "the safe harbor of § 546(e) preempts the Plaintiff's ability to pursue avoidance claims under state law fraudulent transfer

---

[11]  The *Physiotherapy* court referred to *Tribune 2016* as "*Tribune II*", to distinguish it from the lower court decision in that case, which it defined as "*Tribune I*."  In 2019, the Second Circuit amended its decision in that case, *In Re: Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66 (2d Cir. 2019) ("*Tribune 2019*") – after the Supreme Court issued its decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018). In *Tribune 2019*, the Second Circuit adhered to its prior holding in *Tribune 2016* and dismissed the claims because they were preempted by the safe harbor provision, § 546(e).

law as assignees of [creditors]," and therefore dismissed two counts asserting such claims. *Quorum*, 2023 WL 2552399 at *11.

*Physiotherapy*'s reasoning was wrong in yet another respect. It held that § 546(e) does not preempt state law fraudulent avoidance claims when three circumstances are present, the second being where "the transferees received payment for non-public securities." Several Circuit Court cases, both before and after *Physiotherapy*, have held that the safe harbor "extends to transactions involving private securities that do not implicate the national securities clearance market." *Petr v. BMO Harris Bank, N.A.*, 95 F.4th 1090 (7th Cir. 2024). *See also id.* at 1099 (citing cases in the Third, Fifth, Sixth, and Eighth Circuits so holding).

This Court should adopt the reasoning of the more recent Delaware bankruptcy court decision in *Quorum*, and of the Second Circuit in *Tribune 2019* – and hold that the state fraudulent transfer claims are preempted by § 546(e) – rather than follow the discredited reasoning of *Physiotherapy*, on which Plaintiff relies.[12]

---

[12] The holding in *Physiotherapy* applied only to "claims brought *directly* under state law." That court therefore applied the safe harbor provision to and dismissed "the *federal* constructive fraudulent transfer claims . . . brought under section 544" and the Pennsylvania fraudulent transfer law. *Physiotherapy* at *15 (dismissing that claim) and *4 (describing that claim, brought under § 544 and the Pennsylvania law) (emphasis added). Even that court's erroneous holding therefore requires dismissal at least of Count 2 (which alleges constructive fraud under § 544 and an unspecified state fraudulent transfer law).

*Quorum* did hold, as Plaintiff states, that the safe harbor of § 546(e) does not bar certain claims that rely purely on state law, such as unjust enrichment. 2023 WL 2552399 at *11-12. That holding is against the weight of authority, is not binding on this Court, and this Court should not adopt it. *See* the cases cited in the Motion holding that § 546(e) preempts state law claims: *In re U.S. Mortg. Corp.* (Bankr. D.N.J. 2013) (Mot. at 18) (safe harbor bars state conspiracy claim); *Hechinger* (D. Del. 2002) (Mot. at 18) (unjust enrichment); *PHP Liquidating, LLC* (D. Del. 2003) (Mot. at 18-19) (Del. GCL § 160).

Plaintiff tries to but cannot meaningfully distinguish these cases. *In re U.S. Mortg. Corp.* did say, as Plaintiff points out (Opp. at 47), that the term "settlement payment" in § 546(e) does not apply to "systemic fraud," but that does not refer to fraudulent misrepresentations about a company's financial position or results, as alleged here. "Systemic fraud" entails, for example, as *U.S. Mortg.* pointed out, transactions in "fictitious securities" or "unregistered securities" – which is *not* alleged (and cannot be alleged) in this case.

Plaintiff's sole basis for trying to distinguishing *Hechinger* is that it concerned a "leveraged buyout" rather than a "tender offer."  That is a distinction without a difference. Section 546(e) and the reasoning and holding in *Hechinger* apply equally to both kinds of securities transactions (*see* the very broad definition of "securities contract" in 11 U.S.C. § 741(7)). Notably, there were many

12

participants in the Tender Offer apart from the Defendants. In the Tender Offer, Thrasio paid a total of about $150 million, of which, Plaintiff alleges, it paid about $62 million to Defendants combined, which means that other shareholders, including non-Thrasio insiders, received about $83 million, more than 60% of the total. Complaint ¶¶ 60-62. Section 546(e) applies equally to preempt claims against *all* selling shareholders, not just those whom Plaintiff chose to sue in this case.

Plaintiff's sole basis for trying to distinguish *PHP* (which held that § 546(e) bars a trustee's claim under Del. GCL § 160, as the Plaintiff alleges in Count 5) is that there was no dispute in that case that the transactions "cleared through stockbrokers," and Plaintiff claims it's a factual issue whether SMTX "qualifies as a stockbroker."  That is specious; as noted above: Thrasio's own formal Tender Offer documents – signed by its then (and current) Chief Financial Officer – define SMTX as a "broker-dealer" registered with the SEC and a member of FINRA. There is no *legitimate* dispute concerning SMTX's role in the Tender Offer, as more fully discussed above.

In sum, under the heavy weight of caselaw authority, § 546(e) preempts and bars all six claims (Counts 1 through 6) concerning the Tender Offer.

### 3. Section 546(e) applies to alleged actual as well as constructive fraud.

Plaintiff is wrong too in arguing that the § 546(e) safe harbor does not apply to claims of ***actual*** fraudulent transfers (Opp. at 47). The main cases on which

Plaintiff relies, yet again, held otherwise. In *Quorum*, the court dismissed claims seeking to avoid "a constructive ***and intentional*** fraudulent transfer under Bankruptcy Code §§ 544 and 550 and applicable state law . . . because the transfer is protected by safe harbor provisions of Bankruptcy Code Section 546(e)." 2023 WL 2552399 at \*2. And in *Physiotherapy*, the court held that § 546(e) does apply to transferees alleged to have participated in fraud in connection with the sale of "legitimate equity securities."  2016 WL 3611831 at \*11 ("[A]s the statute is currently written, there is no exception for insiders who allegedly acted in bad faith."). The Thrasio shares that were the subject of the Tender Offer indisputably were legitimate.

Plaintiff correctly states that "Section 546(e) explicitly carves out actual or intentional fraudulent transfer claims made ***under 548(a)(1)(A)*** of the Bankruptcy Code" (Opp. at 46 [emphasis added]). But Plaintiff is wrong in stating that § 546(e) "cannot and does not apply to bar Count 3, which alleges an actual fraudulent transfer related to the Tender Offer" (*id*.), because Plaintiff alleges claims under §§ 544 and 550, ***not*** 548(a)(1)(A). *Quorum* dismissed the ***actual*** as well as the constructive fraud claims brought under sections 544 and 550, as noted above.

The sole case on which Plaintiff relies in arguing that § 546(e) does not apply to actual fraudulent transfers, *In re Adler, Coleman Cleaning Corp.*, 263

B.R. 406 (S.D.N.Y. 2001) (Opp. at 47), is easily distinguishable. In that case, the

criminal fraudster "fabricated purchases of [shares] and booked them into the

accounts of real and fictitious customers," *id*. at 440, so "there were no actually

completed transfers of cash and securities," *id*. at 482. On these and other

egregious facts reflecting "massive frauds and other criminal conduct," *id*. at 490,

the district court concluded that the transfers were "so steeped in fraud" that they

did not even qualify as "settlement payments" under § 546(e). Nothing even close

to such circumstances is alleged in this case.

### 4. Application of Section 546(e) in this case is consistent with the Supreme Court's decision in *Merit*.

The Supreme Court's 2018 decision in *Merit Mgmt. Grp., LP v. FTI

Consulting, Inc*., 583 U.S. 366 (2018), does not foreclose application of § 546(e) in

this case, contrary to Plaintiff's argument (Opp. at 49), for two independent

reasons.

*First*, the court in *Merit* did hold that, in determining the reach of § 546(e),

the relevant transaction is the "overarching transfer" that the trustee seeks to avoid.

*Id*. at 386 ("when determining whether the § 546(e) safe harbor saves the transfer

from avoidance liability, *i.e.,* whether it was "made by or to (or for the benefit of) a

... financial institution," the Court must look to the overarching transfer . . . to

evaluate whether it meets the safe-harbor criteria"). But the Court also stated:

> Reading § 546(e) to provide that the relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid under a substantive avoiding power, the question then becomes whether that transfer was "made by or to (or for the benefit of)" a covered entity, *including a securities clearing agency*. If the transfer that the trustee seeks to avoid was made "by" or "to" a securities clearing agency …, then § 546(e) will bar avoidance, ***and it will do so without regard to whether the entity acted only as an intermediary***. The safe harbor will, in addition, bar avoidance if the transfer was made "for the benefit of" that securities clearing agency, even if it was not made "by" or "to" that entity. This reading gives full effect to the text of § 546(e).

*Id*. at 384 (emphasis added). The Court thus clarified that a transfer "to" or "by" an entity covered by § 546(e) – such as a "stockbroker" – may be avoided "without regard to whether the entity acted only as an intermediary." *Id.* An intermediary by definition is not the end-recipient of a transfer. SMTX, a broker-dealer, indisputably is a "stockbroker" and thus a covered entity. Payments under the Tender Offer were made both "to" and "by" SMTX. It therefore falls squarely within the Supreme Court's text quoted above – "§ 546(e) will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary." *Id.*

    ***Second***, and independently, Thrasio – one of the parties to the "overarching transfer" from Thrasio to Silberstein and other Defendants – was also a "financial institution" as defined for purposes of § 546(e), and thus the Tender Offer transfers are protected by the safe harbor. "Financial institution" is one of the entities covered by the safe harbor. That term is defined in 11 U.S.C. § 101(22) to include,

essentially, banks and bank-like entities.[13]  But, in addition, under the last clause of

that definition (emphasized in the footnote), a "financial institution" also includes a

"customer" of such a bank when the bank "is acting as agent or custodian for a

customer . . . in connection with a securities contract (as defined in section 741)."

*See Tribune 2019*, 946 F.3d at 77-78 (the Second Circuit's post-*Merit* decision

holding that the fraudulent transfer claims were barred by § 546(e) because the

transferor, Tribune, was a customer of a bank).

The Tender Offer indisputably was "a securities contract," which is very

broadly defined in 11 U.S.C. § 741(7). That definition includes a list of 11 kinds of

securities-related transactions, including "(vii) any other agreement or transaction

that is similar to an agreement or transaction referred to in this subparagraph; [and]

(viii) any combination of the agreements or transactions referred to in this

subparagraph."

---

[13]  11 U.S.C. § 101(22) states in full (with all emphasis added):

**(22)** The term "financial institution" means--

**(A)** a Federal reserve bank, or an entity that is a commercial or savings bank, industrial
savings bank, savings and loan association, trust company, federally-insured credit union, or
receiver, liquidating agent, or conservator for such entity and, *when any such Federal reserve
bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a
customer (whether or not a "customer", as defined in section 741) in connection with a
securities contract (as defined in section 741) **such customer***; or

**(B)** in connection with a securities contract (as defined in section 741) an investment
company registered under the Investment Company Act of 1940.

As required by the IPAA, Thrasio transferred funds necessary to

consummate the Tender Offer to SMTX's "Bank Account" at Wells Fargo Bank,

N.A. ("Wells Fargo"). IPAA § 6.3, at THRASIO_DEBTORS_672482 (defining

the Bank Account at Wells Fargo). SMTX then disbursed the funds to the Sellers

(*i.e.*, Silberstein, other defendants, and all other Sellers) from that Wells Fargo

Bank Account. IPAA §7.1 at THRASIO_DEBTORS_672483 (requiring SMTX to

make such payments from such Bank Account).

SMTX thus was a "customer" of Wells Fargo, a "financial institution,"

which made SMTX a "financial Institution" as defined in 11 U.S.C. § 101(22).

And Thrasio was a customer of SMTX as a "financial institution," which made

Thrasio a "financial institution" as defined in 11 U.S.C. § 101(22). The transfers

that Plaintiff seeks to avoid, therefore – from Thrasio to Silberstein and other

defendants – fall squarely within the safe harbor, § 546(e), because one of the

parties to the "overarching transfer," Thrasio, was a covered entity, a "financial

institution," under that section.

Accordingly, Counts 1 through 6, all of which are based on the Tender

Offer, are barred by the safe harbor provision in § 546(e) and must be dismissed.

### B.     The Disinterested Directors Report Bars Counts 1 through 6

As set forth in the moving brief, Plaintiff is estopped from bringing claims

with respect to the Tender Offer (Claims 1-6) and Silberstein's Separation

Agreement (Claims 13-14) due to its previous reliance on the DDR. Mot. at 19-20,

52. In reply to Plaintiff's Opposition with respect to these points, Silberstein and

Millhouse hereby adopt and incorporate the arguments regarding the DDR that are

set forth in Section II of Defendants Carlos Cashman, Mounir Ouhadi, Aditya

Rathod, and Cashman Family Investment II, LLC's reply in support of their

motion to dismiss ("Cashman Reply").[14]

### C.      The Business Judgment Rule Bars the Tender Offer and Other Claims

Silberstein and Millhouse hereby adopt and incorporate the reply arguments

on the business judgment rule set forth in Point I of the Cashman Reply. Because

Plaintiff improperly asks this Court to second-guess unanimous decisions of

Thrasio's full board, and fails to allege that a majority of the board was impaired,

the business judgment rule bars all claims based on board-approved actions,

namely Counts 1 through 6, 9, 10, 13, 14, 17, 25, and 26.

