**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
L. Reid Skibell (NJ Bar No. 359852021)
Michael Paul Bowen (*pro hac vice*)
Agustina G. Berro (*pro hac vice*)
George L. Santiago (*pro hac vice*)
Peter C. Charnell (*pro hac vice*)
Email: rskibell@glennagre.com
mbowen@glennagre.com
aberro@glennagre.com
gsantiago@glennagre.com
pcharnell@glennagre.com
*Attorneys for Daniel Boockvar*

| | |
|---|---|
| In re: | Chapter 11 |
| 1 THRASIO ONE, INC.,[1] | Case No. 24-11850 (CMG) |
| *Reorganized Debtor*. | (Jointly Administered) |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust, | |
| *Plaintiffs*, | |
| v. | Adversary Proc. No. 24-01637 (CMG) |
| JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; and YARDLINE CAPITAL CORP., *Defendants*. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT DANIEL BOOCKVAR'S MOTION TO COMPEL ARBITRATION AND STAY, OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT

---

[1] The last four digits of Reorganized Debtor's tax identification number are 4771. The Reorganized Debtor's service address for purposes of this chapter 11 case is 85 West Street, 3rd Floor, Walpole, MA, 02081.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 4

I.     Plaintiff Cannot Avoid its Contractual Obligation to Arbitrate the State Law Claims ...... 4

    A.     Plaintiff is Bound By the Arbitration Agreements Because as Trustee Plaintiff
         Stands in the Shoes of Thrasio................................................................................ 4

    B.     The Arbitration Agreements Survive the Plan's Rejection Because Section 365(g)
         Treats Rejection of Executory Contracts as a Breach, Not Termination ............... 6

    C.     The Arbitration Agreements Cover the State Law Claims .................................... 9

II.    Plaintiff's Opposition Confirms That a Stay Pending Arbitration is Warranted .............. 11

III.   Plaintiff Cannot Establish Subject Matter Jurisdiction Over the State Law Claims......... 14

IV.    Plaintiff's Opposition Confirms That Dismissal of the Claims Against Boockvar
    Is Warranted  ................................................................................................................ 16

    A.     Plaintiff's Mismanagement Claims Remain Deficient (Counts 7-8).................... 17

    B.     Plaintiff's Tender Offer Claim Remains Deficient (Counts 6)............................ 21

    C.     Plaintiff's Secondary Sales Claims Remain Deficient (Counts 9-11) ................. 21

    D.     Plaintiff's Yardline Transaction Claims Remain Deficient (Counts 18, 26)........ 25

    E.     Plaintiff Still Fails to Plausibly Plead Any of the Avoidance
         Claims (Counts 2-4, 25)....................................................................................... 26

CONCLUSION.................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.*,
  362 B.R. 624 (Bankr. S.D.N.Y. 2007) ........................................................................ 28

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*,
  2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023) ................................................... 28

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986) ........................................................................................... 10, 11

*Brayman Const. Corp. v. Home Ins. Co.*,
  319 F.3d 622 (3d Cir. 2003) ............................................................................... 10, 11

*Crawford v. W. Jersey Health Sys. (Voorhees Div.)*,
  847 F. Supp. 1232 (D.N.J. 1994) ............................................................................... 13

*DiValerio v. Best Care Lab'y, LLC*,
  2022 WL 20679837 (D.N.J. Mar. 28, 2022) ............................................................. 13

*Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*,
  2021 WL 4593777 (Del. Ch. Oct. 5, 2021) ............................................................... 18

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
  2007 WL 4292024 (Del. Ch. Nov. 30, 2007) ............................................................ 17

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  885 F.2d 1149 (3d Cir. 1989) ...................................................................................... 5

*Hays v. Almeida*,
  2019 WL 3389172 (Del. Ch. July 26, 2019) ............................................................. 18

*HCB Enters., LLC v. Dickey's Barbecue Rests., Inc.*,
  2020 WL 3643430 (D. Nev. July 6, 2020) .................................................................. 8

*Higher Educ. Mgmt. Grp., Inc. v. Mathews*,
  2014 WL 5573325 (Del. Ch. Nov. 3, 2014) .............................................................. 24

*In re ACandS, Inc.*,
  2011 WL 3471243 (Bankr. D. Del. Aug. 8, 2011) .................................................... 16

*In re AgFeed USA, LLC*,
  546 B.R. 318 (Bankr. D. Del. 2016) ......................................................................... 20

*In re Am. Int'l Grp., Inc.*,
   965 A.2d 763 (Del. Ch. 2009) ............................................................ 17

*In re AstroPower Liquidating Trust*,
   335 B.R. 309 (Bankr. D. Del. 2005) .................................................... 14

*In re Bateman*,
   585 B.R. 618 (Bankr. M.D. Fla. 2018) ............................................... 7, 8

*In re BBCK One Holding Corp.*,
   2024 WL 4772408 (Bankr. D.N.J. Nov. 13, 2024) ................................ 5

*In re CIT Grp. Inc.*,
   2012 WL 831095 (Bankr. S.D.N.Y. Mar. 9, 2012) ............................... 8

*In re Contract Research Solutions, Inc.*,
   2013 WL 1910286 (Bankr. D. Del. May 1, 2013) ................................. 6

*In re Cred Inc.*,
   650 B.R. 803 (Bankr. D. Del. 2023) ............................................... 24, 25

*In re Draw Another Circle.*,
   602 B.R. 878 (Bankr. D. Del. 2019) ................................................... 24

*In re DSI Renal Holdings, LLC*,
   574 B.R. 446 (Bankr. D. Del. 2017) ................................................... 27

*In re EXDS, Inc.*,
   316 B.R. 817 (Bankr. D. Del. 2004) ................................................... 13

*In re EXDS, Inc.*,
   352 B.R. 731 (Bankr. D. Del. 2006) ................................................... 15

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ................................................... 29

*In re Flagstaff Realty Assocs.*,
   60 F.3d 1031 (3d Cir. 1995) ................................................................ 9

*In re Fleming Companies*,
   325 B.R. 687 (Bankr. D. Del. 2005) ................................................... 12

*In re Fleming Companies, Inc.*,
   2007 WL 788921 (D. Del. Mar. 16, 2007) ........................................ 6, 8

*In re Hagerstown Fiber Ltd. P'ship*,
   277 B.R. 181 (Bankr. S.D.N.Y. 2002) ................................................ 13

iv

*In re Highland Cap. Mgmt., L.P.*,
  2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021) ............................................... 7

*In re Insilco Techs., Inc.*,
  330 B.R. 512 (Bankr. D. Del. 2005) .................................................................. 14, 15

*In re Intel Corp. Derivative Litig.*,
  621 F. Supp. 2d 165 (D. Del. 2009) ........................................................................ 17

*In re Paragon Offshore PLC*,
  588 B.R. 735 (Bankr. D. Del. 2018) ............................................................... 5, 8, 14

*In re Pitt Penn Holding Co.*,
  484 B.R. 25 (Bankr. D. Del. 2012) ......................................................................... 29

*In re Ramirez*,
  413 B.R. 621 (Bankr. S.D. Tex. 2009) ................................................................... 29

*In re Statewide Realty Co.*,
  159 B.R. 719 (Bankr. D.N.J. 1993) .......................................................................... 5

*In re TEU Holdings, Inc.*,
  287 B.R. 26 (Bankr. D. Del. 2002) ......................................................................... 20

*In re Think3, Inc.*,
  529 B.R. 147 (Bankr. W.D. Tex. 2015) ................................................................. 19

*In re Washington Mut., Inc.*,
  2012 WL 4755209 (Bankr. D. Del. Oct. 4, 2012) ................................................. 16

*In re: Old Bpsush, Inc.*,
  2021 WL 4453595 (D. Del. Sept. 29, 2021) .......................................................... 18

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ..................................................................................... 25

*Michaels v. World Color Press, Inc. (In re LGI, Inc.)*,
  322 B.R. 95 (Bankr. D.N.J. 2005) .......................................................................... 15

*Neal v. Asta Funding, Inc.*,
  2014 WL 131770 (D.N.J. Jan. 6, 2014) .................................................................. 13

*Newark Bay Cogeneration Partnership, LP v. ETS Power Grp.*,
  2012 WL 4504475 (D.N.J. Sep. 28, 2012) ............................................................. 11

*Olde Discount Corp. v. Tupman*,
  1 F.3d 202 (3d Cir. 1993) ......................................................................................... 9

