**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>Howard J. Kaplan (admitted *pro hac vice*)<br>Michelle A. Rice (admitted *pro hac vice*)<br>KAPLAN RICE LLP<br>142 W. 57th Street, Suite 4A<br>New York, NY 10019<br>Tel. (212) 235-0300<br>*Attorneys for Defendant Ari Horowitz*<br><br>John Jureller, Jr.<br>(NJ Bar No. 056361993)<br>Klestadt Winters Jureller Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, NY 10036.<br>Telephone: 212-679-5315<br>Email: jjureller@klestadt.com<br>*Attorneys for Defendant Hudson Palm, LLC and local counsel for Defendant Ari Horowitz* | |
| In re:<br><br>1 THRASIO ONE, INC.,<br>       *Reorganized Debtor*[1] | ------------------------------<br>Chapter 11<br>Case No. 24-11850-CMG<br>(Jointly Administered)<br>------------------------------ |
| META ADVISORS, LLC, solely in its capacity as Trustee of the Thrasio Legacy Trust,<br>                    Plaintiff,<br>        v.<br><br>JOSHUA SILBERSTEIN; CARLOS CASHMAN; DANIEL BOOCKVAR; JOSEPH FALCAO; MOUNIR OUHADI; ADITYA RATHOD; ARI HOROWITZ; EVERYTHING'S COMING UP MILLHOUSE, LLC; CASHMAN FAMILY INVESTMENT II, LLC; HUDSON PALM LLC; AND YARDLINE CAPITAL CORP.,<br><br>                    Defendants. | Adv. Pro. No. 24-01637-CMG |

**JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS ARI HOROWITZ'S AND HUDSON PALM LLC'S RESPECTIVE MOTIONS TO DISMISS THE COMPLAINT**

---

[1]    The last four digits of Reorganized Debtor's tax identification number are 4771.  The Reorganized Debtor's service address for purposes of this chapter 11 case is 85 West Street, 3rd Floor, Walpole, MA, 02081.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... III

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     PLAINTIFF IS REQUIRED TO LITIGATE ITS CLAIMS AGAINST HOROWITZ IN NEW YORK ...................................................................................................... 2

II.    PLAINTIFF'S CLAIMS ARE BARRED BY THE HOROWITZ RELEASE AGREEMENT ..................................................................................................... 7

    A.     The Horowitz Release Agreement Was Not, and Could Not Be, "Rejected" ........ 7

    B.     Plaintiff Erroneously Suggests that Rejection Nullifies the Horowitz Release Agreement .......................................................................................... 10

    C.     Plaintiff's "Election of Remedy" Argument Is Wrong As a Matter of Law ........ 11

    D.     The Court Should Reject Plaintiff's Attempt to Rewrite the Release Agreement 13

III.   HOROWITZ IS AN EXCLUDED PARTY ONLY TO THE EXTENT SPECIFIED, AND IS OTHERWISE A RELEASED PARTY ............................................................... 15

IV.   PLAINTIFF'S ATTEMPT TO RECOVER FROM HOROWITZ AS A PURPORTED BENEFICIARY OF THE SILBERSTEIN SCHEME IS IRRELEVANT AND REFUTED BY THE COMPLAINT ....................................................................................... 18

V.    PLAINTIFF FAILS TO STATE ANY CLAIM AGAINST HOROWITZ ...................... 22

    A.     The Complaint Fails to State a Fraudulent Transfer Claim against Horowitz...... 22

        1.     Constructive Fraudulent Conveyance ....................................................... 23

        2.     Actual Fraudulent Conveyance ................................................................. 26

        3.     Transfers to a Wholly Owned Subsidiary Are Not Fraudulent................. 27

    B.     The Tender Offer Claims .................................................................................. 28

    C.     Plaintiff Fails to State an Unjust Enrichment Claim............................................ 29

    D.     Plaintiff Has no Claim for Conspiracy................................................................ 31

CONCLUSION............................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ................................................................................................ 21

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ................................................................................................ 21

*BVM S.p.A in Liquidazione v. BVM USA Moda, Inc*,
    2021 WL 3077441 (S.D.N.Y. July 20, 2021) ......................................................... 6

*Charles Ramsey Co., Inc. v. Fabtech-NY LLC*,
    2020 WL 352614 (N.D.N.Y. Jan. 21, 2020) ................................................... 22, 25

*ESPN, Inc. v. Off. of Com'r of Baseball*,
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) ...................................................................... 12

*Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*,
    319 A.3d 849  (Del. 2024) ....................................................................................... 28

*In re AgFeed USA, LLC*,
    2015 WL 9133627 (Bankr. D. Del. Dec. 15, 2015) ......................................... 14, 15

*In re AH Liquidation, Inc.*,
    2025 WL 467580 (D. Del. Feb. 12, 2025) ............................................................. 11

*In re Am. Sweeteners, Inc.*,
    248 B.R. 271 (Bankr. E.D. Pa. 2000) .................................................................... 14

*In re Aphton Corp.*,
    423 B.R. 76 (Bankr. D. Del. 2010) ........................................................................ 30

*In re Avianca Holdings S.A.*,
    618 B.R. 684 (Bankr. S.D.N.Y. 2020) ................................................................... 11

*In re Cybergenics Corp.*,
    226 F.3d 237 (3d Cir. 2000) ................................................................................... 15

*In re DeLauro*,
    207 B.R. 412 (Bankr. D.N.J. 1997) ....................................................................... 10

*In re Exide Techs.*,
    607 F.3d 957 (3d Cir. 2010) ..................................................................................... 8

*In re Fedders*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...................................................................... 31

*In re Glob. Outreach*, S.A.,
2011 WL 2294168 (D.N.J. June 6, 2011) ................................................................ 18, 19

*In re Heidt*,
626 B.R. 777 (Bankr. D.N.J. 2021) (Gravelle, J.) ........................................ 21

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) ................................................................. 27

*In re Mystic Tank Lines Corp.*,
544 F.3d 524 (3d Cir. 2008) ............................................................................ 4

*In re Nat'l Gypsum Co.*,
208 F.3d 498 (5th Cir. 2000) ......................................................................... 10

*In re Odyssey Contracting Corp.*,
581 B.R. 762 (Bankr. W.D. Pa. 2018) ............................................................. 7

*In re Parkwood Realty Corp.*,
157 B.R. 687 (Bankr. W.D. Wash. 1993) ...................................................... 10

*In re PWS*,
303 F.3d 308 (3d Cir. 2002) .................................................................... 15, 18

*In re Rescue Rangers*,
576 B.R. 521 (Bankr. E.D. Va. 2017) ............................................................ 31

*In re S.A. Holding Co., LLC*,
357 B.R. 51 (Bankr. D.N.J. 2006) ............................................................. 8, 10

*In re Tegeler*,
586 B.R. 598 (Bankr. S.D. Tex. 2018) .......................................................... 21

*In re The Aspen St. Corp.*,
405 B.R. 767 (Bankr. E.D. Pa. 2009) ............................................................ 16

*In Re Tribune Media Company*,
902 F.3d 384 (3d Cir. 2018) ............................................................................ 4

*JTED46, Inc. v. Espresso Dream, LLC*,
227 A.D.3d 618 (2024) .................................................................................. 12

*Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of New York*,
94 N.Y.2d 398 (2000) .................................................................................... 17

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir.1976) ............................................................................. 8

*M/S Bremen v. Zapata Off-Shore Co.*,

    407 U.S. 1 (1972) ............................................................................................... 6

*Marcus v. Rapid Advance, LLC*,

    2013 WL 2458347 (E.D. Pa. June 7, 2013) ...................................................... 6

*Marino v. Marino*,

    2014 WL 4160982 (Bankr. D.N.J. Aug. 19, 2014) ......................... 22, 25, 30, 32

*Matter of GEC Indus., Inc.*,

    107 B.R. 491 (Bankr. D. Del. 1989) ............................................................... 10

*Miller-Rich v. Altum Pharms. Inc.*,

    2024 WL 1638637 (S.D.N.Y. Apr. 16, 2024) ................................................... 6

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,

    587 U.S. 370 (2019) ......................................................................................... 11

*Prudential Oil Corp. v. Phillips Petroleum Co.*,

    418 F. Supp. 254 (S.D.N.Y. 1975) (cleaned up) ....................................... 11, 14

*Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,

    950 A.2d 868 (Sup. Ct. N.J. 2008) .................................................................. 30

*Quadrant Structured Prods. Co. v. Vertin*,

    102 A.3d 155 (Del. Ch. 2014) ......................................................................... 28

*ResCap Liquidating Tr.* v. *PHH Mortg. Corp.*,

    518 B.R. 259 (S.D.N.Y. 2014) ...................................................................... 5, 6

*Robinson v. Fam. Dollar Inc*,

    679 F. App'x 126 (3d Cir. 2017) ..................................................................... 23

*Rodermund v. Clark*,

    46 N.Y. 354 (1871) .................................................................................... 12, 13

*Salovaara v. Jackson Nat. Life Ins. Co.*,

    246 F.3d 289 (3d Cir. 2001) .............................................................................. 7

*In re Lizza Equip. Leasing, LLC*,

    614 B.R. 653 (Bankr. D.N.J. 2020) ............................................................... 6, 7

*In re Nutraquest, Inc.*,

    2007 WL 3311725 (Bankr. D.N.J. Nov. 5, 2007) ........................................... 15

*State Dept. of Envtl. Prot. v. Ventron Corp.*,

    468 A.2d 150 (Sup. Ct. N.J. 1983) .................................................................. 30

*Traisman v. Khmelnitsky*,

    2020 WL 2847751 (D.N.J June 1, 2020) .................................................................. 27, 29

*TVT Records v. Island Def Jam Music Grp*.,

    412 F.3d 82 (2d Cir. 2005) .......................................................................................... 7

*Unisys Corp. v. Hercules Inc*.,

    224 A.D.2d 365 (1st Dept. 1996) ................................................................................ 12

*Wilmoth v. Sandor*,

    259 A.D.2d 252 (1st Dept. 1999) ................................................................................ 12

## Statutes

N.J.S.A § 25:2-25 ......................................................................................................... 23

11 U.S.C.A. § 365(a) ............................................................................................... 8, 10

11 U.S.C.A. § 550 .................................................................................................. *passim*

11 U.S.C.A. § 1141(b)(1) ............................................................................................ 10

## Rules

Fed. R. Bankr. P. 6006 ................................................................................................ 10

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 7

Defendant Ari Horowitz and Defendant Hudson Palm, LLC respectfully submit this joint Reply Memorandum of Law in further support of their respective Motions to Dismiss the Complaint (ECF No. 109 (the "Motion," "Moving Brief," or "Br.")) filed in this adversary proceeding commenced by Plaintiff Meta Advisors, LLC.