### D.      Count 1 Fails to Allege Breach of the Fiduciary Duty of Loyalty

Plaintiff's response to Silberstein's arguments for dismissal of Count 1

highlights the extent to which the asserted claims are untethered to law and fact.[15]

---

[14] Plaintiff's argument that incorporation-by-reference is somehow "improper" is absurd. Opp. at 17-18. Plaintiff cites a series of cases regulating attempts to incorporate disparate outside materials into a *complaint* – a far cry from referencing other parties' arguments in legal memoranda. In short, nothing in the authority cited by Plaintiff suggests that each defendant must cut-and-paste identical arguments into separate memoranda of law.

[15] As Silberstein further argues, Count 1 should also be dismissed because the claim is subject to the safe harbor, judicial estoppel, and the business judgment rule. Mot. at 15-21.

***First***, Plaintiff does not dispute that the Tender Offer was governed by the Series C-1 Stock Purchase Agreement ("Stock Agreement") or that the Stock Agreement was an integrated, binding contract between Thrasio and participating shareholders, including Silberstein.[16] Nevertheless, the Opposition suggests, without citation, that contractual preemption is inapplicable here because "the Trust [*i.e.*, Plaintiff] is not arguing that it had a contract with the Company [*i.e.*, Thrasio] that was breached." Opp. at 71. That misses the point: "'the Trustee stands in the shoes of the debtor'" and "'is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor.'" *In re LMI Legacy Holdings, Inc.*, 553 B.R. 235, 246 (Bankr. D. Del. 2016). As the successor in interest to Thrasio's claims (Compl. ¶¶ 24-28), Plaintiff is subject to "the general rule [that] bind[s] trustees to pre-petition non-executory contracts." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989). That Plaintiff was not a party to the Stock Agreement does not preclude Silberstein from relying on it here. *Id.* at 1152-55.

***Second***, Plaintiff does not dispute that Silberstein participated in the Tender Offer on the same terms as other shareholders, nor could it. Mot. at 23 (citing Compl. ¶¶ 59-61). According to Plaintiff, the Complaint "properly alleges self-

---

[16] Declaration of Martin Domb, ECF No. 63-3, at Ex. 2 (DDR) ¶¶ 50-51; *id.* at Ex. 3 (Board Approval), p. 1 and Exhibit A (Offer to Purchase and Letter of Transmittal).

dealing by Cashman and Silberstein who stood on both sides of the Tender Offer

and dictated its terms in a self-dealing manner." Opp. at 55. Count 1 thus presumes

that a director stands on both sides of a tender offer and dictates its terms in a self-

dealing way when he or she votes (with the entire board) to approve the tender

offer and participates in it on the same terms as other shareholders. But that has

been rejected as a viable premise for self-dealing claims. Mot. at 23-24 (citing *In

re Bridgeport Educ., Inc. S'holder Derivative Litig.*, Nos. 13–cv–2947 JM (JLB),

13–cv–2950 JM (JLB) 2014 WL 5325711, at \*12 (S.D. Cal. Oct. 17, 2014)).

Plaintiff does not address this precedent.

  ***Third***, Plaintiff uses the Opposition to make new allegations, accusing

Silberstein and Cashman of "feed[ing] the Board false information" that concealed

Thrasio's insolvency and inability to afford the Tender Offer. Opp. at 55-56. The

Complaint makes no such allegations, and thus they cannot be considered on a

motion to dismiss. *Southey v. Twp. of Vernon,*, No. 21-11844 (JXN) (JBC). 2025

WL 1341742, at \*6 (D.N.J. May 7, 2025) ("'[C]ourts may not consider allegations

raised for the first time in a plaintiff's opposition to a motion to dismiss."') (citing

*Cason v. Middlesex Cnty. Prosecutors' Off.*, 2023 WL 2263674, at \*5 (D.N.J. Feb.

27, 2023)).[17] Moreover, these conclusory assertions are inconsistent with the

---

[17] *See also Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)
("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion
to dismiss.").

Complaint, which shows that the Tender Offer was approved by the board based on its own calculations and conclusions, without relying on anything from Silberstein. Compl. ¶¶ 63-64. And Plaintiff "makes no real challenge [or any challenge at all] to the loyalty of the majority of board members" who approved the Tender Offer, "which [further] 'undercuts any inference that the decisions of the . . . board can be attributed to disloyalty.'" *Schmidt v. Skolas*, 706 F. App'x 68, 74 (3d Cir. 2017).

 ***Fourth***, despite having access to Thrasio's books and records, Plaintiff still fails to support its conclusory allegations that Thrasio was insolvent at the time of the Tender Offer (*i.e.*, July/August 2020) or rendered insolvent by it. These deficiencies are not offset by alleging "the Company's auditors agreed [in 2022] that there was substantial doubt as to the Company's ability to continue as a going concern as early as 2020." Opp. at 2. *E.g.*, *Rudani v. Ideanomics, Inc.*, No. 19 Civ. 6741 (GBD), 2020 WL 5770356, at *8 n.4 (S.D.N.Y. Sept. 25, 2020) (an independent auditor finding "'substantial doubt about the [c]ompany's ability to continue as a going concern'" was insufficient to show that the company was at "risk of insolvency" or "in danger of collapse"). What is more, Plaintiff's allegations of insolvency are further undermined by undisputed facts: for example, it's undisputed that "demand for Thrasio's products [was] skyrocket[ing] due to unprecedented consumer spending on Amazon and other e-commerce sites [in

2020 and 2021]." Declaration of Martin Domb, ECF No. 63-3 ("Domb Decl."), at Ex. 1 (CFO Decl.) ¶ 3.

For the reasons stated above, as well as those set forth in the Motion, Count 1 should be dismissed because it fails to state a claim for breach of the duty of loyalty based on the Tender Offer. And as discussed in section VII below, and in the Motion (Mot. at 25), the claim is time-barred under the applicable statute of limitations.

### E.    Counts 2 and 3 Fail to Allege Any Fraudulent Transfer

Counts 2 and 3 should be dismissed because Plaintiff fails to identify the applicable state law, and because Plaintiff fails to adequately plead the elements of a constructive or actual fraudulent transfer.

#### 1.    Plaintiff fails to identify "applicable state law."

Plaintiff fails to identify the "applicable state law" it seeks to invoke under § 546(b). Compl. ¶¶ 146, 164; Mot. 26-27. This flaw is fatal: § 546(b) does not create an independent cause of action, but rather enables a trustee to stand the shoes of a creditor who has the ability to proceed under a particular non-bankruptcy law. Without any identification of an "applicable law," Defendants are unable to prepare a defense. *In re Exide Techs., Inc*., 299 B.R. 732, 749 (Bankr. D. Del. 2003) (dismissing state-based fraudulent transfer claims where "Plaintiffs have failed to identify the state(s) whose laws apply to these claims"); *In re APF*

*Co.*, 274 B.R. 634, 639 (Bankr. D. Del. 2001) (dismissing complaint because trustee's allegations that transfers were fraudulent "under applicable nonbankruptcy law, which are avoidable and recoverable by the Trustee pursuant to 11 U.S.C. § 544 and applicable state law" were "vague," "conclusory" and "reduce[d] Defendant to guesswork and conjecture").[18]

Plaintiff's reliance on *Oakwood Homes* is inapt for several reasons. Opp. 21 (*citing In re Oakwood Homes Corp*, 340 B.R. 510, 526 (Bankr. D. Del. 2006)). Importantly, *Oakwood Homes* (a 2006 case) expressly relies on former, pre-*Iqbal* federal pleading standards. *Oakwood Homes*, 340 B.R. at 526 ("In coming to this conclusion, the Court notes that . . . [c]omplaints should be short and simple, giving the adversary notice while leaving the rest to further documents.").[19] A few years after *Oakwood Homes*, however, the Supreme Court expressly abandoned this bare-bones notice pleading standard. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Given the split in authority between

---

[18] Plaintiff illogically attempts to distinguish *In re Exide Techs.* on the grounds that the *Exide Techs.* plaintiffs cited model laws, while Plaintiff here cites no law whatsoever. Opp. 22; *In re Exide Techs.*, 299 B.R. 732 (Bankr. D. Del. 2003). Plaintiff's failure to provide any hint as to the applicable law does not render its complaint less deficient than the one in *Exide Techs.*, nor does the Opposition's tardy and scattershot attempt to reference four different states that incorporate two different model laws (see below). Opp. at 22.

[19] Another case cited by Plaintiff, *In re W.R. Grace & Co.*, 281 B.R. 852, 855 (Bankr. D. Del. 2002), likewise pre-dates *Iqbal.*

*Exide Techs.* and *Oakwood Homes* (a split that *Oakwood Homes* explicitly recognizes, 340 B.R. at 526), it is unquestionable that *Exide Techs.* sets forth the rule that accords with modern federal pleading standards.

In any event, *Oakwood Homes* is distinguishable on its facts. In *Oakwood Homes*, the plaintiff suggested a number of states whose fraudulent transfer laws might apply, and there was no indication there was any difference among the relevant state laws. *Oakwood Homes*, 340 B.R. at 528. Plaintiff here attempts the same thing, claiming that "all the potentially applicable jurisdictions – Delaware, Massachusetts, New Jersey, and New York… – have adopted the Uniform Voidable Transactions Act to govern potential claims of fraudulent transfer." Opp. at 22. Plaintiff is wrong: although New York and New Jersey have adopted the UVTA, Delaware and Massachusetts have not, instead retaining the older Uniform Fraudulent Transfer Act.[20]

### 2.    Plaintiff fails to plead *constructive* fraudulent transfer.

Because Thrasio received reasonably equivalent value in exchange for executing the Tender Offer, and Plaintiff fails to allege that Thrasio was rendered insolvent by the Tender Offer, Count 2 should be dismissed. Mot. at 27-29.

---

[20] Voidable Transactions Act, Uniform Law Commission, *available at* https://www.uniformlaws.org/committees/community-home?communitykey=64ee1ccc-a3ae-4a5e-a18f-a5ba8206bf49. Similarly, in the other cases cited by Plaintiff, the court expressly notes that the two states potentially supplying the Section 544(b) "applicable law" had both adopted the UFTA. Opp. 21 (citing *In re FAH Liquidating Corp.*, 572 B.R. 117, 129 (Bankr. D. Del. 2017); *W.R. Grace & Co.*, 281 B.R. at 855.

Although these are two separate inquiries, the Opposition often conflates them and

leaps back and forth between insolvency and equivalent value (*see, e.g*., Opp. at

58-59).

With respect to the equivalent value prong, Plaintiff cannot overcome the

undeniable conclusion that Thrasio netted over $112 million in cash from the

Series C-1 Stock Issuance *after* accounting for the Tender Offer. Mot. at 27.

Plaintiff's argument that the Stock Issuance and Tender Offer must be viewed as

completely separate transactions flies in the face of reality. Opp. at 59-60. As

Thrasio's disinterested directors found following a full inquiry:

> The parties agreed to the Series C-1 Stock Issuance and the Tender
> Offer in a single contract (the Series C Agreement), and the Board
> approved issuing the Series C-1 Stock and launching the Tender Offer
> in a single Unanimous Written Consent, dated as of July 1, 2020.
> Importantly, Thrasio would not have been required to launch the
> Tender Offer if the initial closing of the Series C-1 Stock Issuance did
> not occur.

Domb Decl. Ex. 2 (DDR) ¶ 51; Mot. at 27. Accordingly, "the Series C-1 Stock

Issuance and the Tender Offer should be viewed as a single, integrated

transaction," *i.e.*, the Stock Agreement. *Id.*

Indeed, this case mirrors the facts of *In re Phar-Mor, Inc. Securities*

*Litigation*, 185 B.R. 497 (W.D. Pa. 1995), *aff'd*, 101 F.3d 689 (3d Cir.1996). In

*Phar-Mor*, the debtor raised $200 million of new capital to finance an expansion,

out of which it used $75 million to purchase shares tendered by two shareholders.

*Id.* at 499. As here, the structure of the deal reflected the fact that the capital raise and tender offer were viewed by the debtor as a single transaction. *Id* at 503. The court held that the debtor received reasonably equivalent value for the tendered shares because the "effect of the integrated transaction . . . was a net financial gain for [the debtor] of $125 million in new equity." *Id.* at 504.