*Raynor v. Verizon Wireless (VAW), LLC*,
   2016 WL 1626020 (D.N.J. Apr. 25, 2016) ........................................................ 10, 11

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
   833 A.2d 961 (Del. Ch. 2003) ................................................................................ 22

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
   66 A.3d 963 (Del. Ch. 2013) .................................................................................. 19

*Se. PA Transp. Auth. v. AWS Remediation, Inc.*,
   2003 WL 21994811 (E.D. Pa. Aug.18, 2003) ....................................................... 8, 9

*Segway Inc. v. Cai*,
   2023 WL 8643017 (Del. Ch. Dec. 14, 2023) ......................................................... 17

*Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.*,
   80 B.R. 606 (D. Mass. 1987) ................................................................................... 9

*Townsend v. Pinnacle Entm't, Inc.*,
   457 F. App'x 205 (3d Cir. 2012) ........................................................................... 10

*Truck Drivers Local Union No. 807 Int'l Bhd. of Teamsters v. Bohack Corp.*,
   541 F.2d 312 (2d Cir. 1976) .................................................................................... 6

*West v. Gen. Motors LLC*,
   2011 WL 2223793 (D.N.J. June 7, 2011) .............................................................. 12

*Yurth v. Experian Info. Sols., Inc.*,
   622 F. Supp. 3d 89 (E.D. Pa. 2022) ........................................................................ 5

## Statutes

11 U.S.C. § 365 ............................................................................................................ 7, 8

11 U.S.C. § 365(g) ........................................................................................................ 2, 6

11 U.S.C § 544(b) ............................................................................................................ 29

11 U.S.C § 546(e) ............................................................................................................ 26

## Other Authorities

*Arbitration Agreements as Executory Contracts in Bankruptcy After Mission Product Holdings,
   Inc. v. Tempnology, LLC*,
   96 Am. Bankr. L.J. 769 (2022) .............................................................................. 7, 8

Defendant Daniel Boockvar ("Boockvar" or "Defendant") files this *Reply Memorandum of Law in Further Support of Defendant Daniel Boockvar's Motion to Compel Arbitration and Stay, or, in the Alternative, to Dismiss the Complaint* (the "Reply") in response to *Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss* (the "Opposition" or "Opp. Br.") dated May 12, 2025 [Adv. Proc. Dkt. No. 118].[2]

As with his Opening Brief, Boockvar joins the replies filed by the other Defendants in this action the ("Co-Defendant Replies"). To avoid duplication, this Reply focuses on the arguments specific to Boockvar. In support of the Reply, Boockvar states as follows:

## PRELIMINARY STATEMENT

Plaintiff's sprawling Opposition confirms that Boockvar should never have been named as a Defendant in this action. Even putting aside the fact that this case should have been brought as an arbitration, not a lawsuit, Plaintiff can barely cobble together claims against Boockvar. Having spent months poring over millions of documents in a pre-suit investigation, all Plaintiff can muster is innuendo based on Boockvar's corporate title and a couple of emails regarding inventory issues that occurred during an unprecedented pandemic. Despite Plaintiff's efforts to pin the purported conduct and motivations of other Defendants on Boockvar, the Opposition cannot overcome the fundamental flaws in the Complaint.

*First*, Plaintiff offers no cognizable argument to avoid arbitration under indisputably valid and enforceable arbitration agreements. Plaintiff's primary objections are that the arbitration

---

[2]    References to "Opening Brief" or citations to "Opening Br." refer to the Memorandum of Law in Support of Defendant Daniel Boockvar's Motion To Compel Arbitration and Stay, or, in the Alternative, to Dismiss the Complaint. *See* Adv. Proc. Dkt. No. 66-1. Capitalized terms used but not defined herein shall have the meanings given to those terms in the Opening Brief. Unless otherwise stated, all emphasis is added, and all internal citations and quotations are omitted.

agreements are no longer in effect because the Debtor rejected the agreements under the Plan, and that the State Law Claims do not fall within the scope of the arbitration agreements. But Plaintiff is *wrong on the law*. As Section 365(g) of the Bankruptcy Code states and caselaw confirms, rejection of an executory contract is treated as breach, not termination. That the Debtor chose to reject the agreement in bankruptcy is irrelevant for purposes of determining whether the trustee is bound by an otherwise enforceable arbitration clause in the rejected agreement. And Plaintiff cannot escape the broad scope of arbitration clauses that expressly cover disputes "arising from" and "relating to" Boockvar's employment relationship with Thrasio.

*Second*, despite acknowledging overlapping issues and factual circumstances underlying the arbitrable claims and non-arbitrable claims, Plaintiff argues that a stay is not warranted. In doing so, Plaintiff ignores that the resolution of the arbitrable claims in arbitration may resolve key issues underlying the non-arbitrable claims or even resolve those claims entirely, potentially narrowing the remaining dispute and justifying a stay.

*Third*, in the alternative, the Court should dismiss the claims against Boockvar in their entirety. Regarding Plaintiff's mismanagement-based breach of fiduciary duty and corporate waste claims (Counts 7-8), the Opposition fails to identify a single inventory purchase decision Boockvar made, cannot point to any "red flag" that rose to the level of illegality, pleads no non-conclusory facts in support of Boockvar's supposed bad faith, and cannot explain why management's decision to maintain inventory rather than running out of stock and risk losing crucial Amazon search rankings during a pandemic was anything other than a rational business judgment. Plaintiff's claims are further belied by the fact that Thrasio's Board had Boockvar remain as President well after the alleged misconduct had concluded. The Opposition's telling admission that Plaintiff needs

"discovery" to "provide more specificity as to Boockvar's responses" only confirms the Complaint's deficiencies.

*Fourth*, the Tender Offer claim (Count 6) fails as a matter of law because a claim for unjust enrichment is not available when, as here, a contract governs the relationship between the parties. Plaintiff offers only a half-hearted response, asserting that "neither the Tender Offer agreement, nor Boockvar's employment agreement, preclude Plaintiff's unjust enrichment claim." Plaintiff's conclusory statement is not enough to carry its pleading burden.

*Fifth*, the Secondary Sales claims (Count 9-11) fare no better. In its Opposition, Plaintiff fails to explain how Boockvar's $6 million sale somehow caused Thrasio to lose out on a $1 billion investment or how the Secondary Sales could have usurped an opportunity from Thrasio since it is in the business of aggregating Amazon sellers—not selling stock. Worse, Plaintiff completely fails to address Boockvar's argument that there was no bad faith because presenting the Secondary Sale to the Board created a safe harbor. Instead, Plaintiff selectively quotes from irrelevant portions of Boockvar's cases cited in the Opening Brief hoping to divert the Court's attention.

Regarding its aiding and abetting fiduciary duty claim, Plaintiff also fails to address the case law holding that a fiduciary, like Boockvar, cannot aid and abet its own breach. Plaintiff's arguments as to the elements likewise fail. Plaintiff beseeches the Court to accept labored inferences in the place of particularized facts alleging that Boockvar knowingly participated in Silberstein and Cashman's purported misrepresentations to investors regarding the Secondary Sales. Such allegations do not state a viable claim.

*Sixth*, Plaintiff fails to advance the Yardline Transaction claims whatsoever (Counts 18, 26), much less push them over the pleading goal line. The Complaint's sole specific allegation is that Boockvar "worked with" Silberstein to "finalize" the transaction—a vague assertion that

provides no facts about what Boockvar actually did or knew. Yet again, the Opposition merely relies on Boockvar's position as President to infer that Boockvar must have participated in Silberstein's purported misconduct.

*Finally*, with respect to the avoidance claims (Counts 2-4, 25), unable to plead actual fraud with anything approaching particularity, Plaintiff points to two "badges": the recipients were insiders and Thrasio allegedly received no value. But this assertion ignores that the Tender Offer was part of an integrated financing that netted the company $122 million, that sophisticated investors continued funding Thrasio for years afterward, and the temporal disconnect with PwC's "going concern" qualification in 2020 since the company operated for three more years. Remarkably, for its conspiracy to commit fraudulent transfer claim, Plaintiff relies on a single Texas remand decision while ignoring that every court in this Circuit has rejected the claim as non-cognizable under bankruptcy law.