## PRELIMINARY STATEMENT

Plaintiff's attempt to escape two valid releases barring its claims against Horowitz fails as a matter of law.  Both releases plainly cover the claims and causes of action asserted against Horowitz in the Complaint.

Thrasio and Horowitz agreed in January 2022 to mutual releases in connection with Swiftline's purchase of Yardline from Thrasio in exchange for $7.1 million in cash and $5 million in equity (Compl. ¶ 119) (*i.e.*, the Horowitz Release Agreement).[2]  This prepetition release was not and could not have been rejected under the Bankruptcy Code and is clearly enforceable.[3]  Moreover, the Horowitz Release Agreement provides that New York is the exclusive venue for any related litigation.[4]

The Plan also releases Horowitz.  Plaintiff seeks to avoid the plain meaning of the Plan's release through a strained and incorrect reading of the definition of "Excluded Parties," which was negotiated as part of a settlement between the Debtor and the unsecured creditors committee.  The plain language of these negotiated provisions limits any liability of Horowitz to his receipt as

---

[2]    Capitalized terms not defined herein have the same meaning as defined in the Moving Brief (ECF 109).

[3]    *See* Br. 16-18 and Section II, *infra*.  A copy of the full Horowitz Release Agreement was attached as Exhibit C to the Kaplan Declaration Supporting Horowitz's Motion ("Kaplan Decl.").  ECF No. 109-5.

[4]    *See* Br. 11-14 and Section I, *infra*.

"transferee" of Thrasio's assets in connection with the alleged transactions between Thrasio and Yardline. Plaintiff's attempt to expand its authority and the scope of the claims transferred to the trust should be rejected.[5]

Plaintiff also fails to show that Horowitz was a "transferee" of any Thrasio assets in connection with $21 million in loans allegedly made by Thrasio to Yardline,[6] the only basis on which he can be sued under the Plan.

Finally, the few conclusory allegations against Horowitz are unsupported by any factual content, and fail to establish the elements of any claim asserted against Horowitz.[7] On the contrary, the Complaint repeatedly characterizes Horowitz as a target—and eventual victim—of the same alleged scheme that forms the core of the Complaint. Such contradictory, internally inconsistent allegations cannot sustain Plaintiff's claims against Horowitz.

## **ARGUMENT**

## I.   **PLAINTIFF IS REQUIRED TO LITIGATE ITS CLAIMS AGAINST HOROWITZ IN NEW YORK**

Plaintiff does not dispute that the Horowitz Release Agreement contains a Mandatory Forum Selection Clause, and that this clause unambiguously requires Plaintiff to bring its claims against Horowitz in New York. (Br. 11-14.) Plaintiff's Opposition concedes that the Horowitz Release Agreement is governed by New York law (Opp. 42 (arguing that "New York" is the "state law applicable to the Horowitz Release Agreement")). Plaintiff's one paragraph response erroneously asserts without explication that Horowitz "consented to this Court as the proper **venue**

---

[5]       *See* Br. 16-18 and Section III, *infra*

[6]       *See* Br. 17-18, 23-24, and Sections IV and V.A-B, *infra*

[7]       *See* Br. 18-30, and Section V, *infra.*

for" fraudulent transfer claims by filing Proofs of Claim concerning completely different claims more than six months before this action was filed.  (Opp. 90 (emphasis added)).

Horowitz's filing of Proofs of Claim did not waive the Plaintiff's mandatory forum selection clause.  Horowitz made clear that, by filing Proofs of Claim to avoid a forfeiture of his interests in the bankruptcy proceedings, he was not waving any of his rights.[8]    Indeed, each of the three Proofs of Claim referenced by Plaintiff contains on its face an express "No Waiver" provision,[9] which specifically provides that Horowitz's filing of the proof of claim is not (i) "a waiver or release of Claimant's rights," (ii) "a consent by Claimant to the jurisdiction of the Bankruptcy Court with respect to . . . any objection or other proceeding commenced in this case," or (iii) "a waiver of any rights or claims that Claimant has against the Debtor or any person or entity with respect to any pending or future litigation."  Moreover, Horowitz specifically reserved the right to "challenge the jurisdiction of the Bankruptcy Court."  (*Id.*)

---

[8]    *See* Horowitz Proof of Claim Nos. 109 (Case No. 24-11902), 111 (Case No. 24-11840), and 114 (same) (the "Proofs of Claim"), *available at* https://veritaglobal.net/thrasio/creditor/search/result/2 (last accessed June 16, 2025).

[9]    *See, e.g.*, Horowitz Proof of Claim No. 109, Rider at ¶ 3 ("3.  No Waiver: This Proof of Claim is filed to protect Claimant from forfeiture of the claim and preserve all rights and claims against the Debtor. The filing of the Proof of Claim is not (a) a waiver or release of Claimant's rights against any person, entity or property who may be liable for all or any part of the claims set forth herein, whether an affiliate of the Debtor, an assignee, a guarantor or otherwise; (b) a consent by Claimant to the jurisdiction of the Bankruptcy Court with respect to the subject matter of the claim or any objection or other proceeding commenced in this case against or otherwise involving Claimant; (c) a waiver of the right to move to withdraw the reference or otherwise challenge the jurisdiction of this reference or otherwise challenge the jurisdiction of the Bankruptcy Court; (d) a consent to a jury trial, or a waiver of Claimant's rights to a jury trial, in each case, in the Bankruptcy Court or any other court in any proceeding as to any and all matters so triable herein or therein or in any case, controversy or proceeding related hereto, whether or not the same be designated legal, public or private rights, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such right to a jury trial is pursuant to statute or the Constitution of the United States or any State; (e) a waiver of any right to seek relief under 11 U.S.C. § 362(d); (f) an election of remedy; and (g) a waiver of any rights or claims that Claimant has against the Debtor or any person or entity with respect to any pending or future litigation or to any matters related to such litigation.")

Plaintiff cites two cases, neither of which involve a mandatory forum selection clause.[10]  In *In re Mystic Tank Lines Corp.*, 544 F.3d 524, 528 (3d Cir. 2008), debtor Mystic challenged the New Jersey Bankruptcy Court's decision to allow a proof of claim filed by claimant New York State based on a default judgment it had obtained against debtor Mystic in New York State Court. Debtor Mystic argued that, because New York State had submitted its proof of claim to the New Jersey Bankruptcy Court *before* default judgment was entered in the State Court action, New York lacked subject matter jurisdiction to issue the default judgment.  *Id*.  The court ruled that, "when [claimant] New York filed its proof of claim in the Bankruptcy Court, it submitted to the jurisdiction of the Bankruptcy Court," but made clear that the Bankruptcy Court did not obtain exclusive jurisdiction: "[i]t does not follow that the Bankruptcy Court had **exclusive** jurisdiction over all aspects of the claim." *Id.* (emphasis added).  The *Mystic* court applied this rule to *uphold* the validity of—and not to block—parallel proceedings in New York State court.  *Id.*

Similarly, *In Re Tribune Media Company,* 902 F.3d 384, 396 (3d Cir. 2018), also does not address the enforceability of a mandatory forum selection clause. In *Tribune*, the claimant had already made the "cho[ice] to litigate his [employment discrimination] claims [against debtor] in Bankruptcy Court," by "present[ing] evidence for the Court's consideration and expressly stat[ing] that the evidence would allow the Court "to fully evaluate [his] claim.*" Id*.  Because claimant did not seek to litigate in another forum until *after* the Bankruptcy Court had heard and disposed of that already-litigated claim, the court held only that the Bankruptcy Court had jurisdiction to hear and resolve claimant's lawsuit.  *Id*.  The *Tribune* court thus decided only whether the Bankruptcy Court's already-entered disposition of claimant's claim was jurisdictionally sound.

---

[10]    *See* Official Proof of Claim Form 410, *available at* https://www.uscourts.gov/forms-rules/forms/proof-claim-0.

These cases thus stand for the unremarkable proposition that, where a party initiates a proceeding in the bankruptcy court (by filing a proof of claim or a litigation), the party consents to the jurisdiction of the bankruptcy court for that proceeding, but the bankruptcy court does not thereby acquire exclusive jurisdiction over—or, for that matter, become the exclusive venue for—all disputes between the debtor and the creditor.