The cases cited in the Opposition to support its separate-transaction argument are readily distinguishable from *Phar-Mor* and the facts here. In *In re Maxus Energy Corp.*, the trustee sought to collapse (for statute-of-limitations purposes) transactions that took place over a ***twenty-one year period*** under various owners, where there was no evidence that all defendants knew of all the transactions and there was "no evidence that any party intended that [the] transactions be linked or depend on one another." 641 B.R. 467, 536-37 (Bankr. D. Del. 2022). Similarly, the court in *In re Tronox Inc.*, applying Oklahoma law, had no trouble collapsing a series of eleven transactions that took place in 2002; it required a trial, however, to determine whether defendants intended a series of agreements executed in 2005 to constitute another step in that single transaction. 503 B.R. 239 (Bankr. S.D.N.Y. 2013). And *In re DSI Renal Holdings, LLC* actually undermines Plaintiff's argument: the court there ***did*** view "the multiple transactions at issue . . . as a single integrated transaction" at the motion to dismiss

stage in order to hold that the fraudulent transfer count survived a Rule 9(b) attack.

574 B.R. 446, 468 (Bankr. D. Del. 2017).

Here, in contrast to *Maxus Energy* and *Tronox*, Plaintiff concedes the Series

C-1 Stock Issuance and the Tender Offer took place a mere ***three days apart***,

Compl. ¶ 59, and there can be no dispute that they were viewed by Thrasio at the

time as a single transaction for the reasons set forth in the Motion. Mot. at 27.

The Opposition's alternative argument that "because the Company

immediately retired the shares it redeemed," then, by definition, "the Company did

not receive reasonably equivalent value in the Tender Offer" borders on the absurd.

Opp. at 59. Such tender offers occur all the time; Plaintiff points to no authority

suggesting they are all fraudulent. In any event, Plaintiff ignores the benefits

stemming from a stock redemption, including: reducing outstanding equity,

increasing the value of remaining shares and optimizing the corporation's capital

structure.

With respect to the insolvency prong, the Opposition fails to offer anything

but a recapitulation of the Complaint's conclusory allegations that Thrasio was

insolvent during a period months after the Tender Offer took place. Opp. at 58-59;

Mot. at 28-29. Neither the Complaint nor the Opposition alleges facts regarding

Thrasio's solvency at the time of the Tender Offer. Nor can they undermine

Plaintiff's previous representations to this Court that Thrasio's directors held a

good-faith belief that Thrasio "had a surplus or other funds with which to
effectuate the Tender Offer" even if "the Tender Offer were viewed independently
from the Series C-1 Stock Issuance (which is contrary to the Series C
Agreement)." Domb Decl. Ex. 2 (DDR) ¶¶ 52-53; Mot. at 29.

Plaintiff's attempt to distinguish *In re F-Squared Investment Management* is
unavailing. Opp. 84; Mot. 28 (citing *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-
50716, 2019 WL 4261168, at *11 (Bankr. D. Del. Sept. 6, 2019)). That case stands
for the undisputed and fundamental proposition that "[w]hile it is true that
insolvency is a factual inquiry, the Trustee is still required to plead facts from
which a court can infer that the debtor was insolvent *on the date of each transfer."*
*F-Squared Inv. Mgmt.*, 2019 WL 4261168, at *11 (emphasis added) ("[A]
complaint's recitation of the word 'insolvency' is not enough to support a plausible
claim under the *Twombly* standard.") (quotations omitted). Nothing in the
Complaint or Opposition meets this basic pleading standard.

### 3.    Plaintiff fails to plead *actual* fraudulent transfer.

Plaintiff has previously told the Court that "there were valid business
reasons [for Thrasio] to enter into the Tender Offer and there are no indications
that Thrasio intended to hinder, delay, or defraud its creditors." Domb Decl. Ex. 2
(DDR) ¶¶ 53. The Complaint does not allege facts that would allow the Court to

come to any different conclusion, nor does the Opposition succeed where Plaintiff's pleading fails.

In fact, the Opposition concedes the Motion's argument: the only "badge of fraud" alleged in the Complaint – apart from the constructive fraud elements of a purported failure to receive equivalent value and insolvency, which fail for the reasons set forth above – is that "insiders" participated in the Tender Offer. Mot. at 30; Opp. at 61. As argued in the Motion, however, a mere allegation that insiders (along with non-insiders) participated in a $150 million Tender Offer on the heels of, and in conjunction with, a $260 million capital infusion is utterly insufficient to demonstrate an "actual intent to hinder, delay or defraud any investor." 6 Del. C. § 1304(a); Mot. at 30. Plaintiff does not cite any authority suggesting otherwise.

Plaintiff's citation of *In re Cyber Litigation Inc.*, No. 20-12702 (CTG), 2023 WL 6938144 (Bankr. D. Del. Oct. 19, 2023), is of no help. Opp. at 62. In that case – unlike here – the debtor "never had meaningful customers or revenues" and, importantly, the defendant ***conceded*** that the challenged transfer was meant to defraud the debtor's creditors. *Cyber Litig.*, 2023 WL 6938144, at *2, 7. ("Here, no one disputes that [the CEO's] intent was to defraud the debtor's creditors.").

For these reasons, Plaintiff's constructive and actual fraudulent transfer claims (Counts 2 and 3) fail as a matter of law – even if they were not barred by

the § 546(e) safe harbor, the business judgment rule, or judicial estoppel (which

they are).

### F.    Count 4 Fails to Allege Any Conspiracy

As a threshold issue, Plaintiff does not dispute that, if the Court dismisses

Counts 2 and 3 (fraudulent transfer), it must likewise dismiss Count 4 (conspiracy

to commit fraudulent transfer). Mot. at 31; *Digene Corp. v Ventana Med. Sys., Inc*.,

476 F. Supp. 2d 444, 446 (D. Del. 2007) ("Civil conspiracy is not an independent

cause of action in Delaware, but requires an underlying wrong which would be

actionable absent the conspiracy."); *Repetti v. Vitale*, No. A-0424-10T2, 2011 WL

3962518, at *5 (N.J. Super. Ct. App. Div. Sept. 9, 2011) ("Absent the support of a

timely UFTA claim, plaintiff's conspiracy claim cannot stand alone.").

Plaintiff similarly does not dispute that, under federal law, "Bankruptcy

courts do not recognize claims for damages for conspiracy to commit a fraudulent

transfer." *In re Pitt Penn Holding Co.*, 484 B.R. 25, 48 (Bankr. D. Del. 2012); Mot.

at 32. In an attempt to avoid this dispositive authority, Plaintiff inaptly invokes a

New Jersey state court opinion where a plaintiff was permitted to bring conspiracy

claims under New Jersey law outside the bankruptcy context. Opp. at 63 (citing

*Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 178 (2005)). This gambit, however,

is uniformly rejected in this Circuit when attempted in bankruptcy court. *E.g., In re

Fedders N. Am., Inc.*, 405 B.R. 527, 548-49 (Bankr. D. Del. 2009) (holding that a

bankruptcy "trustee's *only* authority to assert a creditor's state law causes of action related to fraudulent conveyances is found in section 544(b) of the Code," and that even if the relevant state law "does recognize a claim such as . . . 'conspiracy to commit a fraudulent transfer,' bankruptcy courts have refused to permit trustees to use section 544(b) to pursue such a claim") (emphasis added); *see also In re U.S. Mortg. Corp.*, 492 B.R. 784, 821 (Bankr. D.N.J. 2013) (state law civil conspiracy claim "preempted" by Bankruptcy Code).

Moreover, as argued in the Motion, the agreement pled in the Complaint – "an agreement to participate in the Tender Offer and benefit themselves at the expense of the Company," Compl. ¶ 177 – is as consistent with acting individually as with acting in concert, which cannot support a conspiracy claim as a matter of law. Mot. 32 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The Opposition fails to do anything but quote the same sentence of the Complaint and add a bit of conclusory gloss. Opp. at 62-63.

For these reasons – as well as the fact that it is barred by the § 546(e) safe harbor, the business judgment rule, and judicial estoppel – Plaintiff's conspiracy claim is legally deficient. It is also time-barred for the reasons set forth below in Section VII.

### G.  Count 5 Fails to Allege Any Claim Under Del. GCL § 160

Count 5 should be dismissed because, as argued in the Motion, Plaintiff fails

to adequately allege that Thrasio's capital was impaired under 8 Del. Ch.

§ 160(a)(1). Mot. at 33-34. A claim under § 160 requires allegations comparing the

amount of Thrasio's net assets with the par value of its issued stock. Plaintiff

instead relies on its unsubstantiated allegations of insolvency. Mot. at 33-34; Opp.

at 63-64. Delaware, however, rejects the argument that "balance-sheet net worth is

controlling for purposes of determining compliance with" § 160. *Klang v. Smith's

Food & Drug Centers, Inc.,* 702 A.2d 150,153 (Del. 1997).[21]

In response, Plaintiff merely compounds its error, citing a Delaware

Chancery Court case that – according to Plaintiff – equates balance-sheet

insolvency with impairment of capital for purposes of § 160. Opp. at 63 (citing *SV

Inv. Partners, LLC v. ThoughtWorks, Inc*., 7 A.3d 973, 982 (Del. Ch. 2010)). But

Plaintiff significantly omits the second half of the sentence it quotes, which

establishes precisely the opposite. What *SV Investment Partners **actually*** holds is:

"As a practical matter, the test operates roughly to prohibit distributions to

---

[21] Plaintiff also quotes conclusory allegations in the Complaint that Thrasio's capital was impaired at the time of the Tender Offer. Opp. 63. Plaintiff's fact-free recitation of the statutory language is insufficient to plead a claim under § 160. *In re Live Well Fin., Inc.*, No. 19-11317 (LSS), 2023 WL 4025816, at *6 (Bankr. D. Del. June 14, 2023) (although it "need not provide a detailed balance sheet in the Complaint to satisfy Rule 8 . . .  Trustee must still plead facts sufficient for the court to infer that [the corporation]'s capital was impaired at the time of the [transaction].").

stockholders that would render the company balance-sheet insolvent, ***but instead of using insolvency as the cut-off, the line is drawn at the amount of the corporation's capital***." *SV Inv. Partners*, 7 A.3d at 982 (emphasis added). Even under Plaintiff's authority, the Complaint fails to plead the proper comparison, even though Plaintiff has full access to Thrasio's books and records.

Furthermore, as explained in the Motion and above, the § 546(e) safe harbor bars claims brought under § 160 if brought by the Trustee. Mot. at 33. And the DDR also expressly found that Plaintiff has no § 160 claim against Silberstein. *Id.* at 34. Finally, Silberstein is protected by the business judgment rule. *Id.*

### H.    Count 6 Fails to Allege Unjust Enrichment

It is well-settled that state-law unjust enrichment claims are preempted by the Bankruptcy Code, which "provides an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy." *In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 95-97 (D. Del. 2002).

Plaintiff's attempt to distinguish *Hechinger* on the grounds that the court there also discussed "concerns regarding the unraveling of settled securities actions" is unavailing. Opp. at 47-48. Immediately after the sentence cited by Plaintiff regarding the court's concerns, the court continues:

> *Alternatively*, the court *also* finds that the Committee's unjust enrichment claim is preempted because the Bankruptcy Code, particularly sections 544 and 546(e), provides an exclusive framework for addressing claims that seek to avoid transfers made more than one

> year before bankruptcy. Thus the Code preempts the field and
> precludes supplemental state remedies because the Code alone
> comprehensively addresses such claims.

*Hechinger*, 274 B.R. at 97 (emphasis added).[22]

Moreover, there is no basis for Plaintiff's argument that its unjust enrichment claim survives preemption because it is not a "replica[]" of the Complaint's fraudulent transfer claims. Opp. at 46-48. Even the most cursory review of the Complaint demonstrates that the two claims seek precisely the same thing. *Compare* Compl. ¶¶ 156-175 (alleging that "Plaintiff is entitled to recover the transfers or the value thereof" in connection with the Tender Offer) *with* Compl. ¶¶ 187-94 (alleging that "Plaintiff is entitled to restitution from [Silberstein] and an order disgorging amounts received in connection with the Tender Offer").

Plaintiff's unjust enrichment claim fails to plead a cause of action and should therefore be dismissed. As argued elsewhere, it also is barred by the Section 546(e) safe harbor, judicially estopped, barred by the business judgment rule, and time-barred.

---

[22] In any event, Plaintiff's attempt to distinguish *Hechinger* and *PHP Liquidation* by arguing that those cases involved securities sales made through stockbrokers, Opp. 47-48, fails for the reason set forth above: the Tender Offer *was* a securities transaction cleared through a stockbroker. Mot. 16-19. Plaintiff cannot manufacture a fact issue by omitting foundational transaction documents from its Complaint or denying undisputable facts.

## III.   PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON THRASIO'S INTERNAL CONTROLS OR INVENTORY (Counts 7 and 8)

### A.   Count 7 Fails to Allege a *Caremark* Claim Based on "Inadequate Accounting and Inventory Controls"

Delaware courts repeatedly emphasize the "high bar to plead[ing] a

*Caremark* claim." *E.g.*, *Segway Inc. v. Cai*, 2023 WL 8643017, at \*1 (Del. Ch.