## ARGUMENT

I.   **PLAINTIFF CANNOT AVOID ITS CONTRACTUAL OBLIGATION TO ARBITRATE THE STATE LAW CLAIMS**

A.   **Plaintiff is Bound By the Arbitration Agreements Because as Trustee Plaintiff Stands in the Shoes of Thrasio**

1.   The Opening Brief established that where, as here, an arbitration agreement delegates arbitrability to the arbitrator, such questions must be decided by the arbitrator. *See* Opening Br. at 13-14.

2.   Plaintiff does not dispute that the question of arbitrability has been delegated to the arbitrator. Instead, Plaintiff makes the baseless claim that the Court may decide arbitrability because Plaintiff is not a party to the arbitration agreements. *See* Opp. Br. at 104 ("the Court may decide whether the claims are arbitrable, regardless of whether a clause delegating arbitrability to

an arbitrator is present in the underlying agreements" because Plaintiff is not "a party to any arbitration agreement."). That is simply incorrect. As a matter of established law, "the trustee-plaintiff stands in the shoes of the debtor for the purposes of the arbitration clause and [] the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *In re BBCK One Holding Corp.*, 2024 WL 4772408, at *4 (Bankr. D.N.J. Nov. 13, 2024) (same); *In re Statewide Realty Co.*, 159 B.R. 719, 723 (Bankr. D.N.J. 1993) (same).

3.      None of the legal authorities on which Plaintiff relies are even comparable to the situation at issue here, where a party to an arbitration agreement with the debtor is seeking to enforce that agreement against a litigation trustee who is asserting state law claims derived from the debtor.[3] Unlike the litigants in those cases, Plaintiff—as Trustee of the debtor—"stands in the shoes of [Thrasio] for the purposes of the arbitration clause" and "is bound by the clause to the same extent as would [Thrasio]." *Hays & Co.*, 885 F.2d at 1153. As a result, because the question of arbitrability has been delegated to the arbitrator under the agreements—a conclusion that Plaintiff does not contest—the Court must refer the State Law Claims to arbitration.

---

[3]     *See Yurth v. Experian Info. Sols., Inc.*, 622 F. Supp. 3d 89, 97 (E.D. Pa. 2022) (where neither party was bankruptcy trustee, court found that non-signatory could not enforce arbitration clause because it was not a party to the original agreement); *In re Paragon Offshore PLC*, 588 B.R. 735, 759 (Bankr. D. Del. 2018) (finding non-signatory "*Corporate Defendants*" cannot enforce arbitration provision).

**B.  The Arbitration Agreements Survive the Plan's Rejection Because Section 365(g) Treats Rejection of Executory Contracts as a Breach, Not Termination**

4.      Plaintiff's next attempt at avoiding its contractual obligation to arbitrate—that the arbitration agreements are not enforceable because they were purportedly cancelled in Thrasio's bankruptcy—similarly fails.

5.      Plaintiff argues it should not be compelled to arbitrate the State Law Claims because the Separation Agreement and the Consulting Agreement "were rejected in the Bankruptcy Case and are 'no longer in effect.'" Opp. Br. at 106. Plaintiff cites a case explaining that "rejection of an executory contract or unexpired lease must be done in its entirety; the executory contract or unexpired lease cannot be assumed or rejected in part." *Id.* at 107 (quoting *In re Contract Research Solutions, Inc.*, 2013 WL 1910286, at *4 (Bankr. D. Del. May 1, 2013)). It is on this basis that Plaintiff concludes that the arbitration provisions under those agreements were also "rejected" and are thus no longer operative. *Id.*

6.      Plaintiff misapprehends the law.  A debtor's rejection of an executory contract does *not* render the contract or an arbitration clause therein null and void.  Rejection under Section 365(g) "constitutes a breach of the rejected contract, not a termination, and [] an arbitration clause not only survives rejection, but should be enforced (absent statutory claims created by the Bankruptcy Code) consistent with the strong policy favoring arbitration." *In re Fleming Companies, Inc.*, 2007 WL 788921, at *4 (D. Del. Mar. 16, 2007); *see also* 11 U.S.C. § 365(g) ("Except as provided in subsections (h)(2) and (i)(2) of this section, *the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease*…."). Accordingly, "like any other unilateral breach of contract, it does not destroy the contract so as to absolve the parties (particularly the breaching party) from a contractual duty to arbitrate their disputes." *Truck Drivers Local Union No. 807 Int'l Bhd. of Teamsters v. Bohack Corp.*, 541 F.2d

312, 321 n.15 (2d Cir. 1976); *In re Bateman*, 585 B.R. 618, 626 (Bankr. M.D. Fla. 2018) (finding

arbitration clause survives rejection and noting "[f]ew would argue that a 'breach' of a contract

would terminate an arbitration clause contained in the contract").

7.      Despite this well settled authority, Plaintiff cites a single outlier decision—*In re*

*Highland Cap. Mgmt., L.P.*, 2021 WL 5769320 (Bankr. N.D. Tex. Dec. 3, 2021) ("*Highland*

*Capital*")—in support of its argument that rejection of an executory contract terminates an

obligation to arbitrate thereunder. In *Highland Capital*, the court held that following a trustee's

rejection of a Limited Partnership Agreement ("LPA") as an executory contract under Section 365,

it could not "be forced to specifically perform under the Arbitration Clause[.]" *Id.* at 7. The court's

reasoning hinged on treating the arbitration clause in the LPA as "a separate executory agreement,"

which imposed "an independent contractual obligation [on] the parties." *Id.* at 6-7. As such, the

court held, the "arbitration agreement [was] a classic executory contract" that could be rejected.

*Id.* at 7. While acknowledging that rejection constitutes a breach giving rise to monetary damages,

the court held that "the injured party cannot insist on specific performance by the trustee" (*id.*)—

meaning Highland could not be compelled to specifically perform under the arbitration clause.

8.      *Highland Capital*, which is not binding authority, represents a clear departure from

established law. As leading bankruptcy scholars have recognized, *Highland Capital* and the

decision it relied on reached the "erroneous conclusion that rejection of an arbitration agreement

prevents its specific enforcement." Stephen J. Ware, *Arbitration Agreements as Executory*

*Contracts in Bankruptcy After Mission Product Holdings, Inc. v. Tempnology, LLC*, 96 AM.

BANKR. L.J. 769, 796 (2022).[4]

---

[4]    The fundamental flaw in *Highland Capital's* reasoning is its failure to recognize that the
Federal Arbitration Act ("FAA") mandates specific performance of arbitration agreements.  As
*(Cont'd on next page)*

9.        *Highland Capital* is an outlier against a "long line of cases holding, contrary to *Highland*, that the counterparty to a rejected arbitration agreement can compel the debtor or trustee to perform that agreement." *Id.* at 816. These cases uniformly recognize that rejection does not void arbitration provisions. *See In re Fleming Companies, Inc.*, 2007 WL 788921, at *4 (affirming bankruptcy court decision that arbitration provision survives rejection of underlying executory contract); *In re Paragon Offshore PLC*, 588 B.R. at 749 (holding rejection "is only a breach of a contract, and the terms of the contract still control the relationship of the parties," and concluding that "none of the language in the Plan or Confirmation Order, nor any actions taken within the bankruptcy, affect the enforcement of the Arbitration Provision"); *In re Bateman*, 585 B.R. at 626 (holding that even an "implied 'rejection' of the Customer Agreement under § 365 [] does not void the arbitration provision" because "rejection simply means that the contract is in 'breach'"); *In re CIT Grp. Inc.*, 2012 WL 831095, at *1 n.1 (Bankr. S.D.N.Y. Mar. 9, 2012) ("It is well established that 'rejection of a contract, or even breach of it, will not void an arbitration clause . . .'"); *HCB Enters., LLC v. Dickey's Barbecue Rests., Inc.*, 2020 WL 3643430, at *2 (D. Nev. July 6, 2020) (finding that "the bankruptcy code does not render arbitration clauses in rejected executory contracts inoperative" because "[t]he plain language of [] § 365 allows a trustee to reject—not revoke—a contract"); *Se. PA Transp. Auth. v. AWS Remediation, Inc.*, 2003 WL 21994811 at *3 (E.D. Pa. Aug. 18, 2003) (holding that a rejection in bankruptcy did not invalidate the arbitration

---

Professor Ware correctly observes, *Highland Capital's* holding was "incorrect" because it cannot be squared with the FAA's core policy. *See id.* at 815-16. The FAA was enacted precisely because "money damages for breach of arbitration agreements were 'an illusory remedy.'" *Id.* at 787-88. Thus, "the remedy for breach of an arbitration agreement is a court order of specific performance to arbitrate." *Id.*

clause); *Societe Nationale Algerienne Pour La Recherche v. Distrigas Corp.,* 80 B.R. 606, 609 (D. Mass. 1987) (same).