The decision in *ResCap Liquidating Tr.* v. *PHH Mortg. Corp.*, 518 B.R. 259, 268 (S.D.N.Y. 2014), is particularly instructive. There, defendant PHH sold mortgage loans to the debtor pursuant to an agreement containing a mandatory forum selection clause identifying Minnesota as the parties' chosen forum. Debtor defaulted on the loans and commenced bankruptcy proceedings in the Southern District of New York. PHH filed a proof of claim, and a plan was ultimately confirmed. Plaintiff (as successor to debtor) then commenced an adversary proceeding against PHH in the Southern District of New York, which it characterized as a "counterclaim against PHH's [] proof of claim." PHH responded by moving to withdraw the bankruptcy reference and transfer the case to Minnesota pursuant to the parties' mandatory forum selection clause. Even after determining that debtor's adversary complaint was one of the claims specifically enumerated in § 157(b) and thus *technically* a "core" proceeding, the Court nonetheless granted the motion to withdraw the reference and transferred the case to Minnesota.[11] Notably, PHH had submitted a proof of claim before the Bankruptcy Court. The court nonetheless held that transfer was appropriate because the claims in the adversary proceeding "arise from pre-petition contracts, do not derive from the Bankruptcy Code, and are not intertwined with [defendant's] proof of claim." *Id.* at 269. The same result should hold here, where Plaintiff challenges the enforceability of

---

[11]   *Id.* at 268. ("Here, ResCap's counterclaims are core proceedings solely because PHH Mortgage filed a proof of claim, not because the counterclaims are closely intertwined with the claim allowance process or because they derive from the Bankruptcy Code.")

Horowitz's pre-petition contracts, and asserts claims for voidable transfer and unjust enrichment that are all (i) governed by state statutes and common law, and (ii) are not "intertwined" with the proofs of claim.  *See id.*

Plaintiff ignores the caselaw discussed in Horowitz' opening brief in which Bankruptcy Courts have enforced a mandatory forum selection clause despite a party's filing of a proof of claim.  (Opp. 11-14).  Indeed, the Opposition does not even mention any of the cases upon which Horowitz relies here.  These authorities establish that (i) Horowitz's mandatory forum selection clause is enforceable as a matter of law;[12]  (ii) Plaintiff's claims against Horowitz are covered by the "broad" Mandatory Forum Selection Clause because they involve matters that "relate to" the Horowitz Release Agreement;[13] and (iii) the Court may consider the Horowitz Release Agreement (including the Mandatory Forum Selection Clause) despite Plaintiff's strategic choice to not to reference it in the Complaint.[14]

---

[12]    Br. 12, 14.  *See In re Lizza Equip. Leasing, LLC*, 614 B.R. 653, 667 (Bankr. D.N.J. 2020) (because a "forum selection clause is [] entitled to great weight, and is considered presumptively valid," it may only be disregarded where non-movant can make a "strong showing that it should be set aside") (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S. Ct. 1907, 1916 (1972) (to rebut mandatory forum selection clause's presumption of validity, non-movant must "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.").

[13]    Br. 12-13.  *See BVM S.p.A in Liquidazione v. BVM USA Moda, Inc*, 2021 WL 3077441, at *4 (S.D.N.Y. July 20, 2021) ("the dispute here is captured by the broad forum selection clause, which is not limited to disputes that "arise out of" the agreement but also includes disputes that "relate to" the agreement); *Miller-Rich v. Altum Pharms. Inc.*, 2024 WL 1638637, at *3 (S.D.N.Y. Apr. 16, 2024) (holding that "each of Plaintiff's claims involves "matter[s] arising [] under or related [ ] to" the Release, and thus is subject to the Release's forum-selection clause.")

[14]    Br. 13-14.  *See Miller-Rich* 2024 WL 1638637, at *3 (holding that it was "appropriate for the Court to consider the full extent of the Release's forum-selection clause in ruling on the Appearing Defendants' motions to dismiss); *Marcus v. Rapid Advance, LLC*, 2013 WL 2458347, at *3 (E.D. Pa. June 7, 2013); *In re Odyssey Contracting Corp.*, 581 B.R. 762, 779 (Bankr. W.D. Pa. 2018) (citing *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005)), *subsequently aff'd*, 944 F.3d 483 (3d Cir. 2019)).

The Court should dismiss the claims against Horowitz pursuant to Rule 12(b)(6) based on the mandatory forum selection clause.[15]

## II. PLAINTIFF'S CLAIMS ARE BARRED BY THE HOROWITZ RELEASE AGREEMENT

Horowitz's Motion established that Plaintiff's claims against Horowitz are barred by the Horowitz Release Agreement, pursuant to which Debtor released Horowitz  from any and all liability "whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued . . . arising out of any act, omission, transaction, matter, cause or event" involving Horowitz "in any of [his] capacities . . . related to any [Thrasio] entity."  (Br. 8, 14-16.)  Plaintiff's claims clearly are covered by this release, and it does not argue otherwise.

Plaintiff seeks to escape the release by arguing that the Confirmation Order "rejects" the Horowitz Release Agreement (Opp. 38-39), and that New York's election of remedies doctrine precludes Horowitz from enforcing his bargained-for contractual release.  Both arguments lack merit and are wrong as a matter of law.  (Opp. 42-43.)

A.  The Horowitz Release Agreement Was Not, and Could Not Be, "Rejected"

The Confirmation Order does not expressly reject the Horowitz Release Agreement; indeed, this Agreement is not mentioned at all in the Plan or the Confirmation Order (nor in the Disinterested Directors Report on which they were predicated).  Plaintiff does not even attempt to

---

[15]   Br. 11-12, 14.  *See Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 298 (3d Cir. 2001) (affirming dismissal under Rule 12(b)(6) on grounds that there is "no doubt that a 12(b)(6) dismissal is a permissible means of enforcing a forum selection clause that allows suit to be filed in another federal forum" even where a forum selection clause may be enforced via transfer, because "when a defendant moves under Rule 12, a district court retains the judicial power to dismiss."); *In re Lizza*, 614 B.R. at 668 (deciding "to exercise that power and dismiss [Plaintiff's fraud claim] rather than direct a transfer" to the agreed-upon forum pursuant to a mandatory forum selection clause, where the Court further held that Plaintiff's fraud allegations were "vague and conclusory" and thus insufficient "to establish the facial plausibility necessary to survive a motion to dismiss under 12(b)(6)") (citing *Iqbal*).

show that the Horowitz Release Argument was considered in connection with the Plan or the Confirmation Order.   Plaintiff thus is left with an argument that the Confirmation Order by implication rejects the Horowitz Release Agreement, relying on a provision that plainly was aimed at the employment and separation agreements of Silberstein and Cashman.

The Horowitz Release Agreement was not an executory contract and thus not subject to Section 365(a) of the Code, which "allows debtors in possession, 'subject to the court's approval, ... [to] reject any *executory* contract or unexpired lease of the debtor.'"   *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010), *as amended* (June 24, 2010) (emphasis added).   This Circuit has adopted the "Countryman test," which defines an "executory contract" as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* (cleaned up).   Because New York law governs the Agreement, it was Plaintiff's burden—as "the party seeking to reject a contract"—to show that, as of the February 28, 2024 Petition Date, both Thrasio and Horowitz had outstanding obligations under the Horowitz Release Agreement which, if unperformed, would constitute "a breach which is so substantial as to defeat the purpose of the entire transaction." *In re Exide*, 607 F.3d at 962 (quoting Lipsky *v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976)); *In re S.A. Holding Co., LLC, 357 B.R. 51, 57* (Bankr. D.N.J. 2006) ("[T]he question becomes whether both parties have tendered adequate performance of the contract at the time of the filing") (internal quotation marks and citation omitted).

Plaintiff's Opposition does not even attempt to carry this burden. The Horowitz Release Agreement was integral to a larger transaction whereby Swiftline acquired Yardline in exchange for $7.1 million in cash and $5 million in equity. (Compl. ¶ 119.)  The Debtor entered into a Stock

Purchase Agreement with Swiftline (referred to throughout these agreements as the "Transaction")[16] and simultaneously entered into an "Advisory Termination Agreement" with Horowitz. (Br. 7-8).[17] The Advisory Termination Agreement terminated Thrasio's advisory (not employment) agreement with Horowitz, accelerated the vesting of Horowitz's Thrasio stock options (the "Option Vesting") and included the Horowitz Release Agreement setting forth mutual releases between Thrasio and Horowitz. Kaplan Dec. Ex. C. Horowitz's Advisory Termination and Release Agreements were expressly "conditioned upon . . . the closing of the Transaction." *Id*.

The Swiftline SPA and constituent Advisory Termination Agreement were at the latest fully performed as of January 2022. (Compl. ¶ 119; ECF Nos. 109-3, 5). Plaintiff concedes that the Swiftline Sale closed, and that the vesting of Horowitz's options was accelerated. (Compl. ¶ 119; Opp. 42). As a result, the parties fully performed all obligations under these agreements by the January 2022 closing date. The releases do not require either party to take any action in furtherance of the agreements, but merely recognize that, as part of the Swiftline Sale, the parties were waiving any liability they may have had (or may have in the future) against the other. The existence of a release does not alone mean that the contract was executory.[18] *See In re S.A,* 357 B.R. at 57 (holding that release agreement was non-executory under *Countryman* test); *In re*

---

[16]    *See* ECF No. 109-3 (Kaplan Decl. Ex. A (Swiftline SPA)).