Dec. 14, 2023). Silberstein explained why Count 7 fails to meet that high bar. Mot.

at 35-42. Plaintiff largely ignores those arguments, contending a "lenient pleading

standard" applies while conflating the two prongs of *Caremark* and suggesting

Count 7 states a claim under one or both of them. Opp. at 65-70. It does not.

***First***, Plaintiff argues that "*In re Am. Intern. Grp., Inc.* ["*AIG*"] illustrates

how Rule 12(b)(6)'s lenient pleading standard eases this Court's scrutiny of a

*Caremark* claim at the motion to dismiss stage." Opp. at 68. Not true. The *AIG*

court "fully recognize[d] the difficulty of pleading a [*Caremark* claim], even under

a Rule 12(b)(6) standard." *Am. Int'l Grp., Inc. v. Greenberg*, 965 A.2d 763, 799

(Del. Ch. 2009). The complaint in that case, however, had "well-pled allegations of

pervasive, diverse, and substantial financial fraud" that was "extraordinary" in

nature, and included details of criminal wrongdoing, illegal transactions, and

schemes that resulted in over \$5 billion in losses. *Id.* at 775-76, 782. The *AIG*

plaintiffs stated a *Caremark* claim against certain directors because the allegations

showed they knew of the illegal schemes, "knowingly failed to stop them," and

"conscious[ly]" breached their fiduciary duties. *Id.* In sum, the "decision in [*AIG*] demonstrates the stark contrast between the allegations here and allegations that are sufficient to survive a motion to dismiss." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 130 (Del. Ch. 2009) ("Unlike the allegations in this case, the defendants in *AIG* allegedly failed to exercise reasonable oversight over pervasive *fraudulent* and *criminal* conduct.") (emphasis in original).[23]

**Second**, to the extent Plaintiff contends that Count 7 arises under the first prong of *Caremark*, the claim requires allegations that "the directors utterly failed to implement any reporting or information system or controls." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). "[T]he *Stone* court was 'quite deliberate' in endorsing the adverb 'utterly'—a 'linguistically extreme formulation' intended 'to set a high bar when articulating the standard to hold directors personally liable for a failure of oversight under the first *Caremark* prong.'" *In re Plug Power, Inc. S'holder Deriv. Litig.*, No. 2022-0569-KSJM, 2025 WL 1277166, at *12 (Del. Ch. May 2, 2025). Here, the Complaint alleges that Thrasio's controls were *inadequate*, not utterly

---

[23] Other courts have similarly found *AIG* distinguishable when assessing *Caremark* claims. *E.g.*, *Abbott Labs. v. Owens*, No. 13C–09–186 JRJ CCLD, 2014 WL 8407613, at *10 (Del. Super. Ct. Sept. 15, 2014) ("There is a stark contrast between the allegations in the present case and those in *AIG*"); *Iron Workers Mid-S. Pension Fund v. Davis*, No. 13–289 (JRT/JJG), 2013 WL 6858567, at *9 n.11 (D. Minn. Dec. 30, 2013) ("The present case is similarly distinguishable from [*AIG*], in which the court denied a motion to dismiss failure of oversight claims against two officers. In that case, the complaint provided detailed allegations indicating that the officers were 'directly knowledgeable of and involved in much of the wrongdoing.'").

non-existent. *E.g.*, Compl. ¶¶ 33, 44, 47, 50, 54, 57, 199, 211. That is insufficient

for a prong-one claim. Mot. at 36-37 (citing cases involving prong-one claims).

**Third**, Plaintiff fails to state a claim under the second prong because it does

not allege that Silberstein consciously disregarded violations of positive of law.

Mot. at 38 (citing cases).[24] In seeking to expand the "narrow range of actionable

[*Caremark* claims]," *City of Roseville Employees' Ret. Sys. v. Crain*, No. 11–2919

(JLL), 2011 WL 5042061, at *6 (D.N.J. Oct. 24, 2011), Plaintiff attempts to

shoehorn Count 7 into prong two by asserting "a myriad of red flags [were] evident

to the D&O Defendants." Opp. at 66. The Complaint's "red flag" allegations boil

down to a single email from January 2019, in which Silberstein "express[ed]

concerns" about an inaccurate financial statement and a misplaced product

shipment – both of which occurred during Thrasio's first year in business. Compl.

¶ 46; Opp. at 66.[25] The Opposition also points to Thrasio's use of third-party

inventory tracking platforms as another purported red flag. Opp. at 68. To the

extent a prong-two claim doesn't require violations of positive law, these examples

---

[24] *See also Clem v. Skinner*, No. 2021-0240-LWW, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) ("A *Caremark* prong two claim requires a plaintiff to plead that directors were presented with 'red flags related to compliance with law and consciously disregarded' them.").

[25] The Opposition asserts that Silberstein "intentionally misled the Board" with information from "inaccurate financial reports." Opp., at 69. While it's unclear whether Plaintiff makes this assertion to support Count 7, the Complaint makes no such allegation and thus it cannot be considered on a motion to dismiss. *Southey*, 2025 WL 1341742, at *6. Moreover, the only financial statement the Complaint alleges that Silberstein knew was inaccurate was from 2018 (*i.e.*, Thrasio's first, and partial, year in business), and there are no allegations he used it to mislead the board. Compl. ¶¶ 46, 52.

do not amount to red flags, let alone red flags that Silberstein "observed but 'consciously disregarded.'" *In re AgFeed USA, LLC*, 558 B.R. 116, 127 (Bankr. D. Del. 2016). *See also* Mot. at 37-42.[26]

**Fourth**, the Opposition showcases Plaintiff's inability or unwillingness to appreciate the importance of factual context. It accuses Silberstein of "mak[ing] excuses based on COVID" (Opp. at 66), without disputing the pandemic's profound and unexpected impact on Thrasio's business and the entire e-commerce industry (Mot. at 40). These undisputed facts, which were attested to in Thrasio's bankruptcy filings, are highly relevant here because they render Plaintiff's conclusory assertions all the more implausible. *In re Space Case*, No. 22-10657 (BLS), 2024 WL 1628440, at *9 (Bankr. D. Del. Apr. 15, 2024) ("Oversight duties under Delaware law are not, however, designed to subject [fiduciaries] to personal liability for failure to predict the future and to properly evaluate business risk.").

---

[26] The other cases cited in the Opposition further illustrate the high bar for *Caremark* claims. *See In re Think3, Inc.*, 529 B.R. 147, 166-67, 180 (Bankr. W.D. Tex. 2015) (denying dismissal where complaint alleged directors of a global company "utterly failed to track and manage the [company's] massive and increasing" tax liability to the Italian government, which grew by $3 million a year and led to the company's bankruptcy, by which time its tax liability stood at $23 million); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 966, 982-84 (Del. Ch. 2013) (denying dismissal where directors of publicly-traded company were aware of several red flags that showed "extensive problems with internal controls," including that (i) the directors knew of the "challenges in bringing [a foreign company's] internal controls into harmony with U.S. securities reporting systems" but "did nothing to ensure" their accuracy, (ii) the company publicly acknowledged that its financial statements had to be corrected and that its internal controls likely had "material weaknesses," and (iii) NASDAQ warned the company it would "face delisting if [it] did not bring its reporting requirements up to date with the SEC").

Accordingly, for the reasons stated above, as well as those set forth in the

Motion, Count 7 should be dismissed because Plaintiff fails to allege that

Silberstein acted in bad faith or breached the duty of loyalty for alleged oversight

failures. In addition, as discussed in section VII below and in the Motion (Mot. at

41-42), the claim is time-barred under the applicable statute of limitations.

### B.   Count 8 Fails to Allege Corporate Waste Based on Inventory

The Opposition attempts to evade the "'onerous' and 'very rarely' satisfied"

standard for pleading corporate waste, *In re Old Bpsush, Inc.*, No. 16-12373

(BLS), 2021 WL 4453595, at \*16 (D. Del. Sept. 29, 2021), asking the Court to

accept conclusory assertions and draw unwarranted inferences in Plaintiff's favor

while ignoring undisputed facts. The Court should reject that invitation. *Superior*

*Towing & Transp., LLC v. J.B. Hunt Transp., Inc.*, No. 3:21-cv-00900-PGS-LHG,

2021 WL 4482824, at \*4 (D.N.J. Sept. 30, 2021) (courts "will not accept bald

assertions, unsupported conclusions, unwarranted inferences, or sweeping legal

conclusions cast in the form of factual allegations") (citing *Iqbal*, 556 U.S. at 678-

79, 129 S.Ct. 1937; *see also Morse v. Lower Merion School District*, 132 F.3d 902,

906 (3d Cir. 1997)).

*First*, Plaintiff still fails to identify what inventory was purchased, when, by

whom, or for what purpose. These details go to heart of what courts look at when

evaluating waste claims: the transaction or exchange at issue. *Continuing*

*Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 465

(D. Del. 2004); *see also* Mot. at 42-44. Indeed, this point is illustrated by the cases

Plaintiff relies on. *In re World Health Alts., Inc.*, 385 B.R. 576, 583, 593-94

(Bankr. D. Del. 2008) (complaint alleged waste claim based on fiduciaries using

the company's "limited resources on expensive and unnecessary luxuries for [their]

personal benefits" and included details of payments for private jet charters, luxury

automobiles, and excessive bonuses); *In re TEU Holdings, Inc.*, 287 B.R. 26, 30-

31, 35 (Bankr. D. Del. 2002) (complaint alleged waste claim based on CEO's

decision to engage a logistics vendor that the company's steering committee had

already ruled out and terminated as unqualified, which resulted in the company

paying $2 million for inoperable logistics systems that "were incapable of carrying

out the functions required"). Plaintiff's failure to allege any details for any

inventory purchase warrants dismissal of Count 8.

    ***Second***, Plaintiff argues, with emphasis but without support, that "[t]he

D&O Defendants had no valid—or even *any*—business reason to purchase the

amount of excess inventory that they did." Opp. at 72 (emphasis in original). As

attested to in bankruptcy filings, Thrasio's inventory purchases were driven by a

confluence of realities: (1) the dynamics e-commerce platforms and (2) the

unprecedented surge in demand brought about by the Covid pandemic. Mot. at 43-

44 (citing CFO Decl.). A well-stocked inventory allowed Thrasio to thrive in the

midst of surging demand, but it was left with a surplus when post-pandemic

demand "'unpredictably dropped between 2022 and 2023.'" *Id.* That subsequent –

and, in this case, unforeseen – events left Thrasio with an inventory surplus "does

not retroactively render such … ordinary course transaction[s] to be 'waste.'" *Polk*

*33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 44 (D. Del. 2021) (dismissing

inventory-based waste claim). Plaintiff tries to but cannot distinguish *Polk 33*

*Lending, LLC* as involving a "transaction [that] was only retroactively ill-advised"

(Opp. at 72), particularly in light of the undisputed facts, the Complaint's

deficiencies, and the exacting standard for waste claims.[27]

 ***Third***, the Opposition makes new assertions about Thrasio's inventory

purchases: namely, that the purchases "far exceed[ed] any possible demand" and

"were a clear attempt to inflate asset values." Opp. at 73. These assertions cannot

be considered because they are not alleged in the Complaint. *Southey*, 2025 WL

1341742, at *6. They are also unsupported and devoid of any detail, and thus suffer

from the same defects as the allegations in the Complaint.

 For the reasons discussed above, and in the Motion, Count 8 should be

dismissed because Plaintiff fails to state a claim for corporate waste based on

---

[27] *See also In re Verso Techs., Inc.*, 2010 WL 11598054, at *24 (N.D. Ga. June 30, 2010)
("[T]hat certain transactions entered into by [the company] through the [defendants] ultimately
proved unprofitable, combined with the Trustee's disapproval of those transactions in hindsight,
does not meet [Delaware's] exacting standard to state a claim for corporate waste.").

Thrasio's inventory purchases. Additionally, as discussed in section VII below and in the Motion (Mot. at 44-45), the claim is time-barred under the applicable statute of limitations.

## IV.   PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON THE SECONDARY SALES (Counts 9 and 10)

### A.   Count 9 Fails to Allege Usurpation of Corporate Opportunities

According to Plaintiff, alleging that "[p]otential Company investors" bought stock from the D&O Defendants rather than from Thrasio is "sufficient to state" a usurpation claim. Opp. at 74 (relying on *DelphX Corp. v. Fondren*, 600 F. Supp. 3d 540 (E.D. Pa. 2022)). It is not. Plaintiff misleadingly suggests the usurpation claim in *DelphX Corp.* involved a fiduciary's stock trades. Opp. at 74. In fact, the fiduciary defendant in that case allegedly usurped corporate opportunities by forming a new company through which he marketed plaintiff's "proprietary securities products" and attempted to sell them to plaintiff's prospective customers. *DelphX Corp.*, 600 F. Supp. 3d at 543-44, 549. That is a classic usurpation claim, and the court had little trouble concluding it satisfied the claim's four requirements. *Id.* at 549. In contrast, Count 9 is a novel usurpation claim with no basis in law or fact. [28]

---

[28] As discussed in the Motion, usurpation claims have four requirements: "(1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." Mot. at 45-46 (quoting case). Courts have described

The Opposition ignores threshold issues that render the claim facially deficient. Mot. at 46. For one thing, Plaintiff still fails to identify any specific corporate opportunity (*e.g.*, any potential investor or stock sale), its purported value to Thrasio, or which D&O Defendant allegedly usurped it and when. Plaintiff cannot state a usurpation claim without these details. *Bocock v. Innovate Corp.*, No. 2021-0224-PAF, 2022 WL 15800273, at *18 (Del. Ch. Oct. 28, 2022). In addition, the claim itself relies on sweeping and faulty assumptions, including that all secondary stock sales were the same share class as stock being sold by Thrasio, which is incorrect, and that all secondary sale purchasers would have otherwise invested at least the same amount in buying shares from Thasio, which is sheer speculation.[29] While Count 9 should be dismissed for these defects alone, Plaintiff also fails to satisfy the four factors for a usurpation claim.