10.     Finally, *In re Contract Research Solutions, Inc.*, which Plaintiff relies on for the proposition that "assumption or rejection of an executory contract or unexpired lease must be done in its entirety," Opp. Br. at 107, is of no moment.  The rejection of an executory contract "*does not alter the substantive rights of the parties*" to the contract. *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1034 (3d Cir. 1995).  And, critically, "in the context of arbitration, a litigant's procedural right to the agreed forum is raised to a substantive right by the FAA." *Olde Discount Corp. v. Tupman*, 1 F.3d 202, 213 (3d Cir. 1993). Thus, "[w]hile a debtor may reject a contract in its 'entirety,' it may not invalidate freely negotiated methods of dispute resolution [such as arbitration provisions] as they apply to pre-petition acts." *Se. PA Transp. Auth.*, 2003 WL 21994811, at *3.

11.     In sum, Plaintiff's rejection of the Separation Agreement and Consulting Agreement in bankruptcy constituted a breach of those contracts, not their termination. To hold otherwise would allow debtors to circumvent the FAA's mandate by "simply terminat[ing] that contract and avoid[ing] any obligation to arbitrate." *Id*. Accordingly, Plaintiff's State Law Claims must be submitted to arbitration as a matter of law.

## C.  <u>The Arbitration Agreements Cover the State Law Claims</u>

12.     In the Opposition, Plaintiff argues that the arbitration agreements do not cover the State Law Claims even though both agreements unequivocally delegate that question to the arbitrator (*see* Opening Br. at 13-14)—a fact that Plaintiff does not dispute. *See* Opp. Br. at 104.

13.     Even if the Court determines that arbitrability has not been delegated to the arbitrator, the State Law Claims arise out of the subject matter of Boockvar's release under the Separation Agreement because the release broadly covers "any and all claims relating to, or arising from Employee's employment relationship with the Company and the termination of that

relationship," and all the State Law Claims stem from Boockvar's conduct during his employment

with Thrasio, including his alleged breaches of fiduciary duties and participation in transactions

that depleted company resources. *See* Opening Br. at 15-17.

14.     Plaintiff argues that the arbitration provision in the Separation Agreement does not

cover the State Law Claims because the release thereunder is one-directional. Plaintiff asserts that

because only Boockvar released claims against Thrasio, while "Thrasio granted no release of any

claim it may have to any employee in any Separation Agreement," Plaintiff's claims fall outside

the scope of "matters herein released." Opp. Br. at 108-09.

15.     Plaintiff's narrow reading of the arbitration provision contravenes the FAA's policy

favoring broad interpretation of arbitration clauses.  Under the FAA, arbitration "should not be

denied unless it may be said with *positive assurance*" that the arbitration clause does not cover the

dispute.  *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). If a dispute

"relat[es] *in any way*" to the subject matter, *Raynor v. Verizon Wireless (VAW), LLC*, 2016 WL

1626020, at *5 (D.N.J. Apr. 25, 2016), or if "the allegations underlying the claims *touch matters*

covered by an arbitration clause," then those claims must be arbitrated. *Brayman Const. Corp. v.*

*Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003).  When, as here, "phrases such as 'any claim

arising out of' appear in an arbitration provision, they are given a *broad construction*[.]" *Townsend*

*v. Pinnacle Entm't, Inc.*, 457 F. App'x 205, 208-09 (3d Cir. 2012).

16.     Under the Separation Agreement, Boockvar releases Thrasio from "any and all

claims *relating to, or arising from Employee's employment relationship with the Company* . . ."

Ex. B (Separation Agreement) § 5. This broad language defines the *substance* of Boockvar's

release—all matters related to his employment with Thrasio. Given this scope, it cannot be said

with "positive assurance," *AT & T Techs., Inc.*, 475 U.S. at 650, that the State Law Claims do not

relate in "any way" to the release, *Raynor*, 2016 WL 1626020, at *5, or do not "touch matters

covered by an arbitration clause[.]" *Brayman Const. Corp.*, 319 F.3d at 626.

17.    With respect to the Consulting Agreement, Plaintiff asserts that the arbitration

provision covers only post-employment consulting disputes, not prior employment claims. *See*

Opp. Br. at 109-10. But even if Plaintiff were right—and, as explained in the Opening Brief, it is

not (Opening Br. at 15-17)—the arbitration provision in the Consulting Agreement applies to the

State Law Claims for the same reasons that the Separation Agreement covers the claims. *See supra*

at 9-10 ¶¶ 13-16.  That is because the Consulting Agreement expressly incorporated the Separation

Agreement, including the arbitration provision therein. *See* Opening Br. at 12 n.5 (citing Section

25 of the Consulting Agreement: "This Agreement, as well as the Separation Agreement,

constitutes the entire understanding of the parties relating to the subject matter"); *see Newark Bay

Cogeneration Partnership, LP v. ETS Power Grp.*, 2012 WL 4504475 at *3, 8-10 (D.N.J. Sep. 28,

2012) (adopting Magistrate Judge's determination that the arbitration clause contained in a

company's standard Terms and Conditions was incorporated by reference where an underlying

work proposal made explicit reference to the document).

18.    Therefore, given the release's expansive language, which broadly applies to the

*substance* of Boockvar's release (*i.e.*, Boockvar's employment relationship with Thrasio), and the

FAA's "strong presumption in favor of arbitration," where "a court must construe all doubts in

favor of arbitration," *West v. Gen. Motors LLC*, 2011 WL 2223793, at *2 (D.N.J. June 7, 2011),

the Court must compel arbitration of the State Law Claims.

## II.    PLAINTIFF'S OPPOSITION CONFIRMS THAT A STAY PENDING ARBITRATION IS WARRANTED

19.    In opposing Boockvar's request for a stay, Plaintiff does not dispute that the State

Law Claims and bankruptcy based claims are "related" or that the Court has discretion to stay the

proceedings pending arbitration. *See* Opp. Br. at 111-12. While Plaintiff argues that a stay is unwarranted because most of the claims are non-arbitrable, the arbitrable and non-arbitrable claims arise from the same transactions and will require the evaluation of common issues such as the appropriateness of compensation and payments the Defendants received and the state of mind of the parties involved in the transactions. *See* Opening Br. at 18. Indeed, it is impossible to segregate the arbitrable from the non-arbitrable claims because Plaintiff's theory is that the Defendants (primarily other Defendants, but also Boockvar) were engaged in a scheme to loot Thrasio: Defendants supposedly "used their positions of control over Thrasio to enrich themselves," (Compl. ¶ 1), and this nefarious conduct was allegedly pursued "[t]through a combination of self-dealing, gross mismanagement and deception." (*Id.* ¶ 3.) There is no logical division between the claims.

20.      Consider this scenario. If the arbitrator determines that the Board properly approved the Tender Offer after appropriate deliberation, and that the Defendants acted in good faith without breaching their fiduciary duties, a simultaneous ruling by the Court finding that the same transaction was executed with actual fraudulent intent would create a risk of inconsistent outcomes. *See Neal v. Asta Funding, Inc.*, 2014 WL 131770, at *5 (D.N.J. Jan. 6, 2014) (finding that "it would be inadvisable to have these intertwined claims proceed simultaneously in court and in arbitration; such a procedure would be rife with opportunities for mutual interference, inconsistent rulings, and general procedural confusion").

21.      But even if the Court were to find that the resolution of non-arbitrable claims do not depend upon the outcome of any of the arbitral claims, a stay pending arbitration would still be justified. Indeed, a stay is also warranted where, as here, arbitrable claims "will, at the very least, *advance key issues* affecting this matter," *DiValerio v. Best Care Lab'y, LLC*, 2022 WL

20679837, at *2 (D.N.J. Mar. 28, 2022), or where "the arbitration *may contribute* to the resolution

of the issues raised by the [non-arbitrable claims]." *In re EXDS, Inc.*, 316 B.R. 817, 826 (Bankr.

D. Del. 2004) (citing *In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181 (Bankr. S.D.N.Y. 2002)).

As explained above, the overlap between the claims—which involve the same transaction and the

same issues—is undeniable.