[17]    *See* ECF No. 109-5 (Kaplan Dec. Ex. C (Advisory Termination Agreement and Horowitz Release Agreement)).

[18]    Plaintiff's convoluted argument that the Horowitz Release Agreement was rejected pursuant to a provision rejecting certain employment and separation agreements is incorrect. Horowitz's employment was terminated in March 2021 (Compl. ¶ 95), and his Advisory Agreement was not an "employment agreement." Nor was the Advisory Termination Agreement a "separation agreement." The Horowitz Release Agreement thus could not have been among the "separation agreements between the Debtors and the Excluded Parties" identified for "rejection" under Paragraph 85 of the Plan. See ECF 109-6 (Kaplan Dec. Ex. D) ¶ 85.

*Columbia Gas Sys., Inc.*, 146 B.R. 106, 114 (D. Del. 1992) (settlement agreement containing release provision held to be non-executory), *aff'd sub nom. In re Columbia Gas Sys. Inc.*, 50 F.3d 233 (3d Cir. 1995) (agreeing with the District Court's analysis that "if this case involved a simple exchange of money for execution of a release of all claims, there would be no question that the contract would *not* be executory.").[19]

Finally, and as a matter of due process, the Code requires that a Debtor provide notice to a party to an executory contract that it is proposing to reject that contract. *See In re Parkwood Realty Corp.*, 157 B.R. 687, 691 (Bankr. W.D. Wash. 1993) (noticed required under Sections 365(a) and 1141(b)(1)); *see also In re Nat'l Gypsum Co.*, 208 F.3d 498, 513 (5th Cir. 2000) (holding "debtor had responsibility to assure that the non-debtor party was on notice of the debtor's specific intent to assume [or reject] the contract" because, *inter alia*, Federal Bankruptcy Rule 6006's requirement that "Notice ….shall be given to the party to the contract" applies to rejections under a plan).

Conversely, a contracting party that has not received notice of "the debtor's intention to reject is given no opportunity to file a claim. To hold that a claim has been discharged under these circumstances would clearly violate due process." *Parkwood*, 157 BR at 691. Here, Horowitz received no notice of Debtor's purported intent to reject the Advisory Termination agreement (including the Horowitz Release Agreement). Horowitz's agreements were not the subject of any motion or court ruling, and is not even identified in the Plan.

B. Plaintiff Erroneously Suggests that Rejection Nullifies the Horowitz Release Agreement

---

[19]    *See also In re DeLauro*, 207 B.R. 412, 417 (Bankr. D.N.J. 1997) (Trustee could not reject settlement agreement as to claimant that had "fully performed her obligation under the Agreement by releasing" counterparty from liability, as party executing release had "no continuing obligations"); *Matter of GEC Indus., Inc.,* 107 B.R. 491, 492 (Bankr. D. Del. 1989) (continuing warranty obligations in fully-paid sales contract, and thus potential "liability for future warranty adjustments," did "not fit the Countryman definition" and did not render contract executory).

It is well established that a rejection of an executory contract "cannot rescind rights that the contract previously granted." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 379 (2019) (holding that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach . . . the debtor and counterparty do not go back to their precontract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive."); *In re Avianca Holdings S.A.*, 618 B.R. 684, 697 (Bankr. S.D.N.Y. 2020) ("[A] debtor cannot evade its pre-rejection grant of rights."); *In re AH Liquidation, Inc.*, 2025 WL 467580, at *9 (D. Del. Feb. 12, 2025) (rejection does not alter already-granted rights nor already-performed obligations). The Debtor's rejection of a contract thus is a breach. Plaintiff's argument that the Debtor rejected the Advisory Termination Agreement (including the Horowitz Release Agreement), thereby breached those agreements, and through its own misconduct nullified the releases is nonsensical and plainly not the law.

C.  Plaintiff's "Election of Remedy" Argument Is Wrong As a Matter of Law

Plaintiff erroneously argues, based on Horowitz's Proofs of Claim, that New York's "election of remedies" doctrine bars Horowitz from enforcing his bargained-for rights under the Horowitz Release Agreement. (Opp 42 – 43.)

Under New York law, the "doctrine of election of remedies represents a harsh and arbitrary principle designed only to prevent vexatious litigation and should be applied only where there has clearly been an irrevocable election." *Prudential Oil Corp. v. Phillips Petroleum Co.*, 418 F. Supp. 254, 257 (S.D.N.Y. 1975) (cleaned up). A party invoking the doctrine must show that its adversary has "chosen one of two or more co-existing inconsistent remedies," resulting in either an advantage to the adversary, or a detriment to the opposing party. *Id.* Critically, New York law is clear that "[o]nly at trial is the plaintiff required to make an election at a time within the discretion of the

11

Trial Judge." *Wilmoth v. Sandor*, 259 A.D.2d 252, 254, 686 N.Y.S.2d 388, 390–91 (1st Dept. 1999); *see also Unisys Corp. v. Hercules Inc.*, 224 A.D.2d 365, 367, 638 N.Y.S.2d 461, 462 (1st Dept. 1996) (election occurs at trial or upon submission of a motion for summary judgment, the grant of which is "the procedural equivalent of a trial").

First, Horowitz is not required to elect a remedy at this early stage of the litigation. *See JTED46, Inc. v. Espresso Dream, LLC*, 227 A.D.3d 618, 618, 213 N.Y.S.3d 15, 16 (2024) (holding that the trial "court properly instructed plaintiffs to elect either recessionary damages under their fraudulent inducement claim at a bench trial or compensatory damages arising from the alleged breach of contract at a jury trial"); *ESPN, Inc. v. Off. of Com'r of Baseball*, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999) (applying recission-versus-damages election during pre-trial motion for summary judgment and motions *in limine*). Notably, the debtor objected to Horowitz's proof of claim and there has been no further proceedings with respect to such objections.

Second, for the election of remedies doctrine to apply, Horowitz would have had to know of the estate's claims and knowingly elect a remedy. *Rodermund v. Clark*, 46 N.Y. 354, 357 (1871) (a party "determines his election in the case of conflicting and inconsistent remedies" through "[a]ny decisive act of th[at] party, with knowledge of his rights and of the fact[s]".) Plaintiff filed this case six months after Horowitz filed the proofs of claim, and he had no knowledge at that time that he would be sued by the estate for more than $30 million.

Third, each Proof of Claim specifically states that it is not "an election of remedy" and does not constitute "a waiver of any rights or claims that Claimant has against the Debtor or any person or entity with respect to any pending or future litigation." *See supra* at 3.

Fourth, Plaintiff misconstrues New York law regarding the effect of a breach. Plaintiff argues that Horowitz cannot sue for breach and at the same time enforce the contract (Opp. 42),

but that is exactly what New York law provides.  Otherwise, a party can simply breach a contract and thereby avoid all of its obligations.  New York law does not allow a wrongdoer to benefit from its own misconduct.  Here, Horowitz alleges in the Proofs of Claim that Horowitz was "damaged as a result of, *inter alia*, the fraudulent and false misrepresentations about the financial condition of the Debtors."  (Proofs of Claim, Rider at 3-4.)  The Proofs of Claim asserts both a damages claim secured by the 1.4 million in Swiftline Shares transferred as consideration for the Swiftline Sale, as well as an "unsecured claim for damages in an amount to be determined." *Id*.  These assertions are clearly in the alternative, and there has been no determination regarding the applicability of these remedies.   More importantly, the proofs of claim do not seek recission.  As a result, Plaintiffs has failed to show that Horowitz has, in fact, undertaken even one "decisive act . . . with knowledge of his rights, and of the fact[s] that can be interpreted as his clear-cut election to pursue rescission of the Horowitz Release Agreement. *See Rodermund*, 46 N.Y. at 357.

Finally, Plaintiff asserts that the Horowitz Release Agreement "appears to be the same as" the "Restrictive Covenant," which Horowitz purportedly referenced "as a breached contract" in his Proofs of Claim (Opp. 42).  However, the Proofs of Claim do not allege that the Horowitz Release Agreement or any restrictive covenant was breached.  Moreover, an allegation that Thrasio committed a fraud or breached the parties' agreements does not nullify Thrasio's release of Horowitz.

In sum, Plaintiff fails to establish that Horowitz made an "irrevocable election" at odds with Horowitz's arguments supporting dismissal of this Action, or that the application of the election of remedies doctrine would "prevent vexatious litigation" as New York law requires. *Prudential*, 418 F. Supp. at 257.

     D.  <u>The Court Should Reject Plaintiff's Attempt to Rewrite the Release Agreement</u>

Plaintiff argues that the Debtor's fraudulent transfer claims could not have been released pre-petition because these claims belonged to Thrasio's creditors and were not assets of Thrasio at that time. (Opp. 44-45).  However, the Horowitz Release Agreement undisputedly covers these claims.  Specifically, the Horowitz Release Agreement unambiguously releases Horowitz from:

- "any and all liability whatsoever"
- that "Thrasio ever had, now have, or hereafter could, shall or may" have against Horowitz, whether "known or unknown . . absolute or contingent, accrued or unaccrued"
- which "aris[es] out of any act, omission, transaction, matter, cause or event" undertaken by Horowitz "in any of [his] capacities as a stockholder, option holder, warrant holder, director, officer, employee, consultant, independent contractor of or in any other capacity related to any Company entity, whether directly or derivatively through a Company entity
- provided that such act or omission giving rise to Thrasio's claim against Horowitz "occur[ed] contemporaneously with or up to and including the date of the [Swiftline Sale] Transaction" and Horowitz Release Agreement.