---

these as either "four elements" or "four factors." *Compare DelphX Corp.*, 600 F. Supp. 3d at 549 ("[A] usurpation claim requires four elements ….") *with Beam ex rel. Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 972 (Del. Ch. 2003) ("I now address each of the four factors"). However, the bulk of the case law suggests they should be viewed as factors, with "no one factor [being] dispositive." *Bocock v. Innovate Corp.*, No. 2021-0224-PAF, 2022 WL 15800273, at *17 (Del. Ch. Oct. 28, 2022). It makes no difference here: if they are elements, Plaintiff fails to satisfy all four; if they are factors, they weigh heavily, if not entirely, in favor of dismissal. Mot. at 45-48.

[29] Plaintiff has twisted itself into a pretzel with its kitchen sink approach to pleading. Count 9 alleges that secondary sale purchasers would have otherwise bought stock from Thrasio. Meanwhile, Count 10 alleges that the D&O Defendants knew the information provided to secondary sale purchasers (and potential Thrasio investors) was inaccurate, false, or misleading. Opp. at 73-76. While neither count states a claim, the allegations seemingly suggest that a company has a valid and protectable interest in selling stock by providing investors with inaccurate, false, or misleading information.

There is scant case law addressing usurpation claims based on a fiduciary's

corporate stock trades. Silberstein's counsel searched extensively and found one

case, *Beam ex rel. Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961 (Del.

Ch. 2003) ("*Beam*"), which resulted in the claim's dismissal. Mot. at 47. Plaintiff

writes off this case as "inapposite," contending it doesn't stand for the "broad

proposition" for which Silberstein cites it. Opp. at 75. Plaintiff misses the point:

*Beam* illustrates how the second factor – "whether the opportunity is within the

corporation's line of business" – is considered in the context of a claim based on

fiduciaries selling their stock. *Beam*, 833 A.2d at 972-73 (finding this factor

favored dismissal of claim against fiduciaries who sold "large blocks" of stock

because the company was in the business of selling "consumer products" and

"advice to homemakers," not "selling stock"). This factor also favors dismissal

here because Thrasio's line of business was e-commerce, not selling stock.

Plaintiff ignores the point without disputing it and instead argues that *Beam*

is distinguishable because Thrasio was allegedly "seeking new capital" at the time

of the D&O Defendants' secondary stock sales. Opp. at 75. Yet, *Beam* recognized

that "raising capital is a fundamental activity in which businesses are often

engaged." 833 A.2d at 973. But the court rejected the notion that such activity

defined the company's "line of business," which is based on what the company

does to generate profit. *Id*. Thrasio generates profit by e-commerce, not selling stock.

Although the Opposition fails to address any other factors for usurpation claims, those factors also weigh heavily, if not entirely, in favor of dismissal. Mot. at 45-48. Furthermore, it's undisputed that Thrasio's board expressly consented to the secondary sales. Mot. at 47-48; Opp. at 75-76. The board thus renounced and waived a usurpation claim based on those stock sales, to the extent any such claim is cognizable under Delaware law. Mot. at 47-48.[30]

Finally, the Opposition makes various other arguments and assertions that have no merit. *First*, it asserts without citation that "Defendants sought, for certain investors, to make it a precondition to their participation in the Series D that they first purchase Defendants' shares in the Secondary Sales." Opp. at 74. The Complaint makes no such allegation, and therefore it cannot be considered here. *Southey*, 2025 WL 1341742, at *6. Nor does it show that Silberstein (or any other Defendant) usurped any corporate opportunity from Thrasio. *See Bocock*, 2022 WL 15800273, at *18. *Second*, like the Complaint, the Opposition makes the conclusory assertion that the secondary sales were "against the interest of the

---

[30] *See also New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 552 (Del. Ch. 2023) ("A fiduciary that wishes to pursue a corporate opportunity can present it to the board, and if the board renounces the opportunity, then the fiduciary can proceed.").

Company," while ignoring the fact that the DDR reached the opposite conclusion. Opp. at 74; Domb Decl., Ex. 2 (DDR) ¶ 38.

As discussed above, and in the Motion, Count 9 should be dismissed because Plaintiff fails to state a claim for usurpation of corporate opportunities based on the secondary sales. And as discussed in section VII below and in the Motion (Mot. at 52), any portion of the claim that is based on the 2020 secondary sales is time-barred.

## B.    Count 10 Fails to Allege Breach of Fiduciary Duty for Misuse of "Confidential Corporate Information"

Plaintiff characterizes Count 10 as "a claim for breach of fiduciary duty based on the misuse of confidential corporate information," not insider trading. Opp. at 76.[31] But Count 10 alleges the D&O Defendants breached their fiduciary duty by misusing confidential corporate information to make the secondary stock sales (Compl. ¶¶ 227-232), and thus is based on an alleged breach of fiduciary duty for insider trading, also known as a *Brophy* claim, *In re Camping World Holdings, Inc.*, No. 2019-0179-LWW, 2022 WL 288152, at *9 (Del. Ch. Jan. 31, 2022). Delaware sets a "very high" bar for stating such claims because, as a general rule, corporate fiduciaries "'may purchase and sell the corporation's stock at will,

---

[31] As alleged in the Complaint, the purported confidential information consists of the D&O Defendants' *alleged knowledge* that Thrasio "lacked proper internal accounting and inventory controls" and that, in 2021, potential investors were provided with inaccurate 2020 financial records and inflated future projections. Compl. ¶¶ 82-84, 231-232; Mot. at 49.

without any liability to the corporation."' *Cent. Laborers' Pension Fund v. Karp*,

No. 2023-0864-LWW, 2025 WL 1213104, at \*9 (Del. Ch. Apr. 25, 2025).[32]

Plaintiff cannot clear that bar by characterizing Count 10 as something it is not.

*Jarbough v. Attorney Gen. of United States.*, 483 F.3d 184, 189 (3d Cir. 2007)

("We are not bound by the label attached by a party to characterize a claim and

will look beyond the label to analyze the substance of a claim.").[33]

Silberstein explained why Count 10 fails to state a claim. Mot. at 48-51. In

lieu of addressing those arguments, Plaintiff contends its attempt to recast Count

10 as a general fiduciary claim for alleged misuse of confidential information finds

support in a single unpublished decision, *Heartland Payment Sys., LLC v. Carr*,

No. 3:18-CV-9764-BRM-DEA, 2020 WL 13836621 (D.N.J. Jan. 27, 2020). Opp.

at 76-77. While one of the two fiduciary claims in that case was a *Brophy* claim,

Plaintiff cites to the court's discussion of the other claim, which was based on the

fiduciary's disclosure obligations to the company – not, as Plaintiff suggests,

misuse of confidential corporate information. Opp. at 76-77 (citing 2020 WL

13836621, at \*7). The decision also focused on the narrow issues raised in

defendant's motion: whether disgorgement was an available remedy on the *Brophy*

---

[32] *See also In re Camping World Holdings, Inc.*, 2022 WL 288152, at \*9 ("Our law sets the bar for stating a claim for breach of fiduciary duty based on insider trading very high.").

[33] Each D&O Defendant interpreted Count 10 as a fiduciary duty claim for insider trading. ECF Nos. 63-1 (pp. 48-51), 65-1 (pp. 21-22), 66-1 (¶ 65), 67-1 (p. 19 n.72).

claim and whether contract law governed the disclosure claim. *Heartland Payment Sys., LLC*, 2020 WL 13836621, at \*\*5-11.[34] It does not support Plaintiff's attempt to apply an amorphous, catch-all pleading standard to this claim.

Under Delaware law, the recognized exception to the general rule that fiduciaries "'may purchase and sell the corporation's stock at will'" is a *Brophy* claim for insider trading, which requires allegations showing the fiduciary (1) possessed material confidential corporate information and (2) misused it to make trades "based on the substance of that information." *Tilden v. Cunningham*, No. 2017-0837-JRS, 2018 WL 5307706, at \*19 (Del. Ch. Oct. 26, 2018). Plaintiff's attempt to subject this claim to a different standard is incompatible with principles of Delaware corporation law and the legal and policy rationales for the high bar imposed on *Brophy* claims.[35] Given that Plaintiff eschews a claim for insider trading (Opp. at 76) – which would nevertheless be subject to dismissal – Count 10 does not assert a legally cognizable claim. Even so, Plaintiff fails to state a claim under the improper standard it seeks to apply.

---

[34] *See also* Memo. in Supp. of Mot. to Dismiss, July 1, 2019, ECF No. 67-1 at 11-17 and 38-40, *Heartland Payment Sys., LLC v. Carr*, No. 3:18-cv-9764 (D.N.J.).

[35] *E.g.*, *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1107 n.28 (Del. 2014) ('The Delaware courts and legislature have long recognized a 'need for consistency and certainty in the interpretation and application of Delaware corporation law.'") (quoting *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980)); *Cent. Laborers' Pension Fund v. Karp*, No. 2023-0864-LWW, 2025 WL 1213104, at \*20 (Del. Ch. Apr. 25, 2025) ("The bar to *Brophy* liability is set high in recognition of the benefits gained by 'aligning [fiduciaries'] interests with the company through stock ownership, a dynamic facilitated by the fact that many directors and officers are compensated in stock.'").

*First*, Plaintiff's assertions that the D&O Defendants, "by virtue of their respective insider positions," possessed confidential corporate information and misused it "to pursue the Secondary Sales" (Opp. at 76-77), are wholly conclusory and insufficient to show that each D&O Defendant (1) possessed such information and (2) acted with scienter by "enter[ing] into and complet[ing] [each sale] *on the basis of, and because of*, [that] information." *Tilden*, 2018 WL 5307706, at \*\*19-20 (emphasis in original). Count 10 should be dismissed for that reason alone. *Id.*

*Second*, the allegations and undisputed facts fail to show that Silberstein knew the substance of what Plaintiff alleges made the information "confidential" at the time of the secondary sales in 2021 – *e.g.*, purported *knowledge* that the 2020 financials were "inaccurate" or that the projections were "inflated." Mot. at 48-51. Plaintiff cannot rely on Silberstein's position or title to show he possessed such knowledge. *Tilden*, 2018 WL 5307706, at \*\*19-20.

*Third*, the Complaint fails to allege that Silberstein engaged in self-dealing or acted in bad faith with respect to any secondary sale, and thus Plaintiff does not state a general duty of loyalty claim under Count 10. *In re Cred Inc.*, 650 B.R. 803, 830-31 (Bankr. D. Del. 2023) (discussing requirements for duty of loyalty claims).

For the reasons discussed above, as well as in the Motion, Count 10 should be dismissed because Plaintiff fails to state a claim for breach of the duty of loyalty based on Silberstein's alleged misuse of confidential corporate information to

make the 2021 secondary sales. And, as discussed in section VII below and in the

Motion (Mot. at 52), any portion of the claim that is based on the 2020 secondary

sales is time-barred.[36]

## V.    PLAINTIFF FAILS TO STATE A CLAIM BASED ON SILBERSTEIN'S SEPARATION AGREEMENT (Counts 13 and 14)

Plaintiff's claims seeking to avoid Silberstein's Separation Agreement are

hobbled by three threshold issues: judicial estoppel, failure to identify the source of

"applicable law" under § 544, and the business judgment rule. Mot. 52-53. These

arguments are addressed above. In addition, as set forth in the Motion and below,

Counts 13 and 14 also fail to adequately allege the elements of constructive or

actual fraudulent transfer.