22.     Plaintiff also argues that a stay is not warranted because the non-arbitrable claims

predominate in this action, and thus a stay would be inconvenient for Plaintiff. *See* Opp. Br. at 113.

However, Boockvar is an individual who lacks the resources of Plaintiff; he should not be forced

to litigate in two forums simultaneously. That is particularly true given that Boockvar's name is

barely mentioned in Plaintiff's tome-like pleading. Having chosen to assert claims against

Boockvar on such a flimsy foundation, Plaintiff's convenience should not be prioritized over the

prejudice to Boockvar of having to defend himself in this matter in addition to an arbitration.

23.     Moreover, Plaintiff cherry picks convenient facts and mischaracterizes the holdings

of Boockvar's cases. For example, Plaintiff claims that *Crawford v. W. Jersey Health Sys.*

*(Voorhees Div.),* 847 F. Supp. 1232 (D.N.J. 1994), *In re EXDS, Inc.* 316 B.R. at 826, and *Neal*,

2014 WL 131770 at *5 are inapposite because they "granted stays of the resolution of non-

arbitrable claims pending arbitration where none or only a minority of the claims at issue were not

subject to arbitration." Opp. Br. at 112-13. But even if that were factually true, the number of non-

arbitrable claims had no bearing on the courts' decisions to grant a stay. Instead, the courts focused

on the substantial factual overlap between the arbitrable and non-arbitrable claims. *See Crawford*,

847 F. Supp. at 1243 (granting stay because a "significant overlap exists between parties and

issues"); *In re EXDS, Inc.* 316 B.R. at 826 (granting stay due to the fact that "the factual

underpinnings of Claim VI are essentially those underlying Claims I–V"); *Neal*, 2014 WL 131770,

at *5 (stay where the "resolution of the arbitration involve[ed] issues overlapping and bearing upon disputes raised in this action").[5]  The Court should do the same here.

## III.   PLAINTIFF CANNOT ESTABLISH SUBJECT MATTER JURISDICTION OVER THE STATE LAW CLAIMS

24.     Critically, Plaintiff fails to satisfy its burden to show that the State Law Claims have a sufficiently close nexus to the Plan or the bankruptcy proceeding for this Court to retain post-confirmation "related to" subject matter jurisdiction over such claims.

25.     Plaintiff claims that jurisdiction exists over the State Law Claims because the definition of "Cause of Action" in the Plan includes "claim[s] based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty . . .," and it "specifically identifies the individuals and entities who were not granted releases under the Plan." Opp. Br. at 51.  But if anything, this generic language *proves* Boockvar's point.

26.     The specificity required for bankruptcy court jurisdiction demands more than broad terms purporting to retain jurisdiction. Indeed, if "the litigation is truly so critical to the Plan's implementation, it would have been more specifically described in the Disclosure Statement and Plan so that creditors could have considered its effect when deciding whether to vote in favor of the Plan." *In re Insilco Techs., Inc.*, 330 B.R. 512, 525 (Bankr. D. Del. 2005), *aff'd*, 394 B.R. 747 (D. Del. 2008). Thus, the Plan must *specifically* describe the events or subject matter giving rise to the claim. *See*, *e.g.*, *In re AstroPower Liquidating Trust*, 335 B.R. 309, 324-25 (Bankr. D. Del. 2005) (finding that a plan specifically described an action over which the Court had "related to"

---

[5]   Plaintiff's own authority is not to the contrary. In *In re Paragon Offshore PLC*, while the court premised part of its ruling denying the stay on the fact that the number of non-arbitrable claims predominated, the court *also* held that, *unlike* here, the single arbitrable claim did not "have some [e]ffect on the non-arbitrable claims." 588 B.R. at 761-62.

jurisdiction when, unlike here, the definition of "Litigation Claims" included "[c]auses of action arising out of or *in connection with the Debtor's sale of stock in Xantrex Technology, Inc.*"); *In re EXDS, Inc.*, 352 B.R. 731, 736 (Bankr. D. Del. 2006) (finding court retained jurisdiction where, unlike here, plan specifically described "'Litigation Claims'[that] include '[c]auses of action arising out of or *related to* the *Debtors' acquisitions of ... GlobalCenter, Inc.*'"). By contrast, the Plan here does not specify, for example, whether the retained claims are in connection with the Secondary Sales, Tender Offer, or Yardline Transaction. Rather, it generically—and thus impermissibly—describes tort claims against parties released under the Plan.

27.     *Michaels v. World Color Press, Inc. (In re LGI, Inc.),* 322 B.R. 95 (Bankr. D.N.J. 2005), which Plaintiff relies on, is not to the contrary. There, the court found it had jurisdiction where, *unlike here,* "the *World Color action [claims] . . . were specifically identified* in the Asset Purchase Agreement among Excluded Assets," which was "incorporated by reference into the Plan . . ." *Id.* at 103. Thus, the court held, specific reference to the claims in the plan showed that the debtor and the creditors considered the claims to be assets of the estate and treated them as an "important substantive element of the Plan" and thus litigating them served "'the implementation, consummation, [and] execution' of the Plan." *Id.* at 104. By contrast, the Plan's generic reference to tort claims against released parties lacks the specificity found in *Michaels*.

28.     Finally, Plaintiff argues that jurisdiction over the State Law Claims is warranted because the arbitration provisions and the effect of the release provisions in Defendant Cashman's separation agreement on this action "involves interpretation of the Plan and Confirmation Order[.]" Opp. Br. at 52. But simply requiring the Court to interpret these provisions alone is a matter of contract interpretation, which is insufficient to confer jurisdiction. As the court made clear in *In re ACandS, Inc.*, 2011 WL 3471243 (Bankr. D. Del. Aug. 8, 2011), the "sole fact that the plan or plan

documents must be interpreted to resolve a dispute is not enough to create a close nexus to the bankruptcy and thereby confer subject matter jurisdiction over that dispute." *Id.* at *5. The *ACandS* court further emphasized that the "critical inquiry is not strictly whether the plan must be interpreted to resolve the dispute, it is rather whether the resolution of the dispute will have any affect on the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *Id.* at 4. There, the court found no jurisdiction to interpret whether a plan provision constituted an enforceable forum-selection clause, because "resolution of those issues involves nothing more than interpreting a TDP provision" and would "turn on issues of general contract law rather than on any integral issues of bankruptcy law." *Id.* at 1; *see also In re Washington Mut., Inc.*, 2012 WL 4755209, at *3-4 (Bankr. D. Del. Oct. 4, 2012) (rejecting jurisdiction to interpret whether "Insured v. Insured exclusion" provision applied under plan, holding such interpretation "is not the type of plan interpretation sufficient to confer jurisdiction" when "not essential to the integrity of the Plan and its implementation").

29.     Accordingly, because Plaintiff fails to demonstrate a close nexus to the bankruptcy plan or proceedings, this Court lacks subject matter jurisdiction over the State Law Claims.

## IV.   PLAINTIFF'S OPPOSITION CONFIRMS THAT DISMISSAL OF THE CLAIMS AGAINST BOOCKVAR IS WARRANTED

30.     Boockvar incorporates by reference the legal arguments raised in the reply briefs filed by the other Defendants in this action, including those related to Counts 6, 7, 8, 18, 25, and 26 being time barred; impermissible group pleading; the transactions at issue being considered and approved by Thrasio's Board; and the claims being barred by Section 546(e)'s safe harbor.  In particular, Boockvar incorporates by reference the legal arguments raised in the reply brief of Defendants Silberstein and Millhouse regarding Plaintiff's lack of compliance with Rule 8, Plaintiff's tender offer-related claims being barred by Section 546(e)'s safe harbor, Plaintiff's

failure to identify applicable state law in connection with its fraudulent transfer claims, and Plaintiff's claims related to breach of fiduciary duty, corporate waste, conspiracy, and unjust enrichment all being time barred.

### A. Plaintiff's Mismanagement Claims Remain Deficient (Counts 7-8)

31.    The Complaint falls woefully short of pleading that Boockvar acted with the requisite bad faith or alleging with specificity that Boockvar was involved in any decision to purchase inventory or how such inventory became wasteful. *See* Opening Br. at 24-26.