(Br. 8 (quoting Kaplan Decl. Ex. C (Horowitz Release Agreement) at 8 ¶ 2(b).).

The Agreement thus contains an uncontroversial prepetition release that this Court and others routinely uphold.  *See, e.g., In re AgFeed USA, LLC*, 2015 WL 9133627, at *5 (Bankr. D. Del. Dec. 15, 2015) (dismissing adversary claims for fraudulent transfer and unjust enrichment where prepetition "Settlement Agreement contemplates and provides for the situation that arose here, and precludes any cause of action related to" its subject matter); *In re Am. Sweeteners, Inc.,* 248 B.R. 271, 275 (Bankr. E.D. Pa. 2000) (prepetition release agree in which Debtor "released all claims against [adversary defendant] for any conduct" occurring prior to release was "effective to bar any claims" relating to that conduct).

Plaintiff also relies on *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000), to argue that Thrasio could not release Horowitz from liability at the time of entering into the" Horowitz Release Agreement (Opp. 44).  *In re Cybergenics* did not involve a release agreement and is

14

inapposite. Here the release clearly covers Horowitz's liability, including future liability with

respect to unknown claims. (Br. 8). Thrasio's prepetition release expressly immunizes Horowitz

from any and all unknown "*liability*" that Thrasio "**hereafter** could, shall or **may have** against"

Horowitz (emphasis added). The Release is thus not limited to "claims" owned by Thrasio at the

time of execution, but clearly covers future efforts to hold Horowitz liable, so long as the facts

underlying that "liability" occurred on or before the Horowitz Release Agreement was executed

in January 2022.[20] Neither *Cybergenics* nor *In re PWS* addressed such a broad pre-petition release

explicitly contemplating claims known and unknown at the time of execution. *In re AgFeed USA,*

*LLC*, 2015 WL 9133627, at *5 (enforcing pre-petition release where it "contemplates and provides

for the situation that" ultimately arose between the parties).

## III.   HOROWITZ IS AN EXCLUDED PARTY ONLY TO THE EXTENT SPECIFIED, AND IS OTHERWISE A RELEASED PARTY

The Plan broadly releases all directors, officers and equity holders of Thrasio and its

Affiliates, including Yardline. (Br. 16-18.) Horowitz falls within the definition of a "Related

Party" and is therefore released under the Plan. (Br. 16.) *See In re Nutraquest, Inc.*, 2007 WL

3311725, at *11 (Bankr. D.N.J. Nov. 5, 2007).

In this Circuit, it is well-settled that, "[i]n construing a confirmed plan of reorganization,

courts apply contract principles." *In re The Aspen St. Corp.*, 405 B.R. 767, 775 (Bankr. E.D. Pa.

2009); *see also In re Nutraquest, Inc.,* 2007 WL 3311725, at *11 ("When interpreting a plan,

---

[20]     Moreover, Plaintiff's argument here ignores Paragraph 2(d) of the Horowitz Release Agreement, which provides that: "Each party hereto expressly waives the benefit of any statute or rule of law, which, if applied to the Release or the Company Release, as applicable, would otherwise exclude from its binding effect any claim not known by the Released Parties or you on the date of execution of this Release Agreement."  ECF 109-5 (Kaplan Dec. Ex. C) at 2(d). This provision alone defeats Plaintiff's argument here, as the Complaint plainly seeks to undo the binding effect of Horowitz's Release by invoking the Bankruptcy Code.

general principles of contract interpretation apply.")  Here, the Plan carves out certain individuals and transactions from this broad release.  The definition of Excluded Parties first identifies six individuals.  (Plan at Art. I.A ¶ 75(i); Br. 16.)  These individuals are Excluded Parties without any limitation or qualification, and are thus carved out of the release for all purposes.  Horowitz is not named in subsection (i) of Definition 75.  *Id.*

The definition of Excluded Parties also includes "transferees of Thrasio's assets in connection with transactions involving Yardline" during the time period "between April 2020 and January 2022." (*Id.* at ¶ 75(ii); Br. 16-17.)  Such transferees are Excluded Parties only to the extent they received Thrasio's assets.  The single reference to Horowitz in the entire 152-page plan confirms that his status as an Excluded Party is limited to, and dependent upon, his receipt of Thrasio assets as "transferee" in connection with transactions involving Yardline.  (*Id.* (" . . . including but not limited to, Ari Horowitz")).

Reading the Plan as a whole, and giving effect to all of its provisions, Horowitz (i) can only be sued by the Trustee as a "transferee of Thrasio's assets in connection with" those specified Yardline transactions, and (ii) is otherwise released from all liability.[21]

Plaintiff argues that because Horowitz meets the definition of "Excluded Party," he "is not a Released Party, he was not granted any release per the Plan, and claims against him related to the Tender Offer were not released by the Plan." (Opp. 17).  Plaintiff's argument that Horowitz was not released under the Plan is superficial and inconsistent with the limited nature of Definition

---

[21]       Br. 16-17.  *See* Plan Art. I.A ¶ 132 (Horowitz is a "Released Party" because he meets the definition of "Related Party"); Plan Art. VIII.E (as a "Released Party," Horowitz was "deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action . . .").  This is consistent with the findings in the Disinterested Directors Report, which determined as to the Yardline Transfers: "To ensure the effective preservation of these avoidance actions, the transferees of Thrasio's assets in connection with the Yardline Transactions, in such capacity, will also be Excluded Parties under the Plan."  (ECF No. 109-4 (Kaplan Decl. Ex. B) at 7 n.8)

75(ii). Indeed, Plaintiff's argument leads to the absurd result that Horowitz is an Excluded Party

only to the extent he was a transferee of Thrasio's assets in connection with a Yardline transaction

but can generally be sued for any matter relating to Thrasio. This interpretation would render

Definition 75(ii) superfluous, in violation of the well-established rule of construction that a

contract should be interpreted to give effect to all of its terms. *See, e.g.*, *Lawyers' Fund for Client*

*Prot. of State of N.Y. v. Bank Leumi Tr. Co. of New York*, 94 N.Y.2d 398, 404 (2000) (rejecting a

litigant's interpretation of a contractual provision that "would render [another provision]

superfluous" as "unsupportable under standard principles of contract interpretation").

Plaintiff's argument is also inconsistent with the Plan's terms providing that the Trust

received only the Vested Causes of Action[22] (Art. IV.J ("Committee Settlement"), defined to

include only causes of action against the Excluded Parties[23]. The definition of Excluded Parties

thus expressly limits the claims transferred.

Here, Plaintiff's claims against Horowitz relating to the 2020 Tender Offer (Counts II-IV,

VI) have nothing to do with any Yardline transaction, and indeed the tender offer occurred before

Yardline was even created. The Tender Offer claims fall outside the Plan's definition at Paragraph

75(ii), and are not Vested Causes of Action.

Similarly, Plaintiff's claims based on more than $20 million in loans to *Yardline*, and the

forgiveness of those loans (Counts XIX-XXIII), are not properly asserted against Horowitz, who

concededly did not receive any of the funds. Horowitz thus was not a "transferee" of such funds,

---

[22]    ECF 109-6 (Kaplan Decl. Ex. D) ("Plan") at Art. IV.J.1-2 (providing that "the Vested Causes of
Action shall not be released by the Debtors on the Effective Date" and accordingly that "the Thrasio Legacy
Trust's primary purpose is to investigate, prosecute, settle, or abandon the Vested Causes of Action").

[23]    Plan at Art. I.A ¶ 132(a), (l)-(m).

which as the complaint and the Opposition concede, were used by Silberstein and Cashman to pay off Yardline's creditors.  (Br. 15-18).

These claims against Horowitz should therefore be dismissed because they were extinguished under the Plan. *See In re PWS*, 303 F.3d 308, 315 (3d Cir. 2002) ("Much as a party might decide to resolve a claim by reaching an out-of-court settlement, [Debtor] resolved the fraudulent transfer claims here by extinguishing them" under its confirmed plan).

## IV.   PLAINTIFF'S ATTEMPT TO RECOVER FROM HOROWITZ AS A PURPORTED BENEFICIARY OF THE SILBERSTEIN SCHEME IS IRRELEVANT AND REFUTED BY THE COMPLAINT

The plain language of the Plan makes clear that only "transferees of Thrasio's assets in connection with transactions involving Yardline Capital Corp. between April 2020 and January 2022" are Excluded Parties.  (Plan Art. I.A ¶ 75(ii)).  The definition of Excluded Parties, which was negotiated by the debtor and the unsecured creditors committee, is thus limited to "transferees" and does not include beneficiaries.  Plaintiff's attempt to rely on Section 550 of the Bankruptcy Code to show that it may hold Horowitz liable and recover from him on the theory that he was a "beneficiary" the challenged transfers is misguided.