---

[36] Plaintiff argues that the business judgment rule does not apply because Silberstein and Cashman supposedly obtained the board's consent to the 2021 secondary sales by concealing from the board that Silberstein "scuppered a potential SPAC transaction" and that Thrasio's CFO "abruptly resigned." Opp. at 34-35. As explained in the COR Defendants' Reply, these allegations do not preclude application of the business judgment rule. In any event, these vague assertions lend no support to either claim based on the 2021 secondary sales (Counts 9 and 10). The board knew that the SPAC transaction fell through before it consented to those sales. Compl. ¶ 75. As for the CFO's resignation, the Complaint alleges he submitted his resignation on July 8, 2021 – four days before the board gave its written consent to the 2021 secondary sales (*id.* ¶¶ 76-77) – while the Opposition asserts he submitted it "[o]n or about July 20-21, [2021]" (Opp. at 8) – more than a week *after* the board's consent. The Complaint does not allege that any directors were *in fact unaware* of the CFO's resignation at that time, Compl. ¶¶ 76-77, or that the board would have voted any differently had all directors known about his resignation. Plaintiff's assertions about the SPAC transaction and the CFO's departure are red herrings that do not support the claims based on the 2021 secondary sales.

### A.     Count 13 Fails to Allege Constructive Fraudulent Transfers In Connection With the Separation Agreement

As was the case with its Tender Offer fraudulent transfer claims, the Complaint fails to adequately allege that Thrasio did not receive equivalent value for entering into the Silberstein Separation Agreement, or that Thrasio was insolvent at the time the agreement was executed.

The Motion – quoting Thrasio's own DDR – sets forth the significant value received by Thrasio in entering into the Silberstein Separation Agreement. Mot. 53-54 (quoting Domb Decl. Ex. 2 (DDR) ¶ 48). Plaintiff illogically responds that the "fair market value" of Thrasio's release of negligence claims against Silberstein equals "at minimum . . . $183,700,919," or the full amount Silberstein earned from his secondary sales. First, as demonstrated above, Plaintiff has no claim against Silberstein with respect to the secondary sales (whether under a negligence theory or otherwise), so the true value of the release, if any, is negligible.[37]

More fundamentally, a hypothetical claim by Thrasio against Silberstein with respect to his secondary sales would not sound in negligence, or any unintentional tort theory, at all: no one claims that Silberstein *unintentionally* sold

---

[37] In any case, Plaintiff fails to discount its valuation of the release due to: (1) the fact that, in 2021, there was no expectation of suing Silberstein; (2) the possibility of losing or settling a hypothetical lawsuit against Silberstein; or (3) the legal fees involved in suing Silberstein.

his shares in 2021. Even after the release, Thrasio remained free to sue Silberstein under theories of gross negligence, fraud or criminal conduct – which Plaintiff does in this lawsuit in Counts 9 and 10. Compl. ¶ 124. Indeed, by valuing Thrasio's release of *negligence* claims against Silberstein at the full $183 million allegedly received in the secondary sales, Plaintiff implicitly values Counts 9 and 10 at zero dollars. Thrasio accordingly gave up nothing in exchange for releasing Silberstein from any negligence claims with respect to the secondary sales.

Separately, Plaintiff fails to plead Thrasio's insolvency in September 2021, despite being in possession in Thrasio's books and records. Mot. 54. Plaintiff's citation to purely conclusory allegations in the Complaint do nothing to rehabilitate its constructive fraudulent concealment claim. Opp. 84-85.

### B. Count 14 Fails to Allege Actual Fraudulent Transfers In Connection With the Separation Agreement

Once again, Plaintiff fails to adequately allege that Silberstein entered into the Silberstein Separation Agreement with "actual intent to hinder, delay or defraud any creditor of the debtor." 6 Del. C. § 1304(a); *see also* N.J.S.A. § 25:2-25. Indeed, the much more plausible explanation is that Thrasio sought to spare itself a potentially costly and public dispute with Silberstein – as the Disinterested Directors have already determined. Domb Decl. Ex. 2 (DDR) ¶ 48; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (to survive motion to dismiss, plaintiffs must "nudge[] their claims across the line from conceivable to plausible").

As above, Plaintiff claims it meets the actual fraudulent transfer standard by adding a single "badge of fraud" – transactions by those with an insider status – to the two allegations that constitute constructive fraud (no equivalent value and insolvency). Opp. 88. But Plaintiff's argument that Silberstein's insider status rendered his separation agreement fraudulent makes no sense: all separation agreements are, by definition, "transactions involving insiders," and Plaintiff cites no authority suggesting that all such agreements are fraudulent. *Id.*

The cases cited in the Opposition serve only to highlight the deficiencies of the Complaint. In *A.M.E. Inc. v. T.R. Ricotta Elec., Inc*, the plaintiff pled four badges of fraud under the New Jersey UFTA "in *addition* to specifying the fraudulent behavior."[38] The plaintiff in *In re Our Alchemy, LLC*, pled "facts indicative of" no fewer than 7 badges of fraud under Texas's fraudulent concealment statute.[39] Similarly, in *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 474 (1999), "the transfer was laced with at least seven of the 'badges of fraud' enumerated in" New Jersey's fraudulent conveyance statute. *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 478 (1999).

---

[38] No. 22-cv-5211, 2023 WL 3841746, at *4 (D.N.J. June 6, 2023) (emphasis in original) (alleging facts demonstrating concealment, transfer following threatened legal action, transfer of substantially all assets, and immediate termination of operations).

[39] 642 B.R. 155, 164 (Bankr. D. Del. 2022) (alleging facts demonstrating concealment, transfers to insiders, transfers following counterclaims against debtor, lack of consideration, transfer of substantially all assets, insolvency, removal of assets to avoid creditors).

Counts 13 and 14 should be dismissed for the above reasons, and also

because – as set forth above – Plaintiff (1) is judicially estopped from bringing

these claims, (2) fails to identify the source of applicable law, and (3) is barred by

the business judgment rule from alleging fraudulent transfer.

## VI.   PLAINTIFF FAILS TO SHOW IT STATES A CLAIM BASED ON YARDLINE  (Counts 17, 25, and 26)

The Opposition fails to show that the Complaint states a claim against

Silberstein in connection with the Yardline transactions. Counts 17, 25, and 26

should therefore be dismissed.[40] In addition, as discussed in section VII below, and

in the Motion (Mot. at 65), these claims are time-barred to the extent any of them

are based on conduct that allegedly occurred before February 28, 2021.

### A.   Count 17 Fails to Allege Breach of Fiduciary Duty in Connection With the Yardline Transaction.

Silberstein did not argue that the Complaint "need[s] to specify whether

[Count 17 asserts] a breach of duty of loyalty or breach of duty of care," as

Plaintiff contends. Opp. at 92. Rather, Silberstein noted that Count 17 alleges both

bad faith and gross negligence but doesn't specify if it arises under the duty of

---

[40] The Yardline transactions included payments to Yardline lenders and investors, which were made through promissory notes that Thrasio provided to Yardline between late April and early May 2021. Compl. ¶¶ 114-116. These payments were considered a necessary part of the acquisition to avoid the potential of costly litigation against Thrasio. *Id.* Thrasio forgave all outstanding amounts owed under the promissory notes in October 2021, by which time Silberstein was no longer at Thrasio. *Id.* at ¶¶ 116, 122. As Plaintiff concedes, to the extent any claims are based on the forgiveness of these loans, Silberstein cannot be liable because he had already left Thrasio. Opp. at 103 n.6.

loyalty or duty of care. Mot. at 55-56. Delaware has long recognized the

distinctions between these fiduciary duties. *In re Walt Disney Co. Deriv. Litig.*, 906

A.2d 27, 66 n.109 (Del. 2006). The Opposition continues to blur these duties and

suggests, but doesn't directly state, that Count 17 alleges a claim under both duties.

Opp. at 91-95. The Complaint fails to allege a breach of either duty and Plaintiff

cannot save Count 17 by shrouding its deficient allegations in ambiguity.

### 1.   Plaintiff fails to allege breach of the duty of loyalty.

Count 17 alleges that Silberstein "engaged in self-dealing" (*e.g.*, Compl.

¶ 289), which falls under the duty of loyalty. *In re Cred Inc.*, 650 B.R. 803, 830

(Bankr. D. Del. 2023). Thus, to the extent the claim was based on the duty of

loyalty, Silberstein reasonably assumed it attempted to allege self-dealing and

explained why it fails to do so. Mot. at 56-58. Perhaps cognizant of that failure,

Plaintiff contends the loyalty claim is not based on self-dealing but on the duty to

act in good faith (Opp. at 92), which is a "subsidiary element of the duty of

loyalty." *In re Cred Inc.*, 650 B.R. at 831.

To state a duty of loyalty claim for lack of good faith, Plaintiff must allege

bad faith conduct, which requires intentional misconduct that may be shown where

a "fiduciary intentionally acts with a purpose other than that of advancing the best

interests of the corporation." *Books-A-Million, Inc. S'holders Litig.*, No. 11343-

VCL, 2016 WL 5874974, at *11 n.9 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56

(Del. 2017). Courts have observed that "[b]ad faith can be the result of 'any human emotion that may cause a director to place his own interests, preferences or appetites before the welfare of the corporation ….'" *Id.* (alteration omitted). This is how Plaintiff now characterizes the loyalty claim under Count 17. Opp. at 92 (asserting Silberstein failed to act in good faith by "act[ing] on 'personal animosity' [toward Horowitz] . . . to execute a transaction to force [Thrasio] to acquire Yardline for 'no business purpose'"). Repackaging this deficient claim does not save it.[41]

*First*, the Complaint shows that Silberstein believed Thrasio would reap strategic benefits from Yardline. Compl. ¶ 96 ("Silberstein envisioned that Yardline would complement Thrasio's business model by providing debt financing to small businesses that sold products on Amazon but were not yet ready to be acquired by Thrasio."). While that negates an inference of bad faith, Plaintiff's

---

[41] Plaintiff makes the passing assertion that Silberstein and Cashman, "as directors and officers of *an insolvent company*, [owed a duty of loyalty] to maximize value to creditors." Opp. at 91 (emphasis in original) (citing *In re High Strength Steel, Inc.*, 269 B.R. 560 (Bankr. D. Del. 2001)). First, Plaintiff still fails to establish Thrasio's insolvency under Delaware law. *See* Mot. at 24-25. Second, in 2007 the Delaware Supreme Court clarified that fiduciaries of an insolvent company do not owe direct fiduciary duties to creditors. *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-103 (Del. 2007) (noting that such a right would conflict with the "directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it"). Thus, "deepening insolvency" is not a recognized claim and "[d]irectors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) (discussing Delaware law in the "post-*Gheewalla* regime").

conclusory assertions are further defeated by other allegations and undisputed facts, including that: (1) Thrasio provided Yardline with $1 million of founding capital in exchange for Yardline stock (Compl. ¶ 96); (2) Yardline successfully raised additional capital from outside investors in the months leading up to the acquisition (*id.* at ¶¶ 99-105); and (3) Thrasio's board unanimously approved the Yardline transactions (Domb Decl. Ex. 2 (DDR) ¶ 42).

**Second**, the Complaint doesn't allege that Silberstein "force[d] the Company" to either "acquire Yardline" or "make payments to Yardline's lenders," as Plaintiff now asserts. Opp. at 92, 94-95. It alleges, albeit in conclusory fashion, that Silberstein (and Cashman) "acted grossly negligently and/or recklessly in *facilitating* Thrasio's acquisition of Yardline and the payments to noteholders and investors." Compl. ¶ 290 (emphasis added). There is, of course, a vast difference between "forcing" a transaction and "facilitating" one. There's also a difference between acting in bad faith, as a duty of loyalty claim requires, and acting with gross negligence or recklessness, as a duty of care claim requires.[42] Plaintiff alleges neither.

---

[42] *E.g.*, *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("There is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence," which is "conduct that constitutes reckless indifference or actions that are without the bounds of reason," …"and bad faith," which requires "the intentional dereliction of duty or the conscious disregard for one's responsibilities …..") (quoting *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27 at 64–65 (Del. 2006)).

**Third**, Plaintiff cannot meet its burden by "simply argu[ing] in the abstract"

that Silberstein acted in bad faith because he disliked Horowitz. *Quadrant*

*Structured Prods. Co. v. Vertin*, 102 A.3d 155, 189 (Del. Ch. 2014). Specific facts

must be alleged showing that Silberstein "acted with an improper purpose," *id.*,

that is "a purpose other than that of advancing the best interests of [Thrasio],"

*Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at \*11. No such facts

are alleged here. Moreover, Silberstein's alleged animosity toward Horowitz

stemmed from his belief that Horowitz was "generat[ing] interest in the Series A

by 'lying' about Thrasio's support for the proposed financing." Compl. ¶ 105. If a

reasonable inference can be drawn from the allegations, it's that Silberstein acted

to protect and further Thrasio's interests, not his own.

**Fourth**, Thrasio's board unanimously approved the Yardline transactions.

Plaintiff's failure to challenge the loyalty of the majority of Board members further

"undercuts any inference that the decisions of the [B]oard can be attributed to

disloyalty." *Schmidt*, 706 F. App'x at 74. While Plaintiff complains that the

board's unanimous approval came after the transactions, it does not allege or argue

that the board lacked authority to approve transactions after-the-fact or that such

approvals are invalid or unlawful. Opp. at 93-94. [43]

---

[43] Plaintiff contends the Yardline transaction is subject to the entire fairness test based on (1) the
board's after-the-fact approval and (2) the alleged breach of fiduciary duty by Silberstein and
Cashman. Opp., at 93-94. However, "[t]o obtain review under the entire fairness test, [Plaintiff]

For the reasons discussed above, and in the Motion, Plaintiff fails to sufficiently allege that Silberstein breached the duty of loyalty or acted in bad faith. To the extent Count 17 asserts a duty of loyalty claim for lack of good faith, it should be dismissed.