32.    Plaintiff's Opposition only reinforces that conclusion. With respect to its breach of duty of oversight/loyalty (Count 7) claim, Plaintiff claims that "Boockvar inappropriately attempts to hold the Trust to a heightened standard to plead a breach of fiduciary duty" by forcing it to "demonstrate a breach" at the pleading stage. Opp. Br. at 68. That is nonsense. Boockvar seeks to hold Plaintiff to an appropriate burden because pleading bad faith is a "high bar[.]" *Segway Inc. v. Cai*, 2023 WL 8643017, at *1 (Del. Ch. Dec. 14, 2023). Indeed, a "claim under Delaware's failure of oversight theory 'is possibly the most difficult theory in corporation law upon which a plaintiff might hope'" to succeed. *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *7 (Del. Ch. Nov. 30, 2007). That is why courts often dismiss *Caremark* claims where, as here, "Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them." *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009); *see also Segway Inc.*, 2023 WL 8643017, at *4 (allegations that defendant "'was aware of serious issues' with customers that 'led to significant increases' in accounts receivable and 'willfully ignored' problems within her areas of responsibility" insufficient).[6]

---

[6]    Plaintiff relies on *In re Am. Int'l Grp., Inc.*, 965 A.2d 763 (Del. Ch. 2009) ("AIG") to defend its failure to plead specific factual allegations against Boockvar.  In *AIG*, which involved the infamous AIG fraud scandal, the company had faced other litigation and regulatory
*(Cont'd on next page)*

33.     Next, Plaintiff fails to specify how any of the purported "inventory [] problems," Opp. Br. at 67, were illegal. All Plaintiff asserts is that an "'inference that' the Defendants were involved in illegal conduct" is enough. *Id.* at 68. But simply alleging that Boockvar was aware of inventory problems, standing alone, are not "red flags" that rise to the level of "illegality." *Firemen's Ret. Sys. of St. Louis on behalf of Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *15 (Del. Ch. Oct. 5, 2021). Indeed, Plaintiff "does not allege that [anyone was] told, for example, that" the inventory issues "ran afoul of regulatory or legal requirements. The so-called 'red flags' were updates" about "measures that needed improvement." *Id.*; *Hays v. Almeida*, 2019 WL 3389172, at *3 (Del. Ch. July 26, 2019) (rejecting the argument that directors faced oversight liability where "the complaint [did] not allege that the directors knew that Walgreens was violating the law or even engaging in the conduct that risked violating the law"). So too here.

34.     Plaintiff also fails to satisfy its burden to show that Boockvar's conduct lacked any plausible, legitimate explanation. To "plead bad faith, [plaintiff] was required to plead that there is not even '[o]ne plausible, and legitimate, explanation' for the conduct of the Officers." *In re: Old Bpsush, Inc.*, 2021 WL 4453595, at *13 (D. Del. Sept. 29, 2021). But Plaintiff does not address, much less rebut, Boockvar's argument that Thrasio's management made a rational business decision to purchase excess inventory rather than risk losing Amazon search rankings and reasonably assumed pandemic-driven demand would continue. *See* Opening Br. at 7 (citing First Day Declaration ¶¶ 43-44).

---

proceedings "that ha[d] already required the corporation to pay over $1.6 billion in fines and other costs necessary to resolve proceedings against it," *id.* at 775, meaning that it was a foregone conclusion that fraud had occurred. The AIG court explicitly relied on "the pervasiveness of the fraud" in holding that "[e]ven the transactions that cannot be tied to specific defendants support the inference that" the defendants were involved in illegal conduct. *Id.* at 782. Unlike the unique factual situation of AIG, here there is no certainty whether any fraud took place at Thrasio at all.

35.    Moreover, Boockvar's retention as President after the inventory issues were discovered and that new management was brought in further undermines any inference of malfeasance. This is another independent basis for dismissal of Plaintiff's claim.[7]

36.    To rectify these pleading deficiencies, Plaintiff maintains that "[t]hrough discovery, Plaintiff will be able to provide more specificity as to Boockvar's responses (or lack thereof) to inventory controls issues." Opp. Br. at 68. That claim makes no sense because Plaintiff already possesses Thrasio's documents, including Boockvar's work communications; nothing new will come of pursuing discovery against Boockvar individually. Plaintiff cannot credibly argue that access to Boockvar's personal documents will magically enable it to provide the requisite specificity that is wholly lacking from the Complaint regarding Boockvar's alleged involvement in the claims at issue.

---

[7]    Plaintiff attempts to analogize to *In re Think3, Inc.*, 529 B.R. 147 (Bankr. W.D. Tex. 2015) regarding accounting controls, Opp. Br. at 69-70, but the court explicitly draws a distinction between, on the one hand, actionable claims of "alleged intentional failure to act in the face of a 'known duty to act,'" such as in dealing with certainties like taxes, and, on the other hand, unactionable claims related to situations where defendants failed "to predict the future and to properly evaluate business risk." *In re Think3, Inc.*, 529 B.R. at 180. The facts of Thrasio and the allegations in the Complaint fit firmly into the latter category. Plaintiff's narrative is that Thrasio's flawed accounting controls led to the overpurchase of inventory, but deciding how much inventory to buy in the months surrounding the Covid-19 pandemic is an archetypal example of a business risk that is challenging to properly evaluate. Plaintiff's reliance on *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963 (Del. Ch. 2013) is flawed for the same reason. *See* Opp. Br. at 70. *Rich* involved an entity whose sole asset was stock of a Chinese jewelry company, and whose lack of appropriate financial controls resulted in $130 million being transferred out of the company. *Id.* at 966. Just as with the tax situation in *In re Think3*, the directors in *Rich* had a "known duty to act" when faced with the unauthorized transfer of an enormous sum of company funds outside of the company because there is no situation in which a transfer of that magnitude without any consideration in return would be permissible. By contrast, Plaintiff fails to allege that any specific inventory purchase transaction at Thrasio resulted in either an unauthorized transfer of funds outside of the company or a transfer of funds in return for no consideration.

37.    Regarding its corporate waste claim (Count 8), Plaintiff puts forth a false premise, arguing that "no business person of ordinary, sound judgement would conclude that the paying for more $800 million in inventory without also considering for how such inventory may be sold or deposed *[sic]* of . . . would generate adequate consideration for the Company." Opp. Br. at 70. To avoid pleading facts regarding every purchase of inventory, as is required, Plaintiff lumps together numerous transactions over a multi-year period and portrays the "waste" as one large $800 million expenditure. But Plaintiff must specify each individual purchase of inventory that it claims constituted waste. *See In re AgFeed USA, LLC*, 546 B.R. 318, 332 (Bankr. D. Del. 2016) (dismissing corporate waste claim where the "complaint d[id] not specify which transactions constitute[d] a waste of AgFeed's assets").

38.    Nor does Plaintiff plead any facts connecting Boockvar to any purchase of inventory.  Yet the Opposition contends that it is "reasonable to infer that he was involved in decisions related to inventory purchases" given his title as "President" where he was "responsible for overseeing all aspects of Thrasio's operations . . . including inventory functions." Opp. Br. at 71. Boockvar's position at Thrasio does not absolve Plaintiff from pleading particularized facts regarding Boockvar's role in the purchase of inventory.[8]

---

[8]    Plaintiff's reliance on *In re TEU Holdings, Inc.*, 287 B.R. 26 (Bankr. D. Del. 2002) is misplaced. *See* Opp. Br. at 72. The *TEU Holdings* court acknowledged that "[a] corporate waste claim must fail if the corporation received any benefit from the challenged transaction or if there is a good faith judgment that the transaction is worthwhile under the circumstances." *In re TEU Holdings, Inc.*, 287 B.R. at 34.  As Boockvar has shown, Thrasio did make good faith judgments that its inventory purchases were worthwhile under the circumstances. *Supra*, at 34 ¶ 18. Those circumstances also demonstrate that Thrasio received a benefit from the inventory purchases because, at the time of the purchases, Thrasio was concerned about having enough inventory on hand to meet projected demand. *Id.* By contrast, in *TEU Holdings*, the court engaged in a fact-specific inquiry and found that the "selection, engagement, and subsequent failure of [a logistics contractor] is 'sufficiently unusual' to allow the claim to proceed beyond the pleading stage[.]" *In re TEU Holdings, Inc.*, 287 B.R. at 35.