Indeed, by characterizing Horowitz only as a beneficiary of the loans to Yardline, Plaintiff necessarily admits that Horowitz could not be a transferee.  (*See* Opp. 97).  *See, e.g.*, *In re Glob. Outreach*, S.A., 2011 WL 2294168, at *11 (D.N.J. June 6, 2011) ("a subsequent transferee cannot also be an entity for whose benefit the transfer was made" because those sources of recovery are "mutually exclusive").  Plaintiff's assertion that Horowitz can be sued under Section 550 as a beneficiary of the loans to Yardline and the payoff of Yardline creditors

thus precludes Plaintiff from arguing that Horowitz is a "transferee" of those payments.  (Br. at 17-18, 23-24).[24]

In addition, Plaintiff's allegations concerning the supposed benefit to Horowitz are conclusory and are refuted by Plaintiff's allegations against Cashman and Silberstein.  Plaintiff repeatedly alleges that: the loans to Yardline were "[f]ueled by Silberstein's personal feud with Horowitz and his desire to thwart Horowitz's capital raising efforts"; the Yardline Transfers were "motivated by personal interests of Silberstein and Cashman"; and that they "caused the transfers to be made to Yardline . . . ."  (Opp. 89.)  Plaintiff further asserts that this "entire scheme" was also motivated by Cashman's concern based on his role as director of Yardline . . ."  (Opp. 91.)  Plaintiff then posits several conclusory sentences concerning Horowitz, claiming that the Yardline loans "were made to benefit Horowitz and Cashman," and for the purpose of "alleviating their personal litigation risks."  (Opp. 97.)  However, Plaintiff's Complaint asserts no factual allegations regarding Horowitz' personal litigation risks, or why Silberstein and Cashman—who, according to the Complaint, were in the process of throwing Horowitz out of Yardline, taking over the company, and forcing Horowitz to sell his stock to Thrasio (Compl. ¶ 106)—would have ever done anything to benefit Horowitz.

The Complaint's facial implausibility as to Horowitz is readily apparent from Plaintiff's own description of its claims (Opp. 8-9):

> Horowitz, a former senior vice president of Thrasio, ultimately found himself at odds with Silberstein. When Silberstein's and Horowitz's relationship deteriorated,

---

[24]    Plaintiff urges the Court to disregard *In Re Glob. Outreach* on grounds that instead of dismissing the claims, the *In Re Glob. Outreach* court "court held that, the trustee could still seek recover transferred assets under Section 550, citing the goals of the formation of the Trust." (Opp. 98).  But Horowitz cited *In re Glob. Outreach* for the proposition that this Circuit has—adopted *Bonded*'s rule that "the statutory language commands that *legally* an entity may fall into only one category [of 550(a)]" such that they are "mutually exclusive," to wit, an "'entity for whose benefit' a transfer was made is different from a transferee." *Id.*

Silberstein made unfounded and relationship-driven decisions with his personal interest in mind, and sought to strip Horowitz of power, costing the Company millions of dollars of losses in the process thereof. (Compl. ¶¶ 94, 104-06.) After initially removing Horowitz from the Company, Silberstein, Cashman, and Horowitz agreed that Horowitz would form his own company—Yardline—and Thrasio would invest millions of dollars into Yardline and install three Thrasio insiders on the Yardline board: Cashman, Boockvar, and Stephanie Fox. (*Id.* ¶¶ 92, 102.)

Horowitz, on behalf of Yardline, sought consent from Thrasio to close a Series A funding. (*Id.* ¶¶ 103.) Silberstein, again, wanting to sabotage Horowitz, withheld Thrasio's consent and instead caused Thrasio to *acquire* Yardline and make Yardline a subsidiary of the Company through a "loophole" transaction that enraged Yardline's other investors. (*Id.* ¶¶ 103- 113.) When Thrasio faced blowback from other investors in Yardline for the acquisition, Silberstein and Cashman misappropriated Company resources to protect themselves from litigation risk, spending those resources to pay off angry Yardline investors to stave off a potential suit from them. (*Id.* ¶¶ 112-16, 306, 322, 345.) After the acquisition, Thrasio continued to provide Yardline with approximately $25 million in total, including issuing $20.9 million of promissory notes to Yardline (the "Promissory Notes") that were never repaid but issued solely to provide funds to Yardline to use to placate angry investors who may threaten litigation against Cashman. (*Id.* ¶¶ 116-19.)

(*Id.*)  The Complaint's allegations concerning the threats of litigation by Yardline's Noteholders (Compl. ¶¶ 112 – 116) do not even mention Horowitz.  The Complaint then merely recites the element of § 550(a)—without any supporting factual allegations or explanation—to argue that the Yardline Transfer payments were made to benefit Horowitz.  (Compl. ¶¶ 302, 306, 345).  Plaintiff's Opposition sheds no further light on these claims against Horowitz, as it fails to identify any allegations in its Complaint that could plausibly explain: (i) the existence of any threat of litigation against Horowitz; (ii) why the Yardline Noteholders would threaten Horowitz with suit when admittedly they were "antagonized" by Silberstein's scheme to take over Yardline; and (iii) the nature of the purported claim that the Yardline Noteholders even might have considered asserting against Horowitz.

Plaintiff's Opposition makes clear that its entire case against Horowitz relating to the Yardline Transfers relies exclusively on its conclusory and flimsy allegations that Horowitz was the person for whose benefit those Transfers were made.  (Compl. ¶¶ 302, 306 (Count XIX), ¶¶

20

313, 322 (Count XX)).  However, the Court is required to reject these allegations, which are not

supported by any "factual content."  *In re Heidt*, 626 B.R. 777, 788 (Bankr. D.N.J. 2021)

(Gravelle, J.) (Court must "identify and reject labels, conclusory allegations, and formulaic

recitation of the elements of a cause of action"); s*ee Bell Atl. Corp*. v. *Twombly*, 550 U.S. 544,

555 (2007); *Ashcroft* v. *Iqbal*, 556 U.S. 662, 663 (2009)).[25]

The allegations concerning Thrasio's forgiveness of its loans to Yardline also rely on this

contrived and baseless premise.  (Compl. ¶¶ 327, 331, 333 (Count XXI), ¶¶ 336, 345, 347 (Count

XXII).  As the Complaint itself alleges, Thrasio was the 100% owner of Yardline at that time.

*Compare* Compl. ¶ 110 (alleging that Thrasio became "sole shareholder of Yardline" in "May

2021") *with* Compl. ¶ 116 (alleging that "Around October 2021, Thrasio forgave all outstanding

amounts under the [Yardline] Promissory Notes").  And there is no factual matter pleaded

indicating that Thrasio's forgiveness provided any benefit to Horowitz, who was not even a

Yardline shareholder at that time.  (*Id*.)  Indeed, these Counts merely repeat that the benefit to

Horowitz (and Cashman) was "ensuring that they would not be sued by Yardline investors."

(Compl. ¶¶ 331, 345.)  But the Complaint itself alleges that Thrasio had already paid off those

same investors via the Yardline Transfers, thus eliminating any plausible threat of litigation from

---

[25]    Plaintiff's reliance on *Trustmark* is misplaced.  (Opp. at 98-99 (discussing *In re Tegeler*, 586 B.R.
598, 607 (Bankr. S.D. Tex. 2018).)  In *Trustmark*, Plaintiff alleged that it loaned funds to a company
controlled by debtors, that the debtors perpetrated a fraud on Trustmark to obtain the loan, and then used
the funds to obtain a 50% equity interest in another company.  The court pierced the corporate veil, held
that debtors were personally liable to Trustmark, and that the debt was not dischargeable.  While the is a
discussion concerning the "badges of fraud" under Texas Uniform Fraudulent Transfer Act, the court
relied on those factors to determine that debtors intended to defraud Trustmark and pierce the corporate
veil.  The Court found that debtors received a personal benefit, because it used the Trustmark loan to
obtain a 50% interest in another company.  *Trustmark* is completely inapposite here, where Horowitz did
not receive any of the Thrasio loans and did not receive any stock or other benefit with respect to these
payments.  Indeed, the Complaint admits that the Thrasio loans were the first step in acquiring all the
equity of Yardline, and that Thrasio purchased Horowitz's stock on May 10, 2021, within two weeks of
the loans. (Compl.  ¶ 119).

Yardline's investors. (Compl. ¶ 116 (alleging that Yardline was expressly "prohibit[ed] from using the funds [transferred by Thrasio] for any purpose other than paying off the Convertible Noteholders and Series A Investors until those entities were paid off.").)  These contradictory and unsupported allegations plainly do not pass muster under *Iqbal*.

## V.    PLAINTIFF FAILS TO STATE ANY CLAIM AGAINST HOROWITZ

The Complaint's allegations refute Plaintiff's theory that Horowitz was in cahoots with Silberstein and Cashman, or that he was a Thrasio "insider" at the time of the Yardline transactions. As to Horowitz, the Complaint's conclusory allegations have no factual support, and no plausible theory of liability.  *See Marino v. Marino*, 2014 WL 4160982, at *4 (Bankr. D.N.J. Aug. 19, 2014) (dismissing adversary proceeding for failure to plausibly state a claim where "even accepting as true all of the factual allegations contained in the Amended Complaint as required by the *Iqbal* case, [Plaintiff's] fact allegations contradict her legal theory."); *Charles Ramsey Co., Inc. v. Fabtech-NY LLC*, 2020 WL 352614, at *13 (N.D.N.Y. Jan. 21, 2020) ("contradictory pleading fails to satisfy the plausibility standard set out in Twombly and Iqbal.").