### 2.     Plaintiff fails to allege breach of the duty of care.

Plaintiff must meet the "extremely stringent" standard for gross negligence to state a duty of care claim. *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651-52 n.45 (Del. Ch. 2008) (the claim requires gross negligence, which has a "definition [that] is so strict that it imports the concept of recklessness"). Silberstein explained why Count 17 fails to state such a claim (Mot., at 58-61), which Plaintiff ignores in favor of rehashing its conclusory assertions (Opp., at 89-94). The Opposition emphasizes that "inferences [at the pleading stage] are to be drawn in *Plaintiff's* favor" (Opp., at 94), but overlooks the fact that "those inferences must be *reasonable*," *Fountain v. Giove L. Off.*, No. 06–2993 (WHW), 2006 WL 3833471, at *3 (D.N.J. Dec. 29, 2006) (emphasis in original). And reasonable inferences must be based on "well-pleaded factual allegations," not conclusory assertions and speculation. *In re Horizon Healthcare Servs. Inc. Data*

---

must prove that there were not enough independent and disinterested individuals among the directors making the challenged decision to comprise a board majority." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013). Plaintiff makes no such allegations; nor does it cite any case that supports applying the entire fairness test here.

*Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017). No well-pleaded facts or reasonable inferences show that Silberstein acted with gross negligence in breach of the duty of care.

***First***, Plaintiff's lack of due diligence argument is seemingly based on an undated communication between Thrasio's then-CFO and an unidentified member of its finance team. Opp. at 91 (citing Compl. ¶ 110). That communication only suggests that Thrasio may not have obtained or required certain "typical" transaction documents (*i.e.*, financial, pricing, and valuation). Compl. ¶ 110. At the time of the acquisition, however, Thrasio already had extensive, first-hand knowledge of and experience with Yardline's business, management, and operations. Mot. at 59. Plaintiff doesn't argue otherwise. Against that backdrop, there is no basis to reasonably infer that Silberstein (and the entire board) breached the duty of care by failing to "consider all material information reasonably available" and "use the amount of care which ordinarily careful and prudent persons would use in similar circumstances." *In re Space Case*, 2024 WL 1628440, at *6.

***Second***, Plaintiff cannot state a duty of care claim by merely asserting that the acquisition had no "legitimate business justification." And, as discussed above, these unsupported assertions are negated by allegations showing that Silberstein

believed Yardline would complement and advance Thrasio's business model. Compl. ¶ 96.

**Third**, Plaintiff's attempt to distinguish *In re Space Case* misses the mark altogether. The debtor company in that case lost millions of dollars after vastly underestimating the cost of a NASA project it was awarded as the lowest bidder. 2024 WL 1628440, at \*\*2-3. According to the Opposition, the complaint in *Space Case* "alleged that [the company's] unrealistic expectations and unfortunate business decisions led to its bankruptcy." Opp. at 94. In fact, the trustee's complaint in that case alleged the officer defendants breached the duty of care for a host of failures, including "fail[ing] to conduct appropriate due diligence" and "applying 'bare minimum solutions' to systemic problems." *In re Space Case*, 2024 WL 1628440, at \*\*6-8. Although the complaint "may [have] demonstrate[d] that [defendants'] management of the [project] was unsuccessful" and made decisions that were "imperfect in hindsight," it did not show gross negligence. *Id.* at \*8 (granting dismissal). To put it another way, "[t]he mere fact that a strategy turned out poorly is in itself insufficient to create an inference that the officers and directors who oversaw the strategy breached their fiduciaries duties." *Id.* These principles apply with equal force here. *See also* Mot. at 58-61.

**Fourth**, Plaintiff concedes the exculpation provision in Thrasio's charter relieves its directors from personal liability for breach of the duty of care. Opp. at

92-93. That provision precludes Plaintiff from asserting a duty of care claim

against Silberstein. Mot. at 59-60.

Accordingly, for the reasons discussed above, as well as in the Motion,

Plaintiff fails to sufficiently allege that Silberstein breached the duty of care or

acted with gross negligence in the Yardline transaction. Count 17 therefore fails to

state a claim for breach of the duty of care.

### B.    Count 25 Should Be Dismissed Because Plaintiff Fails to Allege Any Conspiratorial Agreement

The Motion argues that, instead of alleging a conspiratorial agreement

among the various Defendants, Plaintiff pleads itself out of Court: the Complaint's

allegations demonstrate a complete *lack* of agreement among the purported

conspirators. Mot. at 61-62 (exhaustively cataloging Plaintiff's allegations of

disagreement and hostility in Compl. ¶¶ 94, 102, 103, 104, 105, 111, 113). The

Opposition simply fails to engage with this argument. Opp. at 100-02. Instead, it

incongruously states that a conspiracy may be inferred by an implicit agreement,

ignoring the Complaint's allegation of a *lack* of agreement. *Id.* Count 25 should be

dismissed for this reason alone.

Moreover, as with Count 4, since the Court should dismiss the Yardline-

related fraudulent transfer claims against Silberstein's alleged co-conspirators for

the reasons set forth in the briefs of those Defendants, it should similarly dismiss

the conspiracy count against Silberstein. *Digene Corp.*, 476 F. Supp. 2d at 446

("Civil conspiracy is not an independent cause of action in Delaware, but requires an underlying wrong which would be actionable absent the conspiracy.").

### C.    Count 26 Fails to Allege Corporate Waste Based on Yardline.

The Opposition contends that Plaintiff "alleged all elements of [a corporate waste] claim" and "pled specific details of the challenged [Yardline] transactions." Opp. at 103. Again, in the absence of factual allegations to support Plaintiff's bald assertions that Yardline had "zero" value and "no business purpose," it's impossible to evaluate the exchange, which is the crux of a corporate waste claim. Mot. at 63. Plaintiff has this information but neither alleges it in Complaint nor includes it in the Opposition. The "rare and highly satisfied" standard for pleading this claim cannot be met with Plaintiff's unsupported say-so. *Polk 33 Lending, LLC*, 555 F. Supp. 3d at 43.

*First*, no alleged facts show that Yardline had "zero value" at the time of the acquisition. Nor does Silberstein's alleged statement from March 2021 – that Yardline "has no meaningful value to Thrasio" (Compl. ¶ 104) – plausibly suggest that Yardline had "zero value." In fact, given Silberstein's then-existing belief that Yardline could complement Thrasio's business model (*id.* at ¶ 96), it's reasonable to infer his statement was aimed at getting Thrasio the best acquisition price. However, it's not reasonable to infer that Silberstein, a co-founder, director, officer, and shareholder of Thrasio, would support an acquisition that he knew or

believed to be "worthless" and of "zero value" to Thrasio. Plaintiff's continued failure to offer any specific facts further indicate that this claim impermissibly rests on conclusory assertions and innuendo.

***Second***, the Complaint does not allege that Thrasio's then-CFO noted the acquisition had "no business purpose." Opp., at 102 (citing Compl. ¶ 110). The paragraph the Opposition cites for that assertion relates to an undated communication about the transaction documents (Compl. ¶ 110), not its "business purpose." Moreover, since Yardline's inception in May 2020, Silberstein envisioned it would benefit Thrasio's business model. Compl. ¶ 96. By the time of the acquisition in May 2021, it's undisputed that Thrasio had extensive, first-hand knowledge of Yardline's business and operations. Mot. at 59 (citing Compl. ¶¶ 92-119). There is no basis to reasonably infer that the acquisition had "no business purpose," let alone that it was "so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *See In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

***Third***, while Plaintiff doesn't dispute that Thrasio received over $12 million in consideration when it sold Yardline in January 2022 – *i.e.*, roughly eight months after the acquisition (Compl. ¶¶ 110, 119) – Plaintiff casts these as "competing facts" that are inappropriate to consider at this stage. Opp. at 103. Not true: they are allegations from the Complaint that render Plaintiff's bald assertions about

Yardline having "zero" value facially implausible. Mot. at 64. And there is no legal

or logical basis to view the purchase and sale transactions "in isolation," as

Plaintiff contends in passing. Opp. at 103.

For the reasons discussed above, as well as those set forth in the Motion,

Count 26 should be dismissed because it fails to state a claim against Silberstein

for corporate waste.

## VII.   PLAINTIFF'S BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, CONSPIRACY AND UNJUST ENRICHMENT CLAIMS ARE TIME-BARRED

### A.     There Is No Basis for Tolling the Fiduciary Duty and Corporate Waste Claims

Plaintiff concedes that all or part of its claims for breach of fiduciary duty

(Counts 1, 7, 9, 10, and 17) and corporate waste (Counts 8 and 26) arose more than

three years before the Petition Date. Opp. at 24-28. Plaintiff, however, contends the

three-year limitations period for these claims should be tolled under one or more

doctrines. As the party seeking to invoke a tolling doctrine, Plaintiff has the

"burden of pleading specific facts to demonstrate that the statute of limitations was,

in fact, tolled." *Pomeranz v. Museum Partners, L.P.*, No. Civ.A. 20211, 2005 WL

217039, at *2 (Del. Ch. Jan. 24, 2005). It does not meet that burden.

#### 1.     Plaintiff fails to show any basis for applying the doctrine of inherently unknowable injuries.

Plaintiff invokes the doctrine of inherently unknowable injuries in an effort

to toll the limitations period for the fiduciary and corporate waste claims (Counts

1, 7, 8, 10, 17, and 26). Opp. at 24-25. Under that doctrine, Plaintiff must show (1) that "it would be practically impossible for [Thrasio] to discover the existence of a cause of action" and (2) that Thrasio "is 'blamelessly ignorant' of both the wrongful act and the resulting harm." *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, No. 2019-0972-KSJM, 2022 WL 3010640, at \*13 (Del. Ch. July 29, 2022). "If the injury is inherently unknowable, the statutory period will be suspended until the plaintiff [has] . . . 'inquiry notice' of the claim." *Altenbaugh v. Benchmark Builders Inc.*, 271 A.3d 188 (Del. 2022). "A party is deemed to have inquiry notice 'upon the discovery of facts constituting a basis for the cause of action, or [where the party] knows facts sufficient to put a person of ordinary intelligence and prudence on inquiry, which, if pursued, would lead to the discovery of such facts."' *Id.*

Plaintiff argues this doctrine should toll the fiduciary and corporate waste claims until June 2022, "when the PwC audit was released," because the "true extent" of Thrasio's purported insolvency and "dismal" finances "was not revealed until [then]." Opp. at 24. Alternatively, Plaintiff argues these claims should at least be tolled until "the fall of 2021," when the findings of AlixPartners indicated "notable issues with Thrasio's financial reporting and inventory tracking." Opp. at 24-25. Neither argument has merit. In fact, several of the claims Plaintiff seeks to toll are not even premised on Thrasio's alleged insolvency or inadequate controls.

At bottom, Plaintiff's arguments illustrate why this tolling doctrine should "rarely, if ever, apply in the entity law context." *In re ML/EQ Real Est. P'ship Litig.*, No. CIV.A. 15741, 1999 WL 1271885, at *2 n.12 (Del. Ch. Dec. 21, 1999) (rejecting doctrine's application to fiduciary duty claim).[44]

Each transaction underlying the fiduciary and corporate waste claims was done with the board's involvement, knowledge, and approval. The Complaint does not allege that the majority of directors who approved those transactions breached their fiduciary duties or were otherwise conflicted. Nor does it allege that the Thrasio's directors and officers were wholly unaware of the Company's then-existing financial conditional or internal controls. There is no basis to reasonably infer that these alleged issues were known only to the D&O Defendants. Plaintiff's attempt to invoke this doctrine is staked on unsupported inferences that defy both reality and logic.

Furthermore, if the Company was insolvent – or on the verge of insolvency – and lacking adequate internal controls, then Thrasio's board and executive management should have known about it at the time (and, in all events, well before

---

[44] *See also Pomeranz v. Museum Partners, L.P.*, No. Civ.A. 20211, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (rejecting doctrine's application to fiduciary duty and other claims, noting "[i]nherently unknowable injuries typically involve acts of malpractice or fraud of the kind that are not alleged [against defendants]").

the Company turned to an outside "investigator" in 2021).[45] The Complaint does not allege otherwise. To the contrary, the allegations show that Thrasio was at least on inquiry notice of the alleged wrongdoing and harm no later than 2020. *E.g.*, Compl. ¶ 13 ("Thrasio had no functioning general ledger" or "the ability to determine the value of existing inventory"); *id.* at ¶ 14 ("Thrasio was unable to complete audited financials for the year 2020"); *id.* at ¶ 47 ("[f]or years, Thrasio did not prepare financial statements in accordance with GAAP"); *id.* at ¶ 49 ("the board recognized the need for an audit committee in 2020"); *id.* at ¶ 54 (Thrasio "relied heavily" on inventory reports from third parties, which the Opposition contends is a red flag); *id.* at ¶ 67 (the entire board was "well aware [by February 10, 2021] . . . that Thrasio was in no position to become a publicly reporting company because the management had made no effort to address any of the numerous issues identified over the years in connection with the Company's lack of proper internal controls").