### B.  Plaintiff's Tender Offer Claim Remains Deficient (Counts 6)

39.    Plaintiff does not engage with Boockvar's arguments in the Opening Brief regarding its failure to plead unjust enrichment against him in connection with the Tender Offer. *See* Opening Br. at 27. As shown, a claim for unjust enrichment is not available when, as here, a contract (Boockvar's Tender Offer and employment agreements, *see id.*) governs the relationship between the parties. Yet Plaintiff's Opposition offers nothing more than the conclusory statement that "neither the Tender Offer agreement, nor Boockvar's employment agreement, preclude Plaintiff's unjust enrichment claim." Opp. Br. at 65. This ipse dixit cannot overcome black-letter law.

40.    Even if unjust enrichment were available, Plaintiff cannot establish that Boockvar's retention of proceeds was unconscionable because he did nothing other than sell his shares in a transaction that was unanimously approved by the Board and netted $122 million for Thrasio.  *See* Opening Br. at 27. In response, Plaintiff, again, baselessly asserts that Boockvar "was well aware of the Company's dysfunctional financial and inventory controls and used that knowledge to put money in his own pockets." Opp. Br. at 65. But the Complaint does not include allegations sufficient for the court to reasonably infer that Boockvar was indeed aware of any purported dysfunction. *See supra* at 18 ¶¶ 33-34.

### C.  Plaintiff's Secondary Sales Claims Remain Deficient (Counts 9-11)

41.    Nor does Plaintiff meaningfully address Boockvar's arguments regarding the Secondary Sales claims.

42.    Regarding the breach of the duty of loyalty for usurping a corporate opportunity claim (Count 9), Plaintiff still offers no explanation as to how Boockvar's $6 million stock sale supposedly caused the Company to lose out on $1 billion in third-party investment. Nor could Plaintiff as a logical matter. The type of investors that would purchase $1 billion in an emerging

company like Thrasio are only interested in large blocks of stock. Although $6 million may seem like a sizeable investment, it is does not justify the due diligence costs for institutional investors. To put it another way, a shopkeeper offering a container of grapes is not going to dissuade wholesalers from buying a farm's harvest of grapes.

43.     Plaintiff's attempt to distinguish *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004), also fails. To state a claim for usurping a corporate opportunity, Plaintiff must show, among other things, that the corporate opportunity was within the corporation's line of business. Opening Br. at 29.  In his Opening Brief, Boockvar cited *Beam* for the proposition that, because Thrasio is in the business of aggregating Amazon sellers—not selling stock—the "within the corporation's line of business" factor is not met. Opening Br. at 29, citing *Beam*, 833 A.2d at 973 (sale of stock was not within the company's line of business where corporation was "a consumer products company, not an investment company" and "selling stock is not the same line of business as selling advice to homemakers."). In its Opposition, Plaintiff quotes a *different* section of *Beam*—addressing the distinct "interest or expectancy" factor—to argue that *Beam* is "inapposite." Opp. Br. at 74-75. That attempted sleight of hand does not change the fact that Plaintiff fails to satisfy the line of business requirement.

44.     Finally, apparently seeking to tie Boockvar to the purported actions of other Defendants, Plaintiff lumps them together, describing actions that "Defendants" allegedly took in connection with the Secondary Sales, such as "engag[ing] in various 'horse and pony' shows to entice investors to purchase secondary shares" or "[seeking], for certain investors, to make it a precondition to their participation in the Series D that they first purchase Defendants' shares in the Secondary Sales." Opp. Br. at 74. These statements do nothing to alter the reality that the only

specific factual allegation regarding Boockvar's involvement in the Secondary Sales is his mere decision to participate in the transaction. And, in any event, Plaintiff ignores the fact that there was excess demand for Thrasio stock, meaning the Secondary Sales actually helped the Company fulfill unmet investor demand rather than taking any opportunity away from it.

45.    Plaintiff also neglects to address the balance of Boockvar's arguments: (i) that an opportunity to defraud investors is not cognizable and (ii) there was no bad faith because presenting the Secondary Sale to the Board created a safe harbor. Both provide an independent basis for the Court to dismiss this claim. *See* Opening Br. at 29.

46.    As to the breach of the duty of loyalty for misusing corporate information claim (Count 10), Plaintiff fails to sufficiently plead that Boockvar misused confidential information. *See* Opening Br. at 30. The Opposition still does not explain how the purported "confidential information" at issue—Thrasio's purportedly dysfunctional financial and inventory controls, *see* Opp. Br. at 76—played any role in Boockvar's decision to participate in the Secondary Sales.

47.    Moreover, the aiding and abetting claim fails because, as a matter of law, a fiduciary cannot aid and abet their own breach. *See* Opening Br. at 30-31. Plaintiff asks the court to ignore *In re Draw Another Circle.*, 602 B.R. 878, 905 (Bankr. D. Del. 2019), because it relied on dicta from a Delaware Chancery Court case to hold that a fiduciary cannot aid and abet its own breach. Opp. Br. at 81. Even assuming that were a legitimate basis to disregard a court's holding—it is not—other courts have independently come to the same conclusion. *See*, *e.g.*, *Higher Educ. Mgmt. Grp., Inc. v. Mathews*, 2014 WL 5573325, at *13 (Del. Ch. Nov. 3, 2014) (holding that as an executive officer, the CFO himself owes fiduciary duties to the corporation and "therefore any conduct of his rising to the level of aiding and abetting would be a breach of his own fiduciary

23

duties"). And, notably, Plaintiff cannot identify any legal authorities that support the proposition that a fiduciary can aid and abet their own breach.

48.     Plaintiff's remaining arguments fare no better. Based on the allegation that Boockvar was "on notice of the Company's dysfunctional financial and inventory controls" (Opp. Br. at 79), Plaintiff makes the incredible leap that "the Court can reasonably infer that Boockvar knew that Silberstein and Cashman were misleading potential investors in the Secondary Sales to induce them to buy shares from insiders rather than directly from the Company[.]" *Id.* These are classic conclusory allegations that are insufficient to adequately allege knowing participation. *See In re Cred Inc.*, 650 B.R. 803, 827 (Bankr. D. Del. 2023) (finding allegations insufficient to establish knowledge element where plaintiff alleged only that defendant's CFO forwarded email claiming 9% returns and asked "How can they do this?," receiving response "Magic?"; that board member expressed being "curious and doubtful as to the risk [t]aken by [the debtor] to guarantee such a return"; and that same board member noted "[t]he lack of visibility around the way [the debtor] deploys its money and recourse" and warned that "[a] failure on their part would . . . almost automatically result in lawsuits against [defendant]"), *aff'd*, 658 B.R. 783 (D. Del. 2024).

49.     At best, Boockvar's knowledge of inventory and financial issues may have raised suspicions that Thrasio's systems needed to be improved but the "presence of suspicious circumstances alone is not enough." *Id.* at 823; *Malpiede v. Townson*, 780 A.2d 1075, 1098 (Del. 2001) ("Although Knightsbridge's tactics here, as alleged, may have been somewhat suspect, we agree with the trial court's conclusion that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that Knightsbridge knowingly participated in a fiduciary breach.").

### D.  **Plaintiff's Yardline Transaction Claims Remain Deficient (Counts 18, 26)**

50.    Boockvar has already shown that Plaintiff's claims for aiding and abetting breach
of fiduciary duty (Count 18) and waste of corporate assets (Count 26) in connection with the
Yardline transaction are not supported by sufficient factual allegations. Opening Br. at 32-33.

51.    In its Opposition, Plaintiff, again, asks the Court to make a series of inferences
about Boockvar's purported involvement in the Yardline Transaction to save its impermissibly
vague and conclusory allegations. *See* Opp. Br. at 95. Plaintiff's reliance on Boockvar's position
and title—as President of Thrasio and member of Yardline's Board—is not a substitute for well
pled facts. The only specific act Plaintiff alleges is that Boockvar "[w]ork[ed] with" Silberstein to
"finalize" the Yardline Transaction (Compl. ¶ 106), but this vague, conclusory assertion provides
no facts about what Boockvar actually did or how his actions substantially assisted any breach.
*See, e.g.*, *In re Cred Inc.*, 650 B.R. at 828-29 (finding allegations that defendant "design[ed],
controll[ed], and facilitat[ed]" program insufficient where complaint failed to include non-
conclusory facts about defendant's actual involvement or how such involvement assisted the
breach). Such factual gaps in the Complaint are especially telling in light of Plaintiff's access to
millions of documents that would show Boockvar's level of involvement in the Yardline
Transaction. *See supra* at 19 ¶ 36.