### A.   The Complaint Fails to State a Fraudulent Transfer Claim against Horowitz[26]

Plaintiff asserts both constructive and actual fraudulent transfer claims against Horowitz. A constructive fraudulent transfer claim requires Plaintiff to show that Thrasio did not receive reasonably equivalent value for the loans that Thrasio made to Yardline, which were used to pay

---

[26]    Contrary to Plaintiff's contention, Horowitz did not argue that the Plaintiff's claims were barred by estoppel (*see* Opp. 16, 18).  However, Horowitz joins Defendant Cashman's estoppel argument.  Horowitz also joins the arguments of Defendant(s) Cashman that Plaintiff's failure to identify the State law(s) under which it purports to bring "fraudulent transfer" requires dismissal of those claims (Counts II-IV, XIX-XXIV) as asserted against Horowitz.  (See, e.g., ECF 67-1 (Cashman Brief) at Section V.A).  Moreover, Horowitz joins the portion(s) of Defendants' Replies arguing that, as a matter of law, the cited text of the Plan (Art IV.O, at 46) does not and cannot operate to deprive Defendants—including Horowitz—of validly-asserted legal defenses.

off Yardline's "angry" creditors, *and* that Thrasio "intended to incur, or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they become due." (Br. 19 (quoting N.J.S.A § 25:2-25).) Constructive fraudulent transfer also may be shown by demonstrating that Thrasio did not receive reasonably equivalent value and was insolvent at the time. (*Id.*)

### 1. Constructive Fraudulent Conveyance

Counts XIX and XXI allege constructive fraudulent transfer claims in connection with approximately $21 million in loans made by Thrasio to Yardline, allegedly for the purpose of paying off Yardline's creditors. Count XXIII alleges a constructive fraudulent transfer claims in connection with Thrasio's forced retirement of Horowitz's Yardline stock as part of Thrasio's scheme to take over Yardline. Plaintiff's Complaint lacks facial plausibility because it fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Robinson v. Fam. Dollar Inc*, 679 F. App'x 126, 131 (3d Cir. 2017) (citing *Twombly* and *Iqbal*).

**Reasonably Equivalent Value.** As already established, the Complaint repeatedly alleges that Silberstein, on behalf of Thrasio, decided to acquire 100% of the stock of Yardline, and to oust Horowitz from the company. (Br. 2-8; *supra* at 1). The Complaint sets forth a well-planned strategy by Thrasio to obtain a majority of Yardline's stock, trigger a provision in the Yardline convertible notes that voided a call option in the Yardline Notes, thereby preventing dilution of Thrasio's equity position, and then paying off Yardline's creditors so that Yardline would have no debt as a wholly owned subsidiary of Thrasio. (Compl. ¶¶ 106-117.) As part of this plan, Thrasio removed "Yardline completely from Horowitz's control" by retiring the stock held by Yardline and

23

other Yardline insiders in May 2021, "after which Thrasio became the sole shareholder of Yardline." (Compl. ¶ 110.)

These allegations refute Plaintiff's allegations that Thrasio did not receive reasonably equivalent value for its loans. First, these loans were apparently documented by promissory notes, not equity, and any default would have allowed the debtor to foreclose on the assets of Yardline. Moreover, through the loans and payments to Yardline's Noteholders, Thrasio was able to accomplish its purpose of acquiring a debt-free company with no convertible securities.

Second, Plaintiff argues (again without any factual support) that Yardline was insolvent and was worth nothing, and that Thrasio received nothing for the retirement of Horowitz's stock in exchange for approximately $1.8 million (Counts XXIII, XXIV). Again, according to the Complaint this "retirement" of Horowitz's stock enabled Thrasio to pursue its plan of taking over Yardline. (Compl. ¶ 110). In addition, Plaintiff's own allegations make clear that the business itself was anticipated to be valuable to Thrasio. (*Id.* ¶ 96 ("Silberstein envisioned that Yardline would complement Thrasio's business model by providing debt financing to small businesses that sold products on Amazon but were not yet ready to be acquired by Thrasio.") The Complaint thus alleges that Thrasio clearly viewed strategic value in the Yardline business.

Third, the Complaint admits that Yardline had raised funds, and was on the verge of raising additional capital when Silbersten and Thrasio interfered with Yardline's Series A capital raise. (Comp. ¶ 112). Indeed, *Thrasio's own board* recognized the need for capital for this business and incentivized Horowitz to rase $4 million for Yardline by April 30, 2021. (*Id.* ¶ 97.) Yardline invested $1 million (*id.* ¶ 98), and Yardline raised funds through the issuance of Convertible Notes in August and November 2020. (*Id.* ¶¶ 99-104.) The Complaint admits that, "by the end of March 2021, Horowitz **had secured enough commitments that would have allowed for the Series A**

**to close**." (*Id.* ¶ 109 (emphasis added).)  Yardline's simultaneous success in obtaining debt and equity financing from "outside investors" establish that Yardline did indeed have value, and that investors were willing to invest millions of dollars.  These allegations clearly render the conclusory allegation that Yardline had no value at all implausible.  (Br. 20-22).  Moreover, contrary to Plaintiff's argument, Horowitz is not seeking to have the Court draw an impermissible inference in Horowitz's favor; the fact that "outside investors" independently sought to invest in Yardline appears on the face of the Complaint.  *See Marino*, 2014 WL 4160982, at *4; *Charles Ramsey Co.*, 2020 WL 352614, at *13.

Fourth, Thrasio's decision to accelerate Yardline's obligation to noteholders and to then pay them as required by their securities was part of the plan to bring this business "in house."  This lending operation obviously needed capital to operate the business; indeed, the Complaint admits that Thrasio invested several million dollars into Yardline *after* it acquired 100% of the Yardline stock.  (Compl. ¶ 117.)  This admission also renders the argument that Yardline was worth nothing implausible.

**Failure to Pay Debts and Insolvency.**  Plaintiff does not contend that Thrasio defaulted on its debt during the period that it acquired Yardline.  Indeed, the Complaint alleges that as of April 27, 2021, and before Thrasio made any of the Yardline Transfers, Thrasio had received an offer from a potential partner to provide $600 million in financing in connection with a potential merger transaction.  (Compl. ¶ 69.)  In addition, during 2021 Thrasio negotiated and closed a $1 billion "Series D" Financing.  (*Id.* ¶ 80.)

In light of these allegations, the Complaint's conclusory allegation that Thrasio could not pay its debts and was insolvent during the period from April 2021 through November 2021 are

facially implausible and fail to plead factual content showing that it is more likely than not that Thrasio was insolvent at the time of each challenged Yardline Transfer.

 2.   Actual Fraudulent Conveyance

Plaintiff also fails to plead any "actual" fraudulent transfer claim against Horowitz arising out of the Yardline Transfers.  (Counts XX, XXII, XXIV.)

First, the Complaint does not plead that Horowitz took any action that interfered with any creditor of Thrasio.  As alleged, all of the actions taken by Thrasio with respect to Yardline were approved by the Thrasio board and orchestrated by Silberstein. (Compl. ¶¶ 96-118.)  Nor does the Complaint allege that Horowitz had any knowledge of any alleged attempt to defraud a Thrasio creditor.  Indeed, the Complaint does not contain any factual allegations that Silberstein or Cashman intended to defraud Thrasio's creditors in connection with the Yardline Transfers.

Second, Plaintiff contends that merely by alleging that Horowitz was an "insider" of Thrasio at the time of the transfers, it has adequately pleaded that Horowitz had "intent" to defraud a Thrasio creditor.   (Counts III, XX, XXII, XXIV) (Opp. at 97-98).  The Complaint admits that Horowitz was fired from his position at Thrasio in March 2021, before any transfers to Yardline. He was not a Thrasio insider at the time of the Yardline Transfers.  Indeed, as established above, the allegations of the complaint establish that Horowitz was thrown out of his own company, and plainly was not benefited by the alleged scheme perpetrated by Silberstein and Cashman to acquire Yardline.  The Complaint concedes that Horowitz thought that his Thrasio stock options were worth $62.5 million in February 2021 (Compl. ¶ 100).  Third, the Complaint's allegations show that Horowitz did not believe that Thrasio was insolvent.  (*See, e.g.*, Compl. ¶ 96, 105.)  None of these allegations implicate Horowitz in any wrongdoing.  Not surprisingly, Plaintiff's brief sets forth nothing more than a few conclusory assertions that Horowitz was an insider.  Neither the

complaint nor the opposition allege any "factual matter" to support these allegations, and this alleged "badge of fraud" should be dismissed. *Traisman v. Khmelnitsky*, 2020 WL 2847751, at *6 (D.N.J June 1, 2020) (where a claim is grounded only in "conclusory statements" respecting the badges of fraud, it should be dismissed for lack of "sufficient factual allegations to permit a reasonable inference that [debtor] acted with "actual intent to hinder, delay, or defraud").

Finally, the retirement of Horowitz' stock in Yardline and the payment to him of approximately $1.8 million cannot as a matter of law establish an intent to defraud Thrasio's creditors. (Br. 29-30.)

### 3. Transfers to a Wholly Owned Subsidiary Are Not Fraudulent

Horowitz's Motion established that Plaintiff's claims challenging transfers from Thrasio to Yardline for the purpose of compensating the Convertible Noteholders (Counts XIX-XXII), do not "amount to a fraudulent transfer" as a matter of law (Br. 20-23) because "[i]t is not fraudulent to allocate property to a solvent, wholly-owned subsidiary because the transferor receives value equal to the transferred asset." *In re HH Liquidation, LLC*, 590 B.R. 211, 266 (Bankr. D. Del. 2018). (Br. 20.)

In response, Plaintiff argues again that "Yardline was an *insolvent* subsidiary." (Opp. 99-100.) As demonstrated in detail above,[27] because the Complaint itself concedes that Yardline was both wholly owned by Thrasio and solvent at the time of these transfers, these claims fail as a matter of law. Nor does Plaintiff identify a single allegation of fact capable of supporting its conclusory allegations of Yardline's insolvency. (Opp. 99.)