These alleged deficiencies were part of Thrasio's regular business operations. If they constituted "red flags" that were obvious to the D&O Defendants, as Plaintiff alleges in conclusory fashion, then they were undoubtedly known or "readily discoverable" to Thrasio. *Altenbaugh*, 271 A.3d 188 (for inquiry

---

[45] As discussed above, and in the Motion, the Complaint fails to allege Thrasio's insolvency under Delaware law.

notice analysis, "[t]he court should consider whether there were red flags that would have left a prudent person of ordinary intelligence to inquire further."); *In re ML/EQ Real Est. P'ship Litig.*, 1999 WL 1271885, at \*2 (noting alleged wrongdoing was "readily discoverable from [the Company's] books and records").

Plaintiff thus falls far short of pleading facts showing that it was "a practical impossibility for the [Company] to discover the alleged wrongdoing." *In re ML/EQ Real Est. P'ship Litig.*, 1999 WL 1271885, at \*2. The doctrine of inherently unknowable injuries provides no basis for tolling the fiduciary claims (Counts 1, 7, 10, and 17) or corporate waste claims (Counts 8 and 26).

### 2. Plaintiff fails to show any basis for applying the doctrine of equitable tolling.

Next, Plaintiff argues the doctrine of equitable tolling applies to the fiduciary claims under Counts 1, 7, 10, and 17. Opp. at 25-26. "[T]he statute of limitations is tolled [under this doctrine] for claims of wrongful self-dealing . . . where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Bocock*, 2022 WL 15800273, at \*11. The doctrine has a "heightened pleading requirement" that does "not require[] [the court] to draw plaintiff-friendly inferences when determining whether the pleadings support tolling." *Id.* at \*12. And where it applies, the limitations period "is tolled only until the plaintiff discovers or, exercising reasonable diligence, should have discovered [their] injury" (*i.e.*, inquiry notice). *Id.* at \*14.

The Opposition contends this doctrine tolls the fiduciary duty claims based on allegations that the D&O Defendants engaged in self-dealing" in connection with the Tender Offer, the secondary sales, and the Yardline transaction. Opp. at 25. And, "[o]nce again," according to Plaintiff, the "true extent" of Thrasio's injury "was obfuscated and unknowable until the audited, accurate financial statements were produced in November 2022." *Id.*[46] Once again, Plaintiff's arguments fail.

*First*, as discussed above in connection with the fiduciary duty claims, the Complaint fails to allege self-dealing. Plaintiff therefore fails to plead the necessary condition for invoking the equitable tolling doctrine.

*Second*, Plaintiff's attempt to use the equitable tolling doctrine fails for similar reasons as its attempt to use the doctrine of inherently unknowable injuries. As discussed above, the allegations show that Thrasio was at least on inquiry notice of the alleged injury in 2019 or 2020. *E.g.*, Compl. ¶¶ 13, 14, 47, 49, 54, 67. To the extent Thrasio did not have actual knowledge by that time, the Company "should have discovered" it by "exercising reasonable diligence." *Bocock*, 2022 WL 15800273, at *14. Plaintiff's conclusory and incredulous arguments fail to show otherwise. Nor does Plaintiff allege any "reasonable steps [Thrasio] took to

---

[46] Given allegations in the Complaint, Silberstein believes November 2022 should be June 2022, when PwC completed the audited financials for 2020. Opp. at 24; Compl. ¶ 14.

monitor [or oversee]" its business operations, as required under the doctrine. *Id.* at *12.

*Third*, the Opposition suggests that "Defendants hid [and obfuscated] the true state" of Thrasio's finances from the Company, its board, and/or its officers. Opp. at 24, 25. The Complaint does not make such allegations, and thus they cannot be considered. *Southey*, 2025 WL 1341742, at *6. Moreover, this conclusory, group-pled assertion does not give Thrasio a pass to ignore alleged "numerous red flags," which, according Plaintiff, had been raised at full mast for years. The allegations show that Thrasio was at least on inquiry notice by 2019 or 2020. The Company "may not simply wait until the details of the harm are provided to [it] before the statute begins to run." *Pomeranz*, 2005 WL 217039, at *12. That the D&O Defendants were fiduciaries does not change that fact. *Id.*

Plaintiff cannot rely on the equitable tolling doctrine because it fails to plead facts showing self-dealing. Even if the doctrine could apply, the fiduciary duty claims (Counts 1, 7, 10, and 17) are time-barred because Thrasio was on inquiry notice as early as 2020.

### 3. Plaintiff fails to show any basis for applying the continuing wrong doctrine.

Plaintiff's last attempt to rescue its fiduciary and corporate waste claims is to allege that they constitute "continuing wrongs," such that Plaintiff can sue for

alleged wrongdoing that concededly occurred outside the limitations period. Opp.

26-28. Plaintiff misconstrues the law, as well as its own pleadings.

In this Circuit, the continuing wrong doctrine is "understandably narrow"

and applies *only* to inherently ongoing wrongful conduct. *Tearpock-Martini v.

Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014); *AM Gen. Holdings LLC

v. Renco Grp., Inc*., No. 7639-VCS, 2016 WL 4440476, *11 (Del. Ch. Aug 22,

2016) ("The continuing breach doctrine is "narrow" and "typically is applied only

in unusual situations."). To plead a continuing wrong, "the plaintiff must allege

that the various acts are so inexorably intertwined that there is but one continuing

wrong." *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987).

The test for whether repeated conduct is a continuing wrong is relatively

straightforward: the continuing wrong doctrine cannot be applied unless the

plaintiff can demonstrate that its "cause of action [did] not accrue until the *last* act

of the continuing wrong," which must have occurred within the limitations period.

*Leb. Cnty. Employees' Ret. Fund  v. Collis*, 287 A.3d 1160, 1197 (Del. Ch. 2022).

In other words, the continuing wrong doctrine "does not apply even when

confronted with numerous wrongs of similar, if not same, character over an

extended period" so long as "plaintiff could have alleged a *prima facie*

case . . . after a single incident."  *AM Gen. Holdings*, 2016 WL 4440476, at *12.

Plaintiff's claims, as pled in the Complaint, allege discrete acts in which Defendant's purported liability – if any – would have accrued at the time of each alleged wrongdoing. Specifically:

Counts 7 and 8 allege that Defendants breached their fiduciary duties and wasted corporate assets "by causing Thrasio to purchase an estimated $800 million in excess inventory by February 2022." Compl. ¶ 212. By definition, each decision to purchase excess inventory was a discrete event, and, if it constituted a breach of Defendants' duty, each purchase was actionable at the moment it occurred. Plaintiff may therefore sue with respect to those inventory purchases post-dating February 28, 2021; claims regarding earlier purchases are time-barred.

Counts 9 and 10 allege that Silberstein breached his duty of loyalty and usurped a corporate opportunity as a result of his secondary stock sales. As above, however, each stock sale was a discrete act, and if any individual sale violated Silberstein's duties to Thrasio, it was actionable upon completion. Plaintiff can timely advance claims with respect to secondary sales after February 28, 2021; claims regarding earlier sales are time-barred.

Counts 17 and 26 allege breach of fiduciary duty and corporate waste related to the Yardline transactions. The Complaint clearly alleges a series of individual "Yardline transactions," and argues that each one was separately actionable.

Compl. ¶¶ 92-119, 370. Accordingly, claims involving transactions post-dating February 28, 2021 are timely; claims regarding earlier transactions are not.

The case cited by Plaintiff (Opp. 26-27), *West Palm Beach Firefighters' Pension Fund*, supports the distinction between the "discrete act method" and the "continuing wrong method," agreeing that the continuing wrong method is inappropriate where "a claim arises at distinct point in time and is effectively complete as of that date." *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 994 (Del. Ch. 2024). Moreover, even if *West Palm Beach Firefighters' Pension Fund* suggested a different approach, the court's decision was based on a laches analysis, not on statutes of limitations, and therefore is inapplicable here. *Id.* at 993-94.

### B. Conspiracy to Fraudulently Transfer Tender Offer Proceeds (Count 4) and Unjust Enrichment (Count 6) Are Untimely Under Delaware Law

Plaintiff does not dispute that its conspiracy and unjust enrichment claims relating to the August 2020 Tender Offer would be time-barred under Delaware's three-year statute of limitations. Mot. 32-33, 34-35; 10 Del. C. § 8106. Citing only state-law cases, however, Plaintiff argues that choice-of-law rules require this Court to apply either New Jersey's six-year statutes of limitations to these claims,

or else Massachusetts's three-year (conspiracy) and six-year (unjust enrichment) limitations periods. Opp. 28-31. Plaintiff is incorrect.[47]

It is "now well-established" in federal and state courts that "only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 386 (3d Cir. 2007), *as amended* (Oct. 12, 2007); *Brotherton v. Celotex Corp*., 202 N.J.Super. 148, 154 n.1 (N.J. Super. 1985). The "internal affairs" doctrine is applicable to both conspiracy claims and unjust enrichment claims where the underlying act implicates the corporation's internal affairs. *In re Fedders North America, Inc*., 405 B.R. 527, 543 (Bankr. Del. 2009) (applying internal affairs doctrine to aiding and abetting claims, which are "essentially civil conspiracy claims"); *Emerson Radio Corp. v. Fok Hei Yu*, 2001 WL 1186824, *4 (D.N.J. Mar 30, 2021) (unjust enrichment claims that are "inextricably intertwined with [corporation's] internal affairs" are governed by law of the state of incorporation).

Given the allegations of the Complaint, there can be no dispute that Plaintiff's conspiracy and unjust enrichment claims – both of which are tied to the Tender Offer – implicate "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" under the

---

[47] Even if Massachusetts's statute of limitations law were held to apply, Plaintiff's conspiracy claim would nonetheless be time-barred because – for the reasons set forth above – Plaintiff is not entitled to toll the 3-year limitations period.

internal affairs doctrine, and therefore are governed by Delaware law. *Krys v. Aaron*, 106 F.Supp.3d 472, 484 (D.N.J. 2015). Plaintiff alleges, among other things, that: Silberstein and Cashman violated their duties as co-CEOs and directors in voting in favor of the Tender Offer, Compl. ¶ 59; the Tender Offer improperly involved "a number of insiders" who wrongfully "exercised control of the Company," *id.* ¶ 60; and the Tender Offer was based on incorrect internal valuations derived by officers and directors, *id.* ¶¶ 63-64. Likewise, Plaintiff's conspiracy count focuses on the actions of corporate insiders. *Id.* ¶ 177 (alleging that insiders "ensured that the Board approved the Tender Offer and signed the consent approving the Tender Offer . . . despite knowing about the internal problems the Company had"); *id.* ¶¶ 188-91.

Indeed, Plaintiff ***acknowledges*** that Delaware law applies to the Tender Offer – at least where such an acknowledgement works in its favor. In Count 5, Plaintiff expressly brings a claim challenging the Tender Offer under ***Delaware statutory law*** – not New Jersey or Massachusetts law. *Id.* ¶¶ 181-86. Plaintiff cannot simply pick and choose which state's laws apply to the Tender Offer based on convenience.[48]

---

[48] Separately, the offering documents with respect to the Tender Offer expressly establish Delaware as the source of governing law "without reference to such state's principles of conflicts of law." Domb Decl. Ex. 3 (Board Approval), at Ex. A pp. 9-10, 34-35. While perhaps not controlling on Plaintiff's tort claims, the choice-of-law provision evinces Thrasio's clear intent to have claims relating to the Tender Offer governed by Delaware law.

Counts 4 and 6 are accordingly time-barred under Delaware's three-year limitations period.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in their Opening Memorandum, Defendants Joshua Silberstein and Everything's Coming Up Millhouse, LLC respectfully request that the Court grant their motion and dismiss (a) Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 17, 25 and 26 of the Complaint as they relate to Joshua Silberstein, and (b) Counts 2, 3 and 6 as they relate to Everything's Coming Up Millhouse, LLC.

Dated:  June 16, 2025

**AKERMAN LLP**

 /s/ Mark S. Lichtenstein
Mark S. Lichtenstein
mark.lichtenstein@akerman.com
Martin Domb (admitted *pro hac vice*)
Martin.domb@akerman.com
Keith Blackman (admitted *pro hac vice)*
keith.blackman@akerman.com
1251 Avenue of the Americas, 37th Floor
New York, NY 10020
Tel.: (212) 880-3800

- and -

John Thompson (admitted *pro hac vice*)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760

*Attorneys for Defendants Joshua
Silberstein and Everything's Coming Up
Millhouse, LLC*