52.    Similarly, for waste of corporate assets, the Opposition merely reiterates the
Complaint's deficient references to (i) emails from Cashman that *post-date* the transaction and do
not establish any knowledge of illegality by Boockvar *prior* to the Yardline acquisition, meaning
that there is no reason to believe Boockvar acted in bad faith based on what he knew at the time
of the Yardline Transaction, and (ii) Boockvar's role as president of Thrasio, despite the
conspicuous absence of any emails sent by Boockvar—which Plaintiff already has in its
possession—that support any inference of bad faith. *See* Opp. Br. at 102-03.

### E. Plaintiff Still Fails to Plausibly Plead Any of the Avoidance Claims (Counts 2-4, 25)

53.     The Avoidance Claims should be dismissed for the reasons addressed in the Co-Defendant Replies, including that they are barred by section 546(e)'s safe harbor, as well as for the additional, independent reasons discussed below.

54.     **Constructive Fraudulent Transfer.** Boockvar showed that Plaintiff failed to adequately plead the element of insolvency required for a constructive fraudulent transfer. *See* Opening Br. at 33-34. Plaintiff failed to meaningfully respond to that portion of Boockvar's argument, which alone warrants dismissal. With respect to the second element of the claim—"no reasonably equivalent value in the transaction"—Plaintiff urges the Court to evaluate the Tender Offer in isolation and ignore the business context in which it was intimately embedded. Opp. Br. at 59-60.

55.     But the Tender Offer and Series C-1 Stock Issuance were a single, integrated transaction that netted Thrasio $122 million. Opening Br. at 34-35. Plaintiff's Opposition does not dispute that (i) the parties agreed to the Series C-1 Stock Issuance and the Tender Offer in a single contract (the Series C Agreement), or that (ii) Thrasio would not have been required to launch the Tender Offer if the initial closing of the Series C-1 Stock Issuance did not occur. As Plaintiff acknowledges, when performing the analysis for collapsing transactions, courts focus "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." Opp. Br. at 60; *In re DSI Renal Holdings, LLC,* 574 B.R. 446, 467 (Bankr. D. Del. 2017). Because the parties here conditioned the Tender Offer on the initial closing of the Series C-1 Stock Issuance, it can be reasonably inferred that the parties intended for an integrated transaction that would ultimately net Thrasio funds—which is exactly what happened, to the tune of $122 million.

56.    **Actual Fraudulent Transfer.** As shown, Plaintiff at most alleged two badges of fraud: (1) obligation was to an insider and (2) Thrasio did not receive reasonably equivalent value. Opening Br. at 35-38. In its Opposition, Plaintiff argues that the Complaint pleads a third badge of fraud—insolvency—but the Complaint fails to plead sufficient facts in support of its claim of insolvency, including because (i) PwC's going concern qualification cannot support a reasonable inference that Thrasio was insolvent at the time of the Tender Offer given that Thrasio continued to operate as a going concern for years after the transaction, and (ii) Plaintiff offers no factual support for the allegation that Thrasio had negative enterprise value as early as 2020, even though sophisticated and highly experienced third-party equity investors believed, based on due diligence, that Thrasio had significant equity value after accounting for the Tender Offer. Opening Br. at 33-34. The Opposition makes no effort to dispute these arguments.

57.    Plaintiff further argues that courts have considered the concealment of the debtor's true financial condition or the existence of irregularities in records or false financial statements to be additional badges of fraud, Opp. Br. at 61, but the factual circumstances in the cases Plaintiff relies on are not analogous to those here. *Bayou Superfund, LLC v. WAM Long/Short-Fund II, L.P.* involved a Ponzi scheme situation so extreme that the court noted "[i]t is difficult to imagine a more comprehensive compendium of alleged 'badges of fraud[.]'" 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007). And *Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)* involved a company that allegedly "had simply offloaded its own unsolvable debt problem onto [a subsidiary it controlled and spun off] and left [the spin off entity] with less than $14 million cash on hand" which meant that the spin off entity "violated its debt covenants almost immediately after the Spin-Off was consummated and was forced to enter into costly amendments to its term loan and dedicate

virtually all of its available cash flows to debt repayment." 2023 WL 2552399, *2-3 (Bankr. D. Del. Mar. 16, 2023).

58.     It is not surprising that Plaintiff would attempt to point to allegations beyond those that are recognized as badges of fraud when it is undisputed (and indisputable) that none of the other recognized badges of fraud were present: Thrasio did not retain possession or control of the property transferred after the transfer, the transfer was not concealed, Thrasio had not been threatened with a lawsuit before the transfer, the transfer was not of substantially all of Thrasio's assets, Thrasio did not abscond, Thrasio did not remove or conceal any assets, the transfer did not occur shortly before or after a substantial debt was incurred, and the asset transferred (*i.e.*, cash) was fungible and was neither essential to Thrasio's business nor was it transferred to a lienor who then transferred it to Boockvar.

59.     For these reasons, Count 3 should be dismissed. Plaintiff's allegation that, at best, the Tender Offer transferred cash to an insider for no consideration is insufficient to plead constructive fraud, much less an actual fraudulent scheme to defraud investors.

60.     **Conspiracy to Fraudulently Transfer.** As already shown, conspiracy to fraudulently transfer is not a cognizable claim under federal law, and bankruptcy courts do not recognize claims for damages for conspiracy to commit a fraudulent transfer.  Opening Br. at 38-39; *see In re Pitt Penn Holding Co.*, 484 B.R. 25, 48 (Bankr. D. Del. 2012). This is not controversial. Plaintiff even admits that "bankruptcy courts may not explicitly recognize conspiracy to commit fraudulent transfer claims as cognizable under the Bankruptcy Code[.]" Opp. Br. at 63. It is well-established that a trustee or someone standing in its shoes, like Plaintiff does here, "cannot assert claims for conspiracy to commit a fraudulent conveyance except as avoidance and recovery actions under §§ 544, 548, and 550." *In re Pitt Penn Holding Co.*, 484 B.R. at 48.

28

61.     In its Opposition, Plaintiff does not attempt to distinguish or even engage with the case law from the Third Circuit and other jurisdictions that confirm it is irrelevant whether any state law recognizes the claim. Opening Br. at 39. "Even where a trustee (or party standing in a trustee's shoes, such as Plaintiff here) is given a lien creditor's rights under the law of a state that does recognize" a claim for conspiracy to commit a fraudulent transfer, "bankruptcy courts have refused to permit trustees to use section 544(b) to pursue such a claim." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 548 (Bankr. D. Del. 2009). The trustee's "only authority to assert a creditor's state law causes of action related to fraudulent conveyances is found in section 544(b)" and section 544(b) "only permits the trustee to avoid a fraudulent transfer"—it does not permit the trustee to seek damages. *See id.*

62.     Recognizing that Third Circuit authority does not support its position, Plaintiff instead relies on a single Texas bankruptcy case involving Texas state law claims, *In re Ramirez*, 413 B.R. 621 (Bankr. S.D. Tex. 2009). *See* Opp. Br. at 63. But *In re Ramirez* was decided in response to a motion to remand state law fraudulent transfer, aiding and abetting, and civil conspiracy claims that had been removed to federal court, which is not analogous to the posture of the claim at issue here. 413 B.R. at 624-25.

63.     Even if conspiracy to fraudulently transfer were a cognizable claim, the claim would still fail because (i) it is time barred under Delaware's three-year statute of limitations and (ii) Plaintiff has failed to show that Thrasio engaged in any fraudulent conveyances. *See* Opening Br. at 39-40. Therefore Counts 4 and 25 should be dismissed.

## **CONCLUSION**

For all these reasons and those in Boockvar's Opening Brief, Defendant Boockvar respectfully requests that the Court grant its Motion and dismiss all claims asserted against him in the Complaint.

Dated: June 16, 2025                    Respectfully submitted,

*/s/ L. Reid Skibell*
**GLENN AGRE BERGMAN & FUENTES LLP**
L. Reid Skibell (NJ Bar No. 359852021)
Michael Paul Bowen (*pro hac vice*)
Agustina G. Berro (*pro hac vice*)
George L. Santiago (*pro hac vice*)
Peter C. Charnell (*pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: rskibell@glennagre.com
      mbowen@glennagre.com
      aberro@glennagre.com
      gsantiago@glennagre.com
      pcharnell@glennagre.com