---

[27]    *See supra* Section V.A.1 (discussing ¶¶ 97-112).

Moreover, neither of the two cases Plaintiff cites addressed the question of whether and when a parent receives "reasonably equivalent value" in exchange for a payment to its wholly owned subsidiary. *See Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 319 A.3d 849, 864 (Del. 2024) (containing no "reasonably equivalent value" analysis whatsoever in litigation concerning insurer's obligation to advance certain defense costs); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 199 (Del. Ch. 2014) (by asserting supporting factual allegations that defendant paid "service fees exceed[ing] market rates" and the "disparity between the [defendant's license] fees paid [] and the value of the software license received," Complaint adequately pleaded failure to receive "reasonably equivalent value").

B.   The Tender Offer Claims

As established in Horowitz's Motion (Br. 17) and further demonstrated above (*supra* Section III): Plaintiff is barred from asserting any claims arising out of the Tender Offer against Horowitz because the Plan released Horowitz from all claims and causes of action except those seeking recovery from him as a potential "transferee of Thrasio's assets in connection with transactions involving Yardline Capital Corp. between April 2020 and January 2022." (Compl. ¶ 24.)  Horowitz's Motion, however, further established that Plaintiff's Tender Offer fraudulent transfer claims (Counts II-III) should be dismissed for the separate reason that they also fail to plausibly allege under *Iqbal* that Thrasio, at the time of the Tender Offer, was both insolvent and failed to receive reasonably equivalent value in exchange for Horowitz's shares.  (Br. 26-27).

Plaintiff's argument that Thrasio did not receive reasonably equivalent value in connection with the tender offer is implausible.  Aside from the fact that the Thrasio board approved the tender offer, and that the tender offer was integrally connected to the Series C-1 fund raising round, in which Plaintiff alleges Thrasio raised "$260 million," Thrasio's stock clearly had value.  (Opp. 7.)

Indeed, the complaint admits that Thrasio netted more than $100 million from these transactions. Plaintiff's position is hopelessly inconsistent; it claims that Thrasio did not receive reasonably equivalent value in the tender offer, but sold stock to the investing public at the same time worth $260 million.

Moreover, Plaintiff claims that Silberstein and Cashman sold their own stock in 2021, and thereby usurped a corporate opportunity for the company to sell its stock to the purchasers in the secondary sales. The claim also obviously assumes that Thrasio's stock had value. These allegations also undermine Plaintiff's allegation that the shares were worthless.

Plaintiff again seeks to characterize Horowitz as an "insider shareholder" (Opp. 7), but Horowitz concededly had been terminated in March 2020, months before the Tender Offer. Plaintiff's suggestion that that Horowitz "used his position" as a personal friend of Cashman to suggest wrongdoing is unsupported by any factual allegations. (Opp. 58.)

As a result, the Court should dismiss Counts II and III for the independent reason that they fail to state a claim. *See Marino*, 2014 WL 4160982, at *4 (dismissing adversary complaint where "plaintiff's fact allegations contradict her legal theory").

C. <u>Plaintiff Fails to State an Unjust Enrichment Claim</u>

Plaintiff begins by reciting the elements of an unjust enrichment claim in New Jersey. (Opp. 64.) Next, and without any explanation, argumentation, or analysis, Plaintiff states in conclusory terms that "the Complaint asserts such unjust enrichment." *See Traisman*, 2020 WL 2847751, at *6 (allegation that "merely parrots the language of the statute" is insufficient to sustain a constructive fraudulent conveyance claim under *Iqbal*). But for the reasons argued in the Motion, it does not (Br. 28); and Plaintiff's Opposition makes no effort to identify—or even speculate about—facts supporting the requisite "quasi contractual relationship" or expectation of

remuneration.  The Court should dismiss this claim which clearly—and impermissibly—sounds in tort.

Plaintiff next argues that the Court should not dismiss its unjust enrichment claim because "the D&O Defendants," because they "are not entitled to be shielded where they engaged in fraud and operated both Thrasio and Yardline as shams to commit fraud." (Opp. 64.)  First and foremost, Plaintiff expressly alleges that Horowitz was terminated "on March 31, 2020"—months before the Tender Offer and over one year before the first challenged Yardline Transfer—due to disagreements with Thrasio's founder and principal Silberstein.  The Complaint includes no other allegations indicating Horowitz's involvement in—much less controlling the "operations" of— Thrasio after his termination.  Horowitz is not alleged to have any involvement in Thrasio's decisions relating to the Tender Offer, and was not on both sides of that transaction.  Moreover, the allegations of the Complaint refute any suggestion that Horowitz engaged in any allegedly fraudulent activity.  *See Marino*, 2014 WL 4160982, at *4 (dismissing adversary proceeding for failure to plausibly state a claim where "even accepting as true all of the factual allegations contained in the Amended Complaint as required by the *Iqbal* case, [Plaintiff's] fact allegations contradict her legal theory).[28]

Finally, relying on *In re Aphton Corp.*, Plaintiff argues that Thrasio was "an insolvent company" at the time of the Tender Offer, and thus "it may be assumed" that the Thrasio shares transferred to Thrasio via the Tender Offer "were worthless." (Opp. 65).  *See In re Aphton Corp.,* 423 B.R. 76, 93 (Bankr. D. Del. 2010).  But Horowitz's Motion—as well as the motions of his

---

[28] Plaintiff's cases do not involve claims for unjust enrichment.  Opp. 65 (citing under "E. Unjust Enrichment" the cases *State Dept. of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150, 164-165 (Sup. Ct. N.J. 1983) and *Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868,877-878 (Sup. Ct. N.J. 2008), neither of which involve claims for unjust enrichment).

codefendants—directly refute the sufficiency of the Complaint's highly implausible allegation that Thrasio was at or even near insolvency at the time of the Tender Offer.  (Br. 27 (citing *In re Nanobeak Biotech Inc*., 656 B.R. 350, 364 (Bankr. S.D.N.Y. 2024) (Trustee did not "trigger the presumption of insolvency" due to its failure to sufficiently allege "that the Debtor had outstanding debts to creditors at the time of the Transfers."))).

For these reasons, the Court should dismiss Count X as to Horowitz.

D.  Plaintiff Has no Claim for Conspiracy

Plaintiff's arguments fare no better with respect to its deficient conspiracy claims (Counts IV, XXV).  Plaintiff seeks to apply New Jersey law, arguing that such a claim is recognized under New Jersey State law.

However, the Delaware Bankruptcy Court in *In re Fedders* (Br. 25) expressly considered and outright rejected Plaintiff's argument here.  *In re Fedders*, 405 B.R. 527, 548 (Bankr. D. Del. 2009).  After "not[ing] that a handful of courts have recognized a cause of action for either aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent conveyance under state law, **including the law of New Jersey**," the Court nonetheless held: "[w]hether any state law recognizes such a claim, **even the law of a controlling state such as New Jersey** or Delaware here, **is irrelevant in bankruptcy proceedings, however.**"  *Id.* (emphasis added) (collecting cases that stand for the proposition that a "trustee's only authority to assert a creditor's state law causes of action related to fraudulent conveyances is found in section 544(b)" which "only permits the trustee to *avoid* a fraudulent transfer.")).  Neither plaintiff, nor its non-binding authority from jurisdictions with no nexus to this Action,[29] offers anything to the contrary.

---

[29]  Ironically, and aside from its inapposite discussion of whether such a claim is permitted under Virginia law, the Court in *In re Rescue Rangers* dismissed the fraudulent transfer claim because—just as here—"[t]he Trustee has not alleged that the Defendant[] received transferred property or benefitted from a transfer." *In re Rescue Rangers*, 576 B.R. 521, 528 (Bankr. E.D. Va. 2017) (observing that "there is no

Finally, the Complaint fails to allege a single fact establishing that Horowitz joined a conspiracy with Silberstein and Cashman.  Plaintiff's claims against Horowitz cannot stand in the face of competing allegations that he was (i) terminated from Thrasio four months before the Tender Offer, (ii) was the victim of Silberstein's plan to oust him from Yardline and take over that company, and (iii) that the Yardline Transfers were undertaken to "to fulfill Silberstein's desire for revenge against Horowitz"  (Opp. 100-101) (Comp. ¶¶ 95-96, 113).  *Marino*, 2014 WL 4160982, at *4.

Plaintiff alleges that Horowitz agreed to join and engaged in a conspiracy, the aim of which was to harm Horowitz.  This highly implausible theory of conspiracy liability should also be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Horowitz's motion to dismiss the Plaintiff's Complaint.  The Court should also grant Hudson Palm's motion to dismiss Plaintiff's Complaint.

Dated:  June 16, 2025

 */s/ John Jureller*           
John Jureller, Jr.
(NJ Bar No. 056361993)
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036.
Telephone: 212-679-5315
Email: jjureller@klestadt.com

*Attorneys for Hudson Palm LLC and local counsel*
*for Defendant Ari Horowitz*

---

such thing as liability for aiding and abetting a fraudulent conveyance as a matter of federal law under the Code.")

 /s/ *Michelle A. Rice*
Howard J. Kaplan (admitted *pro hac vice*)
Michelle A. Rice (admitted *pro hac vice*)
hkaplan@kaplanrice.com
mrice@kaplanrice.com
KAPLAN RICE LLP
142 W. 57th St., Suite 4A
New York, New York 10019
Phone: (212) 235-0300

*Attorneys for Defendant Ari Horowitz*